Dennis F. Dunne, Esq.      (*pro hac vice* pending)
Andrew M. Leblanc, Esq. (*pro hac vice* pending)
Michael W. Price, Esq.     (*pro hac vice* pending)
Lauren C. Doyle, Esq.      (*pro hac vice* pending)
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone:      (212) 530-5000
Facsimile:      (212) 530-5219

Tyler P. Brown, Esq.      (VSB No. 28072)
Justin F. Paget, Esq.      (VSB No. 77949)
Jennifer E. Wuebker, Esq. (VSB No. 91184)
**HUNTON ANDREWS KURTH LLP**
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:      (804) 788-8200
Facsimile:      (804) 788-8218

Thomas R. Kreller, Esq.   (*pro hac vice* pending)
**MILBANK LLP**
2029 Century Park East
33rd Floor
Los Angeles, California 90067
Telephone:      (424) 386-4000
Facsimile:      (213) 629-5063

*Proposed Co-Counsel for Debtors and Debtors in Possession*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GUITAR CENTER, INC. *et al.*,[1] | ) | Case No. 20-34656 (KRH) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

## DECLARATION OF TIM MARTIN  OF GUITAR CENTER, INC., IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Tim Martin, hereby declare under penalty of perjury:

1.      I am the Executive Vice President and Chief Financial Officer of Guitar Center,

Inc. (and together with the other above-captioned debtors and debtors in possession, the "Debtors",

---

[1]      The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Guitar Center Holdings, Inc. (3262); Guitar Center, Inc. (0862); Guitar Center Stores, Inc. (4340); GTRC Services, Inc. (9503); GC Business Solutions, Inc. (3928); Guitar Center Gift Card Company, LLC (3370); Music & Arts Instructor Services, LLC (7811); and AVDG, LLC (4440).  The Debtors' service address is 5795 Lindero Canyon Rd., Westlake Village, CA 91362.

the "Company", or "Guitar Center").[2]  I have served in this role since joining Guitar Center in October of 2012.

2.      I have nearly two decades of experience as a senior financial executive, acting primarily as Chief Financial Officer for large retailers.  From 2009 to 2012, I served as Chief Financial Officer of Lands' End, a leading direct merchant of clothing and home decor.  Before that, I spent three years at Coldwater Creek, Inc., a multi-specialty retailer, serving as Chief Financial Officer from 2007 to 2009 and as Vice President of Finance and Chief Accounting Officer from 2006 to 2007.  Prior to these roles, I served as Chief Accounting Officer and Vice President of Finance and Global Commercial Operations for Amgen Inc., a pharmaceutical company, and as Chief Financial Officer of a division of Gap Inc., a leading international specialty retailer.

3.      The Debtors, known for their iconic Hollywood, California Guitar Center music store and their family of brands Guitar Center, Music & Arts, Musician's Friend and Woodwind and Brasswind, are the leading United States retailers of musical instruments and related products and services.

4.      The Debtors have commenced these chapter 11 cases to implement a comprehensive restructuring pursuant to a restructuring support agreement and "prepackaged" chapter 11 plan ***overwhelmingly supported by stakeholders spanning the Debtors' capital structure, including:***

- holders of **100%** in aggregate principal amount of the Debtors' senior secured superpriority notes;

- holders of over **71%** in aggregate principal amount of the Debtors' senior secured notes;

---

[2]      A corporate organizational chart is attached to this Declaration as **Exhibit A**.

- holders of **84%** in aggregate principal amount of the Debtors' senior unsecured cash/PIK notes; and

- the holder of substantially all of the Debtors' existing common equity.

5.      The restructuring transactions contemplated by the Restructuring Support Agreement[3] and the Plan[4] will allow the Debtors to achieve certain objectives that are critical to their survival: (a)  to continue operations without interruption, including minimizing any potential adverse effects to the Debtors' businesses, customers, employees, and trade partners; (b) to consummate an expedient emergence from these cases; and (c) to ensure ample liquidity and emerge with a de-leveraged capital structure well-positioned for future success.  The Debtors believe, and all of their major stakeholders resoundingly concur, that a smooth and fast path to Plan confirmation and emergence from chapter 11 is imperative as the Debtors strive to maximize the value of their operations and maintain their critical relationships with all of their key constituents.  Delay and distraction will jeopardize those objectives.

6.      The restructuring transactions are essential to the Debtors' survival during these difficult times. The Debtors are the largest national omni-channel musical instrument retailer, serving their customers in over 500 brick and mortar locations nationwide and through their direct sales websites.  The Debtors employ approximately 13,000 people[5] and generated over $2.3 billion in revenue in fiscal year 2019.  Prior to the outbreak of the COVID-19 pandemic, the Debtors had

---

[3]      The "Restructuring Support Agreement", a copy of which is attached as **Exhibit B**.

[4]      The consensual plan of reorganization (the "Plan").

[5]      Of the more than 8,750 employees that were furloughed at the peak of the COVID-19 pandemic, as of the Petition Date, only approximately 900 remain furloughed due to ongoing store closures and reduced hours.

been enjoying sustained comparable sales growth over 10 straight quarters.  However, like many

retailers, COVID-19 wiped out much of the Debtors' progress.

7.    Despite the implementation of numerous cost saving measures, the liquidity

constraints caused by the Debtors' significant debt burden and upcoming maturities, coupled with

the economic upheaval created by the persistence of the COVID-19 pandemic, could not be

resolved through short-term measures.  By mid-summer 2020, the Debtors were working in earnest

on a dual-track process to: gauge potential investors' interest in making a new equity investment

in Guitar Center and engage with the holders of the Debtors' outstanding funded indebtedness to

explore potential long-term solutions to the Debtors' capital structure, hopefully with the benefit

of some infusion of new capital.

8.    On November 13, 2020, the Debtors and their key stakeholders executed the

Restructuring Support Agreement outlining the key terms of the *Joint Pre-Packaged Chapter 11*

*Plan of Guitar Center, Inc. et al.* and comprehensive debtor in possession financing arrangements.

The Restructuring Support Agreement provides for, among other things: (a) an equity infusion of

up to $165 million, from a consortium of parties including the Debtors' existing equity sponsor

and two co-investors; (b)  $375 million in Debtor-In-Possession financing provided by certain of

its existing noteholders and ABL lenders; (c) and a capital raise of $335 million in new senior

secured notes.  The restructuring transactions will reduce the Debtors' overall funded debt burden

by approximately $800 million, while maintaining ordinary course operations and unimpairing all

non-funded debt creditors.

9.    In accordance with the Restructuring Support Agreement, on November 20, 2020,

the Debtors commenced solicitation of votes on the Plan from the holders of claims in the two

classes of claims entitled to vote—the senior secured noteholders and the senior unsecured cash/PIK noteholders.

10.     On November 20, 2020 (the "Petition Date"), each Debtor filed a voluntary petition to effectuate a consensual Plan under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code").

11.     Contemporaneously with the commencement of these cases, and in addition to the Plan and the disclosure statement for the Plan, the Debtors filed a number of motions seeking different types of "first day" relief, including a motion approving the Debtors' debtor-in-possession financing (collectively, the "First Day Motions").  The First Day Motions are designed: (a) to protect and preserve the Debtors' key relationships with its employees, vendors, other supply chain participants, and customers; (b) to provide the Debtors with adequate and readily available liquidity to meet their needs during these cases, which were commenced during the critical holiday selling season; and (c) to establish a prompt and efficient schedule for Plan confirmation that will provide all parties with visibility into and certainty around the Debtors' quick emergence from chapter 11.  With the support of the vast majority of its capital structure already in hand, the Debtors believe they are in a prime position to achieve all of these objectives.

12.     I submit this Declaration: (a) to assist the Court and all parties in interest in understanding the comprehensive restructuring the Debtors have negotiated with their major constituents and the Debtors' intent to utilize these cases to successfully implement that restructuring on an expedited basis; and (b) in support of the Debtors' chapter 11 petitions and the relief sought in the First Day Motions.

13.     I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  Except as otherwise indicated in this Declaration, all facts set forth

in this Declaration are based upon my personal knowledge, input by the Debtors' management team and advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based on my experience and knowledge.

14.     I am over the age of 18 and authorized to submit this declaration on behalf of the Debtors.  If called upon to testify, I could and would testify competently to the facts set forth in this Declaration.

## Introduction

15.     From its opening in 1959 as a single organ store in Hollywood, California, Guitar Center has become the largest and most iconic retailer in the United States musical instrument market.  Embracing the rock and roll culture that came to define the 1960s, Guitar Center found immediate success jettisoning its organ business for guitars and related equipment.  This success led to a monumental expansion of operations and the launch of Guitar Center onto the national scene.  With an enterprise retail footprint of over 500 locations nationwide, there is no musical instrument retailer that has ingrained itself so deeply into the fabric of American culture and into the lives of those who wish to share in the musical experience.

16.     Guitar Center's businesses appeal to all segments of the musical industry landscape, primarily through two business lines.  Its widely-recognized "Guitar Center" core brand offers a broad assortment of musical offerings.  High-end and exclusive products and services including new, used, and vintage guitars, amplifiers, percussion instruments, keyboards, live sound, DJ and recording equipment, lessons, repair services, and instrument rentals are sold through retail stores located across an extensive national footprint, as well as a best-in-class, digital platform offering the largest portfolio of brands available online.

17.     The Guitar Center brand is complemented by the "Music & Arts" business, a leading band and orchestral provider of products and services, appealing primarily to a younger demographic entering organized music.

18.     The Debtors' operations are led by an experienced and highly-qualified management team, supported by the Company's equity sponsor, Ares Management LLC ("Ares", "Sponsor", or the "Sponsor Support Party").  Before the novel Coronavirus pandemic ("COVID-19"), the Company had a substantial liquidity cushion, was improving its operations through a number of strategic initiatives, and was proactively engaging with creditors to deleverage its capital structure and extend its debt maturities to build a healthier balance sheet.  Indeed, the Company experienced significant growth of net revenues and consolidated Adjusted EBITDA through the fiscal years ended February 3, 2019 and February 2, 2020.  The Debtors' management team further led the business to 10 straight quarters of comparable store sales growth during that period, while paying all of their debts as they came due, including all principal, interest, and trade credit.

19.     But COVID-19 hit the Debtors, just as it hit other retailers, and wiped out much of the Company's progress.  In March 2020, national, state, and local governments in the United States imposed shelter-in-place and stay at home orders that required the temporary closure of nearly all of Guitar Center's stores and offices and dramatically restricted supply chain operations. These unprecedented events severely impacted Guitar Center's business and liquidity.

20.     To address these challenges, the Debtors entered into a series of transactions over the course of May through July 2020 with their principal debtholders to receive short-term accommodations and to finance upcoming interest and maturity payments.  As further described below, the Company:  (a) exchanged a majority of its unsecured notes for a new issuance of

unsecured notes, thereby avoiding approximately $9 million of cash interest, and (b) issued new superpriority secured notes to finance the payment of its April 15, 2020 interest due on its existing secured notes (the "Secured Notes").

21.    In addition, the Debtors engaged in aggressive cost-savings and reduction measures, including significantly reducing capital expenditures, limiting inventory purchases, deferring payments to vendors and landlords and negotiating rent abatements, furloughing employees, reducing executive/management salaries, eliminating non-essential expenses, delaying the payment of incentive bonuses earned for 2019, and seeking government relief under the Coronavirus Aid, Relief and Economic Security ("CARES") Act.

22.    Those efforts helped improve Guitar Center's short-term liquidity position, but the persistence of the COVID-19 pandemic created extensive, ongoing economic uncertainty that could not be resolved through short-term measures. These risks were exacerbated by the approaching maturity of approximately $1.0 billion of secured debt in 2021 and concerns about whether a refinancing of that debt would be possible under such uncertain circumstances.

23.    To navigate these ongoing market conditions, the Debtors knew they needed to proactively address their liquidity position and capital structure. The Debtors, with the advice of their legal and financial advisors, redoubled their efforts to analyze the Debtors' financing needs and consider Guitar Center's capital structure alternatives. By mid-summer, the Debtors were working in earnest on a dual-track process to: (i) gauge potential investors' interest in making a new equity investment in Guitar Center; and (ii) engage with the holders of the Debtors' outstanding funded indebtedness to explore potential long-term solutions to the Debtors' capital structure, hopefully with the benefit of some infusion of new capital.

24.     To kick off the capital raise portion of the process, financial advisors reached out to twenty potential equity investors in the first week of August 2020. Fourteen parties expressed interest, signed non-disclosure agreements, and received investor information packages and virtual data room access. Three potential equity investors advanced to the next phase, conducting weeks of additional diligence. Ultimately, The Carlyle Group (together with certain affiliates, "Carlyle" or the "Carlyle Co-Investor") emerged as the frontrunner to provide, alongside the Sponsor Support Party, up to $165 million of new equity investment. Brigade Capital Management L.P. (together with certain affiliates, "Brigade" or the "Brigade Co-Investor"), one of the Debtors' largest existing noteholders and a long-time investor in the Debtors' capital stack, later joined Carlyle and the Sponsor Support Party as part of the co-investor group.

25.     Concurrent with the equity raise process, the Debtors were working with their legal and financial advisors to engage in restructuring discussions with the holders of the Debtors' outstanding funded indebtedness. Specifically, the Debtors engaged in extensive discussions with an *ad hoc* group of holders of the Debtors' senior secured notes that was represented by Stroock & Stroock & Lavan, LLP, as counsel, and Province, Inc., as financial advisor (the "Stroock Group"). Following extensive due diligence and exploration of potential restructuring alternatives, the Debtors and the Stroock Group began closing in on terms that ultimately would become the underpinnings of a comprehensive restructuring transaction to be implemented through a chapter 11 plan of reorganization.

26.     As the capital raise process with Carlyle and the Sponsor Support Party began to converge with the formulation of the restructuring transaction with the Stroock Group, the Debtors also began in-depth discussions about the restructuring process with Brigade, the largest holder of the Debtors' Senior Unsecured Cash/PIK Notes and holder of the Debtors' Senior Secured

Superpriority Notes and Senior Secured Notes.  With the critical holiday retail season approaching, the parties worked hard and moved quickly to negotiate with Brigade for a consensual treatment of its existing debt holdings.  In connection with those discussions, Brigade also expressed a desire to participate in the restructuring as an additional co-investor in the new capital raise.

27.    The Debtors' efforts on all of these fronts bore much fruit, culminating in the execution of the Restructuring Support Agreement in mid-November.  The Restructuring Support Agreement sets forth the terms of a comprehensive restructuring for the Debtors, including all necessary financings, that have been negotiated with, and will be supported by, the members of the Stroock Group (who in the aggregate hold approximately $32.9 million of Superpriority Secured Notes, $439.7 million of Secured Notes and $20.8 million of Unsecured Notes), other holders of the Debtors' notes (who in the aggregate hold approximately $18.5 million of Superpriority Notes, $2.8 million of Secured Notes and $305.9 million of Unsecured Notes), and Carlyle, Brigade and the Sponsor Support Party, as co-investors of $55 million each in new capital to be infused into the Reorganized Debtors under the Plan.

28.    If confirmed and consummated, the Plan will substantially deleverage Guitar Center's balance sheet and allow the Debtors to emerge from these cases as a stronger, better-capitalized enterprise positioned for sustained success.  The Restructuring Support Agreement evidences a remarkable level of support for the Plan throughout the Debtors' capital structure.  The Restructuring Support Agreement also provides support for a Plan that will leave the Debtors' general unsecured creditors unimpaired (other than the holders of unsecured notes).

29.    In short, the Restructuring Support Agreement puts the Debtors on the optimal path to maximize stakeholder recoveries and ensure that Guitar Center can efficiently emerge from chapter 11 and continue to fulfill its role as the industry-leader in the musical instrument market.

30.    The Restructuring Support Agreement is tied to agreements from members of the Stroock Group to provide DIP financing in the form of a term loan (the "Term DIP Facility"; the agent under the Term DIP Facility, "Term DIP Agent" and the lenders, the "Term DIP Lenders"). In addition, subject to approval of the Bankruptcy Court, certain prepetition ABL lenders will provide the Debtors with an asset-based loan DIP facility (the "ABL DIP Facility," and together with the Term DIP Facility, the "DIP Facilities").  The DIP Facilities are a critical element of the restructuring to provide the Company with the liquidity needed to fund these cases, timely pay its employees, vendors and other operational expenses in full in the ordinary course (the "Trade Claims") and pay in full in cash the obligations outstanding under the Prepetition ABL Facility upon the initial funding under the DIP Facilities.

31.    Upon emergence, the Debtors will pay in full all obligations owing under the DIP Facilities with proceeds from:  (a) new $335 million first lien debt to be issued by the Debtors upon emergence (the "New First Lien Debt"); (b) a $165 million new equity investment (the "New Common Equity"); and (c) a $375 million new secured asset-based financing facility to be entered by the Debtors upon emergence (the "New ABL Facility").  As contemplated under the Restructuring Support Agreement, the Debtors also will make an exit payment to the lenders of the DIP Term Loan Facility.

32.    To familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the motions and applications filed today, this declaration is organized as follows:

- **Part I** provides a general overview of the Debtors' corporate history and operations;

- **Part II** provides an overview of the Debtors' prepetition corporate and capital structure;

- **Part III** describes the circumstances leading to these chapter 11 cases;

- **Part IV** describes the Debtors' proposed debtor-in-possession financing;

- **Part V** describes the Restructuring Support Agreement; and

- **Part VI** sets forth an overview of the relief requested in each of the first day pleadings.

## PART I: CORPORATE HISTORY AND OPERATIONS

**A.** **The Debtors' Business Operations**

33.     The Debtors operate two business segments: the "Guitar Center" and "Music & Arts" business.  In total, the Debtors operate over 510 stores and employ approximately 13,000 people.

34.     The Guitar Center segment offers new, used and vintage guitars, amplifiers, percussion instruments, keyboards, live sound, DJ, and recording equipment through retail stores and online, along with lessons, repair services, and instrument rentals offered in the Debtors' stores.  The Guitar Center segment also includes Guitar Center Professional, AVDG, and the "Musician's Friend" and "Music 123" branded website.  As of the Petition Date, the Debtors operate 296 Guitar Center stores across the United States, as well as the guitarcenter.com website.

35.     The Music & Arts segment specializes in rentals and sales of band and orchestra music equipment to students, parents, schools and educators.  Most of the Debtors' Music & Arts stores provide music lessons and also sell a limited assortment of guitars, amplifiers, percussion instruments, and keyboards. The Music & Arts segment also includes the Woodwind and Brasswind e-commerce and catalogue business that specializes in sales of band and orchestra instruments.  As of the Petition Date, the Debtors' Music & Arts business operates 229 stores across the United States, as well as the musicarts.com and wwbw.com branded websites.

12

36.    The in-store experience has been essential to Guitar Center's success.  Nationwide, amateur and professional musicians who visit Guitar Center stores can pick a guitar off the wall, plug into the amp of their choice, and rock out.  There are 296 Guitar Center stores and 229 Music & Arts stores across the country.  The Debtors own the Guitar Center flagship store in Hollywood and a portion of their corporate office space.  The rest of the Debtors' operations—including retail stores, field offices, an office and support center, business headquarters, distribution and fulfillment centers, warehouses and hubs, and customer contact centers—are leased.

**B.    The Debtors' Corporate History**

37.    The Guitar Center story began in 1959 when its founder, Wayne Mitchell, purchased The Organ Center—a small appliance and home organ store in Hollywood, California. As Beatlemania washed onto American shores in 1964, and rock and roll took grip of Americans' collective consciousness, Mr. Mitchell recognized, and seized, an opportunity.  The future of  musical instrument retailing did not lay in organs.  Americans wanted guitars.  Americans wanted amps.  But not just *any* guitars and amps—*Vox*-brand guitars and amps, the same equipment used by the Beatles.  So in 1964, the same year as the Beatles' momentous debut on American soil, Mr. Mitchell ditched the organs, replaced them with the equipment rock-obsessed Americans craved, and rebranded his Hollywood store the "Vox Guitar Center."

13



The timing could not have been better.  Rock and roll music had become a cultural juggernaut, and bands like the Beatles, the Rolling Stones, the Kinks, and others sparked an unprecedented demand for guitars and amps.  "Vox Guitar Center" soon became "Guitar Center," and what would become the nation's largest and most iconic musical instrument retailer was born.

38.    While the talent of the Beatles and those artists that followed was undeniably singular, so was Mr. Mitchell's ability to curate an in-store experience that tapped into the burgeoning, rock-inspired counter-culture.  In sharp contrast to the staid and established music stores in Southern California, Guitar Center sought out musicians to sell its equipment to customers, and encouraged customers to "touch, feel, play" the instruments at their leisure.  Guitar Center was *an experience*—immersive and perfectly suited to the time.  Buoyed by the massive success of its Hollywood store, Guitar Center embarked on a period of unmatched expansion in the musical retail industry.

14

39.    Guitar Center opened a second store in San Francisco in 1972.  The San Francisco store was followed by yet another, in San Diego, the following year.  With its retail presence in California cemented, Guitar Center took the show on the road.



The Company opened stores in major cities across the U.S., such as Minneapolis, Dallas, Houston, and Chicago.  By this time, Guitar Center had expanded its inventory to include drums, keyboards, accessories, and pro audio and recording equipment.  The new stores, with their high ceilings and open floor space to support massive merchandising, heralded the inception of the musical instrument "superstore."



40.    In November 1984, Guitar Center relocated its flagship Hollywood store to its current 30,000-square-foot location on Sunset Boulevard, which remains one of the nation's largest and most iconic retail stores of its kind.



The grand reopening of the Hollywood store also inaugurated the world-famous "Rockwalk"—a sidewalk gallery where hundreds of artists who have made significant contributions to the music industry have pressed their prints in the sidewalk—among them: Aerosmith, Alice Cooper, Chuck Berry, James Brown, the Doobie Brothers, B.B. King, Jerry Lee Lewis, Little Richard, Smokey Robinson, Roy Orbison, Van Halen, Stevie Wonder, and others the world over.



41.    Guitar Center's monumental growth persisted in the 1990s. The Company opened nearly 70 stores throughout the decade, earning it the moniker: "The largest musical instrument retailer in the world." Store grand openings took place at a rate of one or two stores a month, surpassing all other musical instrument retailers. And by March 1997, Guitar Center became the first publicly traded company in the music retail industry.

16



42.    Guitar Center's success and growth continued through the turn of the century.  In 1999, Guitar Center acquired Musician's Friend—then the world's largest mail-order and e-commerce retailer of musical instruments.    This forward-thinking acquisition helped Guitar Center diversify its market share beyond the brick and mortar retail segment of the music industry and into the direct e-commerce space, focusing on self-serve musicians.  Guitar Center further expanded into the music education, family, and student market through its acquisitions, in 2001, of American Music Group—a musical instrument cataloger and retailer specializing in the rental and sale of band instruments and accessories to music educators, band directors, and students—and, in 2005, of Music & Arts—a music products retailer which primarily serves beginning musicians and emphasizes rentals, music lessons, and band and orchestral instrument sales.  In 2007, Guitar Center acquired substantially all of the assets of The Woodwind & The Brasswind and Music123, a direct response retailer of musical instruments.  Finally, between 2017 and 2020, Guitar Center acquired substantially all of the assets of three residential and commercial audio-visual design and integration businesses to form its AVDG business.

43.    The Debtors operated as a public company until October 2007 when entities substantially owned by affiliates of Bain Capital Partners, LLC ("Bain Capital") and a co-investor acquired ownership of the Debtors.  In 2014, the Debtors undertook a series of transactions to restructure their capitalization.  As part of this recapitalization, Ares—which held certain of the Debtors' notes at the time—acquired majority ownership of the outstanding voting securities.

Then in December 2017, Ares purchased all of the common shares owned by Bain Capital and its co-investor.  Ares is now the owner of substantially all of the outstanding voting equity.

### C.     Management and Key Initiatives

44.     Following a decades-long career at various retailers, Ron Japinga joined Guitar Center in July 2014 and has served as President and CEO since September 2016.  Since then, Guitar Center has been on a growth trajectory—both in terms of store numbers, and its slate of in-store offerings.  The Company's retail store growth strategy includes increasing sales at existing Guitar Center and Music & Arts locations and opening new locations.  During 2019, the Company added five new Guitar Center stores and converted one outlet store to a permanent location, and opened a new Guitar Center location during the first half of 2020.  Store growth is also fundamental to the Music & Arts growth model, and the Company opened 67 net new stores in 2018 and 2019 plus had a net gain of one store through the first half of 2020.

45.     A key initiative ushered in by Guitar Center's current management is transforming stores into full-service music shops, offering in-store lessons, repairs, and rentals.  Most Guitar Center stores have space for music lessons following an aggressive campaign in which more than half were opened or retrofitted in 2017 and 2018.  This focus on the service sector of the music business, rather than just merchandise sales, increased margins, boosted customer engagement, and generated steady income streams.  These services also served to help insulate Guitar Center from online only retailers.

46.     In addition, over the past several years, the Company developed and implemented a new centralized order management system, a new e-commerce platform, a new enterprise resource planning system for Music & Arts, a new digital product management platform, a new inventory demand planning system and a new customer relationship management system.

18

47.    At the beginning of the year, the Company made the strategic decision to consolidate and streamline its e-commerce operations.  This change allowed the Debtors to operate the e-commerce brands more efficiently and offer customers a more comprehensive inventory assortment.  Even during a global pandemic, the Company was able to quickly develop a curbside pickup app, greatly improving socially-distanced business operations.

## PART II: PREPETITION CORPORATE AND CAPITAL STRUCTURE

48.    The Debtors' corporate and capital structure, as explained below, is demonstrated in **Exhibit A**.

### A.    Corporate Structure

49.    Guitar Center Holdings, Inc. ("Holdings") is the parent company that wholly owns Guitar Center, Inc.  Holdings has no business activities or operations other than its ownership of the common stock of Guitar Center, Inc.

50.    Guitar Center, Inc. is a wholly owned subsidiary of Holdings.  All of the Debtors' operating activities are conducted through Guitar Center, Inc. and its wholly owned subsidiaries. The remaining Debtors fall under the umbrella of Guitar Center, Inc.  These entities include Guitar Center Stores, Inc., GTRC Services, Inc., GC Business Solutions Inc., Guitar Center Gift Card Company, LLC, Music & Arts Instructor Services, LLC, and AVDG, LLC.

### B.    Capital Structure

51.    As of the Petition Date, the Debtors had outstanding funded debt in the aggregate principal amount of approximately $1,329.8 million under five financing arrangements described below.

### 1.    Prepetition ABL Facility

52.    As of the Petition Date, Guitar Center and Guitar Center Stores, Inc., as borrowers, the other Debtors, as guarantors, Wells Fargo Bank, National Association, as agent (the

"Prepetition ABL Agent"), and certain lenders were parties to an asset-based revolving credit agreement, dated as of April 2, 2014 (as amended, restated, amended and restated, or otherwise modified from time to time, the "Prepetition ABL Facility" and the revolving credit facility and certain other financial accommodations provided thereunder, the "Prepetition ABL Facility").  The Prepetition ABL Facility provided for a senior secured revolving credit facility, with a maximum availability of $375.0 million, subject to a borrowing base (and as reduced by the level of outstanding letters of credit).   As of November 20, 2020, approximately $279 million in borrowings and approximately $7.6 million of letters of credit were outstanding under the Prepetition ABL Facility.

53.    The obligations of the borrowers and guarantors under the Prepetition ABL Facility are secured by (a) a first-priority lien on the Debtors' inventory, accounts receivable, cash and deposit accounts, and proceeds of the foregoing (the "ABL Priority Collateral"), and (b) a third-priority lien on the Debtors' capital stock, intellectual property, and other assets that do not constitute ABL Priority Collateral and proceeds of the foregoing (the "Notes Priority Collateral"), in each case, subject to certain permitted liens and exceptions.

**2.    Superpriority Secured Notes**

54.    As of the Petition Date, Guitar Center had an aggregate principal amount of approximately $35.7 million of obligations outstanding under its 10.000% Senior Secured Superpriority Notes due 2022 (the "Superpriority Secured Notes").   The Superpriority Secured Notes were issued pursuant to an indenture, dated May 15, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Superpriority Secured Notes Indenture"), between Guitar Center, as issuer, the other Debtors, as guarantors, and The Bank of New York Mellon Trust Company, N.A., as trustee and collateral agent (in such capacity, the "Superpriority Secured Notes Trustee").   The Superpriority Secured Notes are subject to a

Repayment Premium (as defined under the Superpriority Secured Notes Indenture) of 17.50% of the aggregate principal amount of Superpriority Secured Notes redeemed, accelerated (including upon the occurrence of a bankruptcy or insolvency event) or otherwise repaid.

55.    The obligations under the Superpriority Secured Notes are secured by (a) a first-priority lien on the Notes Priority Collateral, (b) a second-priority lien on the ABL Priority Collateral, in each case, subject to certain permitted liens and exceptions, and (c) generally, as between the Superpriority Secured Notes and the Prepetition Senior Secured Notes (as defined below), first priority liens on and security interests in all "Shared Collateral," as defined in the Notes Intercreditor Agreement (as defined below), in which the agent for the Superpriority Secured Notes and the agent for the Secured Notes both hold security interests.

### 3.    Secured Notes

56.    As of the Petition Date, Guitar Center had an aggregate principal amount of approximately $640.0 million outstanding under its 9.500% Senior Secured Notes due 2021 (the "Secured Notes").  The Secured Notes were issued pursuant to an indenture, dated March 16, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Secured Notes Indenture"), between Guitar Center, as issuer, certain of Guitar Center's affiliates, as guarantors, and The Bank of New York Mellon Trust Company, N.A., as trustee and collateral agent (in such capacity, the "Secured Notes Trustee").

57.    The obligations under the Secured Notes are secured by (a) a third-priority lien on the ABL Priority Collateral, (b) a second-priority lien on the Notes Priority Collateral, in each case, subject to certain permitted liens and exceptions and (c) generally, as between the Superpriority Secured Notes and the Prepetition Senior Secured Notes, second priority liens on and security interests in all "Shared Collateral," as defined in the Notes Intercreditor Agreement,

in which the agent for the Superpriority Secured Notes and the agent for the Secured Notes both hold security interests.

### 4.     Prepetition Intercreditor Agreements

58.     The Prepetition ABL Agent, the Superpriority Secured Notes Trustee, and the Secured Notes Trustee are parties to an amended and restated intercreditor agreement, dated May 15, 2020, (the "Secured Parties' Intercreditor Agreement"), acknowledged by the Debtors, which governs: (1) the relative lien priorities of the secured parties with respect to the Prepetition ABL Facility, the Superpriority Secured Notes, and the Secured Notes; (2) the rights of the respective secured parties to take enforcement actions against collateral; and (3) waivers of certain rights of certain of the secured parties with respect to, among other things: (a) the provision of debtor-in-possession financing to the Debtors; (b) the ability to seek adequate protection under the Bankruptcy Code; and (c) the ability to contest certain asset sales in a bankruptcy case.

59.     In addition, the Superpriority Secured Notes Trustee and the Secured Notes Trustee are also parties to the Intercreditor Agreement, dated May 15, 2020 (the "Notes Intercreditor Agreement" and, together with the Secured Parties' Intercreditor Agreement, the "Intercreditor Agreements"), acknowledged by the Debtors, which contain provisions setting forth, among other things: (1) the relative lien priorities as between the Superpriority Secured Notes and the Secured Notes; (2) the rights of the parties to take enforcement actions against collateral; and (3) waivers of certain rights of certain parties with respect to, among other things: (a) the provision of debtor-in-possession financing to the Debtors; (b) the ability to seek adequate protection under the Bankruptcy Code; and (c) the ability to contest certain asset sales in a bankruptcy case.

### 5.     Unsecured Notes

60.     As of the Petition Date, Guitar Center had an aggregate principal amount of approximately $5.8 million of obligations outstanding under its 2018-issued 13.000% Cash/PIK

Notes due 2022 (the "2018 Unsecured Cash/PIK Notes").  The 2018 Unsecured Cash/PIK Notes were issued pursuant to an indenture, dated April 16, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "2018 Cash/PIK Notes Indenture"), between Guitar Center, as issuer, the guarantors named therein, and The Bank of New York Mellon Trust Company, N.A. as trustee (in such capacity, the "2018 Unsecured Notes Trustee").  On May 15, 2020, the indenture governing the 2018 Unsecured Cash/PIK Notes was amended by a supplemental indenture that, among other things, released each of the subsidiary guarantees of the 2018 Unsecured Cash/PIK Notes and eliminated or modified substantially all of the restrictive covenants with respect to the 2018 Unsecured Cash/PIK Notes.  Accordingly, as of the Petition Date, the 2018 Unsecured Cash/PIK Notes were solely the unsecured obligations of Guitar Center, and were not guaranteed by any other Debtors.

61.      In addition, as of the Petition Date, Guitar Center had an aggregate principal amount of approximately $379.3 million of obligations outstanding under its 2020-issued 13.000% Cash/PIK Notes due 2022 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "2020 Unsecured Cash/PIK Notes", and together with the 2018 Cash/PIK Notes, the "Unsecured Notes").  The 2020 Unsecured Cash/PIK Notes were issued pursuant to an indenture, dated May 15, 2020 (the "2020 Cash/PIK Notes Indenture"), between Guitar Center, as issuer, the guarantors named therein, and Wilmington Savings Fund Society FSB, as trustee (in such capacity, the "2020 Unsecured Notes Trustee").   As described below, the 2020 Unsecured Cash/PIK Notes were issued in a series of exchanges for approximately $354.2 million in aggregate principal amount of 2018 Unsecured Cash/PIK Notes in the 2020 Refinancing Transactions.

62.     On July 7, 2020, holders of more than 50% in aggregate amount of the then-outstanding 2020 Unsecured Cash/PIK Notes removed The Bank of New York Mellon Trust Company, N.A. as trustee of the 2020 Unsecured Cash/PIK Notes and appointed Wilmington Savings Fund Society FSB as successor trustee (in such capacity, the "2020 Unsecured Notes Trustee") of the 2020 Unsecured Cash/PIK Notes.

### 6.     Prepetition Equity

63.     The Debtors are controlled by one or more investment funds affiliated with the Sponsor Support Party.  The board of directors of Guitar Center Holdings, Inc. is responsible for governing the Debtors' business and affairs.  The Debtors are privately held, and the majority of the members of the board of directors of Holdings are entitled to be selected by the Sponsor Support Party.  As of the Petition Date, the board of directors of Holdings was comprised of nine members, four of which are investment professionals employed by the Sponsor Support Party.

### PART III: EVENTS LEADING TO THESE CHAPTER 11 CASES

### A.     The Company's Prior Efforts to Deleverage Began To Be Reflected in its Bottom-Line Results

64.     One driver of the present need to restructure is the Company's long-dated debt load, which the Company's current management inherited.   However, over several iterations of corporate restructurings and debt refinancings, all conducted out-of-court, the Company nonetheless had engaged in a multi-year effort to deleverage its balance sheet with the support of the Sponsor Support Party.

65.     In particular, in April 2014, the Debtors entered into a series of transactions to restructure the debt and equity capitalization of both Holdings and Guitar Center.  Among other elements of these transactions, the Sponsor agreed to equitize approximately $560.0 million in aggregate amount of unsecured notes of Holdings and Guitar Center it then-held in exchange for

convertible preferred stock in Holdings and preferred equity in Guitar Center.  In doing so, the

Sponsor acquired a majority ownership of the outstanding voting securities of Holdings.  In

December 2017, the Sponsor increased its ownership by purchasing all other common shares of

Holdings resulting in ownership of substantially all outstanding voting equity in Holdings.

### 1.    The 2018 Refinancing Transactions

66.    By 2017 and into 2018, the Company faced two strategic challenges: (1) addressing

the next maturity wall on its debt and (2) maintaining its positive financial performance stemming

from the strategic initiatives described above.  In light of the Company's heavy debt load, the

Company's management determined to finance continued operational growth through additional

working capital flexibility.  Accordingly, the Company, with the support of the Sponsor Support

Party, entered into a series of transactions (collectively, the "2018 Refinancing Transactions")

aimed at reducing its cash interest obligations while extending maturities to allow the Company to

continue to grow its business.  The 2018 Refinancing Transactions resulted in, among other things:

(a) modifications to the Prepetition ABL Facility; (b) the issuance of $635 million in aggregate

principal amount of the Secured Notes; and (c) the issuance of the 2018 Cash/PIK Notes and

warrants in exchange for substantially all of the Company's then-outstanding senior unsecured

notes due 2020.  The 2018 Refinancing Transactions supported the Company's sustained growth

over 10 straight quarters up until the COVID-19 pandemic.

67.    However, the 2018 Refinancing Transactions, while allowing the Company's

management to execute effectively on its goals, the Company remained highly levered (the 2018

Refinancing Transactions did not reduce the Company's funded debt obligations) and, in fact,

increased its effective interest rate, particularly with respect to the paid-in-kind notes.[6]  As a result, the Debtors suffered consolidated net losses of $42.8 million and $61.9 million in the 2018 and 2019 fiscal years, respectively.  Because of the positive trends underlying the operations of the Company's business, these pitfalls were nonetheless sustainable in predictable circumstances and fit in with management's operational expectations.

### 2.    The 2020 Refinancing Transactions

68.    The onset of the COVID-19 pandemic upset the delicate balance between servicing the Company's longstanding heavy debt burden and continuing to finance its long-term growth initiatives.   In light of these unexpected challenges, the Company engaged in a series of transactions over the course of May through July 2020 with their principal debtholders to receive short-term accommodations and to finance upcoming interest and maturity payments (collectively, the "2020 Refinancing Transactions").

69.    In a multi-pronged process, the Company:  (a) exchanged a substantial majority of the 2018 Unsecured Cash/PIK Notes for 2020 Unsecured Cash/PIK Notes, resulting in the effective deferral of a significant portion of the cash portion of the interest payments due on the 2018 Unsecured Cash/PIK Notes on April 15, 2020; (b) issued the Superpriority Secured Notes[7] to certain Secured Noteholders, the net proceeds of which were used to fund the April 15, 2020 cash interest payment due on the Secured Notes and related fees and expenses of the 2020 Refinancing Transactions; and (c) exchanged a majority of the remaining then-outstanding senior

---

[6]    As an example, interest expenses increased by 49.6% from $84.8 million to $126.8 million in the 2018 fiscal year and further increased by 11.5% to $141.4 million in the 2019 fiscal year.

[7]    A 10% PIK fee on the principal amount of the Prepetition Superpriority Secured Notes was payable at closing to such purchasers and therefore increased the total balance due under the Prepetition Superpriority Secured Notes to approximately $35.7 million upon issuance.

unsecured notes that matured on April 15, 2020 for additional Secured Notes, and repaid the remaining un-exchanged senior unsecured notes due 2020 in cash.

70.     Although the Debtors achieved some additional near-term liquidity relief as a result of the 2020 Refinancing Transactions, the business remained highly leveraged and continued to face the challenges caused by the COVID-19 pandemic.

**B.      The Impact of the COVID-19 Pandemic on the Debtors' Businesses**

71.     Until the COVID-19 worldwide pandemic struck, requiring Guitar Center to close nearly 100% of its retail operations, the Debtors' business had been on extraordinarily sound footing.  This is a testament to the strategic initiatives put in place by management prior to the onset of the pandemic and the difficult, but necessary, cost-saving initiatives management implemented to keep the company afloat amidst continuing uncertainty regarding the pandemic and its world-wide impact.

72.     However, the Debtors' liquidity concerns were dramatically accelerated by the COVID-19 pandemic, the ordered shutdown of non-essential businesses throughout the United States, and the closure of the Debtors' retail locations, which resulted in a significant decrease to net sales and Adjusted EBITDA during the first quarter and coincided with interest and maturity payments on their debt due in April 2020.  In addition, while the Debtors' e-commerce fulfillment centers largely continued operating during this period, with limited interruptions from closures, retail and e-commerce facility closures collectively had a significant negative impact on the Debtors' net sales in the first half of 2020.

73.     In late April 2020, the Debtors began to commence limited operations at a number of their retail stores as allowed by government orders, including fulfilling online orders from retail store inventory, offering curbside service and opening with reduced hours and limited occupancy. By the end of May 2020, most of the Debtors' stores were operating in a limited capacity under

27

one of these models, but they have continued to experience intermittent closures at certain stores based on store-specific pandemic-related circumstances. When reopening stores, the Debtors emphasized health, and maintained extensive safety and distancing protocols to protect associates and customers. These protocols, while necessary, have increased costs and decreased overall productivity.

74.     During this period, the Debtors saw strong online demand partially offset decreases from in-store purchases. Digitally-enabled Guitar Center sales increased 130% and sales from all online brands increased 64% over Q2 of 2019. The Company's omni-channel and online sales initiatives prepared them well for the shift in online buying caused by the pandemic. The Debtors also adapted by migrating their lessons businesses to an online platform.

75.     The Debtors took aggressive steps to mitigate the impact of pandemic-related events on their liquidity during the first half of 2020. These steps included, among others: significantly reducing capital expenditures; postponing or reducing inventory purchases; managing vendor and rent obligations; furloughing a significant number of retail store employees and corporate office staff; enacting temporary salary reductions for executives and certain members of management; temporarily suspending employer matching contributions to 401(k) plans; eliminating non-essential expenses; and delaying the payment of incentive bonuses earned for 2019. At the height of the pandemic, Guitar Center took the devastating step of furloughing over 8,750 of its at the time 13,000+ employees. The Debtors are in the process of bringing furloughed employees back to work and hiring new employees to the extent furloughed employees decide to terminate their employment instead of returning to work. The Debtors expect to complete this process by the end of 2020. As of the Petition Date, only approximately 874 remain furloughed due to reduced hours and workload.

76.     The Debtors demonstrated their ability to manage the business in a proactive and adaptable manner while prioritizing the health and safety of customers and associates.  Despite the Debtors' best efforts to take careful and effective steps to reduce costs and preserve liquidity, the pandemic has not abated and the Debtors' upcoming maturities have not moved.

**C.     Exploration of Strategic Alternatives**

77.     Even with management's aggressive cost reduction and cash conservation measures and the liquidity relief provided by the 2020 Refinancing Transactions, the COVID-19 pandemic continued to adversely affect the Debtors' financial position, operations, and cash flows. For the first half of fiscal year 2020, Guitar Center's consolidated net sales decreased 19.6% compared to the first half of fiscal year 2019, and Guitar Center had negative consolidated unadjusted EBITDA for the first half of fiscal year 2020 of $1.0 million, compared to positive consolidated unadjusted EBITDA of $66.0 million for the first half of 2019.

78.     The ongoing COVID-19 pandemic also created great uncertainty for the business going forward and made forecasting an expected recovery difficult.  It was management's belief that the business was susceptible to a second COVID-19 wave and potential government response, and that, in the face of such an eventuality, the Company may not be able to successfully implement the same liquidity preservation measures as it did in early 2020.  Furthermore, the Company was approaching the maturity of its Prepetition ABL Facility and Secured Notes in 2021, and any refinancing transaction in the capital markets would likely be challenging even if the Company was on a path to recovery.

79.     As a result, the Company determined that it needed to aggressively pursue strategic options to optimize its long-term capital structure and position its business for future growth.  In connection with those efforts, the board of directors of Guitar Center (the "<u>Board</u>") engaged its

financial and legal advisors, and ultimately, as discussed further below, established an independent

Transaction Committee to assist in evaluating strategic alternatives.

80.     In August 2020, at the direction of the Board, representatives of the Debtors'

financial advisors launched a dual-track process to (i) gauge potential investors' interest in making

a new equity investment in Guitar Center and (ii) engage with the holders of the Debtors'

outstanding funded indebtedness to develop and negotiate a long-term solution to the Debtors'

capital structure.

81.     The Debtors' financial advisors reached out to twenty potential equity investors,

including the Sponsor Support Party and other third-parties, regarding a potential new money

investment transaction to recapitalize the business.  Fourteen parties expressed interest and, upon

signing non-disclosure agreements ("NDAs"), were provided with, among other things, an investor

information package and access to a virtual data room with more than 20,000 pages of the Debtors'

documents.

82.     Certain potential equity investors declined to proceed for various reasons including

(i) an unwillingness to invest in the retail sector, (ii) valuation considerations and concern about

expected continuing leverage, and (iii) concerns with the complexity of a potential transaction.  By

mid-September 2020, the Debtors received three non-binding indications of interest.  Through

September and into October 2020, the remaining three potential equity investors participated in

management presentations and performed additional diligence via an expanded data room and

follow-up discussions with the management team.  Ultimately, in late October 2020, Carlyle

emerged as the frontrunner to provide, alongside the Sponsor Support Party and, ultimately,

Brigade (which, as discussed below, held positions in the Senior Unsecured Cash/PIK Notes,

Senior Secured Priority Notes and Senior Secured Notes), $165 million (subject to reduction in

accordance with the Restructuring Support Agreement) of new common equity capital in a transaction to be implemented through a plan of reorganization.

83.    At the same time, the Debtors worked with their legal and financial advisors to formulate a restructuring proposal for the holders of the Debtors' outstanding funded indebtedness. In early September 2020, the Debtors' financial advisors commenced a dialogue with the advisors to an ad hoc group of holders of Secured Notes (the "Ad Hoc Group of Noteholders").

84.    The Debtors and the Ad Hoc Group of Noteholders, together with their respective advisors, negotiated extensively.  The parties exchanged multiple rounds of proposals and counter-proposals between mid-September 2020 and early November 2020 in an effort to reach a framework for a restructuring plan for the Debtors.

85.    As discussions with the Ad Hoc Group of Noteholders advanced, the Debtors and their advisors initiated discussions with Brigade, which held approximately 80% of the Debtors' Senior Unsecured Cash/PIK Notes and also held positions in the Debtors' Senior Secured Superpriority Notes and Senior Secured Notes.

86.    In October 2020, as discussions with the Company's debt holders further advanced and the possibility of a complex recapitalization transaction that might involve participation by the Sponsor achieved greater traction, the Board unanimously agreed to appoint a new independent director and establish a capital structure and transaction committee (the "Transaction Committee"). The Transaction Committee was given the responsibility to consider, evaluate and negotiate strategic initiatives, including any restructuring, capital-raising and/or other balance sheet transactions that would be in the best interests of the Debtors and their respective creditors and equity holders.  No representative or investment professional of the Sponsor is a member of the Transaction Committee, positioning the Transaction Committee to evaluate transaction proposals

involving potential participation of the Sponsor. Following its formation, the Transaction Committee guided the Company's negotiation with the Company's noteholders for a number of weeks and considered the advice of the Company's financial and legal advisors to evaluate the transactions contemplated by the Restructuring Support Agreement. Ultimately, after careful consideration of the proposed transaction and potential alternatives and ample opportunity to deliberate among themselves and ask questions, the Transaction Committee determined to recommend that the Board approve the Restructuring Support Agreement and the underlying transactions, including the New Equity Investment. In making this determination, the Transaction Committee consulted with the Company's financial and legal advisors to fully consider the material facts, the pecuniary interests of the Sponsor and the interests of directors on the Board that are investment professionals of the Sponsor in the transactions contemplated by the Restructuring Support Agreement, whether the transactions contemplated by the Restructuring Support Agreement are fair, just, and reasonable to the Company as to terms and process under applicable law, the strategic alternatives available, and the terms of the Restructuring Support Agreement and related documents. On this basis, the Transaction Committee determined that it was advisable and in the best interests of the Company and its respective stakeholders, creditors and other parties in interest to enter into the Restructuring Support Agreement and related documents, and recommended that the Board approve the Company's entry into the Restructuring Support Agreement and related documents.

## PART IV: THE PROPOSED DIP FINANCING AND NEW EQUITY INVESTMENT

### A.    The Proposed DIP Financing

87.    The Debtors and their advisors conducted an exhaustive process to identify sources of DIP financing to ensure the success of these cases. This included contacting twenty potential financers, entering into NDAs and providing data room access to eleven, and ultimately receiving

four term sheets.  A detailed summary of the solicitation and marketing process, as well as the

terms of the DIP Facilities, is set forth in the Winthrop Declaration[8] filed in conjunction with the

DIP Motion.  The Debtors and their advisors conducted extensive negotiations with potential DIP

lenders, including existing members of the Debtors' capital structure.  This process resulted in two

sources of DIP financing—the Term DIP Facility and the ABL DIP Facility—that, collectively,

will be critical to the Debtors' ability to operate postpetition, to ensure sufficient liquidity to stock

sufficient inventory and minimize business disruptions during the crucial holiday season, and

stabilize the Debtors during the administration of these cases.

88.     The Term DIP Facility, provided by the Stroock Group and certain other holders of

Superpriority Secured Notes and Brigade, consists of a $325 million term loan.  Additionally, the

ABL DIP Facility, provided by Wells Fargo, consists of a $50 million ABL facility.  The terms of

the DIP Facilities are described more fully in the DIP Motion (as defined below) and the Winthrop

Declaration.

89.     As detailed in the Winthrop Declaration, the proposed DIP Facilities are (a) the

product of arm's length negotiations, (b) the best available DIP financing option for the Debtors,

and (c) in the best interests of the Debtors and their estates.

**B.     New Money Equity Raise**

90.     The Debtors and their advisors conducted an exhaustive process to raise capital

through equity as part of the Company's restructuring.  As a result of this process, which is

described in full detail in the Winthrop Declaration, it was ultimately agreed that Carlyle, the

---

[8]     The *Declaration Of Eric Winthrop In Support Of Debtors' Motion For Entry Of  Interim And  Final Orders:
(i) Authorizing Them  To Obtain Postpetition Financing;  (ii) Authorizing  The Use Of Cash Collateral;
(iii) Granting Liens  And  Superpriority Administrative Expense Claims;  (iv) Granting Adequate Protection;
(v) Modifying The Automatic Stay; (vi) Scheduling A Final Hearing; And (vii) Granting Related Relief.*

Sponsor Support Party, and Brigade would participate *pro rata* in a contemplated $165 million capital raise for 100% equity ownership in the reorganized entity (subject to warrant and MIP dilution).

91.     As detailed in the Winthrop Declaration, the proposed New Money Equity Raise is (a) the product of arm's length negotiations, (b) the best available new money equity financing option for the Debtors, and (c) in the best interests of the Debtors and their estates.

## PART V: THE RESTRUCTURING SUPPORT AGREEMENT

92.     The Debtors actively engaged with their existing capital structure to set the Company on the best path towards a successful and speedy emergence from these cases.  After several weeks of fulsome, arms'-length negotiations, with the approval of the Board following the recommendation of the Transaction Committee, the Debtors executed the Restructuring Support Agreement on November 13, 2020 with the Creditor Support Parties and the Investor Support Parties (as each is defined in the Restructuring Support Agreement).  The Restructuring Support Agreement contemplates a comprehensive fully-consensual reorganization achieved through the Plan.  The Restructuring Support Agreement commits the Creditor Support Parties and the Investor Support Parties (as applicable) to, among other things:  (i) support the Plan and the consummation of the Restructuring Transactions (as that term is defined in the Restructuring Support Agreement) that will result in a substantial deleveraging of the Debtors' balance sheet by nearly $800 million; (ii) contemporaneously provide the Debtors with a $165 million (subject to reduction in accordance with the Restructuring Support Agreement) infusion from the issuance of the New Common Equity; (iii) vote their Claims, as applicable, in favor of the Plan; (iv) not take any action inconsistent with the Plan; and (iv) commit to provide the financing under the DIP Facilities.

93.    As set forth in the Restructuring Support Agreement, the Debtors and the Support Parties agreed to mutually support confirmation of the Plan and the consummation of the Restructuring Transactions (as defined therein), which contemplates, among other things:

- the entry into the $325 million Term DIP Facility, which will be refinanced with the proceeds of the New Common Equity investment, the New First Lien Debt and/or the New ABL Facility, with Claims arising from the Term DIP Facility to be repaid in full in cash on the Effective Date;

- the entry into the $50 million ABL DIP Facility, which will be refinanced with the proceeds of the New ABL Facility, with any Claims arising from the ABL DIP Facility to be repaid in full in cash on the Effective Date;

- the entry, upon emergence from the Chapter 11 Cases, into the $375 million New ABL Facility;

- the issuance, upon emergence from the Chapter 11 Cases, of the $335 million New First Lien Debt;

- the issuance, upon emergence from the Chapter 11 Cases, of $160 million in new preferred equity of the reorganized company (the "New Preferred Equity") to satisfy, along with an aggregate $450 million cash distribution, Secured Notes Claims (whose holders may further elect to participate in a "cash out" option for up to $30 million of their New Preferred Equity);

- the issuance, upon emergence from the Chapter 11 Cases, of $2 million in new junior preferred equity of the reorganized company (the "New Junior Preferred Equity") to the holders of prepetition Unsecured Notes;

- the $165 million New Common Equity investment by the Investor Support Parties (subject to reduction in accordance with the Restructuring Support Agreement) in exchange for: (a) 100% of the common equity of the Reorganized Company, to be issued upon emergence from the Chapter 11 Cases and subject to dilution by a new management incentive plan, new warrants and all subsequent issuances of common equity; and (b) new warrants ("Warrants") to purchase New Common Equity;

- the satisfaction of Prepetition ABL Claims by the Effective Date;

- the satisfaction of Superpriority Secured Notes Claims by the Effective Date; and

- the unimpairment of General Unsecured Claims.

94.    The Restructuring Support Agreement carries the support of the Debtors, their equity holders and new financing parties, which includes Creditor Support Parties who collectively hold: (a) 100% of the Superpriority Secured Notes; (b) in excess of 71% of the Secured Notes; and (c) in excess of 84% of the Unsecured Notes, the latter two of which constitute the only classes of impaired creditors under the Plan.  After the deleveraging of the Company's balance sheet outlined above, the Debtors will be better capitalized to fund their operational needs.  The evolution of the consensual restructuring and the structure of the Plan emphasize the key purpose of the Plan and the relief sought in the First Day Motions: minimize any potential adverse effects to the Debtors' businesses, customers, employees, and trade partners and consummate an expedient emergence from these cases.

95.    The Debtors believe that entry into the Restructuring Support Agreement and consummation of the Restructuring Transactions represent a comprehensive solution to address the Debtors' liquidity and capital structure.  Following the Debtors' emergence from the Chapter 11 Cases, the Debtors' business will be recapitalized and the Debtors will be well-positioned to execute on and invest in their strategic growth initiatives and continue serving their customers.

## PART VI: THE FIRST DAY MOTIONS[9]

96.    The Debtors have filed a number of First Day Motions seeking orders granting various forms of relief necessary to facilitate the efficient administration of these cases.  I am familiar with the contents of each First Day Motion and believe that the relief sought in each First Day Motion: (i) is necessary to enable the Debtors to operate as debtors in possession with minimal disruption; (ii) constitutes a critical element in maximizing value of the Debtors' estates; and

---

[9]    Capitalized terms used but not otherwise defined in this Declaration have the meanings ascribed to them in the respective First Day Motions.

(iii) best serves the Debtors' estates' and creditors' interests.  The facts set forth in each First Day

Motion are incorporated in this Declaration by reference.

> **1.** **Motion for an Order: (I) Setting an Expedited Hearing on "First Day Motions" and (II) Granting Related Relief (the "<u>Motion for Expedited First Day Hearing</u>")**

97.     The Debtors seek an order: (a) setting an expedited hearing on the First Day

Motions; (b) deeming the *Debtors' Notice of Filing of Chapter 11 Petitions and First Day Motions*

*and of Proposed Hearing on First Day Motions* to be adequate and appropriate under the

circumstances; and (c) granting certain related relief described in the Motion for Expedited First

Day Hearing.

98.     I understand that Local Bankruptcy Rule 9013-1 allows the setting of a hearing on

an expedited basis if the circumstances so warrant.  Here, prompt entry of the relief requested in

the First Day Motions is critical to maintaining the Debtors' operations and value of their estates.

The Debtors will suffer immediate and irreparable harm if the relief requested in the First Day

Motions is not heard and granted on an expedited basis.  I believe that an expedited hearing on the

First Day Motions is appropriate under these circumstances.  Therefore, on behalf of the Debtors,

I respectfully submit that the Motion for Expedited First Day Hearing should be approved.

> **2.** **Debtors' Motion for Entry of an Order: (I) Directing Joint Administration of Chapter 11 Cases; and (II) Granting Related Relief (the "<u>Joint Administration Motion</u>")**

99.     In the Joint Administration Motion, the Debtors seek entry of an order directing the

joint administration of their chapter 11 cases for procedural purposes only and granting certain

related relief, including authority to file monthly operating reports on a consolidated basis.  Given

the integrated nature of the Debtors' operations, many of the filings, hearings, and orders in these

cases will affect each Debtor.  I believe that joint administration of these cases will decrease

administrative costs by allowing the Debtors to avoid duplicative filings that would be required

absent the requested relief.  It will also allow parties in interest to monitor these cases with greater ease and efficiency.

100.    I believe that joint administration of these cases will not harm or otherwise adversely affect any party in interest because the Joint Administration Motion seeks only administrative, and not substantive, consolidation of the Debtors' estates.  Instead, parties in interest will benefit from the cost reductions associated with joint administration.  Accordingly, the joint administration of these cases is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.  On behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

**3.     Debtors' Motion for Entry of Interim and Final Orders: (I) Authorizing Them to Obtain Postpetition Financing; (II) Authorizing the Use of Cash Collateral; (III) Granting Liens and Superpriority Administrative Expense Claims; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; and (VI) Granting Related Relief (the "<u>DIP & Cash Collateral Motion</u>")**

101.    Pursuant to the DIP Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to, among other things:  (i) obtain a $325 million term DIP financing and a $50 million ABL DIP financing; (ii) borrow, upon entry of an interim order, up to $325 million under the Term DIP Facility and $50 million under the ABL DIP Facility; (iii) indefeasibly pay the Prepetition ABL Obligations in full; (iv) grant superpriority administrative claims against each Debtor and grant valid non-avoidable, perfected senior priming liens on and security interests in all DIP Collateral to secure the DIP Obligations, which liens shall be subject to certain exceptions including the Carve Out and the rankings and priorities set forth in the Interim Order; and (v) provide adequate protection to the holders of Prepetition Obligations as and to the extent set forth in the DIP Orders.

102.    As described in this Declaration, the Debtors are facing liquidity constraints and urgently require financing under the proposed DIP Facilities to operate their businesses and to fund these cases.  I believe that the DIP Facility provides the Debtors with much-needed immediate access to liquidity and allows for the continued operation of the Debtors' businesses. The amounts borrowed under the DIP Facilities will be used to fund the cost of these cases and provide the Debtors with the requisite liquidity to pay their ongoing operational needs, such as payments to employees, vendors, and others in the Debtors' value chain, preventing any disruptions in the flow of merchandise that might otherwise result.

103.    Without the DIP Facilities, I believe that substantial value degradation would occur as a result of the Debtors' inability to continue ordinary course operations, which would not only impact revenue generation, but would also risk negatively impacting the Debtors' employees, losing the confidence of the Debtors' vendors and customers, and jeopardizing the Debtors' ability to effect a successful reorganization.

104.    Furthermore, as evidenced in the Restructuring Support Agreement, the Debtors' key stakeholders support the Debtors' need for the DIP Facility and the Debtors' related budget, including the contemplated use of the DIP Facility proceeds.

105.    Accordingly, and as detailed further in the DIP Declaration in support of the DIP Facility, I believe that the Debtors' entry into the DIP Facility will provide critical liquidity and is in the best interests of the Debtors' stakeholders and estates.

**4.    Debtors' Motion For Entry of an Order: (I) Establishing Certain Notice, Case Management, and Administrative Procedures; and (II) Granting Related Relief (the "<u>Case Management Motion</u>")**

106.    In the Case Management Motion, the Debtors seek entry of an order authorizing them to establish certain noticing, case management, and administrative procedures (the "<u>Case Management Procedures</u>") and granting certain related relief, including, among other things:

(a) directing that matters requiring notice under Bankruptcy Rule 2002(a)(2)-(6) be served only on individuals and entities identified on a shortened mailing list and those creditors who, in accordance with Local Bankruptcy Rules 2002-1 and 9013-1(M), file a request that they receive notices pursuant to Bankruptcy Rule 2002; (b) allowing electronic service of all documents (except complaints and summonses) for the Service List; and (c) directing that all matters be heard at periodic omnibus hearings to be scheduled in advance by the Court.

107.    I believe that the establishment of the Case Management Procedures will promote the efficient and orderly administration of these cases, thus providing significant administrative convenience and cost savings for the Debtors.  Therefore, I respectfully submit that this Court should grant the Case Management Motion.

> **5.    Debtors' Application for Entry of an Order Authorizing Retention and Appointment of Prime Clerk LLC as Claims, Noticing, and Administrative Agent, Effective as of the Petition Date (the "<u>Claims and Noticing Agent Retention Application</u>")**

108.    In the Claims and Noticing Agent Retention Application, the Debtors seek entry of an order appointing Prime Clerk LLC ("<u>Prime Clerk</u>") as their Claims, Noticing, and Administrative Agent in these cases, effective as of the Petition Date, to, among other tasks, assume the responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed against the Debtors, preparation of the creditor matrix, plan solicitation, tabulation, and distribution, on the terms, and subject to the conditions, of the engagement agreement between Prime Clerk and the Debtors.

109.    The Debtors anticipate that they will need to provide notices to thousands of persons and entities in these cases.  In light of the number of such parties, I believe that the appointment of a claims and noticing agent will provide the most effective and efficient means, and relieve the Debtors and/or the Clerk's office of the administrative burden, of noticing and

processing proofs of claim and other essential tasks, and is, thus, in the best interests of the

Debtors' estates and creditors.  It is my understanding, based on all proposals considered by the

Debtors from claims and noticing agents, that Prime Clerk's rates are competitive and reasonable

given its expertise.

110.    Based on my discussions with the Debtors' advisors, I believe that the Debtors'

selection of Prime Clerk to act as the Claims, Noticing, and Administrative Agent is appropriate

under the circumstances and in the best interest of the estates.  Accordingly, on behalf of the

Debtors, I respectfully submit that the Court should approve the Claims and Noticing Agent

Retention Application.

> **6.    Debtors' Motion for Entry of an Order: (I) Authorizing the Debtors
> to File Consolidated Lists of (A) Creditors in Lieu of Submitting a
> Mailing Matrix for Each Debtor, and (B) Thirty Largest Unsecured
> Creditors; (II) Authorizing the Debtors to Redact Certain Personal
> Identification Information; and (III) Granting Related Relief (the
> "Consolidated Creditor List Motion")**

111.    Pursuant to the Consolidated Creditor List Motion, the Debtors seek entry of an

order: (i) authorizing them to (a) file a consolidated Creditor List *in lieu* of submitting a separate

mailing matrix for each Debtor; and (b) file a consolidated list of their thirty (30) largest unsecured

creditors *in lieu* of filing such lists for each Debtor; (ii) authorizing the Debtors to redact certain

personal identification information; and (iii) granting certain related relief.

112.    The Debtors are prepared to make the Creditor List available in electronic form to

any party in interest who requests it and in non-electronic form (at the requesting party's sole cost

and expense) *in lieu* of submitting a mailing matrix as specified in Exhibit 5.  Thus, I respectfully

submit that there is no need for the Debtors to provide the mailing matrix formatted in accordance

with Local Bankruptcy Rule 1007-1(H)(1) and Exhibit 5.  Additionally, I believe that compiling

separate largest creditor lists for each Debtor in accordance with Bankruptcy Rule 1007(d) would

consume an excessive amount of the Debtors' time and resources, and filing a consolidated list of the Debtors' thirty (30) largest creditors would more appropriately reflect the Debtors' liabilities on an enterprise level.

113.    Furthermore, I believe that it is appropriate to authorize the Debtors to redact from the Creditor List, as well as from any paper filed or to be filed with the Court in these cases, the home addresses of current and former employees and customers of the Debtors—because: (a) such information can be used to perpetrate identity theft, harassment, or stalking; and (b) such disclosure risks violating the California Consumer Privacy Act of 2018, exposing the Debtors to potential civil liability and significant financial penalties.

114.    On behalf of the Debtors, I respectfully submit that the Court should approve the Consolidated Creditor List Motion.

**7.      Debtors' Motion for Entry of an Order: (I) Scheduling a Combined Hearing to Approve the Disclosure Statement and Confirm the Plan; (II) Establishing Objection Deadlines; (III) Approving the Form and Manner of Combined Notice; (IV) Approving Solicitation Procedures and Ballots; (V) Approving Procedures for Assumption and Rejection of Executory Contracts and Unexpired Leases; (VI) Granting Certain Extensions; and (VII) Granting Related Relief (the "Combined Hearing Motion")**

115.    Pursuant to the Combined Hearing Motion, the Debtors seek entry of an order: (i) scheduling a combined hearing on the adequacy of the Disclosure Statement, the confirmation of the Plan, the proposed assumption of Executory Contracts and Unexpired Leases, and any other matter properly before the Court (the "Combined Hearing");  (ii) establishing December 10, 2020, as the deadline (the "Objection Deadline") for filing objections to the relief sought; (iii) approving the form and manner of various notices and the solicitation procedure; and (iv) granting an extension of time within which (a) the Debtors must file their Statements and Schedules, and (b)

the U.S. Trustee must convene a meeting of creditors required by section 341(e) of the Bankruptcy Code.

116.    Subject to this Court's availability, the Debtors request that this Court approve the following schedule:

| Key Dates and Deadlines | Proposed Schedule |
| --- | --- |
| Voting Record Date | November 17, 2020 |
| Commencement of Solicitation | November 20, 2020 |
| Petition Date | November 21, 2020 |
| Plan Supplement Filing Deadline | December 7, 2020 |
| Voting Deadline | December 10, 2020 at 5:00 p.m. (ET) |
| Objection Deadline | December 10, 2020 at 5:00 p.m. (ET) |
| Deadline for Plan Proponents to File a Brief in Support of Confirmation of the Plan. | December 14, 2020 |
| Deadline for Plan Proponents to File a Reply Brief to an Objection. | December 16, 2020 at 12:00 p.m. (ET) |
| Combined Hearing and Second Day Hearing | December 17, 2020 at 9:00a.m. (ET) |

117.    The Confirmation Schedule reflects milestones that were heavily negotiated as part of the Restructuring Support Agreement, and I believe that the proposed Confirmation Schedule provides ample time for any interested party to participate in these cases and will preserve significant value for the Debtors' estates and their stakeholders.  The form and manner of providing various notices described in the Combined Hearing Motion, including with respect to the notice of commencement of these cases, the date and time of the Combined Hearing, and the date and time for objecting to confirmation of the Plan is appropriate under the circumstances and provides

parties with a reasonable opportunity to be heard and object.  Lastly, the extensions of time with

respect to the filing of the Debtors' schedules and SOFAs and convening the Section 341(a)

Meeting are reasonable.

118.    I believe that the relief requested in the Combined Hearing Motion is in the best

interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the

Debtors to continue to operate their businesses in chapter 11 without disruption, and will permit

the Debtors to emerge from chapter 11 expeditiously and consistent with the milestones set forth

in the Restructuring Support Agreement.  Accordingly, on behalf of the Debtors, I respectfully

submit that this Court should approve the Scheduling Motion.

**8.    Debtors' Motion for Entry of Interim and Final Orders:
(I) Authorizing the Debtors to (A) Continue to Operate Their Cash
Management System and Maintain Existing Bank Accounts and
Business Forms, (B) Continue Using Credit Cards, and (C) Engage in
Intercompany Transactions; (II) Providing Administrative Expense
Priority for Postpetition Intercompany Claims; (III) Granting an
Extension With Respect to Compliance With the Requirements of
Section 345(b) of the Bankruptcy Code; and (IV) Granting Related
Relief (the "Cash Management Motion")**

119.    Pursuant to the Cash Management Motion, the Debtors seek entry of interim and

final orders: (a) authorizing them to (i) continue to operate their Cash Management System and

maintain existing Bank Accounts and Business Forms, (ii) continue using Credit Cards, and (iii)

engage in Intercompany Transactions; (b) providing administrative expense priority for

postpetition Intercompany Claims; (c) granting an extension of time within which the Debtors

must comply with the requirements of section 345(b) of the Bankruptcy Code; and (d) granting

certain related relief.

120.    I believe that the Cash Management System is similar to those used by other

companies of similar size and complexity.  I believe that the continuation of the Cash Management

System is critical to the Debtors' ongoing operations.  Requiring the Debtors to alter the way in

which they collect and disburse cash would be expensive, time-consuming, burdensome, and unnecessarily disruptive to the Debtors' operations, thus needlessly reducing the value of the Debtors' estates to the detriment of their creditors.  Maintaining the current Cash Management System will facilitate the Debtors' transition into chapter 11, minimizing delays in paying postpetition debts and eliminating administrative inefficiencies.  Finally, maintaining the current Cash Management System will allow the Debtors' treasury and accounting employees to focus on their daily responsibilities and thereby maximize the value of the Debtors' estates.

121.    The Cash Management System is organized around the Main Concentration Account.  Funds from the Main Concentration Account are transferred automatically to fund a majority of the Debtors' disbursements, including payroll, benefit obligations, operational expenses, and other business disbursements.  The majority of the Debtors' other accounts (including the depository accounts, which are used to receive sales proceeds, receipts, and other collections) are zero-balance accounts, and, therefore, any funds remaining in these accounts at the end of each day are swept back to the Main Concentration Account.

122.    Of the six (6) Banks, four (4) are designated as authorized depositories under the U.S. Trustee Guidelines.  The remaining two (2) Banks are not authorized depositories.  However, both of those two (2) Banks are insured by the FDIC, and the Bank Accounts held at such Banks generally hold less than $50,000, well below the coverage limits of FDIC insurance.  I believe that the Debtors' funds in all of their Bank Accounts are secure.

123.    On a monthly basis, the Debtors pay approximately $100,000 in Bank Fees.  It is difficult for the Debtors to calculate the precise amount of prepetition Bank Fees due as of the Petition Date because of the fluidity of Bank Account funding and activity.  Pursuant to the Cash

Management Motion, the Debtors seek authority to pay all Bank Fees in the ordinary course, including any prepetition amounts.

124.    The Debtors' treasury department oversees the cash collection and disbursements and maintains records of any payments made among the Debtors.  These payments result in the daily creation of intercompany receivables and payables, reflected as journal entries in the respective Debtors' accounting systems.   If the Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' ordinary course operations would be disrupted to the detriment of the Debtors' estates and their creditors.

125.    The Debtors maintain company-paid Credit Cards issued by Wells Fargo for the use of their salaried employees.  The Debtors rely on the ability of their employees to pay for expenses incurred in the ordinary course and to make other work-related purchases necessary to fulfill their day-to-day professional obligations.  Permitting the Debtors to continue using the Credit Cards and incurring related expenses will ensure that the Debtors' employees are able to fulfill their daily professional obligations and prevent significant disruption to the Debtors' business operations.

126.    Furthermore, to avoid unnecessary expense, the Debtors request a waiver of the U.S. Trustee Guidelines with respect to marking their existing Business Forms with a "Debtor-in-Possession" or "DIP" stamp.

127.    Based on all of the foregoing, I respectfully request that the Court approve the Cash Management Motion.

**9.      Debtors' Motion for Entry of Interim and Final Orders:
(I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries,
Other Compensation, and Reimbursable Expenses, and (B) Continue
Employee Benefits Programs; and (II) Granting Related Relief (the
"Wages Motion")**

128.      Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders

authorizing them to: (a) pay prepetition Employee Compensation and amounts owing under the

Benefits Programs in the ordinary course of business; and (b) continue, in their discretion, to pay

Employee Compensation and administer the Benefits Programs.

129.      The Debtors employ approximately 13,000 Employees on a full- and part-time

basis.  Approximately 11,500 Employees are paid on an hourly basis, and approximately 1,500

Employees earn a salary.  Approximately seventy (70) hourly Employees at four (4) store locations

are unionized.  As a result of the COVID-19 pandemic, approximately 900 Employees remain

furloughed due to ongoing store closures and reduced hours.  The Debtors are in the process of re-

hiring furloughed Employees and hiring new employees as needed to fill open positions.

Additionally, the Debtors have begun hiring seasonal Employees to bolster their workforce

through the holiday season.  In total, the Debtors expect to have approximately 12,600 active

Employees through the end of January.

130.      In addition to the Employees, the Debtors also utilize the services of Temporary

Workers sourced from various Staffing Agencies to fulfill certain duties on a short- and long-term

basis.  The Debtors also employ Independent Contractors to perform specialized services,

primarily information technology systems management and private label product design.  The

number of Independent Contractors and Temporary Workers fluctuate based on the Debtors'

specific needs at any given time and typically account for less than 1% of the Debtors' total

workforce.

131.    As of the Petition Date, the Debtors estimate that the amount of accrued but unpaid obligations owed to Employees on account of Employee Compensation is approximately $7.9 million, including Deductions.  I have been advised that, as of the Petition Date, no Employee is owed Employee Compensation in excess of $13,650.  In addition, as of the Petition Date, the Debtors estimate that they owe approximately $200,000 to the Staffing Agencies on account of services rendered by the Temporary Workers prior to the Petition Date, and $75,000 on account of services rendered by the Independent Contractors prior to the Petition Date.  The Debtors also maintain a number of Commission and Bonus Programs that the Debtors seek to continue in the ordinary course for their non-Insider Employees.

132.    In addition, the Debtors pay and incur a number of obligations related to their Employees in connection with: (a) federal and state withholdings; (b) payroll services; (c) expense reimbursement; (d) certain incentive programs; (e) health insurance, including, medical, dental, vision; (f) life and accidental death and dismemberment insurance; (g) disability benefits; (h) workers' compensation benefits; (i) retirement plans; (j) employee assistance programs; (k) paid time off; and (l) other benefits that the Debtors have historically directly or indirectly provided to the Employees in the ordinary course of business, as further described in the Wages Motion.

133.    The Debtors provide paid Vacation Time to Employees that accrues based on the Employee's level, area of employment, years of service, and date of hire.  The Debtors estimate that, as of the Petition Date, the aggregate amount of accrued but unused Vacation Time is approximately $9.1 million.  The Debtors currently have approximately seventy (70) Employees with accrued but unused Vacation Time in excess of $13,650.  As of the Petition Date, the Debtors do not believe that they have any outstanding cash obligations on account of Vacation Time.  When

an Employee's employment terminates, any accrued but unpaid Vacation Time is paid with such Employee's final paycheck.

134.    I believe that the vast majority of Employees rely exclusively on the Employee Compensation and Benefits Programs to pay their daily living expenses and support their families. Accordingly, Employees will be exposed to significant financial hardship if the Debtors are not permitted to continue the Employee Compensation and Benefits Programs in the ordinary course of business.  I believe that absent the continuation of the Employee Compensation and Benefits Programs, the Debtors run the risk of Employees leaving at this very critical time.  A significant portion of the value of the Debtors' business is tied to their workforce, which cannot be replaced without significant efforts, which efforts may not be successful given the overhang of these cases. I therefore believe that payment of the prepetition obligations with respect to the Employee Compensation and Benefits Programs will give the Debtors the greatest likelihood of retaining their Employees and thus is necessary and critical to the Debtors' efforts to preserve the value of their estates.

135.    In addition, the Debtors request that the Court modify the automatic stay under section 362 of the Bankruptcy Code to permit the Employees, solely to the extent they may assert claims under the workers' compensation program, to proceed with such claims.  I believe that staying the workers' compensation claims could have a detrimental effect on the financial well-being and morale of the Employees and ultimately lead to the departure of certain Employees who are critical to the Debtors' operations.

136.    Accordingly, I respectfully submit that the Court should grant the relief sought in the Wages Motion.

10.    **Debtors' Motion for Entry of Interim and Final Orders: (I)
Authorizing the Debtors to (A) Continue and Renew Their Insurance
Policies and Honor Obligations Thereunder, and (B) Continue Surety
Bond Program; And (II) Granting Related Relief (the "Insurance
Motion")**

137.    In the Insurance Motion, the Debtors seek entry of an order: (a) authorizing them

to (i)  maintain prepetition insurance coverage, including renewing, supplementing, or purchasing

new Insurance Policies in the ordinary course of business, (ii) pay all amounts that become due on

account of the Insurance Policies, including (x) all premiums and all Insurance Broker fees, (y) all

Insurance Deductibles, and (z) all Claims Administrator fees, all in the ordinary course, without

regard to whether such obligations accrued or arose before or after the Petition Date, and

(iii) continue their Surety Bond Program; and (b) granting certain related relief.

138.    The Debtors maintain approximately twenty-eight (28) Insurance Policies that

provide coverage for, among other things, directors' and officers' liability, employment practices

liability, commercial general liability, automobile liability, property liability, and cargo liability.

With the exception of the Debtors' property, ocean cargo, and automobile Insurance Policies, the

entire annual premium for each of the Insurance Policies is prepaid upon renewal on May 15th of

each year.  The premium for the Debtors' property Insurance Policy is paid in two installments in

each of June and November.  The premium for the Debtors' ocean cargo Insurance Policy is paid

in three installments in each of May, August, and November.   On November 25, 2020,

approximately $790,000 will become due on account of the final installment payments for the

2020 premiums with respect to the property and ocean cargo Insurance Policies.  The annual

premium for the Debtors' automobile Insurance Policy is paid in seven monthly installments from

June through January, which cover the full 12-month period.  The Debtors have three remaining

premium installment payments to make on their automobile Insurance Policy for the current

coverage period.  The payments will come due in December and January and total approximately

$166,300.

139.    As of the Petition Date, the Debtors have thirty-two (32) outstanding surety bonds

issued for the benefit of certain third parties, mostly governmental or other public or regulatory

agencies, to secure payment or performance of certain of the Debtors' obligations on account of,

among other things, duties, taxes, and fees for merchandise imported from foreign countries for

the benefit of U.S. Customs. The aggregate annual premiums for the Surety Bonds are

approximately $65,000.  The Debtors remit annual premium payments when the bonds are issued

or renewed.  The Debtors do not believe any premiums are outstanding on account of the Surety

Bonds as of the Petition Date.

140.    I believe that any interruption in insurance coverage or in the Surety Bond Program

would expose the Debtors to a number of risks, including: (a) the possible incurrence of direct

liability for the payment of claims that otherwise would have been covered by the Insurance

Policies; (b) the possible incurrence of material costs and other losses that otherwise would have

been reimbursed, such as attorneys' fees for certain covered claims; (c) the possible inability to

obtain similar types and levels of insurance or surety bond coverage on terms as favorable as the

present coverage; and (d) the possible incurrence of higher costs for re-establishing lapsed

Insurance Policies or cancelled Surety Bonds or obtaining new coverage.  In short, I believe that

maintaining the Insurance Policies and the Surety Bond Program will enable the Debtors to avoid

the incurrence of significant liabilities and therefore represents a sound exercise of their business

judgment.

141.    I believe that the continuation of the Insurance Policies and the Surety Bond

Program is also imperative to the Debtors' continued operation and ability to restructure.

Therefore, I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest.  Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Insurance Motion.

**11.    Debtors' Motion for Entry of Interim and Final Orders: (I) Authorizing the Payment of Certain Taxes and Fees; and (II) Granting Related Relief (the "Taxes Motion")**

142.    Pursuant to the Taxes Motion, the Debtors seek entry of interim and final orders authorizing them to pay and remit, as applicable, Taxes and Fees that accrued prior to the Petition Date and that will become due during the pendency of these cases.  The Debtors estimate that approximately $26,070,000 in Taxes and Fees is due as of Petition Date, approximately $8,547,000 of which may come due within twenty-one (21) days after the Petition Date.

143.    I believe that the payment of the Taxes and Fees in the ordinary course of business is imperative to the Debtors' ability to successfully reorganize.  Failure to pay the Taxes and Fees could materially disrupt the administration of these cases in several ways.  Initially, unpaid Taxes and Fees may result in penalties, including liens on the Debtors' property, the accrual of interest, or both.  Prolonged delays in payment may also result in the suspension of the Debtors' licensing to operate their businesses, which would effectively terminate their restructuring.  In addition, the Authorities, including the IRS, are likely to initiate Audits, which would unnecessarily divert the Debtors' attention from the administration of these cases.  Further, the Authorities may assert that the Debtors' directors and officers are personally liable for payment of certain of the Taxes and Fees even if the failure to pay such Taxes and Fees was not a result of malfeasance on the part of the directors and officers.  I believe that any such litigation would be unnecessarily distracting for the Debtors' directors and officers, as well as this Court, which may be asked to rule on numerous motions seeking injunctions relating to potential court actions.  I respectfully submit that is in the

52

best interests of the Debtors' estates to eliminate the possibility of these distractions and to enable the Debtors to continue operating without interruption.

144.    Additionally, I understand that the failure to pay certain Taxes and Fees could impair the Debtors' ability to operate their businesses in the relevant jurisdictions.  If the Debtors do not pay these Taxes and Fees, notwithstanding the prohibition against discrimination contained in section 525 of the Bankruptcy Code, the Authorities may seek to prevent the Debtors from continuing operations in their respective jurisdictions, thereby disrupting the Debtors' operations. Finally, I believe that the Debtors' other unsecured creditors would not be prejudiced if the Court grants the Taxes Motion because the value of preserving the Debtors' estates will inure to the benefit of the Debtors' estates and their creditors.

145.    For the foregoing reasons, I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest and is critical to the Debtors' continued, uninterrupted operations during the pendency of these cases. Accordingly, on behalf of the Debtors, I respectfully request that this Court approve the Taxes Motion.

**12.    Debtors' Motion for Entry of Interim and Final Orders: (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services; (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services; (III) Approving the Debtors' Proposed Procedures for Resolving Additional Assurance Requests; and (IV) Granting Related Relief (the "Utilities Motion")**

146.    Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders: (a) approving the Proposed Adequate Assurance of payment for future utility services; (b) prohibiting Utility Companies from altering, refusing, or discontinuing services; (c) approving the proposed procedures for resolving Additional Assurance Requests; and (d) granting certain

related relief.  Assuring the receipt of the Utility Services on an uninterrupted basis is essential to the Debtors' business operations.

147.    The Debtors have provided thirty-one (31) of the Utility Companies with cash deposits, escrow agreements, or letters of credit, and estimate that the amount currently held as deposits or prepayments with respect to the Utility Services is approximately $580,483.  To provide additional assurance of payment, the Debtors propose to deposit into a segregated account $662,184 to be maintained for the duration of these cases.  The Adequate Assurance Deposit represents an amount sufficient to cover one half of the Postpetition Monthly Cost, less the amount of the Prepetition Deposits for each respective Utility Company, and may be applied to any postpetition defaults in the payment to the Utility Companies.  The Utility Companies will be the sole beneficiaries of the Adequate Assurance Account; other creditors will have no interest in the Adequate Assurance Account or the Adequate Assurance Deposit until any funds from the Adequate Assurance Account are returned to the Debtors pursuant to the terms set forth in the proposed orders granting the relief sought by the Utilities Motion.

148.    In addition, the proposed Adequate Assurance Procedures will allow the Utility Companies to request additional adequate assurance while allowing the Debtors to administer their chapter 11 estates with as little interruption to the Utility Services as possible, and ensure that all key stakeholder groups obtain notice of such request before it is honored.

149.    The Debtors rely on their Utility Service Providers, Engie and Cass, to process payments for their Utility Services.  The Utility Service Providers allow the Debtors to maintain and remain current on approximately $1.5 million of monthly utility costs across hundreds of Utility Companies.  Cass handles nearly all of the Debtors' telecommunications-related Utility Services.  Pursuant to the Cass Agreement, the Debtors remit to Cass the amounts invoiced for the

applicable Utility Services plus a monthly service fee of approximately $6,600.  Engie handles

nearly all of the Debtors' other Utility Services.  Pursuant to the Engie Agreement, the Debtors

remit to Engie the amounts invoiced for the applicable Utility Services plus a monthly service fee

of approximately $3,200.  I believe it necessary for the Debtors to be able to pay the Service Fees,

both those amounts owed  prepetition—approximately $16,000—and as they come due in the

ordinary course of business.

150.    Therefore, I believe that the relief requested in the Utilities Motion is in the best

interests of the Debtors' estates, their creditors, and all other parties in interest.  Accordingly, on

behalf of the Debtors, I respectfully submit that the Court should approve the Utilities Motion.

### 13.    Debtors' Motion for Entry of An Order: (I) Authorizing the Debtors to Maintain and Administer Certain Customer Programs and to Honor Certain Related Prepetition Obligations; and (II) Granting Related Relief (the "Customer Programs Motion")

151.    Pursuant to the Customer Programs Motion, the Debtors seek entry of an order (a)

authorizing them to continue to maintain and administer their Customer Programs and to honor

certain prepetition obligations related to the Customer Programs; and (b) granting certain related

relief.  I believe that the Debtors' businesses depend upon the loyalty of their customers.  To

maximize customer loyalty, the Debtors have maintained the Customer Programs in the ordinary

course of business to reward and incentivize existing customers and to attract new customers to

the Debtors' stores and websites. The Debtors operate six (6) Customer Programs: (a) the Refund

and Exchange Program; (b) the Rewards Program; (c) the Gear Card Rewards Program; (d) the

Gift Card Program; (e) Purchase Deposits; and (f) the Layaway Program.   I believe that being

unable to continue any of these Customer Programs may cause irreparable harm to the Debtors'

business, goodwill, customer base, and market share.

152.    Under the Refund and Exchange Program, as is customary in the retail industry, the Debtors have historically allowed their customers to return or exchange merchandise (with limited exceptions) within forty-five (45) days of purchase so long as it is returned in saleable condition and accompanied with a return authorization code. As of the Petition Date, approximately $6,961,036 of credit issued for returned merchandise remains outstanding.

153.    In the ordinary course of business, the Debtors also offer the Rewards Program. Among other benefits, the Rewards Members receive eight points for every dollar spent at Musician's Friend (with various promotions doubling or tripling point earnings), ultimately resulting in Reward Certificates of five dollars for every 500 points that may be applied towards their next purchase. Reward Certificates are not redeemable for cash and expire six months from a Rewards Member's last purchase. As of the Petition Date, approximately $10,769,296 worth of Reward Certificates remain outstanding. Assuming a historical percentage of Reward Certificates are redeemed within the prescribed periods, the Reward Certificates represent a contingent prepetition claim of approximately $2,844,227.

154.    The Guitar Center brand offers its customers a private-label credit card, the Gear Card, which is issued and serviced by a third-party provider. Holders of the Gear Card automatically receive Rewards Points under the Gear Card Rewards Program towards five-percent back on purchases made within the Guitar Center brand of stores. Rewards Points convert to ten dollar e-certificates for every $200 spent. The e-certificates expire ninety (90) days after issuance. As of the Petition Date, approximately $4,291,304 worth of Reward Points remain outstanding. Assuming a historical percentage of Reward Points are redeemed within the prescribed periods, the Reward Points represent a contingent prepetition claim of approximately $2,374,566.

155.    Like many retailers, the Debtors maintain a Gift Card Program that allows their customers to purchase physical, pre-paid, non-expiring Gift Cards, which can be redeemed for merchandise at a later date.  Gift Cards are issued in various denominations and are sold in the Debtors' retail stores, online, and at certain third-party vendor locations.  The Debtors pay a monthly fee of approximately $5,000 to outside vendors to administer the Gift Card Program.  As of the Petition Date, approximately $13,307,736 in issued and unredeemed Gift Cards remain outstanding.

156.    In the ordinary course of business, the Debtors require Purchase Deposits to be placed on certain merchandise or services, such as custom orders, special orders, or prepaid music lessons.  The Debtors retain Purchase Deposits until the applicable customer receives the product or service, at which point the Debtors apply the Purchase Deposit against the cost of such good or service.  As of the Petition Date, the Debtors hold approximately $9,908,549 in Purchase Deposits.

157.    The Debtors also offer a layaway program at their Guitar Center stores that allows a customer to pay for products over a thirty day period.  Under the Layaway Program, a customer deposits 25% of the purchase price towards an item, and must pay the balance and pick up the item within the prescribed period.  There are no fees, and deposits are 100% refundable.  Layaways are cancelled if a customer does not pay the balance or pick up the item timely, and the customer's deposit is credited to an account in the customer's name.  As of the Petition Date, approximately $1,684,952 in deposits under the Layaway Program remain outstanding.

158.    In addition to cash, the Debtors accept Non-Cash Payments.  To process the Non-Cash Payments, the Debtors are party to Payment Processing Agreements with the Payment Processing Companies.  Pursuant to the Payment Processing Agreements, funds on account of the

Non-Cash Payments are remitted to the Debtors on a daily basis, net of any Chargebacks, returns, and processing fees. Processing Fees vary, but generally are in the range of one to five percent (with the exception of the Gear Card, which charges no transaction fees). I believe that, absent the ability to pay the Processing Obligations, the Debtors' businesses would be disrupted.

159.    Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Customer Programs Motion.

> **14.     Debtors' Motion for Entry of Interim and Final Orders: (I) Authorizing the Payment of Prepetition Obligations Owed to Trade Creditors in the Ordinary Course of Business; (II) Granting Administrative Expense Priority to all Undisputed Obligations on Amount of Outstanding Orders; and (III) Granting Related Relief (the "<u>All Trade Vendors Motion</u>")**

160.    Pursuant to the All Trade Vendors Motion, the Debtors request interim and final authority to pay, in the ordinary course, the undisputed prepetition claims of their creditors that provide goods or services, and other similar entities that are essential to maintaining the going concern value of the Debtors' enterprise, in each case, subject to the procedures and conditions described in the All Trade Vendors Motion.

161.    I understand that, on an aggregate basis, the Debtors estimate that the amount owed to the Trade Creditors for goods delivered or services provided prior to the Petition Date should not exceed $129.6 million  Of these amounts, I am advised that approximately $3.6 million and $68.1 million, respectively, is attributable to lien claims and claims entitled to priority under section 503(b)(9) of the Bankruptcy Code. Of the aggregate amount, the Debtors are requesting the authority to pay up to $97.4 million on an interim basis, prior to a final hearing.

162.    Many of the Trade Creditors are providers of specialized goods and services that cannot be replaced in a feasible manner, if at all, due to their specialized qualifications or commitments pursuant to the Debtors' customer contracts. Due to, among other things, the

specialized nature of the goods and services required to operate the Debtors' business lines, the Debtors have limited alternatives to such Trade Creditors when going to the market for such necessary goods and services. Having to replace any such vendor could result in substantially higher costs for the Debtors' estates or worse, and may risk delays that could harm the Debtors' value. Additionally, twenty percent of the Debtors' vendors operate in foreign jurisdiction.

163.    The Debtors' strong relationships with these vendors, as well as the vendors that provide supporting services, is what makes the Debtors the leading destination for musical instruments and related products and services. If the Debtors are unable to stock Merchandise due to strained business relationships, they will not have customers in their physical or virtual stores. This disruption would impact the Debtors' other business lines as well: fewer sales will adversely impact the Debtors' sale of future services, maintenance, lessons, and replacement parts.

164.    Failure to pay prepetition Trade Claims would result in a loss of value to Guitar Center's business lines, which would be unable to continue operating without the Trade Creditors. I understand that the Debtors have concluded that if they do not pay the Trade Claims, their value will be reduced by amounts well in excess of amounts that the Debtors seek authorization to pay. Not only could failing to make payments to the Debtors' Trade Creditors jeopardize the Debtors' supply of critical goods and services, but it could also jeopardize the Debtors' relationships with their customers. Payment of the Trade Claims is thus necessary for the Debtors to maintain their operations and thus preserve the value of their businesses. Few, if any, of the Trade Claimants have contracts with the Debtors that allow the Debtors to compel the continuation of services during a chapter 11 case.

165.    The following chart summarizes the different categories of Trade Creditors and Trade Claims to whom the Trade Creditors Motion applies.

| Category: | Estimated Claim: |
|---|---|
| Trade Vendor Claims | $57.9 million |
| Lien Claims | $3.6 million |
| 503(b)(9) Claims | $68.1 million |
| Aggregate: | $129.6 million |

166.    On behalf of the Debtors, I respectfully submit that the Court should approve the

All Trade Vendors Motion.

> **15.     Debtors' Motion for Entry of Interim and Final Orders:
> (I) Approving Notification and Hearing Procedures for Certain
> Transfers of and Declarations of Worthlessness with Respect to
> Common Stock; and (II) Granting Related Relief (the "<u>NOL Motion</u>")**

167.    Pursuant to the NOL Motion, the Debtors seek entry of interim and final orders: (a)

approving certain notification and hearing procedures related to certain transfers of, or declarations

of worthlessness with respect to, the Common Stock or any Beneficial Ownership thereof; (b)

directing that any purchase, sale, other transfer of, or declaration of worthlessness with respect to,

Common Stock or any Beneficial Ownership thereof in violation of the Stock Transfer Procedures

shall be null and void ab initio; and (c) granting certain related relief.

168.    The Debtors estimate that they have approximately $213.38 million of federal NOL

carryforwards, tax credits of approximately $1.98 million, and interest expense carryforwards of

approximately $136.78 million.  I understand that the value of the Tax Attributes may inure to the

benefit of the Debtors' stakeholders because they may be utilized by the Debtors or the reorganized

Debtors to offset taxable income or, potentially, in connection with transactions consummated

during these cases or after a chapter 11 plan goes effective.  I believe that the termination or

limitation of the Tax Attributes would be materially detrimental to all parties in interest in these

cases, and that implementation of the Stock Transfer Procedures is necessary and appropriate to

preserve the value of the Tax Attributes for the benefit of the Debtors' estates, and thereby enhance recoveries for the Debtors' stakeholders.

169.    The Procedures are the mechanism by which the Debtors propose to monitor and, if necessary, object to certain transfers of Beneficial Ownership of Common Stock and declarations of worthlessness with respect to Beneficial Ownership of Common Stock to ensure preservation of the Tax Attributes.  By establishing and implementing the Procedures, the Debtors believe that they will be in a position to object to transactions that may give rise to an "ownership change" that would threaten their ability to preserve the value of their Tax Attributes for the benefit of the estates.

170.    Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the NOL Motion.

*[Remainder of page intentionally left blank]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: November 22, 2020                    /s/ *Tim Martin*
       Richmond, VA

## Exhibit A

**Corporate and Capital Structure**

# Guitar Center

## Organizational and Debt Structure



## Exhibit B

**Restructuring Support Agreement**

*Execution Version*

**THIS RESTRUCTURING SUPPORT AGREEMENT IS NOT AN OFFER OR ACCEPTANCE WITH RESPECT TO ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES AS TO ANY CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE. ANY SUCH OFFER OR SOLICITATION WILL ONLY BE MADE IN COMPLIANCE WITH ALL APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND OTHER APPLICABLE LAWS. NOTHING CONTAINED IN THIS RESTRUCTURING SUPPORT AGREEMENT SHALL BE AN ADMISSION OF FACT OR LIABILITY OR, UNTIL THE OCCURRENCE OF THE EXECUTION DATE ON THE TERMS DESCRIBED IN THIS AGREEMENT, DEEMED BINDING ON ANY OF THE PARTIES TO THIS AGREEMENT.**

## RESTRUCTURING SUPPORT AGREEMENT

This RESTRUCTURING SUPPORT AGREEMENT (including any exhibits, schedules, or annexes attached to this Agreement, as amended, supplemented or otherwise modified, this "**Agreement**") is entered into as of November 13, 2020 (the "**Execution Date**"), by and among:

(i) Guitar Center, Inc., a Delaware corporation ("**Guitar Center**"), Guitar Center Holdings, Inc., a Delaware corporation ("**Holdings**"), and those subsidiaries of Guitar Center that are party to this Agreement (together with Guitar Center and Holdings, the "**Company Parties**");

(ii) the holders (including their Related Persons) of Secured Notes Claims that have executed and delivered counterpart signature pages to this Agreement or a Joinder (together with their successors and assigns, the "**Secured Notes Support Parties**");

(iii) the holders (including their Related Persons) of Superpriority Secured Notes Claims that have executed and delivered counterpart signature pages to this Agreement or a Joinder (together with their successors and assigns, the "**Superpriority Secured Notes Support Parties**");

(iv) the holders (including their Related Persons) of Unsecured Notes Claims that have executed and delivered counterpart signature pages to this Agreement or a Joinder (together with their successors and assigns, the "**Unsecured Notes Support Parties**" and together with the Secured Notes Support Parties and the Superpriority Secured Notes Support Parties, the "**Creditor Support Parties**");

(v) Ares PE Extended Value Fund LP, in its capacity as a holder of the Existing Common Equity and in its capacity as a participant in the New Common Equity Investment (together with its successors and assigns, in such capacities, the "**Sponsor Support Party**");

(vi) Brigade Capital Management, LP, as investment manager for certain funds or accounts, as a participant in the New Common Equity Investment (together with its successors and assigns, in such capacity, the "**Brigade Co-Investor**"); and

(vii) CSP IV Acquisitions, L.P., as a participant in the New Common Equity Investment (together with its successors and assigns, the "**Carlyle Co-Investor**"; together with the Brigade Co-Investor, the "**Co-Investors**", and each individually a "**Co-Investor**"; together with the Brigade Co-Investor and the Sponsor Support Party, the "**Investor Support Parties**", and each individually an "**Investor Support Party**"; and together with the Creditor Support Parties, the "**Support Parties**").

Each of the parties described in this preamble is referred to in this Agreement as a "**Party**" and they are collectively referred to as the "**Parties**."

<u>**RECITALS**</u>

**WHEREAS**, the Company Parties and the Support Parties have in good faith and at arms' length negotiated or been apprised of certain restructuring and recapitalization transactions with respect to the Company Parties' capital structure on the terms:  (a) set forth in this Agreement; and (b) as specified in the Restructuring Term Sheet attached as **Exhibit A** (as amended, supplemented or otherwise modified, the "**Restructuring Term Sheet**," and such transactions as described in and implemented in accordance with the terms of this Agreement and the Restructuring Term Sheet, including the transactions set forth in the DIP Facility Term Sheets, Governance Term Sheet and New Preferred Equity Term Sheet (collectively, the "**Term Sheets**"), the "**Restructuring Transactions**");

**WHEREAS**, the Company Parties intend to implement the Restructuring Transactions by commencing voluntary cases under chapter 11 of the Bankruptcy Code in the Bankruptcy Court (the cases commenced, the "**Chapter 11 Cases**");

**WHEREAS**, certain of the Creditor Support Parties (the "**Term DIP Commitment Parties**") have provided a commitment, on a several and not joint basis, to provide the Term DIP Facility, in accordance with and subject to the terms and conditions set forth in the Term DIP Commitment Letter and the Term DIP Term Sheet annexed to the Term DIP Commitment Letter (as amended, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement, the "**Term DIP Facility Term Sheet**") and pursuant to the terms and conditions to be set forth in the DIP Order and the Term DIP Credit Agreement;

**WHEREAS**, it is contemplated that certain of the Company Parties' lenders under the ABL Credit Agreement (the "**ABL DIP Commitment Parties**"; and together with the Term DIP Commitment Parties, the "**DIP Commitment Parties**") will provide the ABL DIP Facility, in accordance with and subject to the terms and conditions set forth in the ABL DIP Term Sheet attached as Annex 1-2 to the Restructuring Term Sheet (as amended, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement, the "**ABL DIP Facility Term Sheet**") and pursuant to the terms and conditions to be set forth in the DIP Order and the ABL DIP Credit Agreement;

**WHEREAS**, in accordance with and subject to the terms and conditions set forth in the Restructuring Term Sheet and pursuant to the terms and conditions set forth in the New Common Equity Commitment Letters and the terms and conditions to be set forth in the New Common Equity Investment Agreement, the Investor Support Parties have agreed, on a several and not joint basis, to provide the New Common Equity Investment;

**WHEREAS**, subject to the terms of this Agreement, the Parties have agreed to take certain actions in support of the Restructuring Transactions; and

**WHEREAS**, the Parties desire to express their mutual support and commitment in respect of the Restructuring Transactions, including with respect to the consummation of the Plan on the terms and conditions contained in this Agreement and the Restructuring Term Sheet.

**NOW, THEREFORE**, in consideration of the covenants and agreements contained in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged, each Party, intending to be legally bound by this Agreement, agrees as follows:

## AGREEMENT

1.    <u>Definitions</u>. The following terms shall have the following definitions:

"**2018 Cash/PIK Notes**" means Guitar Center's 13.000% Senior Unsecured Cash/PIK Notes due 2022 issued pursuant to the 2018 Cash/PIK Notes Indenture.

"**2018 Cash/PIK Notes Claims**" means any Claim derived from, based upon, or arising under the 2018 Cash/PIK Notes Indenture.

"**2018 Cash/PIK Notes Indenture**" means the Indenture, dated as of April 16, 2018, between Guitar Center and the Trustee governing the 2018 Cash/PIK Notes (as amended, restated, amended and restated, or otherwise modified from time to time).

"**2020 Cash/PIK Notes**" means Guitar Center's 13.000% Senior Unsecured Cash/PIK Notes due 2022 issued pursuant to the 2020 Cash/PIK Notes Indenture.

"**2020 Cash/PIK Notes Claims**" means any Claim derived from, based upon, or arising under the 2020 Cash/PIK Notes Indenture.

"**2020 Cash/PIK Notes Indenture**" means the Indenture, dated as of May 15, 2020, between Guitar Center and the Trustee governing the 2020 Cash/PIK Notes (as amended, restated, amended and restated, or otherwise modified from time to time).

"**ABL Claims**" means any Claim derived from, based upon, or arising under the ABL Loan Documents.

"**ABL Credit Agreement**" means the asset-based revolving credit agreement, dated as of April 2, 2014, by and among Guitar Center and the other parties to such agreement (as amended, restated, amended and restated, or otherwise modified from time to time).

"**ABL DIP Credit Agreement**" means the credit agreement evidencing the ABL DIP Facility in accordance with the terms and conditions of, and subject in all respects to, the ABL DIP Facility Term Sheet and the DIP Order.

"**ABL DIP Commitment Parties**" has the meaning set forth in the recitals to this Agreement.

"**ABL DIP Facility**" means the $50 million debtor-in-possession asset-based loan facility to be provided to the Company Parties in accordance with the terms and conditions of, and subject in all respects to, the ABL DIP Facility Term Sheet and the DIP Order.

"**ABL DIP Facility Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**ABL Loan Documents**" means, collectively, the ABL Credit Agreement and any security documents and any other collateral, guarantee, and ancillary documents executed in connection with the ABL Credit Agreement.

"**Ad Hoc Group**" means those Creditor Support Parties represented by Stroock and Province.

"**Ad Hoc Group Advisors**" means (a) Stroock, (b) Province, (c) one local Virginia counsel and (d) to the extent approved by the Company Parties (such consent not to be unreasonably withheld, delayed or conditioned) any other advisors retained by the Ad Hoc Group that may be reasonably necessary in

connection with the Restructuring Transactions.

"**Ad Hoc Group New Equity Funding Option**" means the right, but not the obligation, of each member of the Ad Hoc Group, on a pro rata basis or as otherwise agreed, to provide the New Common Equity Commitment Investment after a Triggering Event, on substantially similar terms and conditions as set forth in the New Common Equity Commitment Letter, which right shall be exercisable within five (5) Business Days following the time period described in sub-clause (A) of the definition of Replacement Failure in Section 11(g) to the extent that the Company Parties have failed to replace such Defaulting Investor Support Party at such time.

"**Affiliate**" with respect to any specified Entity means any other Entity directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Entity. For purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by," and "under common control with"), as used with respect to any Entity, shall mean the possession, directly or indirectly, of the right or power to direct or cause the direction of the management or policies of such Entity, whether through the ownership of voting securities, by agreement, or otherwise.

"**Agreement**" has the meaning set forth in the preamble to this Agreement.

"**Agreement Effective Date**" has the meaning set forth in Section 2 of this Agreement.

"**Agreement Effective Period**" means, with respect to a Party, the period from the Agreement Effective Date (or, in the case of a Joining Party, the date on which such Joining Party becomes a Party to this Agreement) to the Termination Date applicable to such Party.

"**Alternative Restructuring Proposal**" means any inquiry, proposal, offer, bid, term sheet, discussion, or agreement with respect to a sale, disposition, new-money investment, restructuring, reorganization, merger, amalgamation, acquisition, consolidation, dissolution, debt investment, equity investment, liquidation, tender offer, recapitalization, refinancing (including any debtor-in-possession financing or exit financing), plan of reorganization, share exchange, business combination, or similar transaction involving any one or more Company Parties or the debt, equity, or other interests in any one or more Company Parties that is an alternative to one or more of the Restructuring Transactions.

"**Bankruptcy Code**" means Title 11 of the United States Code, 11 U.S.C. §§ 101–1532, as amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Eastern District of Virginia presiding over the Chapter 11 Cases.

"**Brigade Co-Investor**" has the meaning set forth in the recitals of this Agreement.

"**Business Day**" means any day other than a Saturday, Sunday, or other day on which commercial banks are authorized to close under the Laws of, or are in fact closed in, the state of New York.

"**Carlyle Co-Investor**" has the meaning set forth in the recitals of this Agreement.

"**Chapter 11 Cases**" has the meaning set forth in the recitals of this Agreement.

"**Claim**" has the meaning set forth in section 101(5) of the Bankruptcy Code.

"**Co-Investors**" has the meaning set forth in the preamble to this Agreement.

4

"**Co-Investor Advisors**" means (a) Paul, Weiss, (b) Debevoise & Plimpton LLP, (c) GLC Advisors & Co., LLC, (d) one local Virginia counsel for each Co-Investor and (e) to the extent approved by the Company Parties (such consent not to be unreasonably withheld, delayed or conditioned), any other advisors retained by any of the Co-Investors that may be reasonably necessary in connection with the Restructuring Transactions.

"**Co-Investor Termination Events**" has the meaning set forth in Section 11(e) of this Agreement.

"**Company Claims/Interests**" means any Claim against or Interest in any Company Party, including, without limitation, the ABL Claims, the Secured Notes Claims, the Superpriority Secured Notes Claims, the 2018 Cash/PIK Notes Claims, the 2020 Cash/PIK Notes Claims and the Existing Common Equity.

"**Company Parties**" has the meaning set forth in the preamble to this Agreement.

"**Company Termination Events**" has the meaning set forth in Section 11(f) of this Agreement.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan.

"**Creditor Support Parties**" has the meaning set forth in the preamble to this Agreement.

"**Debtors**" means the Company Parties that commence the Chapter 11 Cases in accordance with this Agreement.

"**Defaulting Investor Support Party**" has the meaning set forth in Section 11(g) of this Agreement.

"**Definitive Documents**" has the meaning set forth in Section 3(a) of this Agreement.

"**DIP Commitment Parties**" has the meaning set forth in the recitals to this Agreement.

"**DIP Credit Agreements**" means the ABL DIP Credit Agreement and the Term DIP Credit Agreement.

"**DIP Facility**" means, collectively, the ABL DIP Facility and the Term DIP Facility.

"**DIP Facility Term Sheets**" means, collectively, the ABL DIP Facility Term Sheet and the Term DIP Facility Term Sheet.

"**DIP Loan Documents**" means, collectively, the DIP Credit Agreements and any security documents and any other collateral, guarantee, and ancillary documents executed in connection with the DIP Credit Agreements, including the DIP Order.

"**DIP Motion**" means the motion filed by the Debtors seeking entry of an interim and final DIP Order.

"**DIP Order**" means the interim or final, as applicable, order of the Bankruptcy Court setting forth the terms of debtor-in-possession financing and use of cash collateral, which shall be consistent with the DIP Facility Term Sheets.

"**Disclosure Statement**" means the related disclosure statement with respect to the Plan containing "adequate information" (as that term is defined in Section 1125(a)(1) of the Bankruptcy Code) with respect to the Plan and the transactions contemplated thereby and this Agreement.

"**Disclosure Statement Order**" means the order of the Bankruptcy Court approving the Disclosure Statement.

"**Entity**" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

"**Execution Date**" has the meaning set forth in the preamble to this Agreement.

"**Existing Common Equity**" means Holdings' outstanding common shares, together with any and all outstanding and unexercised or unvested warrants, options or rights to acquire Holdings' currently outstanding common equity.

"**First Day Pleadings**" means the first-day pleadings that the Company Parties determine are necessary or desirable to file.

"**Governance Term Sheet**" means the term sheet setting forth the terms and governance of Reorganized Guitar Center attached as Annex 3 to the Restructuring Term Sheet, as amended, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement.

"**Guitar Center**" has the meaning set forth in the preamble to this Agreement.

"**Holdings**" has the meaning set forth in the preamble to this Agreement.

"**Indentures**" means, collectively, the 2018 Cash/PIK Notes Indenture, the 2020 Cash/PIK Notes Indenture, the Secured Notes Indenture and the Superpriority Secured Notes Indenture.

"**Initial Secured Notes Support Parties**" means, collectively, the Secured Notes Support Parties who are signatories to this Agreement as of the Agreement Effective Date.

"**Initial Superpriority Secured Notes Support Parties**" means, collectively, the Superpriority Secured Notes Support Parties who are signatories to this Agreement as of the Agreement Effective Date.

"**Interest**" means, collectively, (i) any capital stock (including common stock and preferred stock), limited liability company interests, transferable interests, partnership interests or other equity, ownership, beneficial or profits interests of any Company Party, and (ii) any options, warrants, securities, stock appreciation rights, phantom units, incentives, commitments, calls, redemption rights, repurchase rights or other agreements, arrangements or rights of any kind that are convertible into, exercisable or exchangeable for, or otherwise permit any Person to acquire, any capital stock (including common stock and preferred stock), limited liability company interests, transferable interests, partnership interests or other equity, ownership, beneficial or profits interests of any Company Party (in each case whether or not arising under or in connection with any employment agreement).

"**Investor Support Parties**" has the meaning set forth in the preamble to this Agreement.

"**Joinder**" has the meaning set forth in Section 8(a)(ii) of this Agreement.

"**Joining Party**" has the meaning set forth in Section 8(a)(ii) of this Agreement.

"**Law**" means any federal, state, local, or foreign law (including common law), statute, code, ordinance, rule, regulation, order, ruling, or judgment, in each case, that is validly adopted, promulgated, issued, or entered by a governmental authority of competent jurisdiction (including the Bankruptcy Court).

6

"**Management Incentive Plan**" means the Management Incentive Plan to be implemented with respect to Reorganized Guitar Center on or after the Plan Effective Date, for distributions of the New Common Equity to its participants on terms and conditions set forth in the Restructuring Term Sheet and otherwise reasonably acceptable to the Company Parties and, subject to Section 3(c), the Required Support Parties.

"**Milestones**" has the meaning set forth in Section 4 of this Agreement.

"**New ABL Agreement**" means the credit agreement evidencing the New ABL Facility (as defined in the Term Sheet).

"**New ABL Documents**" means, collectively, the New ABL Agreement and any security documents and any other collateral, guarantee, and ancillary documents executed in connection with the New ABL Agreement.

"**New Common Equity**" means the common stock, limited liability company membership units, or functional equivalent of such interests of Reorganized Guitar Center to be issued on the Plan Effective Date subject to the terms and conditions set forth in the Restructuring Term Sheet and the New Common Equity Documents.

"**New Common Equity Commitment Letters**" means the letters evidencing the commitment of the Investor Support Parties and, following the exercise of the Ad Hoc Group New Equity Funding Option, the members of the Ad Hoc Group who have exercised such option, to provide the New Common Equity Investment in the forms attached as **Exhibit C** to this Agreement.

"**New Common Equity Documents**" means the New Common Equity Investment Agreement, the New Common Equity Commitment Letters and any ancillary documents executed in connection with the New Common Equity Investment.

"**New Common Equity Investment**" means, collectively, the new common equity investment by each of the Investor Support Parties or their affiliated designees (or, to the extent applicable, the members of the Ad Hoc Group who have exercised the Ad Hoc Group New Equity Funding Option) in Reorganized Guitar Center in the aggregate amount, and on the terms and subject to the conditions, set forth in the Restructuring Term Sheet and the New Common Equity Documents.

"**New Common Equity Investment Agreement**" means the agreement evidencing the New Common Equity Investment in the form attached as **Exhibit D** to this Agreement and, following the exercise of the Ad Hoc Group New Equity Funding Option, any agreements evidencing the New Common Equity Investment by the members of the Ad Hoc Group who have exercised such option.

"**New Corporate Governance Documents**" means the form of certificate or articles of incorporation, bylaws, limited liability company agreement, partnership agreement, certificates of designation and such other applicable formation, organizational and governance documents (if any) of Reorganized Guitar Center, including the Warrants, the material terms of each of which shall be included in the Plan Supplement.

"**New Equity**" means, collectively, the New Common Equity, New Preferred Equity, New Junior Preferred Equity and the Warrants.

"**New First Lien Indenture**" means the indenture governing Reorganized Guitar Center's new $335 million aggregate principal amount of New First Lien Debt described in the Restructuring Term Sheet.

"**New First Lien Documents**" means, collectively, the New First Lien Indenture and any security documents and any other collateral, guarantee, and ancillary documents executed in connection with the New First Lien Indenture.

"**New Junior Preferred Equity**" means the junior preferred equity to be issued by Reorganized Guitar Center on the Plan Effective Date in the aggregate amount, and on the terms and subject to the conditions, set forth in the Restructuring Term Sheet.

"**New Junior Preferred Equity Documents**" means the certificates of designation and any other documents executed or entered into in connection with the New Junior Preferred Equity.

"**New Preferred Equity**" means the preferred equity to be issued by Reorganized Guitar Center on the Plan Effective Date in the aggregate amount, and on the terms and subject to the conditions, set forth in the New Preferred Equity Term Sheet.

"**New Preferred Equity Term Sheet**" means the term sheet attached as Annex 2 to the Restructuring Term Sheet, as amended, supplemented or otherwise modified from time to time in accordance with the terms of this Agreement.

"**New Preferred Equity Documents**" means the certificates of designation and any other documents executed or entered into in connection with the New Preferred Equity.

"**Party**" has the meaning set forth in the preamble of this Agreement.

"**Paul, Weiss**" means Paul, Weiss, Rifkind, Wharton & Garrison, LLP.

"**Petition Date**" means the first date of commencement of the Chapter 11 Cases.

"**Plan**" means the Debtors' joint plan of reorganization that will effectuate the Restructuring Transactions on the terms and conditions set forth in this Agreement and the Restructuring Term Sheet.

"**Plan Effective Date**" means the occurrence of the effective date of the Plan according to its terms.

"**Plan Supplement**" means the compilation of documents and forms of documents, agreements, schedules, and exhibits to the Plan to be filed by the Debtors with the Bankruptcy Court.

"**Province**" means Province, Inc.

"**Qualified Marketmaker**" means an Entity that (a) holds itself out to the public or the applicable private markets as standing ready in the ordinary course of business to purchase from customers and sell to customers Company Claims/Interests (or enter with customers into long and short positions in Company Claims/Interests), in its capacity as a dealer or market maker in Company Claims/Interests and (b) is, in fact, regularly in the business of making a market in claims against issuers or borrowers (including debt securities or other debt).

"**Qualified Marketmaker Joinder Date**" has the meaning set forth in Section 8(f) of this Agreement.

"**Related Persons**" means, collectively, beneficial owners, general partners or investment managers, investment advisors, sub-advisors, or managers of discretionary accounts acting for or on behalf of beneficial owners of the applicable Company Claims/Interests.

"**Reorganized Guitar Center**" means, as determined by the Company Parties and the Investor Support Parties, either (a) Holdings, Guitar Center, or any of their successors or assigns, by merger, consolidation, reorganization, or otherwise, on and after the Plan Effective Date, or (b) a new corporation, limited liability company, or partnership that may be formed to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of the Debtors and issue the New Equity to be distributed pursuant to the Plan.

"**Replacement Failure**" has the meaning set forth in Section 11(g) of this Agreement.

"**Required Creditor Support Parties**" means each of the Required Secured Notes Support Parties and the Required Superpriority Secured Notes Support Parties.

"**Required Creditor Termination Events**" has the meaning set forth in Section 11(c) of this Agreement.

"**Required Secured Notes Support Parties**" means, as of the relevant date of determination, the Initial Secured Notes Support Parties that collectively hold greater than 50% of the aggregate outstanding principal amount of Secured Notes that are held by all Initial Secured Notes Support Parties; provided, however that to the extent that the Initial Secured Notes Support Parties collectively hold less than 50% of the aggregate outstanding principal amount of all Secured Notes, then such term shall mean the Secured Notes Support Parties that collectively hold greater than 50% of the aggregate outstanding principal amount of Secured Notes that are held by all Secured Notes Support Parties.

"**Required Superpriority Secured Notes Support Parties**" means, as of the relevant date of determination, the Initial Superpriority Secured Notes Support Parties that collectively hold greater than 50% of the aggregate outstanding principal amount of Superpriority Secured Notes that are held by all Initial Superpriority Secured Notes Support Parties; provided, however that to the extent that the Initial Superpriority Secured Notes Support Parties collectively hold less than 50% of the aggregate outstanding principal amount of all Superpriority Secured Notes, then such term shall mean the Superpriority Secured Notes Support Parties that collectively hold greater than 50% of the aggregate outstanding principal amount of Superpriority Secured Notes that are held by all Superpriority Secured Notes Support Parties.

"**Required Support Parties**" means each of the Required Creditor Support Parties, the Sponsor Support Party and each of the Co-Investors.

"**Restructuring Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Restructuring Transactions**" has the meaning set forth in the recitals to this Agreement.

"**Secured Notes**" means Guitar Center's 9.500% Senior Secured Notes due 2021 issued pursuant to the Secured Notes Indenture.

"**Secured Notes Claims**" means any Claim derived from, based upon, or arising under the Secured Notes Indenture.

"**Secured Notes Indenture**" means the Indenture, dated as of March 16, 2018, between Guitar Center and the Trustee governing the Secured Notes (as amended, restated, amended and restated, or otherwise modified from time to time).

"**Secured Notes Support Parties**" has the meaning set forth in the preamble to this Agreement.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Schedule of Rejected Contracts**" means the schedule of executory contracts and unexpired leases to be rejected by the Debtors pursuant to the Plan, if any, as the same may be amended, modified, or supplemented from time to time.

"**Solicitation Materials**" means all solicitation materials with respect to the Plan, including the Disclosure Statement and related ballots.

"**Sponsor Support Party**" has the meaning set forth in the preamble to this Agreement.

"**Sponsor Support Party Advisors**" means (a) Kirkland & Ellis LLP and (b) one local Virginia counsel.

"**Sponsor Termination Events**" has the meaning set forth in Section 11(d) of this Agreement.

"**Stroock**" means Stroock & Stroock & Lavan, LLP.

"**Superpriority Secured Notes**" means Guitar Center's 10.000% Senior Secured Superpriority Notes due 2022 issued pursuant to Superpriority Secured Notes Indenture.

"**Superpriority Secured Notes Claims**" means any Claim derived from, based upon, or arising under the Superpriority Secured Notes Indenture.

"**Superpriority Secured Notes Indenture**" means the Superpriority Secured Notes Indenture, dated as of May 15, 2020, between Guitar Center and the Trustee governing the Superpriority Secured Notes (as amended, restated, amended and restated, or otherwise modified from time to time).

"**Superpriority Secured Notes Support Parties**" has the meaning set forth in the preamble to this Agreement.

"**Support Parties**" has the meaning set forth in the preamble to this Agreement.

"**Support Party Termination Events**" means, collectively, the Required Creditor Termination Events, the Sponsor Termination Events and the Co-Investor Termination Events.

"**Term DIP Commitment Letter**" means the letter evidencing the commitment by the Term DIP Commitment Parties to provide the Term DIP Facility and attached as **Exhibit B** to this Agreement.

"**Term DIP Commitment Parties**" has the meaning set forth in the recitals to this Agreement.

"**Term DIP Credit Agreement**" means the credit agreement evidencing the Term DIP Facility in accordance with the terms and conditions of, and subject in all respects to, the Term DIP Facility Term Sheet and the DIP Order.

"**Term DIP Facility**" means the $325 million debtor-in-possession term loan facility to be provided to the Company Parties in accordance with the terms and conditions of, and subject in all respects to, the Term DIP Facility Term Sheet and the DIP Order.

"**Term DIP Facility Term Sheet**" has the meaning set forth in the recitals to this Agreement.

"**Term Sheets**" has the meaning set forth in the recitals to this Agreement.

"**Termination Date**" means the date on which termination of this Agreement as to a Party is effective in accordance with Section 11 of this Agreement.

"**Termination Events**" means, collectively, the Support Party Termination Events and the Company Termination Events.

"**Triggering Event**" has the meaning set forth in Section 11(g) of this Agreement.

"**Trustee**" means The Bank of New York Mellon Trust Company, N.A., as trustee under each of the Superpriority Secured Notes Indenture, the Secured Notes Indenture, the 2018 Cash/PIK Notes Indenture and the 2020 Cash/PIK Notes Indenture, as applicable, and in each case, together with its successors and assigns.

"**Unsecured Notes**" means the 2018 Cash/PIK Notes and the 2020 Cash/PIK Notes.

"**Unsecured Notes Claims**" means the 2018 Cash/PIK Notes Claims and the 2020 Cash/PIK Notes Claims.

"**Unsecured Notes Support Parties**" has the meaning set forth in the recitals to this Agreement.

"**Warrant Documents**" means the agreements and documents executed or entered into in connection with the Warrants.

"**Warrants**" means the warrants to purchase New Common Equity on the terms set forth in the Restructuring Term Sheet and the New Common Equity Investment Agreement.

2.    Effectiveness of the Agreement. This Agreement shall become effective and binding upon each of the Parties at 12:00 a.m., prevailing Eastern Time on the date on which all of the following conditions have been satisfied or waived in accordance with this Agreement (the "**Agreement Effective Date**"):

(a)    each of the Company Parties shall have executed and delivered counterpart signature pages of this Agreement to counsel to each of the Support Parties;

(b)    each of the following shall have executed and delivered counterpart signature pages of this Agreement to counsel to the Company Parties and each of the other Support Parties, as applicable:

(i)    holders of at least 66-2/3% of the aggregate principal amount of outstanding Secured Notes, inclusive of validly executed but unsettled trades;

(ii)    holders of at least 66-2/3% of the aggregate principal amount of outstanding Superpriority Secured Notes, inclusive of validly executed but unsettled trades;

(iii)    holders of at least 66-2/3% of the aggregate principal amount of outstanding Unsecured Notes, inclusive of validly executed but unsettled trades; and

(iv)    each Investor Support Party.

(c)    each of the Term DIP Commitment Parties shall have executed and delivered counterpart signature pages of the Term DIP Commitment Letter to counsel to the Company Parties and each of the Support Parties.

3.    <u>Definitive Documents</u>.

(a)    The transactions contemplated by this Agreement will be implemented pursuant to various agreements and related documentation (the "**<u>Definitive Documents</u>**"), in each case on the same economic terms and otherwise consistent in all material respects with this Agreement and the Restructuring Term Sheet. The Definitive Documents governing the Restructuring Transactions shall consist of this Agreement (including, for the avoidance of doubt, and all the exhibits, term sheets, annexes and schedules attached hereto) and each of the following:

(i)      the Plan and its exhibits, ballots, and solicitation procedures;

(ii)     the Confirmation Order;

(iii)    the Disclosure Statement;

(iv)     the order of the Bankruptcy Court approving the Disclosure Statement and the other Solicitation Materials;

(v)      the First Day Pleadings and all orders sought pursuant to the First Day Pleadings;

(vi)     the DIP Order, the DIP Credit Agreements and the other DIP Loan Documents;

(vii)    the New First Lien Indenture, the other New First Lien Documents, the New ABL Agreement, the other New ABL Documents, the New Preferred Equity Documents and the New Junior Preferred Equity Documents;

(viii)   the New Common Equity Documents and the Warrant Documents;

(ix)     the New Corporate Governance Documents;

(x)      the Management Incentive Plan and, if any, post-Plan Effective Date management employment agreements;

(xi)     the Schedule of Rejected Contracts and any and all motions filed to assume, assume and assign or reject an executory contract or unexpired lease and the orders of the Bankruptcy Court approving such motions; and

(xii)    any and all other agreements and other motions, pleadings, orders and other documentation (other than retention and fee applications) necessary to effectuate the Restructuring Transactions or that is contemplated by the Plan, including, without limitation, the Plan Supplement.

(b)    The Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date, including all exhibits, annexes, schedules, amendments and supplements relating to such Definitive Documents, are subject to negotiation and completion. Upon completion, the Definitive Documents shall contain terms, conditions, representations, warranties, and covenants consistent with this Agreement, including, for the avoidance of doubt, the Term Sheets, as they may be modified, amended, or supplemented in accordance with <u>Section 15</u>. Further, the Definitive Documents, including any Definitive Documents not executed or in a form attached to this Agreement as of the Execution Date, and any

12

amendment or modification thereto, shall be in form and substance reasonably acceptable to the Company Parties and subject to <u>Section 3(c)</u> of this Agreement, the Required Secured Notes Support Parties and:

(1)     for those Definitive Documents set forth in clauses (i)-(v) of <u>Section 3(a)</u> of this Agreement, reasonably acceptable to each of the Sponsor Support Party and each Co-Investor;

(2)     for those Definitive Documents set forth in clause (vi) of <u>Section 3(a)</u> of this Agreement, reasonably acceptable to each of the Term DIP Commitment Parties, the Sponsor Support Party and each Co-Investor; and

(3)     for those Definitive Documents set forth in clauses (vii)-(xii) of <u>Section 3(a)</u> of this Agreement, reasonably acceptable to each of the Sponsor Support Party and each Co-Investor.

(c)     The rights of the Required Secured Notes Support Parties set forth in <u>Section 3(b)</u> with respect to the Definitive Documents described in (i) <u>Section 3(a)(viii)</u> shall be applicable only with respect to those portions of such Definitive Documents relating to the amount of the New Common Equity Investment, the timing of, and conditions to, consummation of the New Common Equity Investment and other such terms that could have a material impact on the rights and obligations of the Secured Notes Support Parties and/or the holders of the New Preferred Equity with respect to the Restructuring Transactions pursuant to this Agreement and the Restructuring Term Sheet, (ii) <u>Section 3(a)(ix)</u> shall be applicable only with respect to those portions of such Definitive Documents relating to the rights and obligations of the holders of New Preferred Equity, whether directly or indirectly, and (iii) <u>Section 3(a)(x)</u> shall only be applicable if and to the extent such documents have an adverse economic impact on the New Preferred Equity; <u>provided</u>, <u>however</u>, that to the extent one or more members of the Ad Hoc Group exercise their rights under the Ad Hoc Group New Equity Funding Option, such Ad Hoc Group members shall have the same consent rights as the Co-Investors as it relates to the Definitive Documents described herein.

4.     <u>Milestones</u>. The following milestones (the "**<u>Milestones</u>**") shall apply to this Agreement unless extended or waived in writing (which may be by email) by the Company Parties and the Required Support Parties:

(a)     no later than November 18, 2020 (but in any event prior to the commencement of the Chapter 11 Cases), the Company Parties shall have paid in full in cash all of the reasonable and documented fees and expenses of the Ad Hoc Group Advisors, the Co-Investor Advisors and the Sponsor Support Parties to the extent that (i) such fees and expenses are payable as of the Agreement Effective Date and (ii) the Company Parties have received an invoice for such fees and expenses at least one (1) Business Day prior to the Agreement Effective Date;

(b)     no later than November 18, 2020 (but in any event prior to the commencement of the Chapter 11 Cases), the Company Parties shall have paid in full in cash all of the reasonable and documented fees and expenses under the Term DIP Commitment Letter;

(c)     no later than November 18, 2020, each of the Investor Support Parties (or their Affiliates party to the New Common Equity Investment Agreement and New Common Equity Commitment Letters) shall have executed and delivered counterparty signature pages to the New Common Equity Investment Agreement and New Common Equity Commitment Letters to counsel to the Company Parties and each of the other Support Parties;

(d)     no later than November 19, 2020, the Company Parties shall commence

solicitation of the Plan in accordance with section 1126(b) of the Bankruptcy Code;

(e)    no later than November 22, 2020, the Company Parties shall commence the Chapter 11 Cases and file the First Day Pleadings;

(f)    no later than one (1) day following the Petition Date, the Debtors shall file with the Bankruptcy Court the DIP Motion (including the proposed DIP Order);

(g)    no later than one (1) day following the Petition Date, the Debtors shall file with the Bankruptcy Court the Plan, the Disclosure Statement and a motion seeking approval of, and scheduling a combined hearing on, the Plan and Disclosure Statement;

(h)    no later than two (2) Business Days following the Petition Date, the Bankruptcy Court shall have entered an interim DIP Order;

(i)    no later than forty-five (45) calendar days following the Petition Date, the Bankruptcy Court shall have entered a final DIP Order;

(j)    no later than forty-five (45) calendar days following the Petition Date, the Bankruptcy Court shall have entered the Confirmation Order and an order approving the Disclosure Statement (which order may be the Confirmation Order); and

(k)    no later than February 1, 2021, the Plan Effective Date shall have occurred.

In addition, to the extent the failure to achieve the Milestones set forth in clauses (a) through (j) is on account of the events or circumstances surrounding the virus known as COVID-19, the Required Support Parties and the Company Parties agree to negotiate in good faith with respect to a reasonable extension of any of the dates set forth above, as appropriate. Further, notwithstanding anything in this Agreement to the contrary, with respect to the Milestones set forth in clauses (g) though (i), the applicable dates shall be subject to reasonable adjustment to accommodate the Bankruptcy Court's calendar and any such adjustment will not give rise to a termination right pursuant to Section 11 of this Agreement solely as a result of such adjustment.

5.    Mutual Representations of the Parties. Solely on its own behalf and not on behalf of any other Party, severally and not jointly, each Party represents and warrants that, as of the date such Party executes and delivers this Agreement, the following statements are true, correct and complete:

(a)    (i) such Party has all requisite corporate, partnership, limited liability company or similar authority to: (1) execute this Agreement, and (2) carry out the transactions and perform its obligations as contemplated in this Agreement; (ii) the execution and delivery of this Agreement and the performance of such Party's obligations (except with respect to Company Parties' obligation to commence the Chapter 11 Cases and file the First Day Pleadings) under this Agreement have been duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part; and (iii) the performance of the Company Parties' obligation to commence the Chapter 11 Cases and file the First Day Pleadings under this Agreement will have been duly authorized by all necessary corporate, partnership, limited liability company or other similar action on its part prior to or on such commencement;

(b)    the execution, delivery and performance by such Party of this Agreement does not violate: (i) any provision of law, rule or regulation applicable to it; or (ii) its charter or bylaws (or other similar governing documents);

14

(c)    this Agreement is the legally valid and binding obligation of such Party, enforceable against it in accordance with its terms; however, as to enforcement of remedies, such enforceability is subject to applicable bankruptcy, reorganization, insolvency, moratorium or other laws affecting creditors' rights generally from time to time in effect and to general principles of equity; and

(d)    the execution, delivery and performance by such Party of this Agreement does not and will not require any material registration or material filing with, material consent or material approval of, or material notice to, or other material action to, with or by, any federal, state or other governmental authority or regulatory body, other than: (i) those which have been obtained, taken or made, or will be obtained, taken or made; and (ii) if such Party is a Company Party, any filings with the U.S. Securities Exchange Commission and applicable state securities laws or "blue sky" laws deemed necessary or advisable.

6.    <u>Additional Representations of the Support Parties.</u>

(a)    Solely on its own behalf and not on behalf of any other Support Party, each Sponsor Support Party and each Creditor Support Party, severally and not jointly, represents and warrants that, as of the date such Support Party executes and delivers this Agreement, the following statements are true, correct and complete:

(i)    such Support Party either: (A) is the sole legal and beneficial owner of the aggregate principal amount or number of shares, as applicable, of Company Claims/Interests set forth below its name on the signature page of this Agreement (or the Joinder); or (B) has sole investment and voting discretion with respect to such Company Claims/Interests in respect of matters relating to such Company Claims/Interests, as applicable, contemplated by this Agreement and has the power and authority to bind the beneficial owner(s) of such Company Claims/Interests to the terms of this Agreement;

(ii)    such Support Party has full power and authority to act on behalf of, vote and consent to matters concerning such Company Claims/Interests in respect of matters relating to the Restructuring Transactions and other transactions contemplated by this Agreement;

(iii)    other than as permitted under this Agreement, the Company Claims/Interests, as applicable, held by such Support Party are and shall continue to be free and clear of any pledge, lien, security interest, charge, claim, equity, option, proxy, voting restriction, right of first refusal or other limitation on disposition, or encumbrances of any kind, that would materially and adversely affect in any way such Creditor Support Party's performance of its obligations under this Agreement at the time such obligations are required to be performed;

(iv)    the aggregate principal amount of Superpriority Secured Notes, Secured Notes and Unsecured Notes held by such Support Party as of the date of this Agreement is set forth below its name on the signature pages to this Agreement. Further, such Support Party has made no prior assignment, sale or other transfer of, and has not entered into any other agreement to assign, sell or otherwise transfer, in whole or in part, any portion of its right, title, or interests in such Company Claims/Interests that are subject to this Agreement, the terms of which agreement would render such Support Party unable to comply with its obligations under this Agreement;

(b)    Solely on its own behalf and not on behalf of any other Support Party, each Support Party, severally and not jointly, represents and warrants that, as of the date such Support Party executes and delivers this Agreement, the following statements are true, correct and complete:

(i)    such Support Party has: (i) such knowledge and experience in financial

and business matters of this type that it is capable of evaluating the merits and risks of entering into this Agreement and of making an informed investment decision; (ii) conducted an independent review and analysis of the business and affairs of the Company Parties, in consultation with its advisors, that it considers sufficient and reasonable for purposes of entering into this Agreement; and (iii) had the opportunity to speak with representatives of the Company Parties and to obtain and review information from the Company Parties sufficient to make an investment decision;

(ii)    such Support Party is (i) a "Qualified Institutional Buyer" as defined in Rule 144A under the Securities Act; (ii) an "institutional accredited investor" (as set forth under Rule 501(a)(1), (2), (3), and (7) of Regulation D under the Securities Act) or (iii) a non-U.S. person in an offshore transaction pursuant to Regulation S under the Securities Act;

(iii)    such Support Party acknowledges and agrees that: (i) it is relying entirely on its independent review and analysis of the business and affairs of the Company Parties, in consultation with its own advisors; (ii) it has not relied upon any oral or written representations and warranties of any kind or nature by the Company Parties or any of their Affiliates or advisors, except as specifically set forth in this Agreement or in the Definitive Documents; and (iii) none of the Company Parties nor any of their Affiliates or advisors has made any representations or warranties, express or implied, regarding any of the Company Parties or any aspect of the transactions contemplated by this Agreement, except as set forth in this Agreement or the Definitive Documents; and

(iv)    such Support Party has no fiduciary or similar duty to any person or entity that would prevent it from taking any action required of it under this Agreement.

7.    Agreements of the Support Parties.

(a)    Subject to the terms and conditions of this Agreement, during the Agreement Effective Period, each of the Secured Notes Support Parties, the Superpriority Secured Notes Support Parties, the Unsecured Notes Support Parties and the Sponsor Support Party, in respect of all its Company Claims/Interests agrees, severally and not jointly, that it shall:

(i)    negotiate in good faith the terms of, and, to the extent a party to such Definitive Document, execute and implement, each Definitive Document;

(ii)    support the Restructuring Transactions and exercise each and every Company Claim/Interest and any powers or rights available to it (including in any creditors' meeting or in any process requiring voting or approval to which they are legally entitled to participate) in favor of any matter requiring approval to the extent necessary to implement the Restructuring Transactions and not change or withdraw (or cause to be changed or withdrawn) any such vote;

(iii)    support, consent to be bound by, and not oppose or (to the extent applicable) opt out of the releases, exculpation, discharge, and injunction provisions of the Plan;

(iv)    during the Agreement Effective Period and subject to receipt by such Support Party of the Solicitation Materials, to the extent such Support Party is entitled to vote to accept or reject the Plan pursuant to its terms:  (1) vote (or cause to be voted), as applicable, each of its Company Claims/Interests to accept the Plan by delivering (or causing to be delivered) its duly executed and completed ballot accepting the Plan by the applicable voting deadline following the commencement of the solicitation of the Plan; (2) not object (or cause any other Entity to object) to the Plan; (3) consent (or cause to consent) to and, if applicable, not opt out of (or cause not opt out of), the releases set forth in the Plan; and (4) except as expressly set forth in this Agreement, not change, withdraw, amend, or revoke (or cause

16

to be changed, withdrawn, amended, or revoked) any vote or election referred to in clauses (1) and (3) above; provided, however, that such vote may be revoked (and, upon such revocation, deemed void *ab initio*) by such Support Party at any time following the termination of the Agreement Effective Period applicable to such Support Party (it being understood that any termination of the Agreement Effective Period applicable to a Support Party shall entitle such Support Party to change its vote in accordance with section 1127(d) of the Bankruptcy Code);

(v)      cooperate in good faith with and provide reasonable assistance to the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders;

(vi)      not, and not direct any other person to, exercise any right or remedy for the enforcement, collection, or recovery of any Company Claims/Interests except in a manner consistent with this Agreement, the Plan, or the Definitive Documents;

(vii)      give any notice, order, instruction, or direction to the applicable Trustee necessary to cause such Trustee (1) to take action in support of the Restructuring Transactions, (2) not to object to, delay, impede or take any other action to interfere, directly or indirectly, in any respect with the approval, acceptance or implementation of the Restructuring Transactions, and (3) to give effect to the Restructuring Transactions;

(viii)      provide promptly upon request by the Company Parties or their advisors the aggregate principal amount of each of such Support Party's Claims against the Debtors, on an issuance-by-issuance basis as of the date of such request;

(ix)      not authorize, agree, resolve or consent to actions in contravention of any of the foregoing; and

(x)      use its commercially reasonable efforts to take any and all actions that may be reasonably necessary or advisable to carry out the purposes and intent of this Agreement and to consummate the Restructuring Transactions.

(b)      Subject to the terms and conditions of this Agreement, during the Agreement Effective Period, each of the Secured Notes Support Parties, the Superpriority Secured Notes Support Parties, the Unsecured Notes Support Parties and the Sponsor Support Party, in respect of all its Company Claims/Interests agrees, severally and not jointly, that it shall not directly or indirectly:

(i)      (x) object to, delay, impede or take any other action to interfere, directly or indirectly, in any respect with the approval, acceptance or implementation of the Restructuring Transactions, including the DIP Facility; or (y) encourage any person or Entity (including any Support Party, the Trustee or any holder of any Company Claims/Interests) to do any of the foregoing;

(ii)      take any other actions in contravention of this Agreement, the Restructuring Term Sheet, or the Definitive Documents, or to the material detriment of the Restructuring Transactions;

(iii)      file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments of such documents) that, in whole or in part, is materially inconsistent with the approval of this Agreement, the Restructuring Term Sheet, the Plan or the Restructuring Transactions;

(iv)    initiate, or cause to be initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated in this Agreement against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement;

(v)    object to, delay, impede, or take any other action to interfere with the Company Parties' ownership and possession of their assets, wherever located, or interfere with the automatic stay arising under section 362 of the Bankruptcy Code;

(vi)    object to or commence any legal proceeding challenging, the adequate protection granted or proposed to be granted to the holders of the Superpriority Secured Notes Claims and the Secured Notes Claims under the DIP Order;

(vii)    object to or commence any legal proceeding challenging the liens or claims (including the priority of such liens or claims) granted or proposed to be granted to the DIP Commitment Parties under the DIP Order;

(viii)    directly or indirectly, through any person, seek, solicit, encourage, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing, or prosecution of any Alternative Restructuring Proposal or object to or take any other action that would reasonably be expected to prevent, interfere with, delay, or impede the solicitation, approval of the Disclosure Statement, or the confirmation and consummation of the Plan and the Restructuring Transactions;

(ix)    other than in accordance with <u>Section 8</u> of this Agreement and any applicable order of the Bankruptcy Court pertaining to the preservation of tax attributes, pledge, encumber, assign, sell, or otherwise transfer, including by the declaration of a worthless stock deduction for any tax year ending on or prior to the Plan Effective Date, offer, or contract to pledge, encumber, assign, sell, or otherwise transfer, in whole or in part, any portion of its right, title, or interests in any of its Interests in the Company Parties to the extent such pledge, encumbrance, assignment, sale or other transfer will impair any of the Company Parties' tax attributes; or

(x)    fail to authorize, agree, resolve or consent to actions in contravention of any of the foregoing.

(c)    Subject to the terms and conditions of this Agreement, during the Agreement Effective Period, each of the Co-Investors agrees, severally and not jointly, that it shall:

(i)    negotiate in good faith the terms of, and, to the extent a party to such Definitive Document, execute and, subject to the terms and conditions of the New Common Equity Documents, implement, each Definitive Document;

(ii)    use commercially reasonable efforts to support the Restructuring Transactions;

(iii)    cooperate in good faith with and provide reasonable assistance to the Company Parties in obtaining additional support for the Restructuring Transactions from the Company Parties' other stakeholders; and

(iv)    use its commercially reasonable efforts to take any and all actions that may be reasonably necessary or advisable to carry out the purposes and intent of this Agreement and to

consummate the Restructuring Transactions.

(d)    Subject to the terms and conditions of this Agreement, during the Agreement Effective Period, each of the Co-Investors agrees, severally and not jointly, that it shall not directly or indirectly:

(i)    (x) object to, delay, impede or take any other action to interfere, directly or indirectly, in any respect with the approval, acceptance or implementation of the Restructuring Transactions, including the DIP Facility; or (y) encourage any person or Entity (including any Support Party, the Trustee or any holder of any Company Claims/Interests) to do any of the foregoing;

(ii)    take any other actions in contravention of this Agreement, the Restructuring Term Sheet, or the Definitive Documents, or to the material detriment of the Restructuring Transactions;

(iii)    file any motion, pleading, or other document with the Bankruptcy Court or any other court (including any modifications or amendments of such documents) that, in whole or in part, is materially inconsistent with the approval of this Agreement, the Restructuring Term Sheet, the Plan or the Restructuring Transactions;

(iv)    initiate, or cause to be initiated on its behalf, any litigation or proceeding of any kind with respect to the Chapter 11 Cases, this Agreement, or the other Restructuring Transactions contemplated in this Agreement against the Company Parties or the other Parties other than to enforce this Agreement or any Definitive Document or as otherwise permitted under this Agreement or the Equity Commitment Letter;

(v)    directly or indirectly, through any person, seek, solicit, encourage, propose, support, assist, engage in negotiations in connection with or participate in the formulation, preparation, filing, or prosecution of any Alternative Restructuring Proposal or object to or take any other action that would reasonably be expected to prevent, interfere with, delay, or impede the solicitation, approval of the Disclosure Statement, or the confirmation and consummation of the Plan and the Restructuring Transactions; or

(vi)    fail to authorize, agree, resolve or consent to actions in contravention of any of the foregoing.

(e)    During the Agreement Effective Period and following a Triggering Event, the non-Defaulting Investor Support Parties shall have the option to replace any Defaulting Investor Support Party, and shall otherwise use commercially reasonable efforts to replace any Defaulting Investor Support Party with another person or entity (except as described in Section 11(g) of this Agreement, on substantially the same terms as such Defaulting Investor Support Party) and, if such replacement is not made within five (5) Business Days of the applicable Triggering Event, provide the Ad Hoc Group with the Ad Hoc Group New Equity Funding Option.

(f)    During the Agreement Effective Period, each Creditor Support Party agrees, to forbear from the exercise of its rights (including any right of set-off) or remedies it may have under any of the Indentures and any agreement contemplated thereby or executed in connection therewith, as applicable, and under applicable U.S. or non-U.S. law or otherwise, in each case, with respect to any breaches, defaults, events of defaults or potential defaults by any of the Company Parties. Each Creditor Support Party specifically agrees that this Agreement constitutes a direction to the Trustee (with respect to each Indenture) to refrain from exercising any remedy available or power conferred to the Trustee against any Company

19

Party or any of their respective assets except as necessary to effectuate the Restructuring Transactions.

(g)     Notwithstanding anything to the contrary set forth in this Agreement, (i) other than as expressly contemplated under the Term DIP Commitment Letter, ABL DIP Facility Term Sheet and New Common Equity Documents, nothing in this Agreement shall require any Support Party to incur any expenses, liabilities or other obligations, or agree to any commitments, undertakings, concessions, indemnities or other arrangements that could result in expenses, liabilities or other obligations (including any indemnification obligations) to any Support Party; and (ii) nothing in this Agreement shall (x) affect the ability of any Support Party to consult with any other Support Party, the Company Parties, or any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee); (y) impair or waive the rights of any Support Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (z) prevent any Support Party from enforcing this Agreement or any other Definitive Document or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement or any Definitive Document.

8.     <u>Transfers of Claims</u>.

(a)     So long as this Agreement has not terminated with respect to such Support Party, each Support Party agrees that it shall not sell, transfer, assign or otherwise dispose of any Company Claims/Interests, as applicable, or any option on such Company Claims/Interests or any right or interest (voting or otherwise) in any of its Company Claims/Interests (including any participation in such Claims), except to a party that:

(i)     is a Support Party; or

(ii)     agrees to be bound by all of the terms of this Agreement (as the same may be modified from time to time after the date of this Agreement in accordance with the terms of this Agreement) (a "**<u>Joining Party</u>**") by executing and delivering to the Company Parties a Joinder in the form of **<u>Exhibit E</u>** attached to this Agreement (the "**<u>Joinder</u>**") on or prior to the date of the relevant transfer, in which case such transferee shall be deemed to be a Support Party and a Party for purposes of this Agreement.

Any such Claims sold, assigned or transferred to a Support Party pursuant to the foregoing shall automatically be deemed to be subject to the terms of this Agreement. Subject to <u>Section 8(a)(ii)</u>, the Company shall be deemed to have acknowledged that any such transfer duly made in accordance with this <u>Section 8(a)</u> shall be binding upon the transferee. Any transfer of Claims by a Support Party that does not comply with the procedures set forth in this Agreement shall be void *ab initio* and without effect without the need for further action.

(b)     This Agreement shall in no way be construed to preclude any Support Party from acquiring additional Company Claims/Interests. Such additional Company Claims/Interests shall be subject to all of the terms of this Agreement, including the obligations set forth in <u>Section 7</u> of this Agreement.

(c)     Each Support Party agrees to notify the Company and counsel to the Required Creditor Support Parties in writing of each acquisition or disposition of any Company Claims/Interests, including the aggregate principal amount acquired or disposed of, within three (3) Business Days of the consummation of such transaction.

(d)     A Joinder may also be used by any holder of Company Claims/Interests that is not party to this Agreement on the Execution Date who wishes to become a party to this Agreement as set forth in <u>Section 23</u> of this Agreement.

(e)    Following its execution of a Joinder, the Joining Party shall be deemed to be a Support Party and a Party for all purposes under this Agreement. On the appropriate schedule of its Joinder, each Joining Party shall indicate the aggregate principal amount of Company Claims/Interests held by such Joining Party. Upon consummation of the transfer of such Claims to the Joining Party, the Joining Party makes the representations and warranties of the Support Parties set forth in <u>Sections 5</u> and <u>6</u> of this Agreement to the other Parties.

(f)    Notwithstanding anything to the contrary in this Agreement, (i) any Support Party may transfer any of its Company Claims/Interests to an entity that is acting in its capacity as a Qualified Marketmaker without the requirement that the Qualified Marketmaker be or become a Support Party; <u>provided</u>, <u>however</u>, that the Qualified Marketmaker subsequently transfers all right, title and interest in such Company Claims/Interests to a transferee that is or becomes a Support Party as provided above, and (ii) to the extent any Support Party is acting in its capacity as a Qualified Marketmaker, it may transfer any Company Claims/Interests that it acquires from a holder of such Company Claims/Interests that is not a Support Party without the requirement that the transferee be or become a Support Party. Notwithstanding the foregoing, if, at the time of the proposed transfer of any Company Claims/Interests to a Qualified Marketmaker, such Company Claims/Interests (x) may be voted on the Plan or any Alternative Restructuring Proposal, the proposed transferor Support Party must first vote such Company Claims/Interests in accordance with the requirements of <u>Section 7</u> of this Agreement, or (y) have not yet been and may not yet be voted on the Plan or any Alternative Restructuring Proposal and such Qualified Marketmaker does not transfer such Company Claims/Interests to a subsequent transferee prior to the fifth (5th) Business Day prior to the expiration of the voting deadline (such date, the "**Qualified Marketmaker Joinder Date**"), such Qualified Marketmaker shall be required to (and the transfer documentation to the Qualified Marketmaker shall have provided that it shall), on the first (1st) Business Day immediately following the Qualified Marketmaker Joinder Date, become a Support Party with respect to such Company Claims/Interests in accordance with the terms of this Agreement and vote such Company Claims/Interests in accordance with the requirements of <u>Section 7</u> of this Agreement (provided, that the Qualified Marketmaker shall automatically, and without further notice or action, no longer be a Support Party with respect to such Company Claims/Interests at such time that the transferee of such Company Claims/Interests becomes a Support Party with respect to such Company Claims/Interests).

(g)    Notwithstanding anything to the contrary in this Section 8, the restrictions set forth in this Section 8 shall not apply to the grant of any liens or encumbrances on any claims and interests in favor of a bank or broker-dealer holding custody of such claims and interests in the ordinary course of business and which lien or encumbrance is released upon the transfer of such claims and interests.

9.    <u>Commitments of the Company Parties</u>.

(a)    <u>Affirmative Covenants</u>. Subject to the terms and conditions of this Agreement (including <u>Section 10</u> of this Agreement), during the Agreement Effective Period, each Company Party agrees, severally and jointly, that it shall:

(i)    use commercially reasonable efforts to consummate the Restructuring Transactions in accordance with this Agreement;

(ii)    to the extent any legal or structural impediment arises that would prevent, hinder, or delay the consummation of the Restructuring Transactions contemplated in this Agreement, use commercially reasonable efforts to take all steps reasonably necessary and desirable to address any such impediment;

(iii)    use commercially reasonable efforts to obtain any and all required

regulatory and/or third-party approvals for the Restructuring Transactions;

(iv)    negotiate in good faith the terms of, and use commercially reasonable efforts to execute and deliver the Definitive Documents and any other required agreements to effectuate and consummate the Restructuring Transactions;

(v)    provide draft copies of all Definitive Documents and material motions and pleadings to be filed in the Chapter 11 Cases to counsel to the Required Creditor Support Parties, the Sponsor Support Party and each of the Co-Investors as soon as reasonably practicable, but in no event less than three (3) Business Days prior to the date when the Company Parties intend to file such documents, and, without limiting any approval rights set forth in this Agreement, consult in good faith with counsel to the Required Creditor Support Parties, the Sponsor Support Party and each of the Co-Investors regarding the form and substance of any such proposed filing. Notwithstanding the foregoing, in the event that not less than three (3) Business Days' notice is not reasonably practicable under the circumstances, the Company Parties shall provide draft copies of any such motions, documents, or the pleadings to counsel to the applicable Required Creditor Support Parties, the Sponsor Support Party and each of the Co-Investors as soon as otherwise reasonably practicable before the date when the Company intends to file any such motion, documents, or other pleading;

(vi)    use commercially reasonable efforts to oppose and object to the efforts of any person seeking to object to, delay, impede, or take any other action to interfere with the acceptance, implementation, or consummation of the Restructuring Transactions (including, if applicable, the filing of timely filed objections or written responses) to the extent such opposition or objection is reasonably necessary or desirable to facilitate implementation of the Restructuring Transactions;

(vii)    use commercially reasonable efforts to cooperate with the non-Defaulting Investor Support Parties to replace any Defaulting Investor Support Party (except as described in Section 11(g) of this Agreement, on substantially the same terms as such Defaulting Investor Support Party) and, if such replacement is not made within five (5) Business Days of the applicable Triggering Event, provide the Ad Hoc Group with the Ad Hoc Group New Equity Funding Option;

(viii)    use commercially reasonable efforts to maintain their good standing under the Laws of the state or other jurisdiction in which they are incorporated or organized;

(ix)    use commercially reasonable efforts to seek additional support for the Restructuring Transactions from their other material stakeholders to the extent reasonably prudent; and

(x)    pay in full and in cash all of the reasonable and documented fees, costs and expenses of the Ad Hoc Group Advisors, the Co-Investor Advisors and the Sponsor Support Party Advisors as they come due, including paying in full in cash at least one (1) day prior to the Petition Date any outstanding reasonable and documented fees, costs and expenses of the Ad Hoc Group Advisors and the Co-Investor Advisors for which an invoice is provided to the Company at least one (1) Business Day prior to the Petition Date;

(xi)    use commercially reasonable efforts to provide, and direct their employees, officers, advisors and other representatives to use commercially reasonable efforts to provide, to the Creditor Support Parties, the Sponsor Support Party and each of the Co-Investors and their legal and financial advisors (i) reasonable access to the Company Parties' books and records during normal business hours on reasonable advance notice to the Company Parties' representatives and without disruption to the operation of the Company Parties' business, (ii) reasonable access to the management and advisors of the Company Parties during normal business hours on reasonable advance notice to such persons, without

disruption to the operation of the Company Parties' business, and no more than twice a month, and (iii) such other information as reasonably requested and to the extent reasonably necessary in connection with the Restructuring Transactions by the Creditor Support Parties, the Sponsor Support Party and each of the Co-Investors or their legal and financial advisors, in each case, consistent with the access and information provided to the lenders under the DIP Loan Documents. Notwithstanding the foregoing, (1) if such access or information would result in the disclosure of competitively sensitive information, information concerning the valuation of the Company Parties, personal information that would expose the Company Parties to the risk of liability or that otherwise could cause significant competitive harm to any Company Party if the Restructuring Transactions are not consummated, such access or information may be provided on a professional-eyes-only basis, and (2) in no event shall the Company Parties be required to provide such access or information if such access or information (a) would result in the waiver or loss of the attorney-client privilege, work-product privilege or any other legal privilege or similar doctrine or (b) would be in violation of applicable Laws or the provisions of any agreement to which any Company Party is bound or would violate any fiduciary duty;

(xii)    timely file a formal response in opposition to any objection filed with the Bankruptcy Court by any person with respect to the DIP Facility (or motion filed by such person that seeks to interfere with the DIP Facility) or any of the adequate protection granted pursuant to the DIP Order or otherwise;

(xiii)    timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order (i) directing the appointment of a trustee or examiner (with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), (ii) converting the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, or (iii) dismissing the Chapter 11 Cases;

(xiv)    timely file a formal objection to any motion filed with the Bankruptcy Court by a third party seeking the entry of an order modifying or terminating the Company Parties' exclusive right to file and/or solicit acceptances of a plan of reorganization, as applicable; and

(xv)    in consultation with the Support Parties, use commercially reasonable efforts to preserve or otherwise maximize net operating loss deductions, tax basis, and similar favorable tax attributes of the Company Parties and Reorganized Guitar Center to the extent practicable, as determined by the Company Parties in good faith.

(b)    Negative Covenants. Subject to the terms and conditions of this Agreement (including Section 10 of this Agreement), during the Agreement Effective Period, each Company Party agrees, severally and not jointly, that it shall not directly or indirectly, and shall not directly or indirectly encourage any other Entity to:

(i)    object to, delay, impede, or take any other action or inaction that could interfere with or prevent acceptance, approval, implementation, or consummation of the Restructuring Transactions;

(ii)    take any action that is inconsistent with, or is intended to frustrate or impede approval, implementation and consummation of the Restructuring Transactions;

(iii)    modify the Plan, in whole or in part, in a manner that is not consistent with this Agreement in all material respects;

(iv)    file any pleading, motion, declaration, supporting exhibit or Definitive

23

Document with the Bankruptcy Court or any other court (including any modifications or amendments of such documents) that, in whole or in part, is not consistent with this Agreement, the Plan, or other Definitive Documents and is in contravention of the consent and approval rights of the applicable Support Parties in accordance with this Agreement; or

(v)       take any action or fail to take any action, which action or failure, as applicable, would cause a change to the tax status of Holdings.

10.      Additional Provisions Regarding Company Parties' Commitments.

(a)       Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall require a Company Party (including in its capacity as a Debtor) or the governing body of a Company Party, or its directors, managers, and officers, to take any action or to refrain from taking any action to the extent such person or persons determines, based on the advice of counsel, that taking or failing to take such action (including the termination of this Agreement under Section 11(f)(i) of this Agreement) would be inconsistent with applicable Law or its or their fiduciary obligations under applicable Law. This Section 10(a) shall not impede any Party's right to terminate this Agreement pursuant to Section 11 of this Agreement, including on account of any action or inaction the Company Party or a governing body of a Company Party may take pursuant to this Section 10(a) of this Agreement.

(b)       Notwithstanding anything to the contrary in this Agreement, but subject to the terms of Section 10(a), each Company Party and their respective directors, officers, employees, investment bankers, attorneys, accountants, consultants, and other advisors or representatives, shall have the right to (i) consider and respond to Alternative Restructuring Proposals; (ii) provide access to non-public information concerning any Company Party to any Entity or enter into confidentiality agreements or nondisclosure agreements with any Entity; (iii) maintain or continue discussions or negotiations with respect to Alternative Restructuring Proposals; and (iv) enter into or continue discussions or negotiations with holders of Claims against or Interests in a Company Party, any other party in interest in the Chapter 11 Cases (including any official committee and the United States Trustee), or any other Entity regarding the Restructuring Transactions or Alternative Restructuring Proposals. The Company Parties shall: (x) provide a copy of any written Alternative Restructuring Proposal (and notice of, and a written summary of, any oral Alternative Restructuring Proposal) within two (2) Business Days of the Company Parties' or their advisors' receipt of such Alternative Restructuring Proposal to counsel to each of the Support Parties; (y) provide such information to counsel to the Support Parties as reasonably requested by the Support Parties or as necessary to keep the Support Parties informed as to the status and substance of discussions regarding Alternative Restructuring Proposals with the person(s) making such Alternative Restructuring Proposals; and (z) provide prompt notice to counsel to the Support Parties of the entry of any confidentiality agreement with the Company regarding Alternative Restructuring Proposals.

(c)       Nothing in this Agreement shall: (a) impair or waive the rights of any Company Party to assert or raise any objection permitted under this Agreement in connection with the Restructuring Transactions; or (b) prevent any Company Party from enforcing this Agreement or contesting whether any matter, fact, or thing is a breach of, or is inconsistent with, this Agreement.

11.      Termination of Obligations.

(a)       This Agreement may be terminated as to all Parties by the mutual written consent of the Company and the Required Support Parties.

(b)       This Agreement will automatically terminate upon the Plan Effective Date.

24

(c)    This Agreement may be terminated as to all Parties by the Required Creditor Support Parties upon the occurrence of any of the following events (the "**Required Creditor Termination Events**"):

(i)

(A)    upon the material breach by any Company Party of any of the undertakings, representations, warranties or covenants of the Company set forth in this Agreement, including such Company Party's obligations set forth in Section 9;

(B)    upon the material breach by any Investor Support Party of any of the undertakings, representations, warranties or covenants of such Investor Support Party set forth in this Agreement, including such Investor Support Party's obligations set forth in Section 7; and

in each case, which breach in any of the foregoing clauses (A)-(B) remains uncured for a period of five (5) Business Days after written notice of such breach is provided by the Required Creditor Support Parties to the Company Parties and the breaching Parties, unless such material breach is the result of any act, omission, or delay on the part of any Creditor Support Party in violation of its obligations under this Agreement;

(ii)    if any Company Party executes or seeks approval of any of the Definitive Documents (including any modification or amendments to such Definitive Documents) (x) in a form that is inconsistent with or not permitted by this Agreement and (y) in contravention of the consent and approval rights of the applicable Support Parties in accordance with this Agreement, which occurrence remains uncured (to the extent curable) for five (5) Business Days after such Required Creditor Support Parties provide written notice to the Company Parties;

(iii)    upon the issuance by any governmental authority, or any other regulatory authority or court of competent jurisdiction, of any final, non-appealable injunction, ruling or order that would reasonably be expected to make illegal or otherwise prevent the consummation of the transactions contemplated by this Agreement and any Definitive Documents contemplated by this Agreement;

(iv)    if the Company Parties: (A) withdraw the Plan; (B) publicly announce their intention not to support the Restructuring Transactions; (C) provide notice to counsel to the Support Parties pursuant to Section 10(b); or (D) publicly announce, or execute a definitive written agreement with respect, to an Alternative Restructuring Proposal;

(v)    if any Company Party: (A) files any motion seeking to avoid, disallow, subordinate, or recharacterize any Secured Notes Claims, Superpriority Secured Notes Claims, Unsecured Notes Claims, lien, or interest held by any Creditor Support Parties arising under or relating to the Indentures; or (B) shall have supported any application, adversary proceeding, or cause of action referred to in the immediately preceding clause (A) filed by a third party, or consents to the standing of any such third party to bring such application, adversary proceeding, or cause of action;

(vi)    other than as contemplated under this Agreement, if any Company Party takes any of the following actions: (A) voluntarily commencing any case or filing any petition seeking bankruptcy, winding up, dissolution, liquidation or other substantially similar relief under any federal, state or foreign bankruptcy, insolvency, receivership or substantially similar law now or in effect after the date of this Agreement; (B) applying for or consenting to the appointment of a receiver, administrator, receiver, trustee, custodian, sequestrator, conservator or substantially similar official for the Company or for a substantial part of its assets; (C) filing an answer admitting the material allegations of a petition filed against it in any such proceeding; or (D) making a general assignment or arrangement for the benefit of creditors;

25

(vii)    if the Bankruptcy Court enters an order denying confirmation of the Plan and such order remains in effect for fourteen (14) calendar days after entry of such order;

(viii)    other than as contemplated under this Agreement, upon the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Support Parties), (A) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (C) rejecting this Agreement;

(ix)    if the Company Parties fail to meet any Milestone, which has not been waived or extended in a manner consistent with this Agreement, unless such failure is the result of any act, omission, or delay on the part of any Required Creditor Support Party in violation of its obligations under this Agreement;

(x)    if the Debtors enter into any commitment or agreement to receive or obtain debtor in possession financing, cash collateral usage, and/or other debtor in possession financing arrangements, other than as expressly contemplated in the DIP Loan Documents;

(xi)    if the Debtors' use of cash collateral or the DIP Facility has been validly terminated (or, in the case of the DIP Facility, accelerated) in accordance with the DIP Order and the DIP Loan Documents;

(xii)    entry of an order of the Bankruptcy Court setting forth the terms of debtor-in-possession financing and use of cash collateral, in each case, on terms that are materially inconsistent with the Term DIP Facility Term Sheet;

(xiii)    upon the termination of the New Common Equity Commitment Letters or the New Common Equity Investment Agreement;

(xiv)    the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(xv)    any Company Party (i) files, amends or modifies, or files a pleading seeking approval of any Definitive Document or authority to amend or modify any Definitive Document in a manner that is inconsistent with or not permitted by this Agreement (including with respect to the consent rights afforded the Creditor Support Parties under this Agreement) without the prior written consent of the Required Creditor Support Parties and the Investor Support Parties, and such breach remains uncured for a period of three (3) Business Days after written notice of such breach is provided to the Company Parties, (ii) revokes the Restructuring Transaction without the prior consent of the Required Creditor Support Parties and the Investor Support Parties, or (iii) publicly announces its intention to take any such acts listed in the foregoing clause (i) or (ii) or is otherwise inconsistent with the consent rights afforded such Parties under this Agreement;

(xvi)    upon a Replacement Failure; or

(xvii)    this Agreement is terminated by any of the Co-Investors or the Sponsor Support Party.

26

(d)        This Agreement may be terminated as to the Sponsor Support Party by the Sponsor Support Party upon the occurrence of any of the following events (the "**Sponsor Termination Events**"):

(i)

(A)        upon the material breach by any Company Party of any of the undertakings, representations, warranties or covenants of the Company set forth in this Agreement, including such Company Party's obligations set forth in Section 9;

(B)        upon the material breach by any Co-Investor of any of the undertakings, representations, warranties or covenants of such Co-Investor set forth in this Agreement, including such Co-Investor's obligations set forth in Section 7; and

(C)        upon the material breach by Creditor Support Parties holding greater than 50% of the aggregate outstanding principal amount of either (x) the Secured Notes that are held by all Secured Notes Support Parties or (y) the Superpriority Secured Notes that are held by all Superpriority Secured Notes Support Parties,

in each case, which breach in any of the foregoing clauses (A)-(C) remains uncured for a period of five (5) Business Days after written notice of such breach is provided by the Sponsor Support Party to the Company Parties and the breaching Parties, unless such material breach is the result of any act, omission, or delay on the part of the Sponsor Support Party in violation of its obligations under this Agreement;

(ii)        if any Company Party executes or seeks approval of any of the Definitive Documents (including any modification or amendments to such Definitive Documents) (x) in a form that is inconsistent with or not permitted by this Agreement and (y) in contravention of the consent and approval rights of the applicable Support Parties in accordance with this Agreement, which occurrence remains uncured (to the extent curable) for five (5) Business Days after such Sponsor Support Party provide written notice to the Company Parties;

(iii)        upon the issuance by any governmental authority, or any other regulatory authority or court of competent jurisdiction, of any final, non-appealable injunction, ruling or order that would reasonably be expected to make illegal or otherwise prevent the consummation of the transactions contemplated by this Agreement and any Definitive Documents contemplated by this Agreement;

(iv)        if the Company Parties: (A) withdraw the Plan; (B) publicly announce their intention not to support the Restructuring Transactions; (C) provide notice to counsel to the Support Parties pursuant to Section 10(b); or (D) publicly announce, or execute a definitive written agreement with respect, to an Alternative Restructuring Proposal;

(v)        other than as contemplated under this Agreement, if any Company Party takes any of the following actions: (A) voluntarily commencing any case or filing any petition seeking bankruptcy, winding up, dissolution, liquidation or other substantially similar relief under any federal, state or foreign bankruptcy, insolvency, receivership or substantially similar law now or in effect after the date of this Agreement; (B) applying for or consenting to the appointment of a receiver, administrator, receiver, trustee, custodian, sequestrator, conservator or substantially similar official for the Company or for a substantial part of its assets; (C) filing an answer admitting the material allegations of a petition filed against it in any such proceeding; or (D) making a general assignment or arrangement for the benefit of creditors;

(vi)        if the Bankruptcy Court enters an order denying confirmation of the Plan and such order remains in effect for fourteen (14) calendar days after entry of such order;

(vii)    other than as contemplated under this Agreement, upon the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Support Parties), (A) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (C) rejecting this Agreement;

(viii)    if the Company Parties fail to meet any Milestone, which has not been waived or extended in a manner consistent with this Agreement, unless such failure is the result of any act, omission, or delay on the part of any Sponsor Support Party in violation of its obligations under this Agreement, including such Sponsor Support Party's failure to meet its obligations set forth in Section 4(a);

(ix)    if the Debtors enter into any commitment or agreement to receive or obtain debtor in possession financing, cash collateral usage, and/or other debtor in possession financing arrangements, other than as expressly contemplated in the DIP Loan Documents;

(x)    if the Debtors' use of cash collateral or the DIP Facility has been validly terminated (or, in the case of the DIP Facility, accelerated) in accordance with the DIP Order and the DIP Loan Documents;

(xi)    upon the termination of the New Common Equity Commitment Letters or the New Common Equity Investment Agreement (other than as a result of a breach thereof by the Sponsor Support Party);

(xii)    the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties, to pursue an Alternative Restructuring Proposal;

(xiii)    any Company Party (i) files, amends or modifies, or files a pleading seeking approval of any Definitive Document or authority to amend or modify any Definitive Document in a manner that is inconsistent with or not permitted by this Agreement (including with respect to the consent rights afforded the Sponsor Support Party under this Agreement) without the prior written consent of the Sponsor Support Party, and such breach remains uncured for a period of three (3) Business Days after written notice of such breach is provided to the Company Parties, (ii) revokes the Restructuring Transaction without the prior consent of the Sponsor Support Party, or (iii) publicly announces its intention to take any such acts listed in the foregoing clause (i) or (ii) or is otherwise inconsistent with the consent rights afforded such Parties under this Agreement;

(xiv)    upon a Replacement Failure (other than if the Sponsor Support Party is the Defaulting Investor Support Party that causes such Replacement Failure); or

(xv)    this Agreement is terminated by any of the Co-Investors or the Required Creditor Support Parties.

(e)    This Agreement may be terminated as to any Co-Investor, by such Co-Investor upon the occurrence of any of the following events (the "**Co-Investor Termination Events**"):

(i)

(A)    upon the material breach by any Company Party of any of the undertakings, representations, warranties or covenants of the Company set forth in this Agreement, including such Company Party's obligations set forth in <u>Section 9</u>;

(B)    upon the material breach by any other Investor Support Party of any of the undertakings, representations, warranties or covenants of such Investor Support Party set forth in this Agreement, including such Investor Support Party's obligations set forth in <u>Section 7</u>; and

(C)    upon the material breach by Creditor Support Parties holding greater than 50% of the aggregate outstanding principal amount of either (x) the Secured Notes that are held by all Secured Notes Support Parties or (y) the Superpriority Secured Notes that are held by all Superpriority Secured Notes Support Parties,

in each case, which breach in any of the foregoing clauses (A)-(C) remains uncured for a period of five (5) Business Days after written notice of such breach is provided by the terminating Co-Investor to the Company Parties and the breaching Parties, unless such material breach is the result of any act, omission, or delay on the part of the terminating Co-Investor in violation of its obligations under this Agreement;

(ii)    if any Company Party executes, seeks approval of, or obtains Bankruptcy Court approval of any of the Definitive Documents (including any modification or amendments to such Definitive Documents) (x) in a form that is inconsistent with or not permitted by this Agreement and (y) in contravention of the consent and approval rights of such Co-Investor in accordance with this Agreement, which occurrence remains uncured (to the extent curable) for five (5) Business Days after such Co-Investor provides written notice to the Company Parties;

(iii)    upon the issuance by any governmental authority, or any other regulatory authority or court of competent jurisdiction, of any final, non-appealable injunction, ruling or order that would reasonably be expected to make illegal or otherwise prevent the consummation of the transactions contemplated by this Agreement and any Definitive Documents contemplated by this Agreement;

(iv)    if the Company Parties: (A) withdraw the Plan; (B) publicly announce their intention not to support the Restructuring Transactions; (C) provide notice to counsel to the Support Parties pursuant to <u>Section 10(b)</u>; or (D) publicly announce, or execute a definitive written agreement with respect, to an Alternative Restructuring Proposal;

(v)    other than as contemplated under this Agreement, if any Company Party takes any of the following actions: (A) voluntarily commencing any case or filing any petition seeking bankruptcy, winding up, dissolution, liquidation or other substantially similar relief under any federal, state or foreign bankruptcy, insolvency, receivership or substantially similar law now or in effect after the date of this Agreement; (B) applying for or consenting to the appointment of a receiver, administrator, receiver, trustee, custodian, sequestrator, conservator or substantially similar official for the Company or for a substantial part of its assets; (C) filing an answer admitting the material allegations of a petition filed against it in any such proceeding; or (D) making a general assignment or arrangement for the benefit of creditors;

(vi)    if the Bankruptcy Court enters an order denying confirmation of the Plan and such order remains in effect for fourteen (14) calendar days after entry of such order;

(vii)    other than as contemplated under this Agreement, upon the entry of an order by the Bankruptcy Court, or the filing of a motion or application by any Company Party seeking an order (without the prior written consent of the Required Support Parties), (A) converting one or more of the Chapter 11 Cases of a Company Party to a case under chapter 7 of the Bankruptcy Code, (B) appointing an

29

examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in one or more of the Chapter 11 Cases of a Company Party, or (C) rejecting this Agreement;

(viii)    if the Company Parties fail to meet any Milestone, which has not been waived or extended in a manner consistent with this Agreement, unless such failure is the result of any act, omission, or delay on the part of the terminating Co-Investor in violation of its obligations under this Agreement, including such Co-Investor's failure to meet its obligations set forth in Section 4(a);

(ix)    if the Debtors enter into any commitment or agreement to receive or obtain debtor in possession financing, cash collateral usage, and/or other debtor in possession financing arrangements, other than as expressly contemplated in the DIP Loan Documents;

(x)    if the Debtors' use of cash collateral or the DIP Facility has been validly terminated (or, in the case of the DIP Facility, accelerated) in accordance with the DIP Order and the DIP Loan Documents;

(xi)    upon the termination of any of the New Common Equity Commitment Letters or the New Common Equity Investment Agreement (other than as a result of a breach thereof by the terminating Co-Investor);

(xii)    the board of directors, board of managers, or such similar governing body of any Company Party determines, after consulting with counsel, (i) that proceeding with any of the Restructuring Transactions would be inconsistent with the exercise of its fiduciary duties or applicable Law or (ii) in the exercise of its fiduciary duties (or otherwise), to pursue an Alternative Restructuring Proposal;

(xiii)    any Company Party (i) files, amends or modifies, or files a pleading seeking approval of any Definitive Document or authority to amend or modify any Definitive Document in a manner that is inconsistent with or not permitted by this Agreement (including with respect to the consent rights afforded such Co-Investor under this Agreement) without the prior written consent of such Co-Investor, and such breach remains uncured for a period of three (3) Business Days after written notice of such breach is provided to the Company Parties, (ii) revokes the Restructuring Transaction without the prior consent of such Co-Investor, or (iii) publicly announces its intention to take any such acts listed in the foregoing clause (i) or (ii) or is otherwise inconsistent with the consent rights afforded such Parties under this Agreement;

(xiv)    upon a Replacement Failure (other than if the terminating Co-Investor is the Defaulting Investor Support Party that causes such Replacement Failure); or

(xv)    this Agreement is terminated by the Sponsor Support Party or the Required Creditor Support Parties.

In the event this Agreement is validly terminated by the Brigade Co-Investor as to itself, then each Creditor Support Party that is affiliated with, or managed or advised by, Brigade Capital Management, L.P. shall have the right to terminate this Agreement as to itself.

(f)    This Agreement may be terminated as to all Parties by the Company Parties upon the occurrence of any of the following events (the "**Company Termination Events**"):

(i)    upon the election of a governing body of a Company Party to terminate this Agreement in accordance with Section 10(a) of this Agreement;

(ii)    upon the material breach by the Creditor Support Parties holding greater than 37-1/2% of the aggregate outstanding principal amount of either (x) the Secured Notes that are held by all Secured Notes Support Parties or (y) the Superpriority Secured Notes that are held by all Superpriority Secured Notes Support Parties or an Investor Support Party of any of the undertakings, representations, warranties or covenants of such Creditor Support Parties or Investor Support Party set forth in this Agreement, including any such Creditor Support Parties' or Investor Support Party's obligations under Section 7, which breach remains uncured (to the extent curable) for a period of five (5) Business Days after written notice of such breach is provided by the Company Parties to such Creditor Support Parties or Investor Support Party, unless such material breach is the result of any act, omission, or delay on the part of any Company Party in violation of its obligations under this Agreement;

(iii)    upon the issuance by any governmental authority, or any other regulatory authority or court of competent jurisdiction, of any final, non-appealable injunction, ruling or order that would reasonably be expected to make illegal or otherwise prevent the consummation of the transactions contemplated by this Agreement or any Definitive Documents contemplated by this Agreement;

(iv)    upon the termination of the Term DIP Commitment Letter, the New Common Equity Commitment Letters or the New Common Equity Investment Agreement;

(v)    upon a Replacement Failure; or

(vi)    if the Bankruptcy Court enters an order denying confirmation of the Plan and such order remains in effect for fourteen (14) calendar days after entry of such order.

(g)    Notwithstanding anything in this Section 11 to the contrary, in the event that any Investor Support Party (a "**Defaulting Investor Support Party**") (i) breaches this Agreement, the New Common Equity Commitment Letter to which it is party or the New Common Equity Investment Agreement in a manner that would give rise a termination right under this Section 11 (without giving effect to this Section 11(g)) or (ii) fails to fund its obligations under such New Common Equity Commitment Letter or the New Common Equity Investment Agreement within the applicable time periods set forth therein (each of clauses (i) and (ii), a "Triggering Event"), then no Party shall be entitled to terminate this Agreement pursuant to this Section 11 solely on account of such Triggering Event unless and until (A) the Company Parties fail to replace such Defaulting Investor Support Party with a non-Defaulting Investor Support Party or its designee on substantially the same terms as the Defaulting Investor Support Party (other than the aggregate amount of the New Common Equity Investment, which may be decreased to an aggregate amount of no less than $150 million) within five (5) Business Days of the applicable Triggering Event; and (B) the Ad Hoc Group does not exercise the Ad Hoc Group New Equity Funding Option within five (5) Business Days of the end of the period described in clause (A) (a "**Replacement Failure**"). For the avoidance of doubt, nothing in this Section 11(g): (1) limits the rights of any Party to exercise a Termination Event that is not directly caused by the applicable Triggering Event; (2) limits the rights of any Party to exercise a Termination Event following a Replacement Failure; or (3) obligates any Party to provide the New Common Equity Investment associated with any Defaulting Investor Support Party.

(h)    Upon the valid termination of this Agreement by the Company Parties or the Required Creditor Support Parties pursuant to this Section 11, unless waived under this Agreement, including pursuant to Section 15, this Agreement shall terminate as to all Parties. Notwithstanding the foregoing, in the case of a valid termination with a respect to an Investor Support Party pursuant to Section 11(d) or (e), this Agreement shall terminate solely as to such Investor Support Party. Upon such termination, each Party subject to such termination shall be released from its commitments, undertakings and agreements under or related to this Agreement, including, with respect to the Investor Support Parties, the commitments, undertaking, and agreements with respect to the New Common Equity Documents. Upon

any such termination and except as expressly set forth in this Agreement, there shall be no liability or obligation on the part of any such applicable Party under or related to this Agreement. Notwithstanding the foregoing, in no event shall any such termination relieve any such applicable Party from: (i) liability for its breach or non-performance of its obligations under this Agreement before the date of such termination; or (ii) any obligations under this Agreement that expressly survive any such termination under this Agreement, including pursuant to Section 20 of this Agreement.

12.    Good Faith Cooperation. During the Agreement Effective Period applicable to the Parties and subject to the terms and conditions of this Agreement, the Parties shall cooperate with each other in good faith to complete the Restructuring Transactions and the other transactions contemplated by this Agreement, in each case, in accordance with the terms of this Agreement and the other Definitive Documents.

13.    Automatic Stay. The Debtors acknowledge and agree, and shall not dispute, that after the commencement of the Chapter 11 Cases, the giving of a written notice of termination by the Required Creditor Support Parties, the Sponsor Support Party or any of the Co-Investors pursuant to this Agreement shall not be a violation of the automatic stay of section 362 of the Bankruptcy Code (and the Debtors hereby waive, to the greatest extent possible, the applicability of the automatic stay to the giving of such termination notice), and no cure period contained in this Agreement shall be extended or tolled without the prior written consent of the Required Creditor Support Parties, the Sponsor Support Party and each of the Co-Investors.

14.    Specific Performance. Each of the Parties acknowledges and agrees that money damages would not be a sufficient remedy for any breach of this Agreement by any Party. Accordingly, each non-breaching Party shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach, including, without limitation, any order of a court of competent jurisdiction requiring any Party to comply with any of its obligations under this Agreement. Each Party further agrees to waive any requirement for the securing or posting of a bond in connection with such remedy.

15.    Amendments and Waivers.

(a)    This Agreement may not be modified, amended, or supplemented, and no condition or requirement of this Agreement may be waived, in any manner except in accordance with this Section 15.

(b)    This Agreement may be modified, amended, or supplemented, or a condition or requirement of this Agreement may be waived, in a writing signed by: (i) each Company Party, (ii) the Required Creditor Support Parties, (iii) the Sponsor Support Party, and (iv) each of the Co-Investors. Notwithstanding the foregoing, if the proposed modification, amendment, waiver, or supplement has a material, disproportionate, and adverse effect on any of the Company Claims/Interests held by a Creditor Support Party as compared to other Creditor Support Parties holding the same Company Claims/Interests, then the consent of each such affected Creditor Support Party shall also be required to effectuate such modification, amendment, waiver, or supplement.

(c)    Any proposed modification, amendment, waiver, or supplement that does not comply with this Section 15 shall be ineffective and void *ab initio*.

(d)    The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power, or remedy under this Agreement shall operate as a waiver of any such right, power, or remedy or any provision of this Agreement, nor shall any single or partial exercise of such right, power, or remedy by such Party

preclude any other or further exercise of such right, power, or remedy or the exercise of any other right, power, or remedy. All remedies under this Agreement are cumulative and are not exclusive of any other remedies provided by Law.

16.    Representation by Counsel. Each Party acknowledges that it has had the opportunity to be represented by counsel in connection with this Agreement and the transactions contemplated by this Agreement. Accordingly, any rule of law or any legal decision that would provide any Party with a defense to the enforcement of the terms of this Agreement against such Party based upon lack of legal counsel, shall have no application and is expressly waived.

17.    Governing Law; Trial by Jury Waiver. This Agreement shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require or permit the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, may only be brought in either the United States District Court for the Southern District of New York or any New York state court, in each case, sitting in the Borough of Manhattan of the City of New York. Notwithstanding the foregoing consent to jurisdiction, upon commencement of the Chapter 11 Cases, each of the Parties agree that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (a) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (b) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (c) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any Party. EACH PARTY UNCONDITIONALLY WAIVES TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING REFERRED TO ABOVE.

18.    Execution Date. Each Party shall be bound to the terms of this Agreement as of the Agreement Effective Date. Notwithstanding the foregoing, any Joining Party shall be bound by the terms of this Agreement as of the date that such Joining Party executes the Joinder.

19.    Notices. All demands, notices, requests, consents and other communications under this Agreement shall be in writing and shall be delivered by email, courier or registered or certified mail (return receipt requested) to the address or email address (or at such other address or email address as shall be specified by like notice) set forth on Schedule 1 attached to this Agreement. All such demands, notices, requests, consents and other communications shall be deemed given when received, and any demand, notice, request, consent or other communication transmitted by email, shall be deemed given upon being sent, in each case, at the addresses or email addresses set forth on Schedule 1 attached to this Agreement.

20.    Survival. Notwithstanding (i) any transfer of Company Claims/Interests in accordance with Section 8 or (ii) the termination of this Agreement in accordance with its terms, the agreements and obligations of the Parties in Sections 9(a)(x), 16, 17, 19, 21, 22, 23, 24, 25, 26, 27, 28, 29 and 30, and in this Section 20, shall survive such sale and/or termination and shall continue in full force and effect for the benefit of the Support Parties and the Company in accordance with the terms of this Agreement.

21.    Successors and Assigns; Severability. This Agreement is intended to bind and inure to the benefit of the Parties and their respective permitted successors, assigns, heirs, executors, estates, administrators and representatives. The Parties may not assign their rights and obligations under this Agreement except in accordance with this Agreement including Section 8 of this Agreement unless otherwise agreed by the Company Parties and the Required Support Parties. The invalidity or unenforceability at any time of any provision of this Agreement in any jurisdiction shall not affect or

diminish in any way the continuing validity and enforceability of the remaining provisions of this Agreement or the continuing validity and enforceability of such provision in any other jurisdiction.

22.    <u>Third-Party Beneficiary</u>. Unless expressly stated in this Agreement, this Agreement is intended for the benefit of the Parties and no other person or entity shall be a third-party beneficiary of this Agreement or have any rights under this Agreement.

23.    <u>Counterparts; Additional Support Parties</u>. This Agreement may be executed in several counterparts, each of which shall be deemed to be an original, and all of which together shall be deemed to be one and the same agreement. The signature pages executed by the Support Parties shall be delivered to: (a) each of the other Support Parties in a redacted form that removes the Support Parties' holdings information; and (b) the Company and Stroock in an unredacted form. Execution copies of this Agreement may be delivered by facsimile, electronic mail or otherwise, each of which shall be deemed to be an original for the purposes of this paragraph. Any holder of Company Claims/Interests that is not already an existing Support Party to this Agreement may execute the Joinder and, in doing so, shall become a Joining Party and shall thereafter be deemed to be a "Support Party" and a Party for all purposes under this Agreement. With respect to the Company Claims/Interests held by the Joining Party, the Joining Party makes the representations and warranties of the Support Parties set forth in <u>Sections 5</u> and <u>6</u> of this Agreement to the other Parties.

24.    <u>Entire Agreement</u>. This Agreement (including the Term Sheets) and the Term DIP Commitment Letter, New Common Equity Commitment Letters and New Common Equity Investment Agreement constitute the entire agreement of the Parties with respect to the subject matter of this Agreement and supersedes all prior agreements (oral and written) among the Parties and all other prior negotiations with respect to the subject matter of this Agreement, but shall not supersede the Definitive Documents. The Parties acknowledge and agree, however, that any confidentiality agreements previously executed between the Company and any Support Party shall continue in full force and effect as provided in such confidentiality agreement.

25.    <u>Several Obligations</u>. The agreements, representations and obligations of the Support Parties under this Agreement are, in all respects, several and not joint. Any breach of this Agreement by a Support Party shall not result in liability for any other Support Party. No Support Party shall be responsible in any way for the performance of the obligations of any other Support Party under this Agreement, and nothing contained in this Agreement, and no action taken by any Support Party pursuant to this Agreement shall be deemed to constitute the Support Parties as a partnership, an association or joint venture of any kind, or create a presumption that the Support Parties are in any way acting other than in their individual capacities.

26.    <u>Headings; Other Definitional and Interpretative Provisions</u>. The section headings of this Agreement are for convenience of reference only and shall not, for any purpose, be deemed a part of this Agreement and shall not affect the interpretation of this Agreement. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import. References to any agreement or contract are to that agreement or contract as amended, modified or supplemented from time to time in accordance with the terms of this Agreement. References to any person include the successors and permitted assigns of that person. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. References to Schedules or Exhibits are to be construed to refer to schedules or exhibits to this Agreement, unless otherwise stated.

27.    <u>Settlement Discussions</u>. This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the Parties to this Agreement. Nothing in this Agreement shall be deemed an admission of any kind. Pursuant to Federal Rule of Evidence 408, any applicable state rules of evidence and any other applicable law, foreign or domestic, this Agreement and all negotiations relating to this Agreement shall not be admissible into evidence in any proceeding other than to prove the existence of this Agreement or in a proceeding to enforce the terms of this Agreement.

28.    <u>Publicity</u>. With respect to this Agreement or the transactions contemplated by this Agreement, either before or after the Termination Date, none of the Company Parties shall (i) use the name of any Support Party in any press release without such Support Party's prior written consent or (ii) disseminate to any news media any material press releases or make any public filings that relate to this Agreement or the Restructuring Transactions (including the initial press release announcing the Restructuring Transactions), in either case, the Company Parties first: (x) submit such press releases or public filings to counsel for the Support Parties for review and potential suggestions and comments and (y) receive the prior written consent (by email or otherwise) of counsel for the Support Parties. Notwithstanding the foregoing, no Company Party shall be required to obtain consent pursuant to the preceding sentence to the extent any communication is consistent with information that has been previously been disseminated in compliance with the obligations set forth in the preceding sentence. Either before or after the Termination Date, the Company Parties shall not disclose to any person, other than legal, accounting, financial and other advisors to the Company Parties, the principal amount or percentage of any Superpriority Secured Notes, Secured Notes or 2020 Cash/PIK Notes held by any Support Party. Notwithstanding the foregoing, the Company Parties shall be permitted to disclose at any time the aggregate principal amount of, and aggregate percentage of, the Superpriority Secured Notes held by the Superpriority Secured Notes Support Parties as a group, the Secured Notes held by the Secured Notes Support Parties as a group or the 2020 Cash/PIK Notes held by the Unsecured Notes Support Parties as a group. With respect to this Agreement or the transactions contemplated by this Agreement, either before or after the Termination Date, none of the Support Parties shall: (i) use the name of any Company Party in any press release or (ii) disseminate to any news media any press releases, public filings, public announcements or other public communications unless, in either case, the Support Parties first: (x) submit such press releases, public filings, public announcements or other public communications to counsel for the Company Parties for review and potential suggestions and comments and (y) receive the prior written consent (by email or otherwise) of the Company Parties. Nothing contained in this <u>Section 28</u> shall be deemed, however, to waive, restrict, amend or modify the terms of any existing or future confidentiality or non-disclosure agreement between the Company and any Support Party.

29.    <u>No Offer or Solicitation</u>. This Restructuring Agreement is not and shall not be deemed to be an offer or a solicitation of offer to purchase (for cash or exchange) the New Equity or any other security or a solicitation for votes in favor of the Plan in the Chapter 11 Cases by the Support Parties or a solicitation to tender or exchange any of the Superpriority Secured Notes Claims, Secured Notes Claims, Unsecured Notes Claims or Existing Common Equity. The acceptances of the Support Parties with respect to the Plan will not be solicited until such Support Party has received the Disclosure Statement and the other Solicitation Materials, each as approved or ratified by the Bankruptcy Court.

30.    <u>Rules of Construction</u>. This Agreement is the product of negotiations among the Company Parties and the Support Parties, and in the enforcement or interpretation of this Agreement, is to be interpreted in a neutral manner, and any presumption with regard to interpretation for or against any Party by reason of that Party having drafted or caused to be drafted this Agreement, or any portion of this Agreement, shall not be effective in regard to the interpretation of this Agreement. The Company Parties and the Support Parties were each represented by counsel during the negotiations and drafting of this Agreement and continue to be represented by counsel.

31.    <u>Fiduciary Duties</u>. Notwithstanding anything to the contrary in this Agreement, nothing in this Agreement shall create any fiduciary duty on the part of either of the Company or any members, partners, managers, managing members, officers, directors, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents or other representatives of the Company or its affiliated entities, in each case, in any such person's capacity as a member, partner, manager, managing member, officer, director, employee, advisor, principal, attorney, professional, accountant, investment banker, consultant, agent or other representative of the Company or their affiliated entities. Nothing in this Agreement shall create any fiduciary duty of any of the Support Parties to each other, any other person, the Company or any of the Company's creditors or other stakeholders.

[*Remainder of page intentionally left blank*]

## **Schedule 1**

Notice Addresses

If to the Company Parties:

> **Guitar Center, Inc.**
> 5795 Lindero Canyon Road
> Westlake Village, CA 91362
> <u>Attn</u>: Michael Pendleton, General Counsel
>
> with a copy to
>
> **Milbank LLP**
> 55 Hudson Yards
> New York, NY 10001
> <u>Attn</u>:
> Dennis Dunne
> Adam Moses
> Michael Price
> DDunne@milbank.com
> AMoses@milbank.com
> MPrice@milbank.com

If to a Secured Notes Support Party or a Superpriority Secured Notes Support Parties:

> To the individual named on such Support Party's signature page
>
> with a copy to:
>
> **Stroock & Stroock & Lavan LLP**
> 180 Maiden Lane
> New York, NY 10038
> <u>Attn</u>:
> Kristopher Hansen
> Allison Miller
> Jonathan Canfield
> khansen@stroock.com
> amiller@stroock.com
> jcanfield@stroock.com

If to an Unsecured Notes Support Party:

> To the individual named on such Support Party's signature page
>
> with a copy to:
>
> **Debevoise & Plimpton LLP**
> 919 Third Avenue
> New York, NY 10022
> <u>Attn</u>:

Sidney P. Levinson
Kevin M. Schmidt
Daniel E. Stroik
slevinson@debevoise.com
kmschmidt@debevoise.com
destroik@debevoise.com

If to the Sponsor Support Party:

**Ares PE Extended Value Fund LP**
2000 Avenue of the Stars
Suite 1200
Los Angeles, California 90067
<u>Attn</u>:
Abraham Zilkha
Eric Waxman
azilkha@aresmgmt.com
ewaxman@aresmgmt.com

with a copy to

**Kirkland & Ellis LLP**
2049 Century Park East, 37th Floor
Los Angeles, California 90067
<u>Attn</u>:
Philippa Bond
Michael Woronoff
pippa.bond@kirkland.com
michael.woronoff@kirkland

If to the Brigade Co-Investor:

To the individual named on the Brigade Co-Investor's signature page

with a copy to:

**Debevoise & Plimpton LLP**
919 Third Avenue
New York, NY 10022
<u>Attn</u>:
Sidney P. Levinson
Kevin M. Schmidt
Daniel E. Stroik
slevinson@debevoise.com
kmschmidt@debevoise.com
destroik@debevoise.com

If to the Carlyle Co-Investor:

To the individual named on the Carlyle Co-Investor's signature page

with a copy to:

**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
1285 Avenue of the Americas
New York, New York 10019-6064
<u>Attn</u>:
Paul Basta
Angelo Bonvino
Jacob Adlerstein
pbasta@paulweiss.com
abonvino@paulweiss.com
jadlerstein@paulweiss.com

## **EXHIBIT A**

Restructuring Term Sheet

[Attached.]

**GUITAR CENTER, INC.**

**RESTRUCTURING TERM SHEET**

This restructuring term sheet (the "**Term Sheet**") summarizes certain terms and conditions (and does not purport to summarize all of the terms and conditions) of the proposed restructuring described below (the "**Restructuring**").  Terms not defined in this Term Sheet shall have the meanings given to them in the Restructuring Support Agreement (the "**Agreement**") to which this Term Sheet is attached.

**THIS TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER TO SELL OR BUY, OR THE SOLICITATION OF AN OFFER TO SELL OR BUY, ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES AS TO ANY CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL ONLY BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND OTHER APPLICABLE LAWS.**

Without limiting the generality of the foregoing, this Term Sheet and the undertakings contemplated in connection with the Restructuring described below are subject in all respects to the negotiation, execution, and delivery of definitive documentation in form and substance consistent with this Term Sheet and otherwise acceptable to the Debtors and the Required Support Parties.

This Term Sheet is provided as part of a settlement proposal in furtherance of settlement discussions and is entitled to protection from any use or disclosure to any party or person pursuant to Federal Rule of Evidence 408 and any applicable statutes, doctrines, or rules protecting the use or disclosure of confidential information and information exchanged in the context of settlement discussions.

**SUMMARY OF PRINCIPAL TERMS OF PROPOSED RESTRUCTURING**

This Term Sheet sets forth certain key terms of the proposed Restructuring with respect to the existing debt, equity interests and other obligations of Guitar Center, Inc. ("**Guitar Center**"), Guitar Center Holdings, Inc. ("**Holdings**"), and each of the direct and indirect subsidiaries of Guitar Center (collectively with Guitar Center and Holdings, the "**Debtors**").  As set forth in the Agreement, the Restructuring will be implemented pursuant to the Plan and the other Definitive Documents.

The Restructuring contemplates, among other things:

    (i)       the commencement of voluntary chapter 11 bankruptcy cases of the Debtors (the "**Chapter 11 Cases**") in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "**Bankruptcy Court**");

    (ii)     the filing of and solicitation of acceptances for a joint chapter 11 plan of reorganization (the "**Plan**") on the terms and conditions set forth in this Term Sheet;

    (iii)    a $325 million secured debtor-in-possession facility (the "**Term DIP Facility**"), on the terms and subject to the conditions set forth in the Term DIP Facility Term Sheet attached to this Term Sheet as **Annex 1-1**, the net proceeds of which are contemplated to be used (A) to fund a paydown in full in cash all outstanding Prepetition ABL Claims, (B) to fund the Chapter 11 Cases and (C) for general corporate purposes during the pendency of the Chapter 11 Cases;

    (iv)    a $50 million secured asset based debtor-in-possession facility (the "**ABL DIP Facility**" and together with the Term DIP Facility, the "**DIP Facility**"), on the terms and subject to the

conditions set forth in the ABL DIP Facility Term Sheet attached to this Term Sheet as **Annex 1-2**, the net proceeds of which are contemplated to be used (A) to fund the Chapter 11 Cases and (B) for general corporate purposes during the pendency of the Chapter 11 Cases;

(v)    entry upon emergence into a $375 million secured asset based financing facility on prevailing market terms (as of the date of the Agreement) that are acceptable or reasonably acceptable, as applicable pursuant to the Agreement, to the Support Parties (the "**New ABL Facility**");

(vi)    the issuance upon emergence of $335 million in aggregate principal amount of senior secured, first lien indebtedness pursuant to an indenture on prevailing market terms (as of the date of the Agreement) that are acceptable or reasonably acceptable, as applicable pursuant to the Agreement, to the Support Parties (the "**New First Lien Debt**");

(vii)    the issuance upon emergence of $160 million in New Preferred Equity to the holders of Prepetition Secured Notes Claims on the terms and conditions set forth in the New Preferred Equity Term Sheet attached to this Term Sheet as **Annex 2**;

(viii)    the issuance upon emergence of $2 million in New Junior Preferred Equity to the holders of Prepetition Unsecured Notes Claims on the terms set forth in this Term Sheet; and

(ix)    a $165 million new common equity investment by the Investor Support Parties (unless as otherwise provided in the Agreement) (the "**New Common Equity Investment**") in exchange for (a) 100% of the New Common Equity issued upon emergence, which shall be subject to dilution by the Management Incentive Plan, the Warrants and all subsequent issuances of common equity, and (b) the Warrants, in each case, on the terms and subject to the conditions set forth in this Term Sheet and the New Common Equity Commitment Letters attached to the Agreement as **Exhibit C**.

### PREPETITION FUNDED INDEBTEDNESS

| | |
|---|---|
| **Prepetition ABL Credit Agreement** | As of the Execution Date, approximately $265,000,000 in aggregate principal amount, plus all accrued and unpaid interest, fees, reimbursement obligations, prepayment premiums and other obligations, remains outstanding under the asset-based revolving credit agreement, dated as of April 2, 2014, among Guitar Center and the other parties to such agreement (as amended, restated or otherwise modified, the "**Prepetition ABL Credit Agreement**", and collectively with any security documents and any other collateral, guarantee, and ancillary documents executed in connection with the Prepetition ABL Credit Agreement, the "**Prepetition ABL Loan Documents**"). |
| | "**Prepetition ABL Claims**" means any Claims derived from, based upon, or arising under the Prepetition ABL Loan Documents. |
| **Prepetition Superpriority Notes** | As of the Execution Date, approximately $32,500,000 in aggregate principal amount, plus all accrued and unpaid interest, fees, reimbursement obligations, prepayment premiums and other obligations, remains outstanding under the indenture, dated as of May 15, 2020, between Guitar Center and the Trustee governing the Prepetition Superpriority Notes[1] (as amended, supplemented or |

---

[1]    "**Prepetition Superpriority Notes**" means Guitar Center's 10.000% Senior Secured Superpriority Notes due

otherwise modified, the "**Prepetition Superpriority Notes Indenture**").

"**Prepetition Superpriority Notes Claims**" means any Claims derived from, based upon, or arising under the Prepetition Superpriority Notes Indenture.

| | |
|---|---|
| **Prepetition Secured Notes** | As of the Execution Date, approximately $640,000,000 in aggregate principal amount, plus all accrued and unpaid interest, fees, reimbursement obligations, prepayment premiums and other obligations, remains outstanding under the indenture, dated as of March 16, 2018, between Guitar Center and the Trustee governing the Secured Notes[2] (as amended, supplemented or otherwise modified, the "**Prepetition Secured Notes Indenture**"). |

"**Prepetition Secured Notes Claims**" means any Claims derived from, based upon, or arising under the Prepetition Secured Notes Indenture.

| | |
|---|---|
| **Prepetition Unsecured Notes** | As of the Execution Date, approximately $385 million in aggregate principal amount, plus all accrued and unpaid interest, fees, reimbursement obligations, prepayment premiums and other obligations, remains outstanding on account of the 2018 Unsecured Cash/PIK Notes[3] and the 2020 Cash/PIK Notes[4] (collectively, the "**Prepetition Unsecured Notes**"). |

The "**Prepetition Unsecured Notes Claims**" means any Claims derived from, based upon, or arising under the Prepetition Unsecured Notes.

<u>**TREATMENT OF CLAIMS AND INTERESTS**</u>

The following is a summary of the treatment to be received on or as soon as practicable after the Plan Effective Date by holders of Claims against, and Interests in, the Debtors pursuant to the Plan.

| | |
|---|---|
| **Administrative, Priority, and Tax Claims** | Allowed administrative, priority, and tax Claims will be satisfied in full, in cash, or otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code. |
| **ABL DIP Facility Claims** | The ABL DIP Facility shall be refinanced on the Plan Effective Date with the proceeds of the New ABL Facility. |

On the Plan Effective Date, Claims arising out of the ABL DIP Facility (the

---

2022 issued pursuant to the Superpriority Notes Indenture.

[2]    "**Prepetition Secured Notes**" means Guitar Center's 9.500% Senior Secured Notes due 2021 issued pursuant to the Prepetition Secured Notes Indenture.

[3]    **"2018 Unsecured Cash/PIK Notes**" means Guitar Center's 13.000% Senior Unsecured Cash/PIK Notes due 2022 issued pursuant to the indenture, dated as of April 16, 2018, between Guitar Center and the Trustee governing the 2018 Cash/PIK Notes (as amended, supplemented or otherwise modified, the "**2018 Cash/PIK Notes Indenture**").

[4]    "**2020 Unsecured Cash/PIK Notes**" means Guitar Center's 13.000% Senior Unsecured Cash/PIK Notes due 2022 issued pursuant to the indenture, dated as of May 15, 2020, between Guitar Center and the Trustee governing the 2020 Cash/PIK Notes (as amended, supplemented or otherwise modified, the "**2020 Cash/PIK Notes Indenture**").

<table>
<tr><td></td><td>"<b>ABL DIP Facility Claims</b>") shall be repaid in full in cash.</td></tr>
</table>

| **Term DIP Facility Claims** | The Term DIP Facility shall be refinanced on the Plan Effective Date with the proceeds of the New Common Equity Investment, the New First Lien Debt, the New ABL Facility and/or cash on hand. |
| --- | --- |
| | On the Plan Effective Date, (a) Claims arising out of the Term DIP Facility (the "**Term DIP Facility Claims**") shall be repaid in full in cash; and (b) each holder of a Term DIP Facility Claim shall receive its pro rata share of the 3.0% exit payment payable in cash in accordance with the DIP Facility Term Sheet. |
| **Prepetition ABL Claims** | In exchange for the full and final satisfaction, settlement, release and discharge of the Prepetition ABL Claims, to the extent not satisfied during the Chapter 11 Cases, each holder of a Prepetition ABL Claim shall be paid in full for all outstanding amounts on the Plan Effective Date. |
| | *Voting*: Unimpaired; Not Entitled to Vote (Presumed to Accept). |
| **Prepetition Superpriority Notes Claims** | In exchange for the full and final satisfaction, settlement, release and discharge of the Prepetition Superpriority Notes Claims, each holder of a Prepetition Superpriority Notes Claim shall be paid in full in cash (including the makewhole amount) on the Plan Effective Date. |
| | *Voting*: Unimpaired; Not Entitled to Vote (Presumed to Accept). |
| **Prepetition Secured Notes Claims** | In exchange for the full and final satisfaction, settlement, release and discharge of the Prepetition Secured Notes Claims, each holder of a Prepetition Secured Notes Claim shall receive on the Plan Effective Date its pro rata share of: (a) cash in the aggregate amount of $450 million; and (b) 100% of the New Preferred Equity.[5] |
| | *Voting*: Impaired; Entitled to Vote. |
| **Other Secured Claims** | Except to the extent that a holder of an other secured Claim, if any, agrees to a less favorable treatment, in exchange for the full and final satisfaction, settlement, release and discharge of such Claim, at the option of the Debtors or the Reorganized Debtors,[6] as applicable, but with the consent of the Required Creditor Support Parties and each of the Investor Support Parties: (a) such holder shall receive cash in an amount equal to the allowed amount of such Claim on the later of the Plan Effective Date and the date that is ten (10) |

---

[5]    The Plan will provide a mechanism by which holders of allowed Prepetition Secured Notes Claims may, subject to and effective as of the Plan Effective Date and solely at the options of each such holder, in lieu of receiving their *pro rata* shares of the New Preferred Equity, elect to convey a portion of such New Preferred Equity to the Carlyle Co-Investor on a dollar-for-dollar basis in exchange for cash in an amount equal to the face amount of such portion of New Preferred Equity on the terms and conditions set forth in the New Preferred Equity Term Sheet. The Carlyle Co-Investor will not be required to fund more than $30 million in the aggregate pursuant to this mechanism. For the avoidance of doubt, the Carlyle Co-Investor shall not purchase more than $30 million in the aggregate of the New Preferred Equity on the Plan Effective Date pursuant to this cash-out mechanism.

[6]    "**Reorganized Debtors**" means, on and after the Plan Effective Date, all Debtors, including Reorganized Guitar Center.

business days after the date such Claim becomes an allowed Claim; (b) such Claim shall be reinstated; (c) such holder shall receive the collateral securing such Claim and payment of interest required under section 506(b) of the Bankruptcy Code; or (d) such holder shall receive such other treatment as will render such Claim unimpaired.

*Voting*: Unimpaired; Not Entitled to Vote (Presumed to Accept).

| | |
|---|---|
| **Prepetition Unsecured Notes Claims** | In exchange for the full and final satisfaction, settlement, release and discharge of the Prepetition Unsecured Notes Claims, each holder of a Prepetition Unsecured Notes Claim shall receive its pro rata share of 100% of the New Junior Preferred Equity.<br><br>*Voting*: Impaired; Entitled to Vote. |
| **General Unsecured Claims (other than Unsecured Notes Claims)** | Except to the extent that a holder of a general unsecured Claim (other than a Prepetition Unsecured Notes Claim), if any, agrees to a less favorable treatment, to the extent not satisfied during the Chapter 11 Cases, in exchange for the full and final satisfaction, settlement, release and discharge of such Claim: (a) such holder shall receive cash in an amount equal to the allowed amount of such Claim on the later of the Plan Effective Date and the date that is ten (10) business days after the date such Claim becomes an allowed Claim or (b) such holder shall receive such other treatment as will render such Claim unimpaired.  The election of clause (a) or (b) in the foregoing sentence shall be at the option of the Debtors or the Reorganized Debtors, as applicable, subject to the consent of the Required Creditor Support Parties and each of the Investor Support Parties.<br><br>*Voting*: Unimpaired; Not Entitled to Vote (Presumed to Accept). |
| **Intercompany Claims** | Intercompany Claims shall be reinstated, compromised, or cancelled, as determined by the Debtors but with the consent of the Required Creditor Support Parties and each of the Investor Support Parties.<br><br>*Voting*: Unimpaired; Not Entitled to Vote (Presumed to Accept) / Impaired; Not Entitled to Vote (Presumed to Reject). |
| **Intercompany Interests** | Intercompany Interests shall be reinstated for administrative convenience, unless otherwise determined by the Debtors, but with the consent of each of the Investor Support Parties.<br><br>*Voting*: Unimpaired; Not Entitled to Vote (Presumed to Accept) / Impaired; Not Entitled to Vote (Presumed to Reject). |
| **Existing Equity Interests** | All existing Interests, including the Existing Common Equity, shall be cancelled on the Plan Effective Date.  No holder of the any Interest will receive or retain any distribution, property, or other value on account of any existing Interests.<br><br>*Voting*: Impaired; Not Entitled to Vote (Presumed to Reject). |

5

## OTHER TERMS OF THE RESTRUCTURING

**Critical Vendors**

The Debtors shall seek to obtain Bankruptcy Court approval to pay 503(b)(9) creditors or otherwise treat certain creditors as "critical vendors" and make payments to such 503(b)(9) creditors or such "critical vendors" on account of their prepetition claims. Any such payments shall be made pursuant to orders reasonably acceptable to the Required Support Parties.

**ABL DIP Facility**

Certain lenders under the Prepetition ABL Credit Agreement will provide the Debtors with the financing under the ABL DIP Facility on the terms and conditions set forth in the ABL DIP Facility Term Sheet.

**Term DIP Facility**

Certain holders of the Prepetition Secured Notes will provide the Debtors with the financing under the Term DIP Facility on the terms and conditions set forth in the Term DIP Facility Term Sheet.

**New First Lien Debt**

On the Plan Effective Date, the New First Lien Debt shall be issued in the aggregate principal amount of $335 million pursuant to an indenture (or such other document as agreed by the Required Support Parties) on prevailing market terms (as of the date of the Agreement) that are acceptable or reasonably acceptable, as applicable pursuant to the Agreement, to the Support Parties.

**New Preferred Equity**

On the Plan Effective Date, the New Preferred Equity shall be issued to each holder of a Prepetition Secured Notes Claim, on a *pro rata* basis, on the terms and conditions set forth in the New Preferred Equity Term Sheet attached to this Term Sheet as **Annex 2** and otherwise acceptable or reasonably acceptable, as applicable pursuant to the Agreement, to the Support Parties.

**New Junior Preferred Equity**

On the Plan Effective Date, the New Junior Preferred Equity shall be issued to each holder of a Prepetition Unsecured Notes Claim, on a *pro rata* basis, on the terms and conditions set forth in this Term Sheet and otherwise acceptable or reasonably acceptable, as applicable pursuant to the Agreement, to the Investor Support Parties and, subject to Section 3(c) of the Agreement, the Required Creditor Support Parties.

The New Junior Preferred Equity shall be perpetual and shall be issued with an aggregate liquidation preference of $2 million. Reorganized Guitar Center shall have the right to redeem the New Junior Preferred Equity at any time at a redemption price equal to the liquidation preference; provided that under no circumstances shall the New Junior Preferred Equity be repaid or redeemed in whole or in part if any shares of New Preferred Equity remain outstanding. The New Junior Preferred Equity shall accrue dividends at a rate of 0% per annum. The terms of the New Junior Preferred Equity shall not include any operational or financial covenants on Reorganized Guitar Center or its subsidiaries. Holders of New Junior Preferred Equity shall not be entitled to any voting rights, other than such rights as required by applicable law.

**New Common Equity Investment**

On the Plan Effective Date, the Debtors shall consummate the New Common Equity Investment, on the terms set forth in this Term Sheet and the New Common Equity Documents, in exchange for 100% of the New Common Equity of Reorganized Guitar Center issued on the Plan Effective Date (the

"**New Common Equity**").  The New Common Equity shall be subject to dilution by the Management Incentive Plan and the Warrants.

| | |
|---|---|
| **Warrants** | Pursuant to the New Common Equity Investment, Reorganized Guitar Center will issue two tranches of warrants to the Brigade Co-Investor (or its designee) (the "**Warrants**") as follows: |

- one tranche to purchase up to 7.5% of the common equity of Reorganized Guitar Center as of the Plan Effective Date at any exercise price per share/unit equal to (i) $165 million divided by (ii) the number of shares/units issued on the Plan Effective Date pursuant to the new Common Equity Investment; and

- a second tranche of Warrants to purchase up to 7.5% of the common equity of Reorganized Guitar Center as of the Plan Effective Date at any exercise price per share/unit equal to (i) $264 million divided by (ii) the number of shares/units issued on the Plan Effective Date pursuant to the new Common Equity Investment.

The Warrants will have customary anti-dilution protection for splits and combinations.  Subject to customary exceptions (including, without limitation, for issuances (i) to landlords, lenders and strategic partners, in each case, for bona fide business purposes or (ii) pursuant to the Management Incentive Plan), the Warrants will also have anti-dilution protection for issuances below 95% of fair market value at the time of such issuance (a "**Below FMV Issuance**"), but only if the directors designated by Brigade do not approve such issuance and notify the Company prior to such issuance that they believe such issuance is a Below FMV Issuance.  The Warrants shall expire upon the earlier of (i) 50 years from the Plan Effective Date, (ii) a change of control transaction or sale of the Company to a SPAC, (iii) an underwritten IPO or (iv) a direct listing that would constitute a qualified IPO.  The Warrants shall have the same liquidity rights and obligations as the New Common Equity.  Upon a liquidity event, the Warrants shall become exercisable for reference consideration received in such liquidity event.

| | |
|---|---|
| **Plan Releases, Exculpation, and Injunctions** | The Plan shall include release, exculpation, and injunction provisions as described in the document attached to this Term Sheet as **Annex 4**. |
| **Corporate Governance** | The terms and conditions of the new corporate governance documents of the Reorganized Debtors (including the bylaws, certificates of incorporation, limited liability company agreements, stockholders' agreements or similar documents, among other governance documents) shall be as described in the Governance Term Sheet attached to this Term Sheet as **Annex 3** and otherwise acceptable or reasonably acceptable, as applicable pursuant to the Agreement, to the Support Parties. |

| | |
|---|---|
| **Management Incentive Plan** | On or after the Plan Effective Date, the Reorganized Debtors shall adopt and implement a management incentive plan on the terms and conditions reasonably acceptable to the Company Parties and Investor Support Parties, and subject to Section 3(c) of the Agreement, the Required Secured Notes Support Parties (the "**Management Incentive Plan**").  The Reorganized Debtors shall reserve exclusively for directors and management employees a pool of shares of new common stock (or equivalent equity units) representing 10-12% of the New Common Equity (calculated on a fully diluted basis) for awards under the Management Incentive Plan, with the final amount of such pool being reasonably acceptable to the Company Parties and each of the Investor Support Parties. |
| **Survival of Indemnification Obligations and D&O Insurance** | Any obligations of the Debtors pursuant to corporate charters, bylaws, limited liability company agreements, or other organizational documents to indemnify current and former officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such directors, officers, agents or employees, based upon any act or omission for or on behalf of the Debtors, other than actions arising out of the intentional fraud, gross negligence or willful misconduct of such directors, officers, agents or employees, will not be discharged or impaired by confirmation of the Plan.  All such obligations (other than obligations arising out of the intentional fraud, gross negligence or willful misconduct of such directors, officers, agents or employees) will be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and will continue as obligations of the Reorganized Debtors.

In addition, after the Plan Effective Date, the Reorganized Debtors will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies in effect or purchased as of the Petition Date, and all members, managers, directors and officers of the Debtors who served in such capacity at any time prior to the Plan Effective Date or any other individuals covered by such insurance policies, will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, officers or other individuals remain in such positions after the Plan Effective Date.

On or prior to the Plan Effective Date, the Reorganized Debtors shall, and shall be permitted to, obtain a "tail" insurance policy with a claims period of at least six years from and after the Plan Effective Date from an insurance carrier with the same or better credit rating as the Company Parties' current insurance carrier with respect to directors' and officers' liability insurance and fiduciary liability insurance with benefits and levels of coverage at least as favorable as the Company Parties' existing policies with respect to matters existing or occurring at or prior to the Plan Effective Date (including in connection with the Agreement or the Restructuring Transactions). |
| **Employee Compensation and Benefit Programs** | All employment agreements and severance policies, and all employment, compensation and benefit plans, policies, and programs of the Debtors applicable to any of its employees and retirees, including, without limitation, all workers' compensation programs, savings plans, retirement plans, SERP plans, healthcare plans, disability plans, severance benefit plans, incentive |

8

plans, bonus plans, retention plans, life and accidental death and dismemberment insurance plans, shall be assumed by the Reorganized Debtors pursuant to the Plan (in each case as may have been amended prior to or in connection with the Restructuring Transactions).

| | |
|---|---|
| **Unexpired Leases and Executory Contracts** | As of and subject to the occurrence of the Plan Effective Date and the payment of any applicable cure amount, all executory contracts and unexpired leases to which any Debtor is a party shall be assumed or deemed assumed, unless such contract or lease: (a) was previously assumed or rejected; (b) was previously expired or terminated pursuant to its own terms; (c) is the subject of a motion to reject, assume, or assume and assign filed on or before the entry of the Confirmation Order; or (d) is designated by the Debtors specifically as an executory contract or unexpired lease to be rejected on the Schedule of Rejected Contracts, if any (which such schedule may be amended or supplemented).  Consistent with the above, the Debtors shall assume all prepetition indemnity agreements and director and officer insurance policies, as may be modified. |
| **Exemption Under Section 1145 of the Bankruptcy Code** | The Plan and Confirmation Order shall provide that the issuance of any securities under the Plan, including the New Preferred Equity and New Common Equity, will be exempt from securities laws in accordance with section 1145 of the Bankruptcy Code to the greatest extent possible and, to the extent the Section 1145 exemption is unavailable, will be issued only to persons that are QIBs or IAIs in reliance on the exemption provided by Section 4(a)(2) under the Securities Act or another applicable exemption. For the avoidance of doubt, the New Common Equity issued under the Management Incentive Plan shall be issued in accordance with applicable exemptions under federal and state securities laws. |
| **Tax Structure** | To the extent practicable, the Restructuring shall be structured in a tax efficient manner as determined by mutual agreement of the Debtors and Required Support Parties. |
| **Transaction Expenses** | The Debtors shall pay the reasonable fees, costs and expenses of (i) the Ad Hoc Group Advisors, Co-Investor Advisors and Sponsor Support Party Advisors, (ii) the Trustee for the Unsecured Notes, the Prepetition ABL Agent, Prepetition Superpriority Notes Trustee, Prepetition Secured Notes Trustee, and  (iii) the administrative agents and collateral agents under the DIP Facility (the "**DIP Agents**") ((i)-(iii) collectively, the "**Transaction Expenses**"). |
| **Governing Law** | New York law shall govern this term sheet and parties shall consent to the exclusive jurisdiction of New York courts.  Notwithstanding the foregoing, after the Petition Date, the Bankruptcy Court shall have exclusive jurisdiction over all matters arising out of or in connection with the Restructuring. |
| **Retention of Jurisdiction** | The Plan, as applicable, will provide for a broad retention of jurisdiction by the Bankruptcy Court for (i) resolution of Claims, (ii) allowance of compensation and expenses for pre-Effective Date services, (iii) resolution of motions, adversary proceedings, or other contested matters, (iv) entry of such orders as necessary to implement or consummate the Plan and any related documents or |

agreements, and (v) other customary purposes.

| | |
|---|---|
| **Conditions Precedent to Plan Effective Date** | The occurrence of the Plan Effective Date will be subject to customary conditions to effectiveness, including: |

(i) the Agreement shall be in full force and effect, there shall be no default thereunder or Termination Event that has occurred and is continuing unless waived in writing by the applicable Support Parties, and the Agreement shall not have been terminated in accordance with its terms;

(ii) the Plan shall have been confirmed and the Disclosure Statement approved, and the other Definitive Documents (as applicable) shall be in full force and effect, and in form and substance consistent in all respects with this Term Sheet and the Agreement and otherwise acceptable or reasonably acceptable, as applicable pursuant to the Agreement, to the Support Parties;

(iii) the Bankruptcy Court shall have entered the Confirmation Order, which order shall be a Final Order,[7] in form and substance consistent in all material respects with this Term Sheet and the Agreement and otherwise acceptable or reasonably acceptable, as applicable pursuant to the Agreement, to the Support Parties;

(iv) all conditions precedent to the effectiveness of the New Common Equity Investment, including the conditions precedent in the New Common Equity Documents, shall have been satisfied or duly waived and the Debtors shall have received the New Common Equity Investment;

(v) the Debtors shall not be in default under the Term DIP Facility or the ABL DIP Facility, or the order(s) approving the Term DIP Facility and ABL DIP Facility;

(vi) the New Common Equity Documents shall be in full force and effect, consistent in all material respects with this Term Sheet and the Agreement, and otherwise acceptable or reasonably acceptable, as applicable pursuant to the Agreement, to the Support Parties, there shall be no default thereunder, and the New Common Equity Documents shall not have been terminated in accordance with their terms;

(vii) the New Common Equity and the Warrants shall have been issued and delivered in accordance with the terms set forth in the Agreement and the New Common Equity Documents;

(viii) the New Preferred Equity Documents shall be in full force and effect, consistent with the economic terms and otherwise consistent

---

[7] "**Final Order**" means an order, ruling, or judgment of the Bankruptcy Court (or other court of competent jurisdiction) that (i) is in full force and effect, (ii) is not stayed, and (iii) is no longer subject to review, reversal, vacatur, modification, or amendment, whether by appeal or by writ of certiorari; provided, however, that the possibility that a motion under Rules 50 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in such other court of competent jurisdiction) may be filed relating to such order, ruling, or judgment shall not cause such order, ruling, or judgment not to be a Final Order.

in all material respects with this Term Sheet, the Agreement, and the New Preferred Equity Term Sheet, and otherwise acceptable or reasonably acceptable, as applicable pursuant to the Agreement, to the Support Parties, and there shall be no default thereunder;

(ix)    all of the Transaction Expenses shall have been paid in full in cash to the extent that the Company Parties have received an invoice for such Transaction Expenses at least one (1) Business Day prior to the Plan Effective Date;

(x)    all conditions precedent to the effectiveness of the New First Lien Debt shall have been satisfied or duly waived, the New First Lien Debt shall have been issued, and the New First Lien Documents shall be in full force and effect, and in form and substance consistent in all respects with this Term Sheet and the Agreement and otherwise acceptable or reasonably acceptable, as applicable pursuant to the Agreement, to the Support Parties, and there shall be no default thereunder;

(xi)    all conditions precedent to the effectiveness of the New ABL Facility shall have been satisfied or duly waived and the New ABL Agreement shall be in full force and effect, and in form and substance consistent in all respects with this Term Sheet and the Agreement and otherwise acceptable or reasonably acceptable, as applicable pursuant to the Agreement, to the Support Parties, and there shall be no default thereunder;

(xii)    the New Corporate Governance Documents shall be in full force and effect, in form and substance consistent in all respects with this Term Sheet, the Governance Term Sheet and the Agreement and otherwise acceptable or reasonably acceptable, as applicable pursuant to the Agreement, to the Support Parties;

(xiii)    all waiting periods imposed by any governmental entity or Antitrust Authority[8] in connection with the Restructuring Transactions, including the New Common Equity Investment, shall have terminated or expired and all authorizations, approvals, consents or clearances under Antitrust Laws[9] in connection with the transactions contemplated by the New Common Equity Investment shall have been obtained;

(xiv)    (A) the Debtors shall have complied, in all material respects, with the terms of the Plan that are to be performed by the Debtors on or prior to the Plan Effective Date and (B) the conditions to the occurrence of the Plan Effective Date (other than any conditions relating to the occurrence of the Closing) set forth in the Plan shall

---

[8] "**Antitrust Authorities**" means the United States Federal Trade Commission, the Antitrust Division of the United States Department of Justice, the attorneys general of the several states of the United States and any other foreign or domestic governmental entity having jurisdiction pursuant to the Antitrust Laws.

[9] "**Antitrust Laws**" mean the Sherman Act, the Clayton Act, the HSR Act, the Federal Trade Commission Act, and any other Law governing agreements in restraint of trade, monopolization, pre-Commission Act, and any other Law governing agreements in restraint of trade, monopolization, premerger notification, the lessening of competition through merger or acquisition or anti-competitive conduct, and any foreign investment Laws.

have been satisfied or, with the prior consent of the Support Parties, waived in accordance with the terms of the Plan;

(xv)    all approvals and consents, including Bankruptcy Court approval, that are legally required for the consummation of the Plan and the Restructuring Transactions shall have been obtained, not be subject to unfulfilled conditions and be in full force and effect.

The conditions to effectiveness may be waived, in whole or in part, in writing by the Debtors and the Required Support Parties.

**<u>ANNEX 1-1</u>**

Term DIP Facility Term Sheet

**$325 MILLION SENIOR SECURED SUPERPRIORITY DEBTOR IN POSSESSION
CREDIT FACILITY**

**SUMMARY OF TERMS AND CONDITIONS**

This summary of terms and conditions (this "***DIP Term Sheet***") outlines certain terms and conditions of the DIP Facility referred to below. Capitalized terms used and not defined herein have the meanings assigned to such terms in the Commitment Letter to which this DIP Term Sheet is attached as Annex 1 (the "***Commitment Letter***").

| | |
|---|---|
| **Executive Summary:** | This DIP Term Sheet provides for a $325 million senior secured superpriority debtor in possession credit facility, to be funded in order (i) to refinance the Prepetition ABL Credit Agreement (as defined below), (ii) to finance the Debtors and their operations in accordance with the Budget (as defined below) and (iii) for general working capital purposes, in each case, in accordance with the Budget (as defined below). |
| | The DIP Facility will be fully committed to (and funded) by the financial institutions party to the Commitment Letter (the "***DIP Lenders***") (determined on a pro rata basis among the DIP Lenders based on the aggregate amount of the Prepetition Secured Notes Obligations held by the DIP Lenders (and such DIP Lenders' related funds and affiliates) as of the date of the Commitment Letter (the "***Pro Rata Allocations***")) pursuant to the terms and conditions described in this DIP Term Sheet and the Commitment Letter. |
| | The DIP Facility shall be repaid in-full, in-cash upon the Debtors' (as defined below) emergence from the Chapter 11 Cases through proceeds of new exit debt facilities to be raised and cash on hand. |
| **Borrower:** | Guitar Center, Inc. (the "***DIP Borrower***"), as a debtor and debtor in possession under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "***Bankruptcy Code***"). The DIP Borrower and its affiliated debtors and debtors in possession, collectively, the "***Debtors***". |
| **DIP Facility:** | A non-amortizing senior secured priming term loan facility (the "***DIP Facility***") with a commitment in an aggregate principal amount equal to $325 million (such principal amount, the "***Total Aggregate Commitment***" and the loans thereunder, the "***DIP Loans***") to be funded in one |

Borrowing not later than two (2) business days following the entry of the Interim DIP Order (as defined below) (the "**Borrowing**") and subject to the satisfaction of the Conditions Precedent to Borrowing and otherwise on the terms and conditions in this DIP Term Sheet, the Commitment Letter and the Operative Documents referred to below.

With respect to the DIP Facility, upon satisfaction of the Conditions Precedent to the Borrowing, funds with respect to the Borrowing shall be funded directly to the Debtors for use in accordance with the Budget.

**ABL DIP Facility:** A non-amortizing senior secured priming asset based revolving loan facility (the "**ABL DIP Facility**") with a commitment in an aggregate principal amount equal to $50 million to be funded in multiple borrowings, which shall include customary advance rates on inventory, accounts receivable, general intangibles and supporting obligations relating to each of the foregoing.

**Guarantors:** The obligations of the DIP Borrower shall be unconditionally guaranteed, on a joint and several basis, by each other Debtor (each, a "**Guarantor**" and collectively, the "**Guarantors**"). Each entity which guarantees (or is required to guarantee) the Prepetition Obligations shall be a Guarantor and a Debtor.

**Case:** The bankruptcy cases (the "**Chapter 11 Cases**") of the Debtors to be filed under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "**Bankruptcy Court**") (the date of filing of such petition, the "**Petition Date**"). The Petition Date shall be no later than November 28, 2020.

**DIP Agent:** Delaware Trust Company shall act as administrative agent and collateral agent under the DIP Facility (in such capacity, the "**DIP Agent**") on behalf of the DIP Lenders. Any action, exercise of remedies, approval, consent or similar action to be taken or not taken by the DIP Agent in respect of the DIP Facility shall only be taken (or not taken) as may be directed by the Required DIP Lenders (as defined below). The DIP Agent and the DIP Borrower shall enter into an agency fee letter providing for reasonable fees to be payable to the DIP

2

Agent to be mutually agreed and acceptable to the DIP Borrower.

**DIP Lenders:**

All obligations of the DIP Lenders under the DIP Facility shall be several and not joint.

**Prepetition ABL Credit Agreement:**

The Credit Agreement dated as of April 2, 2014 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Prepetition ABL Credit Agreement***" and the facility thereunder, the "***Prepetition ABL Facility***") by and among the DIP Borrower, the other Borrowers and Guarantors parties thereto, Wells Fargo Bank, National Association, as administrative agent and collateral agent (the "***Prepetition ABL Agent***"), the lenders from time to time party thereto (the "***Prepetition ABL Lenders***") and the other parties thereto. The obligations under the Prepetition ABL Facility are referred to herein as the "***Prepetition ABL Obligations***".

**Prepetition Intercreditor Agreement:**

The Amended and Restated Intercreditor Agreement dated as of May 15, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Prepetition Intercreditor Agreement***") by and among the Prepetition ABL Agent and the Bank of New York Mellon Trust Company, N.A., in its capacity as the Collateral Agent under the Prepetition Superpriority Notes and Prepetition Secured Notes.

**Prepetition Superpriority Notes:**

The senior secured superpriority notes (the "***Prepetition Superpriority Notes***") outstanding under that Indenture, dated as of May 15, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "***Prepetition Superpriority Notes Indenture***") by and among the DIP Borrower, The Bank of New York Mellon Trust Company, N.A., as trustee (the "***Prepetition Superpriority Notes Trustee***"), and the other parties thereto. The holders of such Prepetition Superpriority Notes are referred to herein as the "***Prepetition Superpriority Noteholders***". The obligations under the Prepetition Superpriority Notes are referred to herein as the "***Prepetition Superpriority Notes Obligations***".

**Prepetition Secured Notes:**

The senior secured notes (the "***Prepetition Secured Notes***") outstanding under that Indenture, dated as of March 16, 2018 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the

"*Prepetition Secured Notes Indenture*") by and among the DIP Borrower, The Bank of New York Mellon Trust Company, N.A., as trustee (the "*Prepetition Secured Notes Trustee*"), and the other parties thereto. The holders of such Prepetition Secured Notes are referred to herein as the "*Prepetition Secured Noteholders*". The obligations under the Prepetition Secured Notes are referred to herein as the "*Prepetition Secured Notes Obligations*" (and together with the Prepetition Superpriority Notes Obligations and the Prepetition ABL Obligations, the "*Prepetition Obligations*").

| | |
|---|---|
| **Restructuring Support Agreement:** | A restructuring support agreement executed on or prior to the Petition Date and which is mutually acceptable to the DIP Lenders and the Debtors (the "*RSA*"). |
| **Tenor of DIP Facility:** | The DIP Facility will mature on the earliest of (such earliest date, the "*Maturity Date*"): |

(a) the date that is 12 months after the Petition Date (the "*Scheduled Maturity Date*");

(b) 45 calendar days after the Petition Date, if the order approving the DIP Facility on a final basis (the "*Final DIP Order*" and together with the Interim Order (as defined below), the "*DIP Order*") has not been entered by the Bankruptcy Court prior to the expiration of such 45-day period;

(c) the effective date of a plan of reorganization or liquidation in the Chapter 11 Cases;

(d) the consummation of a sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code or otherwise;

(e) the date of termination of the DIP Lenders' commitments and the acceleration of any outstanding DIP Loans, in each case, under the DIP Facility in accordance with the terms of the DIP Facility credit agreement (the "*DIP Credit Agreement*") and the other definitive documentation with respect to the DIP Facility, which in each case, shall be reasonably acceptable to the Required DIP Lenders and DIP Borrower (collectively with the DIP Credit Agreement

and the related security documents, the "**_Operative Documents_**"); and

(f)   dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code.

**Closing Date:**

The date of the effectiveness of the Operative Documents (the "**_Closing Date_**") (which, for the avoidance of doubt, shall not occur prior to the entry of the Interim DIP Order).

**DIP Facility Interest Rate:**

The DIP Loans under the DIP Facility will bear interest at a rate per annum of 7.00%, compounded monthly and payable monthly in cash in arrears.

At any time when an Event of Default under the DIP Facility has occurred and is continuing, all outstanding amounts under the DIP Facility shall bear interest, to the fullest extent permitted by law, at the interest rate then applicable plus 2.00% per annum and shall be payable on demand in cash (the "**_Default Rate_**"). Interest on overdue amounts under the DIP Facility shall also accrue at the Default Rate and shall be payable in cash.

**DIP Facility Premiums:**

A commitment premium payable in cash to the DIP Lenders equal to 5.00% of each DIP Lender's initial commitments in respect of the DIP Facility (the "**_DIP Facility Premium_**") on the date of execution of the Commitment Letter, which shall be earned upon execution of the Commitment Letter and due and payable prior to the commencement of the Chapter 11 Cases, but in no event later than November 18, 2020.

An exit payment payable in cash to the DIP Lenders equal to 3.00% of each DIP Lender's funded DIP Loans or unfunded commitments under the DIP Facility on the Maturity Date or on the date of any earlier voluntary or mandatory prepayment (the "**_Exit Payment_**").

**Adequate Protection:**

As adequate protection for any diminution in the value of the interests of (i) Prepetition Superpriority Noteholders in the collateral securing the Prepetition Superpriority Notes, (ii) the Prepetition Secured Noteholders in the collateral securing the Prepetition Secured Notes, and (iii) the Prepetition ABL Lenders (solely until the Prepetition ABL Facility is repaid in full in cash) in the collateral securing

the Prepetition ABL Facility, the Prepetition Superpriority Noteholders, Prepetition Secured Noteholders and Prepetition ABL Lenders will receive, subject in all cases to the Carve-Out, the following as adequate protection: (A)(x) the payment of the reasonable and documented out-of-pocket fees and expenses of legal counsel and financial advisors retained by the ad hoc group of Prepetition Superpriority Noteholders and Prepetition Secured Noteholders that are also DIP Lenders, which shall be Stroock (as defined below), Province (as defined below), local counsel, and any other professionals or consultants as may be retained that may be reasonably necessary in connection with the Transaction, and (y) the payment of the reasonable and documented out-of-pocket fees and expenses of one legal counsel of the Prepetition ABL Lenders (such fees and expenses of counsel to the Prepetition ABL Lenders to only be payable until the Prepetition ABL Facility is repaid in full in cash from the proceeds of the DIP Facility and, as applicable, the ABL DIP Facility, and thereafter only in connection with a challenge brought with respect to the Prepetition ABL Obligations or any actions necessary in order for the Prepetition ABL Agent to transfer and assign possession and control of any collateral securing the Prepetition ABL Facility to the DIP Agent), (B) cash payments of accrued and unpaid interest at the default rate on the Prepetition Superpriority Notes and Prepetition ABL Facility, but not the Prepetition Secured Notes, upon entry of the Interim DIP Order (as defined below) and each date thereafter on which such interest payment would otherwise become due under the Prepetition Superpriority Notes Indenture and Prepetition ABL Credit Agreement until the payment in full of the Prepetition Superpriority Notes or Prepetition ABL Facility, as applicable, (C) validly perfected liens on and security interests in the Debtors' post-petition Collateral (as defined below) junior only to Permitted Liens (as defined below) and the liens granted to the DIP Lenders under the DIP Facility and existing valid, perfected, and superior liens in the Collateral held by other creditors (except with respect to liens granted to the Prepetition ABL Agent and Prepetition ABL Lenders securing the Revolver Priority Collateral (as defined in the Prepetition ABL Credit Agreement), which liens shall have priority over such liens granted to the DIP Lenders until the Prepetition ABL Obligations are satisfied) and (D) a superpriority administrative expense claim as contemplated by section

507(b) of the Bankruptcy Code, which claim shall have priority over all priority claims other than the claims of the DIP Lenders under the DIP Facility (except with respect to superpriority administrative claims granted to the Prepetition ABL Agent and Prepetition ABL Lenders with respect to Revolver Priority Collateral, which claims shall have priority over such claims granted to the DIP Lenders until the Prepetition ABL Obligations are satisfied) and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113 and 1114 of the Bankruptcy Code or otherwise (collectively, "***Adequate Protection***").

| | |
|---|---|
| **Optional Prepayments and Commitment Reductions:** | The DIP Borrower may, upon at least one (1) business day's notice, prepay or terminate in full (but not in part), with the payment of the Exit Payment but without other premium or penalty, subject to breakage costs, if applicable, the outstanding DIP Loans and unfunded commitments. Once repaid, DIP Loans may not be re-borrowed. |
| **Mandatory Prepayments:** | Mandatory prepayments of the DIP Loans customary for similar debtor-in-possession financings shall be required, including, in an amount equal to (a) 100% of insurance and condemnation proceeds, (b) 100% of net cash proceeds from the issuance of post-petition indebtedness not permitted by the DIP Credit Agreement and (c) 100% of the net cash proceeds of any sale of assets constituting Collateral and other asset sales (other than, while the ABL DIP Facility is outstanding, proceeds of Current Assets Priority Collateral (as defined below)) (subject to carveouts with respect to store closures and inventory and de minimis dollar carveouts to be agreed). |

All prepayments (within two (2) business day of receipt thereof) shall be applied as follows: <u>first</u>, to pay accrued and unpaid interest on, and expenses in respect of, the obligations under the DIP Facility, to the extent then due and payable; and <u>second</u>, to any principal amounts or other obligations (including the Exit Payment) which are outstanding under the DIP Facility. Other than the Exit Premium, there shall be no premium or penalty payable in connection with mandatory prepayments.

**Security:**

All amounts owing by the DIP Borrower under the DIP Facility and by the Guarantors in respect thereof will be secured by a perfected security interest in, with the priority described below under "Priority," and lien on, substantially all of the Debtors' tangible and intangible assets, including, without limitation, the following (collectively, the "***Collateral***"): collateral securing the Prepetition Obligations, cash and cash equivalents, accounts and other receivables, equipment, inventory, fixtures, contract rights, fee owned and ground leased real estate, real property interests, real property leaseholds, investment property, insurance proceeds, deposit accounts (other than payroll, trust and tax accounts), instruments, documents and chattel paper, securities, franchise rights, patents, tradenames, trademarks, copyrights, licenses and all other intellectual property, general intangibles, tax or other refunds, commercial tort claims, equity interests of subsidiaries of each Debtor and the products and proceeds thereof and, subject to entry of the Final DIP Order, any claims and causes of action arising under chapter 5 of the Bankruptcy Code and the proceeds thereof available to the Debtors' bankruptcy estates pursuant to the Bankruptcy Code, subject to the Carve Out and certain other exclusions to be mutually agreed ("***Permitted Liens***").  The indebtedness under the DIP Facility and guarantees thereof shall rank pari passu in right of payment with the indebtedness under, and guarantees of, the ABL DIP Facility.  The liens securing the ABL DIP Facility on Collateral consisting of inventory, accounts receivable, credit card receivables, chattel paper, general intangibles and supporting obligations relating to each of the foregoing, deposit accounts, securities accounts, cash and cash equivalents (in each case, other than the identifiable proceeds of Fixed Asset Priority Collateral (as defined below) and otherwise consistent with the definition of ABL Priority Collateral in the Prepetition Intercreditor Agreement (collectively, the "***Current Assets Priority Collateral***") shall rank senior in priority to the liens securing the DIP Facility on the Current Assets Priority Collateral. The liens securing the DIP Facility on Collateral other than the Current Assets Priority Collateral (collectively, the "***Fixed Assets Priority Collateral***") shall rank senior in priority to the liens securing the ABL DIP Facility on the Fixed Assets Priority Collateral.  The priority of the security interests and related creditor rights between the DIP Facility and the ABL DIP Facility will be as set forth in the

Prepetition Intercreditor Agreement and the DIP Order (the "*Intercreditor Arrangement*"); provided, in the event of any conflict between any provision in the Prepetition Intercreditor Agreement and a provision in the DIP Order, such provision of the DIP Order shall control.

**Priority:**

Subject in all cases to the Carve-Out, all amounts owing by the DIP Borrower under the DIP Facility and by the Guarantors in respect thereof shall at all times:

(a)    pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to joint and several superpriority administrative expense claims status in the Chapter 11 Cases;

(b)    pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by fully perfected first priority liens on all Collateral that is not subject to valid, perfected, enforceable, and non-avoidable security interest or lien as of the Petition Date, including all unencumbered fee-owned real estate and the proceeds of any unencumbered ground-leased and space-leased real estate, and including upon entry of the Final DIP Order, any claims and causes of action arising under chapter 5 of the Bankruptcy Code and the proceeds thereof; provided that with respect to liens granted to the agents and the lenders under the ABL DIP Facility in the Current Asset Priority Collateral, such liens shall have priority over the liens granted to the DIP Lenders;

(c)    pursuant to section 364(d) of the Bankruptcy Code, be secured by fully perfected first priority and senior priming liens on all Collateral that secures obligations under the Prepetition Obligations (provided that (i) with respect to liens granted to the Prepetition ABL Agent and Prepetition ABL Lenders securing the Revolver Priority Collateral (as defined in the Prepetition ABL Credit Agreement), such liens shall have priority over the liens granted to the DIP Lenders until the Prepetition ABL Obligations are satisfied) and (ii) with respect to liens granted to the agents and the lenders under the ABL DIP Facility in the Current Asset Priority Collateral, such liens shall have priority over the liens granted to the DIP Lenders;

(d)     pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by fully perfected junior priority liens on all other property of the Debtors that is subject to Permitted Liens as of the Petition Date (including liens (if any) perfected subsequent to the Petition Date as permitted by and in accordance with section 546(b) of the Bankruptcy Code) but with a priority immediately junior to such liens.

Such liens shall be senior to all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code.

All liens authorized and granted pursuant to the DIP Orders, as applicable, in each case, entered by the Bankruptcy Court approving the DIP Facility shall be deemed effective and perfected as of the Petition Date and no further filing, notice or act will be required to effect such perfection. The DIP Agent on behalf of the DIP Lenders, shall be permitted, but not required, to make any filings, deliver any notices or take any other acts as may be desirable under state law or other law in order to reflect the perfection and priority of the DIP Agent's (on behalf of the DIP Lenders) claims described herein, other than the filings of mortgages, which the parties agree shall be perfected through the DIP Orders.

**Carve-Out:**     See <u>Schedule I</u> to this DIP Term Sheet.

**Conditions Precedent to the Borrowing:**     The Operative Documents will contain customary conditions precedent to the Borrowing under the DIP Facility and other conditions deemed by the DIP Agent to be appropriate to the specific transaction, and in any event, including, without limitation:

(a)     The filing of the executed RSA.

(b)     The preparation, authorization and execution of the Operative Documents with respect to the DIP Facility, in form and substance consistent with this DIP Term Sheet.

(c)     No later than 5 calendar days after the Petition Date, the Bankruptcy Court shall have entered an interim order approving the DIP Facility on an interim basis (the "***Interim DIP Order***"), in form and substance consistent with this DIP Term Sheet and otherwise

reasonably acceptable to the Required DIP Lenders in their sole discretion, authorizing and approving the DIP Facility and the transactions contemplated hereby, including Adequate Protection, and the Interim DIP Order or the Final DIP Order following its entry shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the Required DIP Lenders, not to be unreasonably withheld or delayed, or, in the case of a Sacred Rights Amendment, each DIP Lender.

(d)   All premiums, payments, fees and documented out-of-pocket fees and expenses (including fees and expenses of counsel and financial advisors) required to be paid to the DIP Lenders and DIP Agent on or before the Closing Date (whether incurred before or after the Petition Date and including estimated fees and expenses through the Closing Date) shall have been paid (including, without limitation, payment of the DIP Facility Premium on or prior to November 18, 2020).

(e)   The delivery of a 11-week cash flow projection (the "***Initial DIP Budget***") in the form substantially consistent with the budget delivered on the date of the Commitment Letter.  Such Initial DIP Budget and all updates thereto (in accordance with reporting requirements described herein) shall include the same line item detail as provided in the Berkeley Research Group, LLC 11-week cash flow provided on the date of the Commitment Letter, and will forecast, on a weekly basis, the period commencing November 23, 2020 through the end of the fiscal month following the last week of such 11-week period, and on a monthly basis for each month thereafter through the Maturity Date; <u>provided</u> that, with the written consent and approval of the DIP Agent, the Initial Budget may be updated by the DIP Borrower (but no more than once per month), which update shall be effective three (3) calendar days following delivery to the DIP Agent except to the extent reasonably objected to by the DIP Agent in writing. Upon effectiveness, such updated budget shall thereupon become the "budget" for purposes of the DIP Facility (as so approved, the "***Budget***").

(f)    The DIP Agent shall have a valid and perfected lien on and security interest in the Collateral with the priority described herein. All filings, recordations and searches necessary or desirable in connection with such liens and security interests shall have been duly made; and all filing and recording fees and taxes shall have been duly paid.

(g)    Since May 12, 2020, there shall not exist any action, suit, investigation, litigation or proceeding pending (other than the Chapter 11 Cases) or threatened in any court or before any arbitrator or governmental authority that has or could be reasonably likely to have a material adverse change or material adverse condition in or affecting the businesses, assets, operations or financial condition of the Debtors and their respective direct and indirect subsidiaries taken as a whole or any of the transactions contemplated hereby; _provided_, that none of (i) the Chapter 11 Cases, actions in connection with the solicitation of holders of claims and execution of the RSA, the events and conditions leading up to the Chapter 11 Cases, or their reasonably anticipated consequences, (ii) the actions expressly required to be taken pursuant to the DIP Credit Agreement or the DIP Order and (iii) the COVID-19 pandemic shall constitute a "material adverse effect" for any purpose ("***Material Adverse Effect***").

(h)    No default or event of default shall exist under the Operative Documents.

(i)    The representations and warranties of the DIP Borrower and each Guarantor under the Operative Documents shall be true and correct in all material respects after giving effect to such funding.

(j)    The making of such DIP Loan shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily or permanently.

(k)    The DIP Agent shall have received all documentation and other information required by bank regulatory authorities under applicable "know-your-customer" and anti-money laundering rules and regulations,

including the U.S. Patriot Act and requested not later than 5 business days prior to the Closing Date.

(l)    An order approving the Debtors' cash management system, the form of which is reasonably acceptable to the Required DIP Lenders, shall have been entered by the Bankruptcy Court.

(m)    Orders approving customary "first day" relief, the form of which is acceptable or reasonably acceptable, as applicable pursuant to the RSA, to the Required DIP Lenders, shall have been entered by the Bankruptcy Court.

(n)    The Debtors shall not have entered into, or made any payment in respect of, any critical vendor agreements or otherwise entered into any agreement to pay, or made on a postpetition basis any payment in respect of, any prepetition trade obligations except as consented to by the DIP Agent pursuant to an order of the Bankruptcy Court (which may be via consent to the "first day" orders).

(o)    Other customary conditions precedent and deliverables for similar debtor-in-possession financings, reasonably requested by the Required DIP Lenders and agreed by the DIP Borrower.

| | |
|---|---|
| **Representations and Warranties:** | The Operative Documents will contain representations and warranties made by the Borrower and the Obligors under the Prepetition ABL Credit Agreement, modified as necessary to reflect the commencement of the Chapter 11 Cases and as is customary for similar debtor-in- possession financings. |
| **Reporting Requirements:** | The Operative Documents will contain financial reporting requirements consistent with the Prepetition ABL Credit Agreement and other reporting requirements customary for similar debtor-in-possession financings, namely, (i) monthly updates of the Budget for each fiscal month of the Debtors to be provided within five (5) business days following the end of any fiscal month of the Debtors, (ii) a weekly cash flow forecast budget to actuals for each line item in a form to be attached to the DIP Credit Agreement and otherwise reasonably acceptable to the DIP Agent, with management commentary on any individual line item with a positive or negative variance of 10.0% or more as |

compared to the Budget (unless the dollar amount corresponding to such percentage variance is less than $1,000,000, in which case no management commentary shall be required) (the "*Weekly Variance Report*"), (iii) monthly delivery of operating statements and balance sheets for the Debtors and their consolidated subsidiaries within 15 business days following the end of the applicable period, (iv) quarterly store-level operating statements for all properties within 45 days following the end of each fiscal quarter; provided that such store-level reporting shall not disclose individual store names or locations, (v) weekly updates on the status of critical vendor agreements (including regarding inventory provided thereunder) and (vi) weekly updates on closures of any store locations related to the COVID-19 pandemic, as applicable.

The Operative Documents will contain additional requirements that the Debtors' counsel provide (when practicable) advance copies of all pleadings and/or filings in the Chapter 11 Cases to be made by the Debtors. The Debtors shall also provide copies of any monthly reporting provided to the Bankruptcy Court or the U.S. Trustee.

|                             |                             |
| --------------------------- | --------------------------- |
| **Other Maintenance Covenants:** | The DIP Borrower's cumulative actual receipts shall not be less than 87.5% of budgeted receipts for the corresponding test period (the "*Permitted Collections Budget Variances*"). |

The DIP Borrower's cumulative actual disbursements (excluding professional fees) will be not more than 15% greater than the budgeted disbursements for the corresponding test period (the "*Permitted Expenditures Budget Variances*").

The Permitted Collections Budget Variances and Permitted Expenditures Budget Variances, together the "*Budget Variances*", in each case, as set forth in the then operative Budget. Notwithstanding anything to the contrary herein, the Debtors and Required DIP Lenders shall agree to include provisions in the Operative Documents providing for the implementation of increased Permitted Expenditures Budget Variances, in the event that the Debtors are able to more rapidly open store locations than anticipated in the Initial DIP Budget; provided, that Permitted Collections Budget Variances shall be adjusted accordingly to the extent agreed.

The Budget Variances shall each be tested against the updated Budget (i) first, on Friday, December 11, 2020 on a cumulative basis for the prior three weeks, (ii) second, on December 18, 2020 on a cumulative basis for the prior three weeks, and (iii) at the end of each week thereafter on a cumulative four week basis for the prior four weeks. The Debtors shall deliver a Weekly Variance Report to the DIP Agent by 12:00 p.m., Eastern time, on Friday of each week.

Simultaneously with the delivery of the Weekly Variance Report, the DIP Borrower shall report on liquidity (calculated as consolidated unrestricted book cash plus undrawn availability under the ABL DIP Facility) as of the end of the preceding week (as reported in the Weekly Variance Report), which shall not be less than $35 million.

**Affirmative Covenants:**

The Operative Documents will contain the affirmative covenants (a) made under the Prepetition ABL Credit Agreement modified as necessary to reflect customary debtor-in-possession financings provisions and (b) the following additional affirmative covenants required by the DIP Lenders and mutually agreeable to the Debtors: (i) the advance delivery (where practicable) of all material pleadings, motions and other material documents filed with the Bankruptcy Court on behalf of the Debtors in the Chapter 11 Cases to counsel to the DIP Lenders, (ii) compliance with Budget covenants consistent with the section titled "Budget and Variances," (iii) compliance with the Milestones in the administration of the Chapter 11 Cases, and (iv) weekly update meetings and/or calls with the Debtors' senior management and advisors and the DIP Lenders, if requested.

**Negative Covenants:**

The Operative Documents will contain negative covenants (a) made under the Prepetition ABL Credit Agreement modified as necessary to reflect customary debtor-in-possession financings provisions and (b) the following additional negative covenants: (i) incurrence of additional debt and liens, (ii) asset sales, (iii) investments, (iv) restricted payments, (v) fundamental changes and (vi) affiliate transactions.

**Events of Default:**

The Operative Documents will contain (a) events of default consistent with the Prepetition ABL Credit Agreement (subject to modification necessary to reflect customary

debtor-in-possession financings provisions) and (b) the following additional events of default (collectively, (a) and (b), the "***Events of Default***") (subject to mutually agreeable materiality thresholds and grace periods as applicable):

(i)  failure to make any payment when due under the Operative Documents;

(ii)  noncompliance with covenants or breaches in any material respect of representations and warranties, in either case, under the Operative Documents;

(iii)  cross-default to any prepetition indebtedness in a principal amount above a threshold to be agreed the enforcement of which is not stayed by the automatic stay in the Chapter 11 Cases;

(iv)  failure to satisfy or stay execution of judgments above a threshold to be agreed not subject to bankruptcy stay;

(v)  the existence of certain employee benefit or environmental liabilities, which would constitute a Material Adverse Effect;

(vi)  any event of default under the ABL DIP Facility that is not amended or waived;

(vii)  change of ownership or control;

(viii)  a trustee or receiver shall have been appointed in one or more of the Chapter 11 Cases;

(ix)  appointment of a responsible officer or examiner with enlarged powers relating to the operation of the business of any Debtor;

(x)  granting of relief from any stay of proceeding (including the automatic stay) so as to allow a third party to proceed against any asset of the Debtors in an amount in excess of $2,000,000 in the aggregate;

(xi)  entry of an order granting any superpriority claim which is senior to or *pari passu* with the DIP Lenders' claims under the DIP Facility without the

16

prior written consent of the DIP Agent (other than as described under the caption "Priority" above);

(xii)    any Debtor shall have filed, proposed, or supported a plan of reorganization, plan of liquidation, or a motion seeking to approve a sale of any material portion of the Collateral, unless such plan of reorganization, plan of liquidation, or motion provides for the payment in full in cash of the DIP Loans or as otherwise agreed to by the Required DIP Lenders;

(xiii)    entry of a final, non-appealable order staying, reversing, vacating or otherwise materially modifying, without the prior written consent of the Required DIP Lenders, not to be unreasonably withheld or delayed (or, in the case of a Sacred Rights Amendment, each DIP Lender), the DIP Facility, or the DIP Order;

(xiv)    payment of, or granting adequate protection with respect to, prepetition debt (other than as contemplated by the Operative Documents) unless otherwise agreed by the Required DIP Lenders (not to be unreasonably withheld or delayed);

(xv)    cessation of liens or superpriority claims granted with respect to the Collateral securing the Debtors' obligations in respect of the DIP Facility to be valid, perfected and enforceable in all respects with the priority described herein;

(xvi)    failure to comply with any of the DIP Milestones;

(xvii)    termination of exclusivity; and

(xviii)    entry into, or the making of any payment in respect of, any critical vendor agreements or otherwise entry into any agreement to pay, or the making of any payment in respect of, any prepetition trade obligations except as consented to by the DIP Agent (which may be via consent to the "first day" orders).

**Remedies:**    Upon the occurrence and during the continuance of an Event of Default, the DIP Agent or the Required DIP Lenders may:

(i) terminate the DIP Facility and any DIP Loan Document as to any future liability or obligation of the DIP Secured Parties (without affecting the outstanding DIP Obligations or DIP Liens); (ii) declare all DIP Obligations immediately due and payable; (iii) invoke the right to charge interest at the default rate under the DIP Loan Documents; (iv) immediately terminate and/or revoke the Debtors' right under the DIP Order and any other DIP Loan Documents to use any Cash Collateral; (v) freeze monies or balances in the Debtors' accounts; (vi) immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Agent or the DIP Lenders against the DIP Obligations; (vii) enforce any and all rights against the DIP Collateral including foreclosure, collection of accounts receivable, occupying the Debtors' premises, sale or disposition of DIP Collateral; (viii) enforce all guaranty rights under the DIP Loan Documents; (ix) and take any other actions permitted in the DIP Order; provided, however, that prior to the exercise of any right or remedy in clause (iv) through (ix) above, the DIP Agent or the DIP Lenders, as applicable, shall be required to provide five (5) business days' written notice to the Debtors, counsel to the Unsecured Creditors' Committee, and the U.S. Trustee of the DIP Agent's intention to exercise remedies.

The limited section 362 relief from the stay in favor of the DIP Agent set forth above shall be embodied in any order approving the DIP Facility and the use of cash collateral. At any hearing addressing the exercise of remedies by the DIP Agent under the Operative Documents, the only objection that may be raised by the Debtors shall be whether an Event of Default has in fact occurred and is continuing, and the Debtors shall waive their right to seek any relief, whether under section 105 of the Bankruptcy Code or otherwise, that would in any way impair, limit, restrict or delay the rights and remedies of the DIP Agent under the Operative Documents.

**Milestones:**

The DIP Borrower shall comply with the following chapter 11 milestones which Milestones may be extended in writing by the DIP Agent in its sole and absolute discretion (the "***Milestones***"). In addition, to the extent the failure to achieve the Milestones set forth in clauses (a) through (f) below is on account of the events or circumstances

18

surrounding the COVID-19 pandemic, the DIP Lenders and the DIP Borrower agree to negotiate in good faith with respect to a reasonable extension of any of the dates set forth below, as appropriate. Further, notwithstanding anything herein to the contrary, with respect to the Milestone set forth in clause (c) below, the applicable date shall be subject to reasonable adjustment to accommodate the Bankruptcy Court's calendar and any such adjustment will not give rise to an Event of Default solely as a result of such adjustment.

(a)    on the Petition Date, the Debtors shall have filed a motion seeking approval of the DIP Facility;

(b)    no later than forty-five (45) calendar days after the Petition Date, the Bankruptcy Court shall have entered the Final DIP Order;

(c)    no later than one (1) calendar day after the Petition Date, the Debtors will (unless otherwise provided for in the RSA) have filed either a motion seeking approval of a disclosure statement with respect to a chapter 11 plan that is reasonably consistent with the RSA and otherwise reasonably acceptable to the Required DIP Lenders;

(d)    no later than forty-five (45) calendar days after the Petition Date, the Bankruptcy Court shall have entered an order reasonably acceptable to the Required DIP Lenders approving an acceptable disclosure statement;

(e)    no later than forty-five (45) calendar days after the Petition Date, the Bankruptcy Court shall have entered one or more orders reasonably acceptable to the Required DIP Lenders confirming an acceptable chapter 11 plan; and

(f)    no later than February 1, 2021 the Plan Effective Date shall have occurred.

**Indemnification:**    Usual and customary for debtor-in-possession facilities of this type.

**Expenses:**    Each Debtor shall jointly and severally be obligated to pay all reasonable and documented out-of-pocket costs and expenses of the DIP Lenders and the DIP Agent, including all reasonable and documented fees, expenses and

disbursements of their respective specified legal counsel, specified financial advisors or other specified professionals retained by the DIP Agent or Required DIP Lenders, which shall be Stroock, Province, local counsel, and any other professionals or consultants as may be retained that may be reasonably necessary in connection with the Transaction in connection with (a) the discussion, negotiation, preparation, execution and delivery of any documents in connection with the proposed financing contemplated by this DIP Term Sheet, including the Operative Documents and the funding of all DIP Loans under the DIP Facility, the administration of the DIP Facility and any amendment, modification or waiver of any provision of the Operative Documents, (b) the interpretation, enforcement or protection of any of their rights and remedies under the Operative Documents or (c) the Chapter 11 Cases.

**Other Bankruptcy Matters:**    The DIP Orders shall be consistent with this DIP Term Sheet and otherwise in form and substance reasonably acceptable to the Required DIP Lenders, and all motions relating thereto, shall be in form and substance reasonably acceptable to the Required DIP Lenders and, unless otherwise agreed by the Required DIP Lenders in writing, shall include the following provisions:

(a)    modifying the automatic stay to permit the creation and perfection of the DIP Lenders' liens on the Collateral;

(b)    prohibiting the assertion of claims arising under section 506(c) of the Bankruptcy Code against any of the DIP Agent, the DIP Lenders, the Prepetition Superpriority Notes Trustee, the Prepetition Superpriority Noteholders, the Prepetition Secured Notes Trustee, the Prepetition Secured Noteholders, the Prepetition ABL Agent, the Prepetition ABL Lenders, or, except as expressly permitted therein, the commencement by the Debtors of other actions adverse to the DIP Agent, the DIP Lenders, the Prepetition Superpriority Notes Trustee, the Prepetition Superpriority Noteholders, the Prepetition Secured Notes Trustee, the Prepetition Secured Noteholders, the Prepetition ABL Agent, the Prepetition ABL Lenders,  or any of their respective rights and remedies under the DIP Facility, the Prepetition Secured Notes Indenture, the Prepetition

Superpriority Notes Indenture, the Prepetition ABL Credit Agreement, as applicable, the DIP Order, or any other order;

(c) prohibiting the incurrence of any debt with priority equal to or greater than the DIP Facility;

(d) prohibiting any granting or imposition of liens senior to the liens granted under the Operative Documents other than Permitted Liens;

(e) authorizing and approving the DIP Facility and the transactions contemplated thereby, including the granting of the superpriority status, security interests and liens and the payment of all premiums, payments and fees, referred to herein;

(f) acknowledging the validity and enforceability of the Prepetition Superpriority Notes Indenture and Prepetition Secured Notes Indenture, the debt outstanding thereunder and the liens granted in connection therewith, subject to a customary investigation period for other parties-in-interest;

(g) waiving any and all claims or causes of action against the Prepetition Superpriority Notes Trustee, the Prepetition Superpriority Noteholders, the Prepetition Secured Notes Trustee, the Prepetition Secured Noteholders whether arising prior to or after the Petition Date including, without limitation, any lender or noteholder liability claims, any subordination claims, subject in each case to a customary investigation period for other parties-in-interest;

(h) providing that the DIP Agent and the DIP Lenders and their respective counsel, advisors and consultants shall be entitled to the benefit of a "good faith" finding pursuant to section 364(e) of the Bankruptcy Code;

(i) providing that the DIP Agent, the DIP Lenders, the Prepetition Superpriority Notes Trustee, the Prepetition Superpriority Noteholders, the Prepetition Secured Notes Trustee, the Prepetition Secured Noteholders, the Prepetition ABL Agent, the Prepetition ABL Lenders, in their order of priority under applicable intercreditor agreements, reserve the

right to credit bid (pursuant to section 363(k) of the Bankruptcy Code and/or applicable law) the DIP Loans and the Prepetition Obligations, as applicable, in whole or in part, in connection with any sale or disposition of assets in the Chapter 11 Cases and shall not be prohibited from making such credit bid "for cause" under section 363(k) of the Bankruptcy Code but any credit bid with respect to the Prepetition Obligations shall be subject to a customary investigation period for other parties-in-interest;

(j)    providing that in no event shall the DIP Agent or the DIP Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Collateral;

(k)    providing that the DIP Agent, the DIP Lenders, the Prepetition Superpriority Notes Trustee, the Prepetition Superpriority Noteholders, the Prepetition Secured Notes Trustee, the Prepetition Secured Noteholders, the Prepetition ABL Agent, and the Prepetition ABL Lenders are entitled to all of the benefits of section 552(b) of the Bankruptcy Code and that the "equities of the case" exception thereunder shall not apply to any of the DIP Agent, the DIP Lenders, the Prepetition Superpriority Notes Trustee, the Prepetition Superpriority Noteholders, the Prepetition Secured Notes Trustee, the Prepetition Secured Noteholders, the Prepetition ABL Agent, and or the Prepetition ABL Lenders; and

(l)    providing that in no event shall any of the Prepetition Superpriority Notes Trustee, the Prepetition Superpriority Noteholders, the Prepetition Secured Notes Trustee, the Prepetition Secured Noteholders, the Prepetition ABL Agent, the Prepetition ABL Lenders, the DIP Agent or the DIP Lenders be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to enforcement of remedies, but subject in each case to the Intercreditor Arrangement.

| | |
|---|---|
| **Assignments:** | Customary for similar debtor-in-possession financings; <u>provided</u> that (i) if no Event of Default has occurred and is continuing, the DIP Borrower's consent shall be required (except with respect to an assignment to any other DIP |

Lender or any entity described in the definition of DIP Lender) for assignments of the DIP Loans, which such consent shall not be unreasonably withheld, conditioned or delayed and (ii) any assignee of the DIP Loans shall have signed a joinder to the RSA prior to becoming a DIP Lender.

**Required DIP Lenders:** DIP Lenders, as of any date of determination, holding greater than 50% of the outstanding DIP Loans and commitments under the DIP Facility held by the DIP Lenders (the "***Required DIP Lenders***"); <u>provided</u> that the consent of each DIP Lender adversely affected thereby shall be required to any amendment or modification (i) to extend the final maturity of any DIP Loan or to waive or postpone the occurrence of the Maturity Date or modify the definition thereof, (ii) to waive, reduce or postpone any scheduled repayment (but not prepayment) of any DIP Loan, (iii) to waive, reduce or postpone the scheduled date of payment of the interest or interest rate, exit payment, premium or fee payable on any DIP Loan (other than any waiver of default interest), or provide that repayment, satisfaction or discharge of the Obligations under the DIP Loan can occur in any manner other than indefeasible payment in full and in cash (iv) to the definition of Pro Rata Allocation or any waterfall for application of funds thereunder, (v) to reduce the percentage specified in the definition of Required DIP Lenders or any other provision requiring adversely affected or all Lender consent, (viii) to increase the amount or extend the expiry date of any DIP Lender's commitment and (ix) any change in the priority of payment and liens of the Borrower's and Guarantors' obligations under the DIP Facility (each such amendment or modification, a "***Sacred Rights Amendment***").

**Governing Law and Submission to Jurisdiction:** State of New York. Exclusive jurisdiction of the Bankruptcy Court, including with respect to the exercise of the remedies by the DIP Lenders and preservation of the value of the Collateral.

**Counsel to the DIP Lenders:** Stroock & Stroock & Lavan LLP ("***Stroock***").

**Financial Advisor to the DIP Lenders:** Province, Inc. ("***Province***").

**Counsel to the DIP Agent:** Pryor Cashman LLP.

Schedule I

DIP Carve Out

(a) <u>Carve Out.</u> As used in this Interim DIP Order, the "**Carve Out**" means (i) all fees required to be paid to (A) the Clerk of the Court and (B) the U.S. Trustee under section 1930(a) of title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 (and any interest thereon) incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by a compensation procedure order, procedural order, or otherwise, all unpaid fees and expenses (including transaction completion and similar fees) (the "**Allowed Professional Fees**") incurred by persons or firms retained by the Debtors pursuant to section 327, 328 or 363 of the Bankruptcy Code (the "**Debtor Professionals**") and a Creditors' Committee (if appointed) pursuant to section 328 or 1103 of the Bankruptcy Code (the "**Committee Professionals**" and, together with the Debtor Professionals, the "**Professional Persons**") at any time before or on the first business day following delivery by the DIP Agent or the DIP Term Loan Agent of a Carve Out Trigger Notice (as defined herein), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice, and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $3,000,000.00 incurred after the first business day following delivery by the DIP ABL Agent or the DIP Term Loan Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by Interim DIP Order, procedural order or otherwise (the amounts set forth in this clause (iv) being the "**Post-Carve Out Trigger Notice Cap**"). For purposes of the foregoing, "**Carve Out Trigger Notice**" shall mean a written notice delivered by email (or other electronic means) by the DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to a Creditors' Committee (if appointed), which notice may be delivered following the

24

occurrence and during the continuation of an Event of Default (as defined in and under the DIP Credit Agreement) stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b) <u>Carve Out Reserves.</u>

(i) The Carve Out Trigger Notice shall be deemed a draw request and notice of borrowing by the Debtors for loans under the DIP Credit Agreement in an amount equal to the sum of (x) the amounts set forth in subclauses (a) and (b) of the definition of Carve Out, and (y) the then unpaid amounts of the Allowed Professional Fees (any such amounts actually advanced shall constitute DIP Loans), and shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees (which cash amounts shall reduce, on a dollar for dollar basis, the draw requests and DIP Loans pursuant to this paragraph 5(5)(i)). The Debtors shall deposit and hold such amounts in a segregated account in trust exclusively to pay such unpaid Allowed Professional Fees referred to in paragraph 5(c)(i) (the "**Pre-Carve Out Trigger Notice Reserve**").

(ii) Carve Out Trigger Notice shall also be deemed a request by the DIP Loan Parties for loans under the DIP Credit Agreement in an amount equal to the Post-Carve Out Trigger Notice Cap (any such amounts actually advanced shall constitute DIP Loans) and shall also constitute a demand to the Debtors to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the Post-Carve Out Trigger Notice Cap (which cash amounts shall reduce, on a dollar for dollar basis, the draw requests and applicable loans under the DIP Credit Agreement pursuant to this paragraph 5(b)(ii)). The DIP Loan Parties shall deposit and hold such amounts in a segregated account in trust exclusively to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "**Post-**

**Carve Out Trigger Notice Reserve**" and, together with the Pre-Carve Out Trigger Notice Reserve, the "**Carve Out Reserves**").

(c) <u>Application of Carve Out Reserves.</u>

(i)        All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in subclauses (i) through (iii) of the definition of Carve Out (the "**Pre- Carve Out Amounts**"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap, until paid in full. If the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, subject to clause (iii), below, all remaining funds shall be distributed *first* to the DIP Agent on account of the applicable DIP Obligations until the Payment in Full of the DIP Obligations, *second* to the Debtors.

(ii) All funds in the Post-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in subclause (iv) of the definition of Carve Out (the "**Post-Carve Out Amounts**"). If the Post-Carve Out Trigger Notice Reserve has not been reduced to zero, subject to clause (iii), below, all remaining funds shall be distributed *first* to the DIP Agent on account of the applicable DIP Obligations until the Payment in Full of the DIP Obligations, *second* to the Debtors.

(iii) Notwithstanding anything to the contrary in the Prepetition Debt Documents, the DIP Documents or this Interim DIP Order, if either of the Carve Out Reserves is not funded in full in the amounts set forth in this paragraph 5(c), then, any excess funds in one of the Carve Out Reserves following the payment of the Pre-Carve Out Amounts and Post-Carve Out Amounts, respectively, shall be used to fund the other Carve Out Reserve to the extent of any shortfall in funding prior to making any payments to the DIP Agent.

(iv) Notwithstanding anything to the contrary in the Prepetition Debt Documents, DIP Debt Documents or this Interim DIP Order, following the third business day after delivery of a Carve

Out Trigger Notice, the DIP Agent and Prepetition Agents shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a security interest in any residual interest in the Carve Out Reserves, with any excess paid as provided in paragraphs (ii) and (iii) above.

(v) Notwithstanding anything to the contrary in this Interim DIP Order, (A) the failure of the Carve Out Reserves to satisfy in full the Allowed Professional Fees shall not affect the priority of the Carve Out with respect to any shortfall (as described below), and (B) in no way shall the Approved Budget, Carve Out, Post-Carve Out Trigger Notice Cap or Carve Out Reserves be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors.

(e) *Reservation of Rights*. Nothing herein shall be construed to impair the right or ability of any party to object to the fees, expenses, reimbursement or other compensation of any Professional Person with respect to the Carve Out provisions.

## **ANNEX 1-2**

ABL DIP Facility Term Sheet

# Wells Fargo DIP ABL Proposal

| Wells Fargo DIP ABL | |
|---|---|
| **Borrower** | Guitar Center, Inc. |
| **Facility** | $50 million DIP ABL revolving credit facility |
| **Admin Agent** | Wells Fargo Bank, National Association |
| **Lenders** | Wells Fargo sole lender |
| **Expected Hold** | $50 million |
| **Maturity** | 12 months after petition date (coterminous with DIP TL) |
| **Security** | First lien on working capital assets |
| | Second lien on non-ABL assets |
| **Unused Line Fee** | 0.375% |
| **Pricing (bps)** | ▪ L + 2.75% (0.50% floor) |
| | ▪ P + 1.75% |
| **L/C Sublimit** | $20,000,000 |
| **L/C Pricing** | Standby - LIBOR Margin |
| | Doc - LIBOR Margin - 50bps |
| ▉▉▉▉▉ | ▉▉▉ |
| ▉▉ | ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ |
| ▉▉ | ▉▉▉▉▉▉ |
| **Borrowing Base** | 90% on eligible credit card AR |
| | (+) 85% of eligible trade AR |
| | (+) lesser of (a) 90% of NOLV, or (b) 75% of eligible inventory |
| | (-) Applicable Reserves |
| | (Cash management included in Availability reserves) |
| **Covenants** | ▪ Variance testing TBD in consultation with Senior Noteholders |
| | ▪ Milestones TBD in consultation with Senior Noteholders |
| **Reserve Notice Requirements** | n/a |
| **Cash Dominion** | Springing if EA fall bellows below $10 million for 3 consecutive business days |
| **Cash Provision** | None |
| **Availability Block** | None |
| **Conditions** | ▪ <u>Milestones</u>: DIP Budget and milestones consistent with DIP TL covenants and milestones (if Noteholders DIP TL approves, ABL Agent will approve – drag along concept) |
| | ▪ <u>Audit/Appraisal</u>: Agent discretion to conduct a field exam if DIP is outstanding after 6 months |
| | ▪ <u>BBC Reporting</u>: Monthly BBC, springs to weekly if EA is less than [$15 million] for 2 business days |
| | ▪ <u>Financial Reporting</u>: Consistent with DIP TL reporting requirements |
| | ▪ <u>Bank Engaged FA</u>: $175,000 per month flat fee for M-III |
| | ▪ <u>Professional Fees</u>: to be paid weekly into a separate account |
| | ▪ <u>Documentation</u>: ABL Revolver will be documented in a separate document than Noteholder DIP TL |

## **ANNEX 2**

New Preferred Equity Term Sheet

GUITAR CENTER, INC.

**NEW PREFERRED EQUITY TERM SHEET**

This new preferred equity term sheet (the "**New Preferred Equity Term Sheet**") summarizes certain terms and conditions of the proposed preferred equity to be issued by Reorganized Guitar Center on the Plan Effective Date in the aggregate amount described below (the "**New Preferred Equity**").  Terms not defined in this New Preferred Equity Term Sheet shall have the meanings given to them in the Restructuring Support Agreement (the "**Agreement**") or the Restructuring Term Sheet to which this New Preferred Equity Term Sheet is attached as **Annex 3**.

**THIS NEW PREFERRED EQUITY TERM SHEET DOES NOT CONSTITUTE (NOR SHALL IT BE CONSTRUED AS) AN OFFER TO SELL OR BUY, OR THE SOLICITATION OF AN OFFER TO SELL OR BUY, ANY SECURITIES OR A SOLICITATION OF ACCEPTANCES AS TO ANY CHAPTER 11 PLAN WITHIN THE MEANING OF SECTION 1125 OF THE BANKRUPTCY CODE.  ANY SUCH OFFER OR SOLICITATION WILL ONLY BE MADE IN COMPLIANCE WITH APPLICABLE PROVISIONS OF SECURITIES, BANKRUPTCY, AND OTHER APPLICABLE LAWS.**

| TERM | DESCRIPTION |
| --- | --- |
| **Issuer** | Reorganized Guitar Center (the "**Issuer**"). |
| **Type of Security** | Preferred Stock of the Issuer (the "**New Preferred Stock**" and the holders thereof, the "**New Preferred Holders**"). |
| **Liquidation Preference** | Initial aggregate liquidation preference of $160 million on the Plan Effective Date (as increased following such date by all accrued and unpaid dividends, the "**Liquidation Preference**"). |
| **Issue Date** | To be issued on the Plan Effective Date in accordance with the Plan. |
| **Dividends** | Dividends shall accrue on a quarterly basis at a compounded rate of 15.00% per annum.<br><br>Notwithstanding the foregoing, the Issuer shall have the option (exercisable in its sole discretion) to pay dividends in cash; provided, that in no event shall the Issuer pay dividends in cash more than five times prior to the third anniversary of the Plan Effective Date. |
| **Tag-Along Right** | In the event one or more holders of common equity of the Issuer ("**Common Equity**") transfers Common Equity that results in a person or group (within the meaning of Rules 13d-3 and 13d-5 of the Exchange Act, or any successor provision) other than Investor Support Parties owning 50% or more of the then outstanding Common Equity, each New Preferred Holder shall have the option to participate in such transaction by selling for cash all of such New Preferred Holder's New Preferred Stock in such transaction at a price equal to the Liquidation Preference at such time *plus* an amount equal to the agreed make-whole amount that would be payable through the first day following the third anniversary of the Plan Effective Date, using a discount rate equal to the treasury rate plus 50 basis points (the "**Make-Whole Premium**") (the "**Tag-Along** |

**Right**”).

The Tag-Along Right shall be subject to customary notice provisions and protections to be negotiated in good faith and mutually agreed between the Company Parties, the Required Secured Notes Support Parties and the Investor Support Parties.

**Optional Redemption**

From and after the third anniversary of the Plan Effective Date, the Issuer may redeem the New Preferred Stock, in whole or in part, at a redemption price equal to the Liquidation Preference at such time.

Prior to the third anniversary of the Plan Effective Date, the Issuer may redeem the New Preferred Stock, in whole or in part, at a redemption price equal to the Liquidation Preference plus the Make-Whole Premium.

**Liquidation Event**

In the event of any liquidation event (including a sale of all or substantially all of the assets of the Issuer and its subsidiaries, taken as a whole), reorganization, dissolution, winding up, or any voluntary or involuntary bankruptcy, insolvency or similar creditors proceeding, of the Issuer (or any subsidiary or multiple subsidiaries of the Issuer if such subsidiary or subsidiaries owns or operates all or substantially all of the assets of the Issuer and its subsidiaries' assets, determined on a consolidated basis), automatically and without any action by any person, the claim amount for the New Preferred Stock shall equal the Liquidation Preference plus the Make-Whole Premium for all purposes.

**Issuer Covenants**

Without the written consent of the holders of at least a majority of the shares of the then outstanding New Preferred Stock, neither the Issuer (nor any of its subsidiaries) shall:

(i)     except as otherwise permitted pursuant to the Covenant Qualification (defined below) (or, if the Covenant Qualification does not apply pursuant to the last paragraph of this section, subject to customary/market exceptions and baskets to be negotiated in good faith and mutually agreed between the Company Parties, the Required Secured Notes Support Parties and the Investor Support Parties):

- make restricted payments to, restricted investments in or restricted acquisitions of any other Entity;

- enter into, supplement, modify or terminate any transaction or agreement between the Issuer and/or its subsidiaries, on one hand, and any Affiliates of the Issuer (other than its subsidiaries), on the other hand, unless (x) approved by a majority of the disinterested directors on the board of directors of the Issuer and (y) on terms that are not materially less favorable to the Issuer and/or its subsidiaries, as applicable, as could be obtained in a *bona fide* arm's length transaction; or

- incur or guarantee any indebtedness for borrowed money, and grant any lien on any material assets, property or other

2

interests; or

(ii)    make, declare, pay or set a record date for any dividend or distribution on, or repurchase or redeem any shares of, its capital stock (other than (1) dividends or distributions payable solely in common stock of the Issuer, (2) cash (in an immaterial amount) paid in lieu of fractional shares in connection with any such dividend payable solely in common stock of the Issuer, (3) redemptions of common stock held by employees upon a termination of employment at no more than fair market value and (4) any dividends or distributions on, or redemptions, purchases or repurchases of, New Preferred Stock).

Notwithstanding the foregoing, in no event shall the foregoing covenants be any more restrictive on the Issuer or its subsidiaries than, and such foregoing covenants shall be deemed to be qualified by the applicable exceptions and baskets contained in, the conceptually corresponding covenants set forth in the New First Lien Documents, as such covenants are amended, supplemented or modified from time to time in accordance with the New First Lien Documents (the "**Covenant Qualification**"); provided, that (i) the Covenant Qualification shall not apply if the Investor Support Parties and/or their respective Affiliates collectively purchase on the Plan Effective Date in excess of 20% of the indebtedness issued pursuant to the New First Lien Documents (and in any event, the Investor Support Parties shall be prohibited from renegotiating or amending the covenants to which the Covenant Qualification applies in the New First Lien Documents in connection with any such purchase of indebtedness on the Plan Effective Date); and (ii) following the Plan Effective Date, no amendment, modification or waiver of any applicable covenants in the New First Lien Documents shall apply for purposes of the application of the Covenant Qualification unless such amendments, modifications or waivers are approved by the holders of a majority of the outstanding indebtedness issued pursuant to the New First Lien Documents held by persons other than the Issuer Support Parties and their respective Affiliates (unless otherwise approved by the prior written consent of holders of at least a majority of the shares of the then outstanding New Preferred Stock).

**Ranking**    Upon any actual liquidation, dissolution or winding up of the Issuer, whether voluntary or involuntary, the New Preferred Holders are entitled to receive out of the assets of the Issuer available for distribution to its equity holders, on a senior, preferred basis, prior to and in preference of any distribution to the holders of (i) any shares of equity junior in right of payment to the New Preferred Stock (including the New Common Equity) and (ii) any other series of preferred stock of the Company (regardless of the date of issuance), an amount of cash per share of New Preferred Stock equal to its Liquidation Preference.

**Governance Rights**    For so long as at least 30% of the shares of New Preferred Stock issued on the Plan Effective Date continue to be held by the initial holders of such shares (the "**Minimum Ownership Threshold**"), the holders of a majority of the then outstanding shares of New Preferred Stock shall have the right to nominate (and replace) one (1) non-voting observer (the "**Observer**") to the Issuer's Board of Directors (the "**Board**") and to any committee of the Board. In the event that the

Minimum Ownership Threshold fails at any time to be satisfied, then, at such time, the Observer shall automatically be removed from office and the right to appoint the Observer shall permanently terminate.  Subject to the continued satisfaction of the Minimum Ownership Threshold set forth in the first sentence of this section, the initial Observer shall be appointed by the Required Creditor Support Parties as of the Plan Effective Date for an initial term of no less than 12 months following the Plan Effective Date.  The Issuer agrees to pay reasonable and customary fees to the Observer, in an amount to be mutually agreed among the Issuer, the Observer and the Required Creditor Support Parties, but which shall in no event exceed the fees paid to independent directors in respect of their service as directors (i.e., excluding any additional compensation paid for committee service or similar additional duties).  In addition, the Issuer shall reimburse all reasonable and documented out-of-pocket expenses of the Observer in connection with attendance of Board and/or committee meetings.

Notwithstanding the foregoing, a majority of the members of the Board shall have the right to: (i) exclude the Observer from its meetings; and (ii) omit or redact from any materials provided to the Observer, certain information, in each case, if such majority reasonably determines (in good faith) that such exclusion, omission or redaction is necessary or appropriate (a) to preserve the attorney-client or any other legal privilege, or where the provision of such information would reasonably be expected to cause the Issuer to breach its obligations with respect to confidential or proprietary information of third parties, or (b) because any actual or potential conflict of interest is present.

| | |
|---|---|
| **Voting Rights** | The New Preferred Holders shall have no right to vote on any matters except as set forth in this New Preferred Equity Term Sheet and: (i) with respect to the issuance of any new equity securities of the Issuer that rank *pari* or senior to the New Preferred Stock; (ii) with respect to any amendments, supplements or modifications to (or waivers that relate to any provision in) the certificate of designation of the New Preferred Stock; and (iii) as otherwise required by law. |
| **Information Rights** | Each New Preferred Holder shall have the right to receive the same information (within the same time periods) as the public-side or, as long as such New Preferred Holder certifies in writing, and otherwise evidences, in a form reasonably acceptable to the Issuer that such New Preferred Holder is not a competitor of the Issuer, at the option of each New Preferred Holder, private-side holders of the New First Lien Debt. |
| **Transfer Restrictions** | The Plan and Confirmation Order shall provide that the New Preferred Equity shall be issued in reliance on the exemption from the registration requirements of the federal securities laws pursuant to section 1145 of the Bankruptcy Code.  The New Preferred Holders shall be subject to transfer restrictions with respect to the New Preferred Stock, including: (i) in compliance with applicable law; (ii) to prohibit transfers to competitors of the Issuer without the approval of the Issuer; (iii) to prevent transfers that would reasonably be expected to require registration or qualification of the New Preferred Stock under the Securities Exchange Act of 1934 or state securities or blue sky laws, or require the Company to file reports pursuant to any applicable federal or state securities or blue sky laws; and (iv) to prevent transfers that would cause (x) the Issuer or any of its subsidiaries to be required to register as an investment company under the Investment Company |

4

Act of 1940, as amended, or to be subject to regulation under the Investment Advisers Act of 1940 or (y) the assets of the Company or any Subsidiary of the Company to be deemed "Plan Assets" as defined under the Employee Retirement Income Security Act of 1974 or its accompanying regulations (collectively, "**ERISA**") or result in any "prohibited transaction" under ERISA.

## **ANNEX 3**

Governance Term Sheet

**Guitar Center:**
**Corporate Governance Term Sheet**

The below construct assumes three principal stockholders with relatively similar levels of common equity ownership as of the closing.

Board

1. Ares - 3 board seats, including Chairman of the Board

2. Brigade - 3 seats

3. Carlyle - 3 seats

4. Each of Ares, Brigade and Carlyle will be entitled to designate one director to each committee of the Board

5. CEO would also serve on the Board

6. Sunset of director rights and other approval rights specified herein upon sell-down at ownership thresholds to be agreed (although rights can be assigned to a permitted transferee who acquires a majority of the assignor's position and exceeds specified ownership threshold).

7. Any duly held meeting of the Board will require a quorum of a majority of the members of the Board being present, with at least one director appointed by each principal stockholder (in each case subject to sunset rights) required to constitute a quorum at any meeting of the Board. Notwithstanding the foregoing, if all of the directors appointed by any principal stockholder fail to attend two out of any three consecutive validly called Board meetings, the meeting with respect to the second such failure shall be adjourned for three days and such director(s) shall not be required for a quorum of the reconvened Board meeting. In addition, if the directors of a principal stockholder are required to recuse themselves pursuant to Section 10 below, the presence of such directors shall not be required for a quorum.

Approval Rights

8. Except as set forth in Section 9 below, all board matters will require approval of the directors designated by two of three principal stockholders. These decisions include (without limitation):

   o Debt financings / recaps / dividends
   o Removal of independent directors, if any

- o  Material changes in a significant accounting policy
- o  Changes to the Company's independent auditor
- o  Approval of the annual budget
- o  Compensation of the CEO and direct reports (procedurally to be done through compensation committee)
- o  Any waiver of terms of stockholders agreement by the Company (which shall not include the party benefitting from the waiver)

9.  The following  matters will require approval by the directors designated by all three principal stockholders:

- o  JV / acquisitions, in each case above $15m (excluding earn-outs); not to exceed $60m (including earn-outs) per year
- o  divestitures above $15m
- o  Equity issuances not subject to preemptive right (not to exceed $100m in the first 3 years after closing)
- o  Bankruptcy, voluntary dissolution, or winding up of the Company
- o  Material changes to nature of the business (note: adding a new line is not a material change)
- o  Transactions with affiliates (more than 5% equityholders)
- o  Sale of the Company/IPO (except pursuant to drag along described below)
- o  Changes to size or composition of the board or any of its committees

10.  If a principal stockholder has a material conflict of interest with respect to a proposed transaction directly involving any of its holdings in the securities or indebtedness of the Company or any of its subsidiaries (other than its (x) common stock, warrants or junior preferred or (y) debt of less than $10m), on the one hand, and a matter requiring an approval contemplated in Section 8 or Section 9 above (a "Conflicted Holder"), on the other hand, the directors designated by the Conflicted Holder will recuse themselves from approving or disapproving such matter, and all such applicable matters contemplated by Sections 8 or 9 will require approval of the directors designated by all principal stockholders other than the Conflicted Holder[s].  For the avoidance of doubt, any transaction the proceeds of which would be used to repay, repurchase or make any payment on or with respect to such securities or indebtedness will be deemed a conflict of interest.

Preemptive Rights

11.  Prior to a Qualified IPO (to be defined), each holder of > 5% of the Common Stock (with affiliates aggregated for such calculation) will have a preemptive right to participate pro rata, on an as converted basis (excluding warrants), in any issuance of securities by the Company (subject to customary exceptions for M&A activity, debt kicker, management/director/consultant issuance).  Equity holders

2

will have ten (10) business days following written notice from the Company to exercise preemptive rights.  Preemptive rights may assigned to affiliates.

<u>Transfers of Equity</u>

12. No transfers (including indirect transfers) for 2.5 years from closing (other than to affiliates or pursuant to the drag-along).  For purposes of transfer provisions, affiliates will be defined to prohibit circumvention.

13. After no transfer period,

- o no transfers to competitors, strategic buyers or entities set forth on an agreed upon DQ list, in any case without prior consent. Entities may be added to the DQ list from time to time with the approval of two principal stockholders.
- o other transfers (other than pursuant to drag along) subject to ROFO in favor of Company (and, if not exercised by the Company, in favor of other principal stockholders).

14. Drag Along:

- o Drag-along right in connection with (i) a sale of at least 80% of the capital stock or all or substantially all the assets of the Company to an unaffiliated party, (ii) a sale to a non-affiliate SPAC, or (iii) a Qualified IPO, in any case if approved by the directors appointed by two of three principal stockholders.  At least 80% of the consideration received in a drag (other than for a Qualified IPO) must be cash or publicly traded securities. In the case of a drag-along  for less than 100% of the Company's capital stock or assets (other than a Qualified IPO),  the value of the sum of (i) the portion of the Company retained plus (ii)  the consideration received in the sale (other than cash and publicly traded securities) may not exceed 20% of the total value of the Company.

- o Prior to 4th anniversary of the Closing, the ability to exercise the drag-along right will be subject to the following MOIC (based on the initial investment in New Common Equity in the Restructuring Transactions, which excludes any investment in debt or preferred securities). For purposes of (a) a Qualified IPO, MOIC will be determined based on the fair market value of any publicly traded securities held by the principal stockholder representing its initial investment in New Common Equity, calculated as if all such shares held by the principal stockholders

3

immediately prior to the IPO were sold on the closing date of the IPO at the valuation at pricing of the IPO, and (b) a sale, merger or other similar transaction, including a sale to a SPAC, MOIC will be determined based on the aggregate consideration set forth in the definitive transaction agreement at the time of signing). Mechanism for valuing non-cash consideration TBD.

| Time period | MOIC |
|---|---|
| <2nd anniversary of the Closing | 3.00x |
| | (2.5x in the case of a QIPO) |
| 2nd - 3rd anniversary of the Closing | 1.75x |
| 3rd - 4th anniversary of the Closing | 1.00x |

- o  Company and all equity holders will cooperate with any drag-along transaction. Company will bear the costs of the drag along transaction.

15.    Tag along rights for all holders of > 5% of the Common Stock (with affiliates aggregated for such calculation) on any transfer (other than to affiliates).  Tag rights may assigned to affiliates.

16.    Drag- and tag-along rights shall be subject to customary limitations on representations, warranties, restrictive covenants and indemnities and the consideration to be received by participating stockholders

17.    Customary demand and piggyback registration rights post IPO.  Cutbacks pro rata based on ownership of Common Stock.

18.    Stockholder agreement terminates upon a Qualified IPO and post Qualified IPO board composition to be developed with managing underwriters based on prevailing practice at the time for similarly situated companies, other than registration rights, and customary provisions regarding confidentiality, information rights and waivers of corporate opportunity.

<u>Individual Consent Rights</u>

19.    Any amendment to the governance or other organizational documents will require the consent of any equity holder (i) that is disproportionately and materially adversely affected by such amendment or (ii) if the amendment modifies, reduces or removes a specific right granted to a such equity holder; provided that consent shall not be required for the grant of rights associated with new equity interests otherwise issued in compliance with the agreement and the organizational documents that do not discriminate among the existing equity holders.

4

20.    The Company may not repurchase equity of any class not pro rata to shareholding (other than customary exceptions for repurchases of management equity upon termination of employment) without the consent of any disproportionately affected shareholder.  Repurchases that are offered on a pro rata basis to each equity holder shall be deemed "pro rata," regardless of whether each equity holder elects to participate.

Other

21.    Stockholders agreement to contain customary provisions regarding confidentiality, information rights and waivers of corporate opportunity.

22.    Representation that no material side agreements between principal stockholders regarding the matters contemplated hereby, including the ownership and disposition of Company securities ("side deals") at effective date.  Covenant (i) prohibiting side deals in the first 6 months following emergence and thereafter, requiring disclosure of side deals between principal stockholders and (ii) requiring disclosure of acquisitions or dispositions of any debt or equity of the Company or any of its subsidiaries.

## ANNEX 4

Releases, Exculpation, and Injunctions

**Releases by the Debtors**

Pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Plan Effective Date, each Released Party[10] is, and is deemed released and discharged by the Debtors, the Reorganized Debtors, and their Estates[11] (and their respective successors and assigns) from any and all Causes of Action,[12] including any derivative claims asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest, or that any holder of any Claim or Interest could have asserted on behalf of the Debtors, based on or relating to, or in any manner arising from, in whole or in part:

i.   the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Agreement, the DIP Facility, the Disclosure Statement, or the Plan;

ii.   any Restructuring, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the

---

[10]   "**Released Party**" means, collectively, and in each case solely in its capacity as such: (a) the Creditor Support Parties; (b) the Investor Support Parties; (c) the Trustees under the Indentures; (d) the DIP Agents; (e) the DIP Commitment Parties; (f) all holders of Claims and Interests who vote to accept the Plan; (g) all holders of Claims in classes that are deemed to accept the Plan; (h) all holders of Claims and Interests in voting classes who abstain from voting on the Plan <u>and</u> who do not opt out of the releases provided by the Plan; (i) all holders of Claims and Interests in voting classes who vote to reject the Plan <u>and</u> who do not opt out of the releases provided by the Plan; and (j) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing entities in clauses (a) through (i), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, funds, portfolio companies, management companies; and (k) with respect to each of the Debtors, the Reorganized Debtors, and each of the foregoing Entities in clauses (a) through (j), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors.  Notwithstanding the foregoing, any holder of a Claim or Interest that objects to the Plan (and thereby opts out of the releases) or otherwise opts out of the releases shall not be a "Released Party."

[11]   "**Estate**" means as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

[12]   "**Causes of Action**" means any claims, Claims, Interests, damages, remedies, causes of action, demands, rights, actions, suits, controversies, proceedings, obligations, liabilities, accounts, defenses, offsets, powers, privileges, licenses, liens, indemnities, guaranties and franchises of any kind or character whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, contingent or non-contingent, liquidated or unliquidated, secured or unsecured, assertable, directly or derivatively, matured or unmatured, suspected or unsuspected, in tort, law, equity, or otherwise.  Causes of Action also include: (a) all rights of setoff, counterclaim, or recoupment and claims on contracts or for breaches of duties imposed by law; (b) the right to object to or otherwise contest Claims or Interests; (c) claims pursuant to sections 362 or Chapter 5 of the Bankruptcy Code; and (d) such claims and defenses as fraud, mistake, duress, and usury and any other defenses set forth in section 558 of the Bankruptcy Code.

Agreement, the DIP Facility, the Disclosure Statement, or the Plan;

iii.   the Chapter 11 Cases, the DIP Facility, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of confirmation of the Plan, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement;

iv.   any securities issued by the Debtors, the ownership thereof and the assertion or enforcement of rights and remedies thereunder against the Debtors; any avoidance actions; and the Indentures; or

v.   any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, in each case related to the foregoing clauses (i) through (iv).

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement executed to implement the Plan, (ii) the rights of any holder of allowed Claims to receive distributions under the Plan, (iii) any obligations of any party under a contract or lease that has been assumed by the Debtors or the Reorganized Debtors, or (iv) any claims, causes of action, defenses, offsets, rights of setoff, rights of recoupment or avoidance actions asserted as defenses or brought as counterclaims to Claims asserted against the Debtors or the Reorganized Debtors.

**Releases by Holders of Claims and Interests of the Debtors**

As of the Plan Effective Date, each Releasing Party[13] is, and is deemed to have released and discharged each Debtor, Reorganized Debtor, and Released Party from any and all Causes of Action, including any derivative claims asserted on behalf of the Debtors, that such Entity would have been legally entitled to assert (whether individually or collectively), based on or relating to, or in any manner arising from, in whole or in part:

i.   the Debtors, the Debtors' in- or out-of-court restructuring efforts, intercompany transactions, the formulation, preparation, dissemination, negotiation, or filing of the Agreement, the DIP Facility, the Disclosure Statement, or the Plan;

---

[13]   "**Releasing Party**" means, collectively, and in each case solely in its capacity as such: (a) the Creditor Support Parties; (b) the Investor Support Parties; (c) the Trustees under the Indentures; (d) the DIP Agents; (e) the DIP Commitment Parties; (f) all holders of Claims and Interests who vote to accept the Plan; (g) all holders of Claims in classes that are deemed to accept the Plan; (h) all holders of Claims and Interests in voting classes who abstain from voting on the Plan and who do not opt out of the releases provided by the Plan; (i) all holders of Claims and Interests in voting classes who vote to reject the Plan and who do not opt out of the releases provided by the Plan; (j) all other holders of Claims and Interests to the fullest extent permitted by law; (k) with respect to each of the foregoing entities in clauses (a) through (j), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, funds, portfolio companies, management companies; and (l) with respect to each of the foregoing Entities in clauses (a) through (k), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors.

ii.     any Restructuring, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Agreement, the DIP Facility, the Disclosure Statement, or the Plan;

iii.     the Chapter 11 Cases, the DIP Facility, the Disclosure Statement, the Plan, the filing of the Chapter 11 Cases, the pursuit of confirmation of the Plan, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance or distribution of securities pursuant to the Plan, or the distribution of property under the Plan or any other related agreement;

iv.     any securities issued by the Debtors, the ownership thereof and the assertion or enforcement of rights and remedies thereunder against the Debtors; any avoidance actions; and the Secured Notes Indenture or the Superpriority Notes Indenture; or

v.     any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Plan Effective Date, in each case related to the foregoing clause (i) through (iv).

Notwithstanding anything to the contrary in the foregoing, the releases set forth above do not release (i) any post-Plan Effective Date obligations of any party or Entity under the Plan, any Restructuring Transaction, or any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or (ii) the rights of any holder of allowed Claims to receive distributions under the Plan.

**Exculpation**     Except as otherwise specifically provided in the Plan, no Exculpated Party[14] shall have or incur, and each Exculpated Party is hereby released and exculpated from any Cause of Action for any Claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, filing, or termination of the Agreement and related prepetition transactions, the Disclosure Statement, the Plan, or any Restructuring, contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement or the Plan, the filing of the Chapter 11 Cases, the pursuit of confirmation of the Plan, the pursuit of consummation of the Plan, the administration and implementation of the Plan, including the issuance of securities pursuant to the Plan,

---

[14]   "**Exculpated Parties**" means, collectively, and in each case solely in its capacity as such: (a) the Debtors and Reorganized Debtors; (b) the Creditor Support Parties; (c) the Investor Support Parties; (d) the Trustees under the Indentures; (e) the DIP Agents; (f) the DIP Commitment Parties; (g) with respect to each of the foregoing entities in clauses (a) through (f), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, funds, portfolio companies, management companies; and (h) with respect to each of the foregoing Entities in clauses (a) through (g), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors.

or the distribution of property under the Plan or any other related agreement, except for claims related to any act or omission that is determined in a final order to have constituted actual fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan.  The Exculpated Parties have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

|  |  |
|---|---|
| **Injunctions** | Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or the Confirmation Order, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to the Plan, shall be discharged pursuant to the Plan, or are subject to exculpation pursuant to the Plan, are permanently enjoined, from and after the Plan Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, or the Released Parties: (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such claims or interests unless such Entity has timely asserted such setoff right in a document filed with the Bankruptcy Court explicitly preserving such setoff, and notwithstanding an indication of a claim or interest or otherwise that such Entity asserts, has, or intends to preserve any right of setoff pursuant to applicable law or otherwise; and (v) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such claims or interests released or settled pursuant to the Plan. |

## **EXHIBIT B**

Term DIP Commitment Letter

[Attached.]

**PERSONAL AND CONFIDENTIAL**

**November 13, 2020**

**Guitar Center, Inc.**
5795 Lindero Canyon Road
Westlake Village, California 91362

Attention: Michael Pendleton, General Counsel

$325 Million Senior Secured Superpriority Debtor-In-Possession Term Loan Credit Facility
Commitment Letter

Ladies and Gentlemen:

Guitar Center, Inc. ("**Guitar Center**", "**you**" or "**your**") has (i) advised the financial institutions, funds, investment managers or other entities signatory hereto (the "**Commitment Parties**", "**we**", "**us**" or "**our**"), that Guitar Center and certain of its subsidiaries (the "**Subsidiary Debtors**") and Guitar Center Holdings, Inc., a Delaware corporation and the direct parent of Guitar Center ("**Holdings**" and, collectively with Guitar Center and the Subsidiary Debtors, the "**Debtors**"), are considering filing voluntary petitions for relief (the "**Chapter 11 Cases**") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "**Bankruptcy Code**"), and (ii) in connection with the foregoing, requested that the Commitment Parties agree to commit to provide a senior secured superpriority debtor-in-possession term loan credit facility for Guitar Center under Sections 364(c) and 364(d) of the Bankruptcy Code in an aggregate principal amount equal to $325 million (the "**DIP Facility**") on the terms and subject to the conditions hereinafter set forth in this commitment letter and on the terms and subject to the conditions set forth in the DIP Term Sheet attached hereto as Exhibit A (collectively, this "**Commitment Letter**").  Unless otherwise specified herein, all references to "$" shall refer to U.S. Dollars.  To the extent not defined in the body of this Commitment Letter, each capitalized term shall have the meaning assigned to it in the DIP Term Sheet attached hereto as Exhibit A. The transactions described above are referred to herein as the "**Transaction**".

1.      **Commitment**

To provide assurance that the DIP Facility shall be available on the terms and conditions set forth herein and in the DIP Term Sheet, each Commitment Party (through one or more of its funds, affiliates or managed accounts) is pleased to advise Guitar Center of its several, but not joint, commitment (the "**Commitment**") to provide the principal amount of the DIP Facility set forth opposite its name on Schedule I hereto, on the terms and conditions set forth herein and in the DIP Term Sheet attached hereto as Exhibit A (the "**DIP Term Sheet**"), subject solely to the satisfaction or waiver by the Commitment Parties of the conditions precedent that are applicable to the relevant borrowing set forth herein (including in the DIP Term Sheet).

2.      **Conditions Precedent**

The Commitment Parties' agreements and obligations are subject to the execution and delivery of definitive loan documents relating to the DIP Facility including, without limitation, the Operative Documents, consistent with the terms set forth in this Commitment Letter (including the DIP Term Sheet) and otherwise reasonably acceptable to you and the Commitment Parties.

Other than as set forth in the immediately preceding paragraph, the conditions precedent with respect to the DIP Facility shall be limited to those described in the DIP Term Sheet.

**3.      Information**

Borrower represents and covenants that (i) all information, documentation and materials that has been or will be made available to the Commitment Parties and/or their professional advisors by or on behalf of the Borrower, any other Debtor, or any of their respective representatives in connection with the transactions contemplated hereunder (collectively, the "**Information**") (other than financial projections, forecasts and other forward-looking statements (collectively, the "**Projections**")) is and will be when furnished, when taken as a whole, complete and correct in all material respects and does not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements contained therein not misleading; and (ii) the Projections that have been or will be made available to the Commitment Parties by or on behalf of the Borrower, any other Debtor, or any of their respective representatives have been and will be prepared in good faith based upon assumptions that are believed by the preparer thereof to be reasonable at the time such Projections are furnished to the Commitment Parties and on the date hereof, it being understood and agreed that the Projections are not a guarantee of financial performance and actual results may differ from the Projections and such differences may be material.  You agree that if at any time prior to the Closing Date, any of the representations in the preceding sentence would be incorrect in any material respect if the information and Projections were being furnished, and such representations were being made, at such time, including to the extent that prior to the Closing Date, any event that has occurred results in or could reasonably be expected to result in a Material Adverse Change (as defined below), then you will promptly supplement, or cause to be supplemented, the information and Projections so that such representations will be correct in all material respects under those circumstances; it being understood, in each case, that such supplement shall cure any breach of such representations and warranties. The Commitment Parties shall be entitled to rely upon on all such Information and Projections without any obligation to conduct any independent evaluation or appraisal of the assets or liabilities of the Borrower and the other Debtors or any other party or to advise or opine on any related solvency issues.  You further understand that in arranging and syndicating the DIP Facility we may use and rely on the Information and Projections without independent verification thereof.

For purposes hereof, "**Material Adverse Change**" means any condition, development or event that after the date hereof has resulted in, or would reasonably be expected to result in a material adverse change in the operations, assets, revenues or financial condition of Borrower and its subsidiaries taken as a whole (other than (i) by virtue of the commencement of the Chapter 11 Cases and the events and conditions typically resulting from and leading up to the filing of the Chapter 11 Cases, (ii) any actions required to be taken pursuant to the DIP Facility and (iii) the COVID-19 pandemic).

**4.      Payment Amounts**

As consideration for the Commitment Parties' commitment hereunder, you agree to pay to the Commitment Parties the nonrefundable amounts set forth in the Payment Letter dated the date hereof and delivered herewith (the "**Payment Letter**") and all amounts set forth in the DIP Term Sheet.

You agree that, once paid, such payments or any part thereof payable under the Payment Letter and the Operative Documents shall not be refundable under any circumstances, regardless of whether the transactions or borrowings contemplated by this Commitment Letter are consummated, except as otherwise agreed in writing by you and the Commitment Parties. All payments payable shall be paid in immediately available funds in U.S. Dollars and shall not be subject to reduction by way of withholding, setoff or counterclaim or be otherwise affected by any claim or dispute related to any other matter. In addition, all payments payable hereunder shall be paid without deduction for any taxes, levies, imposts, duties,

deductions, charges or withholdings imposed by any national, state or local taxing authority, or will be grossed up by you for such amounts.

**5.      Indemnification and Related Matters**

You agree to (a) indemnify and hold harmless each Commitment Party (in its capacity as such) and its affiliates and their respective officers, directors, employees, agents, advisors, attorneys and other representatives and successors of each of the foregoing (each, an "**Indemnified Person**"), from and against any and all losses, claims, demands, damages and liabilities (collectively, "**Losses**") and the reasonable and documented or invoiced out-of-pocket fees and expenses, joint or several, to which any such Indemnified Person may become subject, including to the extent arising out of, resulting from, or in connection with, any actual or threatened claim, litigation, investigation or proceeding (including any inquiry or investigation) relating to this Commitment Letter (including the DIP Term Sheet), the Transaction, the Payment Letter, the Chapter 11 Cases or any related transaction contemplated hereby, the DIP Facility or any use of the proceeds thereof, the commitments furnished pursuant to this Commitment Letter or the Commitment Parties in connection therewith (any of the foregoing, a "**Proceeding**"), regardless of whether any such Indemnified Person is a party thereto and whether or not such Proceedings are brought by you, your equity holders, affiliates or creditors or any other third person, and to reimburse each such Indemnified Person promptly for any reasonable and documented or invoiced out-of-pocket legal fees and expenses incurred in connection with investigating, responding to, or defending any of the foregoing and other reasonable and documented or invoiced out-of-pocket fees and expenses incurred in connection with investigating, responding to, or defending any of the foregoing, and (b) reimburse the Commitment Parties promptly (but in any event within two business days) upon receipt of their demand for any reasonable and documented out-of-pocket (i) legal or other expenses of Stroock & Stroock & Lavan LLP and one reasonably necessary local legal counsel and (ii) fees and expenses of Province incurred in connection with the Chapter 11 Cases, the DIP Facility, the enforcement of this Commitment Letter, the definitive documentation for the DIP Facility, and any ancillary documents and security arrangements in connection therewith, but no other third-party financial advisors (other than Province) without your prior written consent; <u>provided</u> that the foregoing indemnity will not, as to any Indemnified Person, apply to Losses or related expenses (i) to the extent that they have resulted from the willful misconduct or gross negligence of such Indemnified Person or any of such Indemnified Person's controlled affiliates or any of its or their respective officers, directors, employees, agents, advisors or other representatives or successors of any of the foregoing or (ii) to the extent arising from a material breach of the obligations of such Indemnified Person under this Commitment Letter, in each case under clauses (i) and (ii), as determined by a court of competent jurisdiction in a final and non-appealable decision.

You shall not, without the prior written consent of the Commitment Parties and their affiliates, effect any settlement of any pending or threatened Proceedings in respect of which indemnity could have been sought hereunder by such Commitment Party unless (x) such settlement includes an unconditional release of such Indemnified Person in form and substance satisfactory to such Commitment Party from all liability on claims that are the subject matter of such Proceedings and (y) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of such Commitment Party or any injunctive relief or other non-monetary remedy.  You acknowledge that any failure to comply with your obligations under the preceding sentence may cause irreparable harm to such Commitment Party and the other Indemnified Persons.

The expense reimbursements and indemnification provisions of this Commitment Letter shall constitute superpriority administrative expenses under Sections 503(b)(1) and 507(a)(2) of the Bankruptcy Code in the Chapter 11 Cases without the need to file any motion (other than any motion as may be necessary to obtain the approvals of this Commitment Letter and the Payment Letter), application or proof of claim and

notwithstanding any administrative claims bar date, and shall be immediately payable in accordance with the terms hereof without further notice or order of the Bankruptcy Court.

Notwithstanding any other provision of this Commitment Letter, no Indemnified Person shall be liable for (i) any damages arising from the use by others of information or other materials obtained through electronic, telecommunications or other information transmission systems except to the extent such damages are found in a final, non-appealable judgment of a court of competent jurisdiction to have resulted from the willful misconduct or gross negligence of the Indemnified Person, or (ii) any indirect, special, punitive or consequential damages (including, without limitation, any loss of profits, business or anticipated savings) in connection with this Commitment Letter, the Transaction (including the DIP Facility and the use of proceeds thereunder), or with respect to any activities related to the DIP Facility, including the preparation of this Commitment Letter and the Operative Documents.

## 6.      Affiliate Activities, Sharing of Information, Absence of Fiduciary Relationships

The Commitment Parties may employ the services of their affiliates in providing the commitments hereunder and, in connection therewith, may exchange with such affiliates information concerning you and the other companies that may be the subject of the transactions contemplated by this Commitment Letter, and, to the extent so employed, such affiliates shall be entitled to the benefits, and be subject to the obligations, of the Commitment Parties hereunder.  The Commitment Parties shall be responsible for their respective affiliates' failure to comply with such obligations under this Commitment Letter.

You acknowledge that the Commitment Parties, the DIP Lenders and their respective affiliates may be providing debt financing, equity capital or other services (including financial advisory services) to other companies in respect of which you may have conflicting interests regarding the transactions described herein and otherwise.  The Commitment Parties will not use confidential information obtained from you by virtue of the transactions contemplated by this Commitment Letter or their other relationships with you in connection with the performance by such Commitment Parties of services for other companies, and the Commitment Parties will not furnish any such information to other companies.  You also acknowledge that the Commitment Parties have no obligation to use in connection with the transactions contemplated by this Commitment Letter, or to furnish to you, confidential information obtained from other companies.

You agree that each Commitment Party will act under this Commitment Letter as an independent contractor and that nothing in this Commitment Letter will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between the Commitment Parties, on the one hand, and you and your respective equity holders or your and their respective affiliates on the other hand.

You acknowledge and agree that (i) each Commitment Party, on the one hand, and you, on the other hand, have an arm's-length business relationship that does not directly or indirectly give rise to, nor do you rely on, any fiduciary duty on the part of any Commitment Party, (ii) in connection therewith and with the process leading to such transaction each Commitment Party and, if applicable, each of its affiliates, is acting solely as a principal and has not been, is not and will not be acting as an advisor, agent or fiduciary of you, your management, equity holders, creditors, affiliates or any other person, (iii) with respect to  the transactions contemplated hereby or the process leading thereto, each Commitment Party and, if applicable, its affiliates, has not assumed (x) an advisory or fiduciary responsibility in favor of you or your affiliates (irrespective of whether the Commitment Parties or any of their affiliates have advised or are currently advising you or your affiliates on other matters (which, for the avoidance of doubt, includes acting as a financial advisor to the Borrower, any other Debtor, or any of their respective affiliates in respect of any transaction related hereto)) or (y) any other obligation except the obligations expressly set forth in this Commitment Letter and (iv) you have been advised that the Commitment Parties are engaged in a broad range of transactions that may involve interests that differ from your interests and that the Commitment

4

Parties have no obligation to disclose such interests and transactions to you by virtue of any fiduciary, advisory or agency relationship. You further acknowledge and agree that (i) you are responsible for making your own independent judgment with respect to such transactions and the process leading thereto, (ii) you are capable of evaluating, and do understand and accept the terms, risks and conditions of the transactions contemplated hereby, and the Commitment Parties shall have no responsibility or liability to you with respect thereto, and (iii) the Commitment Parties are not advising the Borrower or any other Debtor as to any legal, tax, investment, accounting, regulatory or any other matters in any jurisdiction, and you shall consult with your own advisors concerning such matters and you shall be responsible for making your own independent investigation and appraisal of the transactions contemplated hereby. Any review by the Commitment Parties or any of their affiliates of the Borrower, the transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of the Commitment Parties and shall not be on behalf of the Borrower or any other person. The Borrower (x) agrees that it will not claim that any Commitment Party has rendered any advisory services or assert any claim against any Commitment Party based on an alleged breach of fiduciary duty by any Commitment Party in connection with this Commitment Letter and the transactions contemplated hereby or assert any claim based on any actual or potential conflict of interest that might be asserted to arise or result from the engagement of any Commitment Party or any of their affiliates acting as a financial advisor to the Borrower, the other Debtors or any of their respective affiliates, on the one hand, and the engagement of any Commitment Party hereunder and the transactions contemplated hereby, on the other hand, and (y) waives any claims it may have against the Commitment Parties for breach of fiduciary duty or alleged breach of fiduciary duty and agree that the Commitment Parties shall have no liability (whether direct or indirect) to the Borrower, the other Debtors, or any of their respective affiliates in respect of such a fiduciary duty claim or to any person asserting a fiduciary duty claim on behalf of or in right of the foregoing, including their respective affiliates and any stockholder, employee, or creditor of any of the foregoing or of any affiliate of the foregoing.

Additionally, you acknowledge and agree that the Commitment Parties are not advising you as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction. You shall consult with your own advisors concerning such matters and shall be responsible for making your own independent investigation and appraisal of the transactions contemplated hereby, and the Commitment Parties shall not have any responsibility or liability to you with respect thereto. Any review by any of the Commitment Parties of the Borrower, the transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of the Commitment Parties and shall not be on behalf of you or any of your affiliates.

**7.      Assignments; Amendments**

This Commitment Letter (i) may not be assigned by you or us without the prior written consent of the Commitment Parties (and any purported assignment without such consent will be null and void) and the Borrower, (ii) is intended to be solely for the benefit of the parties hereto (and Indemnified Parties) and (iii) except as set forth in Section 6 above, is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto (and Indemnified Parties). Any and all obligations of any Commitment Party hereunder (including, for the avoidance of doubt, funding obligations) may be performed and any and all rights of such Commitment Party hereunder may be exercised by or through any of its respective affiliates and the provisions of Section 5 shall apply with equal force and effect to such affiliates. This Commitment Letter may not be amended or any term or provision hereof or thereof waived or otherwise modified except by an instrument in writing signed by each of the parties hereto, and any term or provision hereof may be amended or waived only by a written agreement executed and delivered by all parties hereto.

8.    **Confidentiality**

Please note that this Commitment Letter, the Payment Letter, any of their terms or substance, and any written communications provided by, or oral discussions with, any Commitment Party in connection with this arrangement are exclusively for the information of the Borrower and may not be disclosed, directly or indirectly, by you to any third party or circulated or referred to publicly without our prior written consent, except, after providing written notice to the Commitment Parties, pursuant to a subpoena or order issued by a court of competent jurisdiction or by a judicial, administrative or legislative body or committee (in each case excluding disclosure in the context of the Chapter 11 Cases, which shall be governed by the last sentence of this paragraph); *provided* that we hereby consent to your disclosure of (i) this Commitment Letter, any of its terms or substance, and any written communications provided by, or oral discussions with, the Commitment Parties in connection with this arrangement to your affiliates that will be Loan Parties under the DIP Facility and their respective employees, attorneys, financial advisors, officers, directors, agents and advisors who are directly involved in the consideration of the DIP Facility and who have been informed by you of the confidential nature of such advice and this Commitment Letter and who have agreed to treat such information confidentially, (ii) this Commitment Letter or the information contained herein to the extent required in motions, in form and substance reasonably satisfactory to each Commitment Party, that may be filed the Bankruptcy Court seeking in connection with the Borrower seeking to obtain the entry of an order approving your execution, delivery and performance of this Commitment Letter and/or the definitive Operative Documents (but any such disclosure shall be subject to the limitations set forth in in the last sentence of this paragraph), (iii) this Commitment Letter as required by applicable law (including, without limitation, antitrust laws) or compulsory legal process (in which case, to the extent permitted by law, you agree to inform us promptly thereof prior to disclosure) (in each case excluding disclosure in the context of the Chapter 11 Cases, which shall be governed by the last sentence of this paragraph); (iv) with the Commitment Parties' prior written consent to the proposed disclosure and (v) to any official committee appointed in the Chapter 11 Cases (and their advisors) so long as you obtain from the applicable persons or entities a confidentiality agreement with respect to such information in form and substance acceptable to the Commitment Parties (but any such disclosure shall be subject to the limitations set forth in in the last sentence of this paragraph). Notwithstanding anything to the contrary in the foregoing, in connection with seeking court approval of this Commitment Letter and the Payment Letter you shall only be permitted to (i) provide unredacted copies of the Commitment Letter and the Payment Letter to the Bankruptcy Court and the Office of the United States Trustee in connection with any motion seeking approval of this Commitment Letter and the Payment Letter, (ii) publicly disclose the Commitment Letter and the Payment Letter to the extent necessary to obtain approval of the Bankruptcy Court of this Commitment Letter and the Payment Letter or the DIP Facility, provided, that any disclosure of the Payment Letter pursuant to the preceding clause (i) and (ii) shall be made via filing under seal or in a redacted manner in form and substance reasonably satisfactory to the Commitment Parties and, to the extent required, providing an unredacted copy thereof directly to the Bankruptcy Court and the Office of the United States Trustee and (iii) provide unredacted copies of the Commitment Letter and the Payment Letter to advisors to any statutory committee appointed in the Chapter 11 Cases of you or any of the other Debtors, and in each case so long as such disclosure is on a confidential "professionals' eyes only" basis.

The Commitment Parties reserve the right to review and approve, in advance, all materials, press releases, advertisements, and disclosures that you or your affiliates prepare that contain the Commitment Parties' or any of their respective affiliates' names or describe the Commitment Parties' financing commitment, *provided* that such approval shall not be unreasonably withheld or delayed.

Each Commitment Party and its affiliates will use all non-public information provided to it or such affiliates by or on behalf of you hereunder or in connection with the Transaction solely for (i) the purpose of providing the commitments hereunder and (ii) the other transactions contemplated by the RSA, and shall treat confidentially all such information and shall not publish, disclose or otherwise divulge, such

information; provided that nothing herein shall prevent such Commitment Party and its affiliates from disclosing any such information (i) with your consent, (ii) pursuant to the order of any court or administrative agency or in any pending legal, judicial or administrative proceeding, or otherwise as required by applicable law, rule or regulation or compulsory legal process based on the reasonable advice of counsel (in which case such Commitment Party agrees, to the extent not prohibited by applicable law, rule or regulation, to inform you promptly thereof prior to disclosure), (iii) upon the request or demand of any regulatory authority (including any self-regulatory authority) having jurisdiction over such Commitment Party or any of its affiliates (in which case such Commitment Party agrees (except with respect to any audit or examination conducted by bank accountants or any regulatory authority (including any self-regulatory authority) exercising examination or regulatory authority), to the extent not prohibited by applicable law, rule or regulation, to inform you promptly thereof prior to disclosure), (iv) to the extent that such information becomes publicly available other than by reason of improper disclosure by such Commitment Party, any of its affiliates or any of its or their Related Parties in violation of any confidentiality obligations (including those set forth in this paragraph) owing to you or any of your or affiliates or any of your Related Parties, (v) to such Commitment Party's affiliates and to its and their respective directors, officers, employees, shareholders, legal counsel, independent auditors, professionals and other experts or agents (such persons, "**Related Parties**") who need to know such information in connection with the Transaction and who are informed of the confidential nature of such information and who are subject to customary confidentiality obligations of professional practice or who agree to be bound by the terms of this paragraph (or language substantially similar to this paragraph) (with such Commitment Party being responsible for such compliance) and (vi) as is necessary or advisable in protecting and enforcing the Commitment Party' rights with respect to this Commitment Letter.  The Commitment Parties' and their affiliates', if any, obligations under this paragraph shall terminate automatically and be superseded by the confidentiality provisions in the definitive documentation relating to the DIP Facility upon the initial funding thereunder.

9.      **Governing Law and Jurisdiction**

**Each of the parties hereto for itself and its affiliates agrees that any suit or proceeding arising in respect of this Commitment Letter or the Commitment Parties' agreements or obligations hereunder will be tried exclusively in the Bankruptcy Court or, if the Bankruptcy Court does not have subject matter jurisdiction, in any Federal court of the United States of America sitting in the Borough of Manhattan or, if that court does not have subject matter jurisdiction, in any state court located in the City and County of New York, and each of the parties hereby submits to the exclusive jurisdiction of, and to venue in, such court.  Any right to trial by jury with respect to any action or proceeding arising in connection with or as a result of this Commitment Letter, the Payment Letter, the DIP Facility or any matter referred to in this Commitment Letter is hereby waived by the parties hereto. The parties hereto for itself and its affiliates agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Service of any process, summons, notice or document by registered mail or overnight courier addressed to any of the parties hereto at the addresses above shall be effective service of process against such party for any suit, action or proceeding brought in any such court.  This Commitment Letter will be governed by and construed in accordance with the laws of the State of New York.**

10.     **Miscellaneous**

The agreements and obligations of the Commitment Parties hereunder will terminate, unless the Commitment Parties shall have received this Commitment Letter signed by the Borrower prior to 11:59 p.m. New York City time on November 13, 2020.

Each Commitment Party's rights under the provisions set forth under Sections 3, 4, 6, 8 and 9 hereof and this Section 10 will remain in full force and effect regardless of whether definitive Operative Documents are executed and delivered. Each Commitment Party's rights under the provisions set forth under Sections 4, 5, 6, 8 and 9 hereof and this Section 10 will remain in full force and effect notwithstanding the expiration or termination of this Commitment Letter or the Commitment Parties' agreements and obligations hereunder. The provisions of Section 5 will be replaced by the applicable provisions of the Operative Documents once effective.

Notwithstanding any other provision of this Commitment Letter, the obligations under this Commitment Letter with respect to the DIP Facility are joint and several obligations of the Borrower and the other Debtors and several, but not joint, among the Commitment Parties. For the avoidance of doubt, the obligations any Commitment Party hereunder shall be solely in respect of its capacity as Commitment Party and shall not bind, restrict, or limit the actions of the Commitment Party (or of its affiliates) acting in any other capacity, including as a Support Party (as defined in the RSA) or as a creditor of, or potential investor in, any Debtor or its affiliates.

This Commitment Letter may be executed in any number of counterparts, each of which when executed will be an original, and all of which, when taken together, will constitute one agreement. Delivery of an executed counterpart of a signature page of this Commitment Letter by facsimile transmission or electronic transmission (in pdf format) will be effective as delivery of a manually executed counterpart hereof. The words "execution," "executed", "signed," "signature," and words of like import in this Commitment Letter shall be deemed to include electronic signatures or electronic records, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act. This Commitment Letter and the Payment Letter are the only agreements that have been entered into among the parties hereto with respect to the DIP Facility and set forth the entire understanding of the parties with respect thereto and supersedes any prior written or oral agreements among the parties hereto with respect to the DIP Facility and the Transaction.

We hereby notify you that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001) (the "**Patriot Act**")) and the requirements of 31 C.F.R. § 1010.230 (the "**Beneficial Ownership Regulation**"), each of us and each of the DIP Lenders may be required to obtain, verify and record information that identifies the Borrower and each other Loan Party, which information may include its name and address and other information that will allow each of us and the lenders to identify the Borrower and each other Loan Party in accordance with the Patriot Act or the Beneficial Ownership Regulation, as applicable. This notice is given in accordance with the requirements of the Patriot Act and is effective for each of us and the DIP Lenders.

[Remainder of page intentionally left blank]

8

We are pleased to have been given the opportunity to assist you in connection with the financing for the Transaction.

Very truly yours,

**[LENDER]**

By: _____

    Name:

    Title:

[Signature Page to Commitment Letter]

We are pleased to have been given the opportunity to assist you in connection with the financing for the Transaction.

Very truly yours,

**[LENDER]**

By: _____
    Name:
    Title:

[Signature Page to Commitment Letter]

**ACCEPTED AND AGREED AS OF NOVEMBER 13, 2020:**

**GUITAR CENTER, INC.**

By:_____

Name:

Title:

[Signature Page to Commitment Letter]

**<u>EXHIBIT A</u>**

**<u>DIP TERM SHEET</u>**

## **EXHIBIT C**

New Common Equity Commitment Letters

[Attached.]

ARES PE EXTENDED VALUE FUND LP
2000 AVENUE OF THE STARS
SUITE 1200
LOS ANGELES, CA 90067

November [ ● ], 2020

Guitar Center Holdings, Inc.
5795 Lindero Canyon Road
Westlake Village, California 91362

Guitar Center, Inc.
5795 Lindero Canyon Road
Westlake Village, California 91362

Re: Equity Commitment Letter

Ladies and Gentlemen:

Reference is made to:

(i)        the Restructuring Support Agreement (the "**Support Agreement**"), by and among Guitar Center, Inc., a Delaware corporation ("**Guitar Center**"), Guitar Center Holdings, Inc., a Delaware corporation ("**Holdings**"), and those subsidiaries of Guitar Center that are party to the Support Agreement (together with Guitar Center and Holdings, the "**Company Parties**"), the Creditor Support Parties (as defined in the Support Agreement), and each of the Investor Support Parties (as defined in the Support Agreement);

(ii)       the equity commitment letter, dated on or about the date of this Letter, between Carlyle Co-Investor (as defined in the Support Agreement) and the Company Parties (the "**Carlyle ECL**");

(iii)      the equity commitment letter, dated on or about the date of this Letter, between Brigade Co-Investor (as defined in the Support Agreement) and the Company Parties (the "**Brigade ECL**" and together with the Carlyle ECL, the "**Other Investor ECLs**"); and

(iv)      the New Common Equity and Warrant Investment Agreement in the form attached to the Support Agreement (the "**Investment Agreement**")

Capitalized terms used but not defined in this equity commitment letter (the "**Letter**") shall have the meanings given to them in the Support Agreement.

1.        <u>Commitment</u>. Subject to the terms and conditions set forth in this Letter, the undersigned Investor Support Party commits that, on the Plan Effective Date, it shall purchase pursuant to the Investment Agreement, or shall cause the purchase of, 33 1/3% of the New Common Equity of Reorganized Guitar Center, subject to dilution by the Management Incentive Plan, the Warrants and any subsequent issuances of common equity of Reorganized Guitar Center,

for an aggregate amount not to exceed $55,000,000, as such amount may be increased or reduced in accordance with this Letter (the "**Equity Investment**").

The Equity Investment and the equity investments received by the other Investor Support Parties pursuant to the Other Investor ECLs (the "**Other Investor Equity Investments**" and together with the Equity Investment, the "**Aggregate Investment**") will be made on a several and not joint basis, and the proceeds thereof will be used solely as contemplated by the Plan. Subject to the terms and conditions of this Letter and the Other Investor ECLs, the Company Parties shall cause the remainder of the Aggregate Investment to be funded by the other Investor Support Parties, as applicable, in accordance with the terms and conditions of each Other Investor ECL.

Notwithstanding any other provision of this Letter, the undersigned Investor Support Party shall not be obligated to contribute to, purchase equity or debt of, or otherwise provide funds to, Reorganized Guitar Center in any amount in excess of the Equity Investment (the "**Cap**"). Under no circumstances shall this Letter be enforced without giving full and absolute effect to the Cap. The undersigned Investor Support Party may effect its Equity Investment directly or indirectly through one or more Affiliates or designees.

2. <u>Conditions</u>. The obligation of the undersigned Investor Support Party to fund its Equity Investment is subject to:

(a)    the Support Agreement shall be in full force and effect;

(b)    there shall be no Co-Investor Termination Event or Sponsor Termination Event that has occurred and is continuing, unless such event has been waived in writing by the applicable Investor Support Party;

(c)    no notice of default shall have been delivered under the Support Agreement unless such default has been waived or cured in accordance with the terms of the Support Agreement;

(d)    other than funding of the Equity Commitment and issuance of the New Common Equity, each of the conditions to the occurrence of the Plan Effective Date set forth in the Restructuring Term Sheet shall have been satisfied or waived in accordance with the terms of the Support Agreement and the Restructuring Term Sheet;

(e)    each of the conditions to consummation of the transactions contemplated by the Investment Agreement shall have been satisfied or waived in accordance with its terms;

(f)    the prior or substantially simultaneous consummation of the Restructuring Transactions pursuant to the Plan on the terms and conditions set forth in the Support Agreement, including (without limitation) the conditions precedent in the Restructuring Term Sheet;

(g)    the prior or substantially simultaneous incurrence of the New First Lien Debt; and

(h)    the prior or substantially simultaneous funding of each other Investor Party's pro rata portion of the Aggregate Investment pursuant to their respective Other Investor ECL and the

2

Investment Agreement, unless the Equity Cure (as defined herein) is exercised to fund the Aggregate Investment.

3.    <u>Termination</u>. Including without limitation the obligation of the undersigned Investor Support Party to make the Equity Investment (except as set forth in clause (d) below), this Letter will terminate automatically and immediately upon the earliest to occur of:

(a)    the termination of the Support Agreement with respect to the undersigned Investor Support Party;

(b)    the termination of either of the Other Investor ECLs; <u>provided</u> that, if either the Equity Cure or the Ad Hoc Group New Equity Funding Option is exercised to fund the Aggregate Investment, then this Letter shall not terminate pursuant to this <u>Section 3(b)</u>;

(c)    the termination of the Investment Agreement; and

(d)    the effectiveness of the Plan (subject to the fulfilment of (i) the undersigned Investor Support Party's obligations hereunder and under the Investment Agreement and (ii) the other Investor Support Parties' obligations under each of the Other Investor ECLs and under the Investment Agreement.

Upon any termination of this Letter, neither the undersigned Investor Support Party nor any of its Affiliates shall have any further obligations or liabilities under this Letter, or, following its execution and delivery, the Investment Agreement, in each case whether based upon contract, tort or any other claim or legal theory, and whether at law or equity. This <u>Section 3</u> and <u>Sections 4-9</u>, <u>11</u> and <u>12</u> shall survive any termination of this Letter.

4.    <u>No Modification; Entire Agreement</u>.

(a)    This Letter may not be amended, modified or supplemented except by an agreement in writing signed by each Investor Support Party and the Company. Each other Investor Support Party is a third party beneficiary of the immediately preceding sentence. Together with the Support Agreement, the Restructuring Term Sheet, and the Investment Agreement, this Letter constitutes the sole and entire agreement of the undersigned Investor Support Party or any of its Affiliates, on the one hand, and the other Company Parties, on the other, with respect to the subject matter contained in this Letter. This Letter supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to the subject matter of this Letter.

(b)    The Company Parties shall not amend, modify, supplement, assign, terminate or waive this Letter or any provision of, any of the Other Investor ECLs or the Investment Agreement, in each case, without the prior written agreement of each Investor Support Party.

5.    <u>Parties in Interest; Third-Party Beneficiaries; Specific Performance</u>.

(a)    Except as set forth in <u>Section 4(a)</u>, <u>Section 4(b)</u>, <u>Section 5(b)</u> and <u>Section 5(c)</u>, this Letter is for the sole benefit of the parties to this Letter. Except as set forth in <u>Section 4(a)</u>, <u>Section 4(b)</u>, <u>Section 5(b)</u> and <u>Section 5(c)</u>, nothing in this Letter, whether express or implied, is intended to, or shall, confer upon any Person, other than the parties to this Letter, any legal or equitable

right, benefit or remedy of any nature whatsoever. Without limiting the foregoing, other than as expressly set forth in the Support Agreement, creditors of the Company Parties shall have no right to cause the Company Parties to enforce this Letter.

(b)    Notwithstanding Section 5(a), (i) the other Investor Support Parties (other than the undersigned) are each a third-party beneficiary of this Letter and (ii) each Creditor Support Party is a third-party beneficiary of this Letter, but solely for purposes of this clause (ii) seeking specific performance of the Company Parties' right to cause the undersigned Investor Support Party to fund the Equity Investment to the Reorganized Guitar Center when such funding is required pursuant to, and in accordance with the terms of, this Letter. For the avoidance of doubt, the Creditor Support Parties shall not be third-party beneficiaries of this Letter for any other purpose, including, without limitation, any claim for monetary damages or any other remedy under this Letter, the Support Agreement or otherwise.

(c)    Notwithstanding anything herein to the contrary, the parties hereto acknowledge and agree that in the event that the undersigned Investor Support Party fails to perform its obligations under this Letter, (i) irreparable damage would occur and (ii) monetary damages, even if available, may not be an adequate remedy for any such failure to perform this Letter. Accordingly, subject to the terms and conditions of this Letter, in the event of any such failure to perform, each of the other Investor Support Parties (other than the undersigned) shall be entitled to either (x) specific performance to enforce the undersigned Investor Support Party obligations hereunder to fund the Equity Investment pursuant to the terms and conditions of this Letter, or (y) within five (5) Business Days of receipt from the Company parties of written notice of the undersigned Investor Party's failure to perform, fund (or cause a designee to fund) an amount equal to its portion (allocated between the remaining other Investor Support Parties pro rata or as they may otherwise determine) of the Equity Investment hereunder in lieu of the undersigned Investor Support Party funding such amount (the "**Equity Cure**"), whereby the other Investor Support Parties (or its designees) so funding will be entitled to receive a proportionate share of the New Common Equity of the undersigned Investor Support Party and the undersigned Investor Support Party will cease to have any further rights or obligations hereunder.  If an Equity Cure occurs, the non-breaching Investor Support Parties participating in the Equity Cure can reduce the Aggregate Investment Amount from $165 million to not less than $150 million.

6.    Governing Law; Jurisdiction; Waiver of Jury Trial.

(a)    This Letter and all suits, proceedings, claims or causes of action (whether in contract, tort or otherwise) that in any way is, or may be, directly or indirectly based upon, arising out of, or related to, this Letter or the negotiation, execution, performance, non-performance, interpretation, termination or construction of this Letter, or the legal relationships of the parties to this Letter (whether at law or inequity, and whether in contract, tort or otherwise) (each, a "**Proceeding**"), shall be construed in accordance with, governed for all purposes by, and enforced pursuant to the internal substantive laws of the State of New York applicable to contracts executed and to be wholly performed within New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the law of any jurisdiction other than the State of New York.

(b)    Any Proceeding or judgment entered by any court in respect thereof shall be brought exclusively in the United States District Court for the Southern District of New York or

4

any New York state court, in each case, sitting in the Borough of Manhattan of the City of New York (collectively, the "**Designated Courts**"). The parties to this Letter irrevocably agree and consent to be subject to the exclusive jurisdiction of the Designated Courts for the purpose of any Proceeding.  Notwithstanding the foregoing consent to jurisdiction, upon commencement of the Chapter 11 Cases, each party to this Letter agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Letter, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Letter: (i) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (iii) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any party to this Letter.

(c)      Each party to this Letter agrees that service of any process, summons, notice or document by United States registered mail addressed to such party at the address of the party set forth above in the manner provided for the giving of notices in Section 19 of the Support Agreement shall be effective service of process for any Proceeding brought against such party in any such court.

(d)      Each party to this Letter irrevocably waives, to the fullest extent permitted by law, any objection which it may now or after the date of this Letter have to the laying of venue of any Proceeding arising out of or relating to this Letter in any Designated Court or any judgment entered by any of the Designated Courts and also irrevocably waives any claim that any Proceedings brought in the Designated Courts has been brought in an inconvenient forum. Notwithstanding the foregoing, if the Chapter 11 Cases are commenced, nothing in this <u>Section 6</u> shall limit the authority of the Bankruptcy Court to hear any matter under or arising out of this Letter.

(e)      **Each party acknowledges and agrees that any controversy that is, or may be, directly or indirectly based upon, arising out of, or related to, this Letter or the negotiation, execution, performance, non-performance, interpretation, termination or construction of this Letter, or the legal relationships of the parties to this Letter, is likely to involve complicated and difficult issues. Therefore, each party irrevocably and unconditionally waives to the fullest extent permitted by law any right such party may have to a trial by jury in respect of any Proceeding, in each case, whether now existing or arising after the date of this Letter, and whether in contract, tort, equity or otherwise. Each party certifies and acknowledges that (i) no representative, agent or attorney or any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver, (ii) such party understands and has considered the implications of this waiver, (iii) such party makes this waiver voluntarily and (iv) each party has been induced to enter into this Letter by, among other things, the mutual waivers and certifications of this <u>Section 6(d)</u>. Any party may file an original counterpart or a copy of this Letter with any court as written evidence of the consent of the parties to the waiver of their right to trial by jury.**

7.      <u>No Assignment</u>. The rights and obligations under this Letter may not be assigned by any party, directly or indirectly (by operation of law or otherwise), without the prior written consent of the other parties to this Letter. Notwithstanding the foregoing, (a) the undersigned Investor Support Party's obligation to fund all or any portion of the Equity Investment set forth in this Letter and any of its rights herein may be assigned by the undersigned Investor Support Party

to one or more of its controlled Affiliates. Any assignment permitted under this <u>Section 7</u> shall not relieve the assigning party of its obligations under this Letter, except to the extent such obligations are actually satisfied by the applicable assignee or in accordance with <u>Section 5(c)</u> and (b) the rights of Holdings under this Letter may be assigned to Reorganized Guitar Center. Any attempted or purported assignment in contravention of this <u>Section 7</u> shall be null and void and of no force or effect. The Creditor Support Parties' rights under <u>Section 5(b)</u> may not be assigned, in whole or in part, by any Creditor Support Party, directly or indirectly (by operation of law or otherwise), and any attempted or purported assignment shall be null and void and of no force or effect.

8.      <u>Counterparts</u>. This Letter may be executed in any number of counterparts with the same effect as if all signatory parties had signed the same document. All counterparts shall be construed together and shall constitute one and the same instrument. A signature delivered by facsimile transmission or by electronic mail in portable document format (.pdf) shall be deemed to be an original signature for all purposes under this Letter.

9.      <u>Confidentiality</u>. This Letter shall be treated as confidential and is being provided to the other parties to the Support Agreement solely in connection with the transactions contemplated by the Support Agreement. This Letter may not be used, circulated, quoted or otherwise referred to in any document, except with the written consent of the undersigned Investor Support Party. Notwithstanding the foregoing, the undersigned Investor Support Party may disclose the existence of this Letter to: (a) its Affiliates and advisors; and (b) to the extent required by law.

10.     <u>Representations and Warranties</u>. The undersigned Investor Support Party represents and warrants that:

(a)     it is duly organized and validly existing under the applicable laws of the jurisdiction of its formation, and has all limited partnership or equivalent power and authority to execute, deliver and perform this Letter;

(b)     its execution, delivery and performance of this Letter has been duly and validly authorized and approved by all necessary limited partnership or equivalent action;

(c)     this Letter has been duly and validly executed and delivered by the undersigned Investor Support Party and constitutes a valid and legally binding obligation of the undersigned Investor Support Party, enforceable against the undersigned Investor Support Party in accordance with its terms, except that such enforceability may be: (i) limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar applicable laws of general application relating to or affecting creditors' rights generally; and (ii) subject to general equitable principles (whether considered in a proceeding in equity or at law); and

(d)     its execution, delivery and performance of this Letter does not and will not violate its organizational and governing documents, any material contract to which it is a party or any applicable law.

11.     <u>No Recourse</u>. Notwithstanding anything that may be expressed or implied in this Letter or any document or instrument delivered in connection with this Letter or otherwise, and notwithstanding the fact that the undersigned Investor Support Party may be a partnership:

(a)     no Person other than the undersigned Investor Support Party and the Company Parties has any obligations under this Letter and no recourse shall be had against any other Person under this Letter or under any document or instrument delivered in connection with this Letter, or for any claim based on, in respect of, or by reason of, such obligations or their creation;

(b)      no personal liability shall attach to (i) any affiliate, stockholder, partner, member, manager, director, officer, representative, agent or employee of the undersigned Investor Support Party or any of its successors or assigns, (ii) any affiliate, stockholder, partner, member, manager, director, officer, representative, agent or employee of any other Investor Support Party or any of its successors or assigns, or (iii) any affiliate, stockholder, partner, member, manager, director, officer, representative, agent, employee, successor or assignee of any of the foregoing, in each case whether current, former or future (each such person or entity, a "**Representative**"), whether by or through attempted piercing of the corporate veil, by or through a claim by or on behalf of any Company Party or the Credit Support Parties against any Representative, by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any law, or otherwise; and

(c)      recourse against the undersigned Investor Support Party pursuant to this Letter shall be the sole and exclusive remedy of the Company Parties against the undersigned Investor Support Party or any of its Representatives in respect of any liabilities or obligations arising under, or in connection with, the Support Agreement, the Investment Agreement or the transactions contemplated by the Support Agreement or the Investment Agreement.

The limitation on remedies set forth in this Section 11 shall apply without regard to whether any claim or action sounds in contract, tort or any other claim or legal theory, and whether at law or in equity. Without limiting the foregoing, the limitation on remedies set forth in this Section 11 shall apply to any claim or action directly or indirectly (i) arising under, or in connection with, this Letter, the Investment Agreement or the Support Agreement or in connection with the transactions contemplated by this Letter, the Investment Agreement or the Support Agreement or (ii) in respect of any oral representations or warranties made or alleged to have been made in connection with this Letter, the Investment Agreement or the Support Agreement or in connection with the transactions contemplated by this Letter or the Support Agreement. The limitations set forth in this Section 11 fully apply without regard to whether any Investor Support Party breaches its obligations under the Support Agreement or the Investment Agreement, with the sole exceptions of (i) the Company Parties' and each Investor Support Party's rights to seek specific performance to cause the undersigned Investor Support Party to fund the Equity Investment under the conditions and limitations set forth in this Letter and the Investment Agreement and (ii) the Equity Cure.

12.      Severability.  In the event that any provision of this Letter, or the application of this Letter, becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, or incapable of being enforced under any applicable law, the remainder of this Letter will continue in full force and effect and the application of such provision to other Persons or circumstances will be interpreted so as reasonably to effect the intent of the parties to this Letter. The parties to this Letter further agree to replace such void or unenforceable provision of this Letter with a valid and enforceable provision that will achieve, to the fullest extent possible, the economic, business and other purposes and effects of such void or unenforceable provision. Notwithstanding the foregoing, this Letter may not be enforced without giving full force and effect to the limitations set forth in this Section 12 and Sections 3-9 and 11 of this Letter.

13.      Miscellaneous. The parties to this Letter agree that they have each been represented by counsel during the negotiation and execution of this Letter and have participated jointly in the drafting of this Letter. Consequently, each of the parties to this Letter waives the application of any law, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document. The descriptive

headings set forth in this Letter are inserted for convenience of reference only and are not intended to be part of or to describe, interpret, define or limit the scope, extent or intent of this Letter or any provision of this Letter.

[SIGNATURE PAGE FOLLOWS]

Very truly yours,

[Ares]

By: [ ● ]

By: _____
        Name:
        Title:

Agreed to and accepted:

GUITAR CENTER HOLDINGS, INC.

By: _____
        Name:
        Title:

GUITAR CENTER, INC.

By: _____
        Name:
        Title:

GUITAR CENTER STORES, INC.

By: _____
        Name:
        Title:

GTRC SERVICES, INC.

By: _____
        Name:
        Title:

GC BUSINESS SOLUTIONS, INC.

By: _____
        Name:
        Title:

*[Signature Page to Equity Commitment Letter]*

GUITAR CENTER GIFT CARD
COMPANY, LLC

By: _____
        Name:
        Title:

MUSIC & ARTS INSTRUCTOR
SERVICES, LLC
By: _____
        Name:
        Title:

AVDG, LLC
By: _____
        Name:
        Title:

*[Signature Page to Equity Commitment Letter]*

BRIGADE CAPITAL MANAGEMENT, LP
399 Park Avenue New York, NY 10022
New York, NY 10022

November 13, 2020

Guitar Center Holdings, Inc.
5795 Lindero Canyon Road
Westlake Village, California 91362

Guitar Center, Inc.
5795 Lindero Canyon Road
Westlake Village, California 91362

Re: Equity Commitment Letter

Ladies and Gentlemen:

Reference is made to:

(i)        the Restructuring Support Agreement (the "**Support Agreement**"), by and among Guitar Center, Inc., a Delaware corporation ("**Guitar Center**"), Guitar Center Holdings, Inc., a Delaware corporation ("**Holdings**"), and those subsidiaries of Guitar Center that are party to the Support Agreement (together with Guitar Center and Holdings, the "**Company Parties**"), the Creditor Support Parties (as defined in the Support Agreement), and each of the Investor Support Parties (as defined in the Support Agreement);

(ii)       the equity commitment letter, dated on or about the date of this Letter, between Carlyle Co-Investor (as defined in the Support Agreement) and the Company Parties (the "**Carlyle ECL**");

(iii)      the equity commitment letter, dated on or about the date of this Letter, between the Sponsor Support Party (as defined in the Support Agreement) and the Company Parties (the "**Ares ECL**" and together with the Carlyle ECL, the "**Other Investor ECLs**"); and

(iv)      the New Common Equity and Warrant Investment Agreement in the form attached to the Support Agreement (the "**Investment Agreement**")

Capitalized terms used but not defined in this equity commitment letter (the "**Letter**") shall have the meanings given to them in the Support Agreement.

1.        <u>Commitment</u>. Subject to the terms and conditions set forth in this Letter, the undersigned Investor Support Party commits that, on the Plan Effective Date, it shall purchase pursuant to the Investment Agreement, or shall cause the purchase of, 33 1/3% of the New Common Equity of Reorganized Guitar Center, subject to dilution by the Management Incentive Plan, the Warrants and any subsequent issuances of common equity of Reorganized Guitar Center,

for an aggregate amount not to exceed $55,000,000, as such amount may be increased or reduced in accordance with this Letter (the "**Equity Investment**").

The Equity Investment and the equity investments received by the other Investor Support Parties pursuant to the Other Investor ECLs (the "**Other Investor Equity Investments**" and together with the Equity Investment, the "**Aggregate Investment**") will be made on a several and not joint basis, and the proceeds thereof will be used solely as contemplated by the Plan. Subject to the terms and conditions of this Letter and the Other Investor ECLs, the Company Parties shall cause the remainder of the Aggregate Investment to be funded by the other Investor Support Parties, as applicable, in accordance with the terms and conditions of each Other Investor ECL.

Notwithstanding any other provision of this Letter, the undersigned Investor Support Party shall not be obligated to contribute to, purchase equity or debt of, or otherwise provide funds to, Reorganized Guitar Center in any amount in excess of the Equity Investment (the "**Cap**"). Under no circumstances shall this Letter be enforced without giving full and absolute effect to the Cap. The undersigned Investor Support Party may effect its Equity Investment directly or indirectly through one or more Affiliates or designees.

2.    <u>Conditions</u>. The obligation of the undersigned Investor Support Party to fund its Equity Investment is subject to:

(a)    the Support Agreement shall be in full force and effect;

(b)    there shall be no Co-Investor Termination Event or Sponsor Termination Event that has occurred and is continuing, unless such event has been waived in writing by the applicable Investor Support Party;

(c)    no notice of default shall have been delivered under the Support Agreement unless such default has been waived or cured in accordance with the terms of the Support Agreement;

(d)    other than funding of the Equity Commitment and issuance of the New Common Equity, each of the conditions to the occurrence of the Plan Effective Date set forth in the Restructuring Term Sheet shall have been satisfied or waived in accordance with the terms of the Support Agreement and the Restructuring Term Sheet;

(e)    each of the conditions to consummation of the transactions contemplated by the Investment Agreement shall have been satisfied or waived in accordance with its terms;

(f)    the prior or substantially simultaneous consummation of the Restructuring Transactions pursuant to the Plan on the terms and conditions set forth in the Support Agreement, including (without limitation) the conditions precedent in the Restructuring Term Sheet;

(g)    the prior or substantially simultaneous incurrence of the New First Lien Debt; and

(h)    the prior or substantially simultaneous funding of each other Investor Party's pro rata portion of the Aggregate Investment pursuant to their respective Other Investor ECL and the

Investment Agreement, unless the Equity Cure (as defined herein) is exercised to fund the Aggregate Investment.

3.      Termination. Including without limitation the obligation of the undersigned Investor Support Party to make the Equity Investment (except as set forth in clause (d) below), this Letter will terminate automatically and immediately upon the earliest to occur of:

(a)      the termination of the Support Agreement with respect to the undersigned Investor Support Party;

(b)      the termination of either of the Other Investor ECLs; provided that, if either the Equity Cure or the Ad Hoc Group New Equity Funding Option is exercised to fund the Aggregate Investment, then this Letter shall not terminate pursuant to this Section 3(b);

(c)      the termination of the Investment Agreement; and

(d)      the effectiveness of the Plan (subject to the fulfilment of (i) the undersigned Investor Support Party's obligations hereunder and under the Investment Agreement and (ii) the other Investor Support Parties' obligations under each of the Other Investor ECLs and under the Investment Agreement.

Upon any termination of this Letter, neither the undersigned Investor Support Party nor any of its Affiliates shall have any further obligations or liabilities under this Letter, or, following its execution and delivery, the Investment Agreement, in each case whether based upon contract, tort or any other claim or legal theory, and whether at law or equity. This Section 3 and Sections 4-9, 11 and 12 shall survive any termination of this Letter.

4.      No Modification; Entire Agreement.

(a)      This Letter may not be amended, modified or supplemented except by an agreement in writing signed by each Investor Support Party and the Company. Each other Investor Support Party is a third party beneficiary of the immediately preceding sentence.  Together with the Support Agreement, the Restructuring Term Sheet, and the Investment Agreement, this Letter constitutes the sole and entire agreement of the undersigned Investor Support Party or any of its Affiliates, on the one hand, and the other Company Parties, on the other, with respect to the subject matter contained in this Letter. This Letter supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to the subject matter of this Letter.

(b)      The Company Parties shall not amend, modify, supplement, assign, terminate or waive this Letter or any provision of, any of the Other Investor ECLs or the Investment Agreement, in each case, without the prior written agreement of each Investor Support Party.

5.      Parties in Interest; Third-Party Beneficiaries; Specific Performance.

(a)      Except as set forth in Section 4(a), Section 4(b), Section 5(b) and Section 5(c), this Letter is for the sole benefit of the parties to this Letter. Except as set forth in Section 4(a), Section 4(b), Section 5(b) and Section 5(c), nothing in this Letter, whether express or implied, is intended to, or shall, confer upon any Person, other than the parties to this Letter, any legal or equitable

3

right, benefit or remedy of any nature whatsoever. Without limiting the foregoing, other than as expressly set forth in the Support Agreement, creditors of the Company Parties shall have no right to cause the Company Parties to enforce this Letter.

(b)       Notwithstanding <u>Section 5(a)</u>, (i) the other Investor Support Parties (other than the undersigned) are each a third-party beneficiary of this Letter and (ii) each Creditor Support Party is a third-party beneficiary of this Letter, but solely for purposes of this clause (ii) seeking specific performance of the Company Parties' right to cause the undersigned Investor Support Party to fund the Equity Investment to the Reorganized Guitar Center when such funding is required pursuant to, and in accordance with the terms of, this Letter. For the avoidance of doubt, the Creditor Support Parties shall not be third-party beneficiaries of this Letter for any other purpose, including, without limitation, any claim for monetary damages or any other remedy under this Letter, the Support Agreement or otherwise.

(c)       Notwithstanding anything herein to the contrary, the parties hereto acknowledge and agree that in the event that the undersigned Investor Support Party fails to perform its obligations under this Letter, (i) irreparable damage would occur and (ii) monetary damages, even if available, may not be an adequate remedy for any such failure to perform this Letter. Accordingly, subject to the terms and conditions of this Letter, in the event of any such failure to perform, each of the other Investor Support Parties (other than the undersigned) shall be entitled to either (x) specific performance to enforce the undersigned Investor Support Party obligations hereunder to fund the Equity Investment pursuant to the terms and conditions of this Letter, or (y) within five (5) Business Days of receipt from the Company parties of written notice of the undersigned Investor Party's failure to perform, fund (or cause a designee to fund) an amount equal to its portion (allocated between the remaining other Investor Support Parties pro rata or as they may otherwise determine) of the Equity Investment hereunder in lieu of the undersigned Investor Support Party funding such amount (the "**Equity Cure**"), whereby the other Investor Support Parties (or its designees) so funding will be entitled to receive a proportionate share of the New Common Equity of the undersigned Investor Support Party and the undersigned Investor Support Party will cease to have any further rights or obligations hereunder.  If an Equity Cure occurs, the non-breaching Investor Support Parties participating in the Equity Cure can reduce the Aggregate Investment Amount from $165 million to not less than $150 million.

6.       <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>.

(a)       This Letter and all suits, proceedings, claims or causes of action (whether in contract, tort or otherwise) that in any way is, or may be, directly or indirectly based upon, arising out of, or related to, this Letter or the negotiation, execution, performance, non-performance, interpretation, termination or construction of this Letter, or the legal relationships of the parties to this Letter (whether at law or inequity, and whether in contract, tort or otherwise) (each, a "**Proceeding**"), shall be construed in accordance with, governed for all purposes by, and enforced pursuant to the internal substantive laws of the State of New York applicable to contracts executed and to be wholly performed within New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the law of any jurisdiction other than the State of New York.

(b)       Any Proceeding or judgment entered by any court in respect thereof shall be brought exclusively in the United States District Court for the Southern District of New York or

any New York state court, in each case, sitting in the Borough of Manhattan of the City of New York (collectively, the "**Designated Courts**"). The parties to this Letter irrevocably agree and consent to be subject to the exclusive jurisdiction of the Designated Courts for the purpose of any Proceeding.  Notwithstanding the foregoing consent to jurisdiction, upon commencement of the Chapter 11 Cases, each party to this Letter agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Letter, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Letter: (i) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (iii) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any party to this Letter.

(c)      Each party to this Letter agrees that service of any process, summons, notice or document by United States registered mail addressed to such party at the address of the party set forth above in the manner provided for the giving of notices in Section 19 of the Support Agreement shall be effective service of process for any Proceeding brought against such party in any such court.

(d)      Each party to this Letter irrevocably waives, to the fullest extent permitted by law, any objection which it may now or after the date of this Letter have to the laying of venue of any Proceeding arising out of or relating to this Letter in any Designated Court or any judgment entered by any of the Designated Courts and also irrevocably waives any claim that any Proceedings brought in the Designated Courts has been brought in an inconvenient forum. Notwithstanding the foregoing, if the Chapter 11 Cases are commenced, nothing in this <u>Section 6</u> shall limit the authority of the Bankruptcy Court to hear any matter under or arising out of this Letter.

(e)      **Each party acknowledges and agrees that any controversy that is, or may be, directly or indirectly based upon, arising out of, or related to, this Letter or the negotiation, execution, performance, non-performance, interpretation, termination or construction of this Letter, or the legal relationships of the parties to this Letter, is likely to involve complicated and difficult issues. Therefore, each party irrevocably and unconditionally waives to the fullest extent permitted by law any right such party may have to a trial by jury in respect of any Proceeding, in each case, whether now existing or arising after the date of this Letter, and whether in contract, tort, equity or otherwise. Each party certifies and acknowledges that (i) no representative, agent or attorney or any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver, (ii) such party understands and has considered the implications of this waiver, (iii) such party makes this waiver voluntarily and (iv) each party has been induced to enter into this Letter by, among other things, the mutual waivers and certifications of this <u>Section 6(d)</u>. Any party may file an original counterpart or a copy of this Letter with any court as written evidence of the consent of the parties to the waiver of their right to trial by jury.**

7.      <u>No Assignment</u>. The rights and obligations under this Letter may not be assigned by any party, directly or indirectly (by operation of law or otherwise), without the prior written consent of the other parties to this Letter. Notwithstanding the foregoing, (a) the undersigned Investor Support Party's obligation to fund all or any portion of the Equity Investment set forth in this Letter and any of its rights herein may be assigned by the undersigned Investor Support Party

to one or more of its controlled Affiliates. Any assignment permitted under this <u>Section 7</u> shall not relieve the assigning party of its obligations under this Letter, except to the extent such obligations are actually satisfied by the applicable assignee or in accordance with <u>Section 5(c)</u> and (b) the rights of Holdings under this Letter may be assigned to Reorganized Guitar Center. Any attempted or purported assignment in contravention of this <u>Section 7</u> shall be null and void and of no force or effect. The Creditor Support Parties' rights under <u>Section 5(b)</u> may not be assigned, in whole or in part, by any Creditor Support Party, directly or indirectly (by operation of law or otherwise), and any attempted or purported assignment shall be null and void and of no force or effect.

8.    <u>Counterparts</u>. This Letter may be executed in any number of counterparts with the same effect as if all signatory parties had signed the same document. All counterparts shall be construed together and shall constitute one and the same instrument. A signature delivered by facsimile transmission or by electronic mail in portable document format (.pdf) shall be deemed to be an original signature for all purposes under this Letter.

9.    <u>Confidentiality</u>. This Letter shall be treated as confidential and is being provided to the other parties to the Support Agreement solely in connection with the transactions contemplated by the Support Agreement. This Letter may not be used, circulated, quoted or otherwise referred to in any document, except with the written consent of the undersigned Investor Support Party. Notwithstanding the foregoing, the undersigned Investor Support Party may disclose the existence of this Letter to: (a) its Affiliates and advisors; and (b) to the extent required by law.

10.    <u>Representations and Warranties</u>. The undersigned Investor Support Party represents and warrants that:

(a)    it is duly organized and validly existing under the applicable laws of the jurisdiction of its formation, and has all limited partnership or equivalent power and authority to execute, deliver and perform this Letter;

(b)    its execution, delivery and performance of this Letter has been duly and validly authorized and approved by all necessary limited partnership or equivalent action;

(c)    this Letter has been duly and validly executed and delivered by the undersigned Investor Support Party and constitutes a valid and legally binding obligation of the undersigned Investor Support Party, enforceable against the undersigned Investor Support Party in accordance with its terms, except that such enforceability may be: (i) limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar applicable laws of general application relating to or affecting creditors' rights generally; and (ii) subject to general equitable principles (whether considered in a proceeding in equity or at law); and

(d)    its execution, delivery and performance of this Letter does not and will not violate its organizational and governing documents, any material contract to which it is a party or any applicable law.

11.    <u>No Recourse</u>. Notwithstanding anything that may be expressed or implied in this Letter or any document or instrument delivered in connection with this Letter or otherwise, and notwithstanding the fact that the undersigned Investor Support Party may be a partnership:

(a)    no Person other than the undersigned Investor Support Party and the Company Parties has any obligations under this Letter and no recourse shall be had against any other Person under this Letter or under any document or instrument delivered in connection with this Letter, or for any claim based on, in respect of, or by reason of, such obligations or their creation;

6

(b)      no personal liability shall attach to (i) any affiliate, stockholder, partner, member, manager, director, officer, representative, agent or employee of the undersigned Investor Support Party or any of its successors or assigns, (ii) any affiliate, stockholder, partner, member, manager, director, officer, representative, agent or employee of any other Investor Support Party or any of its successors or assigns, or (iii) any affiliate, stockholder, partner, member, manager, director, officer, representative, agent, employee, successor or assignee of any of the foregoing, in each case whether current, former or future (each such person or entity, a "**Representative**"), whether by or through attempted piercing of the corporate veil, by or through a claim by or on behalf of any Company Party or the Credit Support Parties against any Representative, by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any law, or otherwise; and

(c)      recourse against the undersigned Investor Support Party pursuant to this Letter shall be the sole and exclusive remedy of the Company Parties against the undersigned Investor Support Party or any of its Representatives in respect of any liabilities or obligations arising under, or in connection with, the Support Agreement, the Investment Agreement or the transactions contemplated by the Support Agreement or the Investment Agreement.

The limitation on remedies set forth in this Section 11 shall apply without regard to whether any claim or action sounds in contract, tort or any other claim or legal theory, and whether at law or in equity. Without limiting the foregoing, the limitation on remedies set forth in this Section 11 shall apply to any claim or action directly or indirectly (i) arising under, or in connection with, this Letter, the Investment Agreement or the Support Agreement or in connection with the transactions contemplated by this Letter, the Investment Agreement or the Support Agreement or (ii) in respect of any oral representations or warranties made or alleged to have been made in connection with this Letter, the Investment Agreement or the Support Agreement or in connection with the transactions contemplated by this Letter or the Support Agreement. The limitations set forth in this Section 11 fully apply without regard to whether any Investor Support Party breaches its obligations under the Support Agreement or the Investment Agreement, with the sole exceptions of (i) the Company Parties' and each Investor Support Party's rights to seek specific performance to cause the undersigned Investor Support Party to fund the Equity Investment under the conditions and limitations set forth in this Letter and the Investment Agreement and (ii) the Equity Cure.

12.      Severability.  In the event that any provision of this Letter, or the application of this Letter, becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, or incapable of being enforced under any applicable law, the remainder of this Letter will continue in full force and effect and the application of such provision to other Persons or circumstances will be interpreted so as reasonably to effect the intent of the parties to this Letter. The parties to this Letter further agree to replace such void or unenforceable provision of this Letter with a valid and enforceable provision that will achieve, to the fullest extent possible, the economic, business and other purposes and effects of such void or unenforceable provision. Notwithstanding the foregoing, this Letter may not be enforced without giving full force and effect to the limitations set forth in this Section 12 and Sections 3-9 and 11 of this Letter.

13.      Miscellaneous. The parties to this Letter agree that they have each been represented by counsel during the negotiation and execution of this Letter and have participated jointly in the drafting of this Letter. Consequently, each of the parties to this Letter waives the application of any law, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document. The descriptive

7

headings set forth in this Letter are inserted for convenience of reference only and are not intended to be part of or to describe, interpret, define or limit the scope, extent or intent of this Letter or any provision of this Letter.

[SIGNATURE PAGE FOLLOWS]

Very truly yours,


[BRIGADE]

By: [ ● ]

By:    _____
              Name:
              Title:



Agreed to and accepted:

GUITAR CENTER HOLDINGS, INC.

By:    _____
              Name:
              Title:


GUITAR CENTER, INC.

By:    _____
              Name:
              Title:


GUITAR CENTER STORES, INC.

By:    _____
              Name:
              Title:


GTRC SERVICES, INC.

By:    _____
              Name:
              Title:


GC BUSINESS SOLUTIONS, INC.

By:    _____
              Name:
              Title:


*[Signature Page to Equity Commitment Letter]*

GUITAR CENTER GIFT CARD
COMPANY, LLC

By:    _____
   Name:
   Title:


MUSIC & ARTS INSTRUCTOR
SERVICES, LLC
By:    _____
   Name:
   Title:


AVDG, LLC
By:    _____
   Name:
   Title:

*[Signature Page to Equity Commitment Letter]*

CSP IV ACQUISITIONS, L.P.
520 Madison Avenue
New York, NY 10022

November 13, 2020

Guitar Center Holdings, Inc.
5795 Lindero Canyon Road
Westlake Village, California 91362

Guitar Center, Inc.
5795 Lindero Canyon Road
Westlake Village, California 91362

Re: Equity Commitment Letter

Ladies and Gentlemen:

Reference is made to:

(i)      the Restructuring Support Agreement (the "**Support Agreement**"), by and among Guitar Center, Inc., a Delaware corporation ("**Guitar Center**"), Guitar Center Holdings, Inc., a Delaware corporation ("**Holdings**"), and those subsidiaries of Guitar Center that are party to the Support Agreement (together with Guitar Center and Holdings, the "**Company Parties**"), the Creditor Support Parties (as defined in the Support Agreement), and each of the Investor Support Parties (as defined in the Support Agreement);

(ii)      the equity commitment letter, dated on or about the date of this Letter, between the Sponsor Support Party (as defined in the Support Agreement) and the Company Parties (the "**Ares ECL**");

(iii)      the equity commitment letter, dated on or about the date of this Letter, between Brigade Co-Investor (as defined in the Support Agreement) and the Company Parties (the "**Brigade ECL**" and together with the Ares ECL, the "**Other Investor ECLs**"); and

(iv)      the New Common Equity and Warrant Investment Agreement in the form attached to the Support Agreement (the "**Investment Agreement**")

Capitalized terms used but not defined in this equity commitment letter (the "**Letter**") shall have the meanings given to them in the Support Agreement.

1.      Commitment. Subject to the terms and conditions set forth in this Letter, the undersigned Investor Support Party commits that, on the Plan Effective Date, it shall purchase pursuant to the Investment Agreement, or shall cause the purchase of, 33 1/3% of the New Common Equity of Reorganized Guitar Center, subject to dilution by the Management Incentive Plan, the Warrants and any subsequent issuances of common equity of Reorganized Guitar Center,

for an aggregate amount not to exceed $55,000,000, as such amount may be increased or reduced in accordance with this Letter (the "**Equity Investment**").

The Equity Investment and the equity investments received by the other Investor Support Parties pursuant to the Other Investor ECLs (the "**Other Investor Equity Investments**" and together with the Equity Investment, the "**Aggregate Investment**") will be made on a several and not joint basis, and the proceeds thereof will be used solely as contemplated by the Plan. Subject to the terms and conditions of this Letter and the Other Investor ECLs, the Company Parties shall cause the remainder of the Aggregate Investment to be funded by the other Investor Support Parties, as applicable, in accordance with the terms and conditions of each Other Investor ECL.

Notwithstanding any other provision of this Letter, the undersigned Investor Support Party shall not be obligated to contribute to, purchase equity or debt of, or otherwise provide funds to, Reorganized Guitar Center in any amount in excess of the Equity Investment (the "**Cap**"). Under no circumstances shall this Letter be enforced without giving full and absolute effect to the Cap. The undersigned Investor Support Party may effect its Equity Investment directly or indirectly through one or more Affiliates or designees.

2.     Conditions. The obligation of the undersigned Investor Support Party to fund its Equity Investment is subject to:

(a)     the Support Agreement shall be in full force and effect;

(b)     there shall be no Co-Investor Termination Event or Sponsor Termination Event that has occurred and is continuing, unless such event has been waived in writing by the applicable Investor Support Party;

(c)     no notice of default shall have been delivered under the Support Agreement unless such default has been waived or cured in accordance with the terms of the Support Agreement;

(d)     other than funding of the Equity Commitment and issuance of the New Common Equity, each of the conditions to the occurrence of the Plan Effective Date set forth in the Restructuring Term Sheet shall have been satisfied or waived in accordance with the terms of the Support Agreement and the Restructuring Term Sheet;

(e)     each of the conditions to consummation of the transactions contemplated by the Investment Agreement shall have been satisfied or waived in accordance with its terms;

(f)     the prior or substantially simultaneous consummation of the Restructuring Transactions pursuant to the Plan on the terms and conditions set forth in the Support Agreement, including (without limitation) the conditions precedent in the Restructuring Term Sheet;

(g)     the prior or substantially simultaneous incurrence of the New First Lien Debt; and

(h)     the prior or substantially simultaneous funding of each other Investor Party's pro rata portion of the Aggregate Investment pursuant to their respective Other Investor ECL and the

2

Investment Agreement, unless the Equity Cure (as defined herein) is exercised to fund the Aggregate Investment.

3.    <u>Termination</u>. Including without limitation the obligation of the undersigned Investor Support Party to make the Equity Investment (except as set forth in clause (d) below), this Letter will terminate automatically and immediately upon the earliest to occur of:

(a)    the termination of the Support Agreement with respect to the undersigned Investor Support Party;

(b)    the termination of either of the Other Investor ECLs; <u>provided</u> that, if either the Equity Cure or the Ad Hoc Group New Equity Funding Option is exercised to fund the Aggregate Investment, then this Letter shall not terminate pursuant to this <u>Section 3(b)</u>;

(c)    the termination of the Investment Agreement; and

(d)    the effectiveness of the Plan (subject to the fulfilment of (i) the undersigned Investor Support Party's obligations hereunder and under the Investment Agreement and (ii) the other Investor Support Parties' obligations under each of the Other Investor ECLs and under the Investment Agreement.

Upon any termination of this Letter, neither the undersigned Investor Support Party nor any of its Affiliates shall have any further obligations or liabilities under this Letter, or, following its execution and delivery, the Investment Agreement, in each case whether based upon contract, tort or any other claim or legal theory, and whether at law or equity. This <u>Section 3</u> and <u>Sections 4-9</u>, <u>11</u> and <u>12</u> shall survive any termination of this Letter.

4.    <u>No Modification; Entire Agreement</u>.

(a)    This Letter may not be amended, modified or supplemented except by an agreement in writing signed by each Investor Support Party and the Company. Each other Investor Support Party is a third party beneficiary of the immediately preceding sentence.  Together with the Support Agreement, the Restructuring Term Sheet, and the Investment Agreement, this Letter constitutes the sole and entire agreement of the undersigned Investor Support Party or any of its Affiliates, on the one hand, and the other Company Parties, on the other, with respect to the subject matter contained in this Letter. This Letter supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to the subject matter of this Letter.

(b)    The Company Parties shall not amend, modify, supplement, assign, terminate or waive this Letter or any provision of, any of the Other Investor ECLs or the Investment Agreement, in each case, without the prior written agreement of each Investor Support Party.

5.    <u>Parties in Interest; Third-Party Beneficiaries; Specific Performance</u>.

(a)    Except as set forth in <u>Section 4(a)</u>, <u>Section 4(b)</u>, <u>Section 5(b)</u> and <u>Section 5(c)</u>, this Letter is for the sole benefit of the parties to this Letter. Except as set forth in <u>Section 4(a)</u>, <u>Section 4(b)</u>, <u>Section 5(b)</u> and <u>Section 5(c)</u>, nothing in this Letter, whether express or implied, is intended to, or shall, confer upon any Person, other than the parties to this Letter, any legal or equitable

3

right, benefit or remedy of any nature whatsoever. Without limiting the foregoing, other than as expressly set forth in the Support Agreement, creditors of the Company Parties shall have no right to cause the Company Parties to enforce this Letter.

(b)    Notwithstanding <u>Section 5(a)</u>, (i) the other Investor Support Parties (other than the undersigned) are each a third-party beneficiary of this Letter and (ii) each Creditor Support Party is a third-party beneficiary of this Letter, but solely for purposes of this clause (ii) seeking specific performance of the Company Parties' right to cause the undersigned Investor Support Party to fund the Equity Investment to the Reorganized Guitar Center when such funding is required pursuant to, and in accordance with the terms of, this Letter. For the avoidance of doubt, the Creditor Support Parties shall not be third-party beneficiaries of this Letter for any other purpose, including, without limitation, any claim for monetary damages or any other remedy under this Letter, the Support Agreement or otherwise.

(c)    Notwithstanding anything herein to the contrary, the parties hereto acknowledge and agree that in the event that the undersigned Investor Support Party fails to perform its obligations under this Letter, (i) irreparable damage would occur and (ii) monetary damages, even if available, may not be an adequate remedy for any such failure to perform this Letter. Accordingly, subject to the terms and conditions of this Letter, in the event of any such failure to perform, each of the other Investor Support Parties (other than the undersigned) shall be entitled to either (x) specific performance to enforce the undersigned Investor Support Party obligations hereunder to fund the Equity Investment pursuant to the terms and conditions of this Letter, or (y) within five (5) Business Days of receipt from the Company parties of written notice of the undersigned Investor Party's failure to perform, fund (or cause a designee to fund) an amount equal to its portion (allocated between the remaining other Investor Support Parties pro rata or as they may otherwise determine) of the Equity Investment hereunder in lieu of the undersigned Investor Support Party funding such amount (the "**Equity Cure**"), whereby the other Investor Support Parties (or its designees) so funding will be entitled to receive a proportionate share of the New Common Equity of the undersigned Investor Support Party and the undersigned Investor Support Party will cease to have any further rights or obligations hereunder.  If an Equity Cure occurs, the non-breaching Investor Support Parties participating in the Equity Cure can reduce the Aggregate Investment Amount from $165 million to not less than $150 million.

6.    <u>Governing Law; Jurisdiction; Waiver of Jury Trial</u>.

(a)    This Letter and all suits, proceedings, claims or causes of action (whether in contract, tort or otherwise) that in any way is, or may be, directly or indirectly based upon, arising out of, or related to, this Letter or the negotiation, execution, performance, non-performance, interpretation, termination or construction of this Letter, or the legal relationships of the parties to this Letter (whether at law or inequity, and whether in contract, tort or otherwise) (each, a "**Proceeding**"), shall be construed in accordance with, governed for all purposes by, and enforced pursuant to the internal substantive laws of the State of New York applicable to contracts executed and to be wholly performed within New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the law of any jurisdiction other than the State of New York.

(b)    Any Proceeding or judgment entered by any court in respect thereof shall be brought exclusively in the United States District Court for the Southern District of New York or

any New York state court, in each case, sitting in the Borough of Manhattan of the City of New York (collectively, the "**Designated Courts**"). The parties to this Letter irrevocably agree and consent to be subject to the exclusive jurisdiction of the Designated Courts for the purpose of any Proceeding.  Notwithstanding the foregoing consent to jurisdiction, upon commencement of the Chapter 11 Cases, each party to this Letter agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Letter, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Letter: (i) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (iii) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any party to this Letter.

(c)    Each party to this Letter agrees that service of any process, summons, notice or document by United States registered mail addressed to such party at the address of the party set forth above in the manner provided for the giving of notices in Section 19 of the Support Agreement shall be effective service of process for any Proceeding brought against such party in any such court.

(d)    Each party to this Letter irrevocably waives, to the fullest extent permitted by law, any objection which it may now or after the date of this Letter have to the laying of venue of any Proceeding arising out of or relating to this Letter in any Designated Court or any judgment entered by any of the Designated Courts and also irrevocably waives any claim that any Proceedings brought in the Designated Courts has been brought in an inconvenient forum. Notwithstanding the foregoing, if the Chapter 11 Cases are commenced, nothing in this <u>Section 6</u> shall limit the authority of the Bankruptcy Court to hear any matter under or arising out of this Letter.

(e)    **Each party acknowledges and agrees that any controversy that is, or may be, directly or indirectly based upon, arising out of, or related to, this Letter or the negotiation, execution, performance, non-performance, interpretation, termination or construction of this Letter, or the legal relationships of the parties to this Letter, is likely to involve complicated and difficult issues. Therefore, each party irrevocably and unconditionally waives to the fullest extent permitted by law any right such party may have to a trial by jury in respect of any Proceeding, in each case, whether now existing or arising after the date of this Letter, and whether in contract, tort, equity or otherwise. Each party certifies and acknowledges that (i) no representative, agent or attorney or any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver, (ii) such party understands and has considered the implications of this waiver, (iii) such party makes this waiver voluntarily and (iv) each party has been induced to enter into this Letter by, among other things, the mutual waivers and certifications of this <u>Section 6(d)</u>. Any party may file an original counterpart or a copy of this Letter with any court as written evidence of the consent of the parties to the waiver of their right to trial by jury.**

7.    <u>No Assignment</u>. The rights and obligations under this Letter may not be assigned by any party, directly or indirectly (by operation of law or otherwise), without the prior written consent of the other parties to this Letter. Notwithstanding the foregoing, (a) the undersigned Investor Support Party's obligation to fund all or any portion of the Equity Investment set forth in this Letter and any of its rights herein may be assigned by the undersigned Investor Support Party

to one or more of its controlled Affiliates. Any assignment permitted under this <u>Section 7</u> shall not relieve the assigning party of its obligations under this Letter, except to the extent such obligations are actually satisfied by the applicable assignee or in accordance with <u>Section 5(c)</u> and (b) the rights of Holdings under this Letter may be assigned to Reorganized Guitar Center. Any attempted or purported assignment in contravention of this <u>Section 7</u> shall be null and void and of no force or effect. The Creditor Support Parties' rights under <u>Section 5(b)</u> may not be assigned, in whole or in part, by any Creditor Support Party, directly or indirectly (by operation of law or otherwise), and any attempted or purported assignment shall be null and void and of no force or effect.

8.      <u>Counterparts</u>. This Letter may be executed in any number of counterparts with the same effect as if all signatory parties had signed the same document. All counterparts shall be construed together and shall constitute one and the same instrument. A signature delivered by facsimile transmission or by electronic mail in portable document format (.pdf) shall be deemed to be an original signature for all purposes under this Letter.

9.      <u>Confidentiality</u>. This Letter shall be treated as confidential and is being provided to the other parties to the Support Agreement solely in connection with the transactions contemplated by the Support Agreement. This Letter may not be used, circulated, quoted or otherwise referred to in any document, except with the written consent of the undersigned Investor Support Party. Notwithstanding the foregoing, the undersigned Investor Support Party may disclose the existence of this Letter to: (a) its Affiliates and advisors; and (b) to the extent required by law.

10.     <u>Representations and Warranties</u>. The undersigned Investor Support Party represents and warrants that:

(a)      it is duly organized and validly existing under the applicable laws of the jurisdiction of its formation, and has all limited partnership or equivalent power and authority to execute, deliver and perform this Letter;

(b)      its execution, delivery and performance of this Letter has been duly and validly authorized and approved by all necessary limited partnership or equivalent action;

(c)      this Letter has been duly and validly executed and delivered by the undersigned Investor Support Party and constitutes a valid and legally binding obligation of the undersigned Investor Support Party, enforceable against the undersigned Investor Support Party in accordance with its terms, except that such enforceability may be: (i) limited by bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and other similar applicable laws of general application relating to or affecting creditors' rights generally; and (ii) subject to general equitable principles (whether considered in a proceeding in equity or at law); and

(d)      its execution, delivery and performance of this Letter does not and will not violate its organizational and governing documents, any material contract to which it is a party or any applicable law.

11.     <u>No Recourse</u>. Notwithstanding anything that may be expressed or implied in this Letter or any document or instrument delivered in connection with this Letter or otherwise, and notwithstanding the fact that the undersigned Investor Support Party may be a partnership:

(a)      no Person other than the undersigned Investor Support Party and the Company Parties has any obligations under this Letter and no recourse shall be had against any other Person under this Letter or under any document or instrument delivered in connection with this Letter, or for any claim based on, in respect of, or by reason of, such obligations or their creation;

(b)      no personal liability shall attach to (i) any affiliate, stockholder, partner, member, manager, director, officer, representative, agent or employee of the undersigned Investor Support Party or any of its successors or assigns, (ii) any affiliate, stockholder, partner, member, manager, director, officer, representative, agent or employee of any other Investor Support Party or any of its successors or assigns, or (iii) any affiliate, stockholder, partner, member, manager, director, officer, representative, agent, employee, successor or assignee of any of the foregoing, in each case whether current, former or future (each such person or entity, a "**Representative**"), whether by or through attempted piercing of the corporate veil, by or through a claim by or on behalf of any Company Party or the Credit Support Parties against any Representative, by the enforcement of any assessment or by any legal or equitable proceeding, by virtue of any law, or otherwise; and

(c)      recourse against the undersigned Investor Support Party pursuant to this Letter shall be the sole and exclusive remedy of the Company Parties against the undersigned Investor Support Party or any of its Representatives in respect of any liabilities or obligations arising under, or in connection with, the Support Agreement, the Investment Agreement or the transactions contemplated by the Support Agreement or the Investment Agreement.

The limitation on remedies set forth in this <u>Section 11</u> shall apply without regard to whether any claim or action sounds in contract, tort or any other claim or legal theory, and whether at law or in equity. Without limiting the foregoing, the limitation on remedies set forth in this <u>Section 11</u> shall apply to any claim or action directly or indirectly (i) arising under, or in connection with, this Letter, the Investment Agreement or the Support Agreement or in connection with the transactions contemplated by this Letter, the Investment Agreement or the Support Agreement or (ii) in respect of any oral representations or warranties made or alleged to have been made in connection with this Letter, the Investment Agreement or the Support Agreement or in connection with the transactions contemplated by this Letter or the Support Agreement. The limitations set forth in this <u>Section 11</u> fully apply without regard to whether any Investor Support Party breaches its obligations under the Support Agreement or the Investment Agreement, with the sole exceptions of (i) the Company Parties' and each Investor Support Party's rights to seek specific performance to cause the undersigned Investor Support Party to fund the Equity Investment under the conditions and limitations set forth in this Letter and the Investment Agreement and (ii) the Equity Cure.

12.      <u>Severability</u>.  In the event that any provision of this Letter, or the application of this Letter, becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, or incapable of being enforced under any applicable law, the remainder of this Letter will continue in full force and effect and the application of such provision to other Persons or circumstances will be interpreted so as reasonably to effect the intent of the parties to this Letter. The parties to this Letter further agree to replace such void or unenforceable provision of this Letter with a valid and enforceable provision that will achieve, to the fullest extent possible, the economic, business and other purposes and effects of such void or unenforceable provision. Notwithstanding the foregoing, this Letter may not be enforced without giving full force and effect to the limitations set forth in this <u>Section 12</u> and <u>Sections 3-9</u> and <u>11</u> of this Letter.

13.      <u>Miscellaneous</u>. The parties to this Letter agree that they have each been represented by counsel during the negotiation and execution of this Letter and have participated jointly in the drafting of this Letter. Consequently, each of the parties to this Letter waives the application of any law, holding or rule of construction providing that ambiguities in an agreement or other document will be construed against the party drafting such agreement or document. The descriptive

7

headings set forth in this Letter are inserted for convenience of reference only and are not intended to be part of or to describe, interpret, define or limit the scope, extent or intent of this Letter or any provision of this Letter.

[SIGNATURE PAGE FOLLOWS]

Very truly yours,

**CSP IV Acquisitions, L.P.**

By:  CSP IV (Cayman 1) General Partner,
L.P., its general partner
By:  TC Group CSP IV, L.L.C., its
general partner

By:   _____
      Name:
      Title:

Agreed to and accepted:

GUITAR CENTER HOLDINGS, INC.

By:   _____
      Name:
      Title:

GUITAR CENTER, INC.

By:   _____
      Name:
      Title:

GUITAR CENTER STORES, INC.

By:   _____
      Name:
      Title:

GTRC SERVICES, INC.

By:   _____
      Name:
      Title:

GC BUSINESS SOLUTIONS, INC.

By:   _____
      Name:
      Title:

*[Signature Page to Equity Commitment Letter]*

GUITAR CENTER GIFT CARD
COMPANY, LLC

By: _____

    Name:
    Title:

MUSIC & ARTS INSTRUCTOR
SERVICES, LLC

By: _____

    Name:
    Title:

AVDG, LLC

By: _____

    Name:
    Title:

*[Signature Page to Equity Commitment Letter]*

## **EXHIBIT D**

New Common Equity Investment Agreement

[Attached.]

## NEW COMMON EQUITY AND WARRANT INVESTMENT AGREEMENT

November [●], 2020

Ladies and Gentlemen:

Reference is made to: (i) the Restructuring Support Agreement (the "**Support Agreement**"), by and among Guitar Center, Inc., a Delaware corporation (the "**Company**"), Guitar Center Holdings, Inc., a Delaware corporation ("**Holdings**"), those subsidiaries of Guitar Center that are party to the Support Agreement and the Support Parties (as defined in the Support Agreement); (ii) the equity commitment letter, dated on or about the date hereof, between the Sponsor Support Party (as defined in the Support Agreement) and the Company Parties (the "**Ares ECL**"); (iii) the equity commitment letter, dated on or about the date hereof, between Carlyle Co-Investor (as defined in the Support Agreement) and the Company Parties (the "**Carlyle ECL**"); (iv) the equity commitment letter, dated on or about the date of this Agreement, between Brigade Co-Investor (as defined in the Support Agreement) and the Company Parties (the "**Brigade ECL**" and together with the Ares ECL and Carlyle ECL, the "**Investor ECLs**"). Capitalized terms used but not defined in this New Common Equity and Warrant Investment Agreement (the "**Agreement**") shall have the meanings given to them in the Support Agreement.

In connection with the Restructuring Transactions, Reorganized Guitar Center proposes to issue and sell to each Investor Support Party *pro rata* in accordance with such Investor Support Party's commitments as set forth in their respective Investor ECL, 33 1/3% of the New Common Equity of Reorganized Guitar Center for an aggregate amount not to exceed, in each case, $55,000,000, as such amount may be increased or reduced in accordance with their applicable Investor ECL (the "**Securities**"), and, solely in the case of Brigade Co-Investor, the Warrants, subject to dilution by the Management Incentive Plan, the Warrants and any subsequent issuances of common equity of Reorganized Guitar Center, on the terms and conditions set forth in this Agreement.

The Securities and the Warrants will be issued on the Plan Effective Date at the Closing. The Securities and the Warrants will be issued only in book-entry form. The Securities and the Warrants are being offered and sold in connection with a series of transactions contemplated by the Support Agreement.

This Agreement, the Support Agreement, the Definitive Documents, the Securities and the Warrants, in each case, including all exhibits, schedules and annexes to such documents, are referred to herein as the "**Transaction Documents**."

The Securities, and solely in the case of Brigade Co-Investor, the Warrants, to be offered and sold to the Investor Support Parties without being registered with the Securities and Exchange Commission (the "**SEC**") under the Securities Act of 1933 (as amended, the "**Securities Act**," which term, as used herein, includes the rules and regulations of the SEC promulgated thereunder), in reliance upon exemptions therefrom.

The Company hereby confirms its agreements with the Investor Support Parties as follows:

SECTION 1.        **Representations and Warranties**. The Company hereby represents and warrants to the Investor Support Parties:

(a)        **No Registration Required**. Subject to compliance by the Investor Support Parties with the representations and warranties set forth in Section 3 hereof, it is not necessary in connection with the offer, sale and delivery of the Securities and the Warrants to the Investor Support Parties, as applicable, in the manner contemplated by this Agreement to register the Securities or the Warrants under the Securities Act or any other similar blue sky securities laws of any applicable state.

(b)        **Power and Authorization.** The Company has all requisite power and authority necessary for the execution, delivery and performance of this Agreement and each other Transaction Document to which it is (or with respect to the Transaction Documents to be entered into at the Closing, will be) a party. The Company has duly authorized by all necessary action the execution, delivery and performance of this Agreement and each other Transaction Document. This Agreement and each other Transaction Document to which the Company is a party (i) has been (or, in the case of Transaction Documents to be entered into at Closing, will be) duly executed and delivered by the Company, and (ii) is (or in the case of the Transaction Documents to be delivered at Closing, will be when executed and delivered) a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with the terms hereof or thereof except to the extent limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally or by general equitable principles.

(c)        **Authorization of Securities and Warrants.** At the Closing, the Securities and the Warrants to be issued to the applicable Investor Support Parties by Reorganized Guitar Center will have been duly authorized and, the Securities, when issued and paid for as contemplated by this Agreement, and the securities issued upon the exercise of the Warrants, when so issued and paid for pursuant to the terms of the Warrants (as applicable), will, when issued, be validly issued, duly paid and non-assessable and free and clear of any lien, encumbrance, pledge, mortgage, deed of trust, hypothecation, easement, right of way, covenant, restriction, encroachment, security interest, or any other claim or charge ("**Liens**").  At the Closing, the Securities and the Warrants to be issued to the Investor Support Parties by Reorganized Guitar Center, together with the New Preferred Equity and New Junior Preferred Equity issued on the Plan Effective Date pursuant to the Plan and any securities issued pursuant to the Management Incentive Plan at or prior to the Closing, will constitute all of the issued and outstanding capital securities of Reorganized Guitar Center.

(d)        **No Material Adverse Change.** Except (i) as otherwise disclosed in the Company's Quarterly Report for the fiscal quarter ended August 1, 2020 (the "**Quarterly Report**") and (ii) for the transactions contemplated by the Support Agreement, during the period beginning August 1, 2020 and ending on the date of this Agreement: (A) there has been no material adverse change, or any change, event, circumstance, effect or development that could reasonably be expected to result in a material adverse change, in (x) the assets, properties, condition, financial or otherwise, or in the earnings, business or operations, whether or not arising from transactions in the ordinary course of business, of

the Company and its subsidiaries, considered as one entity (any such change is called a "**Material Adverse Change**"), *provided*, that (I) the effects of the COVID-19 pandemic and (II) any actions taken in connection with the preparation, commencement and pendency of the Chapter 11 Cases, in each case, on the assets, properties, condition, financial or otherwise, or in the earnings, business or operations, of the Company and its subsidiaries, considered as one entity business, shall not be given effect in determining whether a Material Adverse Change has occurred; or (y) the ability of the Company and its subsidiaries, considered as one entity, to perform their respective obligations hereunder or under the other Transaction Documents or to consummate the transactions contemplated hereby or thereby; and (B) other than the transactions contemplated by the Transaction Documents, the Company and its subsidiaries, considered as one entity, have not incurred any material liability or obligation, indirect, direct or contingent, not in the ordinary course of business nor entered into any material transaction or agreement not in the ordinary course of business.

(e)     **Financial Statements**. (a) The audited financial statements of the Company and its subsidiaries set forth in the Annual Report for the fiscal year ended February 1, 2020 (the "**Annual Report**" and together with the Quarterly Report, the "**Company Reports**") and the unaudited financial statements of the Company and its subsidiaries set forth in the Quarterly Report present fairly in all material respects the consolidated financial position of the entities to which they relate as of and at the dates indicated, and the consolidated results of its operations and cash flows for the periods specified; and (b) such financial statements have been prepared in accordance with generally accepted accounting principles in the United States applied on a consistent basis ("**GAAP**") throughout the periods covered thereby, subject to the limitations set out in the notes to such financial statements. Neither the Company nor any of its subsidiaries is party to any "off-balance sheet arrangements" (as defined in the Securities Exchange Act of 1934, as amended (the "**Exchange Act**" which term, as used herein, includes the rules and regulations of the SEC promulgated thereunder)).

(f)     **Material Misstatements**. The Company Reports, as of their respective dates, did not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(g)     **No Undisclosed Material Liabilities**. There are no material liabilities or obligations of the Company or its subsidiaries of any kind, whether accrued or fixed, contingent, asserted, unasserted, matured or unmatured, known or unknown, absolute or otherwise, other than (a) liabilities specifically reflected and adequately provided for in the most recent balance sheet included in the Quarterly Report, (b) liabilities incurred in connection with the transactions contemplated hereby and by the Support Agreement and (c) liabilities incurred in the ordinary course of business in light of the circumstances (including, without limitation, the COVID-19 Actions) since the date of the most recent balance sheet included in the Quarterly Report (none of which is a liability resulting from breach of contract, breach of warranty, tort, infringement or misappropriation, other than a breach for which the Company Parties have received a forbearance or waiver pursuant to the Support Agreement or otherwise) that would not, individually or in the aggregate,

3

reasonably be expected to result in a Material Adverse Change.  For purposes of this Agreement, "**COVID-19 Actions**" means any commercially reasonable actions that the Company or any of its subsidiaries reasonably determines are necessary or prudent for the Company or any of its subsidiaries to take in connection with (a) events related to any pandemic or public health emergency caused by COVID-19, (b) mitigating the adverse effects of such events, pandemic or public health emergency on the business of the Company and its subsidiaries, including in response to third-party supply or service disruptions caused by the COVID-19 pandemic and (c) protecting the health and safety of customers, employees and other business relationships to ensure compliance with any applicable law, recommendations or restrictions imposed by the Centers for Disease Control and Prevention or any other governmental authorities or quasi-governmental authorities having jurisdiction over the Company or any of its subsidiaries.

    (h)    **Incorporation and Good Standing of the Company and its Subsidiaries; Capitalization; Subsidiaries.**

    (i)    Each of the Company and the Company's subsidiaries has been, and at the Closing Reorganized Guitar Center will be, duly incorporated or formed, as applicable, and is or will be validly existing as a corporation, limited partnership or limited liability company, as applicable, in good standing under the laws of the jurisdiction of its incorporation or formation, as applicable, and has all requisite corporate, partnership or limited liability company, as applicable, power and authority to own, lease and operate its properties and to conduct its business as described in the Company Reports, except where the failure to be in good standing would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change and in the case of the Company, to enter into and perform its obligations under each of the Transaction Documents to which it is a party. The Company and each subsidiary of the Company is, and at the Closing Reorganized Guitar Center will be, duly qualified as a foreign corporation, limited partnership or limited liability company, as applicable, to transact business and is in good standing in each jurisdiction in which such qualification is required, whether by reason of the ownership or leasing of property or the conduct of business, except for such jurisdictions where the failure to so qualify or to be in good standing would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change.

    (ii)    Each of the outstanding equity securities of the Company and each subsidiary of the Company is duly authorized, validly issued, fully-paid, non-assessable and is directly owned of record by Holdings, the Company or a subsidiary of the Company, free and clear of any Liens.  (A) There are no other equity securities of the Company or any subsidiary of the Company authorized, issued, reserved for issuance or outstanding and no outstanding or authorized options, warrants, convertible or exchangeable securities, subscriptions, rights (including any preemptive rights), stock appreciation rights, calls, puts or commitments of any character whatsoever to which Holdings, the Company or any subsidiary of the Company is a party or bound requiring the issuance, delivery or sale of equity securities of the Company or any subsidiary of the Company or the issuance, delivery or sale of other securities of any subsidiary of the Company or securities convertible into or exchangeable for the equity securities of the Company or any subsidiary

of the Company, and (B) there are no outstanding or authorized stock appreciation, phantom stock, profit participation or similar rights with respect to the equity securities of, or other equity or voting interest in, the Company or any subsidiary of the Company to which Holdings, the Company or a subsidiary of the Company is bound.  Neither the Company nor any subsidiary of the Company has any authorized or outstanding bonds, debentures, notes or other indebtedness, the holders of which have the right to vote (or convertible into, exchangeable for, or evidencing the right to subscribe for or acquire securities having the right to vote) with the equity holders of the Company or such subsidiary of the Company on any matter.  There are no written contracts, agreements, indentures, notes, bonds, leases, licenses, commitments, arrangements, undertakings, understandings or other legally binding agreements to which Holdings, the Company or any subsidiary of the Company is a party or by which Holdings, the Company or any subsidiary of the Company is bound to (x) repurchase, redeem or otherwise acquire any equity securities of the Company or any subsidiary of the Company or (y) vote or dispose of any equity securities of the Company or any subsidiary of the Company.  Except for its ownership interest in Music Aficionado Inc., neither Holdings, the Company nor any subsidiary of the Company owns or controls, directly or indirectly, any equity or voting interest in any individual or any corporation, association, partnership, limited liability company, joint venture, joint stock or other company, business trust, trust, organization, governmental authority or other entity of any kind (each, a "**Person**") (other than the Company or a subsidiary of the Company), or has any obligation or commitment to acquire any such equity or voting interest. Neither the Company nor any subsidiary of the Company has any obligation to make any capital contribution or loan (other than loans to employees made in the ordinary course of business) to any Person (other than to another wholly-owned subsidiary of the Company).

(iii)    If Reorganized Guitar Center is not Holdings or the Company, except as contemplated by the Transaction Documents, immediately prior to the Closing, (A) there will be no other equity securities of Reorganized Guitar Center authorized, issued, reserved for issuance or outstanding and no outstanding or authorized options, warrants, convertible or exchangeable securities, subscriptions, rights (including any preemptive rights), stock appreciation rights, calls, puts or commitments of any character whatsoever to which Reorganized Guitar Center is bound requiring the issuance, delivery or sale of equity securities of Reorganized Guitar Center or securities convertible into or exchangeable for the equity securities of Reorganized Guitar Center, other than those that would be canceled on the Plan Effective Date at the Closing, (B) there will be no outstanding or authorized stock appreciation, phantom stock, profit participation or similar rights with respect to the equity securities of, or other equity or voting interest in, Reorganized Guitar Center to which Reorganized Guitar Center is bound, (C) there will not be any authorized or outstanding bonds, debentures, notes or other indebtedness, (D) there will be no written contracts, agreements, indentures, notes, bonds, leases, licenses, commitments, arrangements, undertakings, understandings or other legally binding agreements to which Reorganized Guitar Center is a party or is bound to (x) repurchase, redeem or otherwise acquire any equity securities of Reorganized Guitar Center or (y) vote or dispose of any equity securities of Reorganized Guitar Center, (E) Reorganized Guitar Center will not own or control, directly or indirectly, any equity or voting interest in any Person (other than the Company or a subsidiary of the Company), or have any obligation

or commitment to acquire any such equity or voting interest, and (F) there will be no obligation to make any capital contribution or to any Person.

(iv)     If Reorganized Guitar Center is not Holdings or the Company, except as contemplated by the Transaction Documents, Reorganized Guitar Center (A) will be a single purpose entity that does not carry on, and has never carried on, any business, does not and has never had, any employees, does not own, and has never owned, any property or assets or any interests of any nature or kind whatsoever, and has never entered into any transaction and (B) has no obligations, liabilities (whether actual or contingent) or indebtedness outstanding and owing to any Person, including any liabilities in respect of any judgements, orders, fines, interests, penalties, awards or decrees of any governmental authority.

(i)     **Non-Contravention of Existing Instruments; No Further Authorizations or Approvals Required**.

(i)     Assuming the consents described in clauses (A) through (D) of Section 1(i)(ii) are obtained, the execution and delivery by the Company and, if applicable, Reorganized Guitar Center, of this Agreement and the other Transaction Agreements, the compliance by the Company and, if applicable, Reorganized Guitar Center, with the provisions hereof and thereof and the consummation of the transactions contemplated herein and therein will not (A) conflict with, or result in a breach, modification or violation of, any of the terms or provisions of, or constitute a default under (with or without notice or lapse of time, or both), or result in the termination of, or result, except to the extent specified in the Plan, in the acceleration of, or the creation of any Lien under, or cause any payment or consent to be required under any contract to which the Company or Reorganized Guitar Center or any of its subsidiaries will be bound as of the Closing after giving effect to the Plan or to which any of the property or assets of the Company or Reorganized Guitar Center or any of its subsidiaries will be subject as of the Closing Date after giving effect to the Plan, (B) result in any violation of the provisions of the charter, bylaws or other constitutive document of the Company or Reorganized Guitar Center or any of its subsidiaries (other than, for the avoidance of doubt, a breach or default that would be triggered as a result of the Chapter 11 Cases or the undertakings to implement the Restructuring Transactions through the Chapter 11 Cases), or (C) result in any breach or violation of, or constitute a default under (with or without notice or lapse of time, or both) any applicable law, except in each of the cases described in clause (A) or (C) for any conflict, breach, modification, violation, default, termination, acceleration or Lien which would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Change.

(ii)     No consent, approval, authorization or other order of, or registration, declaration or filing with, any court or other governmental or regulatory authority or agency or any other Person ("**Consents**") is required for the execution, delivery and performance of the Transaction Documents by the Company or, if applicable, Reorganized Guitar Center, or the issuance and delivery of the Securities and the Warrants, or consummation of the transactions contemplated hereby and thereby, except (A) entry of the Confirmation Order, (B) entry by the Bankruptcy Court, or any other court of

competent jurisdiction, of any orders as may be necessary in the Chapter 11 Cases from time to time, (C) filings, notifications, authorizations, approvals, consents, clearances, ratifications, waivers, registrations, qualifications, designations, declarations or termination or expiration of all applicable waiting or review periods under any antitrust laws in connection with the transactions contemplated by this Agreement or the other Transaction Documents and (D) any other Consents that, if not made or obtained, would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Change.

(j)     **No Material Actions or Proceedings**.

(i)     Except as contemplated by the Support Agreement (including, without limitation, the Chapter 11 Cases), there are no legal or governmental actions, suits or proceedings (whether civil, criminal or administrative and whether brought at law or in equity) (collectively, "**Actions**") pending or, to the best of the Company's knowledge, threatened (i) against or affecting the Company or any of the Company's subsidiaries or (ii) which has as the subject thereof any property or assets owned or leased by, the Company or any of the Company's subsidiaries and any such Action, if determined adversely to the Company or any of the Company's subsidiaries, would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change or adversely affect the consummation of the transactions contemplated by this Agreement.

(ii)     Neither the Company nor any of its subsidiaries is a party to or subject to the provisions of any material unsatisfied order, judgment, injunction, ruling, award, decree or writ adopted or imposed by, including any settlement agreement with, any governmental authority ("**Orders**").

(k)     **Intellectual Property Rights.** Except as disclosed in the Company Reports, (i) the Company and the Company's subsidiaries either own or possess sufficient rights to use, pursuant to a valid and binding agreement, all trademarks, trade names, patent rights, copyrights, software, domain names, licenses, approvals, trade secrets and other similar rights (collectively, "**Intellectual Property Rights**") reasonably necessary to conduct their businesses as now conducted; (ii) such Intellectual Property Rights will be owned, licensed or available for use by the Company and the Company's subsidiaries on the same terms and conditions as exist of the date hereof immediately following the Closing; and (iii) the expected expiration of any of such Intellectual Property Rights would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change. The Company and the Company's subsidiaries have taken all commercially reasonable steps and precautions necessary to maintain the confidentiality of and otherwise protect and enforce their rights in all Intellectual Property Rights reasonably necessary to conduct their businesses as now conducted. None of the Company or any of the Company's subsidiaries has received any written notice of infringement or conflict with asserted Intellectual Property Rights of others, which infringement or conflict, if the subject of an unfavorable decision, would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change and no claims relating to any such infringement or conflict are pending. The conduct of the business of the Company and the Company's subsidiaries does not infringe upon, dilute, misappropriate or otherwise violate any Intellectual Property

7

Rights of any third party and to the best of the Company's knowledge, no third party is infringing upon, diluting, misappropriating or otherwise violating any Intellectual Property Rights owned by the Company or the Company's subsidiaries.

      (l)    **All Necessary Permits; Compliance with Laws.**

      (i)    Except as disclosed in the Company Reports, (x) the Company and each other subsidiary of the Company possess such valid and current certificates, authorizations, license, approval or permits issued by the appropriate state, federal or foreign regulatory agencies or bodies necessary to own, lease and operate its properties and to conduct their respective businesses in all material respects, and (y) none of the Company or any subsidiary of the Company has received any written notice of proceedings relating to the revocation or modification of, or non-compliance with, any such certificate, authorization, license, approval or permit which, individually or in the aggregate, if the subject of an unfavorable decision, ruling or finding, would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change.

      (ii)    The Company and each of its subsidiaries are in compliance with all applicable laws and Orders by any governmental authority, except for such violations that would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change.

      (m)    **Title to Properties.** The Company and each of the Company's subsidiaries has good and marketable title to all the properties and assets reflected as owned in the financial statements set forth in the Company Reports, in each case free and clear of any Liens and other defects, except as disclosed in the Company Reports and except such as do not materially and adversely affect the value of such property and do not materially interfere with the use made or proposed to be made of such property by the Company or such subsidiary of the Company. The real property, improvements, equipment and personal property held under lease by the Company or any subsidiary of the Company are held under valid and enforceable leases, with such exceptions as are not material and do not materially interfere with the value or use made or proposed to be made of such real property, improvements, equipment or personal property by the Company or such subsidiary of the Company. Other than in connection with COVID-19 Actions, there exists no default under any of the real property leases by the Company or any of the Company's subsidiaries or, to the knowledge of the Company, any other party thereto, except for such defaults that would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change.  Neither the Company nor any of the Company's subsidiaries has leased, subleased, licensed or otherwise granted to any Person the right to use or occupy on of the Company's owned or leased real property. The Company has the right to use all real property necessary to conduct the Company's business.

      (n)    **Tax Law Compliance.**

      (i)    Except as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change: (A) the Company and each of its subsidiaries have filed all Tax returns, statements and reports required to have been filed

by them and have paid all Taxes required to have been paid by them (including in the capacity of a tax withholding agent), (B) the Company has made adequate charges, accruals and reserves in accordance with GAAP in the applicable financial statements set forth in the Company Reports in respect of all Taxes for all periods as to which the Tax liability of the Company or any of its subsidiaries is not yet due and payable, and (C) there are (I) no outstanding or pending audits, assessments, disputes or claims concerning any Tax liability of the Company or its subsidiaries and (II) no Liens for Taxes on any asset of the Company or its subsidiaries, except, in each case of clauses (I) and (II), with respect to Taxes not yet due or payable or that are being contested in good faith and for which adequate reserves have been established in accordance with GAAP in the applicable financial statements set forth in the Company Reports.

(ii)     Neither the Company nor any of its subsidiaries is or has been a party to any "listed transaction," as defined in Treasury Regulation Section 1.6011-4(b)(2), or any similar provision of state, local, or non-U.S. Tax law.

(iii)     As used in this Agreement, "**Taxes**" means (A) all U.S. and non-U.S., federal, state and local taxes, including income, gross receipts, license, payroll, employment, excise, severance, occupation, premium, windfall profits, customs, duties, capital stock, franchise, profits, withholding, unemployment, disability, escheat, unclaimed property, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, and estimated, levied by any governmental authority and (B) any liability for Taxes of any person (other than the Company or its subsidiaries) arising from the application of Treasury Regulation Section 1.1502-6 or any analogous provision of state, local or non-U.S. law, by contract, or as a transferee or successor, and including, in each case of clauses (A) and (B), any interest, penalties, and additions to Tax imposed in connection therewith or with respect thereto.

(o)     **Company Is Not An "Investment Company".** The Company has been advised of the rules and requirements under the Investment Company Act of 1940, as amended (the "**Investment Company Act**," which term, as used herein, includes the rules and regulations of the SEC promulgated thereunder). The Company is not, and after receipt of payment for the Securities and the Warrants will not be, required to register as an "investment company" or an entity "controlled" by an "investment company" under the Investment Company Act and will conduct its business in a manner so that it will not be required to register as an investment company under the Investment Company Act.

(p)     **Insurance**. Each of the Company and its subsidiaries are insured by recognized, financially sound institutions with policies in such amounts and with such deductibles and covering such risks as management believes are adequate and customary for their businesses including, without limitation, policies covering real and personal property owned or leased by the Company and its subsidiaries against theft, damage, destruction, acts of vandalism, flood, earthquakes and Actions by directors or officers acting on behalf of the Company or any of the Company's subsidiaries. Each such policy is in full force and effect (or has been renewed in the ordinary course of business) and none of the Company nor any of its subsidiaries is in default with respect to its obligations under any such policies as would, individually or in the aggregate, reasonably be expected to

result in Material Adverse Change. The Company has no reason to believe that it or any subsidiary will not be able (i) to renew its existing insurance coverage as and when such policies expire or (ii) to obtain comparable coverage from similar institutions as may be necessary or appropriate to conduct its business as now conducted and at a cost that would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change.

(q)      **Company's Accounting System.** The Company and its subsidiaries maintain systems of "internal control over financial reporting" (as defined in Rule 13a-15(f) of the Exchange Act) that comply in all material respects with the requirements of the Exchange Act and have been designed by or under the supervision of, their respective principal executive and principal financial offers, or persons performing similar functions to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with GAAP. The Company and its subsidiaries maintain a system of accounting controls that is sufficient to provide reasonable assurances that: (i) transactions are executed in accordance with management's general or specific authorization; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain accountability for assets; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

(r)      **Disclosure Controls and Procedures.** The Company has established and maintains disclosure controls and procedures (as such term is defined in Rules 13a-15 and 15d-15 under the Exchange Act); such disclosure controls and procedures are designed to ensure that material information relating to the Company and its subsidiaries is made known to the chief executive officer and chief financial officer of the Company by others within the Company or any of its subsidiaries, and such disclosure controls and procedures are reasonably effective to perform the functions for which they were established subject to the limitations of any such control system; the Company's auditors and the Audit Committee of the Board of Directors of the Company have been advised of: (i) any significant deficiencies or material weaknesses in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize, and report financial data; and (ii) any fraud, whether or not material, that involves management or other employees who have a role in the Company's internal controls; and since the date of the most recent evaluation of such disclosure controls and procedures, there have been no significant changes in internal controls or in other factors that could significantly affect internal controls, including any corrective actions with regard to significant deficiencies and material weaknesses.

(s)      **Compliance with and Liability Under Environmental Laws.** Except as otherwise disclosed in the Company Reports or as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change: (i) each of the Company and its subsidiaries and their respective operations and facilities are in compliance with, and not subject to any known liabilities under, applicable Environmental Laws, which compliance includes, without limitation, having obtained and being in

compliance with any permits, licenses or other governmental authorizations or approvals, and having made all filings and provided all financial assurances and notices, required for the ownership and operation of the business, properties and facilities of the Company or its subsidiaries under applicable Environmental Laws, and compliance with the terms and conditions thereof; (ii) neither the Company nor any of its subsidiaries has received any written communication, whether from a governmental authority, citizens group, employee or otherwise, that alleges that the Company or any of its subsidiaries is in violation of any Environmental Law; (iii) there is no claim, action or cause of action filed with a court or governmental authority, no investigation with respect to which the Company has received written notice, and no written notice by any person or entity alleging actual or potential liability on the part of the Company or any of its subsidiaries based on or pursuant to any Environmental Law pending or, to the best of the Company's knowledge, threatened against the Company or any of its subsidiaries or any person or entity whose liability under or pursuant to any Environmental Law the Company or any of its subsidiaries has retained or assumed either contractually or by operation of law; (iv) neither the Company nor any of its subsidiaries is conducting or paying for, in whole or in part, any investigation, response or other corrective action pursuant to any Environmental Law at any site or facility, nor is any of them subject or a party to any order, judgment, decree, contract or agreement which imposes any obligation or liability under any Environmental Law; (v) no Lien or other restriction has been recorded pursuant to any Environmental Law with respect to any assets, facility or property owned, operated or leased by the Company or any of its subsidiaries; and (vi) to the Company's knowledge, there are no past or present actions, activities, circumstances, conditions or occurrences, including, without limitation, the Release or threatened Release of any Material of Environmental Concern, that could reasonably be expected to result in a material violation of or material liability under any Environmental Law on the part of the Company or any of its subsidiaries, including without limitation, any such liability which the Company or any of its subsidiaries has retained or assumed either contractually or by operation of law.

For purposes of this Agreement, "**Environment**" means ambient air, indoor air, surface water, groundwater, drinking water, soil, surface and subsurface strata, and natural resources such as wetlands, flora and fauna. "**Environmental Laws**" means the common law and all federal, state and local laws or regulations, ordinances, codes, orders, decrees, judgments and injunctions issued, promulgated or entered thereunder, relating to pollution or protection of the Environment or worker health and safety (as it relates to exposure to Materials of Environmental Concern), including without limitation, those relating to (i) the Release or threatened Release of Materials of Environmental Concern; and (ii) the manufacture, processing, distribution, use, generation, treatment, storage, transport, handling or recycling of Materials of Environmental Concern. "**Materials of Environmental Concern**" means any substance, material, pollutant, contaminant, chemical, waste, compound, or constituent, in any form, including without limitation, petroleum and petroleum products, subject to regulation or which can give rise to liability under any Environmental Law. "**Release**" means any release, spill, emission, discharge, deposit, disposal, leaking, pumping, pouring, dumping, emptying, injection or leaching into the Environment, or into, from or through any building, structure or facility.

(t)    **ERISA Compliance**.

11

(i)    Except as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change, each "employee benefit plan" (as defined under the Employee Retirement Income Security Act of 1974 (as amended, "**ERISA**," which term, as used herein, includes the regulations and published interpretations thereunder)), but not including any Multiemployer Plan (as defined below), established, contributed to or maintained by the Company or its subsidiaries are in compliance in form and operation with ERISA, the Code and all applicable laws. "**ERISA Affiliate**" means, with respect to the Company or a subsidiary, any member of any group of organizations described in Section 414(b), (c), (m) or (o) of the Internal Revenue Code of 1986 (as amended, the "**Code**," which term, as used herein, includes the regulations and published interpretations thereunder) of which the Company or such subsidiary is a member. No "reportable event" (as defined in Section 4043(c) of ERISA) has occurred or is reasonably expected to occur with respect to any "employee benefit plan" (as defined under ERISA) established or maintained by the Company, its subsidiaries or any of their ERISA Affiliates, that would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change. Neither the Company, its subsidiaries nor any of their ERISA Affiliates has incurred or reasonably expects to incur any liability under Sections 412, 4971, 4975 or 4980B of the Code or Section 4062(e) of ERISA that would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change. Each "employee benefit plan" (as defined under ERISA) established or maintained by the Company or its subsidiaries that is intended to be qualified under Section 401 of the Code is so qualified and, to the Company's knowledge, nothing has occurred, whether by action or failure to act, which would reasonably be expected to cause the loss of such qualification to the extent any loss of qualified status would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change.  Neither the Company, its subsidiaries nor any ERISA Affiliate sponsors, maintains, contributes to (or is required to contribute to) or has any current or contingent liability or obligation under or with respect to any (i) "multiemployer plan" as defined in Section 3(37) of ERISA (a "**Multiemployer Plan**"); (ii) "multiple employer plan" within the meaning of Section 413(c) of the Code; or (iii) "multiple employer welfare arrangement" as defined in Section 3(40) of ERISA or (iv) a defined benefit pension plan subject to Title IV of ERISA.

(ii)    Each employee benefit plan subject to the Patient Protection and Affordable Care Act (the "**ACA**") has been administered in all material respects, a manner to avoid any excise or penalty taxes under the ACA. Neither the Company nor its subsidiaries has incurred (whether or not assessed), or is reasonably expected to incur or to be subject to, any penalty or Tax with respect to the reporting requirements under Sections 6055 and 6056 of the Code in relation to a Company Plan, as applicable, or Section 4980H, 4980B or 4980D of the Code, except, in each case, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Change.  Neither the Company nor any of its subsidiaries has any obligation or commitment to "gross up" any Person with respect to Taxes under Section 409A or 4999 of the Code. Neither the Company nor any of its subsidiaries has any current or contingent material obligation to provide, any post-termination or post-retirement health or life insurance benefits to any current or former employee. With respect to any "employee benefit plan" (as defined under ERISA) sponsored or maintained by the Company or its subsidiaries, no actions, disputes, litigation, claims, audits or investigations (other than routine, undisputed claims for

12

benefits in the Ordinary Course of Business) are pending or, to the knowledge of the Company, threatened in writing, except as would not, in each case, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change. Except as provided under the Holdings' 2015 Stock Incentive Plan and the Holdings' Preferred Stock Unit Plan, neither the execution nor the delivery of this Agreement nor the consummation of the transactions contemplated by this Agreement (either alone or in conjunction with any other event) will, directly or indirectly, (i) entitle any current or former director, officer, employee or other individual service provider of the Company or any of its subsidiaries (each, a "**Covered Individual**") to any change in control, transaction or retention bonus, severance pay or other similar payment or benefit; (ii) accelerate the time of payment, funding or vesting or materially increase the amount of compensation or benefits due to any Covered Individual; or (iii) result in any payment (whether in cash or property or the vesting of property) to any "disqualified individual" (as such term is defined in Treasury Regulations Section 1.280G-1) that would, individually or in combination with any other such payment, constitute an "excess parachute payment" (as defined in Section 280G(b)(1) of the Code).

(u)     **Compliance with Labor Laws**. Except as disclosed in the Company Reports or as would not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change, (i) there is (A) no unfair labor practice complaint pending or, to the best of the Company's knowledge, threatened against the Company or any of its subsidiaries before the National Labor Relations Board, and no grievance or arbitration proceeding arising out of or under collective bargaining agreements is pending, or to the best of the Company's knowledge, threatened, against the Company or any of its subsidiaries, and (B) no strike, labor dispute, slowdown or stoppage pending or, to the best of the Company's knowledge, threatened against the Company or any of its subsidiaries; and (ii) the Company and the Company subsidiaries are in compliance in all material respects with all applicable laws relating to labor and employment, including provisions thereof relating to employment practices, terms and conditions of employment and wages and hours, and are not engaged in any unfair labor practice. The Company and each subsidiary are in compliance with the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101, et. seq. ("**WARN**") or any similar state or local law, except for such non-compliance that, would, individually or in the aggregate, reasonably be expected to result in a Material Adverse Change. The Company has timely provided any required notices under WARN or any similar state or local law.

(v)     **Related Party Transactions**. No relationship, direct or indirect, exists between or among any of the Company or any affiliate of the Company, on the one hand, and any director, officer, member, stockholder, customer or supplier of the Company or any affiliate of the Company, on the other hand, which would be required by the Securities Act to be disclosed in a registration statement on Form S-1 which is not so disclosed in the Company Reports. Except as otherwise disclosed in the Company Reports or as not prohibited by the Securities or the Warrants, there are no outstanding loans, advances (except advances for business expenses in the ordinary course of business) or guarantees of indebtedness by the Company or any affiliate of the Company to or for the benefit of any of the officers or directors of the Company or any affiliate of the Company or any of their respective family members.

13

(w)    **No Unlawful Contributions or Other Payments**. None of the Company or any of the Company's subsidiaries, nor any director or officer of the Company or any of the Company's subsidiaries nor, to the knowledge of the Company, any other employee, agent, representative, affiliate or other person associated with or acting on behalf of the Company or any of the Company's subsidiaries has, nor will the proceeds of the offering of the Securities or the Warrants hereunder be, (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made or taken an act in furtherance of an offer, promise or authorization of any direct or indirect unlawful payment or benefit to any foreign or domestic government official or employee (including any "foreign official" (as such term is defined in the FCPA)) of any government-owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of the foregoing, or any political party or party official or any candidate for political office; (iii) violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977, as amended (the "**FCPA**") or any applicable law or regulation implementing the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, or committed an offence under the Bribery Act 2010 of the United Kingdom, or any other applicable anti-bribery or anti-corruption law; or (iv) made, offered, agreed or requested any unlawful bribe or other unlawful benefit, including, without limitation, any rebate, payoff, influence payment, kickback or other unlawful or improper payment or benefit. The Company and the Company's subsidiaries have instituted, maintain and enforce, and will continue to maintain and enforce policies and procedures designed to promote and ensure compliance with all applicable anti-bribery and anticorruption laws.

(x)    **No Conflict with Money Laundering Laws**. The operations of the Company and the Company's subsidiaries are and have been conducted at all times in material compliance with applicable financial recordkeeping and reporting requirements, including those of the Currency and Foreign Transactions Reporting Act of 1970, as amended, the applicable money laundering statutes of all jurisdictions where the Company or any of its subsidiaries conducts business, the rules and regulations thereunder and any related or similar rules, regulations or guidelines, issued, administered or enforced by governmental agency (collectively, the "**Anti-Money Laundering Laws**"), and no Action by or before any court or governmental agency, authority or body or any arbitrator involving the Company or any of the Company's subsidiaries with respect to the Anti-Money Laundering Laws is pending or, to the knowledge of the Company, threatened.

(y)    **No Conflict with Sanctions Laws**. None of the Company or any of the Company's subsidiaries, nor any directors or officers of the Company or any of its subsidiaries, or to the knowledge of the Company, any employees, agents, affiliates or other persons associated with or acting on behalf of the Company or any of the Company's subsidiaries is currently the subject or the target of any sanctions administered or enforced by the U.S. government, (including, without limitation, the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC") or the U.S. Department of State and including, without limitation, the designation as a "specially designated national" or "blocked person"), the United Nations Security Council ("**UNSC**"), the European Union, Her Majesty's Treasury ("**HMT**"), or other relevant sanctions authority (collectively, "**Sanctions**"), nor is the Company or any of the Company's subsidiaries located, organized

14

or resident in a country or territory that is the subject or target of Sanctions, including, without limitation, Cuba, Iran, North Korea, Sudan Syria, Venezuela and the Crimea region of Ukraine (each, a "**Sanctioned Country**"); and the Company will not directly or indirectly knowingly use the proceeds of the offering of the Securities or the Warrants hereunder, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other person or entity (i) to fund or facilitate any activities of or business with any person that, at the time of such funding or facilitation, is the subject or target of Sanctions, (ii) to fund or facilitate any activities of or business in any Sanctioned Country or (iii) in any other manner that will result in a violation by any person (including any person participating in the transaction, whether as underwriter, initial purchaser, advisor, investor or otherwise) of Sanctions. For the past five years, the Company and the Company's subsidiaries have not knowingly engaged in, are not now knowingly engaged in any dealings or transactions with any person that at the time of the dealing or transaction is or was the subject or the target of Sanctions or with any Sanctioned Country.

(z) **Privacy and Data Security.** To the Company's knowledge, no Person has gained unauthorized access to or made any unauthorized use of any Personal Data maintained by the Company or any of its subsidiaries. The Company and its subsidiaries have taken all steps necessary and appropriate (including implementing and monitoring compliance with adequate measures with respect to technical and physical security) to ensure that Personal Data and other confidential information is protected against loss and against unauthorized access, use, modification, disclosure or other misuse, including implementation of commercially reasonable security measures to protect Personal Data and confidential information they receive and store in their respective computer systems from illegal use by third parties. No Action or investigation is pending or, to the Company's Knowledge, threatened against the Company or its subsidiaries relating to the collection or use of Personal Data. The Company and its subsidiaries take commercially reasonable actions to protect the confidentiality, integrity and security of its software, databases, systems, networks and Internet sites and all information stored or contained therein or transmitted thereby from potential unauthorized use, access, interruption or modification by third parties. The Company and its subsidiaries have, as of the date hereof, complied in all material respects with (i) all applicable laws relating to the use, processing, storage, protection, privacy and security of Personal Data, including the California Consumer Protection Act, and applicable data breach notification laws, and (ii) their respective privacy policies and contractual obligations. For the purposes of this paragraph, "**Personal Data**" means a natural person's name, street address, telephone number, email address, photograph, social security number or tax identification number, driver's license number, passport number, credit card number, bank information, or biometric identifiers or any other piece of information that, alone or in combination with other information held by the Company or its subsidiaries, allows the identification of or contact with a natural person, or can be used to identify a natural person.

(aa) **Brokers and Finders**. Neither the Company nor any of its subsidiaries has engaged any broker, finder or similar intermediary or incurred any liability for any brokerage fees, commissions or finder's fees in connection with the Restructuring Transactions, except with respect to Houlihan Lokey, Inc. or as contemplated by the Support Agreement.

SECTION 2.       **Purchase, Sale and Delivery of the Securities and the Warrants; Covenants**.

(a)       **The Securities and the Warrants**. Upon the basis of the representations, warranties and agreements set forth herein, and subject to the terms and conditions set forth herein, (i) the Company agrees to cause Reorganized Guitar Center to issue and sell to the Investor Support Parties, based on their respective entitlement thereto pursuant to this Agreement and their respective Investor ECL, all of the Securities and solely in the case of Brigade Co-Investor, the Warrants, free and clear of all Liens, and (ii) each Investor Support Party severally agrees, based on their respective entitlement thereto pursuant to this Agreement and their respective Investor ECL, to purchase from Reorganized Guitar Center the Securities and solely in the case of Brigade Co-Investor, the Warrants, free and clear of all Liens, in each case, at the Closing. Notwithstanding anything to the contrary herein, each of the parties acknowledge and agree the rights, interests and obligations of the Investor Support Parties under this Agreement are several and not joint.

(b)       **The Closing**. The Closing of the purchase and sale of the Securities and the Warrants will take place by telephone conference and electronic exchange of documents at a closing on the Plan Effective Date at 10:00 a.m. New York City time (the "**Closing**" and the date of the Closing, the "**Closing Date**"), or such other time as mutually agreed by the parties.

(c)       **Delivery of the Securities and the Warrants**. At the Closing, Reorganized Guitar Center shall deliver, or cause to be delivered, for the accounts of the Investor Support Parties, evidence of the applicable issuance and allocation of the Securities and, solely in the case of Brigade Co-Investor, the Warrants, in each case, in book-entry form to be purchased by the Investor Support Parties against the irrevocable release of a wire transfer of immediately available funds for the amount of the purchase price therefor.

(d)       **Conduct of the Business Generally**.  From the date of this Agreement until the Closing, or the earlier termination of this Agreement in accordance with Section 7, without the prior written consent of each Investor Support Party, which shall not be unreasonably withheld, conditioned or delayed, the Company and each of its subsidiaries shall conduct the business only in the ordinary course of business, taking into account the preparation, commencement and pendency of the Chapter 11 Cases. Notwithstanding anything to the contrary contained in this Agreement, none of the Restructuring Transactions, any COVID-19 Action or any actions taken or not taken in accordance with the Transaction Documents shall be deemed to violate or breach this Agreement in any way, be deemed to constitute an action taken outside of the ordinary course of business or serve as a basis for the Investor Support Parties to terminate this Agreement or assert that any of the conditions to the Closing contained herein have not been satisfied.

(e)       **Specific Prohibitions**.  Without limiting the generality or effect of Section 2(d), from the date of this Agreement until the Closing Date, or the earlier termination of this Agreement in accordance with Section 7, except (A) as otherwise contemplated, permitted or required by the Transaction Documents or the Restructuring Transactions, (B) as required by any applicable law or applicable Order, (C) in connection with actions taken

16

in response to a business emergency or other unforeseen operational matters, (D) for any COVID-19 Actions or (E) as consented to or approved by each Investor Support Party in writing, which consent shall not be unreasonably withheld, conditioned or delayed, none of the Company or any of its subsidiaries shall take any of the following actions:

(i)      amend its (A) certificate or articles of incorporation, association or organization or any limited liability company, operating or partnership agreement adopted or filed in connection with the creation, formation or organization or (B) by-laws or equity holders agreements to which the Company or any of its subsidiaries is a party relating to the organization or governance the Company or such subsidiary, in each case, as amended or supplemented, effect any split, combination, reclassification or similar action with respect to its capital stock or other equity interests or adopt or carry out any plan of complete or partial liquidation or dissolution;

(ii)      issue, sell, grant or otherwise dispose of any of its equity interests or other securities, or amend any term of any of its outstanding equity interests or other securities (excluding issues of equity interests upon the exercise of any convertible equity interests outstanding as of the date of this Agreement);

(iii)      incur, assume or otherwise become liable in respect of any indebtedness;

(iv)      enter into any transactions with any Affiliate of the Company or any of its subsidiaries other than on an arms' length basis;

(v)      sell or otherwise dispose of any of its assets which would reasonably be expected to be material to the Company except in the ordinary course of business;

(vi)      make any material change in its methods of accounting or accounting practices (except as required by changes in GAAP);

(vii)      settle, agree to settle or waive any pending Actions (A) involving potential payments to any of the Company or any of its subsidiaries or by the Company or any of its Subsidiaries after the Closing which are either in excess of $1,000,000 or not otherwise in the ordinary course of business of the Company or any of its subsidiaries or (B) that admit liability or consent to non-monetary relief;

(viii)      other than in the ordinary course of business, (A) license or otherwise dispose of the rights to use any material patent, material trademark or other material Intellectual Property Right or disclose material trade secrets to a third party other than pursuant to a confidentiality agreement or (B) abandon, let lapse or cancel any material Intellectual Property Right; or

(ix)      enter into any contractual obligations to do any of the things referred to elsewhere in this Section 2(e).

For the avoidance of doubt, nothing contained in this Agreement (including this Section 2(e)) shall give any Investor Support Party, directly or indirectly, the right to control or direct the operations

17

of the Company or any of its subsidiaries prior to the Closing Date. Prior to the Closing Date, the Company and each of its subsidiaries shall exercise, consistent with the terms and conditions of this Agreement and with past practices, complete control and supervision over their respective operations.

(f)     **Approvals and Consents**.

(i)     Within ten (10) Business Days of the date of this Agreement, unless the parties hereto agree, acting reasonably, in writing that HSR Approval is not required, the Company, Reorganized Guitar Center (if applicable) and any relevant Investor Support Party, shall make all filings and submissions necessary under the HSR Act, and to the extent mutually determined to be required, any other applicable competition, merger, antitrust, or other similar law, ordinance or regulation ("**Antitrust Law**"), and the parties will request any expedited processing available. Payment obligations of any applicable filing fees under the HSR Act or any other applicable Antitrust Law shall be paid by the Company. For purposes of this Agreement (A) "**HSR Act**" means the Hart-Scott-Rodino Antitrust Improvement Act of 1976, as amended, and the rules and regulations promulgated thereunder and (B) "**HSR Approval**" means the expiration or earlier termination of the applicable statutory waiting periods under the HSR Act.

(ii)     The Company, Reorganized Guitar Center (if applicable), and any Investor Support Party, as required, shall cooperate and furnish to the other parties such necessary information and reasonable assistance as the other parties may request in connection with its preparation of any filing or submission in connection with obtaining HSR Approval, if required.

(iii)     To the extent permitted by applicable law, each of the Company, Reorganized Guitar Center (if applicable) and any Investor Support Party, as required, will provide to the other parties copies of all submissions and filings provided to a governmental authority pursuant to any applicable Antitrust Law, excluding the HSR Act (provided, that in respect of HSR Act submissions or filings, such documents shall only be provided if deemed necessary by the Company, Reorganized Guitar Center (if applicable) and any Investor Support Party, as required, acting reasonably), and will provide reasonable opportunity to comment on such filings and submissions prior to submitting same to the governmental authority; notwithstanding the foregoing, submissions, filings or other written communications to a governmental authority may be redacted as necessary before sharing with the other parties to address reasonable attorney-client or other privilege or confidentiality concerns, provided that external legal counsel to the Company, Reorganized Guitar Center (if applicable), and any Investor Support Party, as required, shall receive non-redacted versions of drafts or final submissions, filings or other written communications to the governmental authority on the basis that the redacted information will not be shared with their respective clients.

(iv)     To the extent permitted by applicable law, the Company, Reorganized Guitar Center (if applicable) and any Investor Support Party, as required, will promptly inform the other of any material communication received by such party from any governmental authority or proposed to be made to any governmental authority, and shall

18

provide the other party and its counsel an opportunity to attend and participate in any meetings of a substantive nature with a governmental authority, with respect to the HSR Act or any other applicable Antitrust Law.

(v)     Each of the Company, Reorganized Guitar Center (if applicable), and any Investor Support Party, as required, will make and use reasonable best efforts to obtain HSR Approval, if required, and any other approval of any governmental authority required to consummate the transactions contemplated by this Agreement.   Without limiting the generality of the foregoing, the Company, Reorganized Guitar Center (if applicable), and any Investor Support Party, as required, shall each (A) use its respective reasonable best efforts to comply as expeditiously as possible with all requests of any governmental authority for additional information and documents, including information or documents requested under the HSR Act or other applicable Antitrust Law; (B) not (x) extend any waiting period under the HSR Act or any applicable Antitrust Law; or (y) enter into agreement with any governmental authority not to consummate the transactions contemplated by this Agreement, except, in each case, with the prior consent of the other parties hereto; and (C) cooperate with the other parties hereto and use reasonable best efforts to contest and resist any action, including legislative, administrative or judicial action, and to have vacated, lifted, reversed or overturned any Order (whether temporary, preliminary or permanent) that delays, restricts, prevents or prohibits the consummation of the transactions contemplated by this Agreement. The Company and Reorganized Guitar Center (if applicable), and any Investor Support Party, as required, shall not agree to any settlements, undertakings, consent decrees, stipulations, Orders or other agreements with any governmental authority relating to the transactions contemplated by this Agreement except, in each case, with the prior written consent of each Investor Support Party.

(vi)     In furtherance of the foregoing, as soon as reasonably possible following the date hereof, the Company, Reorganized Guitar Center (if applicable), and any Investor Support Party, as required, shall make all such filings and seek all such Consents with any other governmental authorities or other Persons whose Consent is required for consummation of the transactions contemplated by this Agreement, Including under any Permits or Contracts required in connection with the completion of the transactions contemplated by this Agreement, and the parties will request any expedited processing available and will use their respective reasonable best efforts to cooperate in connection with the foregoing.

SECTION 3.     **Representations and Warranties of the Investor Support Parties**. Each Investor Support Party hereby severally, and not jointly, represents and warrants to the Company that:

(a)     **Status**. The Investor Support Party is a "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act or an institutional "accredited investor" within the meaning of Rule 501(a)(1), (2), (3) or (7) under the Securities Act. The Investor Support Party, either alone or together with its representatives, has such knowledge, sophistication and experience in business and financial matters so as to be capable of evaluating the merits and risks of the prospective investment in the Securities and solely in the case of Brigade Co-Investor, the Warrants, as applicable, and has so

evaluated the merits and risks of such investment. The Investor Support Party is able to bear the economic risks of such investment in the Securities and solely in the case of Brigade Co-Investor, the Warrants, as applicable, and, at the present time and the foreseeable future, is able to afford a complete loss of such investment. The Investor Support Party has conducted its own independent evaluation, made its own analysis and consulted with advisors as it has deemed necessary, prudent or advisable in order for the Investor Support Party to make its own determination and decision to execute and deliver this Agreement and purchase the Securities, and solely in the case of Brigade Co-Investor, the Warrants, as applicable. The Investor Support Party has adequate information to evaluate the Securities and the Warrants, as applicable, and has had the opportunity to discuss such information with its advisors.

(b)     **Purchase for Investment**. The Investor Support Party is purchasing the Securities, and solely in the case of Brigade Co-Investor, the Warrants, for its own account or for one or more separate accounts maintained by the Investor Support Party or for the account of one or more pension or trust funds and not with a view to the distribution thereof, provided that the disposition of the Investor Support Party's property shall at all times be within the Investor Support Party's control. The Investor Support Party understands that neither the Securities nor the Warrants have been registered under the Securities Act and may be resold only if registered pursuant to the provisions of the Securities Act or if an exemption from registration is available, except under circumstances where neither such registration nor such an exemption is required by law, and that neither the Company nor Reorganized Guitar Center is required to register the Securities or the Warrants. The Company may rely upon the truth and accuracy of, and the Investor Support Party's compliance with, the representations, warranties, acknowledgments and understandings of such investment and purchase set forth herein in order to determine the availability of such exemptions and the eligibility of the Investor Support Party to acquire the Securities, and solely in the case of Brigade Co-Investor, the Warrants.

(c)     **Power and Authority**. The Investor Support Party has all requisite power and authority, and has taken all action necessary to execute, deliver and perform its obligations under this Agreement. This Agreement has been duly executed and delivered by the Investor Support Party, and (assuming the due authorization, execution and delivery of this Agreement and thereof by the other signatories thereto) is a valid and binding obligation of the Investor Support Party, enforceable against the Investor Support Party in accordance with its terms, except to the extent limited by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally or by general equitable principles.

(d)     **No Conflicts**. Neither the execution, delivery or performance of this Agreement nor the compliance by the Investor Support Party with its obligations hereunder or thereunder, nor the consummation of the transactions contemplated hereby by the Investor Support Party will violate any provision of the organizational documents of the Investor Support Party or violate any provision of law, rule, regulation, injunction, judgment, order, decree, ruling, charge or other restriction of any governmental authority to which the Investor Support Party or any of its subsidiaries is subject, in each case, except where such violation would not, individually or in the aggregate, reasonably be expected

to have a material adverse effect on the ability of the Investor Support Party to consummate the transactions contemplated by this Agreement.

(e)    **Consents**. Assuming the consents described in clauses (A) through (D) of Section 1(i)(ii) are obtained, no Consents are required for the valid authorization, execution, delivery or performance by the Investor Support Party of this Agreement or the consummation of the transaction contemplated by this Agreement, except where such failure to obtain such Consent would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the ability of the Investor Support Party to consummate the transactions contemplated by this Agreement.

SECTION 4.    **Conditions to the Obligations of the Investor Support Parties, the Company and Reorganized Guitar Center**. The obligations of each of the parties to this Agreement to consummate the transactions contemplated by this Agreement shall be subject to the satisfaction or waiver by all parties hereto, prior to or at the Closing, of each of the following additional conditions:

(a)    no law shall have been enacted, adopted or issued by any governmental entity that prohibits the transactions contemplated by this Agreement;

(b)    all waiting periods imposed by any governmental entity in connection with the transactions contemplated by this Agreement shall have terminated or expired and all authorizations, approvals, consents or clearances (including HSR Approval, if required) under applicable Antitrust Laws in connection with the transactions contemplated by this Agreement shall have been obtained;

(c)    the Support Agreement shall be in full force and effect and there shall be no Co-Investor Termination Event or Sponsor Termination Event that has occurred and is continuing unless waived in writing by the applicable Investor Support Party and there shall be no notice of default having been delivered under the Support Agreement that has not been waived or cured in accordance with the terms of the Support Agreement;

(d)    other than funding of the equity commitment and issuance of the New Common Equity, each of the conditions to the occurrence of the Plan Effective Date set forth in the Restructuring Term Sheet shall have been satisfied or waived in accordance with the terms of the Support Agreement and the Restructuring Term Sheet;

(e)    the prior or substantially simultaneous consummation of the transactions contemplated by each of the Investor ECLs and on the terms and conditions set forth in therein, unless the Equity Cure (as defined in the applicable Investor ECL) is exercised to fund the Aggregate Investment; and

(f)    the prior or substantially simultaneous consummation of the Restructuring Transactions pursuant to the Plan and on the terms and conditions set forth in the Support Agreement including the conditions precedent in the Restructuring Term Sheet.

SECTION 5.    **Conditions of the Obligations of the Investor Support Parties**. The obligations of the Investor Support Parties to purchase and pay for the Securities, and solely in the

case of Brigade Co-Investor, the Warrants, as provided herein at the Closing shall be subject to the satisfaction or waiver, in writing, by all of the Investor Support Parties, prior to or at the Closing, of each of the following additional conditions:

(a)     <u>Accuracy of Representations and Warranties</u>. (A) The representations and warranties (other than the Company Fundamental Representations) of the Company set forth in Section 1 hereof (without giving effect to any material, materiality, Material Adverse Change or similar qualification contained therein other than in Section 1(d) and Section 1(e)) shall be true and correct as of the date hereof and as of the Closing Date with the same effect as if made on and as of the Closing Date (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), except where the failure to be so true and correct would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Change; and (B) the Company Fundamental Representations shall be true and correct in all but *de minimis* respects, in each case, as of the date hereof and as of the Closing Date with the same effect as if made on and as of the Closing Date (except for such representations and warranties made as of a specified date, which shall be true and correct only as of the specified date).

(b)     <u>Compliance with Obligations</u>. The Company and, if applicable, Reorganized Guitar Center shall have performed and complied in all material respects with all covenants and agreements required in this Agreement to be performed or complied with by it on or prior to the Closing Date.

For purposes of this Section 5(a), "**Company Fundamental Representations**" shall mean those representations and warranties contained in Section 1(a) (No Registration Required), Section 1(b) (Power and Authorization), Section 1(c) (Authorization of Securities and Warrants), Section 1(h)(i), Section 1(h)(ii) (solely with respect to the Company) (other than the last two sentences of such section), Section 1(h)(iii) and Section 1(h)(iv) (Incorporation and Good Standing of the Corporation and its Subsidiaries; Capitalization; Subsidiaries) and Section 1(aa) (Brokers and Finders).

(c)     <u>Termination of Related Party Agreements</u>. On or prior to the Closing Date, each agreement, whether written or oral, direct or indirect, that exists between or among any of the Company or any affiliate of the Company, on the one hand, and the Sponsor Support Party or any of its affiliates, on the other hand, shall be terminated without any further liability to the Company or any of its subsidiaries following the Closing Date.

(d)     <u>Material Adverse Change</u>. Since the date of this Agreement, there shall not have occurred a Material Adverse Change.

SECTION 6.     **Conditions of the Obligations of the Company and Reorganized Guitar Center**. The obligations of Reorganized Guitar Center to issue and sell the Securities, and solely in the case of Brigade Co-Investor, the Warrants, as provided herein at the Closing shall be subject to the satisfaction or waiver in writing by the Company, prior to or at the Closing, of each of the following additional conditions: the representations and warranties of each Investor Support Party set forth in Section 3 hereof shall be true and correct as of the date hereof and as of the Closing Date with the same effect as if made on and as of the Closing Date (except for such

representations and warranties made as of a specified date, which shall be true and correct only as of the specified date), except where the failure to be so true and correct would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the ability of each Investor Support Party to consummate the transactions contemplated by this Agreement.

SECTION 7.  **Termination**.

(a)  This Agreement will terminate automatically and immediately upon the termination of the Support Agreement;

(b)  This Agreement will terminate automatically and immediately upon the termination of an Investor ECL; provided that, if the Equity Cure is exercised to fund the Aggregate Investment, then this Agreement shall not terminate pursuant to this Section 7(b);

(c)  This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing Date:

(i)  by mutual written consent of the Company and each of the Investor Support Parties;

(ii)  by written notice of the Company or an Investor Support Party to the other parties, upon the issuance by any governmental entity of an order restraining, enjoining, or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or declaring unlawful the transactions contemplated by this Agreement, and such order having become final, binding and non-appealable; provided that no termination may be made by a party under this Section 7(b)(ii) if the issuance of such order was caused by the breach of such party with respect to any obligation of such party under this Agreement or any other Transaction Document;

(iii)  by written notice from an Investor Support Party to the Company if (A) any representation or warranty of the Company will have become untrue, in each case, such that any condition set forth in Section 5(a) would not be satisfied; (B) an Investor Support Party shall have provided notice to the Company of such breach; and (C) if such breach is curable by the Company, such breach has not been cured by the tenth (10th) Business Day after receipt of such notice; or

(iv)  by written notice from the Company to each of the Investor Support Parties if (A) any representation or warranty of an Investor Support Party will have become untrue, in each case, such that any condition set forth in Section 6 would not be satisfied; (B) the Company shall have provided notice to each Investor Support Party of such breaching Investor Support Party's breach; and (C) if such breach is curable by such Investor Support Party, such breach has not been cured by the tenth (10th) Business Day after receipt of such notice.

Upon any termination of this Agreement, none of the parties hereto shall have any further obligations or liabilities under this Agreement, whether based upon contract, tort or any other claim or legal theory and whether at law or equity, excluding any claims relating to willful and material

breach prior to termination or claims relating to actual and intentional fraud. This Section 7 and Sections 8-18 shall survive any termination of this Agreement.

SECTION 8.        **Notices**. All communications hereunder shall be in writing and shall be mailed, delivered by electronic transmission, hand delivered or couriered and confirmed to the parties hereto as follows:

If to the Investor Support Parties:

    ARES PE Extended Value Fund LP
    2000 Avenue of the Stars
    Suite 1200
    Los Angeles, California 90067
    Attention:    Abraham Zilkha; Eric Waxman
    E-Mail:      azilkha@aresmgmt.com; ewaxman@aresmgmt.com

    CSP IV Acquisitions, L.P.
    520 Madison Avenue
    New York, NY 10022
    Attention:    Shary Moalemzadeh
    E-Mail:      shary.moalemzadeh@carlyle.com

    Brigade Capital Management, LP
    399 Park Avenue
    New York, NY 10022
    Attention:    Aaron Daniels ; Chris Chaice ; Matt Perkal
    E-Mail:      AD@brigadecapital.com; CC@brigadecapital.com;
                 MP@brigadecapital.com

with a copy (which shall not constitute notice) to:

    Kirkland & Ellis LLP
    2049 Century Park East, 37th Floor
    Los Angeles, California 90067
    Attention:    Philippa Bond, P.C.; Michael A. Woronoff, P.C.
    E-Mail:      pippa.bond@kirkland.com; michael.woronoff@kirkland.com

    Paul, Weiss, Rifkind, Wharton & Garrison LLP
    1285 Avenue of the Americas
    New York, New York 10019-6064
    Attention:    Paul Basta; Angelo Bonvino; Jacob Adlerstein
    E-Mail:      pbasta@paulweiss.com; abonvino@paulweiss.com;
    jadlerstein@paulweiss.com

Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022
Attention:    Sidney P. Levinson; Kevin M. Schmidt; Daniel E. Stroik;
Emily MacKay
E-Mail:    slevinson@debevoise.com; kmschmidt@debevoise.com;
fdestroik@debevoise.com ; efmackay@debevoise.com

If to the Company:

Guitar Center, Inc.
5795 Lindero Canyon Road
Westlake Village, California 91362
Attention:    Michael Pendleton, General Counsel
E-Mail:    mpendleton@guitarcenter.com

with a copy (which shall not constitute notice) to:

Milbank LLP
2029 Century Park East, 33rd Floor
Los Angeles, California 90067
Attention:    Dennis Dunne; Adam Moses; Michael Price
E-Mail:    ddunne@milbank.com; amoses@milbank.com;
mprice@milbank.com

Any party hereto may change the address or facsimile number for receipt of communications by giving written notice to the others.

SECTION 9.    **Successors and Assigns**. This Agreement will inure to the benefit of and be binding upon the parties hereto, and in each case their respective successors, and no other Person will have any right or obligation hereunder. The term "successors" shall not include any other purchaser of the Securities or the Warrants from an Investor Support Party merely by reason of such purchase. Notwithstanding anything to the contrary in this Agreement, no party may assign, delegate or otherwise transfer either this Agreement or any of its rights, interests or obligations hereunder without the prior written approval of the other parties and each of the Investor Support Parties, and any attempt to do so will be null and void *ab initio*; <u>provided</u>, that an Investor Support Party may assign all or any portion of its rights and obligations under this Agreement to a controlled Affiliate without the prior consent of any other Person; <u>provided further</u>, that no such assignment shall release such Investor Support Party from any liability or obligation under this Agreement

SECTION 10.    **No Modification; Entire Agreement.**    The parties agree that, notwithstanding anything to the contrary contained in the Investor ECLs or this Agreement, in no event shall an Investor ECL or this Agreement be amended, modified, supplemented or terminated, and no waiver may be given, by the parties hereunder or thereunder, in each case, except by an agreement in writing signed by each of the parties hereto. Together with the Support Agreement, the Restructuring Term Sheet, the Investor ECLs and the other applicable Definitive Documents,

this Agreement constitutes the sole and entire agreement of the parties with respect to the subject matter contained in this Agreement. This Agreement supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, with respect to the subject matter of this Agreement.

SECTION 11.    **Severability**.  In the event that any provision of this Agreement, or the application of this Agreement, becomes or is declared by a court of competent jurisdiction to be illegal, void or unenforceable, or incapable of being enforced under any applicable law, the remainder of this Agreement will continue in full force and effect and the application of such provision to other Persons or circumstances will be interpreted so as reasonably to effect the intent of the parties to this Agreement.  The parties to this Agreement further agree to replace such void or unenforceable provision of this Agreement with a valid and enforceable provision that will achieve, to the fullest extent possible, the economic, business and other purposes and effects of such void or unenforceable provision.

SECTION 12.    **Governing Law Provisions; Consent to Jurisdiction; Waiver of Jury Trial**.

(a)    This Agreement and all Actions that in any way is, or may be, directly or indirectly based upon, arising out of, or related to, this Agreement or the negotiation, execution, performance, non-performance, interpretation, termination or construction of this Agreement, or the legal relationships of the parties to this Agreement (whether at law or in equity, and whether in contract, tort or otherwise) (each, a "**Proceeding**"), shall be construed in accordance with, governed for all purposes by, and enforced pursuant to the internal substantive laws of the State of New York applicable to contracts executed and to be wholly performed within New York, without giving effect to any choice of law or conflict of law provision or rule (whether of the State of New York or any other jurisdiction) that would cause the application of the law of any jurisdiction other than the State of New York.

(b)    Any Proceeding or judgment entered by any court in respect thereof shall be brought exclusively in the United States District Court for the Southern District of New York or any New York state court, in each case, sitting in the Borough of Manhattan of the City of New York (collectively, the "**Designated Courts**"). The parties to this Agreement irrevocably agree and consent to be subject to the exclusive jurisdiction of the Designated Courts for the purpose of any Proceeding.  Notwithstanding the foregoing consent to jurisdiction, upon commencement of the Chapter 11 Cases, each party to this Agreement agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, to the extent possible, in the Bankruptcy Court, and solely in connection with claims arising under this Agreement: (i) irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; (ii) waives any objection to laying venue in any such action or proceeding in the Bankruptcy Court; and (iii) waives any objection that the Bankruptcy Court is an inconvenient forum or does not have jurisdiction over any party to this Agreement.

(c)    Each party to this Agreement agrees that service of any process, summons, notice or document by United States registered mail addressed to such party at the address

of the party set forth above in the manner provided for the giving of notices in Section 19 of the Support Agreement shall be effective service of process for any Proceeding brought against such party in any such court.

(d)    Each party to this Agreement irrevocably waives, to the fullest extent permitted by law, any objection which it may now or after the date of this Agreement have to the laying of venue of any Proceeding arising out of or relating to this Agreement in any Designated Court or any judgment entered by any of the Designated Courts and also irrevocably waives any claim that any Proceedings brought in the Designated Courts has been brought in an inconvenient forum. Notwithstanding the foregoing, if the Chapter 11 Cases are commenced, nothing in this <u>Section 12</u> shall limit the authority of the Bankruptcy Court to hear any matter under or arising out of this Agreement.

(e)    **Each party acknowledges and agrees that any controversy that is, or may be, directly or indirectly based upon, arising out of, or related to, this Agreement or the negotiation, execution, performance, non-performance, interpretation, termination or construction of this Agreement, or the legal relationships of the parties to this Agreement, is likely to involve complicated and difficult issues. Therefore, each party irrevocably and unconditionally waives to the fullest extent permitted by law any right such party may have to a trial by jury in respect of any Proceeding, in each case, whether now existing or arising after the date of this Agreement, and whether in contract, tort, equity or otherwise. Each party certifies and acknowledges that (i) no representative, agent or attorney or any other party has represented, expressly or otherwise, that such other party would not, in the event of litigation, seek to enforce the foregoing waiver, (ii) such party understands and has considered the implications of this waiver, (iii) such party makes this waiver voluntarily and (iv) each party has been induced to enter into this Agreement by, among other things, the mutual waivers and certifications of this <u>Section 12(e)</u>. Any party may file an original counterpart or a copy of this Agreement with any court as written evidence of the consent of the parties to the waiver of their right to trial by jury.**

SECTION 13.    **No Advisory or Fiduciary Responsibility¶.** Each of the Company and the Investor Support Parties acknowledges and agrees that the issuance and sale of the Securities and the Warrants pursuant to this Agreement is an arm's-length commercial transaction between the Company, on the one hand, and the Investor Support Parties, on the other hand, and the Company and the Investor Support Parties are capable of evaluating and understanding and understand and accept the terms, risks and conditions of the transactions contemplated by this Agreement. The Company agrees and acknowledges: (i) in connection with each transaction contemplated hereby and the process leading to such transaction each Investor Support Party is and has been acting solely as a principal and is not the agent or fiduciary of the Company or its affiliates, stockholders, creditors or employees or any other party; (ii) No Investor Support Party has either assumed or will assume an advisory or fiduciary responsibility in favor of the Company or in favor of any other Investor Support Party with respect to any of the transactions contemplated hereby or the process leading thereto (irrespective of whether such Investor Support Party has advised or is currently advising the Company on other matters) or any other obligation to the Company except the obligations expressly set forth in this Agreement; and (iii) the Investor

Support Parties and their respective affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Company, and the Investor Support Parties have no obligation to disclose any of such interests by virtue of any fiduciary or advisory relationship. No party to this Agreement has provided any legal, accounting, regulatory or tax advice with respect to the offering contemplated hereby to another party, and each party to this Agreement has consulted their own legal, accounting, regulatory and tax advisors to the extent they deemed appropriate.

SECTION 14.    **General Provisions**. This Agreement constitutes the entire agreement of the parties to this Agreement and supersedes all prior written or oral and all contemporaneous oral agreements, understandings and negotiations with respect to the subject matter hereof. This Agreement may be executed in two or more counterparts, each one of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by telecopier, facsimile or other electronic transmission (i.e., a "pdf" or "tif") shall be as effective as delivery of a manually executed counterpart thereof. This Agreement may not be amended or modified unless in writing by all of the parties hereto, and no condition herein (express or implied) may be waived unless waived in writing by each party whom the condition is meant to benefit. The section headings herein are for the convenience of the parties only and shall not affect the construction or interpretation of this Agreement.

SECTION 15.    **No Survival**. None of the representations and warranties of the parties set forth in this Agreement shall survive the Closing Date.

SECTION 16.    **Specific Performance; Parties in Interest; Third-Party Beneficiaries**.

(a)    Nothing in this Agreement is intended to, or shall, confer upon any Person, other than the parties to this Agreement, any legal or equitable right, benefit or remedy of any nature whatsoever. Without limiting the foregoing, creditors of the Company Parties shall have no right to cause the Company or the Investor Support Parties to enforce this Agreement.

(b)    The parties hereto agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties hereto shall be entitled to an injunction or injunctions without the necessity of posting a bond to prevent breaches of this Agreement or to enforce specifically the performance of the terms and provisions hereof, including the consummation of the Closing hereunder, in addition to any other remedy to which they are entitled at law or in equity. Unless otherwise expressly stated in this Agreement, no right or remedy described or provided in this Agreement is intended to be exclusive or to preclude a party hereto from pursuing other rights and remedies to the extent available under this Agreement, at law or in equity.

SECTION 17.    **No Reliance**. No party hereto shall have any duties or obligations to any other party to this Agreement in respect of this Agreement or the transactions contemplated hereby, except those expressly set forth herein. Each party hereto expressly acknowledges that it has, independently and without reliance upon the other party or any other person, and based on such documents and information as it has deemed appropriate, made its own analysis and decision to

enter into this Agreement. The Investor Support Parties may not rely, and each confirms that it has not relied, on any due diligence investigation that any other person may have conducted with respect to the Company or any of its affiliates or any of their respective securities. Each party hereto will consult with its own legal counsel and other advisors to the extent that it deems necessary in connection with this Agreement and the matters and transactions contemplated herein.

SECTION 18.    **Settlement Discussions and Waiver**. This Agreement is part of a proposed settlement of matters that could otherwise be the subject of litigation among the parties hereto. Nothing herein shall be deemed an admission of any kind. If the Restructuring Transaction is not consummated, or if this Agreement is terminated for any reason, the parties hereto fully reserve any and all of their rights. Pursuant to Federal Rule of Evidence 408 and any applicable state rules of evidence, all negotiations relating to this Agreement shall not be admissible into evidence in any proceeding other than a proceeding to enforce the terms of this Agreement.

*[Signature Pages Follow]*

       If the foregoing is in accordance with your understanding of our agreement, kindly sign and return to the Company the enclosed copies hereof, whereupon this instrument, along with all counterparts hereof, shall become a binding agreement in accordance with its terms.

Very truly yours,


Guitar Center, Inc.

By: _____
Name: Tim Martin
Title:   Chief Financial Officer

[*Signature Page to New Common Equity Investment Agreement*]

The foregoing New Common Equity Investment Agreement is hereby confirmed and accepted by the Investor Support Parties as of the date first above written.

By: AEVF Management LP
Its: General Partner
By: AEVF Management GP LLC
Its: General Partner

By: _____
Name: _____
Title:   Authorized Signatory

[*Signature Page to New Common Equity Investment Agreement*]

[Brigade]

By: _____

Name: _____

Title: _____

[*Signature Page to New Common Equity Investment Agreement*]

**CSP IV Acquisitions, L.P.**

By:  CSP IV (Cayman 1) General Partner, L.P., its general partner
By:  TC Group CSP IV, L.L.C., its general partner


By: _____
     Name:
     Title:

[*Signature Page to New Common Equity Investment Agreement*]

## EXHIBIT E

Form of Joinder

The undersigned ("**Transferee**") acknowledges that it has read and understands the Restructuring Support Agreement, dated as of November 13, 2020 (the "**Agreement**"), by and among Guitar Center, Inc. (the "**Company**") and certain holders of claims against and interests in the Company Parties signatory to the Agreement and other parties in interest, and agrees to be bound by the terms and conditions of the Agreement, and shall be deemed a "Joining Party" under the terms of the Agreement. The Transferee makes the representations and warranties of the Support Parties (as defined in the Agreement) set forth in Sections 5 and 6 of the Agreement to the other Parties. This joinder shall be governed by, and construed in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction.

Date Executed: _____

**TRANSFEREE**

Name of Institution:

By:_____
Name:
Title:

Address:
Attention:
Telephone:
Facsimile:
Email:


PRINCIPAL AMOUNT OF SECURED NOTES OF SUPPORT PARTY:

$_____


PRINCIPAL AMOUNT OF SUPERPRIORITY SECURED NOTES OF SUPPORT PARTY:

$_____


PRINCIPAL AMOUNT OF 2018 CASH/PIK NOTES OF SUPPORT PARTY:

$_____


PRINCIPAL AMOUNT OF 2020 CASH/PIK NOTES OF SUPPORT PARTY:

$_____


OTHER HOLDINGS OR INTERESTS OF SUPPORT PARTY:

_____