| | |
|---|---|
| Dennis F. Dunne, Esq.    (*pro hac vice* pending) | Tyler P. Brown, Esq.    (VSB No. 28072) |
| Andrew M. Leblanc, Esq. (*pro hac vice* pending) | Justin F. Paget, Esq.    (VSB No. 77949) |
| Michael W. Price, Esq.    (*pro hac vice* pending) | Jennifer E. Wuebker, Esq. (VSB No. 91184) |
| Lauren C. Doyle, Esq.    (*pro hac vice* pending) | **HUNTON ANDREWS KURTH LLP** |
| **MILBANK LLP** | Riverfront Plaza, East Tower |
| 55 Hudson Yards | 951 East Byrd Street |
| New York, New York 10001 | Richmond, Virginia 23219 |
| Telephone:    (212) 530-5000 | Telephone:    (804) 788-8200 |
| Facsimile:    (212) 530-5219 | Facsimile:    (804) 788-8218 |

Thomas R. Kreller, Esq.   (*pro hac vice* pending)
**MILBANK LLP**
2029 Century Park East
33rd Floor
Los Angeles, California 90067
Telephone:    (424) 386-4000
Facsimile:    (213) 629-5063

*Proposed Co-Counsel for Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GUITAR CENTER, INC. *et al.*,[1] | ) | Case No. 20-34656 (KRH) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |

**DECLARATION OF ERIC WINTHROP
IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF
INTERIM AND FINAL ORDERS: (I) AUTHORIZING THE DEBTORS
TO OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY
POSTPETITION FINANCING; (II) AUTHORIZING USE OF CASH
COLLATERAL; (III) GRANTING LIENS AND PROVIDING CLAIMS WITH
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (IV) GRANTING
ADEQUATE PROTECTION; (V) MODIFYING THE AUTOMATIC STAY;
(VI) SCHEDULING A FINAL HEARING; AND (VII) GRANTING RELATED RELIEF**

---

[1]   The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Guitar Center Holdings, Inc. (3262); Guitar Center, Inc. (0862); Guitar Center Stores, Inc. (4340); GTRC Services, Inc. (9503); GC Business Solutions, Inc. (3928); Guitar Center Gift Card Company, LLC (3370); Music & Arts Instructor Services, LLC (7811); and AVDG, LLC (4440). The Debtors' service address is 5795 Lindero Canyon Rd., Westlake Village, CA 91362.

I, Eric Winthrop, make this declaration pursuant to 28 U.S.C. § 1746:

1. I am a Managing Director at Houlihan Lokey Capital, Inc. ("Houlihan"). Houlihan has served as financial advisor and investment banker to the above-captioned debtors and debtors in possession (collectively, the "Debtors") in the chapter 11 cases commenced on November 21, 2020 (the "Petition Date").  I submit this declaration (the "Declaration") in support of the *Debtors' Motion for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, and 507:  (I) Authorizing Debtors to Obtain Senior Secured Priming Superpriority Postpetition Financing; (II) Authorizing Use of Cash Collateral; (III) Granting Liens and Providing Claims with Superpriority Administrative Expense Status; (IV) Granting Adequate Protection; (V) Modifying the Automatic Stay; (VI) Scheduling a Final Hearing; and (VII) Granting Related Relief* (the "DIP Motion").[2] .

2. Houlihan is an internationally recognized investment banking and financial advisory firm, with 22 offices worldwide and more than 1,050 financial professionals, 225 of which are in Houlihan's Financial Restructuring Group.  Houlihan is one of the leading advisors and investment bankers to unsecured and secured creditors, debtors, acquirers, and other parties-in-interest involved with financially troubled companies both in and outside of bankruptcy. Houlihan Lokey has been, and is, involved in a number of large restructuring cases in the United States, including representing debtors in: In re Promise Healthcare Group, LLC, Case No. 18-12491 (CSS) (Bankr. D. Del. November 5, 2018); In re Heritage Home Grp. LLC, Case No. 18-11736 (KG) (Bankr. D. Del. July 29, 2018); In re Walter Inv. Mgmt. Corp., Case No. 17-13446 (JLG) (Bankr. S.D.N.Y. Nov. 30, 2017); In re Angelica Corp., Case No. 17- 10870 (JLG) (Bankr. S.D.N.Y. May 9, 2017); In re Gawker Media LLC, Case No. 16-11700 (SMB) (Bankr. S.D.N.Y.

