| | |
|---|---|
| Dennis F. Dunne, Esq.    (admitted *pro hac vice*) | Tyler P. Brown, Esq.    (VSB No. 28072) |
| Andrew M. Leblanc, Esq. (admitted *pro hac vice*) | Justin F. Paget, Esq.    (VSB No. 77949) |
| Michael W. Price, Esq.    (admitted *pro hac vice*) | Jennifer E. Wuebker, Esq.  (VSB No. 91184) |
| Lauren C. Doyle, Esq.    (admitted *pro hac vice*) | **HUNTON ANDREWS KURTH LLP** |
| **MILBANK LLP** | Riverfront Plaza, East Tower |
| 55 Hudson Yards | 951 East Byrd Street |
| New York, New York 10001 | Richmond, Virginia 23219 |
| Telephone:    (212) 530-5000 | Telephone:    (804) 788-8200 |
| Facsimile:    (212) 530-5219 | Facsimile:    (804) 788-8218 |

Thomas R. Kreller, Esq.    (admitted *pro hac vice*)
**MILBANK LLP**
2029 Century Park East
33rd Floor
Los Angeles, California 90067
Telephone:    (424) 386-4000
Facsimile:    (213) 629-5063

*Proposed Co-Counsel for Debtors and Debtors in Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GUITAR CENTER, INC. *et al.*,[1] | ) | Case No. 20-34656 (KRH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

## DEBTORS' MEMORANDUM OF LAW IN SUPPORT OF
## AN ORDER: (I) APPROVING, ON A FINAL BASIS, ADEQUACY
## OF THE DISCLOSURE STATEMENT; (II) CONFIRMING THE JOINT
## PRE-PACKAGED CHAPTER 11 PLAN; AND (III) GRANTING RELATED RELIEF

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Guitar Center Holdings, Inc. (3262); Guitar Center, Inc. (0862); Guitar Center Stores, Inc. (4340); GTRC Services, Inc. (9503); GC Business Solutions, Inc. (3928); Guitar Center Gift Card Company, LLC (3370); Music & Arts Instructor Services, LLC (7811); and AVDG, LLC (4440). The Debtors' service address is 5795 Lindero Canyon Rd., Westlake Village, CA 91362.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ...................................................................................................... 3

I.      The Solicitation Process and Voting Results. ................................................ 3

II.     The Plan. ...................................................................................................... 7

ARGUMENT ........................................................................................................... 8

I.      Approval of the Disclosure Statement and the Debtors' Prepetition Solicitation is
        Warranted.......................................................................................................... 8

        A.      The Disclosure Statement Contains Adequate Information................................... 8

        B.      Solicitation Complied with the Requirements of Sections 1125(g) and
                1126(b) of the Bankruptcy Code.......................................................... 10

        C.      The Debtors Complied with the Scheduling Order.............................................. 12

        D.      Solicitation of the Plan Was in Good Faith and Complied with the
                Bankruptcy Code. .......................................................................... 14

II.     The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code. ............. 14

        A.      The Plan Complies with Section 1129(a)(1) of the Bankruptcy Code ................ 15

                1.      The Plan Satisfies the Classification Requirements of Section 1122
                        of the Bankruptcy Code. ................................................. 15

                2.      The Plan Satisfies the Mandatory Requirements of Section 1123(a)
                        of the Bankruptcy Code. ................................................. 16

                        a.      Designation of Classes of Claims and Equity Interests
                                (§ 1123(a)(1)).............................................. 16

                        b.      Specification of Unimpaired Classes (§ 1123(a)(2)) .................... 16

                        c.      Treatment of Impaired Classes (§ 1123(a)(3))............................. 16

                        d.      Equal Treatment within Classes (§ 1123(a)(4))............................ 17

                        e.      Means for Implementation (§ 1123(a)(5)) ..................................... 17

                        f.      Issuance of Non-Voting Securities (§ 1123(a)(6))........................ 18

g.      Directors and Officers (§ 1123(a)(7)) ........................................... 18

3.      The Plan Is Consistent with the Discretionary Provisions of
Section 1123(b) of the Bankruptcy Code.................................................... 19

a.      The Plan Is Consistent with Sections 1123(b)(1) and (2) of
the Bankruptcy Code...................................................................... 19

b.      The Plan's Release, Exculpation, and Injunction Provisions
Satisfy Section 1123(b)(3) of the Bankruptcy Code..................... 20

(i)      The Debtors' Releases Are Appropriate and Should
Be Approved ..................................................................... 20

(ii)      The Third-Party Releases Are Consensual,
Appropriate, and Compliant with the Bankruptcy
Code ................................................................................... 23

(iii)      The Exculpation Provision is Appropriate and
Complies with the Bankruptcy Code ................................ 29

(iv)      The Injunction Provision is Appropriate........................... 32

4.      The Plan Complies with Section 1123(d) of the Bankruptcy Code.......... 33

B.      The Debtors Complied with the Applicable Provisions of
Section 1129(a)(2) of the Bankruptcy Code. ........................................................ 33

C.      The Plan Was Proposed in Good Faith (Section 1129(a)(3) of the
Bankruptcy Code). ............................................................................................... 34

D.      The Plan Provides that the Debtors' Payment of Professional Fees and
Expenses Are Subject to Court Approval (Section 1129(a)(4) of the
Bankruptcy Code). ............................................................................................... 35

E.      The Debtors Disclosed All Necessary Information Regarding Directors,
Officers, and Insiders (Section 1129(a)(5) of the Bankruptcy Code). ................. 36

F.      The Plan Does Not Require Governmental Regulatory Approval
(Section 1129(a)(6) of the Bankruptcy Code). .................................................... 37

G.      The Plan Is in the Best Interests of All the Debtors' Creditors
(Section 1129(a)(7) of the Bankruptcy Code). .................................................... 37

H.      The Plan Does Not Comply with Section 1129(a)(8) of the Bankruptcy
Code but Does Satisfy Section 1129(b) of the Bankruptcy Code......................... 38

I.      The Plan Provides for Payment in Full of All Allowed Priority Claims
(Section 1129(a)(9) of the Bankruptcy Code). .................................................... 39

J.     At Least One Class of Impaired, Non-Insider Claims Accepted the Plan
(Section 1129(a)(10) of the Bankruptcy Code). ................................................. 40

K.     The Plan Is Feasible (Section 1129(a)(11) of the Bankruptcy Code). .................. 41

L.     All Statutory Fees Have Been or Will Be Paid (Section 1129(a)(12) of the
Bankruptcy Code). ............................................................................................... 42

M.     All Retiree Benefits Will Continue Post-Confirmation
(Section 1129(a)(13) of the Bankruptcy Code). ................................................. 42

N.     Section 1129(b) is Satisfied. ............................................................................... 43

       1.     The Plan Does Not Unfairly Discriminate Against the Rejecting
              Classes ..................................................................................................... 44

       2.     The Plan is Fair and Equitable with Respect to the Rejecting
              Classes ..................................................................................................... 45

O.     The Plan Complies with the Other Applicable Provisions of Section 1129
of the Bankruptcy Code (Sections 1129(c), (d)). ................................................ 46

P.     Good Cause Exists to Waive the Stay of the Confirmation Order. ...................... 46

CONCLUSION ................................................................................................................. 47

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Adelphia Commc'ns Corp.*,
  368 B.R. 140 (Bankr. S.D.N.Y. 2007) ...............................................................28, 38

*In re Alpha Natural Res., Inc.*,
  556 B.R. 249 (Bankr. E.D. Va. 2016) ...............................................................27, 31

*In re Alpha Natural Res., Inc.*,
  No. 15-33896 (KRH) (Bankr. E.D. Va. July 12, 2016) ...............................29, 30, 31

*In re Am. Commercial Lines, Inc.*,
  No. 20-30982 (MI) (Bankr. S.D. Tex. Mar. 20, 2020) .......................................13

*In re AMF Bowling Worldwide, Inc.*,
  No. 12-36495 (KRH) (Bankr. E.D. Va. June 25, 2013) ...................................30, 31

*In re Armstrong World Indus., Inc.*,
  348 B.R. 111 (D. Del. 2006) ..................................................................................15

*In re Ashley River Consulting, LLC*,
  No. 14-13406 (MG), 2015 Bankr. LEXIS 3819 (Bankr. S.D.N.Y. Nov. 6,
  2015) ......................................................................................................................9

*In re Aztec Co.*,
  107 B.R. 585 (Bankr. M.D. Tenn. 1989) ...............................................................44

*B.D. Int'l Disc. Corp. v. Chase Manhattan Bank, N.A. (In re B.D. Int'l Disc.
  Corp.)*,
  701 F.2d 1071 (2d Cir. 1983) ................................................................................34

*In re Bally Total Fitness of Greater N.Y., Inc.*,
  No. 07-12395 (BRL), 2007 WL 2779438 (Bankr. S.D.N.Y. Sept. 17, 2007) ...........14, 32

*Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
  526 U.S. 434 (1999).................................................................................................37

*Bank of New York Trust Co., NA v. Official Unsecured Creditors' Comm. (In re
  Pac. Lumber Co.)*,
  584 F.3d 229 (5th Cir. 2009) .................................................................................31

*Behrmann v. Nat'l Heritage Found.*,
  663 F.3d 704 (4th Cir. 2011) ....................................................................26, 28, 34

*In re Bennett*,
 No. 07-10864 (SSM), 2008 WL 1869308 (Bankr. E.D. Va. Apr. 23, 2008)..........................34

*In re Bermuda Bay, L.L.C.*,
 No. 09-32130, 2009 WL 5218071 (Bankr. E.D. Va. Dec. 31, 2009) ........................................8

*In re Bowles*,
 48 B.R. 502 (Bankr. E.D. Va. 1985).....................................................................................44

*In re Calpine Corp.*,
 No. 05-60200 (BRL), 2007 WL 4565223 (Bankr. S.D.N.Y. Dec. 19, 2007).........................30

*In re Century Glove*,
 Nos. 90-400-401-SLR, 1993 WL 239489 (D. Del. Feb. 10, 1993) ........................................38

*In re Chemtura Corp.*,
 439 B.R. 561 (Bankr. S.D.N.Y. 2010) ...................................................................................31

*In re Chinos Holdings, Inc.*,
 No. 20-32181 (KLP), (Bankr. E.D. Va. Aug. 26, 2020)...............................................24, 26, 29

*In re Circuit City Stores, Inc.*,
 No. 08-35653 (KRH) (Bankr. E.D. Va. Sept. 14, 2010)......................................................30, 32

*In re Conseco, Inc.*,
 301 B.R. 525 (Bankr. N.D. Ill. 2003) ....................................................................................24

*Crestar Bank v. Walker* (*In re Walker*),
 165 B.R. 994 (E.D. Va. 1994)...........................................................................................34, 41

*In re Cypresswood Land Partners*,
 409 B.R. 396 (Bankr. S.D. Tex. 2009) ..................................................................................33

*In re DBSD N. Am., Inc.*,
 419 B.R. 179 (Bankr. S.D.N.Y. 2009) ...................................................................................24

*In re DeLuca*,
 Nos. 95-11893, 95-11924-AM, 1996 WL 910908 (E.D. Va. Apr. 12, 1996).........................41

*In re Drexel Burnham Lambert Grp.*,
 960 F.2d 285 (2d Cir. 1992).............................................................................................28, 32

*First Am. Bank v. Century Glove, Inc.*,
 81 B.R. 274 (D. Del. 1988), *aff'd in part*, 860 F.2d 94 (3d Cir. 1988)........................... *passim*

*In re Freymiller Trucking, Inc.*,
 190 B.R. 913 (Bankr. W.D. Okla. 1996) ...............................................................................44

*In re Gemstone Sols. Grp., Inc.*,
No. 19-30258 (KLP) (Bankr. E.D. Va. June 5, 2020) ...........................................24, 26, 29, 31

*In re Granite Broad. Corp.*,
369 B.R. 120 (Bankr.S.D.N.Y.2007) ......................................................................................45

*In re Health Diagnostic Lab., Inc.*,
551 B.R. 218 (Bankr. E.D. Va. 2016) .........................................................................29, 30, 45

*In re Health Diagnostic Labs, Inc.*,
No. 15-32919 (KRH) (Bankr. E.D. Va. May 12, 2016) ....................................................30, 32

*Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe
Enters., Ltd. II)*,
994 F.2d 1160 (5th Cir. 1993) ...............................................................................................14

*Hernandez v. Larry Miller Roofing, Inc.*,
628 F. App'x 281 (5th Cir. 2016) ...........................................................................................25

*Hobson v. Travelstead (In re Travelstead)*,
227 B.R. 638 (D. Md 1998) ...................................................................................................41

*In re Idearc Inc.*,
423 B.R. 138 (Bankr. N.D. Tex. 2009) ...................................................................................44

*In re Indianapolis Downs, LLC*,
486 B.R. 286 (Bankr. D. Del. 2013) .................................................................................24, 27

*In re James River Coal Co.*,
No. 14-31848 (KRH) (Bankr. E.D. Va. Mar. 21, 2016) ....................................................30, 32

*In re Johns-Manville Corp.*,
68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987),
*aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) ........................44

*In re Kolton*,
No. 89-53425, 1990 WL 87007 (Bankr. W.D. Tex. Apr. 4, 1990).........................................44

*In re LandAmerica Fin. Grp.*,
No. 08-35994 (KRH) (Bankr. E.D. Va. Nov. 23, 2009)....................................................30, 32

*Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd.
P'ship)*,
115 F.3d 650 (9th Cir. 1997) .................................................................................................44

*Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*,
150 F.3d 503 (5th Cir. 1998), *cert. denied*, 526 U.S. 1144 (1999)...........................................8

*Maharaj v. Stubbs & Perdue, P. A. (In re Maharaj)*,
    681 F.3d 558 (4th Cir. 2012) ...............................................................43

*Menard-Sanford v. Mabey (In re A. H. Robins Co.)*,
    (4th Cir. 1998)...................................................................................8

*Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*,
    478 F.3d 452 (2d Cir. 2007)................................................................21

*In re Manchester Oaks Homeowners Assoc., Inc.*,
    No. 11-10179-BFK 2014 WL 961167 (Bankr. E.D. Va. Mar. 12, 2014)...............................33

*In re Nat'l Heritage Found., Inc.*,
    478 B.R. 216 (Bankr. E.D. Va. 2012), *aff'd, Nat'l Heritage Found. v. Highbourne Found.*, 760 F.3d 344 (4th Cir. 2014)........................................27, 29

*In re Neogenix Oncology, Inc.*,
    508 B.R. 345 (Bankr. D. Md. 2014) .....................................................24

*In re NII Holdings, Inc.*,
    536 B.R. 61 (Bankr. S.D.N.Y. 2015).....................................................21