---

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion.

June 10, 2016); In re Relativity Fashion, LLC, Case No. 15-11989 (MEW) (Bankr. S.D.N.Y. Feb. 1, 2016); In re Phoenix Brands, LLC, Case No. 16-11242 (BLS) (Bankr. D. Del. Jul. 5, 2016); In re Trump Entertainment Resorts, Inc., Case No. 14-12103 (KG) (Bankr. D. Del. Sept. 9, 2014); In re Tactical Intermediate Holdings, Inc., Case No.14-11659 (KG) (Bankr. D. Del. July 8, 2014); In re Northhampton Generating Co., LP, Case No. 11- 33095 (JCW) (Bankr. W.D.N.C. Dec. 5, 2011); In re AES Thames, L.L.C., No. 11-10334 (KJC) (Bankr. D. Del. Feb. 1, 2011); In re MSR Resort Golf Course LLC, Case No. 11-10372 (SHL) (Bankr. S.D.N.Y. Feb. 1, 2011); In re Truvo USA LLC, No. 10-13513 (AJG) (Bankr. S.D.N.Y July 1, Case 20-11768-CSS Doc 118 Filed 07/09/20 Page 4 of 19526753739.12010); In re Mark IV Indus., Inc., Case No. 09-12705 (SMB) (Bankr. S.D.N.Y. Apr. 30, 2009); In re Premier Inter. Holdings, Inc., Case No. 09-12019 (CSS) (Bankr. D. Del. Jun. 13, 2009); In re Aventine Renewable Energy Holdings, Inc., Case No. 09-11214 (KG) (Bankr. D. Del. Apr. 7, 2009); In re Foamex Inter. Inc., Case No. 09-10560 (KJC) (Bankr. D. Del. Feb. 18, 2009); and In re Buffets Holdings, Inc., Case No. 08-10141 (MFW) (Bankr. D. Del. Jan. 22, 2008).

3. I have been employed by Houlihan for 22 years. Before joining Houlihan, I was a member of the corporate finance, restructuring, and disputes group of PricewaterhouseCoopers. During my time there, I specialized in operational consulting for financially distressed companies as well as in valuations and litigation consulting-related projects. I have authored or co-authored materials and/or spoken on a number of topics, including: "Trends and Opportunities in U.S. Restructurings"; "Financial Restructuring Issues Impacting Trade Creditors"; "Buying & Selling the Troubled Company"; and "Investing in Distressed Securities: An Overview of an Expanding Asset Class". I hold a B.A. in Business Economics, with honors,

from the University of California, Santa Barbara and am a member of the Turnaround Management Association and the American Bankruptcy Institute.

    4.  During the course of my career, I have advised both debtors and creditors in financial restructurings and distressed mergers and acquisitions, raised capital for troubled businesses, and represented debtors and creditor constituencies in bankruptcy proceedings. I have also advised companies and creditor groups in connection with a variety of financing-related issues, including assisting chapter 11 debtors in obtaining and negotiating the terms of debtor-in-possession loans. My restructuring experience includes the following: Bumble Bee Foods, Intelsat S.A., PetSmart, Skillsoft, Affinion Group, Getty Images, Charter Communications, Southern California Edison, Education Media and Publishing Group International (a.k.a. Houghton Mifflin Harcourt), Northwest Airlines Corp., Dex One (f.k.a. RH Donnelley), Freedom Communications, Inc., GateHouse Media, Inc., Travelport, American Restaurant Group, Inc. (Stuart Anderson's Black Angus), DDi Corp., Scotia Pacific Company LLC, Silicon Graphics, Pacific Lumber Company, Atlas Air Worldwide Holdings, Inc., Malden Mills Industries, Huntsman International LLC, and SpectraSite Communications, Inc., among others.