*NLRB v. Bildisco & Bildisco*,
    465 U.S. 513 (1984)..........................................................................34

*Official Comm. of Unsecured Creditors v. White Plains Joint Venture (In re Bond)*,
    16 F.3d 408 (4th Cir. 1994) (unpublished table decision) .....................................21

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
    848 F.2d 414 (3d Cir. 1988).................................................................8

*In re Osborne*,
    No. 12-00230 (SWH), 2013 WL 2385136 (Bankr. E.D.N.C. May 30, 2013).........................34

*In re Patriot Coal Corp.*,
    No. 15-32450 (Bankr. E.D. Va. Oct. 9, 2015) ........................................24, 30, 31

*In re Penn Virginia Corp.*,
    No. 16-32395 (Bankr. E.D. Va. Aug. 11, 2016) ......................................24

*In re Pier 1 Imports, Inc.*,
    No. 20-30805 (KRH) (Bankr. E.D. Va. July 30, 2020) .........................24, 26, 29, 31

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000)................................................................30

*In re QCE Finance LLC*,
    No. 14-10543 (LSS) (Bankr. D. Del. May 12, 2014) ............................................12

*Quality Inns Int'l, Inc. v. L.B.H. Assocs. Ltd.*,
    911 F.2d 724, 1990 WL 116761 (4th Cir. 1990) (unpublished table decision)........................8

*In re Remington Outdoor Co.*,
    No. 18-10684 (BLS) (Bankr. D. Del. May 4, 2018)................................................12

*In re Residential Capital*,
    LLC, No. 12-12020 (MG) 2013 WL 12161584 (Bankr. S.D.N.Y. Dec. 11,
    2013) ........................................................................................................31

*In re Revel AC, Inc.*,
    No. 13-16253 (JHW) (Bankr. D.N.J. May 15, 2013) ............................................12

*In re S & W Enter.*,
    37 B.R. 153 (Bankr. N.D. Ill. 1984) ....................................................................15

*In re Sbarro LLC*,
    No. 14-10557 (MG) (Bankr. S.D.N.Y. May 19, 2014)..........................................12

*In re Sears Methodist Ret. Sys., Inc.*,
    No. 14-32821-11, 2015 WL 1066882 (Bankr. N.D. Tex. Mar. 6, 2015)................................31

*In re Stearns Holdings, LLC*,
    607 B.R. 781 (Bankr. S.D.N.Y. 2019) ..................................................................28

*In re The Gymboree Corp.*,
    No. 17-32986 (Bankr. E.D. Va. Sept. 7, 2017)...............................................24, 26

*In re Toys "R" Us, Inc.*,
    No. 17-34665 (KLP) (Bankr. E.D. Va. Dec. 17, 2018) ....................................24, 26

*In re Trans Max Techs., Inc.*,
    349 B.R. 80 (Bankr.D.Nev.2006) ........................................................................45

*Travelers Ins. Co. v. Bryson Props., XVII (In re Bryson Props., XVIII)*,
    961 F.2d 496 (4th Cir. 1992) ........................................................................15, 45

*In re Tribune Co.*,
    464 B.R. 126, modified, 464 B.R. 208 (Bankr. D. Del. 2011) ..............................27

*U.S. Bank Nat'l Assoc. v. Wilmington Trust Co.* (*In re Spansion, Inc.*),
    426 B.R. 114 (Bankr. D. Del. 2010) ....................................................................21

*In re U.S. Fidelis, Inc.*,
    481 B.R. 503 (Bankr. ED. Mo. 2010).................................................................24

*In re U.S. Truck Co.*,
  47 B.R. 932 (E.D. Mich. 1985), *aff'd*, 800 F.2d 581 (6th Cir. 1986) ......................................41

*In re Walker*,
  198 B.R. 476 (Bankr. E.D. Va. 1996) ...................................................................................8

*In re Wash. Mut., Inc.*,
  442 B.R. 314 (Bankr. D. Del. 2011) ...................................................................................21

*In re Wool Growers Cent. Storage Co.*,
  371 B.R. 768 (Bankr. N.D. Tex. 2007) ...............................................................................24

**Statutes**

11 U.S.C. § 328(a) ...........................................................................................................35

11 U.S.C. § 330 (a)(1)(A) .................................................................................................35

11 U.S.C. § 1123(b)(1), (2) ..............................................................................................18

11 U.S.C. § 1123(b)(3)(A) ...............................................................................................19

11 U.S.C. § 1125(a)(1) .......................................................................................................7

11 U.S.C. § 1125(e) .........................................................................................................30

11 U.S.C. § 1126(b)(2) .....................................................................................................12

11 U.S.C. § 1126(c) ..........................................................................................................38

11 U.S.C. § 1129(a)(3) .....................................................................................................34

11 U.S.C. § 1129(a)(5)(A)(ii) ..........................................................................................36

11 U.S.C. § 1129(a)(7) .....................................................................................................37

11 U.S.C. § 1129(a)(8) .....................................................................................................38

11 U.S.C. § 1129(a)(9) .....................................................................................................39

11 U.S.C. § 1129(a)(11) ...................................................................................................41

11 U.S.C. § 1129(b) ..........................................................................................................39

15 U.S.C. § 77d(a)(2) ........................................................................................................11

28 U.S.C. § 157(b)(2)(L) ..................................................................................................30

**Rules**

Fed. R. Bankr. P. 3017 ...................................................................................................13

Fed. R. Bankr. P. 3018 ...................................................................................................13

Fed. R. Bankr. P. 3020 ...................................................................................................46

Fed. R. Bankr. P. 3020(e) ...............................................................................................46

Fed. R. Bankr. P. 6004(h) ...............................................................................................46

Fed. R. Bankr. P. 6006 ...................................................................................................47

Fed. R. Bankr. P. 6006(d) ...............................................................................................46

**Other Authorities**

17 C.F.R. § 230.501 .......................................................................................................12

17 C.F.R. § 230.902 .......................................................................................................11

BLACK'S LAW DICTIONARY 300 (11th ed. 2019) ...................................................24

H.R. Rep. No. 95-595 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963 .........................15

S. Rep. No. 95-989 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5907 .................8

S. Rep. No. 95-989 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5912 ...............15

The above-captioned debtors and debtors in possession (collectively, the "Debtors")
submit this memorandum of law (this "Memorandum") in support of:  (a) approval of adequacy of
the *Disclosure Statement for Joint Pre-Packaged Chapter 11 Plan of Reorganization of Guitar
Center, Inc. et al.* [Docket No. 15] (the "Disclosure Statement"); and (b) confirmation of the
*Amended Joint Pre-Packaged Chapter 11 Plan of Reorganization of Guitar Center, Inc. et al.*
[Docket No. ___] (as the same may be amended, restated, supplemented, or otherwise modified
from time to time, the "Plan").[2]  In support of the foregoing, the Debtors rely on:  (i) the Martin
Declaration;[3]  (ii) the Winthrop Declaration;[4]  (iii) the Shapiro Declaration;[5]  (iv) the Voting
Declaration;[6] and (v) the record in these cases; and the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.      The Plan is the result of extensive good faith negotiations between the Debtors and
their key stakeholders, provides for a comprehensive and value-maximizing restructuring of the
Debtors and is being implemented through a "straddle pre-pack" structure.  The efficient timeline

---

[2]    Capitalized terms used but not otherwise defined in this Memorandum have the meanings ascribed to them in the
Plan.  Where context demands, the term "Plan" also includes the *Joint Pre-Packaged Chapter 11 Plan of
Reorganization of Guitar Center, Inc. et al.* [Docket No. 16] (the "Original Plan").  An amended version of the
Plan will be filed prior to the Combined Hearing.  A detailed description of the Debtors and their businesses and
the facts and circumstances surrounding these chapter 11 cases, are set forth in greater detail in the *Declaration
of Tim Martin of Guitar Center Inc., in Support of Chapter 11 Petitions and First Day Motions* (the "First Day
Declaration") [Docket No. 19], which is incorporated by reference in this Memorandum.

[3]    The *Declaration of Tim Martin in Support of Confirmation of the Joint Pre-Packaged Plan of Reorganization of
Guitar Center, Inc. et al.* (the "Martin Declaration"), filed substantially contemporaneously with this
Memorandum.

[4]    The *Declaration of Eric Winthrop in Support of Confirmation of the Joint Pre-Packaged Plan of Reorganization
of Guitar Center, Inc. et al.* (the "Winthrop Declaration"), filed substantially contemporaneously with this
Memorandum.

[5]    The *Declaration of Rob Shapiro in Support of Confirmation of the Joint Pre-Packaged Plan of Reorganization
of Guitar Center, Inc. et al.* (the "Shapiro Declaration"), filed substantially contemporaneously with this
Memorandum.

[6]    The *Declaration of Craig E. Johnson of Prime Clerk LLC Regarding the Solicitation of Votes and Tabulation of
Ballots Cast on the Joint Pre-Packaged Chapter 11 Plan of Reorganization of Guitar Center, Inc. et al.* [Docket
No. 245] (the "Voting Declaration").

provided by this structure will minimize the uncertainty of the Debtors having to operate under bankruptcy protection while simultaneously ensuring a robust voting period for the Voting Classes (as defined below).  Among other things, the Plan will allow the Debtors to: (a) obtain a $165 million equity investment from the Investor Support Parties (subject to reduction to no less than $150 million); (b) pay holders of Allowed General Unsecured Claims in full or otherwise leave them unimpaired; (c) pay holders of Superpriority Secured Notes Claims in full in Cash; (d) provide holders of Secured Notes Claims with $450 million in Cash and $160 million in New Preferred Equity; (e) provide holders of Unsecured Notes Claims with $2 million in New Junior Preferred Equity; and (f) obtain exit financing in the form of a $375 million New ABL Facility and $350 million in New First Lien Debt.

2.      The de-leveraging transactions contemplated by the Plan will eliminate approximately $800 million in funded debt from the Reorganized Debtors' balance sheet and provide for excess liquidity of approximately $100 million, positioning the Debtors to improve their financial condition and overall creditworthiness and emerge from chapter 11 a stronger, better capitalized company—a remarkable result for a retail company in the current environment.  The Plan has the overwhelming support of the Debtors' economic stakeholders, including the Creditor Support Parties and the Sponsor Support Party, as well as the support of the other Investor Support Parties.  With their balance sheet right-sized, the Reorganized Debtors will be able to continue as the leading United States retailers of musical instruments and related products and services.

3.      Leading up to the Petition Date, the Debtors engaged in negotiations with their prepetition lenders and equity sponsor, as well as certain potential investors, to explore a value-maximizing restructuring.  Ultimately, these hard-fought, arm's-length negotiations led to the execution of the Restructuring Support Agreement by holders of 100% of the Superpriority

2

Secured Notes, over 71% of the Secured Notes, and over 84% of the Unsecured Notes, the Debtors'

prepetition equity sponsor, and third-party investors.  Having secured substantial support for the

Plan, prior to the Petition Date, the Debtors commenced solicitation of votes on the pre-packaged

Plan by distributing the Solicitation Packages (as defined below) to holders of Claims in the only

two Classes (Classes 4 and 6) entitled to vote on the Plan (the "Voting Classes").

4.      ***The Plan was comfortably accepted by each Voting Class***:  Holders of over 80%

in amount and 64% in number of the Secured Notes Claims (Class 4) and over 98% in amount and

97% in number of the Unsecured Notes Claims (Class 6) voted to accept the Plan.

5.      As set forth below:  (a) the Disclosure Statement and the Debtors' solicitation

satisfy the requirements of sections 1125 and 1126 of the Bankruptcy Code; and (b) the Plan

satisfies the requirements of section 1129 of the Bankruptcy Code and achieves the objectives of

chapter 11.  For these and other reasons set forth more fully in this Memorandum, and based on

the evidence to be presented at the Combined Hearing, the Debtors respectfully request that the

Court approve the Disclosure Statement, confirm the Plan, and enter the proposed order confirming

the Plan and approving the Disclosure Statement to be filed by the Debtors prior to the Combined

Hearing (the "Confirmation Order").

## BACKGROUND

**I.      The Solicitation Process and Voting Results.**

6.      On November 20, 2020, prior to commencing these cases, the Debtors' claims and

noticing agent, Prime Clerk LLC ("Prime Clerk"), mailed, or caused to be delivered electronically,

solicitation packages (the "Solicitation Packages") containing the Disclosure Statement, the

Original Plan, applicable customized Ballots, and, in the case of holders of Secured Notes Claims,

the Cash-Out Election Notices, to holders (as of the Voting Record Date) of Claims in the Voting

Classes.[7]

7.     Holders of Claims in the Voting Classes were provided instructions on how to cast

their votes to accept or reject the Plan by completing and submitting their respective Ballots in

accordance with the procedures described in the Ballots and the Disclosure Statement.   The

Disclosure Statement and the Ballots contained language expressly informing each holder (i) of

the procedures for submitting their Ballots either directly or through their nominees and (ii) that

its Ballot must be received by Prime Clerk by December 10, 2020 at 5:00 p.m. (prevailing Eastern

Time) (the "Voting Deadline") for its vote to be counted.[8]   The Ballots further contained prominent

and unambiguous text of the third-party release provisions set forth in Article IX.B.2 of the Plan

(the "Third-Party Releases") and clearly indicated that each claimholder could elect to opt out of

the Third-Party Releases and described the mechanism for making such election.   Holders of

Claims were also clearly informed that, if they voted to accept the Plan, failed to vote on the Plan,

or failed to opt out of the Third-Party Releases, they would be deemed to have granted the Third-

Party Releases.

8.     Holders of Claims and Interests in Classes other than Class 4 and Class 6 (the "Non-

Voting Classes") were either (i) Unimpaired by the Plan and, therefore, conclusively presumed to

accept the Plan under section 1126(f) of the Bankruptcy Code or (ii) Impaired by the Plan and not

receiving or retaining any property under the Plan and, therefore, conclusively presumed to reject

---

[7]    This process is fully described in the *Debtors' Motion For Entry Of An Order: (I) Scheduling A Combined
Hearing to Approve The Disclosure Statement And Confirm The Plan; (II) Establishing Objection Deadlines;
(III) Approving The Form And Manner Of Combined Notice; (IV) Approving Solicitation Procedures And Ballots;
(V) Approving Procedures For Assumption And Rejection Of Executory Contracts And Unexpired Leases; (VI)
Granting Certain Extensions; And (Vii) Granting Related Relief* [Docket No. 14] (the "Scheduling Motion").