    5.  Except as otherwise indicated, all statements set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances gleaned during the course of my engagement with the Debtors, information learned from my review of relevant documents, information supplied by members of the Debtors' management, other members of Houlihan's team or the Debtors' other advisors, or my opinion informed by my experience, knowledge, and information concerning the Debtors' operations and financial affairs. If called upon to testify, I could and would testify competently to the facts set forth in this Declaration on that basis.

**Houlihan Retention**

6.  In March 2020, Houlihan was engaged by the Debtors to act as their investment banker in connection with the Debtors' restructuring initiatives. Since Houlihan's engagement, Houlihan has worked closely with the Debtors' management and other professionals retained by the Debtors and has become well-acquainted with the Debtors' capital structure, liquidity needs, and business operations. Contemporaneously with the Debtors' consideration of a potential chapter 11 filing, Houlihan worked closely with their management to evaluate chapter 11 financing needs and alternatives available to the Debtors.

**The Debtors' Funded Debt**

7.  The Debtors have approximately $1,339.8 million in aggregate principal amount of outstanding funded debt, consisting of $954.7 million in secured funded debt and $385.1 million in unsecured funded debt.

8.  The Debtors' secured funded debt consists of: (i) approximately $279.0 million in principal amount of borrowings and approximately $7.6 million of letters of credit outstanding under an asset-based revolving credit agreement (as amended, restated, amended and restated, or otherwise modified from time to time, the "Prepetition ABL Facility", and the lenders under the Prepetition ABL Facility, the "Prepetition ABL Lenders"); (ii) approximately $35.7 million in aggregate principal amount outstanding under the 10.000% Senior Secured Superpriority Notes due 2022 (the "Superpriority Secured Notes", and the holders of the Superpriority Secured Notes, the "Superpriority Secured Noteholders"); and (iii) $640.0 million in aggregate principal amount outstanding under the 9.500% Senior Secured Notes due 2021 (the "Secured Notes", and the holders of the Senior Secured Notes, the "Secured Noteholders", and together with the Superpriority Secured Noteholders, the "Senior Secured Noteholders", and the

Senior Secured Noteholders together with the Prepetition ABL Lenders, the "Prepetition Secured Lenders").

9. The Debtors' obligations under the ABL Credit Agreement, Superpriority Secured Notes, and Secured Notes are secured by "criss-crossing" senior- and junior-priority liens on substantially all of the Debtors' assets: (a) the Prepetition ABL Facility is secured by a first-priority lien on the Debtors' inventory, accounts receivable, cash and deposit accounts, and proceeds of the foregoing (the "ABL Priority Collateral") and a third-priority lien on the Debtors' capital stock, intellectual property, and other assets that do not constitute ABL Priority Collateral and proceeds of the foregoing (the "Notes Priority Collateral"), in each case, subject to certain permitted liens and exceptions; (b) the Superpriority Secured Notes are secured by a first-priority lien on the Notes Priority Collateral and a second-priority lien on the ABL Priority Collateral, in each case, subject to certain permitted liens and exceptions; and (c) the Secured Notes are secured by a third-priority lien on the ABL Priority Collateral and a second-priority lien on the Notes Priority Collateral, in each case, subject to certain permitted liens and exceptions, as further explained in the First Day Declaration.

10. The Debtors' unsecured funded debt consists of two issuances of unsecured notes in an aggregate principal amount of approximately $385.1 million (the "Unsecured Notes").[3]

**The Debtors' Need for DIP Financing and Use of Cash Collateral**

11. The Debtors require immediate access to DIP financing so that they can stabilize their business, fund the administration of these cases, and provide sufficient runway to execute their consensual restructuring transactions. The Debtors are entering chapter 11 with

---

[3] A comprehensive description of the Debtors' business and operations, capital structure and the events leading to the commencement of these cases can be found in the *Declaration of Tim Martin, Chief Financial Officer of Guitar Center, Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration").