[8]    Holders of Secured Notes Claims also were informed, through the Cash-Out Election Notice, of the deadline and
the procedures for making the Cash-Out Election (as defined below).

the Plan under section 1126(g) of the Bankruptcy Code.  Consistent with the Scheduling Order, the Debtors did not deliver Solicitation Packages to holders of Claims and Interests in the Non-Voting Classes.  Instead, each such holder was served with a notice (the "Combined Notice")[9] of the commencement of these cases and of the combined hearing to consider approval of the Disclosure Statement and confirmation of the Plan (the "Combined Hearing").  The Combined Notice informed such holder of the deadline and procedures for filing objections to the adequacy of the Disclosure Statement and/or the confirmation of the Plan and of the treatment of their Claims and Interests, as applicable, proposed in the Plan, as well as how to obtain copies of the Disclosure Statement and the Plan.

9.    On November 21, 2020 (the "Petition Date"), the Debtors filed voluntary chapter 11 petitions with this Court.  The Debtors concurrently filed, among other pleadings, the Original Plan and the Disclosure Statement, along with the Scheduling Motion. On November 23, 2020, the Court granted the relief sought in the Scheduling Motion,[10] which, among other things, (a) established December 10, 2020, at 5:00 p.m. (prevailing Eastern Time), as the Objection Deadline and the Voting Deadline; (b) set the Combined Hearing for December 17, 2020 at 9:00 a.m. (prevailing Eastern Time); (c) approved the form of the Combined Notice and its publication form (the "Publication Notice"); (d) established procedures for objecting to the adequacy of the Disclosure Statement and/or confirmation of the Plan; and (e) approved the solicitation and vote tabulation procedures.

---

[9]    *See Notice of: (I) Commencement of Chapter 11 Bankruptcy Cases; (II) Hearing on the Approval of Disclosure Statement, Confirmation of the Pre-Packaged Plan and Related Matters; and (III) Certain Objection Deadlines* [Docket No. 84].

[10]   *See Order: (I) Scheduling A Combined Hearing To Approve The Disclosure Statement And Confirm The Plan; (II) Establishing Objection Deadlines; (III) Approving The Form And Manner Of Combined Notice; (IV) Approving Solicitation Procedures And Ballots; (V) Approving Procedures For Assumption And Rejection Of Executory Contracts And Unexpired Leases; (VI) Granting Certain Extensions; And (VII) Granting Related Relief* [Docket No. 82]  (the "Scheduling Order").

10.    In accordance with the terms of the Scheduling Order, Prime Clerk, on behalf of the Debtors, served the Combined Notice on all parties in interest on November 25, 2020 and caused the Publication Notice to be published in the *New York Times, National Edition* on November 27, 2020.[11]

11.    Following the Voting Deadline, Prime Clerk tabulated all timely received Ballots and Master Ballots (as well as the results of the Cash-Out Elections).  The votes cast were overwhelmingly in favor of the Original Plan.  Specifically, the final voting results on the Original Plan were as follows (all percentages are with respect to the votes actually cast):[12]

| Class | Number Voted to Accept (%) | Number Voted to Reject (%) | Amount Voted to Accept (%) | Amount Voted to Reject (%) |
|---|---|---|---|---|
| Class 4 (*Secured Notes Claims*) | 78 (64.46%) | 43 (35.54%) | $474,872,370.07 (80.84%) | $112,530,000.00 (19.16%) |
| Class 6 (*Unsecured Notes Claims*) | 80 (97.56%) | 2 (2.44%) | $326,834,632.00 (98.73%) | $4,202,263.00 (1.27%) |

12.    On December 3, 2020, the Debtors filed the *Notice of Assumption of Certain Executory Contracts and Unexpired Leases in connection with the Confirmation of the Debtors' Joint Pre-Packaged Chapter 11 Plan of Reorganization* [Docket No. 157] (as amended by the *Supplemental Notice of Assumption of Certain Executory Contracts and Unexpired Leases in connection with the Confirmation of the Debtors' Joint Pre-Packaged Chapter 11 Plan of Reorganization* [Docket No. 185] filed on December 8, 2020 and as may be further amended

---

[11]    *See Affidavit of Service* [Docket No. 143]; and *Affidavit of Publication* [Docket No. 138].

[12]    *See* the Voting Declaration.

restated, supplemented, or otherwise modified from time to time), and the *Notice of Rejection of Certain Executory Contracts and Unexpired Leases in connection with the Confirmation of the Debtors' Joint Pre-Packaged Chapter 11 Plan of Reorganization* [Docket No. 158] (as modified by Exhibit G to the Plan Supplement and as it may be further amended, supplemented, or modified from time to time). In accordance with the Scheduling Order, December 10, 2020 at 5:00p.m. (prevailing Eastern Time) was established as the deadline for filing an objection to the assumption or rejection of an Executory Contract or Unexpired Lease.

## II.   The Plan.

13.     Through the Plan, the Debtors seek to implement an efficient, comprehensive and value-maximizing restructuring of their balance sheet that will eliminate approximately $800 million in prepetition funded debt. Among other things, the Plan contemplates:

(i)     the repayment in full in Cash of the DIP Claims (other than the Surviving ABL DIP Obligations and the Surviving Term DIP Obligations), Prepetition ABL Claims (to the extent not previously satisfied during these cases),[13] and the Superpriority Secured Notes Claims with the proceeds of the New Common Equity Investment, the New First Lien Debt, and/or the New ABL Facility;

(ii)    the unimpairment of all Allowed General Unsecured Claims;

(iii)   a $165 million New Common Equity Investment by the Investor Support Parties (subject to reduction to no less than $150 million) in exchange for: (a) 100% of the New Common Equity to be issued upon emergence (subject to dilution by the Management Incentive Plan and the Warrants); and (b) the Warrants to purchase additional New Common Equity;

(iv)    the distribution to the holders of the Secured Notes Claims their *pro rata* shares of (a) $160 million of New Preferred Equity and (b) $450 million in Cash (provided that they may elect (the "Cash-Out Election") to receive Cash in lieu of up to $30 million of their aggregate New Preferred Equity);

---

[13]   In accordance with the DIP Order, the proceeds of the DIP Facilities were used, in part, to repay the Prepetition ABL Claims in full in Cash (other than certain surviving obligation identified in the DIP Order).

(v)     the issuance of $2 million in New Junior Preferred Equity to the holders of the
Unsecured Notes Claims; and

(vi)    (a) a $375 million New ABL Facility, and (b) $350 million of New First Lien Debt.

## ARGUMENT

I.    **Approval of the Disclosure Statement and the Debtors' Prepetition Solicitation is Warranted.**

    A.    **The Disclosure Statement Contains Adequate Information.**

    14.    The primary purpose of a disclosure statement is to provide "adequate information" to enable parties entitled to vote on a proposed chapter 11 plan to make an informed decision about whether to vote to accept or reject the plan.[14] "Adequate information" is a flexible standard, based on the facts and circumstances of each case.[15] Courts within the Fourth Circuit and elsewhere acknowledge that determining what constitutes "adequate information" for the purpose of satisfying section 1125 of the Bankruptcy Code lies within the court's discretion.[16]

---

[14]  *See, e.g., Menard-Sanford v. Mabey (In re A. H. Robins Co.)*, (4th Cir. 1998) (stating that the purpose of the disclosure statement is to provide "sufficient information to permit a reasonable, typical creditor to make an informed judgment about the merits of the proposed plan"); *Quality Inns Int'l, Inc. v. L.B.H. Assocs. Ltd.*, 911 F.2d 724, 1990 WL 116761, at *1 (4th Cir. 1990) (unpublished table decision) (same); *In re Bermuda Bay, L.L.C.*, No. 09-32130, 2009 WL 5218071, at *3 (Bankr. E.D. Va. Dec. 31, 2009) (same).

[15]  11 U.S.C. § 1125(a)(1) ("'adequate information' means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records"); *Quality Inns Int'l, Inc. v. L.B.H. Assocs. L.P.*, 911 F.2d 724, 725(4th Cir. 1990) (unpublished table decision) ("The adequacy of a disclosure statement is determined on a case by case basis in light of the particular facts and circumstances."); *In re Walker*, 198 B.R. 476, 479 (Bankr. E.D. Va. 1996) ("Adequate information for purposes of 11 U.S.C. § 1125 is to be determined by the facts and circumstances of each case."); *Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case."); *First Am. Bank v. Century Glove, Inc.*, 81 B.R. 274, 279 (D. Del. 1988), *aff'd in part*, 860 F.2d 94 (3d Cir. 1988) (noting that adequacy of disclosure for a particular debtor will be determined based on how much information is available from outside sources); and S. Rep. No. 95-989, at 121 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 5787, 5907 ("the information required will necessarily be governed by the circumstances of the case").

[16]  *See, e.g., A.H. Robins*, 880 F.2d at 696 (*quoting Tex. Extrusion Corp. v. Lockheed Corp. (In re Tex. Extrusion Corp.)*, 844 F.2d 1142, 1157 (5th Cir. 1988)) ("The determination of what is adequate information is subjective and made on a case by case basis. This determination is largely within the discretion of the bankruptcy court."); *see also Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 518 (5th Cir. 1998), *cert. denied*, 526 U.S. 1144 (1999) ("The legislative history of § 1125 indicates that, in determining what constitutes 'adequate information' with respect to a particular disclosure statement, 'both the kind and form of information are left essentially to the judicial discretion of the court' and that 'the information required will necessarily be governed by the circumstances of the case.'") (internal citations omitted).

15.    Courts look for certain information when evaluating the adequacy of a disclosure statement, including:

a.    the events that led to the filing of a bankruptcy petition;

b.    a description of the available assets and their value;

c.    the anticipated future of the company;

d.    the source of information stated in the disclosure statement;

e.    the condition of a debtor while in chapter 11;

f.    the estimated return to creditors under a chapter 7 liquidation;

g.    the future management of a debtor;

h.    the chapter 11 plan or a summary thereof;

i.    financial information, valuations, and projections relevant to the claimants' decision to accept or reject the chapter 11 claim;

j.    information relevant to the risks posed to creditors under the plan;

k.    litigation likely to arise in a nonbankruptcy context;

l.    the tax attributes of a debtor; and

m.    the relationship of the debtor with affiliates.[17]

16.    The Disclosure Statement contains adequate information.    The Disclosure Statement contains descriptions and summaries of (among other things): (a) the Debtors' reorganization efforts; (b) events and negotiations preceding the commencement of these cases; (c) the key terms of the Restructuring Support Agreement and the Plan; (d) the classification and treatment of Claims and Interests; (e) risk factors with respect to the Plan; (f) a liquidation analysis setting forth the estimated recovery that holders of Claims and Interests would receive in a hypothetical chapter 7 case; (g) financial information that is relevant for determining whether the Plan is feasible; and (h) federal tax and securities law consequences of the Plan.

---

[17]    *See In re Ashley River Consulting, LLC*, No. 14-13406 (MG), 2015 Bankr. LEXIS 3819, at *27-28 (Bankr. S.D.N.Y. Nov. 6, 2015).

17.     Multiple parties reviewed and commented on the Disclosure Statement including, among others, counsel for the Prepetition ABL Agent, the Creditor Support Parties, the Sponsor Support Party, the Carlyle Co-Investor, and the Brigade Co-Investor.  No holder of Claims or Interests (or any other party) has objected to the adequacy of the Disclosure Statement.

18.     Accordingly, the Debtors submit that the Disclosure Statement contains adequate information within the meaning of section 1125(a) of the Bankruptcy Code and should be approved.

**B.      Solicitation Complied with the Requirements of Sections 1125(g) and 1126(b) of the Bankruptcy Code.**

19.     The Debtors' solicitation of votes on the Plan complied with the applicable provisions of sections 1125 and 1126 of the Bankruptcy Code.

20.     Section 1125(g) of the Bankruptcy Code authorizes prepetition solicitation of votes on a plan as follows:

> [A]n acceptance or rejection of the plan may be solicited from a holder of a claim or interest if such solicitation complies with applicable nonbankruptcy law and if such holder was solicited before the commencement of the case in a manner complying with applicable nonbankruptcy law.

21.     Section 1126(b) of the Bankruptcy Code further provides that:

> [A] holder of a claim or interest that has accepted or rejected the plan before the commencement of the case under this title is deemed to have accepted or rejected such plan, as the case may be, if—(1) the solicitation of such acceptance or rejection was in compliance with any applicable nonbankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; or (2) if there is not any such law, rule, or regulation, such acceptance or rejection was solicited after disclosure to such holder of adequate information, as defined in section 1125(a) of this title.

22.     Prepetition solicitation must therefore either comply with generally applicable federal and state securities laws and regulations or, if no such laws and regulations apply, the

solicited holders must receive "adequate information," as defined in section 1125(a) of the Bankruptcy Code, that would enable a hypothetical investor typical of the holders of claims and interests in the case to make an informed judgment about the Plan.

23.    Section 1126(b)(1) of the Bankruptcy Code requires that solicitation of votes on a chapter 11 plan comply with applicable nonbankruptcy law.  The Debtors' prepetition solicitation was exempt from the registration requirements of the Securities Act under one or more of the exemptions from registration provided thereunder, including section 4(a)(2) thereof, Regulation S under the Securities Act, state "Blue Sky" laws, or any similar rules, regulations, or statutes.

24.    Section 4(a)(2) of the Securities Act creates an exemption from securities law for transactions that do not involve a "public offering."[18]  Regulation S further creates an exemption for offers or sales of securities outside the United States.[19]  The holders of Claims in the Voting Classes will not receive securities pursuant to a "public offering."   There was no general solicitation in connection with the sale of securities under the Plan, and the Debtors understand that substantially all members of the Voting Classes are "accredited investors," as that term is defined in Rule 501 of Regulation D.   Accordingly, the Debtors' prepetition solicitation falls within the exemption set out in section 4(a)(2) of the Securities Act.   Further, the Debtors' solicitation with respect to persons outside of the United States was made in compliance with Regulation S.

25.    Because there is no nonbankruptcy law governing the prepetition solicitation of votes on the Plan, such solicitation must be based on the provision of "adequate information" to

---

[18]   15 U.S.C. § 77d(a)(2).

[19]   17 C.F.R. § 230.902.

the holders of Claims in the Voting Classes.[20]  Thus, consistent with the foregoing, the Debtors

respectfully submit that the prepetition solicitation of the votes on the Plan satisfied sections

1126(b) and 1125(g) of the Bankruptcy Code.

      **C.**     **The Debtors Complied with the Scheduling Order.**[21]

     26.     The Debtors complied with the solicitation and tabulation procedures, as approved

by the Scheduling Order, and with Bankruptcy Rules 3017 and 3018.

     27.     *First*, prior to the commencement of these cases, on November 20, 2020, the

Debtors caused Prime Clerk to distribute the Solicitation Packages to the holders of Claims in the

Voting Classes as of the Voting Record Date.  Each Ballot stated prominently that votes were

being solicited only from holders (the "<u>Eligible Holders</u>") that certified that they were either (1)

located inside the United States and (a) "qualified institutional buyers" (as defined in Rule 144A

under the Securities Act) or (b) "accredited investors" (as defined in Rule 501(a) of Regulation D

under the Securities Act) or (2) located outside the United States and were persons other than "U.S.