6

limited cash on hand, and the Prepetition Secured Lenders' consent to the use of their cash collateral is conditioned upon the transactions contemplated in the Restructuring Support Agreement, including the Debtors' access to DIP financing. Without access to DIP financing, and the associated use of the Prepetition Secured Lenders' cash collateral, I believe that the Debtors would not be able to fund costs associated with these cases and consummate the restructuring transactions envisioned in the Restructuring Support Agreement.

12. Critically, the Debtors have commenced these cases at the most sensitive time of year for a retailer: the start of the holiday season. In fact, the Debtors seek entry of the Interim Order in the same week as Black Friday. As is the case with most retail companies, the Debtors must pay employees and vendors to continue to receive and sell merchandise and to stock shelves. These key considerations are heightened during the holiday period when many retailers earn a significant portion of their annual earnings. Based on my experience with the retail industry, the health of the Debtors' business, if not its very survival, hinges on continued ordinary course operations during the period covered by these prepackaged cases.

13. In advance of the commencement of these cases, the Debtors, with the assistance of their advisors, evaluated their cash flow and liquidity needs in a chapter 11 scenario to determine how much DIP financing the Debtors would reasonably need to operate their businesses and pay the expenses of a chapter 11 process while consummating their consensual prepackaged plan of reorganization (the "Plan"). The sizing of the DIP financing and the cash collateral forecasts reflect the Debtors' assumptions as to the liquidity needed to operate the Debtors' business and fund administrative costs of these cases.

14. I believe that, absent authority to access DIP financing (and the associated use of the Prepetition Secured Lenders' cash collateral), even for a limited period of time, the

Debtors would be unable to continue operating their business, resulting in a deterioration of value, immediate and irreparable harm to the Debtors' estates, and the corresponding inability to effectuate the restructuring transaction embodied in the Plan. Based on the Debtors' current financial condition and the costs associated with these cases and their ongoing business operations, I believe that the Debtors' liquidity needs will be satisfied if the Debtors are authorized to borrow under the DIP Facilities.

15. While the Debtors are in need of an immediate infusion of liquidity, the Debtors have a fundamentally valuable going concern and an experienced management team. Critically, on November 13, 2020 the Debtors executed the Restructuring Support Agreement with the Creditor Support Parties and the Investor Support Parties (as each is defined in the Restructuring Support Agreement). The Restructuring Support Agreement carries the support of (i) the holders of 100% in aggregate principal amount of the Superpriority Secured Notes; (ii) the holders of over 71% in aggregate principal amount of the Secured Notes; (iii) the holders of 84% in aggregate principal amount of the Unsecured Notes; and (iv) the holder of substantially all of the Debtors' existing common equity. In addition, the Debtors continue to collaborate with Wells Fargo Bank, National Association, as administrative agent and collateral agent under the Prepetition ABL Facility (in such capacity, the "Prepetition ABL Agent"), at which (or at an affiliate of which) most of the Debtors' bank accounts and cash are held and which will serve as the ABL DIP Agent under the ABL DIP Facility. Further, the Debtors will use proceeds of the DIP Facilities to pay in full the Prepetition ABL Obligations, which, based on the most recent borrowing base, do not exceed the value of the ABL Priority Collateral. Based on discussions with other participants and advisors, the consensual restructuring transactions contemplated under

the Restructuring Support Agreement depend on the availability of the borrowings under the DIP Facilities.

16. As a result of the Restructuring Support Agreement, the Debtors commenced solicitation of votes on the Plan prior to the Petition Date with the overwhelming support of stakeholders spanning the Debtors' capital structure. The Debtors therefore have a clear and expeditious path to emergence, and the DIP Facilities will permit the Debtors to complete the restructuring transactions that will enable them to successfully reorganize. Moreover, because the Debtors expect, subject to Court approval, to consummate the Plan at or soon after the Final Hearing on the DIP Motion (and are requesting that the Final Hearing on the DIP Motion occur on the same day as the hearing on the confirmation of the Plan), the Debtors do not anticipate their liquidity needs following entry of the Final Order to be substantial. Instead, in the time leading up to the Final Hearing, I understand, based on discussions with the Debtors' management and other advisors, that most prepetition (and a substantial amount of postpetition) amounts owed to the Debtors' vendors will come due under normal payment terms.