Persons" (as defined in Rule 902 under the Securities Act).  The definition of "accredited investor"

is broad, and includes any "corporation . . . or partnership, not formed for the specific purpose of

acquiring the securities offered, with total assets in excess of $5,000,000."[22]  Based on the

certifications made in the Ballots, the Debtors believe that each holder voting on the Plan is an

Eligible Holder.[23]

---

[20]   *See* 11 U.S.C. § 1126(b)(2).

[21]   The factual and legal arguments set forth in the Scheduling Motion are incorporated in this Memorandum by reference.

[22]   *See* 17 C.F.R. § 230.501.

[23]   *See, e.g., In re Sbarro LLC*, No. 14-10557 (MG) (Bankr. S.D.N.Y. May 19, 2014) [Docket. No. 238] (confirming plan involving prepetition solicitation of secured lenders who were accredited investors and thus exempt from securities laws); *In re Revel AC, Inc.*, No. 13-16253 (JHW) (Bankr. D.N.J. May 15, 2013) [Docket. No. 300] (same); *In re Remington Outdoor Co.*, No. 18-10684 (BLS) (Bankr. D. Del. May 4, 2018) [Docket. No. 248] (same); *In re QCE Finance LLC*, No. 14-10543 (LSS) (Bankr. D. Del. May 12, 2014) [Docket No. 318] (same);

Case 20-34656-KRH   Doc 253   Filed 12/14/20   Entered 12/14/20 23:45:08   Desc Main
Document   Page 24 of 59

28.    *Second*, on November 25, 2020, the Debtors caused Prime Clerk to transmit the Combined Notice to all of the Debtors' known creditors and equity security holders of record, informing them of, among other things: (a) the commencement of these cases; (b) the date and time set for the Combined Hearing; and (c) the deadline for filing objections to the adequacy of the Disclosure Statement or confirmation of the Plan.[24]   On November 27, 2020, the Debtors caused the Publication Notice to be published in *New York Times, National Edition*.[25]   The Combined Notice and Publication Notice included instructions on how to obtain copies of the Plan and Disclosure Statement by writing to, emailing, or calling Prime Clerk and through the Debtors' restructuring website, https://cases.primeclerk.com/guitarcenter.

29.    *Third*, the voting period, which spanned November 20, 2020 to December 10, 2020, complied with the Scheduling Order and was not "unreasonably short," but was adequate under the particular facts and circumstances of these cases.   In addition, no holder of Claims objected to the duration of the voting period.

30.    *Fourth*, the forms of Ballots comply with the Bankruptcy Rules and is consistent with the Scheduling Order.   No party has objected to the forms of Ballots.

31.    *Fifth,* as set forth in the Voting Declaration, Prime Clerk reviewed and processed all Ballots and Master Ballots (as well as all Cash-Out Elections and opt-out elections made) received through the Voting Deadline in compliance with the procedures described in the

---

*In re Am. Commercial Lines, Inc.*, No. 20-30982 (MI) (Bankr. S.D. Tex. Mar. 20, 2020) [Docket. No. 245] (confirming plan where substantially all creditors and interest holders solicited prepetition were accredited investors).

[24]  *See Affidavit of Service* [Docket No. 143].  Also, on November 20, 2020, the Debtors caused Prime Clerk to serve the Cash-Out Election Notice.  *See Affidavit of Service* [Docket No. 119].

[25]  *See Affidavit of Publication* [Docket No. 138].

Scheduling Motion and the Disclosure Statement.[26]  The Debtors respectfully submit that the procedures utilized by Prime Clerk for processing and tabulating the returned Ballots and Master Ballots comply with the procedures approved by the Court and with Bankruptcy Rule 3018 and are otherwise appropriate.

32.    Accordingly, the Debtors submit that they complied with the Scheduling Order and satisfied the requirements of Bankruptcy Rules 3017 and 3018.

**D.    Solicitation of the Plan Was in Good Faith and Complied with the Bankruptcy Code.**

33.    Section 1125(e) of the Bankruptcy Code provides that "a person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title . . . is not liable" on account of such solicitation for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan.

34.    As set forth in the First Day Declaration and the Disclosure Statement, the Debtors and other parties to the Restructuring Support Agreement complied with sections 1125 and 1126 of the Bankruptcy Code in soliciting the Plan.  Therefore, the Debtors respectfully request that the Court grant these parties the protections provided by section 1125(e) of the Bankruptcy Code.

**II.    The Plan Satisfies the Requirements of Section 1129 of the Bankruptcy Code.**

35.    The Debtors, as the proponents of the Plan, have the burden of proving that the Plan satisfies sections 1129(a) and (b) of the Bankruptcy Code, and must do so by a preponderance of the evidence.[27]  As demonstrated below, the Plan complies with the applicable requirements of section 1129 of the Bankruptcy Code.

---

[26]    *See generally* the Voting Declaration.

[27]    *See In re Bally Total Fitness of Greater N.Y., Inc.*, No. 07-12395 (BRL), 2007 WL 2779438, at *3 (Bankr. S.D.N.Y. Sept. 17, 2007) ("The Debtors, as proponents of the [p]lan, have the burden of proving the satisfaction of . . . Sections 1129(a) and (b) . . . by a preponderance of the evidence."); *see also Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters., Ltd. II (In re Briscoe Enters., Ltd. II)*, 994 F.2d 1160, 1165 (5th Cir. 1993) ("The

### A.     The Plan Complies with Section 1129(a)(1) of the Bankruptcy Code

36.     Under section 1129(a)(1) of the Bankruptcy Code, a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."  The legislative history of section 1129(a)(1) of the Bankruptcy Code explains that this provision encompasses the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern the classification of claims and the contents of a plan, respectively.[28]  The Plan complies with sections 1122 and 1123 of the Bankruptcy Code.

### 1.     The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code.

37.     Section 1122(a) of the Bankruptcy Code provides, in pertinent part, as follows:

> Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

38.     Courts in this jurisdiction have recognized that plan proponents have significant flexibility in placing similar claims into different classes, provided there is a rational basis to do so.[29]  The Plan's classification of Claims and Interests satisfies the requirements of section 1122 of the Bankruptcy Code because the Plan places Claims and Interests into ten (10) separate Classes, with Claims and Interests assigned to each Class being substantially similar to the other Claims

---

combination of legislative silence, Supreme Court holdings, and the structure of the [Bankruptcy] Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown."); *In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006) ("[T]he [D]ebtors' standard of proof that the requirements of § 1129 are satisfied is preponderance of the evidence.").

[28]  *See* S. Rep. No. 95-989, at 126 (1978), *as reprinted in* 1978 U.S.C. C.A.N. 5787, 5912; H.R. Rep. No. 95-595, at 412 (1977), *reprinted in* 1978 U.S.C. C.A.N. 5963, 6368; *In re S & W Enter.*, 37 B.R. 153, 158 (Bankr. N.D. Ill. 1984) ("An examination of the Legislative History of [section 1129(a)(1)] reveals that although its scope is certainly broad, the provisions it was most directly aimed at were [s]ections 1122 and 1123.").

[29]  *See Travelers Ins. Co. v. Bryson Props., XVII (In re Bryson Props., XVIII),* 961 F.2d 496, 502 (4th Cir. 1992) ("Section 1122 [of the Bankruptcy Code] requires substantial similarity between claims that are placed in the same class.").

15

and Interests in such Class (and differing from the Claims and Interests in each other Class based
on relevant criteria).[30]

39.    The Plan's classification scheme generally tracks the Debtors' prepetition capital
structure and classifies Claims and Interests based on the underlying instruments giving rise to
such Claims and Interests (if any).  In addition, Claims (rights to payment) are classified separately
from Interests (representing ownership in the business).

40.    Accordingly, the Plan satisfies section 1122(a) of the Bankruptcy Code, and no
party has asserted otherwise.

> **2.    The Plan Satisfies the Mandatory Requirements of Section 1123(a) of the Bankruptcy Code.**

41.    Section 1123(a) of the Bankruptcy Code sets forth seven requirements that every
chapter 11 plan must satisfy.  The Plan satisfies each of these requirements.

> *a.    Designation of Classes of Claims and Equity Interests (§ 1123(a)(1))*

42.    As set forth above, Article II of the Plan designates Classes of Claims and Interests
and thus satisfies the requirement of Section 1123(a)(1) of the Bankruptcy Code.

> *b.    Specification of Unimpaired Classes (§ 1123(a)(2))*

43.    Article II of the Plan specifies that Classes 1, 2, 3, 5, and 7 and, potentially, Classes
8 and 9 are Unimpaired, thus satisfying section 1123(a)(2) of the Bankruptcy Code.

> *c.    Treatment of Impaired Classes (§ 1123(a)(3))*

44.    Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the
treatment of any class of claims or interests that is impaired under the plan."  The Plan satisfies

---

[30]    *See* Plan Art. II.C.

this requirement by setting forth, in Article II, the treatment of each Class that is Impaired –

Classes 4, 6, and 10 and, potentially, Classes 8 and 9.

> d.    *Equal Treatment within Classes (§ 1123(a)(4))*

45.    Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same

treatment for each claim or interest of a particular class, unless the holder of a particular claim or

interest agrees to a less favorable treatment of such particular claim or interest."  The Plan satisfies

this requirement because Allowed Claims or Interests in each Class will receive the same treatment

as all other Allowed Claims or Interests in such Class.  Further, all Allowed Claims in the Voting

Classes will receive the same distributions on account of their Claims regardless of whether they

voted to accept or to reject the Plan, and each holder of Claims in Class 4 has been given the

opportunity to make the Cash-Out Election.

> e.    *Means for Implementation (§ 1123(a)(5))*

46.    Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide

"adequate means" for its implementation.  The Plan provides such means.  Among other things,

Article IV of the Plan: (a) authorizes the Debtors to take all actions necessary or appropriate to

effectuate the Plan; (b) authorizes the Debtors and the Reorganized Debtors to fund distributions

under the Plan from Cash on hand and the proceeds from the borrowings under the New ABL

Facility, the issuance of the New First Lien Debt, and the New Common Equity Investment;

(c) provides for the vesting of all estate assets in the Reorganized Debtors; (d) authorizes the

Reorganized Debtors to execute certain contracts and engage in other actions contemplated under

the Plan; (e) authorizes the Reorganized Debtors to adopt the New Corporate Governance

Documents; and (f) provides for the appointment of the members of the New Board and the

officers, directors, and/or managers of each of the Reorganized Debtors.  The terms governing

many of the transactions contemplated by the Plan, including the Restructuring Transactions, are set forth in greater detail in the Plan Supplement.

47.    Accordingly, the Plan satisfies section 1123(a)(5), and no party has asserted otherwise.

*f.    Issuance of Non-Voting Securities (§ 1123(a)(6))*

48.    Section 1123(a)(6) of the Bankruptcy Code requires that the reorganized debtor's constituent documents prohibit the issuance of non-voting equity securities. Article IV.B of the Plan provides that the certificates of incorporation, certificates of formation, limited liability company agreements, operating agreements, bylaws, or other organizational documents of the Reorganized Debtors will prohibit the issuance of non-voting equity securities to the extent required by section 1123(a)(6) of the Bankruptcy Code.

49.    Accordingly, the Plan satisfies section 1123(a)(6) of the Bankruptcy Code, and no party has asserted otherwise.

*g.    Directors and Officers (§ 1123(a)(7))*

50.    Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any other successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy." Article IV.C of the Plan outlines the manner of selecting the officers, directors, and/or managers of the Reorganized Debtors, which accords with applicable state law, the Bankruptcy Code, the interests of creditors and equity security holders, and public policy.

51.    Accordingly, the Plan satisfies section 1123(a)(7) of the Bankruptcy Code, and no party has asserted otherwise.

### 3. The Plan Is Consistent with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code.

*a.    The Plan Is Consistent with Sections 1123(b)(1) and (2) of the Bankruptcy Code*

52.    Section 1123(b) of the Bankruptcy Code sets forth various discretionary provisions that may be incorporated into a chapter 11 plan.  Among other things, section 1123(b) of the Bankruptcy Code provides that a plan may: (a) impair or leave unimpaired any class of claims or interests; and (b) provide for the assumption or rejection of executory contracts and unexpired leases.[31]  The Plan is consistent with these provisions of section 1123(b) of the Bankruptcy Code.

53.    Specifically, Classes 1, 2, 3, 5, and 7 and, potentially, Classes 8 and 9 are Unimpaired because the Plan leaves unaltered the legal, equitable, and contractual rights of the holders of the Allowed Claims and Interests in such Classes.[32]   Classes 4, 6, and 10, and, potentially, Classes 8 and 9 are Impaired since the Plan modifies the rights of the holders of the Claims and Interests in such Classes.[33]

54.    Article V.A of the Plan provides that each Executory Contract and Unexpired Lease will be assumed or deemed assumed by the applicable Reorganized Debtor, as of the Effective Date, unless such Executory Contract or Unexpired Lease is to be excluded pursuant to Article V.A of the Plan.

---

[31]    11 U.S.C. § 1123(b)(1), (2).

[32]    *See* Plan Art. II.

[33]    *See Id.*

> b.  *The Plan's Release, Exculpation, and Injunction Provisions Satisfy Section 1123(b)(3) of the Bankruptcy Code*

55.  Section 1123(b)(3)(A) of the Bankruptcy Code states that the Plan may "provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estate."[34] The Plan includes certain releases and an exculpation provision.  These discretionary provisions are proper because, among other things, they are the product of extensive good-faith, arm's-length negotiations, were provided for consideration, and were a material inducement for parties to enter into the Restructuring Support Agreement and provide DIP and exit financing, as well as the New Equity Investment.  These releases and exculpations provide the Released Parties and the Exculpated Parties, which include the Creditor Support Parties, the Prepetition ABL Agent, the DIP Secured Parties, and the Investor Support Parties (as well as their respective related parties), with the requisite assurance that all matters relating to the carefully negotiated restructuring of the Debtors' balance sheet are comprehensively and finally resolved.  Moreover, the overwhelming approval of the Plan by the Debtors' economic stakeholders strongly supports the conclusion that the release and exculpation provisions are appropriate.