### The DIP Marketing Process

17. Leading up to the Petition Date, the Debtors, with the assistance of their advisors, including Houlihan, engaged in a thorough competitive marketing process to obtain postpetition DIP financing on the best available terms. The Debtors and their advisors conducted extensive negotiations with potential DIP lenders, including existing members of the Debtors' capital structure. This process resulted in two sources of DIP financing—the Term DIP Facility and the ABL DIP Facility.

18. In the build up to the execution of the Restructuring Support Agreement, the Debtors, with the assistance of their advisors, including Houlihan, negotiated heavily with key holders in their existing capital structure while at the same time conducted an extensive marketing

process. Beginning in October 2020, the Debtors and Houlihan sought alternative DIP financing packages from potential third-party lenders on more favorable terms. The Debtors' advisors contacted 20 financial institutions to solicit offers for providing DIP financing to the Debtors on a junior lien basis and/or a priming basis. The Debtors' advisors made it clear to the potential third-party financing sources that the Debtors were willing and open to evaluate any realistic financing structures, regardless of form, type, structure or size, provided such financing structures would meet the Debtors' projected liquidity needs. The Debtors' advisors sent non-disclosure agreements ("NDAs") to 12 potential lenders and ultimately executed NDAs with 11 of these potential lenders. Each party that executed an NDA received comprehensive diligence files with detailed information regarding the Debtors, as well as an overview presentation to guide their decision-making processes. The Debtors then received term sheets from 4 of these potential lenders.

19. In spite of these efforts and multiple rounds of telephonic conversations with each of the potential lenders who had executed NDAs, none of the third parties ultimately was able to submit a viable alternative proposal for DIP financing. No potential third-party lender was willing to provide debtor-in-possession financing to the Debtors on an unsecured basis or junior to the obligations owed to the Prepetition Secured Lenders. Instead, each potential lender providing feedback on a potential financing proposal indicated that they would require priming liens on the Debtors' assets, and some parties would not consider providing a financing proposal without the explicit support of the Prepetition Secured Lenders.

20. Further to this marketing process, the ad hoc group of secured noteholders represented by Stroock & Stroock & Lavan LLP and McGuireWoods LLP, as counsel, and Province, Inc., as financial advisor (the "Ad Hoc Group of Secured Noteholders") that collectively holds a majority of the Secured Notes and the Superpriority Secured Notes, together with certain

other holders of Superpriority Secured Notes (collectively, the "Term DIP Commitment Parties"), proposed a term sheet for the Term DIP Facility, as an integrated part of a broader restructuring transaction. The Debtors, with the assistance of their advisors, evaluated the proposal, considering, among other factors: the terms and conditions in light of the Debtors' needs; the proposed economics; the perceived ability of the proposed lenders to fully commit and underwrite the facility; the proposed financing structure (including the use of proceeds to repay in full the Prepetition ABL Obligations); the perceived deal risk; and the proposed covenants.

21.     After numerous rounds of negotiations over the course of several weeks, during which the Debtors and their advisors endeavored to obtain the best possible DIP financing for the Debtors, the parties have arrived at the proposed $325 million term loan provided by the Term DIP Commitment Parties. During this process, the Debtors and their advisors also negotiated extensively with the Prepetition ABL Agent to secure a $50 million ABL DIP Facility to fund these cases.