### (i)  The Debtors' Releases Are Appropriate and Should Be Approved

56.  Article IX.B.1 of the Plan provides for releases by the Debtors, their Estates, and the Reorganized Debtors (the "Debtors' Releases"), as of the Effective Date, of, among other things, certain claims, rights, and Causes of Action that the Debtors or the Reorganized Debtors may have against the Released Parties.  A debtor may release claims under section 1123(b)(3)(A)

---

[34]  11 U.S.C. § 1123(b)(3)(A).

of the Bankruptcy Code "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate."[35]

57.    The Debtors' Releases meet this standard.  The Debtors' Releases fall comfortably within the Debtors' business judgment, they are fair and equitable, and they are in the best interests of the Debtors' estates.  *First*, the Debtors' Releases are an essential piece of the Debtors' restructuring and are a recognition of the Released Parties' contributions to the Debtors' restructuring.   The Debtors successful reorganization would be impossible without the contributions and concessions of the Released Parties embodied in the Plan, which will facilitate the Debtors' swift emergence from these cases.

58.    *Second*, the Released Parties are providing consideration for the Debtors' Releases, including in the form of, as applicable: (a) the agreement to fund payments to the Debtors' ordinary course unsecured creditors, such as employees, trade vendors and other service providers;[36] (b) the agreement to provide exit financing in the form of the New ABL Facility and the New First Lien Debt and the New Common Equity Investment; (c) the agreement by (i) the Secured Notes Support

---

[35]  *U.S. Bank Nat'l Assoc. v. Wilmington Trust Co.* (*In re Spansion, Inc.*), 426 B.R. 114, 143 (Bankr. D. Del. 2010); *see also In re Wash. Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'") (internal citation omitted); *Official Comm. of Unsecured Creditors v. White Plains Joint Venture (In re Bond)*, 16 F.3d 408, 411 (4th Cir. 1994) (unpublished table decision) (when determining whether a settlement is fair and equitable, the court may give deference to the debtor's business judgment at the time of execution of the settlement); *see also Motorola, Inc. v. Official Comm. of Unsecured Creditors (In re Iridium Operating LLC)*, 478 F.3d 452, 462 (2d Cir. 2007) (setting forth a non-exclusive list of factors considered by a court in determining whether a debtor release is in the best interest of the estate); *In re NII Holdings, Inc.*, 536 B.R. 61, 100 (Bankr. S.D.N.Y. 2015) (same).

[36]  *See, e.g., Final Order: (I) Authorizing Payment Of Prepetition Obligations Owed To Trade Creditors In The Ordinary Course Of Business; (II) Granting Administrative Expense Priority To All Undisputed Obligations On Account Of Outstanding Orders; And (III) Granting Related Relief* [Docket No. 237]; *and Final Order: (I) Authorizing The Debtors To (A) Pay Prepetition Wages, Salaries, Other Compensation, And Reimbursable Expenses, And (B) Continue Employee Benefits Programs; And (II) Granting Related Relief* [Docket No. 249] (the "Wages Order").

Parties to extinguish their Secured Notes Claims, including their Liens, and (ii) the Unsecured

Notes Support Parties to extinguish their Unsecured Notes Claims, in each case, in exchange for a

reduced recovery that permits the Allowed General Unsecured Claims to be satisfied in full; and

(d) the willingness to support the transactions contemplated by the Plan.

59.    **Third,** the Plan, including the Debtors' Releases, was vigorously negotiated by

sophisticated entities that were represented by able counsel and financial advisors.  These release

provisions were a necessary element of consideration that these parties required before entering

into the Restructuring Support Agreement and agreeing to support the Plan.

60.    **Fourth**, the Debtors' Releases are narrowly tailored and balance the desire for the

comprehensive, consensual and expedient settlement and resolution of claims held by or against

the Debtors with the ability of the Debtors to pursue valid claims and thereby maximize recoveries

for the Debtors' stakeholders.  In addition, prosecution of potential claims and Causes of Action

released by the Debtors' Releases would be complex and time consuming, could mire parties in

interest in costly litigation rather than effectuate a consensual pre-packaged restructuring, and

likely would result in lower recoveries for creditors.  Furthermore, the Debtors are not releasing

any obligations of any party under the Plan, or any documents contained in the Plan Supplement,

or any Causes of Action retained by the Debtors and the Reorganized Debtors pursuant to Article

IV.H of the Plan, including those set forth on Exhibit J to the Plan Supplement.

61.    **Finally**, the Debtors' Releases are in the best interests of creditors and equity

holders.  The Supporting Parties, who hold the overwhelming majority of the Claims and Interests

across the Debtors' funded capital structure, have agreed to support the Plan, including the

Debtors' Releases.  Moreover, each Voting class has overwhelmingly voted in favor of the Plan,

including the Debtors' Releases, and no economic stakeholder has objected to the Debtors' Releases.

62.     Ultimately, the Debtors' Releases provide the Debtors and the Released Parties with the global closure for which they negotiated in exchange for, among other things, the various concessions and benefits provided to the Debtors' Estates under the Plan, and the Debtors submit that the Debtors' Releases are consistent with applicable law, represent a valid settlement and release of claims the Debtors may have against the Released Parties pursuant to section 1123(b)(3)(A) of the Bankruptcy Code, is a valid exercise of the Debtors' business judgment, and is in the best interests of their Estates.

> (ii)     **The Third-Party Releases Are Consensual, Appropriate, and Compliant with the Bankruptcy Code**

63.     Article IX.B.2 of the Plan provides for the Third-Party Releases to the Released Parties by: (a) those parties that were participants in the formulation and negotiation of the Plan; (b) holders of Claims who voted to accept the Plan; (c) holders of Claims in Classes deemed to accept the Plan; (d)  holders of Claims in Voting Classes who abstained from voting on the Plan and who did not opt out of these releases; (e) holders of Claims in Voting Classes who voted to reject the Plan and who did not opt out of these releases; (f) all other holders of Claims and Interests to the fullest extent permitted by law; and (g) certain Related Parties of the foregoing entities.  The value-maximizing restructuring contemplated by the Plan would not be possible absent the support of the Released Parties.  The Third-Party Releases optimize the Debtors' fresh start by minimizing the possibility of distracting post-emergence litigation or other disputes.  Moreover, as set forth below, the Third-Party Releases are a permissible consensual release consistent with Fourth Circuit law.

64.    ***The Third-Party Releases are Consensual.*** Courts in this district—including this

Court—have approved third-party releases on the basis of consent in chapter 11 cases of similar

size and complexity where the releasing parties had the opportunity to object or opt out.[37]  In fact,

"[m]ost courts allow consensual [third-party] releases to be included in a plan."[38]  Indeed, "[t]he

validity of a consensual release is primarily a question of contract law because such releases are

no different from any other settlement or contract."[39]

65.    "Consent" may be expressed or implied by conduct without any direct expression.[40]

Courts have routinely held that a release is consensual where parties have received sufficient notice

of the plan's release provisions and had an opportunity to object to or opt out of the release and

failed to do so (including where such parties abstained from voting altogether).[41]  For example, in

*In re U.S. Fidelis, Inc.*, the court remarked:

---

[37]    *See, e.g.*, *In re Chinos Holdings, Inc.*, No. 20-32181 (KLP) (Bankr. E.D. Va. Aug. 26, 2020) [Docket No. 880]; *In re Pier 1 Imports, Inc.*, No. 20-30805 (KRH) (Bankr. E.D. Va. Jul. 30, 2020)  [Docket No. 967]; *In re Gemstone Sols. Grp.*, No. 19-30258 (KLP)  (Bankr. E.D. Va. June 5, 2020) [Docket No.1636]; *In re Toys "R" Us, Inc.*, No. 17-34665 (KLP)  (Bankr. E.D. Va. Dec. 17, 2018) [Docket No. 5979] (confirming the plan for the Taj and TRU Inc. entities); *In re The Gymboree Corp.*, No. 17-32986 (Bankr. E.D. Va. Sept. 7, 2017) [Docket No. 646]; *In re Penn Virginia Corp.*, No. 16-32395 (Bankr. E.D. Va. Aug. 11, 2016) [Docket No. 581]; *In re Patriot Coal Corp.*, No. 15-32450 (Bankr. E.D. Va. Oct. 9, 2015) [Docket No. 1615].

[38]    *In re Wool Growers Cent. Storage Co.*, 371 B.R. 768, 775 (Bankr. N.D. Tex. 2007); *see also In re Neogenix Oncology, Inc.*, 508 B.R. 345, 361 (Bankr. D. Md. 2014) ("It is well recognized that, where the application of the *Dow Corning* or other applicable factors leads to the conclusion that the third-party releases should not be approved, the court can nevertheless approve the releases with the consent of the releasing parties.  The rationale for allowing consensual third-party releases is that the affected parties are bound by their consensual agreement."); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 305 (Bankr. D. Del. 2013) ("Courts in this jurisdiction have consistently held that a plan may provide for a release of third party claims against a non-debtor upon consent of the party affected.").

[39]    *Wool Growers*, 371 B.R. at 775 (internal citations omitted).

[40]    *See* BLACK'S LAW DICTIONARY 300 (11th ed. 2019)

[41]    *See, e.g.*, *Indianapolis Downs*, 486 B.R. at 306 ("As for those impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt out of the releases, the record reflects these parties were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots.  Under these circumstances, the Third Party Releases may be properly characterized as consensual and will be approved"); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 218-19 (Bankr. S.D.N.Y. 2009) ("Except for those who voted against the Plan, or who abstained and then opted out, I find the Third Party Release provision consensual and within the scope of releases permitted in the Second Circuit."); *In re Conseco, Inc.*, 301 B.R. 525,

> The purpose of voting is to express acceptance or rejection of the plan, to determine whether cramdown must be accomplished for confirmation. Its purpose is not to act as a mechanism for consent to third-party releases in a plan that is otherwise confirmable. If a creditor wants to preserve his right to object to confirmation, on whatever ground, he must file an objection. If he does not file an objection, he generally cannot complain about the results of the confirmation proceeding—even if he voted to reject the plan.[42]

66.    The Third-Party Releases are consensual because the Plan, the Disclosure Statement and the Ballots describe the Third-Party Releases in bold-faced text and with sufficient detail and clearly provide a mechanism by which holders of Claims and Interests may opt out of giving the Third-Party Releases.  The Ballots give holders of Claims in the Voting Classes that vote to reject the Plan or that abstain from voting on the Plan the opportunity to opt out of the Third-Party Releases by checking the applicable box on the Ballots.

67.    Similarly, the Combined Notice included the Third-Party Releases in bold-faced text and with sufficient detail, contained plain and prominent instructions on filing objections and provided recipients with timely, sufficient, appropriate and adequate notice of the Third-Party Releases, including that the Third-Party Releases would be provided by the Releasing Parties.[43] Given the extensive disclosure and opportunity to opt out by objecting to the Third-Party Releases, the Third-Party Releases are consensual.  In fact, certain holders of Claims and Interests in the

---

528 (Bankr. N.D. Ill. 2003) ("The Article X release now binds only those creditors who agreed to be bound, either by voting for the Plan or by choosing not to opt out of the release. Therefore, the Article X release is purely consensual and within the scope of releases that *Specialty Equipment* permits.").

[42]    *In re U.S. Fidelis, Inc.*, 481 B.R. 503, 517 (Bankr. E.D. Mo. 2012); *see also Hernandez v. Larry Miller Roofing, Inc.*, 628 F. App'x 281, 286 (5th Cir. 2016) ("we have previously explained that when a bankruptcy plan has been confirmed by the bankruptcy court and gone unchallenged on direct appeal, a 'specific discharge or release' in such a plan can release claims against non-debtors") (citing *Applewood Chair Co. v. Three Rivers Planning & Dev. Dist. (In re Applewood)*, 203 F.3d 914, 919 (5th Cir. 2000); *Republic Supply Co. v. Shoaf*, 815 F.2d 1046, 1049 (5th Cir. 1987)).

[43]    *See* Combined Notice.

Non-Voting Classes did opt out of the Third-Party Releases via objection and therefore, under the

Plan, shall not be a Releasing Party or a Released Party.

68.    Indeed, Courts in this jurisdiction have repeatedly held that chapter 11 plans may

include similar third-party releases. This Court noted recently in *Pier 1 Imports, Inc., et al.*:

> [T]he Court finds that the opt-out provision with regard to the proposed releases is
> sufficient to allow parties to opt out if they want to. If they don't want to, then they can
> be deemed to -- or that can be affirmative acceptance. And there are many provisions
> in the law that provide for that. ***This court has provided for that type of mechanism,
> specifically Judge Phillips in* Gymboree *and in* Toys.** And this -- I don't have any
> reason to disagree with my esteemed colleague who occupies the chambers next to
> me.[44]

69.    Accordingly, for the reasons described above, the Third-Party Releases are

appropriate consensual releases and should be approved.

70.    However, even if this Court were to find the Third-Party Releases to be non-

consensual, the Court should approve them under the circumstances of these cases.

71.    The propriety of non-consensual third-party releases in the Fourth Circuit "turn[s]

on the particular facts and circumstances of the case."[45]   When assessing the appropriateness of

third-party releases, this Court has previously stated its adherence to a six-factor test prescribed by

the Fourth Circuit under *Behrmann*:

> (1) There is an identity of interests between the debtor and the third party ...; (2) The
> non-debtor has contributed substantial assets to the reorganization; (3) The injunction
> is essential to reorganization...; (4) The impacted class, or classes, has overwhelmingly
> voted to accept the plan; (5) The plan provides a mechanism to pay for all, or

---

[44]    *In re Pier 1 Imports, Inc.*, No. 20-30805 (KRH) Confirmation Hr'g Transcript at 32:16-24 (Bankr. E.D.V.A. July 30, 2020) [Docket No. 975]. *See also, In re Chinos Holdings, Inc.*, No. 20-32181 (KLP) (Bankr. E.D. Va. Aug. 26, 2020) [Docket No. 880] (approving consensual third-party releases that afforded parties with the opportunity to opt out) (emphasis added); *I n re Gemstone Sols. Grp.*, No. 19-30258 (KLP) (Bankr. E.D. Va. June 5, 2020) [Docket No. 1636] (approving a similar opt-out mechanism for third-party releases).

[45]    *Behrmann v. Nat'l Heritage Found.*, 663 F.3d 704, 711-12 (4th Cir. 2011).

substantially all, of the class or classes affected by the injunction; [and] (6) The plan provides an opportunity for those claimants who choose not to settle to recover in full.[46]

As set forth below, the Third-Party Releases are consistent with the Fourth Circuit requirements and with other chapter 11 plans confirmed in this Court.

72.    ***First***, there is an identity of interests between the Debtors and the Released Parties. Each of the Released Parties, as stakeholders and key participants in the Debtors' reorganization process, shares a common goal with the Debtors in seeing the Plan succeed and this company emerge a healthy enterprise.[47]    Furthermore, the Debtors are obligated to indemnify certain Released Parties pursuant to the agreements governing the DIP Facilities, the Prepetition ABL Facility (as defined in the Disclosure Statement), the Superpriority Secured Notes, the Secured Notes, and the Unsecured Notes or, in the case of directors and officers of the Debtors, the Indemnification Agreements, and therefore any claim against these Released Parties is, in reality, a claim against the Debtors.[48]

73.    ***Second***, the Released Parties have made a substantial contribution to the Debtors' reorganization, highlighted by their "offering funding to the Debtors or by contributing sweat equity to the Debtors."[49]    Additional consideration provided by the Released Parties is set forth in paragraph 58 of this Memorandum.