22.     All negotiations between the Debtors and each of the Term DIP Commitment Parties and the Prepetition ABL Agent regarding the terms of each DIP Facility and the consensual use of cash collateral were conducted in good faith and at arms'-length. Ultimately, the Debtors and their advisors determined, and I believe, that none of the potential third-party lenders contacted was able to offer DIP financing that was on better terms than the DIP Facilities resulting from the negotiations. The relative attractiveness of the DIP Facilities was even more pronounced by the fact that the vast majority of the Debtors' assets are encumbered by liens granted to the Prepetition Secured Lenders, such that any potential third-party financing would have to be either fully or partially unsecured, be on a junior basis, or "prime" the Prepetition Secured Lenders' liens. The DIP Facilities allow the Debtors to preserve cash management service

continuity. The DIP Facilities also permit the Debtors to use the Prepetition Secured Lenders' cash collateral pursuant to an approved budget in exchange for, among other things, adequate protection for the Prepetition Secured Lenders in the form of replacement liens, superpriority administrative expense claims, current pay on interest at the default rate (but not in the case of the Secured Noteholders) and the payment of certain fees and expenses (which, in the case of the Prepetition ABL Secured Parties, is only until such time as the Prepetition ABL Obligation are paid in full).

### Overview of the DIP Facilities

23. The proposed DIP Facilities includes two sources of DIP financing—the Term DIP Facility and the ABL DIP Facility. The Term DIP Facility, provided by the Term DIP Commitment Parties, consists of a $325 million term loan. The ABL DIP Facility, provided by the Prepetition ABL Agent, consists of a $50 million ABL facility.

24. Under the proposed Interim Order, the Debtors are authorized to use Cash Collateral and proceeds of the DIP Facilities for working capital, other general corporate purposes, and payments of the costs of administration of these cases, including, in particular, the payment in full in cash of the Prepetition ABL Obligations, and payment of certain other permitted prepetition claims.

25. The DIP Loan Documents contain milestones that the Debtors must meet throughout these cases. The milestones are consistent with those set forth in the Restructuring Support Agreement and were negotiated by the DIP Lenders as a condition to providing the DIP Facilities. Given the financial and operating condition of the Debtors and their negotiations with other potential DIP lenders, I believe these milestones reflect the best executable terms available to the Debtors as of the Petition Date, afford the Debtors adequate time to consummate the

prepackaged Plan and the Restructuring Transaction and are therefore reasonable under the circumstances.

26. Accordingly, based upon the marketing process conducted, I believe the proposed DIP Facilities are, collectively, the financing package that best suits the Debtors' needs. Importantly, the DIP Facilities will play a critical role in the Debtors' ability to operate postpetition and minimize business disruptions during the crucial holiday season, stabilize the Debtors during the administration of these cases, and ensure sufficient liquidity to stock sufficient inventory.

### The Costs of the DIP Financing Are Reasonable

27. Based on my experience as a restructuring professional and my understanding of the Debtors' capital structure and need for postpetition financing, I believe the interest rate and other consideration payable under each DIP Facility are reasonable under the circumstances and current industry environment. The contemplated payments and other economic terms of the DIP Facilities were the subject of arm's length and good faith negotiations and are, in the aggregate, generally consistent with the costs of debtor-in-possession financings in comparable circumstances in today's market for similarly situated businesses. Further, the exit payment to the lenders of the Term DIP Facility is reasonable. These economic terms are an integral component of the DIP Facilities and were required by each of the Prepetition ABL Agent and the Senior Secured Noteholders separately.

28. The proposed DIP Facilities provide the Debtors a path to an expeditious chapter 11 balance-sheet reorganization and ensure that the Debtors will have access to the liquidity projected by the Debtors' management and advisors to be necessary to allow the Debtors to continue to operate their business, repay the Prepetition ABL Obligations in full, and implement

a consensual prepackaged restructuring embodied in the Plan for the benefit of the Debtors' estates and stakeholders.

29.   It is my opinion that the Debtors have evaluated all of the reasonably available options for postpetition financing within the available timeframe and that the DIP Facilities represents the best currently available option for meeting the Debtors' financing needs and chapter 11 goals.

30.   Accordingly, I believe that the Debtors' obtaining the proposed DIP Facilities reflects a sound exercise of the Debtors' business judgment, and that each DIP Facilities should be approved on the terms and conditions described in the DIP Loan Documents and the Interim Order.

31.   Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: November 22, 2020
    Richmond, Virginia

*/s/ Eric Winthrop*
Eric Winthrop