---

[46]    *In re Alpha Natural Res., Inc.*, 556 B.R. 249, 261-62 (Bankr. E.D. Va. 2016) (citing *Nat'l Heritage Found., Inc. v. Highbourne Found.*, 760 F.3d 344, 347 (4th Cir. 2014)).

[47]    *See In re Tribune Co.*, 464 B.R. 126, 187, modified, 464 B.R. 208, 222 (Bankr. D. Del. 2011) (noting the existence of an identity of interest between the debtors and the settling parties where such parties "share[] the common goal of confirming the DCL Plan and the DCL Plan Settlement").

[48]    *See Indianapolis Downs*, 486 B.R. at 303 ("An identity of interest exists when, among other things, the debtor has a duty to indemnify the non-debtor receiving the release.").

[49]    *Alpha Natural Res.*, 556 B.R. at 62.

74.    **Third**, the Third-Party Releases are essential to the Debtors' reorganization.[50]  As described in more detail in paragraphs 57-59 of this Memorandum, the transactions contemplated by the Plan are value-maximizing, permit the Debtors to satisfy all Allowed General Unsecured Claims in full and would not be possible absent the contributions and concessions made by the Released Parties, particularly at a time of exceptional stress on the U.S. and global economy imposed by the COVID-19 pandemic.  Indeed, the Third-Party Releases (together with the Debtors Releases) are an integral component of the Debtors' restructuring and a key inducement to bring stakeholder groups to the bargaining table.  Put simply, the Debtors and their key stakeholders would be unwilling to support the Plan without assurances that they would not be subject to post-emergence litigation or other disputes relating to the restructuring.  The Third-Party Releases therefore not only benefit the Released Parties, but also the Debtors' post-emergence enterprise as a whole as they provide finality and closure for the Debtors and these Chapter 11 Cases.

75.    **Finally**, this Plan provides for the satisfaction in full of all Allowed General Unsecured Claims and all other Classes of Claims other than the Voting Classes (who voted to approve the Plan) and Claims held by the Debtors.  As discussed above, the satisfaction of these Claims would not have been possible without the support of the Support Parties, which would not have been possible absent the Third-Party Releases.

76.    Courts in this jurisdiction have repeatedly found similar third-party release mechanics to be approved under the *Behrmann* factors:

> The non-debtor parties have made substantial contributions to the reorganization
> efforts. The injunction is also essential to the reorganization. There is an identity of

---

[50]    *Cf. In re Drexel Burnham Lambert Grp.*, 960 F.2d 285, 293 (2d Cir. 1992) ("In bankruptcy cases, a court may enjoin a creditor from suing a third party, provided the injunction plays an important part in the debtor's reorganization plan."); *In re Stearns Holdings, LLC*, 607 B.R. 781, 788-789 (Bankr. S.D.N.Y. 2019) (approving third-party releases as "integral to the Debtors' reorganization efforts" even if viewed as non-consensual); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 268 (Bankr. S.D.N.Y. 2007) (approving non-consensual releases of asset purchasers that had contributed $17.5 billion to estate).

interest between the debtors and the entities that will benefit from the releases, resulting from indemnification obligations to some extent as well. The release parties support and contributions have made this plan largely consensual and achievable. The third party releases were necessary and fundamental in order to reach the consensus and support of the plan and were an essential component of the agreement between the debtors and the third party releases.[51]

77.     Accordingly, the releases are amply justified and should be approved.

### (iii)     The Exculpation Provision is Appropriate and Complies with the Bankruptcy Code

78.     Article IX.A of the Plan provides exculpation to the Exculpated Parties[52] from any claim or Cause of Action in connection with or arising out of the administration of these cases and certain related transactions, except for acts or omissions that are a criminal act or constitute actual fraud, willful misconduct, or gross negligence as determined by a Final Order (the "Exculpation Provision").  In the Fourth Circuit, exculpation provisions "are permissible, so long as they are properly limited and not overly broad."[53]

79.     Unlike the Third-Party Releases, the Exculpation Provision does not affect the liability of third-parties *per se*, but rather sets a standard of care of actual fraud, willful misconduct,

---

[51]  *In re Chinos Holdings, Inc.*, No. 20-32181 (KLP) Confirmation Hr'g Transcript at 39:2-18 (Bankr. E.D. Va. Aug. 25, 2020) [Docket No. 849]; *See also In re Pier 1 Imports, Inc.*, No. 20-30805 (KRH) (Bankr. E.D. Va. July 30, 2020) [Docket No. 967]; *In re Gemstone Sols. Grp.,*  No. 19-30258 (KLP) (Bankr. E.D. Va. June 5, 2020) [Docket No. 1636]; *In re Alpha Natural Res., Inc.*, No. 15-33896 (KRH) (Bankr. E.D. Va. July 12, 2016) [Docket No. 3038].

[52]  The "Exculpated Parties" are, collectively, and in each case solely in its capacity as such: (a) the Debtors and Reorganized Debtors; (b) the Creditor Support Parties; (c) the Investor Support Parties; (d) the Trustees under the Indentures; (e) the DIP Secured Parties; (f) the Term DIP Commitment Parties; (g) with respect to each of the foregoing entities in clauses (a) through (f), each such Entity's current and former predecessors, successors, Affiliates (regardless of whether such interests are held directly or indirectly), subsidiaries, direct and indirect equity holders, funds, portfolio companies, management companies; and (h) with respect to each of the foregoing Entities in clauses (a) through (g), each of their respective current and former directors, officers, members, employees, partners, managers, independent contractors, agents, representatives, principals, professionals, consultants, financial advisors, attorneys, accountants, investment bankers, and other professional advisors.

[53]  *In re Nat'l Heritage Found., Inc.*, 478 B.R. 216 (Bankr. E.D. Va. 2012), *aff'd, Nat'l Heritage Found. v. Highbourne Found.*, 760 F.3d 344 (4th Cir. 2014).  *See also In re Health Diagnostic Lab., Inc.*, 551 B.R. 218, 232 (Bankr. E.D. Va. 2016) ("Exculpation provisions in chapter 11 plans are not uncommon and 'generally are permissible, so long as they are properly limited and not overly broad.'") (internal citation omitted).

or gross negligence in hypothetical future litigation against an Exculpated Party for acts arising out of the Debtors' restructuring.[54]  A bankruptcy court has the power to approve an exculpation provision in a chapter 11 plan because a bankruptcy court cannot confirm a chapter 11 plan unless it finds that the plan has been proposed in good faith.[55]  As such, an exculpation provision represents a legal conclusion that flows inevitably from several different findings a bankruptcy court must reach in confirming a plan.[56]  Once the court makes its good faith finding, it is appropriate to set the standard of care of the parties involved in the negotiation and formulation of that chapter 11 plan.[57]  Exculpation provisions, therefore, prevent future collateral attacks against a court's good faith finding.

80.   Courts have approved exculpation provisions where they were deemed "appropriately tailored to protect the Exculpated Parties from inappropriate litigation and do not relieve any party of liability for gross negligence or willful misconduct."[58]  Exculpation provisions

---

[54]   *See, e.g.*, *Health Diagnostic Lab., Inc.*, 551 B.R. at 232 ("The practical effect of a proper exculpation provision is not to provide a release for any party, but to raise the standard of liability of fiduciaries for their conduct during the bankruptcy case."); *see also In re PWS Holding Corp.*, 228 F.3d 224, 245 (3d Cir. 2000) (holding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code.").

[55]   *See* 11 U.S.C. § 1129(a)(3).

[56]   *See* 28 U.S.C. § 157(b)(2)(L); 11 U.S.C. § 1125(e) ("A person that solicits acceptance or rejection of a plan, in good faith and in compliance with the applicable provisions of this title, or that participates, in good faith and in compliance with the applicable provisions of this title, in the offer, issuance, sale, or purchase of a security, offered or sold under the plan, of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan or the offer, issuance, sale, or purchase of securities.").

[57]   *See, e.g., In re Alpha Natural Res., Inc.*, No. 15-33896 (KRH) (Bankr. E.D. Va. July 12, 2016) [Docket No. 3038] (granting exculpation to non-estate fiduciaries); *In re Patriot Coal Corp.*, No. 15-32450 (KLP) (Bankr. E.D. Va. Oct. 19, 2015) [Docket No. 1615] (same); *In re AMF Bowling Worldwide, Inc.*, No. 12-36495 (KRH) (Bankr. E.D. Va. June 25, 2013) [Docket No. 1049] (same); *In re Health Diagnostic Labs, Inc.*, No. 15-32919 (KRH) (Bankr. E.D. Va. May 12, 2016) [Docket No. 1095] (same); *In re James River Coal Co.*, No. 14-31848 (KRH) (Bankr. E.D. Va. Mar. 21, 2016) [Docket No. 1704] (same); *In re Circuit City Stores, Inc.*, No. 08-35653 (KRH) (Bankr. E.D. Va. Sept. 14, 2010) [Docket No. 8555] (same); *In re LandAmerica Fin. Grp.*, No. 08-35994 (KRH) (Bankr. E.D. Va. Nov. 23, 2009) [Docket No. 2666] (same).

[58]   *See In re Calpine Corp.*, No. 05-60200 (BRL), 2007 WL 4565223, at *10 (Bankr. S.D.N.Y. Dec. 19, 2007).

are permissible when they are important to a debtor's plan or where the exculpated party has provided substantial consideration to a debtor's reorganization.[59]

81.     Here, the Exculpation Provision is narrowly tailored to protect the Exculpated Parties from inappropriate litigation based on the Debtors' restructuring and does not release any claim based on any act or omission that constitutes actual fraud, willful misconduct, or gross negligence.  There can be no doubt that the Debtors are entitled to the relief embodied in the Exculpation Provision.  Having acted in "good faith" within the meaning of section 1125(e) and 1129(a)(3) of the Bankruptcy Code, the Debtors are entitled to the protections afforded by section 1125(e) of the Bankruptcy Code and the Exculpation Provision.[60]  Further, granting such relief falls within the "fresh start" principles underlying the Bankruptcy Code.[61]

82.     Furthermore, courts recognize the appropriateness of extending exculpation beyond estate fiduciaries to parties who make a substantial contribution to a debtor's restructuring and, specifically, those who play an integral role in building consensus in support of a debtor's restructuring.[62]  Courts in this and other districts have approved exculpation when parties have performed necessary and valuable duties in connection with the cases.[63]  Although certain of the

---

[59]  *See In re Chemtura Corp.*, 439 B.R. 561, 610-11 (Bankr. S.D.N.Y. 2010); *see also In re Residential Capital*, LLC, No. 12-12020 (MG) 2013 WL 12161584, at *13 (Bankr. S.D.N.Y. Dec. 11, 2013) (order confirming plan that contained exculpations for parties that were "instrumental to the successful prosecution of the Chapter 11 Cases or their resolution pursuant to the Plan, and/or provided a substantial contribution to the Debtors.").

[60]  *See In re Sears Methodist Ret. Sys., Inc.,* No. 14-32821-11 (SGCJ), 2015 WL 1066882, at *9 (Bankr. N.D. Tex. Mar. 6, 2015).

[61]  *See Bank of New York Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252 (5th Cir. 2009).

[62]  *Alpha Natural Res.*, 556 B.R. at 260-61 ("exculpations are necessary to ensure that capable, skilled individuals are willing to assist in the reorganization efforts in chapter 11 cases.").

[63]  *See, e.g., In re Pier 1 Imports, Inc.*, No. 20-30805 (KRH) (Bankr. E.D. Va. July 30, 2020) [Docket No. 967] (granting exculpation to non-estate fiduciaries); *In re Gemstone Sols. Grp., Inc.*, No. 19-30258 (KLP) (Bankr. E.D. Va. June 5, 2020) [Docket No. 1636] (same); *In re Alpha Natural Res., Inc.*, No. 15-33896 (KRH) (Bankr. E.D. Va. July 12, 2016) [Docket No. 3038] (same); *In re Patriot Coal Corp.*, No. 15-32450 (KLP) (Bankr. E.D. Va. Oct. 19, 2015) [Docket No. 1615] (same); *In re AMF Bowling Worldwide, Inc.*, No. 12-36495 (KRH) (Bankr.

Exculpated Parties do not owe fiduciary duties to the Debtors, such parties were integral participants in the Plan negotiation process, worked hand-in-hand with the Debtors, were instrumental in ensuring the success of the Debtors' restructuring and acted in good faith before and throughout these cases. Moreover, the Exculpated Parties participated in these cases in reliance upon the protections afforded to them by the Exculpation Provision. Failure to approve the Exculpation Provision would undermine the compromises and settlements embodied in the Plan and Restructuring Support Agreement by allowing parties to pursue claims post-emergence that are otherwise fully and finally resolved by the Plan.

83.     Accordingly, the Exculpation Provision is appropriate and conforms to existing case precedent and should therefore be approved.

### (iv)    The Injunction Provision is Appropriate

84.     The injunction provision set forth in Article IX.C of the Plan implements the Plan's release and exculpation provisions, in part, by permanently enjoining all persons and entities from commencing or continuing any action or other proceeding on account of or in connection with any Claims, claims, interests or Interests released or settled pursuant to the Plan. Without such injunction provisions, the Plan's release and exculpation provisions would lose their impact.[64]  As such, to the extent the Court finds that the exculpation and release provisions are appropriate, the Debtors respectfully submit that the injunction provision must also be appropriate.

---

E.D. Va. June 25, 2013) [Docket No. 1049] (same); *In re Health Diagnostic Lab., Inc.*, No. 15-32919 (KRH) (Bankr. E.D. Va. May 12, 2016) [Docket No. 1095] (same); *In re James River Coal Co.*, No. 14-31848 (KRH) (Bankr. E.D. Va. Mar. 21, 2016) [Docket No. 1074] (same); *In re Circuit City Stores, Inc.*, No. 08-35653 (KRH) (Bankr. E.D. Va. Sept. 10, 2010) [Docket No. 8555] (same); *In re LandAmerica Fin. Grp.,* No. 08-35994 (KRH) (Bankr. E.D. Va. Nov. 23, 2009) [Docket No. 2666] (same).

[64]   *See Bally Total Fitness of Greater N.Y., Inc.*, 2007 WL 2779438, at *8 (finding exculpation, release, and injunction provisions appropriate because they were fair and equitable, necessary to successful reorganization, and integral to the plan); *Drexel*, 960 F.2d at 293 (holding that a court may approve injunction provision where such provision "plays an important part in the debtor's reorganization plan").

4.        **The Plan Complies with Section 1123(d) of the Bankruptcy Code.**

85.    Section 1123(d) of the Bankruptcy Code provides that "if it is proposed in a plan to cure a default the amount necessary to cure the default shall be determined in accordance with the underlying agreement and nonbankruptcy law."

86.    The Plan complies with section 1123(d) of the Bankruptcy Code.  The Plan provides for the satisfaction of monetary defaults under each Executory Contract and Unexpired Lease to be assumed under the Plan by payment of the Cure amount, if any, in Cash on the Effective Date or in the ordinary course of business, subject to Article VI of the Plan.

87.    Accordingly, the Debtors submit that the discretionary provisions of the Plan are consistent with section 1123(b) of the Bankruptcy Code.  In light of the foregoing, because the Plan complies with sections 1122 and 1123 of the Bankruptcy Code, the Debtors submit that the Plan complies with the requirements of section 1129(a)(1) of the Bankruptcy Code.

B.        **The Debtors Complied with the Applicable Provisions of Section 1129(a)(2) of the Bankruptcy Code.**

88.    Section 1129(a)(2) of the Bankruptcy Code requires that the proponent of a chapter 11 plan comply with the applicable provisions of the Bankruptcy Code.  The legislative history to section 1129(a)(2) of the Bankruptcy Code explains that this provision is intended to encompass the disclosure and solicitation requirements of sections 1125 and 1126 of the Bankruptcy Code.[65] As discussed in Part I of this Memorandum, the Debtors have complied with the solicitation and disclosure requirements of sections 1125 and 1126 of the Bankruptcy Code.

---

[65]    *See In re Manchester Oaks Homeowners Assoc., Inc.*, No. 11–10179–BFK, 2014 WL 961167 at *11 (Bankr. E.D. Va. Mar. 12, 2014) (Noting that "[s]ection 1125 of the Code, [is] . . . itself set out as a separate requirement for confirmation of a plan in [s]ection 1129(a)(2) of the Code (requiring the plan proponent comply with applicable provisions of Title 11)."); *In re Cypresswood Land Partners*, 409 B.R. 396, 424 (Bankr. S.D. Tex. 2009) ("Bankruptcy courts limit their inquiry under § 1129(a)(2) to ensuring that the plan proponent has complied with the solicitation and disclosure requirements of § 1125.").

### C.    The Plan Was Proposed in Good Faith (Section 1129(a)(3) of the Bankruptcy Code).

89.    Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."[66]  Courts in the Fourth Circuit have held that the "overriding standard for good faith within the meaning of 11 U.S.C. § 1129(a)(3) is whether 'there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code.'"[67]  The fundamental purpose of chapter 11 is to enable a distressed business to reorganize its affairs to prevent job losses and the adverse economic effects associated with disposing of assets at liquidation value.[68]  Whether a plan satisfies this test is a question of fact assessed on a case-by-case basis in light of the totality of the circumstances.[69]  As a general rule, courts in the Fourth Circuit have found that when a plan maximizes the economic return to the creditors in light of the totality of the facts and circumstances of the case, the good faith standard is satisfied.[70]

90.    The Plan satisfies section 1129(a)(3) of the Bankruptcy Code.  The Plan was proposed with the goal of maximizing value and creditor recoveries and implementing the

---

[66]   11 U.S.C. § 1129(a)(3).

[67]   *See Crestar Bank v. Walker* (*In re Walker*), 165 B.R. 994, 1001 (E.D. Va. 1994) (quoting *Hanson v. First Bank of S. Dakota, N.A.*, 828 F.2d 1310, 1315 (8th Cir. 1987)); *In re Osborne*, No. 12-00230 (SWH), 2013 WL 2385136, at *4 (Bankr. E.D.N.C. May 30, 2013).

[68]   *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 528 (1984); *B.D. Int'l Disc. Corp. v. Chase Manhattan Bank, N.A.* (*In re B.D. Int'l Disc. Corp.*), 701 F.2d 1071, 1075 n.8 (2d Cir. 1983) (stating that "the two major purposes of bankruptcy [are] achieving equality among creditors and giving the debtor a fresh start").

[69]   *In re Walker*, 165 B.R. at 1001 ("[W]hether a plan is filed in good faith is a matter to be assessed in view of the totality of the circumstances which necessitated the plan, in perspective of the purposes of the Bankruptcy Code").

[70]   *Behrmann*, 663 F.3d at 709-10 (upholding the ruling that the debtor's plan was proposed in good faith based on a finding that the plan was proposed for the "legitimate and honest purpose of reorganizing and maximizing both the value of the debtor's estate and the recovery to the claimants"); *In re Bennett*, No. 07-10864 (SSM), 2008 WL 1869308, at *2 (Bankr. E.D. Va. Apr. 23, 2008) (finding the good faith requirement met where "no evidence was presented at the [confirmation] hearing to show that the debtor had the financial ability to pay more on account of unsecured claims than proposed in his plan.").

compromises and settlements agreed to with the Support Parties, satisfies the purposes of the

Bankruptcy Code, and has a high chance of success.  The Plan will enable the Debtors to right-

size their balance sheet, improve liquidity, and strengthen go-forward operations—positioning the

Reorganized Debtors for long-term success.  Moreover, the Plan is the product of extensive arm's-

length negotiations among the Debtors and the Support Parties and is calibrated for successful

implementation.[71]  The Plan's strong support by the Voting Classes is a testament to this reality.

Accordingly, the Plan has been proposed in good faith and not by any means forbidden by law as

required by section 1129(a)(3) of the Bankruptcy Code, and no party has asserted otherwise.

> **D.     The Plan Provides that the Debtors' Payment of Professional Fees and Expenses Are Subject to Court Approval (Section 1129(a)(4) of the Bankruptcy Code).**

91.     Section 1129(a)(4) of the Bankruptcy Code requires that certain fees and expenses

paid by the plan proponent, by the debtor, or by a person receiving distributions of property under

the plan be approved by the bankruptcy court as reasonable or remain subject to approval by the

bankruptcy court as reasonable.

92.     The Plan satisfies section 1129(a)(4) of the Bankruptcy Code.  Pursuant to Article

II.A.1.c of the Plan, all Professionals must file their final requests for payment no later than sixty

(60) days after the Effective Date.  Thus, the payment of Fee Claims is subject to prior approval

of the Court based on the reasonableness standard of sections 328 and/or 330 of the Bankruptcy

Code.[72]  Accordingly, the Plan satisfies section 1124(a)(4) of the Bankruptcy Code, and no party

has asserted otherwise.

---

[71]    *See* Martin Declaration ¶ 16.

[72]    11 U.S.C. §§ 328(a), 330(a)(1)(A).

E.      **The Debtors Disclosed All Necessary Information Regarding Directors, Officers, and Insiders (Section 1129(a)(5) of the Bankruptcy Code).**

93.      Section 1129(a)(5)(A)(i) of the Bankruptcy Code requires that the proponent of a plan disclose the identity and affiliations of the proposed officers and directors of the reorganized Debtors.  Additionally, section 1129(a)(5)(A)(ii) provides that the appointment or continuance of such officers and directors be consistent with the interests of creditors and equity security holders and with public policy.  Section 1129(a)(5)(B) requires the plan proponent to disclose the identity of an "insider" (as defined by section 101(31) of the Bankruptcy Code) to be employed or retained by the reorganized debtor and the nature of any compensation for such insider.

94.      In accordance with Article IV.C of the Plan, as of the Effective Date, the New Board will be comprised of ten (10) members.  The Debtors will disclose prior to the Combined Hearing the identities and affiliations of the persons proposed to serve on the New Board.  In addition, the Plan provides that the Debtors' current officers will retain such positions as of the Effective Date and continue to serve at the discretion of the New Board.

95.      The appointment or continuance of the Reorganized Debtors' officers, directors, and managers is "consistent with the interests of creditors and equity security holders and with public policy."[73]  The proposed directors, managers, and officers of the Reorganized Debtors have significant knowledge and solid business and industry experience, are competent, and will give the Reorganized Debtors both continuity and fresh insights into running the business.

96.      Finally, the Debtors will have satisfied section 1129(a)(5)(B) of the Bankruptcy Code because they will disclose the identity of all insiders that the Reorganized Debtors will employ or retain and the nature of such insiders' compensation.

---

[73]  11 U.S.C. § 1129(a)(5)(A)(ii).

97.    Accordingly, the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code, and no party has asserted otherwise.

**F.    The Plan Does Not Require Governmental Regulatory Approval (Section 1129(a)(6) of the Bankruptcy Code).**

98.    Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over a debtor after confirmation has approved any rate change provided for in the plan.  Section 1129(a)(6) Bankruptcy Code is not applicable to the Plan.

**G.    The Plan Is in the Best Interests of All the Debtors' Creditors (Section 1129(a)(7) of the Bankruptcy Code).**

99.    Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," provides, in relevant part:

> With respect to each impaired class of claims or interests—
>
> (A)    each holder of a claim or interest of such class—
>
> > (i)    has accepted the plan; or
> >
> > (ii)    will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date . . . . [74]

100.    The best interests test applies to individual holders of impaired claims and interests that voted to reject the plan (rather than to classes) and is generally satisfied through a comparison of the estimated recoveries by the stakeholders in a hypothetical chapter 7 liquidation with their estimated recoveries under that debtor's plan.[75]

---

[74]    11 U.S.C. § 1129(a)(7).

[75]    *Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n13 (1999) ("The 'best interests' test applies to individual creditors holding impaired claims, even if the class as a whole votes to accept

101.    As demonstrated by the Liquidation Analysis,[76] which the Debtors have prepared

with the assistance of their advisors, and as set forth more fully in the Martin Declaration and the

Shapiro Declaration, the projected recoveries under the Plan for each holder of Claims and

Interests in the Impaired Classes are equal to or in excess of the recoveries estimated for such

holders in a hypothetical chapter 7 liquidation.  Specifically, in a chapter 7 liquidation, the holders

of unsecured Claims and of Interests are not expected to realize any recovery, while the holders of

Class 4 Claims (Secured Notes Claims) are expected to receive a substantially lower recovery as

compared to their recoveries under the Plan.

102.    Accordingly, the Plan satisfies the best interests test of section 1129(a)(7) of the

Bankruptcy Code, and no party has asserted otherwise.

**H.     The Plan Does Not Comply with Section 1129(a)(8) of the Bankruptcy Code
but Does Satisfy Section 1129(b) of the Bankruptcy Code.**

103.    Section 1129(a)(8) of the Bankruptcy Code requires that each class of claims and

interests must either accept the plan or be unimpaired under the plan.[77]

104.    As set forth above and in the Voting Declaration, each of the Voting Classes (*i.e.*,

Classes 4 and 6) voted to accept the Plan in accordance with section 1126 of the Bankruptcy

Code.[78]  Additionally, holders of Claims and Interests in Unimpaired Classes (*i.e.*, Classes 1, 2, 3,

---

the plan."); *In re Century Glove*, Nos. 90-400-401-SLR, 1993 WL 239489, at *7 (D. Del. Feb. 10, 1993); *Adelphia Commc'ns Corp.*, 368 B.R. at 251 (stating that section 1129(a)(7) is satisfied when an impaired holder of claims would receive "no less than such holder would receive in a hypothetical chapter 7 liquidation").

[76]   *See* Disclosure Statement, Ex. E.

[77]   11 U.S.C. § 1129(a)(8). A class of impaired claims accepts a plan if holders of at least two-thirds in dollar amount and more than half in number of the claims in that class vote to accept the plan. 11 U.S.C. § 1126(c).

[78]   *See* the Voting Declaration, Ex. A.

5 and 7 and, potentially, Classes 8 and 9) are conclusively presumed to have accepted the Plan

pursuant to section 1126(f) of the Bankruptcy Code.

105.    However, holders of Claims and Interests in the Impaired Classes that are not

entitled to receive any recoveries or retain any property on account of their Claims or Interests

under the Plan (*i.e.*, Class 10 and, potentially, Classes 8 and 9) are conclusively presumed to have

rejected the Plan (the "Rejecting Classes") in accordance with section 1126(g) of the Bankruptcy

Code.  Accordingly, the Plan does not satisfy the requirement of section 1129(a)(8).

106.    Nevertheless, section 1129(b) of the Bankruptcy Code allows for the confirmation

of a plan despite non-compliance with section 1129(a)(8) as long as the plan: (a) complies with all

other applicable provisions of section 1129(a) of the Bankruptcy Code and (b) satisfies the

"cramdown" requirements of section 1129(b) of the Bankruptcy Code with respect to each

Rejecting Class.[79]  As demonstrated below, the Plan satisfies such requirements and thus may be

confirmed despite non-compliance with section 1129(a)(8).

    **I.**    **The Plan Provides for Payment in Full of All Allowed Priority Claims (Section 1129(a)(9) of the Bankruptcy Code).**

107.    Section 1129(a)(9) of the Bankruptcy Code requires that, "except to the extent that

a holder of a particular claim has agreed to a different treatment," certain priority claims be paid

in full on the effective date of a plan and that the holders of certain other priority claims receive

specified deferred cash payments.[80]

108.    The Plan satisfies section 1129(a)(9)(A) of the Bankruptcy Code because Article

II.A.1.a of the Plan provides that each holder of an Allowed Administrative Claim will receive

---

[79]    11 U.S.C. § 1129(b).

[80]    11 U.S.C. § 1129(a)(9).

Cash in an amount equal to the Allowed amount of such Claim that is due on or before the Effective Date (or, if payment is not then due, as it becomes due in the ordinary course). The Plan also satisfies section 1129(a)(9)(B) of the Bankruptcy Code because no holders of the types of Claims specified by 1129(a)(9)(B) of the Bankruptcy Code are Impaired under the Plan and such Claims generally have been paid in the ordinary course pursuant to the Court's orders on various first day motions.[81] Finally, the Plan satisfies section 1129(a)(9)(C) of the Bankruptcy Code because Article II.A.1.d provides that holders of Allowed Priority Tax Claims will be treated in accordance with the terms of section 1129(a)(9)(C) of the Bankruptcy Code.

109.    The Plan thus satisfies each of the requirements of section 1129(a)(9) of the Bankruptcy Code, and no party has asserted otherwise.

**J.      At Least One Class of Impaired, Non-Insider Claims Accepted the Plan (Section 1129(a)(10) of the Bankruptcy Code).**

110.    Section 1129(a)(10) of the Bankruptcy Code provides that, to the extent there is an impaired class of claims, at least one such impaired class must accept the plan, "without including any acceptance of the plan by any insider."

111.    As set forth above and in the Voting Declaration, both Voting Classes, which are Impaired under the Plan, voted overwhelmingly to accept the Plan, independent of any insiders' votes. The Plan thus satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code, and no party has asserted otherwise.

---

[81]    *See, e.g.*, the Wages Order.

### K.    The Plan Is Feasible (Section 1129(a)(11) of the Bankruptcy Code).

112.    Section 1129(a)(11) of the Bankruptcy Code requires that the Court find that a plan is feasible.  Specifically, the court must determine that:

> Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan.[82]

113.    To demonstrate that a plan is feasible, it is not necessary for a debtor to guarantee success.[83]  Rather, a debtor must provide only a reasonable assurance of success.[84]  The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds.[85]

114.    The Plan is clearly feasible.  *First*, as set forth in the Disclosure Statement and the Martin Declaration, and as supported by the Winthrop Declaration, the Debtors have thoroughly analyzed and are satisfied as to the ability of the Reorganized Debtors to meet their obligations under the Plan and to continue as a going concern without the need for further financial restructuring.

115.    *Second*, the Debtors have prepared consolidated financial projections for the post-Effective Date period for the one-month remaining for the fiscal year 2020 and the fiscal years ending January 31, 2021 through January 31, 2024, which are attached as Exhibit D to the Disclosure Statement (the "Financial Projections").  As set forth in Section VII.C.2 of the

---

[82]    11 U.S.C. § 1129(a)(11).

[83]    *In re Walker*, 165 B.R. at 1004 (Noting that the "plan must present a workable scheme of reorganization and operation from which there may be a reasonable expectation of success.").

[84]    *Hobson v. Travelstead (In re Travelstead)*, 227 B.R. 638, 651 (D. Md 1998) (*quoting Kane v. Johns-Mansville Corp. (In re Johns-Mansville Corp.)*, 843 F.2d 636, 649 (2d Cir. 1988)); *In re DeLuca*, Nos. 95-11893, 95-11924-AM, 1996 WL 910908 at *22 (E.D. Va. Apr. 12, 1996) ("[T]he debtor must show more than a bare possibility of success; the debtor must show at least a reasonable likelihood of success, that is, that success is more likely than failure").

[85]    *See In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985), *aff'd*, 800 F.2d 581 (6th Cir. 1986).

41

Disclosure Statement, based on the Financial Projections, the Debtors believe they will have sufficient resources to make all payments required pursuant to the Plan and that confirmation is not likely to be followed by liquidation or the need for further reorganization.

116.    And *third*, the Plan eliminates approximately $800 million of the Debtors' funded debt obligations, thereby reducing debt service expenses, and provides for the infusion of an additional $165 million of new equity capital (subject to reduction to no less than $150 million), $375 million under the New ABL Facility and of $350 million of the New First Lien Debt ($15 million of which was added for additional liquidity after the execution of the Restructuring Support Agreement) to, among other uses, support the Reorganized Debtors' operations upon emergence.

117.    As a result, confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.  Thus, the Plan satisfies section 1129(a)(11) of the Bankruptcy Code, and no party has asserted otherwise.

**L.     All Statutory Fees Have Been or Will Be Paid (Section 1129(a)(12) of the Bankruptcy Code).**

118.    Section 1129(a)(12) of the Bankruptcy Code requires the payment of "[a]ll fees payable under section 1930 of title 28 [of the United States Code], as determined by the court at the hearing on confirmation of the plan."

119.    The Plan satisfies section 1129(a)(12) of the Bankruptcy Code because Article II.A.1.b of the Plan provides that all such fees and charges, to the extent not previously paid, will be paid until the closing of the applicable case.

**M.     All Retiree Benefits Will Continue Post-Confirmation (Section 1129(a)(13) of the Bankruptcy Code).**

120.    Section 1129(a)(13) of the Bankruptcy Code requires that all retiree benefits continue post-confirmation at the levels established in accordance with section 1114 of the Bankruptcy Code.

121.    Article II of the Plan provides that all Allowed General Unsecured Claims, including those arising on account of retiree benefits (as defined in section 1114 of the Bankruptcy Code) for which the Debtors are responsible, are unimpaired and will "ride through," unaffected by the Plan.  Additionally, as further described in Article V.G of the Plan, all Benefits Programs will be treated as executory contracts, and will be deemed assumed by the Reorganized Debtors on the Effective Date.

122.    Therefore, the Plan satisfies the requirements of section 1129(a)(13) of the Bankruptcy Code, and no party has asserted otherwise.[86]

**N.      Section 1129(b) is Satisfied.**

123.    As discussed above, the Plan does not comply with section 1129(a)(8) of the Bankruptcy Code.  Section 1129(b)(1) of the Bankruptcy Code provides, however, that, if all applicable requirements of section 1129(a) of the Bankruptcy Code are met other than section 1129(a)(8) of the Bankruptcy Code, the plan may be confirmed so long as the requirements set forth in section 1129(b) of the Bankruptcy Code are satisfied.  To confirm a plan pursuant to these "cramdown" requirements, the plan proponent must show that the plan does not "discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired classes.[87]  The Plan satisfies the cramdown requirements of section 1129(b) of the Bankruptcy Code with respect to the non-accepting Impaired Classes (Class 10 and, potentially, Classes 8 and 9).  Additionally, although Class 10 is deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code, the holder of substantially all of the Interests in such Class is a party to the Restructuring Support Agreement and supports the Plan.

---

[86]    Sections 1129(a)(14) through 1129(a)(16) do not apply to the Plan.

[87]    *See Maharaj v. Stubbs & Perdue, P. A. (In re Maharaj)*, 681 F.3d 558, 562 (4th Cir. 2012) (citing 11 U.S.C. § 1129(b)(1)).

### 1.   The Plan Does Not Unfairly Discriminate Against the Rejecting Classes.

124.   The Bankruptcy Code does not provide a standard for determining when discrimination is "unfair."[88]   Rather, courts typically examine the facts and circumstances of the particular case to determine whether unfair discrimination exists.[89]   At a minimum, the unfair discrimination standard prevents creditors and interest holders with similar legal rights from receiving materially different treatment under the plan without a compelling justification.[90]

125.   A plan does not unfairly discriminate where it provides different treatment to classes composed of dissimilar claims or interests.[91]   Likewise, there is no unfair discrimination if, taking into account the particular facts and circumstances of the case, there is a reasonable basis for the disparate treatment.[92]   Thus, a plan only "unfairly" discriminates in violation of section 1129(b) when "similar claims are treated differently without a reasonable basis for the disparate

---

[88]   *See In re Idearc Inc.*, 423 B.R. 138, 171 (Bankr. N.D. Tex. 2009).

[89]   *See In re Bowles*, 48 B.R. 502, 507 (Bankr. E.D. Va. 1985) ("[W]hether or not a particular plan does [unfairly] discriminate is to be determined on a case-by-case basis. . . ."); *see also In re Kolton*, No. 89-53425, 1990 WL 87007 at *5 (Bankr. W.D. Tex. Apr. 4, 1990) (same); *In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a determination of unfair discrimination requires a court to "consider all aspects of the case and the totality of all the circumstances").

[90]   *See Idearc Inc.*, 423 B.R. at 171 ("[T]he unfair discrimination standard prevents creditors and equity interest holders with similar legal rights from receiving materially different treatment under a proposed plan without compelling justifications for doing so."); *Liberty Nat'l Enters. v. Ambanc La Mesa Ltd. P'ship (In re Ambanc La Mesa Ltd. P'ship)*, 115 F.3d 650, 654 (9th Cir. 1997); *In re Aztec Co.*, 107 B.R. 585, 589–91 (Bankr. M.D. Tenn. 1989); *In re Johns-Manville Corp.*, 68 B.R. 618, 636 (Bankr. S.D.N.Y. 1986), *aff'd*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988).

[91]   *See Ambanc La Mesa Ltd. P'ship*, 115 F.3d at 655; *Aztec Co.*, 107 B.R. at 589–91; *Johns-Manville Corp.*, 68 B.R. at 636.

[92]   *Aztec Co.*, 107 B.R. at 590.

treatment, or a class receives consideration of a value that is greater than the amount of its allowed claims."[93]

126.    Here, all similarly situated holders of Claims and Interests will receive substantially similar treatment and the Plan's classification scheme rests on a legally acceptable rationale. Moreover, the Sponsor Support Party and the Debtors, as holders of substantially all Claims and Interests in Classes 8, 9 and 10, would have voted to support the Plan had such holders been entitled to vote on the Plan in such capacities.

127.    Accordingly, the Plan does not discriminate unfairly in contravention of section 1129(b)(1) of the Bankruptcy Code, and no party has asserted otherwise.

## 2.    The Plan is Fair and Equitable with Respect to the Rejecting Classes.

128.    A plan is "fair and equitable" with respect to an impaired class of claims or interests that rejects the plan (or is deemed to reject the plan) if it complies with the "absolute priority rule,"[94] i.e., if: (a) no holder of a claim or interest in a class junior to such rejecting class receives or retains any distribution under a plan; and (b) no holder of a claim or interest in a class senior to such rejecting class receives or retains under a plan more than 100% of the value it is entitled to under the Plan.[95]

---

[93]    *Health Diagnostics Lab, Inc.*, 551 B.R. at 230 ("A plan unfairly discriminates in violation of § 1129(b) of the Bankruptcy Code only if similar claims are treated differently without a reasonable basis for the disparate treatment, or a class of claims receives consideration of a value greater than the amount of its allowed claims.").

[94]    *See Bryson Properties, XVIII*, 961 F.2d at 503 ("The absolute priority rule was "codified in 11 U.S.C. § 1129(b)(2)(B)(ii) of the Bankruptcy Code and stems from the requirement that a plan must be fair and equitable before it can be confirmed over the objecting dissenting creditors.").

[95]    *See In re Granite Broad. Corp.*, 369 B.R. 120, 140 (Bankr.S.D.N.Y.2007) ("There is no dispute that a class of creditors cannot receive more than full consideration for its claim, and that excess value must be allocated to junior classes of debt or equity, as the case may be."); *In re Trans Max Techs., Inc.*, 349 B.R. 80, 89 (Bankr. D. Nev. 2006) ("One component of the fair and equitable treatment is that a plan may not pay a premium to a senior class.").

129.     No holders of Claims or Interests in any Class junior to the Rejecting Classes are receiving or retaining any distribution under the Plan, and no holders of Claims or Interests in any Class senior to the Rejecting Classes are receiving or retaining more than 100% of the value they are legally entitled to.  Accordingly, the Plan satisfies the absolute priority rule with respect to the Rejecting Classes, and no party has asserted otherwise.  Based on the forgoing, the Plan may be confirmed despite of the deemed rejection by the Rejecting Classes.

**O.      The Plan Complies with the Other Applicable Provisions of Section 1129 of the Bankruptcy Code (Sections 1129(c), (d)).**

130.     The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code. Section 1129(c) of the Bankruptcy Code, which prohibits confirmation of multiple plans, is not implicated because there is only one plan for the Debtors has been proposed.

131.     The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act.  Moreover, no governmental unit or any other party has requested that the Court decline to confirm the Plan on such grounds. Accordingly, the Plan satisfies the requirements of section 1129(d) of the Bankruptcy Code.

132.     Thus, the Plan satisfies the Bankruptcy Code's mandatory confirmation requirements.

**P.      Good Cause Exists to Waive the Stay of the Confirmation Order.**

133.     Bankruptcy Rule 3020(e) provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the Court orders otherwise." Bankruptcy Rules 6004(h) and 6006(d) provide similar stays to orders authorizing the use, sale or lease of property (other than cash collateral) and orders authorizing a debtor to assign an executory contract or unexpired lease under section 365(f) of the Bankruptcy Code.  Each rule also permits modification of the imposed stay upon court order.

134.     Good cause exists for waiving and eliminating any stay of the Confirmation Order pursuant to Bankruptcy Rules 3020, 6004, and 6006 so that the Confirmation Order will be effective immediately upon its entry.  As noted above, these cases, the Plan and the transactions contemplated by the Plan have been negotiated and implemented in good faith and with a high degree of transparency and public dissemination of information, designed to facilitate a fast and efficient path to emergence for the Debtors in the current challenging economic environment.

135.     Given the complexity of the Plan and the various transactions implicated by the Plan, the Debtors may take certain steps to effectuate the Plan in anticipation of and to facilitate the occurrence of the Effective Date so that the Effective Date can occur promptly.  Therefore, good cause exists to waive any stay imposed by the Bankruptcy Rules so that the proposed Confirmation Order may be effective immediately upon its entry.

## **CONCLUSION**

136.     For all of the reasons set forth in this Memorandum, the Martin Declaration, the Winthrop Declaration, the Shapiro Declaration and the First Day Declaration, and as will be further shown at the Combined Hearing, the Debtors respectfully request that the Court: (a) approve the Disclosure Statement; (b) confirm the Plan; and (c) grant such other and further relief as is just and proper.

*[Remainder of page intentionally left blank]*

Dated:  December 14, 2020          */s/ Jennifer E. Wuebker*  _____
Richmond, Virginia                 Tyler P. Brown, Esq.          (VSB No. 28072)
                                   Justin F. Paget, Esq.         (VSB No. 77949)
                                   Jennifer E. Wuebker, Esq. (VSB No. 91184)
                                   **HUNTON ANDREWS KURTH LLP**
                                   Riverfront Plaza, East Tower
                                   951 East Byrd Street
                                   Richmond, Virginia 23219
                                   Telephone:      (804) 788-8200
                                   Facsimile:      (804) 788-8218
                                   Email:          tpbrown@huntonak.com
                                                   jpaget@huntonak.com
                                                   jwuebker@huntonak.com


                                   -and-


                                   Dennis F. Dunne, Esq.     (admitted *pro hac vice*)
                                   Andrew M. Leblanc, Esq. (admitted *pro hac vice*)
                                   Michael W. Price, Esq.    (admitted *pro hac vice*)
                                   Lauren C. Doyle, Esq.     (admitted *pro hac vice*)
                                   **MILBANK LLP**
                                   55 Hudson Yards
                                   New York, New York 10001
                                   Telephone:      (212) 530-5000
                                   Facsimile:      (212) 530-5219
                                    Email:         ddunne@milbank.com
                                                   aleblanc@milbank.com
                                                   mprice@milbank.com
                                                   ldoyle@milbank.com


                                   Thomas R. Kreller, Esq. (admitted *pro hac vice*)
                                   **MILBANK LLP**
                                   2029 Century Park East
                                   33rd Floor
                                   Los Angeles, California 90067
                                   Telephone:      (424) 386-4000
                                   Facsimile:      (213) 629-5063
                                   Email:          tkreller@milbank.com


                                   *Proposed Co-Counsel for Debtors and Debtors in Possession*