Dennis F. Dunne, Esq.      (admitted *pro hac vice*)
Andrew M. Leblanc, Esq.  (admitted *pro hac vice*)
Michael W. Price, Esq.      (admitted *pro hac vice*)
Lauren C. Doyle, Esq.       (admitted *pro hac vice*)
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone:       (212) 530-5000
Facsimile:       (212) 530-5219

Tyler P. Brown, Esq.       (VSB No. 28072)
Justin F. Paget, Esq.       (VSB No. 77949)
Jennifer E. Wuebker, Esq. (VSB No. 91184)
**HUNTON ANDREWS KURTH LLP**
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:       (804) 788-8200
Facsimile:       (804) 788-8218

Thomas R. Kreller, Esq.   (admitted *pro hac vice*)
**MILBANK LLP**
2029 Century Park East
33rd Floor
Los Angeles, California 90067
Telephone:       (424) 386-4000
Facsimile:       (213) 629-5063

*Co-Counsel for Debtors and Debtors in Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| GUITAR CENTER, INC. *et al.*,[1] | ) | Case No. 20-34656 (KRH) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**FINAL ORDER PURSUANT
TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 503,
506, AND 507: (I) AUTHORIZING DEBTORS TO OBTAIN SENIOR SECURED
PRIMING SUPERPRIORITY POSTPETITION FINANCING; (II) AUTHORIZING USE
OF CASH COLLATERAL; (III) GRANTING LIENS AND PROVIDING CLAIMS WITH
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (IV) GRANTING
ADEQUATE PROTECTION; (V) MODIFYING THE AUTOMATIC STAY;
AND (VI) GRANTING RELATED RELIEF**

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are: Guitar Center Holdings, Inc. (3262); Guitar Center, Inc. (0862); Guitar Center Stores, Inc. (4340); GTRC Services, Inc. (9503); GC Business Solutions, Inc. (3928); Guitar Center Gift Card Company, LLC (3370); Music & Arts Instructor Services, LLC (7811); and AVDG, LLC (4440).  The Debtors' service address is 5795 Lindero Canyon Rd., Westlake Village, CA 91362.

Upon the motion (the "Motion"),[2] of the above-captioned debtors and debtors in possession

(collectively, the "Debtors") in the above-captioned chapter 11 cases (collectively, the "Chapter

11 Cases"), for entry of the Interim Order (as defined below) and this final order (together with all

annexes, schedules and exhibits hereto, this "Final Order") pursuant to sections 105, 361, 362,

363(b), 363(c)(2), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 503, 506(c), and 507 of title

11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (as amended, the "Bankruptcy Code"),

Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), and Rules 2002-1, 4001(a)-1, 6004-2, 9013-1 and 9014-1 of the Local Rules

of the United States Bankruptcy Court for the Eastern District of Virginia (the "Local Bankruptcy

Rules"):

(1)    authorizing the Debtors to obtain a superpriority senior secured priming debtor-in-possession term loan credit facility (the "Term DIP Facility"), in an aggregate principal amount of up to $325,000,000 (the "Term DIP Loans"), pursuant to the terms and conditions of the Interim Order and this Final Order and that certain Senior Secured Superpriority Priming Debtor-In-Possession Credit Agreement, dated as of November 24, 2020 and attached hereto as **Exhibit A** (as amended, supplemented, restated or otherwise modified from time to time in accordance with the terms thereof, the "Term DIP Credit Agreement" and together with all agreements, documents, instruments and certificates executed, delivered or filed in connection therewith, as amended, supplemented, restated otherwise modified from time to time in accordance with the terms thereof, collectively, the "Term DIP Loan Documents") by and among Guitar Center, Inc. ("Guitar Center"), as lead borrower (in such capacity, the "DIP Borrower"), the guarantors party thereto (the "DIP Guarantors" and, together with the DIP Borrower, the "DIP Loan Parties"), Delaware Trust Company, as administrative and collateral agent (in such capacities, the "Term DIP Agent"), and the lenders party thereto from time to time (the "Term DIP Lenders" and together with the Term DIP Agent, the "Term DIP Secured Parties");

(2)    authorizing the Debtors to obtain a superpriority senior secured priming debtor-in-possession revolving credit facility (the "ABL DIP Facility," and together with the Term DIP Facility, the "DIP Facilities"), in an aggregate principal amount of up to $50,000,000 (the "ABL DIP Loans," and together with the Term DIP Loans, the "DIP Loans"), pursuant to the terms and conditions of the Interim Order and this Final Order and that certain Senior Secured Superpriority Priming Debtor-in-Possession Credit Agreement, dated as of November 24, 2020 and attached hereto as **Exhibit B** (as amended, supplemented, restated or otherwise modified from time to time

---

[2]    Capitalized terms used but not otherwise defined in this Final Order shall have the meanings given to them in the Motion.

in accordance with the terms thereof, the "ABL DIP Credit Agreement," and together with all agreements, documents, instruments and certificates executed, delivered, or filed in connection therewith, as amended, supplemented, restated otherwise modified from time to time in accordance with the terms thereof, collectively, the "ABL DIP Loan Documents") by and among the DIP Borrower, the DIP Loan Parties, Wells Fargo Bank, National Association, as administrative and collateral agent (in such capacities, the "ABL DIP Agent," and together with the Term DIP Agent, the "DIP Agents"), and the lenders party thereto from time to time (the "ABL DIP Lenders," and together with the ABL DIP Agent, the "ABL DIP Secured Parties");

(3)      authorizing the Debtors to execute, deliver to the Term DIP Secured Parties and the ABL DIP Secured Parties (the Term DIP Secured Parties and the ABL DIP Secured Parties, collectively, the "DIP Secured Parties"), and perform under the Term DIP Credit Agreement and the ABL DIP Credit Agreement (the Term DIP Credit Agreement and the ABL DIP Credit Agreement, collectively, the "DIP Credit Agreements") and the other Term DIP Loan Documents and the other ABL DIP Loan Documents (the Term DIP Loan Documents, the ABL DIP Loan Documents and that certain Intercreditor Acknowledgment dated as of the closing date of the DIP Facilities (the "DIP Intercreditor Acknowledgment"), collectively, the "DIP Loan Documents") and to perform such other and further acts as may be necessary or desirable in connection with the DIP Loan Documents;

(4)      authorizing and directing the Debtors to incur and pay, and for the DIP Guarantors to jointly and severally irrevocably and unconditionally guaranty all  (a) "Obligations" (as defined in the Term DIP Credit Agreement) as such become earned, due and payable in accordance with the applicable DIP Loan Documents (the "Term DIP Obligations"), and (b) all "Obligations" (as defined in the ABL DIP Credit Agreement) as such become earned, due and payable in accordance with the applicable DIP Loan Documents (the "ABL DIP Obligations," and together with the Term DIP Obligations, the "DIP Obligations");

(5)      authorizing the Debtors to borrow, in accordance with the applicable DIP Loan Documents, up to an aggregate principal amount of $325,000,000 of Term DIP Loans and $50,000,000 of ABL DIP Loans (the "Interim Financing") upon entry of the Interim Order to avoid immediate and irreparable harm;

(6)      authorizing and directing the Debtors, upon entry of the Interim Order, to indefeasibly pay the Prepetition ABL Obligations (as defined below), subject to the terms of the Interim Order which are ratified on a final basis by this Final Order;

(7)      granting to the DIP Agents, for the benefit of themselves and the other applicable DIP Secured Parties, and authorizing the Debtors to incur, valid, enforceable, non-avoidable, and automatically and fully perfected liens on and security interests in all DIP Collateral (as defined below), including, without limitation, all Cash Collateral (as defined below), to secure the DIP Obligations, which liens and security interests shall be subject to the rankings and priorities set forth in this Final Order;

(8)      granting to the DIP Secured Parties allowed superpriority administrative expense claims against each of the Debtors, on a joint and several basis, in respect of all DIP Obligations, as set forth in this Final Order;

3

(9)      authorizing the Debtors' use of the proceeds of the DIP Facilities and Cash Collateral, in each case solely in accordance with the Approved Budget (as defined below), and subject to the terms and conditions set forth in the Interim Order and this Final Order and the DIP Loan Documents;

(10)      providing adequate protection, as and to the extent set forth in this Final Order, to the holders of Prepetition Obligations (as defined below);

(11)      approving certain stipulations by the Debtors with respect to the Prepetition Secured Debt Documents (as defined below), the Prepetition Obligations (as defined below), and the Prepetition Collateral;

(12)      modifying or vacating the automatic stay imposed by section 362 of the Bankruptcy Code or otherwise to the extent necessary to implement and effectuate the terms and provisions of this Final Order and the DIP Loan Documents, and waiving any applicable stay (including under Bankruptcy Rule 6004) with respect to the effectiveness and enforceability of this Final Order, and providing for the immediate effectiveness of this Final Order;

(13)      authorizing the Debtors to waive (a) their right to surcharge the DIP Collateral and the Prepetition Collateral, pursuant to section 506(c) of the Bankruptcy Code and (b) any right of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code to the extent set forth herein; and

(14)      waiving the equitable doctrine of "marshaling" and other similar doctrines to the extent set forth in this Final Order.

The Court having considered the Motion, the DIP Loan Documents on file with the Court, the *Declaration of Tim Martin of Guitar Center, Inc, in Support of Chapter 11 Petitions and First Day Motions* and any exhibits thereto (the "First Day Declaration"), the Declaration of Eric Winthrop in support of the Motion (the "DIP Declaration"), the pleadings filed with the Court, and the evidence proffered or adduced at the interim hearing held on November 23, 2020 (the "Interim Hearing"); and the hearing held before this Court on December 17, 2020 (the "Final Hearing") and notice of the Interim Hearing and Final Hearing having been given in accordance with Bankruptcy Rules 4001 and 9014 and all applicable Local Bankruptcy Rules; the Court having entered the *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 503, 506, and 507: (I) Authorizing The Debtors to Obtain Senior Secured Priming Superpriority Postpetition Financing; (II) Authorizing Use of Cash Collateral; (III) Granting Liens And Providing Claims With Superpriority Administrative Expense Status; (IV) Granting Adequate Protection; (V) Modifying The Automatic Stay; (VI) Scheduling a Final Hearing; And (VII) Granting Related Relief* on November 23, 2020 [Docket No. 81] (the "Interim Order") and all objections, if any, to the final relief requested in the Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that granting the final relief requested in the Motion is fair and reasonable and in the best interests of the Debtors, their estates and their creditors, represents a sound exercise of the Debtors' business judgment and is necessary for the continued operation of the Debtors' businesses; and upon the record of the Chapter 11 Cases; after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**BASED UPON THE RECORD ESTABLISHED AT THE INTERIM AND FINAL HEARINGS, THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**[3]

A.    *Petition Date*.    On November 21, 2020 (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court, commencing these cases (the "Chapter 11 Cases").

B.    *Debtors-in-Possession*.    The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in any of the Chapter 11 Cases.

C.    *Committee Formation*.    As of the date of this Final Order, the United States Trustee (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in the Chapter 11 Cases (the "Official Committee").

D.    *Jurisdiction and Venue*.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Standing Order of Reference from the United States District Court for the Eastern District of Virginia*, dated August 15, 1984.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The bases for the relief requested in this Motion are sections 105, 361, 362, 363, 364, 503, 506, and 507 of the Bankruptcy Code; rules 2002, 4001, 6003, 6004, and 9014 of the Bankruptcy Rules, and rule 9013-1 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Virginia (the "Local Bankruptcy Rules").

E.    *Debtors' Stipulations*.    After consultation with their attorneys and financial advisors, and without prejudice to the rights of parties-in-interest as set forth in paragraph 32 of

---

[3]    Where appropriate in this Final Order, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

this Final Order, the Debtors, on their behalf and on behalf of their estates, hereby admit,

acknowledge, stipulate and agree as follows:

(i)    <u>Prepetition ABL Facility</u>.  Pursuant to that certain Credit Agreement, dated as of April 2, 2014 (as amended, supplemented, restated, amended and restated, or otherwise modified from time to time prior to, and as in effect on, the Petition Date, the "<u>Prepetition ABL Credit Agreement</u>" and, together with all other agreements, documents, instruments, and certificates executed or delivered in connection therewith, including the Prepetition Secured Parties Intercreditor Agreement and the Prepetition ABL Payoff Letter (each as defined below), collectively, the "<u>Prepetition ABL Loan Documents</u>") by and among (a) Guitar Center, as lead borrower, and each of the other borrowers from time to time party thereto (collectively, the "<u>Prepetition ABL Borrowers</u>"), (b) the guarantors party thereto (the "<u>Prepetition ABL Guarantors</u>" and, together with the Prepetition ABL Borrowers, the "<u>Prepetition ABL Loan Parties</u>"), (c) the lenders party thereto from time to time (the "<u>Prepetition ABL Lenders</u>"), and (d) Wells Fargo Bank, National Association, as administrative agent and collateral agent (the "<u>Prepetition ABL Agent</u>" and, together with the Prepetition ABL Lenders and the other "Secured Parties" as defined in the Prepetition ABL Credit Agreement, the "<u>Prepetition ABL Secured Parties</u>"), the Prepetition ABL Lenders provided a revolving credit facility and certain other financial accommodations (the "<u>Prepetition ABL Facility</u>"), to the Prepetition ABL Borrowers.

(ii)    <u>Prepetition ABL Facility Obligations</u>.  As of the Petition Date, without defense, counterclaim, or offset of any kind, the Prepetition ABL Loan Parties were jointly and severally indebted to the Prepetition ABL Lenders in the aggregate principal amount of not less than approximately $279 million, plus approximately $7.55 million in face amount of outstanding and undrawn letters of credit issued under the Prepetition ABL Loan Documents (collectively the "<u>Letters of Credit</u>"), <u>plus</u> any other amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Prepetition ABL Loan Documents, including, without limitation, accrued and unpaid interest, premiums, reimbursement obligations (contingent or otherwise), any fees, expenses and disbursements (including, without limitation, attorneys' and financial advisors' fees and expenses), indemnification obligations, any other charges, amounts and costs of whatever nature that may be due, owing, or chargeable in connection therewith, in each case, as and to the extent provided for in the Prepetition ABL Loan Documents (collectively, the "<u>Prepetition ABL Obligations</u>").

(iii)    <u>Prepetition ABL Liens and Collateral</u>.  To secure the Prepetition ABL Obligations, each of the Prepetition ABL Loan Parties granted to the Prepetition ABL Agent, for the benefit of itself and the other Prepetition ABL Secured Parties, properly perfected continuing liens on and security interests in (collectively, the "<u>Prepetition ABL Liens</u>") all "Collateral" (as defined in the Prepetition ABL Credit Agreement) (the "<u>Prepetition ABL Collateral</u>"), subject to the terms of the Prepetition Secured Parties Intercreditor Agreement.  In accordance with the Prepetition Intercreditor Agreements (as defined below), the Prepetition ABL Liens consist of: (a) first priority liens on and security interests in all "ABL Priority Collateral" as defined in the Prepetition Secured Parties Intercreditor Agreement (collectively, the "<u>ABL Priority Collateral</u>"); and (b) third priority liens on and security interests in all "Notes Priority Collateral" as defined in

the Prepetition Secured Parties Intercreditor Agreement (collectively, the "Notes Priority Collateral").

(iv)    Prepetition Superpriority Notes.  Pursuant to that certain Indenture, dated as of May 15, 2020 (as amended, supplemented, restated, amended and restated or otherwise modified from time to time prior to, and as in effect on, the Petition Date, the "Superpriority Notes Indenture" and, together with all other agreements, documents, instruments, and certificates executed or delivered in connection therewith, including the Prepetition Intercreditor Agreements, the "Superpriority Notes Documents"), among: (a) Guitar Center, as issuer (the "Superpriority Notes Issuer"); (b) the guarantors party thereto (the "Superpriority Notes Guarantors" and, together with the Superpriority Notes Issuer, the "Superpriority Notes Parties"); and (c) The Bank of New York Mellon Trust Company, N.A., as indenture trustee and notes collateral agent (the "Superpriority Notes Trustee"), Guitar Center issued 10.00% senior secured superpriority notes due May 2022 (the "Superpriority Notes", and the holders of such Superpriority Notes, the "Superpriority Noteholders").

(v)    Prepetition Superpriority Notes Obligations.  As of the Petition Date, without defense, counterclaim, or offset of any kind, the Superpriority Notes Parties are jointly and severally indebted to the Superpriority Notes Trustee and the Superpriority Noteholders in the aggregate principal amount of approximately $35.8 million plus approximately $2.1 million of accrued but unpaid interest and approximately $6.3 million of prepayment premium, plus any other amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Superpriority Notes Documents, including, without limitation, principal, accrued and unpaid interest (including at the default rate), premiums, makewholes, any reimbursement obligations (contingent or otherwise), exit payments, any fees, expenses and disbursements (including, without limitation, attorneys' fees, financial advisors' fees, related expenses, and disbursements), indemnification obligations, any other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect thereof, in each case, to the extent provided in the Superpriority Notes Documents (collectively, the "Prepetition Superpriority Notes Obligations").

(vi)    Prepetition Superpriority Notes Collateral.  To secure the Superpriority Notes Obligations, the Superpriority Notes Parties granted to the Superpriority Notes Trustee, for the benefit of the Superpriority Noteholders, properly perfected continuing liens on and security interests in (collectively, the "Superpriority Notes Liens") all "Collateral" (as defined in the Superpriority Notes Indenture) (the "Superpriority Notes Collateral"), subject to the terms of the Prepetition Intercreditor Agreements.    In accordance with the Prepetition Intercreditor Agreements, the Superpriority Note Liens consist of: (a) first priority liens on and security interests in all Notes Priority Collateral; and (b) second priority liens on and security interests in all ABL Priority Collateral.

(vii)    Prepetition Senior Secured Notes.  Pursuant to that certain Indenture, dated as of March 16, 2018 (as amended, supplemented, restated, amended and restated or otherwise modified from time to time, the "Senior Secured Notes Indenture" and, together with all other agreements, documents, instruments and certificates executed or delivered in connection therewith, including the Prepetition Intercreditor Agreements, the "Senior Secured Notes Documents"; the Senior Secured Notes Documents, together with the Superpriority Notes

7

Documents, the "Prepetition Notes Documents"; the Prepetition Notes Documents, together with the Prepetition ABL Loan Documents, the "Prepetition Secured Debt Documents"), among: (a) Guitar Center Escrow Issuer Inc. (which merged with and into Guitar Center, with Guitar Center as the surviving entity), as issuer (the "Senior Secured Notes Issuer"); (b) the guarantors party thereto (the "Senior Secured Notes Guarantors" and, together with the Senior Secured Notes Issuer, the "Senior Secured Notes Parties"; the Senior Secured Notes Parties, together with the Superpriority Notes Parties, the "Prepetition Notes Parties"); and (c) The Bank of New York Mellon Trust Company, N.A., as indenture trustee and notes collateral agent (the "Senior Secured Notes Trustee" and, together with the Superpriority Notes Trustee, the "Prepetition Secured Notes Trustees"; the Prepetition Secured Notes Trustees, together with the Prepetition ABL Agent, the "Prepetition Agents"), Guitar Center issued 9.50% senior secured notes due October 2021 (the "Senior Secured Notes" and, together with the Superpriority Notes, the "Prepetition Notes"; the holders of the Senior Secured Notes, the "Senior Secured Noteholders" and, together with the Superpriority Noteholders, the "Prepetition Noteholders"; the Prepetition Noteholders, together with the Prepetition Secured Notes Trustees, the "Prepetition Notes Secured Parties"; the Prepetition Noteholders, together with the Prepetition ABL Lenders, the "Prepetition Secured Lenders"; the Prepetition Notes Secured Parties, together with the Prepetition ABL Secured Parties, the "Prepetition Secured Parties").[4]

(viii)    Prepetition Senior Secured Notes Obligations.  As of the Petition Date, without defense, counterclaim, or offset of any kind, the Senior Secured Notes Parties were jointly and severally indebted to the Senior Secured Notes Trustee and the Senior Secured Noteholders in the aggregate principal amount of $640 million, plus approximately $36.5 million of accrued but unpaid interest, plus any other amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the Senior Secured Notes Documents, including, without limitation, principal, accrued and unpaid interest (including at the default rate), premiums, makewholes, any reimbursement obligations (contingent or otherwise), exit payments, any fees, expenses and disbursements (including, without limitation, attorneys' fees, financial advisors' fees, related expenses and disbursements), indemnification obligations, and any other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect thereof, in each case, to the extent provided in the Senior Secured Notes Documents (collectively, the "Prepetition Senior Secured Notes Obligations" and, together with the Prepetition Superpriority Notes Obligations, the "Prepetition Notes Obligations"; the Prepetition Notes Obligations, together with the Prepetition ABL Obligations, the "Prepetition Obligations").

(ix)    Prepetition Senior Secured Notes Collateral.  To secure the Prepetition Senior Secured Notes Obligations, the Senior Secured Notes Parties granted to the Senior Secured Notes Trustee, for the benefit of the Senior Secured Noteholders, properly perfected continuing liens on and security interests in (collectively, the "Senior Secured Notes Liens" and together with the Superpriority Notes Liens, the "Prepetition Notes Liens"; the Prepetition Notes Liens, together with the Prepetition ABL Liens, the "Prepetition Liens") all "Collateral" (as defined in the Senior

---

[4]    All references to the consent of a Prepetition Agent in this Final Order shall mean the consent of such Prepetition Agent, at the direction of the "Required Lenders," under the applicable Prepetition Secured Debt Documents.

Secured Notes Indenture) (the "Senior Secured Notes Collateral" and, together with the Superpriority Notes Collateral, the "Prepetition Notes Collateral"; the Prepetition Notes Collateral, together with the Prepetition ABL Collateral, the "Prepetition Collateral"), subject to the terms of the Prepetition Intercreditor Agreements. In accordance with the Prepetition Intercreditor Agreements, the Senior Secured Note Liens consist of: (a) second priority liens on and security interests in all Notes Priority Collateral; and (b) third priority liens on and security interests in all ABL Priority Collateral.

(x)    Validity and Enforceability of Prepetition Liens and Prepetition Obligations. (a) The Prepetition Liens are valid, binding, enforceable, non-avoidable, and perfected liens, with priority over any and all other liens (other than liens expressly permitted to be senior to such Prepetition Liens under a Prepetition Secured Debt Document, but solely to the extent permitted under the applicable Prepetition Secured Debt Document and only to the extent such permitted liens were existing, valid, enforceable, properly perfected, and non-avoidable as of the Petition Date or perfected subsequent to the Petition Date as permitted by 546(b) of the Bankruptcy Code (collectively, the "Permitted Prior Senior Liens")[5]), subject to the terms of the Prepetition Intercreditor Agreements; (b) the Prepetition ABL Obligations constitute legal, valid, binding, and non-avoidable obligations of the Prepetition ABL Loan Parties, enforceable in accordance with the terms of the Prepetition ABL Loan Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), the aggregate value of the ABL Priority Collateral exceeds the amount of the Prepetition ABL Obligations and the Prepetition ABL Obligations constitute allowed, secured claims within the meaning of sections 502 and 506 of the Bankruptcy Code; (c) the Prepetition Superpriority Notes Obligations constitute legal, valid, binding and non-avoidable obligations of the Superpriority Notes Parties, enforceable in accordance with the terms of the Superpriority Notes Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code); (d) the Prepetition Senior Secured Notes Obligations constitute legal, valid, binding, and non-avoidable obligations of the Senior Secured Notes Parties, enforceable in accordance with the terms of the Senior Secured Notes Documents (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code); and (e) the Debtors and their estates hold no valid or enforceable claims (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses, or setoff rights of any kind against any of the Prepetition Secured Parties, and waive, discharge and release any right they may have to: (A) challenge the validity, enforceability, priority, security and perfection of any of the Prepetition Obligations, the Prepetition Secured Debt Documents or the Prepetition Liens, respectively; and (B) assert any and all claims (as defined in the Bankruptcy Code) or causes of action against any of the Prepetition Secured Parties, and each of their respective officers, directors, equity holders, members, partners, subsidiaries, affiliates, funds, managers, managing members, employees, advisors, principals, attorneys, professionals, accountants, investment bankers, consultants, agents, and other representatives (in each case, in their respective capacities

---

[5]    Nothing herein shall constitute a finding or a ruling by this Court that any alleged Permitted Prior Senior Lien is valid, senior, enforceable, prior, perfected, or non-avoidable. Moreover, nothing shall prejudice the rights of any party-in-interest, including, but not limited to the Debtors, the DIP Agents, the Prepetition Secured Parties or the Official Committee, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged Permitted Prior Senior Lien. For the avoidance of doubt, as used in this Final Order, no reference to the Permitted Prior Senior Liens shall refer to or include any of the Prepetition Liens.

as such), whether arising at law or in equity, including any recharacterization, subordination, avoidance, or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other similar provisions of applicable state or federal law, in each case, arising out of, based upon or related to the Prepetition Secured Debt Documents, the Prepetition Liens or the Prepetition Obligations, as applicable.

(xi)    _Enforceability of Prepetition Intercreditor Agreements_.  The relative rights and remedies of the Prepetition ABL Secured Parties, on one hand, and the Prepetition Notes Secured Parties, on the other hand, and the relative priority of their respective security interests in any shared or common Prepetition Collateral are governed by that certain Amended & Restated Intercreditor Agreement dated as of May 15, 2020 (as amended, supplemented or otherwise modified from time to time) by and among the Debtors, the Prepetition ABL Agent, the Senior Secured Notes Trustee, and the Superpriority Notes Trustee (the "_Prepetition Secured Parties Intercreditor Agreement_").  The relative rights and remedies of the Prepetition Notes Secured Parties, and the relative priority of their respective security interests in any shared or common Prepetition Collateral are governed by that certain Intercreditor Agreement dated as of May 15, 2020 (as amended, supplemented or otherwise modified from time to time) by and among the Debtors and the Prepetition Secured Notes Trustees (the "_Prepetition Notes Intercreditor Agreement_" and, together with the Prepetition Secured Parties Intercreditor Agreement, the "_Prepetition Intercreditor Agreements,_" and together with the DIP Intercreditor Acknowledgment and the intercreditor arrangements set forth in this Final Order, the "_Intercreditor Agreements_").

(xii)    _No Control_.  None of the Prepetition Secured Parties control the Debtors or their properties or operations, have authority to determine the manner in which any Debtors' operations are conducted or are control persons or insiders of the Debtors by virtue of any of the actions taken with respect to, in connection with, related to or arising from the Prepetition Secured Debt Documents.

(xiii)    _Cash Collateral_.  All of the Debtors' cash (subject to amounts required to be held in trust for the benefit of third parties under applicable law but only for so long as such amounts remain unpaid), whether existing on the Petition Date or thereafter, wherever located (including, without limitation, any cash in deposit accounts of the Debtors or otherwise), whether as original collateral or proceeds of other Prepetition Collateral, constitutes cash collateral of the Prepetition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "_Cash Collateral_").

(xiv)    _Default_.  Prior to the Petition Date, the Prepetition Notes Parties were in default under the Prepetition Notes Documents due to the failure to make scheduled interest payments.  As of the Petition Date, the aforementioned defaults are continuing, and the Prepetition Notes Parties are also in default under the Prepetition Notes Documents on account of entry into the Chapter 11 Cases.

F.    _Release_.  Effective upon entry of the Interim Order, and as hereby ratified on a final basis, each Debtor has stipulated and agreed and hereby stipulates and agrees that it absolutely, unconditionally and irrevocably releases and forever discharges and acquits the DIP Secured

Parties and, subject to the rights of parties-in-interest as set forth in paragraph 32 of this Final

Order the Prepetition Secured Parties, and each of their respective representatives (solely in their

respective capacities as such, collectively, the "Released Parties"), of and from any and all

obligations and liabilities to such Debtor (and its successors and assigns) and from any and all

claims, counterclaims, demands, defenses, offsets, debts, accounts, contracts, liabilities, actions

and causes of action of any kind, nature or description, whether matured or unmatured, known or

unknown, asserted or unasserted, foreseen or unforeseen, accrued or unaccrued, suspected or

unsuspected, liquidated or unliquidated, pending or threatened, arising in law or equity, upon

contract or tort or under any state or federal law or otherwise, arising out of or related to (as

applicable) the Interim Order, this Final Order, the Prepetition Secured Debt Documents, the DIP

Loan Documents, the Term DIP Commitment Letter (as defined below), the obligations owing and

the financial obligations made thereunder, the negotiation thereof and of the deal reflected thereby,

and the obligations and financial obligations made thereunder, in each case that such Debtor at any

time had, now has or may have, or that their successors or assigns hereafter has or may have against

any of the Released Parties for or by reason of any act, omission, matter, cause or thing whatsoever

arising at any time on or prior to the date of this Final Order, including, without limitation, (a) any

so-called "lender liability" or equitable subordination or recharacterization claims or defenses,

(b) any and all claims and causes of action arising under the Bankruptcy Code, and (c) any and all

claims and causes of actions with respect to the validity, priority, perfection, or avoidability of the

liens or claims of the DIP Secured Parties and the Prepetition Secured Parties.  For the avoidance

of doubt, nothing in this release shall relieve the DIP Secured Parties of their obligations under the

DIP Loan Documents from and after the date of this Final Order.

      G.      Findings Regarding Postpetition Financing.

(i)      Request for Postpetition Financing.  The Debtors have sought authority to: (a) enter into the DIP Facilities on the terms described in the Interim Order, this Final Order and in the DIP Loan Documents; and (b) use Cash Collateral on the terms described in the Interim Order, this Final Order and in the DIP Loan Documents in order to administer the Chapter 11 Cases and fund the operation of their businesses.  Notice of the Final Hearing and Final Order has been provided in accordance with the Interim Order.  Good cause has been shown for the entry of this Final Order.

(ii)      Priming of Certain Prepetition Liens.  The priming of certain of the Prepetition Liens on certain of the Prepetition Collateral under section 364(d)(1) of the Bankruptcy Code, as contemplated by this Final Order and the DIP Facilities and as further described below, will enable the Debtors to obtain the DIP Facilities and, among other benefits, to continue to operate their businesses for the benefit of their estates and stakeholders.  The Superpriority Notes Trustee, on behalf of the Superpriority Noteholders, and the Senior Secured Notes Trustee, on behalf of the Senior Secured Noteholders, consent or are deemed to consent to the priming of the Superpriority Notes Liens and the Senior Secured Notes Liens, as applicable, and have no objection to the adequate protection thereof as provided in this Final Order.

(iii)      Need for Postpetition Financing and Use of Cash Collateral.  The Debtors' need to use Cash Collateral on a final basis and to obtain credit pursuant to the DIP Facilities on a final basis, as provided for in this Final Order, is necessary to enable the Debtors to continue operations, administer the Chapter 11 Cases, and preserve the value of their estates.  The ability of the Debtors to maintain business relationships with their vendors, suppliers, and customers, pay their employees and otherwise finance their operations requires the availability of working capital from the DIP Facilities and the use of Cash Collateral.  Without the ability to access the DIP

Facilities and the authority to use Cash Collateral, the Debtors' chances for a successful

reorganization and exit from the Chapter 11 Cases would be jeopardized.  The Debtors do not have

sufficient available sources of unencumbered working capital and financing to operate their

businesses or maintain their properties in the ordinary course of business without the DIP Facilities

and authorized use of Cash Collateral.  The terms of the DIP Facilities and the DIP Loan

Documents are fair and reasonable and reflect the Debtors' exercise of sound business judgment

and are supported by reasonably equivalent value.

　　　　　(iv)    No Credit Available on More Favorable Terms.    Given their current

financial condition, financing arrangements, and capital structure, the Debtors have been unable

to obtain financing from sources other than the Term DIP Lenders and the ABL DIP Lenders

(collectively, the "DIP Lenders") on terms more favorable than those provided under the DIP

Facilities and the DIP Loan Documents.  The Debtors have been unable to obtain sufficient

unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy

Code.  The Debtors also have been unable to obtain sufficient credit: (a) having priority over

administrative expenses of the kind specified in sections 503(b), 507(a), and 507(b) of the

Bankruptcy Code; (b) secured by a lien on property of the Debtors and their estates that is not

otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtors and

their estates that is subject to a lien.  Postpetition financing is not otherwise available without

granting the DIP Agents, for the benefit of themselves and the applicable DIP Lenders: (1) the DIP

Liens on all DIP Collateral, as set forth in this Final Order; (2) the Superpriority DIP Claims (as

defined below); and (3) the other protections set forth in this Final Order and the DIP Loan

Documents.  After considering all alternatives, the Debtors have properly concluded, in the

exercise of their sound business judgment, that the DIP Facilities represent the best financing available to them at this time and is in the best interests of all of their stakeholders.

(v)    Use of Proceeds of the DIP Facilities and Cash Collateral.  As a condition to entry into the DIP Credit Agreements, the extension of credit under the DIP Facilities and the authorization to use Cash Collateral (including, without limitation, the proceeds of the DIP Facilities), the DIP Agents and the DIP Lenders require, and the Debtors have agreed, that Cash Collateral and the proceeds of the DIP Facilities shall be used only in a manner consistent with the terms and conditions of the DIP Loan Documents, the Interim Order and this Final Order, and solely in accordance with and subject to the Approved Budget and the Permitted Variances thereto.

H.    Adequate Protection.  The Prepetition Secured Notes Trustees and the Prepetition Secured Noteholders have consented or are deemed to have consented to the subordination of their Prepetition Notes Liens to the DIP Liens, and the Prepetition Agents and Prepetition Secured Lenders have agreed or are deemed hereby to have agreed to permit the Debtors' use of Prepetition Collateral (including Cash Collateral), in each case, in accordance with and subject to the terms of this Final Order, the Approved Budget and the DIP Loan Documents.  The Prepetition Secured Parties are entitled, pursuant to sections 361, 362, 363, and 364 of the Bankruptcy Code, to adequate protection against the diminution in value of their respective interests in the Prepetition Collateral (including Cash Collateral) resulting from, among other things: (a) the use, sale or lease by the Debtors (or other decline in value) of the Prepetition Collateral (including Cash Collateral); (b) the imposition of the Carve Out (as defined below) and the DIP Liens; and (c) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, the "Diminution in Value"), as and to the extent set forth in this Final Order; provided that nothing in this Final Order or the DIP Loan Documents shall (x) be construed as the affirmative consent by

14

any of the Prepetition Secured Parties for the use of Cash Collateral other than on the terms set forth in this Final Order and in the context of the DIP Facilities authorized by this Final Order or (y) without limiting the effect of the Prepetition Secured Debt Documents, be construed as a consent by any party to the terms of any other financing or any other lien encumbering the Prepetition Collateral (whether senior or junior) or (z) prejudice, limit or otherwise impair the rights of any of the Prepetition Secured Parties to seek new, different or additional adequate protection or assert the interests of any of the Prepetition Secured Parties, and the rights of any other party in interest, including the Debtors, to object to such relief are hereby preserved.

I.      Sections 506(c) and 552(b).  As a material inducement to the DIP Lenders to agree to provide the DIP Facilities, and in exchange for: (a) the DIP Secured Parties' agreement to subordinate their liens and superpriority claims to the Carve Out; (b) the Prepetition Notes Secured Parties' agreement to subordinate their Prepetition Notes Liens and the Noteholder Adequate Protection Liens (defined below) to the DIP Liens, the Superpriority DIP Claims and the Carve Out and (c) the Prepetition Secured Parties' consent to the use of Cash Collateral in accordance with and subject to the Approved Budget, the DIP Loan Documents, and the terms of the Interim Order and this Final Order, each of the DIP Agents, the DIP Lenders and the Prepetition Secured Parties is entitled to (1) a waiver of any "equities of the case" exceptions or claims under section 552(b) of the Bankruptcy Code and (2) a waiver of the provisions of section 506(c) of the Bankruptcy Code.

J.      Good Faith of the DIP Secured Parties.

(i)      Willingness to Provide Financing.  The DIP Lenders have indicated a willingness to provide postpetition financing to the Debtors subject to, among other things: (a) the entry by the Court of the Interim Order and this Final Order; (b) approval by the Court of the terms

and conditions of the DIP Facilities and the DIP Loan Documents and of the satisfaction of the

Prepetition ABL Obligations and termination of the Prepetition ABL Credit Agreement as

contemplated by the Interim Order and this Final Order; and (c) findings by the Court that such

financing is essential to the Debtors' estates, that the DIP Secured Parties are extending

postpetition credit to the Debtors pursuant to the DIP Loan Documents, the Interim Order and this

Final Order in good faith, and that the DIP Secured Parties' claims, superpriority claims, security

interests and liens and other protections granted pursuant to the Interim Order, this Final Order

and the DIP Loan Documents will have the protections provided in section 364(e) of the

Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur,

amendment, reargument or reconsideration of the Interim Order, this Final Order or any other

order.

(ii)    <u>Business Judgment and Good Faith Pursuant to Section 364(e)</u>.  The terms

and conditions of the DIP Facilities, including the extension of credit, the fees and other amounts

paid and to be paid thereunder, and the Cash Collateral arrangements described in the DIP

Facilities and in the Interim Order and this Final Order: (a) are fair and reasonable; (b) are the best

available to the Debtors under the circumstances; (c) reflect the Debtors' exercise of prudent

business judgment consistent with their fiduciary duties; and (d) are supported by reasonably

equivalent value and fair consideration.  The DIP Facilities and the use of Cash Collateral were

negotiated in good faith and at arms' length among the Debtors, the DIP Secured Parties and the

Prepetition Secured Parties.  The credit extended under the Interim Order and the credit to be

extended under the DIP Facilities shall be deemed to have been so advanced, made, used and/or

extended in good faith, and for valid business purposes and uses, within the meaning of section

364(e) of the Bankruptcy Code, and the DIP Secured Parties are therefore entitled to the protection

and benefits of section 364(e) of the Bankruptcy Code and this Final Order.

K.      Fair Consideration.  All obligations incurred, payments made, and transfers or

grants of security and liens set forth in the Interim Order, this Final Order and/or the DIP Loan

Documents by any Debtor are granted to or for the benefit of the DIP Secured Parties for fair

consideration and reasonably equivalent value, and are granted contemporaneously with the

making of the loans and/or commitments and other financial accommodations secured thereby.

L.      Notice.  Notice of the Final Hearing and the final relief requested in the Motion has

been provided by the Debtors, whether by email, facsimile, overnight courier or hand delivery, to

certain parties-in-interest, including:[6]  (A) the Office of the U.S. Trustee, Attn: Kathryn R.

Montgomery, Esq.; (B) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis;

(C) counsel to (i) the ABL DIP Agent and (ii) the Term DIP Agent; (D) counsel to the Ad Hoc

Group of Noteholders and the Term DIP Lenders; (E) counsel to the Prepetition ABL Agent;

(F) counsel to the Sponsor Support Party; (G) counsel to (i) the Brigade Co-Investor and (ii) the

Carlyle Co-Investor; (H) counsel to the Trustee under each of (i) the Superpriority Notes Indenture,

(ii) the Senior Secured Notes Indenture, (iii) the 2018 Cash/PIK Notes Indenture, and (iv) the 2020

Cash/PIK Notes Indenture; (I) the Securities and Exchange Commission; (J) the Internal Revenue

Service; (K) the United States Attorney's Office in each jurisdiction in which the Debtors operate;

(L) the National Association of Attorneys General, (M) any banking or financial institution that

holds the Debtors' accounts; and (N) all other parties entitled to notice pursuant to Bankruptcy

Rule 2002 (the "Notice Parties").   The Debtors have made reasonable efforts to afford the best

---

[6]   Capitalized terms used but not otherwise defined in this Paragraph L shall have the meanings given to them in the First Day Declaration.

notice possible under the circumstances and such notice is good and sufficient to permit the relief set forth in this Final Order.

M.   <u>Relief Essential</u>.  The Court concludes that entry of this Final Order is in the best interest of the Debtors' estates and creditors, and is necessary, essential and appropriate for the continued operation of the Debtors' businesses and the management and preservation of their assets and properties.

NOW THEREFORE, based upon the foregoing findings and conclusions, the Motion, the First Day Declaration, the DIP Declaration and the record made before the Court with respect to the Motion at the Interim Hearing, the Final Hearing and otherwise, and after due consideration, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, THAT:**

1.   <u>Motion Granted</u>.  The Motion is hereby granted on a final basis, on the terms and conditions set forth in this Final Order and the DIP Loan Documents.  All objections to the relief sought in the Motion or to entry of this Final Order, to the extent not withdrawn, waived, settled, or resolved, and all reservation of rights included in the Motion, are hereby denied and overruled. This Final Order shall become effective immediately upon its entry.

2.   <u>Authorization of the DIP Facilities</u>.

(a)   The DIP Facilities are hereby approved on a final basis.  The Debtors were, by the Interim Order, and hereby are on a final basis expressly and immediately authorized and empowered: (a) to establish the DIP Facilities; (b) to execute, deliver and perform under the DIP Loan Documents, and to borrow, incur, guarantee (as applicable), perform and pay the DIP Obligations and create and grant the DIP Liens on the DIP Collateral in favor of the DIP Agents for the benefit of the DIP Secured Parties, in each case, in accordance with and subject to the terms

18

of this Final Order, the Approved Budget and the DIP Loan Documents; (c) to execute, deliver and perform under any and all other instruments, certificates, agreements, and documents which may be reasonably requested by the DIP Agents or the DIP Lenders; and (d) to take any and all other actions, which may be required, necessary or prudent for the performance by the applicable Debtors under the DIP Facilities or the DIP Loan Documents, the creation and perfection of the DIP Liens or to implement any of the transactions contemplated by the DIP Loan Documents or this Final Order.  Without limiting the foregoing, the Debtors were, by the Interim Order, and hereby are authorized and directed, on a final basis, to pay, in accordance with this Final Order, all DIP Obligations, which shall not be subject to further approval of this Court and shall be non-refundable and not subject to contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, applicable non-bankruptcy law or otherwise in any respect including, without limitation, the non-refundable and irrevocable payment (and the ratification of any premiums or fees paid or payments made prior to the date of the Interim Order, each of which was found to be reasonable and to have been paid in exchange for fair and reasonably equivalent value, and which premiums, payments, and fees were approved upon entry of the Interim Order and hereby are ratified and approved on a final basis) of any and all premiums, payments, fees, costs, and expenses payable pursuant to the DIP Loan Documents, that certain Commitment Letter, dated November 13, 2020 (the "Term DIP Commitment Letter"), or that certain Payment Letter, dated November 13, 2020 (the "Payment Letter").  The DIP Loan Documents represent valid and binding obligations of the Debtors, enforceable against each of the Debtors and their estates, and the DIP Obligations shall be due and payable, in each case, in accordance with the terms of the Interim Order, this Final Order and the DIP Loan Documents.

All premiums, payments, fees, or expenses payable under or in connection with, or related to, the DIP Loan Documents, including without limitation those contained in the Payment Letter are hereby ratified and approved on a final basis.

        (b)     The DIP Obligations shall include, without limitation, principal, interest, fees, premiums, and other payments (including unused facility premiums, fees, or payments, amendment premiums, fees, or payments, early termination premiums, fees, or payments, servicing premiums fees, or payments, audit premiums, fees, or payments, liquidator premiums, fees, or payments, appraisal premiums, fees, or payments,  structuring premiums, fees, or payments, administrative agent's, collateral agent's or trustee's fees, upfront premiums, fees, or payments, closing premiums, fees, or payments, commitment premiums, fees, or payments, exit premiums, fees, or payments, backstop premiums, fees, or payments, and professional fees), and other amounts payable under the DIP Loan Documents, the Term DIP Commitment Letter, the Agent Fee Letter (as defined in the Term DIP Agreement), and the Payment Letter, original issue discount, costs and out-of-pocket expenses, charges, prepayment premiums or similar amounts, any obligations in respect of indemnity claims, whether contingent or absolute, due under the applicable DIP Loan Documents and any other amounts that are or may become due under the applicable DIP Loan Documents (or in any separate letter agreements, including, without limitation, any fee letters between any or all Debtors, on the one hand, and any of the DIP Secured Parties, on the other, in connection with the DIP Facilities) in each case, whether or not such premiums, fees and expenses arose before or after the Petition Date, as such amounts become earned, due and payable under the DIP Loan Documents, without the need to obtain further Court approval; provided that all out of pocket costs and expenses must be reasonable and documented and any professional fees incurred after the Closing Date (as defined in the DIP Credit

Agreements) shall be subject to the procedures set forth in paragraph 27 of this Final Order.  In

accordance with the Interim Order, ratified and approved on a final basis with this Final Order, all

Bank Products (as defined in the Prepetition ABL Credit Agreement), Cash Management Services

(as defined in the Prepetition ABL Credit Agreement) and Letters of Credit issued or provided by

the Prepetition ABL Agent under the Prepetition ABL Agreement continued in place in accordance

with their existing program terms on the Closing Date and all obligations under or in connection

with such Bank Products, Cash Management Services and Letters of Credit were approved and

automatically deemed issued under the ABL DIP Credit Agreement and constituted and continue

to constitute ABL DIP Obligations.

3.    <u>Authorization to Borrow</u>.  The Interim Financing was approved by the Interim

Order and is hereby approved on a final basis.  The DIP Borrower is hereby authorized, on a final

basis, to continue to borrow the  DIP Loans from the DIP Lenders under the applicable DIP

Facilities, subject to the terms and conditions set forth in this Final Order and the applicable DIP

Loan Documents, and the DIP Guarantors are hereby authorized to unconditionally guarantee, on

a joint and several basis, the repayment of all DIP Loans borrowed pursuant to the Interim Order

and this Final Order.  Except as required to fund the Carve Out as set forth in this Final Order (in

which instance, for the avoidance of doubt, no DIP Agent and no DIP Lender shall be required to

exceed its respective outstanding commitment (without giving effect to any DIP Agent's or DIP

Lender's unilateral reduction or termination of such commitment as a result of an Event of

Default)), no DIP Agent and no DIP Lender shall have an obligation to make any loan or advance

any funds under the DIP Loan Documents unless all of the conditions precedent to the making of

such extension of credit under the DIP Loan Documents and this Final Order have been satisfied

in full or waived in accordance with the DIP Loan Documents and the DIP Loan Parties are

otherwise in compliance with the terms of the DIP Loan Documents. The Debtors were authorized to use the proceeds of the DIP Loans to, among others things, pay in full in cash all outstanding Prepetition ABL Obligations pursuant to the terms of the Prepetition ABL Payoff Letter. Such payment was approved pursuant to the Interim Order and is ratified and approved on a final basis with this Final Order.

4. <u>DIP Obligations</u>. This Final Order and the DIP Loan Documents shall evidence the applicable DIP Obligations, which DIP Obligations are valid, binding and enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any estate representative or trustee appointed in any of the Chapter 11 Cases, or upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, or in any other proceedings superseding any of the foregoing (collectively, the "<u>Successor Cases</u>"), and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Cases, and their creditors and other parties-in-interest, in each case, in accordance with the terms of this Final Order and the DIP Loan Documents. No obligation, payment, transfer, or grant of security or lien under the Interim Order, this Final Order and/or under the DIP Loan Documents (including any DIP Obligation or DIP Liens) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, Uniform Voidable Transactions Act or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise), counter-claim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

5.     <u>DIP Liens</u>.

(a)     As security for the DIP Obligations, immediately upon, and effective as of, entry of the Interim Order, the DIP Agents, for the benefit of themselves and each of the other DIP Secured Parties, were each granted (and such grant is hereby ratified and approved on a final basis) continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens on (collectively, the "<u>DIP Liens</u>") all DIP Collateral (subject to the priorities and terms of the Intercreditor Agreements and this Final Order) as collateral security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of all DIP Obligations.

(b)     The term "DIP Collateral" means the Debtors' interest in all assets and properties (whether tangible, intangible, real, personal or mixed), whether now owned by or owing to, or hereafter acquired by, or arising in favor of, the Debtors (including under any trade names, styles, or derivations thereof), and whether owned or consigned by or to, or leased from or to, the Debtors, and regardless of where located, including, without limitation, all of the Debtors' rights, title and interest in: (i) all Prepetition Collateral; (ii) all cash and cash equivalents; (iii) all funds in any deposit account, securities account or other account of the Debtors and all money, cash, cash equivalents, instruments and other property deposited therein or credited thereto from time to time; (iv) all accounts and other receivables; (v) all contract rights; (vi) all instruments, documents and chattel paper; (vii) all securities (whether or not marketable); (viii) all goods, as-extracted collateral, furniture, machinery, equipment, inventory, and fixtures; (ix) all real property interests; (x) all interests in leaseholds, (xi) all franchise rights; (xii) all patents, tradenames, trademarks (other than intent-to-use trademarks), copyrights, licenses, and all other intellectual property; (xiii) all general intangibles, tax or other refunds, or insurance proceeds; (xiv) all equity interests,

23

capital stock, limited liability company interests, partnership interests and financial assets; (xv) all investment property; (xvi) all supporting obligations; (xvii) all letters of credit issued to the Debtors and letter of credit rights; (xviii) all commercial tort claims; (xix) all other claims and causes of action and the proceeds thereof (including those arising pursuant to section 549 of the Bankruptcy Code and all claims and causes of action arising under chapter 5 of the Bankruptcy Code and the proceeds thereof); (xx) all books and records (including, without limitation, customers lists, credit files, computer programs, printouts and other computer materials and records); (xxi) to the extent not covered by the foregoing, all other assets or properties of the Debtors, whether tangible, intangible, real, personal or mixed; and (xxii) all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, including any and all proceeds of any insurance, indemnity, warranty or guaranty payable to such Debtor from time to time with respect to any of the foregoing; provided, however, that the DIP Collateral shall not include Excluded Assets (as defined in the DIP Loan Documents) but shall include the proceeds of Excluded Assets unless such proceeds are also Excluded Assets, and provided, further, that, without a further order of the Court, with respect to the Debtors' non-residential real property leases, no liens or encumbrances shall be granted or extended to such leases themselves under this Final Order, except as permitted in the applicable lease or pursuant to applicable law, but rather any liens granted shall extend only to the proceeds of such leases, books and records of the foregoing, accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds. Subject to the DIP Loan Documents, (A) ABL Priority Collateral, all products and proceeds of ABL Priority Collateral, the ABL DIP Loans, and all products and proceeds of the ABL DIP Loans, shall constitute "ABL DIP Priority Collateral," and (B) Notes Priority Collateral, all products and proceeds of Notes Priority

Collateral, the Term DIP Loans, all products and proceeds of the Term DIP Loans and all other

DIP Collateral that is not ABL DIP Priority Collateral, shall constitute "Term DIP Priority

Collateral."

          (c)     Subject to the provisions herein that state that no liens or encumbrances

shall be granted or extended to the Debtors' non-residential real property leases under this Final

Order, except as permitted in the applicable lease or pursuant to applicable law, but rather any

liens granted shall extend only to the proceeds of such leases, books and records of the foregoing,

accessions and proceeds of the foregoing, wherever located, including insurance or other proceeds,

any provision of any lease, loan document, easement, use agreement, proffer, covenant, license,

contract, organizational document, or other instrument or agreement that requires the consent or

the payment of any fees or obligations to any governmental entity or non-governmental entity in

order for the Debtors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or

leasehold interest or the proceeds thereof or other DIP Collateral, shall have no force or effect with

respect to the DIP Liens on such leasehold interests or other applicable DIP Collateral or the

proceeds of any assignment and/or sale thereof by any Debtor, in favor of the DIP Secured Parties

in accordance with the terms of the DIP Loan Documents and this Final Order or in favor of the

Prepetition Secured Parties in accordance with this Final Order. Nothing in this paragraph 5(c)

shall modify or expand the terms set forth in paragraph 5(b) of this Final Order.

        6.       <u>Priority of DIP Liens</u>.

          (a)     Pursuant to section 364(c) and 364(d) of the Bankruptcy Code, effective as

of entry of the Interim Order and hereby ratified and approved on a final basis by this Final Order,

the DIP Liens securing the Term DIP Obligations (the "<u>Term DIP Liens</u>") are valid, automatically

perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral

interest, lien or claim to any of the DIP Collateral, except that the Term DIP Liens shall be subject to the Carve Out as set forth in this Final Order and shall otherwise be junior only to applicable Permitted Prior Senior Liens and, as to ABL DIP Priority Collateral, the ABL DIP Liens. Pursuant to section 364(c) and 364(d) of the Bankruptcy Code, effective as of entry of the Interim Order and hereby ratified and approved on a final basis by this Final Order, the DIP Liens securing the ABL DIP Obligations (the "ABL DIP Liens") are valid, automatically perfected, non-avoidable, senior in priority and superior to any security, mortgage, collateral interest, lien or claim to any of the DIP Collateral, except that the ABL DIP Liens shall be subject to the Carve Out as set forth in this Final Order and shall otherwise be junior only to applicable Permitted Prior Senior Liens and, as to Term DIP Priority Collateral, (A) the Term DIP Liens, (B) the Prepetition Notes Liens, and (C) the Notes Adequate Protection Liens.

(b)    Except as expressly set forth in this Final Order, the DIP Liens: (i) shall not be made subject to or *pari passu* with (A) any lien or security interest heretofore or hereinafter granted in any of the Chapter 11 Cases or any Successor Cases, and shall be valid and enforceable against the Debtors, their estates, any trustee or any other estate representative appointed or elected in the Chapter 11 Cases or any Successor Cases and/or upon the dismissal of any of the Chapter 11 Cases or any Successor Cases, (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, and (C) any intercompany or affiliate lien; and (ii) shall not be subject to sections 506(c), 510, 549, 550, or 551 of the Bankruptcy Code.

7.    Superpriority DIP Claims. Subject and subordinate to the Carve Out, immediately upon, and effective as of, entry of the Interim Order, (a) the Term DIP Agent, for itself and for the benefit of the Term DIP Lenders, and (b) the ABL DIP Agent, for itself and for the benefit of the

26

ABL DIP Lenders, were each granted (and such grant is hereby ratified and approved on a final basis), pursuant to section 364(c)(1) and 364(e) of the Bankruptcy Code, allowed superpriority administrative expense claims in each of the Chapter 11 Cases or any Successor Cases (the "Superpriority DIP Claims"), on account of all applicable DIP Obligations.  The Superpriority DIP Claims granted to the DIP Agents shall be subject to the Intercreditor Agreements and have the same priorities and rights with respect to the DIP Collateral as they had with respect to Prepetition Collateral of similar kind in the Intercreditor Agreements.  The Superpriority DIP Claims shall have priority over any and all administrative expense claims, unsecured claims, and all other claims against the Debtors or their estates in any of the Chapter 11 Cases or any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses, unsecured claims, or other claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, and (b) which shall at all times be senior to the rights of the Debtors or their estates, and any trustee appointed in the Chapter 11 Cases or any Successor Cases to the extent permitted by law.  The Superpriority DIP Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all DIP Collateral in accordance with this Final Order and the Intercreditor Agreements.

8.    Use of DIP Facilities Proceeds.

(a)    *Use of DIP Facilities Proceeds and Cash Collateral.*  From and after the

Closing Date, the Debtors have been and shall be permitted to draw upon the DIP Facilities, and,

in each case, use the proceeds of the DIP Facilities and Cash Collateral only for the following

purposes, in each case, solely in accordance with and subject to this Final Order, the DIP Loan

Documents and the Approved Budget (subject to the variances permitted in the Term DIP Credit

Agreement (the "Permitted Variances") thereto): (a) the general corporate and working capital

purposes of the Debtors during the Chapter 11 Cases in the ordinary course of business; (b) for the

payment of prepetition amounts as authorized by the Court pursuant to orders approving the first

day motions filed by the Debtors that are in form and substance reasonably acceptable to the

Required Term DIP Lenders and the ABL DIP Agent; (c) to make all payments of costs and

expenses of administration of the Chapter 11 Cases allowed or approved by the Court; (d) to pay

in cash the Prepetition ABL Obligations in accordance with the Prepetition ABL Payoff Letter (as

hereinafter defined); (e) to pay interest, payments, fees, costs and expenses related to the DIP

Facilities, including, without limitation, those set forth in the Term DIP Commitment Letter and

the Agent Fee Letter and the reasonable fees and expenses of the DIP Lender Advisors (as defined

below); (f) to satisfy any adequate protection obligations owing under the Interim Order or this

Final Order; (g) to automatically convert the Letters of Credit, Bank Products and Cash

Management Services into ABL DIP Obligations; (h) to make any other payments permitted by

the Approved Budget (including the payment of interest, fees, other payments, costs, and the

allowed expenses of professionals retained by the Debtors), and (i) to pay (to the extent the Debtors

are otherwise permitted to pay) Transaction Expenses (as defined in the Restructuring Support

Agreement) in accordance with the terms thereof and to make payments pursuant to Section 9(a)(x)

of the Restructuring Support Agreement, to the extent the Debtors are otherwise permitted to make

28

such payments  (with such amounts set forth in this clause (i) being deemed to be included in any

Approved Budget).

(b)      *Payoff of Prepetition ABL Obligations and Automatic Termination of*

*Prepetition ABL Liens*.  In accordance with the Interim Order, the Debtors were authorized on the

Closing Date to draw upon the Interim Financing to pay the Prepetition ABL Obligations

(including, without limitation, accrued and unpaid interest, fees, expenses, legal fees,

disbursements, and other amounts properly chargeable thereunder which, for the avoidance of

doubt, will not include any success or transaction fees of any kind for any professional) in

accordance with that certain payoff letter (the "Prepetition ABL Payoff Letter"), dated November

24, 2020, setting forth the terms and conditions of the satisfaction of the outstanding Prepetition

ABL Obligations (the date the Prepetition ABL Obligations were satisfied in accordance with the

Prepetition ABL Payoff Letter (other than contingent obligations with respect to then unasserted

claims), the "Prepetition ABL Payoff Date"), and such repayment is hereby ratified and approved

on a final basis.  On the Prepetition ABL Payoff Date, in accordance with the Interim Order and

hereby ratified and approved on a final basis, the Prepetition ABL Agent has and was deemed to

have transferred and assigned possession and control of any Prepetition ABL Collateral to the ABL

DIP Agent; *provided*, *however*, that nothing in the Interim Order or this Final Order shall discharge

or otherwise impair the Prepetition ABL Reimbursement and Indemnity Obligations (as defined

below), which shall survive the Prepetition ABL Payoff Date and the termination of any

"Commitments" (as defined in the Prepetition ABL Agreement).  In accordance with the Interim

Order, and as hereby ratified and approved on a final basis, all Bank Products, Cash Management

Services and Letters of Credit previously issued or provided by the Prepetition ABL Agent under

the Prepetition ABL Agreement continued in place on the Closing Date in accordance with their

existing program terms and all obligations under or in connection with such Bank Products, Cash

Management Services and Letters of Credit were automatically deemed issued under the ABL DIP

Credit Agreement and continue to constitute ABL DIP Obligations.

9.    <u>Authorization to Use Cash Collateral</u>.  The Debtors were, by the Interim Order, and

hereby are, on a final basis, authorized to use Cash Collateral in accordance with the Approved

Budget (subject to Permitted Variances) and subject to the terms and conditions of the DIP Loan

Documents and this Final Order.  Nothing in this Final Order shall authorize the disposition of any

assets of the Debtors or their estates outside the ordinary course of business, or the Debtors' use

of Cash Collateral or other proceeds resulting therefrom in each case, except as expressly permitted

in this Final Order and the DIP Loan Documents and in accordance with the Approved Budget and

the Permitted Variances thereto.  The Prepetition Liens on the Prepetition Collateral shall continue

to attach to the Cash Collateral irrespective of the commingling of the Cash Collateral with other

cash.  Any failure by the Debtors on or after the Petition Date to comply with the segregation

requirements of section 363(c)(4) of the Bankruptcy Code in respect of any Cash Collateral shall

not be used as a basis to challenge the Prepetition Obligations, or the extent, validity, enforceability

or perfected status of the Prepetition Liens.

10.    <u>Adequate Protection</u>.  In consideration for the Debtors' use of the Prepetition

Collateral (including Cash Collateral), and to protect the Prepetition Secured Parties against the

Diminution in Value of their interests in the Prepetition Collateral, the Prepetition Secured Parties

shall receive, solely to the extent of any such Diminution in Value, the following adequate

protection:

(a)    *ABL Adequate Protection Liens*.  Solely with respect to the Prepetition ABL

Reimbursement and Indemnity Obligations, until the Prepetition ABL Obligations are Paid in

Full,[7] pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, the Prepetition ABL

Agent, for the benefit of itself and the Prepetition ABL Lenders, effective as of the entry of the

Interim Order, was granted (and such grant is hereby ratified and approved on a final basis)

continuing, valid, binding, enforceable and automatically perfected postpetition liens on all DIP

Collateral (the "ABL Adequate Protection Liens"), which liens will be junior only to (i) the Carve

Out, (ii) Permitted Prior Senior Liens, (iii) the ABL DIP Liens, (iv) the Prepetition ABL Liens,

and (v) with respect to the Term DIP Priority Collateral, (A) the Term DIP Liens, (B) the

Prepetition Notes Liens (C) the Notes Adequate Protection Liens (as defined below), and (D) the

ABL DIP Liens.  The ABL Adequate Protection Liens shall be senior in priority to all other liens

on the DIP Collateral.  Except as provided in this Final Order, the ABL Adequate Protection Liens

shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter

granted or created in any of the Chapter 11 Cases or any Successor Cases and shall be valid and

enforceable against the Debtors, their estates and any successors thereto, including, without

limitation, any trustee appointed in any of the Chapter 11 Cases or any Successor Cases.  The ABL

Adequate Protection Liens shall not be subject to sections 549 or 550 of the Bankruptcy Code.  No

---

[7]    As used in this Final Order, "Paid in Full" means the indefeasible repayment in full in cash of all obligations (including principal, interest, fees, prepayment premiums, expenses, indemnities, other than contingent indemnification obligations for which no claim has been asserted) under the applicable credit facility, the cash collateralization of all treasury and cash management obligations, hedging obligations, and bank product obligations, and the cancelation, replacement, backing or cash collateralization of letters of credit, in each case, in accordance with the terms of the applicable credit facility and, with respect to the Prepetition ABL Obligations, the Prepetition ABL Payoff Letter.  No facility shall be deemed to have been Paid in Full until such time as, with respect to the applicable facility, (a) the commitments to lend thereunder have been terminated, (b) with respect to the Prepetition ABL Obligations, (i) the Challenge Period (as defined below) shall have expired without the timely and proper commencement of a Challenge or (ii) if a Challenge is timely and properly asserted prior to the expiration of the Challenge Period, upon the final, non-appealable disposition of such Challenge; (c) the Prepetition Agent or the DIP Agent for the applicable facility has received (i) a countersigned payoff letter in form and substance satisfactory to such Agent and (ii) releases in form and substance satisfactory to such Agent, each in its sole discretion.

lien or interest avoided and preserved for the benefit of the estates pursuant to section 551 of the

Bankruptcy Code shall be *pari passu* with or senior to the ABL Adequate Protection Liens.

(b)     *Superpriority Notes Adequate Protection Liens*.  Pursuant to sections 361,

363(e), and 364(d) of the Bankruptcy Code, the Superpriority Notes Trustee, for the benefit of

itself and the Superpriority Noteholders, effective as of the entry of the Interim Order, was granted

(and such grant is hereby ratified and approved on a final basis) continuing, valid, binding,

enforceable and automatically perfected postpetition liens on all DIP Collateral (the "Superpriority

Notes Adequate Protection Liens"), which liens shall be junior only to (i) the Carve Out, (ii)

Permitted Prior Senior Liens, (iii) the Term DIP Liens, and (iv) with respect to the ABL DIP

Priority Collateral, (A) the ABL DIP Liens and (B) the ABL Adequate Protection Liens.  The

Superpriority Notes Adequate Protection Liens shall be senior in priority to all other liens on the

DIP Collateral.  Except as provided in this Final Order, the Superpriority Notes Adequate

Protection Liens shall not be made subject to or *pari passu* with any lien or security interest

heretofore or hereinafter granted or created in any of the Chapter 11 Cases or any Successor Cases

and shall be valid and enforceable against the Debtors, their estates and any successors thereto,

including, without limitation, any trustee appointed in any of the Chapter 11 Cases or any

Successor Cases until such time as the Prepetition Superpriority Notes Obligations are Paid in Full.

The Superpriority Notes Adequate Protection Liens shall not be subject to sections 549 or 550 of

the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estates

pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the

Superpriority Notes Adequate Protection Liens.

(c)     *Senior Secured Notes Adequate Protection Liens*.  Pursuant to sections 361,

363(e) and 364(d) of the Bankruptcy Code, the Senior Secured Notes Trustee, for the benefit of

itself and the Senior Secured Noteholders, effective as of the entry of the Interim Order, was granted (and such grant is hereby ratified and approved on a final basis) continuing, valid, binding, enforceable and automatically perfected postpetition liens on all DIP Collateral (the "Senior Secured Notes Adequate Protection Liens", and together with the Superpriority Notes Adequate Protection Liens, the "Notes Adequate Protection Liens"; the Notes Adequate Protection Liens, together with the ABL Adequate Protection Liens, the "Adequate Protection Liens"), which liens shall be junior only to (i) the Carve Out, (ii) Permitted Prior Senior Liens, (iii) the Term DIP Liens, (iv) the Prepetition Superpriority Notes Liens, (v) the Superpriority Notes Adequate Protection Liens and (vi) with respect to the ABL DIP Priority Collateral, (A) the ABL DIP Liens and (B) the ABL Adequate Protection Liens.  The Senior Secured Notes Adequate Protection Liens shall be senior in priority to all other liens on the DIP Collateral.  Except as provided in this Final Order, the Senior Secured Notes Adequate Protection Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted or created in any of the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases or any Successor Cases until such time as the Prepetition Senior Secured Notes Obligations are Paid in Full.  The Senior Secured Notes Adequate Protection Liens shall not be subject to sections 549 or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estates pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Senior Secured Notes Adequate Protection Liens.

(d)     *ABL Superpriority Claim*.  Pursuant to section 507(b) of the Bankruptcy Code, solely with respect to the Prepetition ABL Reimbursement and Indemnity Obligations until the Prepetition ABL Obligations are Paid in Full, the Prepetition ABL Agent, on behalf of itself

33

and the Prepetition ABL Lenders, effective as of the entry of the Interim Order, was granted (and

such grant is hereby ratified and approved on a final basis) an allowed superpriority administrative

expense claim (the "ABL Superpriority Claim"), which claim shall be junior to (i) the Superiority

DIP Claims (except with respect to the ABL DIP Priority Collateral, in respect of which the ABL

Superpriority Claim will be senior to the Superpriority DIP Claim of the Term DIP Agent), (ii) the

Carve Out, and (iii) the Notes Superpriority Claims (except with respect to the ABL DIP Priority

Collateral).   The ABL Superpriority Claim shall be senior to and have priority over any other

administrative expense claims, unsecured claims, and all other claims against the Debtors or their

estates in any of the Chapter 11 Cases or any Successor Cases, at any time existing or arising, of

any kind or nature whatsoever, including, without limitation, administrative expenses or other

claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365,

503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy

Code, and any other provision of the Bankruptcy Code, whether or not such expenses or claims

may become secured by a judgment lien or other non-consensual lien, levy, or attachment.   The

ABL Superpriority Claim shall be considered an administrative expense allowed under section

503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall

be payable from and have recourse to all DIP Collateral in accordance with this Final Order.

Except as provided in this Final Order, the ABL Superpriority Claim shall not be made subject to

or *pari passu* with any claim heretofore or hereinafter granted or created in any of the Chapter 11

Cases or any Successor Cases and shall be valid and enforceable against the Debtors, their estates

and any successors thereto, including, without limitation, any trustee appointed in any of the

Chapter 11 Cases or any Successor Cases until such time as the Prepetition ABL Obligations are

Paid in Full.

34

(e)     *Superpriority Notes Superpriority Claim*.  Pursuant to section 507(b) of the
Bankruptcy Code, the Superpriority Notes Trustee, on behalf of itself and the Superpriority
Noteholders, effective as of the entry of the Interim Order, was granted (and such grant is hereby
ratified and approved on a final basis) an allowed superpriority administrative expense claim (the
"Superpriority Notes Superpriority Claim"), which claim shall be junior to (i) the ABL
Superpriority Claim with respect to the Priority ABL Collateral (solely with respect to the
Prepetition ABL Reimbursement and Indemnity Obligations), (ii) the Superiority DIP Claims
(except with respect to the Term DIP Priority Collateral, in respect of which the Superpriority
Notes Superpriority Claim will be senior to the Superpriority DIP Claim of the ABL DIP Agent),
and (iii) the Carve Out.  The Superpriority Notes Superpriority Claim shall be senior to and have
priority over any other administrative expense claims, unsecured claims, and all other claims
against the Debtors or their estates in any of the Chapter 11 Cases or any Successor Cases, at any
time existing or arising, of any kind or nature whatsoever, including, without limitation,
administrative expenses or other claims of the kinds specified in or ordered pursuant to sections
105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113,
and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, whether or
not such expenses or claims may become secured by a judgment lien or other non-consensual lien,
levy, or attachment.  The Superpriority Notes Superpriority Claim shall be considered an
administrative expense allowed under section 503(b) of the Bankruptcy Code, shall be against each
Debtor on a joint and several basis, and shall be payable from and have recourse to all DIP
Collateral; provided, however that the Superpriority Notes Superpriority Claims shall not be
payable from or have recourse to the ABL DIP Priority Collateral until the ABL DIP Obligations
and the Prepetition ABL Obligations are Paid in Full.  Except as provided in this Final Order, the

35

Superpriority Notes Superpriority Claim shall not be made subject to or *pari passu* with any claim heretofore or hereinafter granted or created in any of the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases or any Successor Cases until such time as the Prepetition Superpriority Notes Obligations are Paid in Full.

(f)    *Senior Secured Notes Superpriority Claim.*  Pursuant to section 507(b) of the Bankruptcy Code, the Senior Secured Notes Trustee, on behalf of itself and the Senior Secured Noteholders, effective as of the entry of the Interim Order, was granted (and such grant is hereby ratified and approved on a final basis) an allowed superpriority administrative expense claim (the "Senior Secured Notes Superpriority Claim", and together with the Superpriority Notes Superpriority Claim, the "Notes Superpriority Claims"), which claim shall be junior to (i) the ABL Superpriority Claims with respect to the Priority ABL Collateral (solely with respect to the Prepetition ABL Reimbursement and Indemnity Obligations), (ii) the Superiority DIP Claims (except with respect to the Term DIP Priority Collateral, in respect of which the Senior Secured Notes Superpriority Claim will be senior to the Superpriority DIP Claim of the ABL DIP Agent), (iii) the Superpriority Notes Superpriority Claim, and (iv) the Carve Out.  The Senior Secured Notes Superpriority Claim shall be senior to and have priority over any other administrative expense claims, unsecured claims and all other claims against the Debtors or their estates in any of the Chapter 11 Cases or any Successor Cases, at any time existing or arising, of any kind or nature whatsoever, including, without limitation, administrative expenses or other claims of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, and 1114 of the Bankruptcy Code, and any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured

36

by a judgment lien or other non-consensual lien, levy, or attachment.  The Senior Secured Notes Superpriority Claim shall be considered an administrative expense allowed under section 503(b) of the Bankruptcy Code, shall be against each Debtor on a joint and several basis, and shall be payable from and have recourse to all DIP Collateral; provided, however that the Senior Secured Notes Superpriority Claims shall not be payable from or have recourse to the ABL DIP Priority Collateral until the ABL DIP Obligations and the Prepetition ABL Obligations are Paid in Full. Except as provided in this Final Order, the Senior Secured Notes Superpriority Claim shall not be made subject to or *pari passu* with any claim heretofore or hereinafter granted or created in any of the Chapter 11 Cases or any Successor Cases and shall be valid and enforceable against the Debtors, their estates, and any successors thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases or any Successor Cases until such time as the Prepetition Senior Secured Notes Obligations are Paid in Full.

11. <u>Additional Adequate Protection</u>.  As further adequate protection for the Prepetition Secured Parties:

(a) In accordance with the Interim Order, and as hereby ratified and approved in full, on the Prepetition ABL Payoff Date, the Debtors funded for the benefit of the Prepetition ABL Agent the sum of $250,000 into a non-interest bearing account to be designated and held by the Prepetition ABL Agent to secure the Prepetition ABL Reimbursement and Indemnity Obligations (the "<u>ABL Facility Reimbursement Account</u>"), which account shall not constitute DIP Collateral until the Prepetition ABL Obligations are Paid in Full.  No liens shall attach to the ABL Facility Reimbursement Account other than the Prepetition ABL Agent (for itself and the Prepetition ABL Lenders) shall have a first-priority lien (the "<u>ABL Facility Reimbursement Account Liens</u>") on the ABL Facility Reimbursement Account and all amounts held in the ABL

Facility Reimbursement Account without the need for any further approval or order of the Court, which for the avoidance of doubt shall not be subject to the Carve Out.  The Debtors shall continue to pay the Prepetition ABL Reimbursement and Indemnity Obligations in the ordinary course.  The Prepetition ABL Agent in its sole discretion may apply amounts in the ABL Facility Reimbursement Account to unpaid Prepetition ABL Reimbursement and Indemnity Obligations after compliance with the notice procedures set forth in paragraph 11 of this Final Order.  On the date the Prepetition ABL Obligations are Paid in Full, the ABL Facility Reimbursement Account Liens shall automatically terminate and all remaining amounts held in the ABL Facility Reimbursement Account shall automatically constitute property of the Debtors and DIP Collateral hereunder.

(b)      The Debtors were, by the Interim Order, and hereby are authorized, on a final basis to (i) on the Closing Date, pay to the Superpriority Notes Trustee, for the benefit of the Superpriority Noteholders, in full in cash all accrued and unpaid (whether accrued prior to or after the Petition Date) interest at the default rate under the Superpriority Notes Indenture and (ii) on a monthly basis, until all of the Superpriority Notes Obligations have been paid in full, pay to the Superpriority Notes Trustee, for the benefit of the Superpriority Noteholders, cash interest at the default rate set forth in the Superpriority Notes Indenture on any Superpriority Notes under the Superpriority Notes Indenture that remain outstanding.

(c)      The Debtors shall pay all prepetition and postpetition reasonable and documented fees, costs and out-of-pocket expenses incurred by (i) without duplication of the fees payable to the ABL DIP Secured Party Advisors, the Prepetition ABL Agent (such fees, costs and out-of-pocket expenses, the "Prepetition ABL Reimbursement and Indemnity Obligations") (including all reasonable and documented fees and out-of-pocket expenses of professional advisors

38

to the Prepetition ABL Agent,  Morgan, Lewis & Bockius LLP, M3 Capital Partners LLC and

Williams Mullen (the "Prepetition ABL Agent Professionals")) until such time as the Prepetition

ABL Obligations are Paid in Full; (ii) the Superpriority Notes Trustee (including all reasonable

and documented fees and out-of-pocket expenses of counsel to the Superpriority Notes Trustee,

Emmet, Marvin & Martin LLP and applicable Virginia counsel) (the "Superpriority Notes Trustee

Professionals")), (iii) the Senior Secured Notes Trustee (including all reasonable and documented

fees and out-of-pocket expenses of counsel to the Senior Secured Notes Trustee, Emmet, Marvin

& Martin LLP and applicable Virginia counsel)) (the "Senior Secured Notes Trustee

Professionals") and (iv) without duplication of the fees payable to the Term DIP Secured Party

Advisors pursuant to paragraph 27 of this Final Order, the ad hoc group of Prepetition Noteholders

(the "Ad Hoc Group of Noteholders") and the reasonable and documented fees, costs and out-of-

pocket expenses of their legal and financial advisors, if any (including: (A) Stroock & Stroock &

Lavan LLP ("Stroock"); (B) McGuireWoods LLP; (C) Province Inc. ("Province"), and (D) such

other consultants or other professionals as may be retained by the Ad Hoc Group of Noteholders

with the consent of the Debtors, such consent not to be unreasonably withheld, delayed, or

conditioned (collectively, the "Ad Hoc Group of Noteholders Professionals", and together with

the Prepetition ABL Agent Professionals, Superpriority Notes Trustee Professionals, and Senior

Secured Notes Professionals, the "Lender Professionals").  Invoices for the fees and out-of-pocket

expenses of the Lender Professionals to be paid pursuant to this paragraph shall not be required to

comply with the U.S. Trustee guidelines, may be in summary form only and not be required to

contain detailed time entries (and may contain redactions of privileged, confidential or otherwise

sensitive information), and shall be provided to counsel to the Debtors, with a copy to the U.S.

Trustee and counsel to any Official Committee (if appointed) (collectively, the "Fee Notice

Parties"). If no objection to payment of the requested fees and out-of-pocket expenses is made in writing and delivered to the applicable Lender Professionals and counsel to the Debtors (which delivery may be made via electronic mail) by any of the Fee Notice Parties within ten (10) calendar days after delivery of such invoices (the "Fee Objection Period"), then, without further order of, or application to, the Court or notice to any other party, such fees and out-of-pocket expenses shall be promptly paid by the Debtors. The Debtors were authorized, and are hereby authorized on a final basis, to pay upon entry of the Interim Order the fees and out of pocket expenses of the Lender Professionals incurred on or prior to entry of the Interim Order without the need to provide notice to any other party or otherwise comply with the procedures set forth in this paragraph 11. If an objection (solely as to reasonableness) is made by any of the Fee Notice Parties within the Fee Objection Period to payment of the requested fees and out-of-pocket expenses, then only the disputed portion of such fees and out-of-pocket expenses shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court, and the undisputed portion shall be promptly paid by the Debtors. No payments made under the Interim Order or this Final Order shall be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, applicable non-bankruptcy law or otherwise.

(d)     *Budget Compliance*. The Debtors shall comply with the Approved Budget (subject to any Permitted Variances) and all budget requirements set forth in this Final Order and in the DIP Loan Documents.

(e)     *Information; Access to Books and Records*. The Debtors will provide to the Prepetition Secured Notes Trustees and the Prepetition Noteholders such reports and information

required to be delivered pursuant to the Term DIP Credit Agreement.  In addition, without limiting

the rights of access and information afforded the Prepetition Secured Parties, the DIP Agents and

the DIP Lenders under this Final Order and/or the DIP Loan Documents, the Debtors shall, upon

reasonable advance notice of the DIP Agents, the DIP Lenders, Prepetition Secured Notes Trustees

and the Ad Hoc Group of Noteholders, as applicable, and their respective representatives, agents

and/or employees, reasonable access to the Debtors' premises and their books and records and

shall reasonably cooperate, consult with, and provide to such persons all such information as may

be reasonably requested.  In addition, the Debtors authorize their independent certified public

accountants, financial advisors, investment bankers, and consultants to cooperate, consult with,

and provide to the DIP Agents, the DIP Lenders, the Prepetition ABL Agent, Prepetition Secured

Notes Trustees, and the Ad Hoc Group of Noteholders, as applicable, all such information as may

be reasonably requested with respect to the business, results of operations and financial condition

of any of the Debtors.

12.    <u>Adequate Protection Reservation</u>.  The receipt by the Prepetition Secured Parties of

the adequate protection provided pursuant to the Interim Order or this Final Order shall not be

deemed an admission that the interests of the Prepetition Secured Parties are indeed adequately

protected.  Further, this Final Order shall not prejudice or limit the rights of the Prepetition Notes

Secured Parties to seek additional conditions with respect to the use of Cash Collateral or for

additional adequate protection; <u>provided</u> that any such additional or alternative adequate protection

approved by the Court shall at all times be subordinate and junior to the Carve Out, any Permitted

Prior Senior Liens, the Term DIP Liens, and, solely as to the ABL DIP Priority Collateral, the

ABL DIP Liens and the ABL Adequate Protection Liens (solely with respect to the Prepetition

ABL Reimbursement and Indemnity Obligations) granted under this Final Order and the DIP Loan

Documents.  Without limiting the foregoing, nothing in this Final Order shall impair or modify the application of section 507(b) of the Bankruptcy Code in the event that the adequate protection provided under this Final Order is insufficient to compensate for any Diminution in Value during any of the Chapter 11 Cases, subject to the Carve Out.

13.     <u>Amendments</u>.  The Debtors, the DIP Agents and the DIP Lenders are authorized to enter into the DIP Loan Documents and implement, in accordance with the terms of the applicable DIP Loan Documents, one or more amendments, waivers, consents or other modifications to and under the DIP Loan Documents, in each case in accordance with the provisions of the applicable DIP Loan Document governing amendments thereto and otherwise in such form as the Debtors and the Required Term DIP Lenders (in the case of the Term DIP Credit Agreement) or the ABL DIP Agent (in the case of the ABL DIP Credit Agreement) may agree, and no further approval of the Bankruptcy Court shall be required for non-material amendments, waivers, consents or other modifications to and under the DIP Loan Documents (and any reasonable fees paid in connection therewith); <u>provided</u>, <u>however</u>, that the Debtors shall provide notice (which may be provided through electronic mail) of any material amendment, waiver, consent or other modification under the DIP Loan Documents to counsel to the Official Committee (if any), the U.S. Trustee and the DIP Agent not party to such material amendment, waiver, consent other modification, five (5) calendar days prior to the effective date thereof to the extent practicable.  If no objections are timely received to a material amendment within five (5) calendar days from the date of delivery of such notice (or if, prior to such date, the U.S. Trustee and the Official Committee (if any) indicate via electronic mail or otherwise that they have no objection), the Debtors may proceed to execute such amendment, which shall become effective immediately upon execution.  In no event shall any amendment or modification of this Final Order contravene any Sacred Right (as defined in the

Term DIP Loan Credit Agreement) without the consent of each affected Term DIP Lender.

14.    <u>Budget Covenants</u>.

(a)    *Initial Budget and Updated Budget.*    The Debtors have prepared and delivered to the DIP Agents and the DIP Lenders, and the DIP Agents and DIP Lenders have approved, an initial budget, a copy of which is attached hereto as **<u>Exhibit C</u>** (the "<u>Initial Budget</u>"), which reflects the Debtors' anticipated cash receipts and all anticipated necessary and required disbursements for each calendar week during the period from the Petition Date through and including the end of the eleventh (11th) week following the date of the delivery of the Initial Budget to the DIP Lenders.    The Initial Budget, and each Updated Budget (as defined below) approved by the DIP Agents and the Required Term DIP Lenders, shall be deemed the "Approved Budget" for all purposes of this Final Order until superseded by another Approved Budget pursuant to the provisions set forth below.

(b)    *Updated Budget*.    The Debtors shall prepare in good faith and deliver to the DIP Agents and the professionals for the DIP Lenders updated cash flow forecasts consistent with the form and level of detail of the Initial Budget and otherwise in form and substance reasonably acceptable to the Required Term DIP Lenders, as and to the extent required by, and at such times, and for the periods required under, the DIP Credit Agreements (each such updated forecast, an "<u>Updated Budget</u>").    Each budget delivered to the DIP Agents and the DIP Lenders shall be accompanied by such supporting documentation as reasonably requested by the DIP Agents, the Required Term DIP Lenders and/or the Lender Professionals, and shall be prepared in good faith, with due care and based upon assumptions the Debtors believe to be reasonable.    For the avoidance of doubt, no amendment, modification or update to an Approved Budget shall be effective without

43

the approval of the Required Term DIP Lenders (which approval shall not be unreasonably withheld, conditioned or delayed).

(c)    *Variance Reporting.*  The Debtors are subject to the variance reporting and testing as set forth in, and in accordance with the terms of, the DIP Credit Agreements.  Variances in excess of Permitted Variances, if any, from the Approved Budget, and any proposed changes to the Approved Budget, shall be subject to written agreement by the Debtors, the ABL DIP Agent, and the Term DIP Agent (acting at the direction of Required Term DIP Lenders), in each case without further notice, motion or application to, order of, or hearing before, the Court.

15.    Modification of Automatic Stay.  The automatic stay imposed by section 362(a) of the Bankruptcy Code is hereby modified as necessary to permit: (a) the Debtors to grant the DIP Liens and the Superpriority DIP Claims, and to perform such acts as the DIP Agents or the Required Term DIP Lenders may reasonably request to assure the perfection and priority of the DIP Liens; (b) the Debtors to grant the Adequate Protection Liens and the Adequate Protection Claims, and to take all appropriate action to ensure that the Adequate Protection Liens granted under this Final Order are perfected and maintain the priority set forth in this Final Order; (c) the Debtors to incur all liabilities and obligations to the Prepetition Secured Parties and the DIP Secured Parties as contemplated under the Interim Order, this Final Order, and the DIP Loan Documents; (d) the Debtors to pay all amounts referred to, required under, in accordance with, and subject to the DIP Loan Documents, the Interim Order and this Final Order; (e) the DIP Secured Parties and the Prepetition Secured Parties to retain and apply payments made in accordance with the DIP Loan Documents, the Interim Order, and this Final Order; (f) subject to paragraph 24 of this Final Order, the DIP Agents and the DIP Lenders to exercise, upon the occurrence and during the continuance of any applicable Event of Default (as defined in the respective DIP Credit

Agreements), all rights and remedies provided for in the DIP Loan Documents and take any or all actions provided therein; (g) the Debtors to execute and perform under the DIP Loan Documents any and all other instruments, certificates, agreements and documents which may be required, necessary or prudent for the performance by the applicable Debtors under the DIP Loan Documents and any transactions contemplated therein or in this Final Order; and (h) the implementation of all of the terms, rights, benefits, privileges, remedies and provisions of this Final Order and the DIP Loan Documents, in each case, without further notice, motion or application to, or order of, or hearing before, this Court, subject to the terms of this Final Order including as to the Remedies Notice Period (as defined below).

16.     <u>Perfection of DIP Liens and Adequate Protection Liens</u>.  This Final Order shall be sufficient and conclusive evidence of the validity, perfection and priority of all security interests and liens granted in the Interim Order and this Final Order, including, without limitation, the DIP Liens, the Adequate Protection Liens and the ABL Facility Reimbursement Account Liens, without the necessity of executing, filing or recording any financing statement, mortgage, notice or other instrument or document that may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable law) such liens, or to entitle the Prepetition Secured Parties, the DIP Agents or the DIP Lenders to the priorities granted in the Interim Order and this Final Order.  Notwithstanding the foregoing, each of the DIP Agents and the Prepetition Agents, without any further consent of any party, was, by the Interim Order, and hereby is authorized, on a final basis, to execute, file or record, and the DIP Agent(s) or Prepetition Agent(s), as applicable, may require the execution, filing or recording, as each, in its sole discretion deems necessary, of such financing statements, mortgages, notices of

45

lien, and other similar documents (other than the filings of mortgages, which were perfected through the Interim Order and hereby ratified and approved on a final basis) to enable the DIP Agent(s) and the Prepetition Agents, as applicable, to further validate, perfect, preserve, and enforce the DIP Liens and/or the Adequate Protection Liens, as applicable, and all such financing statements, mortgages, notices, and other documents shall be deemed to have been executed, filed or recorded as of the Petition Date; provided, however, that no such execution, filing or recordation shall be necessary or required in order to create or perfect the DIP Liens and/or the Adequate Protection Liens.   The Debtors were, by the Interim Order, and hereby are, on a final basis, authorized and directed to execute and deliver promptly upon demand to the DIP Agents or any of the Prepetition Agents, as applicable, all such financing statements, notices, and other documents as the DIP Agents, the Required Term DIP Lenders or any of the Prepetition Agents may reasonably request.   The DIP Agents or any of the Prepetition Agents, each in its discretion, may file a photocopy of this Final Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien, or similar instruments, and in such event, the filing or recording office shall be authorized and directed to file or record such photocopy of this Final Order.

17.    Protection of DIP Lenders' Rights and Adequate Protection Liens.  So long as there are any DIP Obligations outstanding, the Prepetition Secured Parties shall: (a) absent the written consent of (x) the Required Term DIP Lenders (or, if the Term DIP Loan Documents require a different threshold of Term DIP Lenders to approve such action, such to other threshold) or (y) with respect to ABL DIP Priority Collateral, the ABL DIP Agent, have no right to, and take no action to, foreclose upon or recover in connection with the liens granted thereto pursuant to the Prepetition Secured Debt Documents, the Interim Order, this Final Order or otherwise seek or

exercise any enforcement rights or remedies against any DIP Collateral or in connection with the

debt and obligations underlying the Prepetition Secured Debt Documents or Adequate Protection

Liens, including, without limitation, in respect of the occurrence or continuance of any Event of

Default (as defined in the Prepetition Secured Debt Documents); (b) be deemed to have consented

to any transfer, disposition or sale of, or release of liens on the DIP Collateral (but not any proceeds

of such transfer, disposition or sale to the extent remaining after payment in cash in full of the DIP

Obligations and termination of the DIP Commitments) authorized under the DIP Loan Documents;

(c) not file any further financing statements, patent filings, trademark filings, copyright filings,

mortgages, memoranda of lease, notices of lien or similar instruments, or otherwise take any action

to perfect their security interests in the DIP Collateral unless, solely as to this clause (c), the DIP

Agents or the DIP Lenders filing financing statements or other documents to perfect the liens

granted pursuant to the DIP Loan Documents, the Interim Order and/or this Final Order, or as may

be required by applicable state law to continue the perfection of valid and unavoidable liens or

security interests as of the date of filing; and (d) deliver or cause to be delivered, at the Debtors'

costs and expense (for which the Prepetition Secured Parties shall be reimbursed upon submission

to the Debtors of invoices or billing statements), any termination statements, releases and/or

assignments (to the extent provided for herein) in favor of the DIP Agents and the DIP Lenders or

other documents necessary to effectuate and/or evidence the release, termination and/or

assignment of Adequate Protection Liens or the Prepetition Liens on any portion of the DIP

Collateral subject to any sale or disposition approved or arranged for by the ABL DIP Agent, the

Required Term DIP Lenders or the Term DIP Agent (upon direction from the Required Term DIP

Lenders).

18.     To the extent any Prepetition Notes Secured Party has possession of any Prepetition

Collateral or DIP Collateral or has control with respect to any Prepetition Collateral or DIP

Collateral, or has been noted as secured party on any certificate of title for a titled good constituting

Prepetition Collateral or DIP Collateral, then such Prepetition Notes Secured Party shall be deemed

to maintain such possession or notation or exercise such control as a gratuitous bailee and/or

gratuitous agent for perfection for the benefit of the DIP Secured Parties, and such Prepetition

Notes Secured Party shall comply with the instructions of the Term DIP Agent, acting at the

direction of the Required Term DIP Lenders, with respect to the exercise of such control.

19.     Any proceeds of Prepetition Notes Collateral subject to the DIP Liens received by

any Prepetition Notes Secured Party, whether in connection with the exercise of any right or

remedy (including setoff) relating to the Prepetition Notes Collateral shall be segregated and held

in trust for the benefit of and forthwith paid over to the applicable DIP Agent for the benefit of the

applicable DIP Secured Parties in the same form as received, with any necessary endorsements.

The DIP Agents are hereby authorized to make any such endorsements as agent for any such

Prepetition Notes Secured Party.  This authorization is coupled with an interest and is irrevocable.

20.     Proceeds of Subsequent Financing.  Without limiting the provisions of the

immediately preceding paragraph, if the Debtors, any trustee, any examiner with enlarged powers

or any responsible officer subsequently appointed in any of the Chapter 11 Cases or any Successor

Cases shall obtain credit or incur debt pursuant to sections 364(b), (c), or (d) of the Bankruptcy

Code in violation of this Final Order or the DIP Loan Documents at any time prior to the DIP

Obligations being Paid in Full, the satisfaction of the Superpriority DIP  Claims and the Adequate

Protection Claims, and the termination of the DIP Agents' and the DIP Lenders' obligations to

extend credit under the DIP Facilities and this Final Order, including subsequent to confirmation

48

of any plan with respect to any or all of the Debtors and the Debtors' estates (but excluding the escrowed proceeds of any capital markets transaction contemplated by the Restructuring Support Agreement), then unless otherwise agreed by the DIP Agent(s) and the Required Term DIP Lenders, all cash proceeds derived from such credit or debt shall immediately be turned over to DIP Agents to be applied to the DIP Obligations in accordance with the DIP Loan Documents (including the Intercreditor Agreements) until the DIP Obligations are Paid in Full and after the DIP Obligations are Paid in Full, hereafter to the Prepetition Agents to be applied to the Prepetition Obligations (in accordance with the Prepetition Secured Debt Documents, including the Prepetition Intercreditor Agreements).

21.     <u>Maintenance of DIP Collateral</u>.   Until such time as the DIP Obligations and the Prepetition Obligations are Paid in Full, the Debtors shall continue to maintain all property, operational and other insurance as required and as specified in the DIP Loan Documents.   Upon entry of the Interim Order and until the DIP Obligations are Paid in Full, to the fullest extent provided by applicable law, the DIP Agents (on behalf of the DIP Secured Parties) were, and shall remain, without any further action or notice, named as additional insureds and loss payee on each insurance policy maintained by the Debtors that in any way relates to the DIP Collateral.   Until the DIP Obligations and Prepetition Obligations are Paid in Full, the Debtors shall also maintain the cash management system in effect as of the Petition Date, as modified by this Final Order and any order of the Court authorizing the continued use of the cash management system that is acceptable to the Required Term DIP Lenders and the DIP Agents.   The Debtors shall not open any new deposit or securities account that is not subject to the security interests of each of the DIP Secured Parties and the Prepetition Secured Parties (in which case they shall be subject to the lien priorities set forth in this Final Order) except for such accounts specifically contemplated under this Final

Order or, to the extent not inconsistent with the DIP Loan Documents, another order of the Bankruptcy Court.

22.     <u>Disposition of or New Liens on DIP Collateral</u>.  The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral (or enter into any binding agreement to do so) other than in the ordinary course of business or that constitutes a Permitted Disposition under the applicable DIP Loan Documents without the prior written consent of the DIP Agents (in the case of the Term DIP Agent, upon direction from the Required DIP Lenders) (subject to the Intercreditor Agreements and, if applicable, the Sacred Rights (as defined in the Term DIP Credit Agreement)).

23.     <u>DIP Termination Date</u>.  As to each of the Term DIP Facility and the ABL DIP Facility, each of the following shall constitute a termination event under this Final Order (each a "<u>Termination Event</u>", and the date upon which such Termination Event occurs, the "<u>DIP Termination Date</u>"), unless waived in writing by the applicable DIP Agent and the Required Term DIP Lenders (as applicable): (a) the occurrence of the maturity date or termination date of the applicable DIP Facility; (b) occurrence of an "Event of Default" under and as defined in the applicable DIP Credit Agreement (subject to any applicable grace period); (c) the consummation of a sale of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code or otherwise; (d) the effective date of a chapter 11 plan confirmed in the Chapter 11 Cases; or (e) the failure by the Debtors to timely perform in any material respect any of the material terms, provisions, conditions, covenants, or other obligations under this Final Order, which remains uncured for a period of five (5) business days after notice of such failure, unless waived.

24.     <u>Rights and Remedies Upon Termination Event</u>.  Immediately upon the occurrence and during the continuation of a Termination Event under (x) the  ABL DIP Facility the ABL DIP

Agent may or (y) the Term DIP Facility, the Term DIP Agent, upon direction from the Required

Term DIP Lenders or the Required Term DIP Lenders may (and any automatic stay otherwise

applicable to the DIP Secured Parties, whether arising under sections 105 or 362 of the Bankruptcy

Code or otherwise, is hereby modified, without further notice to, hearing of, or order from this

Court, to the extent necessary to permit the DIP Secured Parties to), subject to the Intercreditor

Agreements: (a) terminate the applicable DIP Facility and any applicable DIP Loan Document as

to any future liability or obligation of the DIP Secured Parties, but without affecting any of the

DIP Obligations or the DIP Liens securing the DIP Obligations; (b) declare all applicable DIP

Obligations to be immediately due and payable, without presentment, demand, protest or other

notice of any kind, all of which are expressly waived by the Debtors; (c) invoke the right to charge

interest at the default rate under the applicable DIP Loan Documents; (d) with respect to the

applicable DIP Facility, immediately terminate and/or revoke the Debtors' right under this Final

Order and any other DIP Loan Documents to use any Cash Collateral; (e) freeze monies or balances

in the Debtors' accounts; (f) immediately set-off any and all amounts in accounts maintained by

the Debtors with the applicable DIP Agent or DIP Lenders against the DIP Obligations; (g) enforce

any and all rights against the DIP Collateral, including, without limitation, foreclosure on all or

any portion of the DIP Collateral, collection of accounts receivable, occupying the Debtors'

premises, sale or disposition of the DIP Collateral; (h) enforce all of the guaranty rights under the

applicable DIP Loan Documents; and (i) take any other actions or exercise any other rights or

remedies permitted under this Final Order, the applicable DIP Loan Documents or applicable law;

provided, however, that prior to the exercise of any right or remedy in clauses (d) through (i) of

this paragraph, the applicable DIP Agent or the DIP Lenders, as applicable, shall be required to

provide five (5) business days' written notice (which delivery may be made via electronic mail) to

counsel to the Debtors, counsel to any Official Committee, counsel to the DIP Agent not providing

such notice, and the U.S. Trustee of the applicable DIP Agent's intent to exercise its rights and

remedies (the "Remedies Notice Period").  Unless the Court finds, during the Remedies Notice

Period, that a Termination Event has not occurred, the applicable DIP Agent and/or the applicable

DIP Lenders shall be deemed to have received relief from the automatic stay and may exercise all

rights and remedies set forth in the Interim Order, this Final Order, the DIP Loan Documents, and

as otherwise available at law or equity without further notice to, hearing of, or order from this

Court, and without restriction or restraint by any stay under sections 105 or 362 of the Bankruptcy

Code or otherwise.  The rights and remedies of the DIP Secured Parties specified in this Final

Order are cumulative and not exclusive of any rights or remedies that the DIP Secured Parties have

under the DIP Loan Documents or otherwise.  The Debtors and any Official Committee shall be

deemed to have waived any right to seek relief under the Bankruptcy Code, including under section

105 thereof, to the extent such relief would restrict or impair the rights and remedies of the DIP

Agents or the DIP Lenders as set forth in this Final Order or the DIP Loan Documents.  During

the Remedies Notice Period, the Debtors shall be entitled to seek an emergency hearing within the

Remedies Notice Period with the Court for the sole purpose of contesting whether a Termination

Event has occurred and/or is continuing.  However, the Debtors shall not challenge or raise any

other objections to the exercise of such rights or remedies, and the sole issue that the Debtors may

raise at any hearing addressing the exercise of remedies by the DIP Agents or the DIP Lenders is

whether a Termination Event has in fact occurred and is continuing.  The Debtors shall cooperate

with the DIP Secured Parties in their exercise of rights and remedies, whether against the DIP

Collateral or otherwise and shall not take or direct any entity to take any action designed or

intended to hinder or restrict in any respect such DIP Secured Parties from enforcing their security

52

interests in the DIP Collateral.  During the Remedies Notice Period, the Debtors may use Cash

Collateral only to fund the Carve Out and pay the following amounts and expenses solely in

accordance with the respective Approved Budget line items: (i) expenses that the Debtors, the

ABL DIP Agent, the Term DIP Agent and/or and Required Term DIP Lenders have determined in

good faith are in the ordinary course and critical to the preservation of the Debtors and their estates

and (ii) such other amounts as have been approved in advance in writing by the ABL DIP Agent

and the Required Term DIP Lenders.

25.    <u>Landlord Agreements; Access</u>.  Upon expiration of the Remedies Notice Period,

subject to the terms of the DIP Loan Documents and the Intercreditor Agreements, the DIP Agents

(in the case of the Term DIP Agent, upon direction from the Required Term DIP Lenders) shall be

permitted to: (a) access and recover any and all DIP Collateral; and (b) enter onto any leased or

licensed premises of any Debtor and exercise all of the Debtors' rights and privileges as lessee or

licensee under any applicable lease or license in connection with an orderly liquidation of the DIP

Collateral (including the use of any and all trademarks, trade names, copyrights, licenses, patents,

or any other similar assets of the Debtors solely for such liquidation, subject to the applicable

licensor's rights under applicable law) provided, however, in the case of clause (b),

notwithstanding anything to the contrary herein, the DIP Agents can only enter upon a leased

premises during the continuation an Event of Default in accordance with (i) a separate written

agreement by and between the applicable DIP Agent and the applicable landlord, (ii) pre-existing

rights of the DIP Agents, as applicable, and any applicable landlord under applicable non-

bankruptcy law, (iii) consent of the applicable landlord, or (iv) entry of an order of this Court

obtained by motion of the applicable DIP Agent on such notice to the landlord as shall be required

by this Court; <u>provided</u>, <u>however</u>, that, solely with respect to rent due to a landlord of any such

leased premises, the applicable DIP Agent (on behalf of the applicable DIP Secured Parties) shall

be obligated only for the payment of rent of the Debtors that first accrues after the expiration of

the Remedies Notice Period that is payable during the period of such occupancy by such DIP Agent

calculated on a daily per diem basis; provided, further, that nothing herein shall relieve the Debtors

of their obligations pursuant to section 365(d)(3) of the Bankruptcy Code for the payment of rent

that accrues prior to the expiration of the Remedies Notice Period through and including any

assumption and/or rejection of any lease.  Nothing in this Final Order shall require the Debtors or

the DIP Secured Parties to assume any lease as a condition to the rights afforded in this paragraph.

26.     Good Faith under Section 364(e) of the Bankruptcy Code; No Modification or Stay

of this Final Order.  The DIP Secured Parties have acted in good faith in connection with the

DIP Facilities, the DIP Loan Documents, the Interim Order, and this Final Order, and their reliance

on the Interim Order and this Final Order is in good faith.  Based on the findings set forth in the

Interim Order and this Final Order and the record made during the Interim Hearing and the Final

Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of

the provisions of this Final Order are hereafter modified, reversed, amended or vacated by a

subsequent order of the Court or any other court, the DIP Secured Parties and the Prepetition

Secured Parties are entitled to the benefits and protections provided in section 364(e) of the

Bankruptcy Code.  Any such modification, reversal, amendment or vacatur shall not affect the

validity and enforceability of any advances previously made or made under the Interim Order or

this Final Order, or lien, claim or priority authorized or created hereby.  Any security interests,

liens or claims granted to the DIP Secured Parties arising prior to the effective date of any such

modification, reversal, amendment or vacatur of the Interim Order or this Final Order shall be

governed in all respects by the original provisions of the Interim Order and this Final Order (as the

54

case may be), including entitlement to all rights, remedies, privileges, and benefits granted in this Final Order.

27.      <u>DIP Fees and Other Expenses</u>.  The Debtors were, by the Interim Order, and hereby are, on a final basis, authorized and directed to pay, in cash and on a current basis all fees, costs, expenses and other charges payable at any time under the DIP Loan Documents and this Final Order (including, without limitation, the reasonable and documented prepetition and postpetition fees, costs and expenses of (i) (A) Pryor Cashman LLP and LimNexus LLP; (B) Stroock, McGuireWoods LLP, and Province; and (C) any other professionals or consultants as may be retained by the Required Term DIP Lenders with the consent of the Debtors, such consent not to be unreasonably withheld, delayed or conditioned) in connection with advising the Term DIP Secured Parties (subparagraph (i), collectively, the "<u>Term DIP Secured Party Advisors</u>") and (ii) (A) Morgan, Lewis & Bockius LLP, (B) M3 Capital Partners LLC and (C) Williams Mullen (subparagraph (ii), collectively, the "<u>ABL DIP Secured Party Advisors</u>," and together with the Term DIP Secured Party Advisor, the "<u>DIP Secured Party Advisors</u>"), and any prior payments of such premiums, fees, costs, disbursements and expenses is expressly ratified and approved, whether or not the transactions contemplated hereby are consummated, whether incurred or paid prior to, on or after the Petition Date, and whether or not contained in the Approved Budget and without limitation with respect to the dollar estimates included in the Approved Budget; <u>provided</u>, <u>however</u> that such overages shall not weigh against the Debtors in any testing related to compliance with the Approved Budget.  In addition, all obligations to make, and all payments made, by any of the Debtors, to the DIP Agents and/or the DIP Lenders, in each case, whether prior to or after the commencement of the Chapter 11 Cases and prior to entry of this Final Order, are hereby reaffirmed and ratified in all respects.  Payments made under this paragraph 27 shall not be subject

to further review, application or allowance by the Court. The invoices for such fees and expenses shall not be required to comply with the U.S. Trustee guidelines, may be in summary form only (provided that if a narrative is provided, such narrative may contain redactions of privileged, confidential or otherwise sensitive information), and shall be provided to the Fee Notice Parties. If no objection to payment of the requested fees and out-of-pocket expenses are made, in writing and delivered to the applicable DIP Secured Party Advisors and counsel to the Debtors (which delivery may be made via electronic mail) by any of the Fee Notice Parties within the Fee Objection Period, then, without further order of, or application to, the Court or notice to any other party, such fees and out-of-pockets expenses shall be promptly paid by the Debtors. If an objection (only as to reasonableness or whether such fee is then due and owing) is made by any of the Fee Notice Parties within the Fee Objection Period to payment of the requested fees and out-of-pocket expenses, then only the disputed portion of such fees and out-of-pocket expenses shall not be paid until the objection is resolved by the applicable parties in good faith or by order of the Court, and the undisputed portion shall be promptly paid by the Debtors. The Debtors were authorized, and are hereby authorized on a final basis, to pay on the Closing Date the reasonable and documented fees and out of pocket expenses of the DIP Secured Party Advisors incurred on or prior to such date without the need to provide notice to any other party or otherwise comply with the procedures set forth in this paragraph 27. Payments of any amount set forth in this paragraph 27 shall not be subject to any contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, applicable non-bankruptcy law or otherwise.

28.     Indemnification. The Debtors were, by the Interim Order, and hereby are, on a final basis, authorized to jointly and severally indemnify and hold harmless the DIP Agents (solely in

each of their capacities as DIP Agent), each DIP Lender (solely in its capacity as a DIP Lender) and each other Indemnified Party (as defined in the DIP Credit Agreements) in accordance and subject to the terms and conditions set forth in the DIP Credit Agreements.  Upon the earlier of the (a) payment in cash in full of the ABL DIP Obligations or (b) conclusion of the Remedies Notice Period and funding of the Carve Out, $250,000 from proceeds of the ABL DIP Priority Collateral shall be deposited into an indemnity account (the "DIP ABL Indemnity Account") subject to the first priority liens of the ABL DIP Agent, for the benefit of the ABL DIP Secured Parties.  The DIP ABL Indemnity Account shall be released to the Debtors upon the ABL DIP Obligations being Paid in Full.

29.     Proofs of Claim.  The DIP Secured Parties and the Prepetition Secured Parties shall not be required to file proofs of claim in any of the Chapter 11 Cases for any claim against the Debtors.  The Debtors' stipulations, admissions and acknowledgments and the provisions of this Final Order shall be deemed to constitute a timely filed proof of claim for the DIP Secured Parties and the Prepetition Secured Parties with regard to all claims against the Debtors, including, without limitation, any claims arising under or in connection with the DIP Loan Documents or the Prepetition Secured Debt Documents.  Any proof of claim filed by the DIP Secured Parties or the Prepetition Secured Parties shall be deemed to be in addition to (and not in lieu of) any other proof of claim that may be filed by any such persons.  Any order entered by the Court in relation to the establishment of a bar date in any of the Chapter 11 Cases shall not apply to claims of the DIP Secured Parties or the Prepetition Secured Parties.

30.     Carve Out.

(a)     *Carve Out*.  As used in this Final Order, the "Carve Out" means: (i) all fees required to be paid to (A) the Clerk of the Court and (B) the U.S. Trustee under section 1930(a) of

title 28 of the United States Code plus interest at the statutory rate (without regard to the notice set forth in (iii) below); (ii) all reasonable fees and expenses up to $50,000 (and any interest thereon) incurred by a trustee under section 726(b) of the Bankruptcy Code (without regard to the notice set forth in (iii) below); (iii) to the extent allowed at any time, whether by a compensation procedure order, procedural order, or otherwise, all unpaid fees and expenses (including transaction completion and similar fees) (the "Allowed Professional Fees") incurred by persons or firms retained by the Debtors pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "Debtor Professionals") and an Official Committee (if appointed) pursuant to section 328 or 1103 of the Bankruptcy Code (the "Committee Professionals" and, together with the Debtor Professionals, the "Professional Persons") at any time before or on the first business day following delivery by the ABL DIP Agent or the Term DIP Agent of a Carve Out Trigger Notice (as defined herein), whether allowed by the Court prior to or after delivery of a Carve Out Trigger Notice (which, with respect to the ABL DIP Priority Collateral, shall be limited to the ABL Professional Fee Carve Out Cap (as defined herein)); and (iv) Allowed Professional Fees of Professional Persons in an aggregate amount not to exceed $3,000,000.00 incurred after the first business day following delivery by the ABL DIP Agent or the Term DIP Agent of the Carve Out Trigger Notice, to the extent allowed at any time, whether by interim order, procedural order or otherwise (the amounts set forth in this clause (iv) being the "Post-Carve Out Trigger Notice Cap").  For purposes of the foregoing, "Carve Out Trigger Notice" shall mean a written notice delivered by email (or other electronic means) by a DIP Agent to the Debtors, their lead restructuring counsel, the U.S. Trustee, and counsel to a Creditors' Committee (if appointed), which notice may be delivered following the occurrence and during the continuation of an Event of Default (as defined in and

under the DIP Credit Agreements) stating that the Post-Carve Out Trigger Notice Cap has been invoked.

(b)     *Delivery of Weekly Fee Statements*.  Not later than 7:00 p.m. New York time on the third Business Day of each week starting with the second week following the Petition Date, each Professional Person shall deliver to the Debtors and the DIP Agents a statement setting forth a good-faith estimate of the amount of fees and expenses incurred by such Professional Person during the preceding week (through Saturday of each such week, the "Calculation Date"), along with a good-faith estimate of the cumulative total of fees and expenses incurred in the Chapter 11 Cases and a statement of the amount of such fees and expenses which have been paid to date by the Debtors (each such statement, a "Weekly Statement").  If any Professional Person fails to deliver a Weekly Statement within two calendar days after such Weekly Statement is due hereunder and such failure continues unremedied for a period of five calendar days, then such Professional Person's entitlement to any funds in the Carve Out Reserves with respect to the applicable period(s) for which such Professional Person that failed to deliver a Weekly Statement, shall be limited to the Allowed Professional Fees included for such Professional Person in the Budget for such period which shall be funded into the applicable Carve Out Reserve.  Solely as it relates to the ABL DIP Secured Parties, the Carve Out under paragraph (a)(iii) above shall be limited to the greater of (x) the aggregate amount of Allowed Professional Fees included in Weekly Statements timely received by the DIP Agents that remains unpaid prior to delivery of the Carve Out Trigger Notice and (y) the aggregate amount of unpaid Allowed Professional Fees included in the Budget for the period prior to delivery of the Carve Out Trigger Notice (such amount, the "ABL Professional Fee Carve Out Cap").  For the avoidance of doubt, the ABL DIP Agent shall

be entitled to maintain a reserve in the amount of the Carve Out, less amounts funded into the Pre-Carve Out Trigger Notice Reserve in accordance with paragraph 30(c)(i).

(c)    *Carve Out Reserves*.

(i)    Prior to the delivery of the Carve Out Trigger Notice, the Debtors shall maintain an escrow account funded on a weekly basis in the amount of the greater of (x) the aggregate principal unpaid amount of Allowed Professional Fees included in the Weekly Statements (as defined below) through the prior week and (y) the aggregate unpaid Allowed Professional Fees included in the Budget through the prior week.

(ii)    Upon delivery of the Carve Out Trigger Notice, the Carve Out Trigger Notice shall be deemed a demand to utilize cash on hand as of such date and any available cash thereafter held by any Debtor (or, if insufficient cash on hand and available cash exists, a draw request and notice of borrowing by the Debtors for loans (or for the use of loans already extended) under the DIP Credit Agreements, in which instance, for the avoidance of doubt, the DIP Agents and the DIP Lenders shall not be required to lend in excess of their outstanding commitments (without giving effect to any DIP Agent's or DIP Lender's unilateral reduction or termination of such commitment as a result of an Event of Default)) to fund a reserve, to the extent not already funded in accordance with this paragraph or paragraph 30(c)(i) of this Final Order, in an amount equal to the sum of (x) the amounts set forth in subclauses (i) and (ii) of the definition of Carve Out, and (y) the then unpaid amounts of the Allowed Professional Fees (subject, in the case of the ABL DIP Facility, to the ABL Professional Fee Carve Out Cap), .  The Debtors shall deposit and hold such amounts in an escrow account in trust exclusively to pay such unpaid Allowed Professional Fees referred to in paragraph 30(a) (the "Pre-Carve Out Trigger Notice Reserve"). Any amounts actually advanced by any DIP Lenders under the DIP Facilities to fund the Pre-Carve

Out Trigger Notice Reserve in accordance with this paragraph 30(c)(ii) shall constitute DIP Loans under the applicable DIP Facility.

(iii)    In addition, the Carve Out Trigger Notice shall also be deemed a demand to utilize cash on hand as of such date and any available cash thereafter held by any Debtor (or, if insufficient cash on hand and available cash exists, a draw request and notice of borrowing by the Debtors for loans (or the use of loans already extended) under the DIP Credit Agreements, in which instance, for the avoidance of doubt, the DIP Agents and the DIP Lenders shall not be required to lend in excess of their commitments (without giving effect to any DIP Agent's or DIP Lender's unilateral reduction or termination of such commitment as a result of an Event of Default)) in an amount equal to the Post-Carve Out Trigger Notice Cap (with any amounts actually advanced by DIP Lenders in accordance with this paragraph 30(c)(iii) constituting DIP Loans under the applicable DIP Facility).  Notwithstanding anything to the contrary in the Prepetition Secured Debt Documents, the DIP Loan Documents, the Interim Order or this Final Order (including, without limitation, paragraph 24 of this Final Order), the DIP Loan Parties shall deposit and hold such amounts in an escrow account in trust exclusively to pay such Allowed Professional Fees benefiting from the Post-Carve Out Trigger Notice Cap (the "Post-Carve Out Trigger Notice Reserve" and, together with the Pre-Carve Out Trigger Notice Reserve, the "Carve Out Reserves").

(d)    *Application of Carve Out Reserves*.

(i)    All funds in the Pre-Carve Out Trigger Notice Reserve shall be used first to pay the obligations set forth in subclauses (i) through (iii) of the definition of Carve Out (the "Pre-Carve Out Amounts"), but not, for the avoidance of doubt, the Post-Carve Out Trigger Notice Cap. If the Pre-Carve Out Trigger Notice Reserve has not been reduced to zero, remaining funds in such reserve shall be distributed first, if the Post-Carve Out Trigger Notice Reserve was not funded in

full in the amount set forth in paragraph 30(a)(iv) then, until such Post-Carve Out Trigger Notice

Reserve has been funded in full be distributed on a ratable basis (x) to the ABL DIP Agent on

account of any then outstanding the ABL DIP Obligations and (y) to fund Post-Carve Out Trigger

Notice Reserve, with such ratio being based on the amount of ABL DIP Priority Collateral and

Term DIP Priority Collateral, respectively, used to fund the Pre-Carve Out Trigger Notice Reserve

(the "Funding Ratio") *second* after the Post-Carve Out Trigger Notice Reserve is funded in the

full amount set forth in paragraph 30(a)(iv), to the ABL DIP Agent and Term DIP Agent based on

the Funding Ratio until the ABL DIP Obligations and/or Term DIP Obligations (as the case may

be) are Paid in Full, *third*, to pay any outstanding DIP Obligations *pro rata* and *fourth*, after the

ABL DIP Obligations and Term DIP Obligations are Paid in Full, to the Debtors.

(ii)     All funds in the Post-Carve Out Trigger Notice Reserve shall be used first

to pay the obligations set forth in subclause (iv) of the definition of Carve Out (the "Post-Carve

Out Amounts").  If the Post-Carve Out Trigger Notice Reserve has not been reduced to zero,

subject to clause (iii), below, remaining funds in such reserve shall be distributed *first* pro rata to

the DIP Agents on account of the applicable DIP Obligations until such DIP Obligations are Paid

in Full, and *second* to the Debtors.

(iii)     Notwithstanding anything to the contrary in the Prepetition Secured Debt

Documents, the DIP Loan Documents or this Final Order (including, without limitation, paragraph

24 of this Final Order), if either of the Carve Out Reserves is not funded in full in the amounts set

forth in this paragraph 30(d), then, any excess funds in one of the Carve Out Reserves following

the payment of the Pre-Carve Out Amounts or Post-Carve Out Amounts, respectively, may be used

to fund the other Carve Out Reserve to the extent set forth in 30(d)(i) or 30(d)(ii).

(iv)    Notwithstanding anything to the contrary in the Prepetition Secured Debt Documents, DIP Loan Documents or this Final Order (including, without limitation, paragraph 24 of this Final Order), following delivery of a Carve Out Trigger Notice, the DIP Agents agree not to sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the Debtors until the Carve Out Reserves have been fully funded, but shall have a residual security interest in the Carve Out Reserves, with any excess paid as provided in paragraphs (i) and (ii) above.

(v)    Notwithstanding anything to the contrary in this Final Order, (A) the failure of the Carve Out Reserves to satisfy in full Allowed Professional Fees shall not affect the priority of the Carve Out with respect to any shortfall, and (B) in no way shall the Approved Budget, Carve Out, Post-Carve Out Trigger Notice Cap or Carve Out Reserves be construed as a cap or limitation on the amount of the Allowed Professional Fees due and payable by the Debtors; *provided* that in all cases until the ABL DIP Obligations are Paid in Full, clause (iii) of the Carve Out with respect to the ABL DIP Priority Collateral and the ABL DIP Secured Parties will always be subject to the ABL Professional Fee Carve Out Cap.

(e)    *Reservation of Rights*.  Nothing herein shall be construed to impair the right or ability of any party to object to the fees, expenses, reimbursement or other compensation of any Professional Person.  The DIP Secured Parties and the Prepetition Secured Parties shall not be responsible for the payment or reimbursement of any fees or disbursements of any Professional Person incurred in connection with the Chapter 11 Cases or any Successor Cases.  Nothing in this Final Order or otherwise shall be construed to obligate the DIP Secured Parties or the Prepetition Secured Parties in any way to pay compensation to, or reimburse the expenses of, any Professional

Person or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

31.    <u>Limitations on the DIP Facilities, the DIP Collateral, the Prepetition Collateral, the Cash Collateral and the Carve Out</u>.  Except as otherwise provided in this Final Order (including with respect to the rights otherwise granted in this Final Order with respect to the Remedies Notice Period to contest the occurrence and/or continuance of a Termination Event), no DIP Collateral, Prepetition Collateral, DIP Loans, Cash Collateral, proceeds of any of the foregoing or any portion of the Carve Out may be used, directly or indirectly, by any of the Debtors, any Official Committee, if any, or any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Cases or any other person or entity (or to pay any professional fees, disbursements, costs or expenses incurred in connection therewith): (a) to object to, prevent, hinder, or delay the DIP Agents', the DIP Lenders', and the Prepetition Secured Parties' enforcement or realization upon any of the DIP Collateral, Prepetition Collateral or Cash Collateral, once a Termination Event occurs; (b) to use or seek to use Cash Collateral other than as provided pursuant to the Interim Order or this Final Order, except to the extent expressly permitted by the terms of the DIP Loan Documents, selling or otherwise disposing of DIP Collateral, in each case, without the consent of the ABL DIP Agent (to the extent of Priority ABL Collateral) and the Required Term DIP Lenders; (c) to seek authorization to obtain liens or security interests that are senior to, or on a parity with, the DIP Liens or the Superpriority DIP Claims; or (d) to investigate (including by way of examinations or discovery proceedings), prepare, assert, join, commence, support or prosecute any action for any claim, counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, any of the Prepetition Secured

Parties with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (A) any claims or causes of action arising under chapter 5 of the Bankruptcy Code, (B) any so-called "lender liability" claims and causes of action, (C) any action with respect to the amount, validity, enforceability, priority, and extent of, or asserting any defense, counterclaim, or offset to, the DIP Obligations, the Superpriority DIP Claims, the DIP Liens, the DIP Loan Documents, the Term DIP Commitment Letter, the Prepetition ABL Loan Documents, the Prepetition ABL Obligations, the Superpriority Notes Documents, the Prepetition Superpriority Notes Obligations, the Senior Secured Notes Documents or the Prepetition Senior Secured Notes Obligations, (D) any action seeking to challenge, invalidate, modify, set aside, avoid, marshal, recharacterize or subordinate, in whole or in part, the DIP Obligations, the DIP Liens, the Superpriority DIP Claims, the DIP Collateral, the Prepetition Collateral or the Prepetition Obligations, (E) any action seeking to modify any of the rights, remedies, priorities, privileges, protections, and benefits granted to either the DIP Agents or the DIP Lenders under the Interim Order, this Final Order or under any of the DIP Loan Documents, the Term DIP Commitment Letter, any of the Prepetition Secured Parties under any of the Prepetition Secured Debt Documents (in each case, including, without limitation, claims, proceedings or actions that might prevent, hinder or delay any of the DIP Agents' or the DIP Lenders' assertions, enforcements, realizations or remedies on or against the DIP Collateral in accordance with the applicable DIP Loan Documents, the Interim Order, and this Final Order), and (F) objecting to, contesting, or interfering with, in any way, the DIP Agents' and the DIP Lenders' enforcement or realization upon any of the DIP Collateral once an "Event of Default" (as defined in the applicable DIP Credit Agreement) has occurred; provided, however, that no more than $50,000 in the aggregate of the DIP Collateral (including the Cash Collateral), proceeds from

65

the borrowings under the DIP Facilities, the Carve Out, or any other amounts, may be used by any

Official Committee to investigate claims and/or liens, including the validity, enforceability,

perfection, priority or extent of the Prepetition Liens, of the Prepetition ABL Agent and the

Prepetition ABL Lenders under the Prepetition ABL Loan Documents, the Superpriority Notes

Trustee and the Superpriority Noteholders under the Superpriority Notes Documents, and the

Senior Secured Notes Trustee and the Senior Secured Noteholders under the Senior Secured Notes

Documents.

        32.    <u>Reservation of Certain Third Party Rights and Bar of Challenges and Claims</u>.

        (a)    Each stipulation, admission, and agreement contained in this Final Order

including, without limitation, the Debtors' stipulations contained in paragraphs E and F of this

Final Order (collectively, the "<u>Stipulations</u>"), shall be binding upon the Debtors and any successor

thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for

any of the Debtors in the Chapter 11 Cases or any Successor Cases) under all circumstances and

for all purposes, and the Debtors are deemed to have irrevocably waived and relinquished all

Challenges as of the Petition Date.

        (b)    Notwithstanding the generality of clause (a) above, the Debtors'

Stipulations shall be binding upon all other parties in interest (including without limitation, any

Official Committee, if appointed) and any other person or entity acting or seeking to act on behalf

of the Debtors' estates, in all circumstances and for all purposes, unless (1) an Official Committee,

if any, or a party in interest (in each case, to the extent requisite standing is obtained pursuant to

an order of this Court entered prior to the expiration of the Challenge Period), has timely and duly

filed an adversary proceeding or contested matter (subject to the limitations contained in this Final

Order) (each, a "<u>Challenge Proceeding</u>") by the expiration of the Challenge Period (as defined

below), objecting to or challenging the amount, validity, perfection, enforceability, priority or extent of the Prepetition Obligations, the Prepetition Liens or the Prepetition Secured Debt Documents, or otherwise asserting or prosecuting any avoidance action or any other claim, counterclaim, cause of action, objection, contest or defense (each, a "Challenge") against any of the Prepetition Secured Parties or any of their respective affiliates, subsidiaries, officers, directors, managers, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and the respective successors and assigns thereof (in each case, in their respective capacities as such), arising under, in connection with or related to the Prepetition Senior Obligations, the Prepetition Liens or the Prepetition Secured Debt Documents, and (2) there is entered a final non-appealable order in favor of the plaintiff in any such timely filed Challenge Proceeding; provided, however, that any pleadings filed in any Challenge Proceeding shall set forth with specificity the basis for such Challenge (and any Challenges not so specified prior to the expiration of the Challenge Period shall be deemed forever, waived, released and barred).

(c)        Only those parties in interest who properly commence a Challenge within the Challenge Period may prosecute such Challenge.  As to (x) any parties in interest, including any Official Committee, who fail to file a Challenge prior to the expiration of the Challenge Period, or if any such Challenge is filed and overruled, or (y) any and all matters that are not expressly the subject of a timely Challenge: (1) any and all such Challenges by any party (including, without limitation, any Official Committee, any chapter 11 trustee, any examiner or any other estate representative appointed in the Chapter 11 Cases, or any chapter 7 trustee, any examiner or any other estate representative appointed in any Successor Cases), shall be deemed to be forever waived and barred; (2) all of the findings, Stipulations, waivers, releases, affirmations and other stipulations under this Final Order, including without limitation, as to the priority, extent,

allowability, validity, and perfection as to the Prepetition Liens, the Prepetition Obligations or the Prepetition Secured Debt Documents, which, in each case, shall be of full force and effect and forever binding upon the applicable Debtors' bankruptcy estates and all creditors, interest holders, and other parties in interest in the Chapter 11 Cases and any Successor Cases; (3) [reserved]; (4) the Prepetition Obligations shall constitute allowed claims and shall not be subject to any defense, claim, counterclaim, recharacterization, subordination, offset, avoidance, for all purposes in the Chapter 11 Cases and any Successor Cases; (5) the Prepetition Secured Debt Documents shall be deemed to have been valid, as of the Petition Date, and enforceable against each of the Debtors (subject to the Prepetition Intercreditor Agreements) in the Chapter 11 Cases and any Successor Cases; and (6) the Prepetition Liens shall be deemed to have been, as of the Petition Date, legal, valid, binding, perfected, security interests and liens, not subject to recharacterization, subordination, avoidance or other defense;

(d)      If any such Challenge Proceeding is timely and properly filed during the Challenge Period, the Stipulations shall nonetheless remain binding and preclusive (as provided in paragraph 30(b) hereof) on any Official Committee and on any other person or entity, except to the extent that such Stipulations were expressly and successfully challenged in such Challenge Proceeding as set forth in a final, non-appealable order of a court of competent jurisdiction.

(e)      The "Challenge Period" shall mean the date that is the earliest of: (i) February 6, 2021 and (ii) the date of entry of an order of this Court confirming a plan of reorganization of the Debtors or approving the sale of all or substantially all of the assets of the Debtors.  The Challenge Period may only be extended with the written consent of the applicable Prepetition Agent at the direction of the "Required Lenders", as defined in the applicable Prepetition Secured Debt Documents, prior to the expiration of the Challenge Period.

68

(f)     Notwithstanding anything to the contrary in this Final Order: (x) if any Challenge is timely commenced, the Stipulations shall nonetheless remain binding and preclusive on all parties-in-interest (other than the party that has brought such Challenge in connection therewith and then only with respect to the Stipulations that are subject to the Challenge and not to any Stipulations not subject to the Challenge) except to the extent that such Stipulations are successfully challenged in such Challenge; and (y) the Prepetition Secured Parties reserve all of their rights to contest on any grounds any Challenge and preserve any and all of their rights to appeal and stay any orders issued in connection with a successful Challenge.  Nothing in this Final Order vests or confers on any person (as defined in the Bankruptcy Code), including any Official Committee or any non-statutory committees that may be appointed in the Chapter 11 Cases, standing or authority to pursue any cause of action belonging to the Debtors or their estates, and all rights to object to such standing are expressly reserved.

33.     No Third Party Rights.  Except as explicitly provided for in this Final Order, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect or incidental beneficiary.

34.     Section 506(c).  In partial consideration for, among other things, the Carve Out and the payments contemplated by the Approved Budget to administer the Chapter 11 Cases with the use of Cash Collateral, no costs or expenses of administration which have been or may be incurred in the Chapter 11 Cases at any time shall be charged against the DIP Agents, the DIP Lenders, any of the DIP Obligations, any of the DIP Collateral,  the Prepetition Agents, the Prepetition Secured Parties, any of the Prepetition Obligations, or any of the Prepetition Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code or otherwise for any costs and expenses incurred in connection with the preservation, protection, or enhancement of realization by the DIP Lenders

upon the DIP Collateral or Prepetition Secured Parties upon the Prepetition Collateral, as applicable, without the prior express written consent of the affected applicable DIP Agent, Prepetition Agent and/or affected DIP Lender or Prepetition Lender, in their sole discretion and no consent shall be implied from any other action, inaction or acquiescence by the applicable DIP Agent, the DIP Secured Parties, or the Prepetition Secured Parties.  For the avoidance of doubt, consent to the Carve Out or the approval of any budget under this Final Order shall not be deemed a consent under this paragraph.

35.     <u>Section 552(b)</u>.  The Prepetition Secured Parties are and shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) shall not apply to the Prepetition Secured Parties or the Prepetition Obligations.

36.     <u>No Marshaling/Application of Proceeds</u>.  In no event shall any DIP Secured Party or Prepetition Secured Party be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the enforcement of remedies in respect of the DIP Collateral or the Prepetition Collateral, as applicable, and all proceeds shall be received and applied in accordance with this Final Order, <u>provided</u> that any such enforcement receipt and application shall be in accordance with the Intercreditor Agreements.

37.     <u>Right to Credit Bid</u>.  Subject to paragraph 32 of this Final Order and the Intercreditor Agreements, pursuant to section 363(k) of the Bankruptcy Code, each of the DIP Secured Parties (subject to the terms of the DIP Loan Documents) and the Prepetition Agents shall have the unqualified right to "credit bid" up to the full amount of the applicable DIP Obligations, Prepetition Superpriority Notes Obligations, or Prepetition Senior Secured Notes Obligations, respectively, and in their order of priority, in connection with any sale or other disposition of all

or any portion of the DIP Collateral or the Prepetition Collateral, respectively, including, without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code, and shall automatically be deemed a "qualified bidder" with respect to any disposition of the applicable collateral under or pursuant to (a) section 363 of the Bankruptcy Code, (b) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (c) a sale or disposition by a chapter 7 trustee for any of the Debtors under section 725 of the Bankruptcy Code, subject in each case to the Intercreditor Agreements.  The rights set forth herein are subject to any successful Challenge under paragraph 32 of this Final Order.

38.  <u>Discharge Waiver/Release</u>.  The DIP Obligations, the Superpriority DIP Claims and the obligations of the Debtors with respect to adequate protection under this Final Order, including granting the Adequate Protection Liens and the Adequate Protection Superpriority Claims, shall not be discharged by the entry of an order confirming any plan of reorganization in any of the Chapter 11 Cases, notwithstanding the provisions of section 1141(d) of the Bankruptcy Code, unless such obligations have been Paid in Full, on or before the effective date of such confirmed plan of reorganization, or each of the DIP Agents, each Term DIP Lender, and, solely in respect of the ABL DIP Priority Collateral, the Prepetition ABL Agent have otherwise agreed, including as provided in an Acceptable Plan (as defined in the DIP Credit Agreements).  None of the Debtors shall propose or support any plan of reorganization or sale of all or substantially all of the Debtors' assets, or order confirming such plan or approving such sale, that is not conditioned upon the DIP Obligations being Paid in Full and, solely in the case of the sale of ABL DIP Priority Collateral, the Prepetition ABL Obligations being Paid in Full within a commercially reasonable period of time, in no event later than the effective date of such plan of reorganization or sale,

without the written consent of the DIP Agents (upon direction of each Term DIP Lender with respect to the Term DIP Agent) and the Prepetition ABL Agent, as applicable.  Unless otherwise agreed to by an individual DIP Lender with respect to amounts owed to it, all DIP Obligations shall be Paid in Full on the Effective Date of any plan.

39.    Rights Preserved.  Notwithstanding anything in this Final Order to the contrary, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the rights of the DIP Secured Parties or the Prepetition Secured Parties to seek any other or supplemental relief in respect of the Debtors; (b) the rights of the DIP Secured Parties or the Prepetition Secured Parties under the DIP Loan Documents, the applicable Prepetition Secured Debt Documents, the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of any of the Chapter 11 Cases, conversion of any or all of the Chapter 11 Cases to a case under chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan or plans of reorganization; or (c) any other rights, claims, or privileges (whether legal, equitable or otherwise) of the DIP Secured Parties or the Prepetition Secured Parties.  Notwithstanding anything in this Final Order to the contrary, the entry of this Final Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the Debtors', the Official Committee's (if any) or any party-in-interest's right to oppose any of the relief requested in accordance with the immediately preceding sentence, except as expressly set forth in this Final Order.

40.    Limitation of Liability.  In determining to make any loan or other extension of credit under the DIP Loan Documents, to permit the use of the DIP Collateral or Prepetition Collateral

(including Cash Collateral) or in exercising any rights or remedies as and when permitted pursuant to the Interim Order, this Final Order or the DIP Loan Documents or Prepetition Secured Debt Documents, none of the DIP Secured Parties or Prepetition Secured Parties shall (a) have any liability to any third party or be deemed to be in "control" of the operations of the Debtors; (b) owe any fiduciary duty to the Debtors, their respective creditors, shareholders or estates; or (c) be deemed to be acting as a "Responsible Person" or "Owner" or "Operator" or "managing agent" with respect to the operation or management of any of the Debtors (as such terms or similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601, *et seq.*, as amended, or any other federal or state statute, including the Internal Revenue Code).  Furthermore, nothing in this Final Order shall in any way be construed or interpreted to impose or allow the imposition upon any of the DIP Agents, the DIP Secured Parties, the Prepetition Agents or the Prepetition Secured Parties of any liability for any claims arising from the prepetition or postpetition activities of any of the Debtors and their respective affiliates (as defined in section 101(2) of the Bankruptcy Code).

41.     No Waiver by Failure to Seek Relief.  The failure, at any time or times hereafter, of the DIP Secured Parties or the Prepetition Secured Parties, to require strict performance by the Debtors of any provision of the Interim Order or this Final Order shall not waive, affect or diminish any right of such parties thereafter to demand strict compliance and performance therewith.  No delay on the part of any party in the exercise of any right or remedy under the Interim Order or this Final Order shall preclude any other or further exercise of any such right or remedy or the exercise of any other right or remedy.  None of the rights or remedies of any party under this Final Order shall be deemed to have been amended, modified, suspended or waived unless such amendment, modification, suspension or waiver is in writing and signed by the party against whom

such amendment, modification, suspension, or waiver is sought.  No consents by any of the DIP Secured Parties or the Prepetition Secured Parties required under this Final Order shall be implied by any inaction or acquiescence by any of the DIP Secured Parties or the Prepetition Secured Parties.

42.     <u>Binding Effect of this Final Order</u>.  Immediately upon, and effective as of, entry by the Court, this Final Order shall inure to the benefit of the Debtors, the DIP Secured Parties and the Prepetition Secured Parties, and it shall become valid and binding upon the Debtors, the DIP Secured Parties, and the Prepetition Secured Parties, any and all other creditors of the Debtors, any Official Committee or other committee appointed in the Chapter 11 Cases, any and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed as legal representative of any of the Debtors in any of the Chapter 11 Cases or any Successor Cases, or upon dismissal of any of the Chapter 11 Cases.  Further, by the Interim Order, the Stipulations were held to be binding on the Debtors and the DIP Obligations were held to constitute allowed claims for all purposes in each of the Chapter 11 Cases, and such order is hereby ratified and approved on a final basis.

43.     <u>No Modification to Final Order</u>.  Until and unless the DIP Obligations and the Prepetition Obligations have been Paid in Full, the Debtors irrevocably waive the right to seek and shall not seek or consent, directly or indirectly, without the prior written consent of the DIP Agents, subject to the Intercreditor Agreements to: (a) (i) any modification, stay, vacatur or amendment to this Final Order or (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in sections 503(b), 506(c), 507(a), or 507(b) of the Bankruptcy Code) in the Chapter 11 Cases, equal or superior to the Superpriority

74

DIP Claims, other than the Carve Out; (b) any order authorizing the use of Cash Collateral that is inconsistent with this Final Order; (c) any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens, except as specifically provided in the DIP Loan Documents or this Final Order; or (d) without the prior written consent of the Prepetition Secured Notes Trustees, any lien on any of the DIP Collateral with priority equal or superior to the Prepetition Liens or the Adequate Protection Liens.  The Debtors irrevocably waive any right to seek any amendment, modification or extension of this Final Order without the prior written consent of the ABL DIP Agent and the Required Term DIP Lenders and to the extent set forth herein, the Prepetition Agents.

44.    Order Controls.  In the event of any inconsistency between the terms and conditions of the DIP Loan Documents, any other document or any other order of the Court and of this Final Order, the provisions of this Final Order shall govern and control.

45.    Limits on Lender Liability.  Nothing in the Interim Order, this Final Order, or in any of the DIP Loan Documents, the Prepetition Secured Debt Documents or any other documents related to this transaction shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Secured Parties or the Prepetition Secured Parties of any liability for any claims arising from any and all activities by the Debtors in the operation of their businesses in connection with the Debtors' postpetition restructuring efforts.

46.    Survival.  The provisions of this Final Order and any actions taken pursuant hereto shall survive, and shall not be modified, impaired or discharged by entry of any order that may be entered: (a) confirming any plan of reorganization in any of the Chapter 11 Cases; (b) converting any or all of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; (c) dismissing any or all of the Chapter 11 Cases; or (d) pursuant to which the Court abstains from hearing any of the Chapter 11 Cases.  The terms and provisions of this Final Order, including the claims, liens,

security interests, and other protections (as applicable) granted to the DIP Secured Parties and the Prepetition Secured Parties pursuant to this Final Order, notwithstanding the entry of any such order, shall continue in any of the Chapter 11 Cases or any Successor Cases, and following dismissal of any of the Chapter 11 Cases, and shall maintain their priority as provided by this Final Order until the DIP Obligations, the Prepetition Obligations and the Adequate Protection Obligations shall have been Paid in Full.  The rights, privileges, benefits and protections afforded herein and in the DIP Loan Documents, including the DIP Liens, the Superpriority DIP Claims, the Adequate Protection Liens, and the Adequate Protection Claims (collectively, the "DIP Protections"), as well as the terms and provisions concerning the indemnification of the DIP Secured Parties and the Prepetition Secured Parties, shall continue in any of the Chapter 11 Cases following dismissal of any of the Chapter 11 Cases, termination of the provisions of this Final Order, and/or the indefeasible payment in full of the DIP Obligations.

47.    Dismissal.  If any order dismissing any of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code), that (i) the DIP Protections shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations and Prepetition Obligations have been Paid in Full (and that all DIP Protections and Adequate Protection Liens shall, notwithstanding such dismissal, remain binding on all parties in interest), and (ii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such DIP Protections and the Adequate Protection Liens.

48.    Entry of this Final Order/Waiver of Applicable Stay.  The Clerk of the Court is hereby directed to forthwith enter this Final Order on the docket of the Court maintained in regard to the Chapter 11 Cases.  This Final Order shall be effective upon its entry and not subject to any

stay (all of which are hereby waived), notwithstanding anything to the contrary contained in Bankruptcy Rule 4001(a)(3).

49.    <u>Notice of Entry of this Final Order</u>.  The Debtors' counsel shall serve a copy of this Final Order or a suitable notice respecting same on all Notice Parties.

50.    <u>Effect of this Final Order</u>.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062, and 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

51.    <u>Certain Taxing Authorities</u>.  Notwithstanding any other provisions included in this Final Order, or any agreements approved in this Final Order, any statutory liens (collectively, the "Tax Liens"), of Certain Taxing Authorities[8] shall not be primed by nor made subordinate to any liens granted to any party by this Final Order to the extent such Tax Liens are valid, senior, perfected, and unavoidable, and all parties' rights to object to the priority, validity, amount, and extent of the claims and liens asserted by Certain Taxing Authorities are fully preserved.

52.    <u>Retention of Jurisdiction</u>.  The Court shall retain jurisdiction to hear, determine and, if applicable, enforce the terms of, any and all matters arising from or related to the DIP Facilities and/or this Final Order.

Dated: _____
      Dec 17 2020

Richmond, Virginia

/s/ Kevin R Huennekens
_____
UNITED STATES BANKRUPTCY JUDGE

Entered On Docket:  Dec 17 2020

---

[8]    "<u>Certain Taxing Authorities</u>" means Maricopa County Treasurer, Bell County Tax Appraisal District, Denton County, Bexar County, City of Mesquite, Cypress-Fairbanks ISD, Dallas County, El Paso, Fort Bend Co. WCID #02, Fort Bend County, Harris County, Hidalgo County, Lewisville ISD, McAllen, Northwest ISD, Nueces County, Smith County, Tarrant County, Randall County Tax Office, Arlington ISD, Crowley ISD, Plano ISD, Lubbock Central Appraisal District, Brazoria County, Cinco Mud 12, Willowfork Drainage, Fort Bend ISD, Fort Bend County LID 2, JC DD6, Tomball ISD, Malcomson Rud UD, Clear Creek ISD, Baybrook MUD, Spring Branch ISD, City of Houston, Harris-FB MUD 3, Pasadena ISD, and Humble ISD.

WE ASK FOR THIS:

*/s/   Jennifer E. Wuebker*
Tyler P. Brown, Esq.        (VSB No. 28072)
Justin F. Paget, Esq.        (VSB No. 77949)
Jennifer E. Wuebker, Esq. (VSB No. 91184)
**HUNTON ANDREWS KURTH LLP**
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219
Telephone:    (804) 788-8200
Facsimile:    (804) 788-8218

- and -

Dennis F. Dunne, Esq.    (admitted *pro hac vice*)
Andrew M. Leblanc, Esq. (admitted *pro hac vice*)
Michael W. Price, Esq.    (admitted *pro hac vice*)
Lauren C. Doyle, Esq.    (admitted *pro hac vice*)
**MILBANK LLP**
55 Hudson Yards
New York, New York 10001
Telephone:    (212) 530-5000
Facsimile:    (212) 530-5219

Thomas R. Kreller, Esq. (admitted *pro hac vice*)
**MILBANK LLP**
2029 Century Park East
33rd Floor
Los Angeles, California 90067
Telephone:    (424) 386-4000
Facsimile:    (213) 629-5063

*Co-Counsel for Debtors and Debtors in Possession*

## CERTIFICATION OF ENDORSEMENT
## UNDER LOCAL BANKRUPTCY RULE 9022-1(C)

Pursuant to Local Bankruptcy Rule 9022-1(C), I certify that the foregoing proposed order has been endorsed by or served upon all necessary parties.

*/s/   Jennifer E. Wuebker*

<u>**Exhibit A**</u>

**Term DIP Credit Agreement**

**EXECUTION VERSION**

SENIOR SECURED SUPER-PRIORITY PRIMING DEBTOR-IN-POSSESSION CREDIT
AGREEMENT

dated as of
November 24, 2020

GUITAR CENTER, INC.,
as the Borrower
THE FACILITY GUARANTORS PARTY HERETO FROM TIME TO TIME,

DELAWARE TRUST COMPANY,
as Administrative Agent and Collateral Agent,

and

THE LENDERS
NAMED HEREIN

# TABLE OF CONTENTS

ARTICLE I ....................................................................................................................1

    SECTION 1.01    Definitions ...............................................................................1
    SECTION 1.02    Terms Generally .....................................................................33
    SECTION 1.03    Accounting Terms....................................................................34
    SECTION 1.04    Rounding...................................................................................35
    SECTION 1.05    Times of Day ...........................................................................35
    SECTION 1.06    [Reserved].................................................................................35
    SECTION 1.07    Certifications............................................................................35
    SECTION 1.08    [Reserved].................................................................................35
    SECTION 1.09    Divisions ..................................................................................35

ARTICLE II  Amount and Terms of Loans....................................................................35

    SECTION 2.01    Commitments of the Lenders....................................................35
    SECTION 2.02    [Reserved].................................................................................36
    SECTION 2.03    Borrowings...............................................................................36
    SECTION 2.04    [Reserved].................................................................................36
    SECTION 2.05    [Reserved].................................................................................36
    SECTION 2.06    [Reserved].................................................................................36
    SECTION 2.07    Notes ........................................................................................36
    SECTION 2.08    Interest on Loans......................................................................36
    SECTION 2.09    [Reserved].................................................................................36
    SECTION 2.10    [Reserved].................................................................................36
    SECTION 2.11    [Reserved].................................................................................36
    SECTION 2.12    Default Interest ........................................................................36
    SECTION 2.13    [Reserved].................................................................................37
    SECTION 2.14    Increased Costs.........................................................................37
    SECTION 2.15    [Reserved].................................................................................38
    SECTION 2.16    Optional Prepayment of Loans; Reimbursement of Lenders.....................38
    SECTION 2.17    Mandatory Prepayment; Commitment Termination....................................38
    SECTION 2.18    [Reserved].................................................................................39
    SECTION 2.19    Fees; Payments.........................................................................39
    SECTION 2.20    Maintenance of Loan Account; Statements of Account .............................39
    SECTION 2.21    Payments; Sharing of Setoff ....................................................40
    SECTION 2.22    [Reserved].................................................................................41
    SECTION 2.23    Taxes........................................................................................41
    SECTION 2.24    Mitigation Obligations; Replacement of Lenders....................................44
    SECTION 2.25    [Reserved].................................................................................44
    SECTION 2.26    Security Interests in Collateral................................................44
    SECTION 2.27    Defaulting Lenders ..................................................................45

ARTICLE III  Representations and Warranties................................................................46

    SECTION 3.01    Organization; Powers...............................................................46

SECTION 3.02    Authorization; Enforceability ......................................................46
SECTION 3.03    No Conflicts ...........................................................................47
SECTION 3.04    Financial Condition..................................................................47
SECTION 3.05    Properties ................................................................................47
SECTION 3.06    Litigation and Environmental Matters........................................48
SECTION 3.07    Compliance with Laws and Agreements .....................................49
SECTION 3.08    Investment Company Status ......................................................50
SECTION 3.09    Taxes......................................................................................50
SECTION 3.10    ERISA .....................................................................................50
SECTION 3.11    Disclosure ...............................................................................50
SECTION 3.12    Subsidiaries .............................................................................51
SECTION 3.13    [Reserved]...............................................................................51
SECTION 3.14    Labor Matters...........................................................................51
SECTION 3.15    Security Documents .................................................................52
SECTION 3.16    Federal Reserve Regulations .....................................................52
SECTION 3.17    Initial Budget ..........................................................................52
SECTION 3.18    Chapter 11 Cases .....................................................................54
SECTION 3.19    [Reserved]...............................................................................54
SECTION 3.20    OFAC/Sanctions......................................................................54
SECTION 3.21    [Reserved]...............................................................................54
SECTION 3.22    Orders......................................................................................54
SECTION 3.23    Petition Date; Claims and Collateral ..........................................54

ARTICLE IV  Conditions ..............................................................................54

    SECTION 4.01    Closing Date ......................................................................54

ARTICLE V  Affirmative Covenants ..............................................................57

    SECTION 5.01    Reporting Requirements .......................................................57
    SECTION 5.02    Notices of Material Events ....................................................61
    SECTION 5.03    Information Regarding Collateral............................................61
    SECTION 5.04    Existence; Conduct of Business..............................................61
    SECTION 5.05    Payment of Obligations ........................................................62
    SECTION 5.06    Maintenance of Properties .....................................................62
    SECTION 5.07    Insurance..............................................................................62
    SECTION 5.08    Books and Records; Inspection and Audit Rights; Appraisals;
                    Accountants ........................................................................64
    SECTION 5.09    [Reserved].............................................................................65
    SECTION 5.10    Compliance with Laws ..........................................................65
    SECTION 5.11    Use of Proceeds ...................................................................65
    SECTION 5.12    Additional Subsidiaries..........................................................66
    SECTION 5.13    Further Assurances ...............................................................66
    SECTION 5.14    Corporate Separateness.........................................................66
    SECTION 5.15    [Reserved]............................................................................67
    SECTION 5.16    [Reserved]............................................................................67
    SECTION 5.17    OFAC; Sanctions .................................................................67

SECTION 5.18   Lender Calls ............................................................................67
SECTION 5.19   Milestones ...............................................................................67
SECTION 5.20   Other Bankruptcy Matters ........................................................67

ARTICLE VI  Negative Covenants .......................................................................68

SECTION 6.01   Indebtedness and Other Obligations .........................................68
SECTION 6.02   Liens .......................................................................................68
SECTION 6.03   Fundamental Changes; New Subsidiaries ..................................68
SECTION 6.04   Investments .............................................................................69
SECTION 6.05   Asset Sales ..............................................................................69
SECTION 6.06   Restricted Payments; Certain Payments of Indebtedness ...........69
SECTION 6.07   Transactions with Affiliates .....................................................69
SECTION 6.08   Restrictive Agreements ............................................................70
SECTION 6.09   Amendment of Material Documents ..........................................70
SECTION 6.10   Fiscal Year ..............................................................................70
SECTION 6.11   Chapter 11 Cases. No Loan Party will, nor will it permit any
                       Subsidiary of it to: ..................................................................71
SECTION 6.12   Use of Proceeds .......................................................................71
SECTION 6.13   Budget Covenant ......................................................................71
SECTION 6.14   Subrogation .............................................................................72

ARTICLE VII  Events of Default ........................................................................72

SECTION 7.01   Events of Default .....................................................................72
SECTION 7.02   Remedies on Default .................................................................78
SECTION 7.03   Application of Proceeds ............................................................80

ARTICLE VIII  The Agents ................................................................................81

SECTION 8.01   Appointment and Administration by Administrative Agent..........81
SECTION 8.02   Appointment of Collateral Agent ..............................................81
SECTION 8.03   Sharing of Excess Payments .....................................................81
SECTION 8.04   Agreement of Applicable Lenders .............................................82
SECTION 8.05   Liability of Agents ...................................................................82
SECTION 8.06   Notice of Default .....................................................................85
SECTION 8.07   Credit Decisions ......................................................................85
SECTION 8.08   Reimbursement and Indemnification .........................................85
SECTION 8.09   [Reserved] ...............................................................................86
SECTION 8.10   Notice of Transfer ...................................................................86
SECTION 8.11   Successor Agents .....................................................................86
SECTION 8.12   Relation Among the Lenders .....................................................87
SECTION 8.13   Reports and Financial Statements .............................................87
SECTION 8.14   Agency for Perfection ..............................................................88
SECTION 8.15   Reserved..................................................................................88
SECTION 8.16   Collateral Matters ....................................................................88

ARTICLE IX  Miscellaneous ...................................................................................88

SECTION 9.01    Notices ...........................................................................88
SECTION 9.02    Waivers; Amendments.....................................................89
SECTION 9.03    Expenses; Indemnity; Damage Waiver.............................92
SECTION 9.04    Successors and Assigns ...................................................93
SECTION 9.05    Survival ...........................................................................97
SECTION 9.06    Counterparts; Integration; Effectiveness ........................98
SECTION 9.07    Severability .....................................................................98
SECTION 9.08    Right of Set-off ...............................................................98
SECTION 9.09    Governing Law; Jurisdiction; Consent to Service of Process.....99
SECTION 9.10    WAIVER OF JURY TRIAL...........................................99
SECTION 9.11    [Reserved]......................................................................100
SECTION 9.12    Headings ........................................................................100
SECTION 9.13    Interest Rate Limitation ................................................100
SECTION 9.14    Additional Waivers .......................................................100
SECTION 9.15    Confidentiality ..............................................................102
SECTION 9.16    Patriot Act .....................................................................103
SECTION 9.17    Foreign Asset Control Regulations.................................103
SECTION 9.18    Order, Intercreditor Arrangement .................................104
SECTION 9.19    [Reserved]......................................................................104
SECTION 9.20    [Reserved]......................................................................104
SECTION 9.21    Acknowledgment and Consent to Bail-In of EEA Financial
                Institutions ...................................................................104

**EXHIBITS**

| | |
|---|---|
| Exhibit A: | Form of Assignment and Acceptance |
| Exhibit B: | Form of Joinder |
| Exhibit C: | Form of Guarantee |
| Exhibit D: | Form of Interim Order |
| Exhibit E-1 – E-4: | Tax Compliance Certificates |
| Exhibit F | Form of Initial Budget |

## SCHEDULES

Schedule 1.1(a):          Lenders and Commitments
Schedule 1.1(b):          Excluded Subsidiaries
Schedule 3.01:            Organization Information
Schedule 3.05(b):         Intellectual Property
Schedule 3.05(c)(i):      Owned Real Property
Schedule 3.05(c)(ii):     Leased Real Property
Schedule 3.06(a):         Disclosed Matters
Schedule 3.12:            Subsidiaries; Joint Ventures
Schedule 5.19:            Milestones
Schedule 6.01:            Permitted Indebtedness
Schedule 6.02:            Permitted Encumbrances
Schedule 6.04:            Permitted Investments
Schedule 6.05:            Permitted Dispositions

### SENIOR SECURED SUPER-PRIORITY PRIMING DEBTOR-IN-POSSESSION CREDIT AGREEMENT

This **SENIOR SECURED SUPER-PRIORITY PRIMING DEBTOR-IN-POSSESSION CREDIT AGREEMENT** (as amended, restated or otherwise modified from time to time in accordance with the terms hereof, this "Agreement"), dated as of November 24, 2020, is among Guitar Center, Inc., a corporation organized under the laws of the State of Delaware (the "Borrower"), the Facility Guarantors from time to time party hereto, the Lenders from time to time party hereto and Delaware Trust Company, as administrative agent (in such capacity, the "Administrative Agent"), and as collateral agent (in such capacity, the "Collateral Agent"), for its own benefit and the benefit of the other Secured Parties.

WHEREAS, each Loan Party (as defined below) filed voluntary petitions for relief under chapter 11 (such proceedings, the "Chapter 11 Cases") of the Bankruptcy Code (as defined herein) in the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Bankruptcy Court"), bearing Case No. 20-34655, on November 21, 2020 (the "Petition Date");

WHEREAS, each of the Loan Parties is continuing in the possession of its assets and in the management of its business as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, on November 23, 2020 (the "Interim Order Date"), the Bankruptcy Court entered the Interim Order (as defined below); and

WHEREAS, the Lenders are willing, subject to the terms and conditions set forth herein, to make a term loan in an aggregate principal amount equal to $325,000,000 to the Borrower.

NOW THEREFORE, in consideration of the mutual covenants and agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and benefits to be derived herefrom, the parties hereto hereby covenant and agree as follows:

### ARTICLE I

SECTION 1.01      Definitions.  As used in this Agreement, the following capitalized terms shall have the meanings specified below:

"ABL Agent" means Wells Fargo Bank, National Association in its capacity as administrative agent under the ABL DIP Facility.

"ABL DIP Facility" means that certain Senior Secured Super Priority Priming Debtor-In-Possession Credit Agreement dated as of the date hereof, by and among Guitar Center, Inc., as the Lead Borrower, the other borrowers party thereto from time to time, Wells Fargo Bank, National Association, as administrative agent, and the banks and other financial institutions party thereto, as in effect on the Closing Date and as the same may be amended from time to time and the Intercreditor Acknowledgment.

"<u>Accommodation Payment</u>" has the meaning provided in SECTION 9.14.

"<u>Account(s)</u>" means "accounts" as defined in the UCC, and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of or (b) for services rendered or to be rendered.  The term "Account" does not include (a) rights to payment evidenced by chattel paper or an instrument, (b) commercial tort claims, (c) deposit accounts, (d) investment property, or (e) letter-of-credit rights or letters of credit.

"<u>Acquisition</u>" means, with respect to a specified Person, (a) an Investment in or a purchase of a 50% or greater interest in the Capital Stock of any other Person, (b) a purchase or acquisition of all or substantially all of the assets of any other Person, (c) a purchase or acquisition of a Real Estate portfolio or Stores from any other Person, or (d) any merger or consolidation of such Person with any other Person or other transaction or series of transactions resulting in the acquisition of all or substantially all of the assets, or a 50% or greater interest in the Capital Stock of, any Person, in each case in any transaction or group of transactions which are part of a common plan.

"<u>Adequate Protection Liens</u>" has the meaning assigned to the term "Adequate Protection Liens" in the Interim Order (or the Final Order, when applicable).

"<u>Adequate Protection Superpriority Claims</u>" has the meaning assigned to the term "Adequate Protection Superpriority Claims" in the Interim Order (or the Final Order, when applicable).

"<u>Administrative Agent</u>" has the meaning provided in the preamble to this Agreement.

"<u>Affiliate</u>" means, with respect to a specified Person, any other Person that directly or indirectly through one or more intermediaries Controls, is Controlled by or is under common Control with the Person specified.

"<u>Agency Fee Letter</u>" means the Agency Fee Letter dated as of the date hereof by and between the Agents and the Borrower, as amended and in effect from time to time, providing for reasonable fees to be payable to the Administrative Agent to be mutually agreed and acceptable to the Borrower.

"<u>Agents</u>" means, collectively, the Administrative Agent and the Collateral Agent.

"<u>Agreement</u>" means this Credit Agreement, as modified, amended, supplemented or restated, and in effect from time to time.

"<u>Anti-Corruption Laws</u>" means the FCPA, the U.K. Bribery Act of 2010, as amended, and all other applicable laws and regulations or ordinances concerning or relating to bribery, money laundering or corruption in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates is located or is doing business.

"<u>Anti-Money Laundering Laws</u>" means the applicable laws or regulations in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates is located or is doing

2

business that relates to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto.

"Applicable Law" means as to any Person: (a) all laws, statutes, rules, regulations, orders, codes, ordinances, treaties or other requirements having the force of law; and (b) all court orders, decrees, judgments, injunctions, enforceable notices, binding agreements and/or rulings, in each case of or by any Governmental Authority which has jurisdiction over such Person, or any property of such Person.

"Applicable Lenders" means the Required Lenders or all Lenders, as applicable.

"Approved Budget" means the Initial Budget until updated in accordance with Section 5.01(j).

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that advises, administers or manages a Lender.

"Assignment and Acceptance" means an assignment and acceptance entered into by a Lender and an assignee (with the consent of any party whose consent is required by SECTION 9.04), and accepted by the Administrative Agent, in substantially the form of Exhibit A, or any other form approved by the Administrative Agent.

"Avoidance Actions" means any and all claims and causes of action of any Loan Party's estate arising under Sections 502(d), 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code, or any other avoidance action under the Bankruptcy Code, together with any proceeds, settlements or judgments recovered therefrom.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bankruptcy Code" means Title 11 of the United States Code (11 U.S.C. §§101-1532), as applicable to the Chapter 11 Cases.

"Bankruptcy Court" means the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division, or any other court having jurisdiction over the Chapter 11 Cases.

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" has the meaning set forth in the Preamble to this Agreement.

"Borrowing" means the incurrence of the Loans.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to remain closed.

"Capital Lease Obligations" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP; for purposes of this Agreement, the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP (except for temporary treatment of construction related expenditures under EITF 97-10, "The Effects of Lessee Involvement in Asset Construction" which will ultimately be treated as operating leases upon a sale-leaseback transaction); provided, however, that, for the avoidance of doubt, any obligations relating to a lease that was accounted for by such Person as an operating lease as of the Closing Date and any similar lease entered into after the Closing Date by such Person shall be accounted for as an operating lease and not a Capital Lease Obligation.

"Capital Stock" means, as to any Person that is a corporation, the authorized shares of such Person's capital stock, including all classes of common, preferred, voting and nonvoting capital stock, and, as to any Person that is not a corporation or an individual, the membership or other ownership interests in such Person, including, without limitation, the right to share in profits and losses, the right to receive distributions of cash and other property, and the right to receive allocations of items of income, gain, loss, deduction and credit and similar items from such Person, whether or not such interests include voting or similar rights entitling the holder thereof to exercise Control over such Person, collectively with, in any such case, all warrants, options and other rights to purchase or otherwise acquire, and all other instruments convertible into or exchangeable for, any of the foregoing.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq.

"Change in Control" means, at any time:

      (a)     any "change in/of control" or similar event as defined in any of the Senior Secured Notes Documents, the Senior Secured Superpriority Notes Documents or the Senior Unsecured Notes Documents; or

      (b)     [reserved]; or

      (c)     a change in the Control of Holdings such that the Loan Parties are not Controlled by any one or more of the Sponsor Group; or

      (d)     Holdings fails at any time to own, directly or indirectly (i) 100% of the voting Capital Stock of the Borrower or (ii) 100% of the Capital Stock of each of its other Subsidiaries (other than Subsidiaries that are directly or indirectly owned by the

Borrower), in each case, free and clear of all Liens (other than those Liens specified in clauses (a), (e), (i), (l) and (r) of the definition of Permitted Encumbrances), except, in the case of clause (ii), where such failure is as a result of a transaction permitted by the Loan Documents.

"Change in Law" means (a) the adoption of any Applicable Law after the Closing Date, (b) any change in any Applicable Law or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (c) compliance by any Credit Party (or, for purposes of SECTION 2.14, by any lending office of such Credit Party or by such Credit Party's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date applicable to the Loan Parties; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Chapter 11 Cases" has the meaning specified in the recitals hereto.

"Charges" has the meaning provided in SECTION 9.13.

"Charter Document" means as to any Person, its partnership agreement, certificate of incorporation, certificate of formation, operating agreement, membership agreement or similar constitutive document or agreement or its by-laws.

"Closing Date" means the date hereof, upon the conditions precedent in SECTION 4.01 being satisfied or waived in accordance with SECTION 9.02.

"Code" means the Internal Revenue Code of 1986, as amended, and the Treasury regulations promulgated thereunder.

"Collateral" means any and all "Collateral", "Pledged Collateral" or words of similar intent as defined in any applicable Security Document or words of similar intent, as defined in the Orders.

"Collateral Agent" has the meaning provided in the preamble to this Agreement.

"Commitments" means, with respect to each Lender, the aggregate commitments of such Lender hereunder to make Loans to the Borrower in the amount set forth opposite its name on Schedule 1.1(a) hereto.  The aggregate Commitments of all Lenders on the Closing Date equals $325,000,000.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Compliance Certificate" has the meaning provided in SECTION 5.01(d).

5

"Consolidated" means, when used to modify a financial term, test, statement, or report of a Person, the application or preparation of such term, test, statement or report (as applicable) based upon the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries.

"Control" means the possession, directly or indirectly, of the power (a) to vote 50% or more of the securities having ordinary voting power for the election of directors (or any similar governing body) of a Person, or (b) to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power or by contract. The terms "Controlling" and "Controlled" have meanings correlative thereto.

"Cost" means the cost of purchases, as reported on the applicable Loan Party's financial stock ledger based upon the Loan Parties' accounting practices in effect on the Closing Date or thereafter consented to by the Administrative Agent, whose consent will not be unreasonably withheld. "Cost" does not include inventory capitalization costs or other non-purchase price charges (except for freight charges with respect to all Inventory to the extent treated consistently with the Loan Parties' accounting practices in effect on the Closing Date) used in the applicable Loan Party's calculation of cost of goods sold.

"Covered Entity" means any of the following:

(i)    a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(ii)    a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(iii)    a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"Covered Party" has the meaning assigned to it in SECTION 9.22.

"COVID-19 Pandemic" means the COVID-19 pandemic and the economic, financial, business, operational and healthcare effects thereof and the response of governmental and healthcare authorities with respect thereto.

"Credit Party" means (a) the Lenders, (b) the Agents and their respective Affiliates and (c) the successors and permitted assigns of each of the foregoing.

"Credit Party Expenses" means, without limitation, all of the following to the extent incurred in connection with this Agreement and the other Loan Documents: (a) all reasonable documented out-of-pocket expenses incurred by the Agents and the Lenders, including the reasonable documented fees, charges and disbursements of (i) Stroock & Stroock & Lavan, LLP, as counsel to certain Lenders, (ii) Province, Inc., as advisor to certain Lenders, and (iii) Pryor Cashman LLP, as counsel for the Agents (plus one local counsel in any other jurisdiction to the extent reasonably necessary), in connection with the preparation and administration of the Loan Documents, the arrangement of the credit facilities provided for herein, or any amendments, modifications or waivers requested by a Loan Party of the provisions hereof or thereof (whether

or not any such amendments, modifications or waivers shall be consummated), and (b) all reasonable documented out-of-pocket expenses incurred by the Agents or any Lender and their respective Affiliates and branches, including the reasonable documented fees, charges and disbursements of (i) Stroock & Stroock & Lavan, LLP, as counsel to certain Lenders, (ii) Province, Inc., as advisor to certain Lenders, and (iii) Pryor Cashman LLP, as counsel for the Agents and their respective Affiliates (plus one local counsel in any other jurisdiction to the extent reasonably necessary) and outside consultants for the Agents (including, without limitation, one inventory appraisal firm and one real estate appraisal firm), in each case, in connection with the enforcement and protection of their rights in connection with the Loan Documents, including all such reasonable documented out-of-pocket expenses incurred during any workout, restructuring or related negotiations.  Except as expressly provided above, Credit Party Expenses shall not include the allocation of any overhead expenses of any Credit Party.

"Debtors" means, collectively, the Borrower, Holdings and their Subsidiaries, each in their capacity as debtors and debtors-in-possession in the Chapter 11 Cases.

"Default" means any event or condition described in SECTION 7.01 that constitutes an Event of Default or that upon notice, lapse of any cure period set forth in SECTION 7.01, or both, would, unless cured or waived, become an Event of Default.

"Default Rate" has the meaning provided in SECTION 2.12.

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Defaulting Lender" means any Lender that (a) has failed to fund any amounts required to be funded by it under this Agreement within one (1) Business Day of the date that it is required to do so under this Agreement (including the failure to make available to the Administrative Agent amounts required pursuant to a settlement), (b) notified the Borrower, the Administrative Agent, or any Lender in writing that it does not intend to comply with all or any portion of its funding obligations under this Agreement, (c) has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or under other agreements generally (as reasonably determined by the Administrative Agent) under which it has committed to extend credit, (d) failed, within one (1) Business Day after written request by the Administrative Agent (acting at the written direction of the Required Lenders), to confirm that it will comply with the terms of this Agreement relating to its obligations to fund any amounts required to be funded by it under this Agreement, (e) otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it under this Agreement within one (1) Business Day of the date that it is required to do so under this Agreement, or (f) (i) becomes or is insolvent or has a parent company that has become or is insolvent, (ii) becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment, or (iii) becomes the subject of a Bail-in Action.

7

"Disqualified Capital Stock" means any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) is mandatorily redeemable in whole or in part prior to the Maturity Date, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for Indebtedness or any Capital Stock referred to in (a) above prior to the Maturity Date, or (c) contains any mandatory repurchase obligation which comes into effect prior to the Maturity Date, provided that any Capital Stock that would not constitute Disqualified Capital Stock but for provisions thereof giving holders thereof (or the holders of any security into or for which such Capital Stock is convertible, exchangeable or exercisable) the right to require the issuer thereof to redeem such Capital Stock upon the occurrence of a Change in Control shall not constitute Disqualified Capital Stock.

"Documents" has the meaning assigned to such term in the Security Agreement.

"dollars" or "$" refers to lawful money of the United States of America.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Eligible Assignee" means a commercial bank, insurance company, or company engaged in the business of making commercial loans or a commercial finance company or any Affiliate of any Credit Party under common control with such Credit Party, or an Approved Fund, or a Related Fund of any Credit Party (any two or more Related Funds being treated as a single Eligible Assignee for all purposes hereof), provided, that in any event, unless consented to by each of the Lenders, "Eligible Assignee" shall not include (x) any natural person, (y) the Sponsor Group or any of their respective Affiliates or (z) any Loan Party or any of its Subsidiaries; provided, further, that no Person that has not executed the Restructuring Support Agreement shall be an Eligible Assignee unless it executes a joinder to the Restructuring Support Agreement.

"Environmental Laws" means all Applicable Laws issued, promulgated or entered into by or with any Governmental Authority, relating in any way to the protection of human health from environmental hazards, to the protection of the environment, to the handling, treatment, storage, disposal of Hazardous Materials or to the assessment or remediation of any Release or threatened Release of any Hazardous Material to the environment.

"Environmental Liability" means any liability, contingent or otherwise (including, without limitation, any liability for damages, natural resource damage, costs of environmental remediation, administrative oversight costs, fines, penalties or indemnities), of any Loan Party or any Subsidiary directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414(m) or Section 414(o) of the Code.

"ERISA Event" means: (a) any Reportable Event; (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), and, on and after the effectiveness of the Pension Act, any failure by any Plan to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Plan, whether or not waived; (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, the failure to make by its due date a required installment under Section 412(m) of the Code with respect to any Plan or the failure to make any required contribution to a Multiemployer Plan; (d) the incurrence by any of the Loan Parties or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) on and after the effectiveness of the Pension Act, a determination that any Plan is, or is expected to be, in "at risk" status (within the meaning of Title IV of ERISA); (f) the receipt by any of the Loan Parties or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan under Section 4042 of ERISA; (g) the incurrence by any of the Loan Parties or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (h) the receipt by any of the Loan Parties or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from any of the Loan Parties or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization or in endangered or critical status, within the meaning of Section 432 of the Code or Section 305 or Title IV of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning provided in SECTION 7.01.

"Excess Availability" has the meaning assigned to such term in the ABL DIP Facility (in effect on the date hereof).

"Excluded Net Proceeds" means, with respect to any Net Proceeds received from a sale, transfer or disposition of any Revolver Priority Collateral or any event described in clause (b) of the definition of "Prepayment Event" with respect to any of the Revolver Priority Collateral only, such amount of such Net Proceeds as is required to be paid to the DIP ABL Lenders under the ABL DIP Facility pursuant to the terms of such DIP Facility.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to the Agents, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Loan Parties hereunder or under any other Loan Document or required to be withheld or deducted from a payment to such recipients, (a) income or franchise Taxes imposed on (or measured by) its net income (however denominated), in each case, (i) by the United States of America, or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located (or any political subdivision thereof,) or (ii) that are Other Connection Taxes, (b) any branch profits taxes, (i) imposed by the United States of America or any similar tax imposed by any other jurisdiction under the laws of which the Agents or any Lender is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located (or any political subdivision thereof,) or (ii) that are Other Connection Taxes, (c) in the case of a U.S. Lender, any United States backup withholding tax imposed on amounts payable to such U.S. Lender that is attributable to such U.S. Lender's failure to comply with SECTION 2.23(f), (d) in the case of a Lender (other than an assignee pursuant to a request by a Borrower under SECTION 2.24(a)), any United States withholding tax that is imposed on amounts payable to such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which such Lender becomes a party to this Agreement (or designates a new lending office other than at the request of a Borrower under SECTION 2.24), except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Loan Parties with respect to such withholding tax pursuant to SECTION 2.23(a), and (e) any U.S. federal withholding Taxes imposed under FATCA.

"Executive Order" has the meaning set forth in SECTION 9.17.

"Exit Payment" has the meaning set forth in SECTION 2.19.

"Exit Payment Other Event" means the satisfaction, release, replacement, reinstatement, defeasance or compromise of any of the Obligations in any proceeding, including the Chapter 11 Case, foreclosure (whether by power of judicial proceeding or otherwise) or deed in lieu of foreclosure or the making of a distribution of any kind to the Secured Parties (whether directly or indirectly), in full or partial satisfaction of the Obligations; and (b) the termination of this Agreement (including by any defeasance or satisfaction and discharge) for any reason.

"Facility Guarantee" means any Guarantee of the Obligations executed by Holdings and its Subsidiaries which are or hereafter become Facility Guarantors in favor of the Agents and the other Secured Parties, which shall be in the form of Exhibit C attached hereto.

10

"<u>Facility Guarantors</u>" means any Person executing a Facility Guarantee.

"<u>FATCA</u>" means (a) Sections 1471 through 1474 of the Code, or any current or future Treasury regulations promulgated or Revenue Ruling, Revenue Procedure, Notice or other administrative guidance issued thereunder, (b) any treaty, law, regulation or other official guidance enacted in any other jurisdiction, or relating to an intergovernmental agreement between the U.S. and any other jurisdiction which (in either case) facilitates the implementation of the preceding clause (a), or (c) any agreement entered into pursuant to the implementation of the preceding clauses (a) or (b) with the United States Internal Revenue Service, the U.S. Government or any governmental or taxation authority under any other jurisdiction.

"<u>FCPA</u>" means the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"<u>Federal Funds Rate</u>" means, for any period, a fluctuating interest rate per annum equal to, for each day during such period, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by Administrative Agent from three Federal funds brokers of recognized standing selected by it (and, if any such rate is below zero, then the rate determined pursuant to this definition shall be deemed to be zero).

"<u>Final Order</u>" means a final order of the Bankruptcy Court approving the Loans, the Facility and the Loan Documents on a final basis, in form and substance reasonably acceptable to the Required Lenders, which Final Order shall be in full force and effect and shall not have been reversed, vacated, stayed or subject to the possibility of appeal, and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Administrative Agent and (x) in the case of any amendment, supplement or other modification affecting or implicating the Sacred Rights, each Lender and (y) otherwise, the Required Lenders, which consent from the Required Lenders not to be unreasonably withheld or delayed (for the avoidance of doubt, such written consent shall be given by the Administrative Agent on behalf of itself and the Required Lenders).

"<u>Financial Officer</u>" means, with respect to any Loan Party, the chief financial officer, chief accounting officer, treasurer, assistant treasurer, controller or assistant controller of such Loan Party.

"<u>Fiscal Month</u>" means any fiscal month of any Fiscal Year, which month shall end on the last day of each calendar month in accordance with the fiscal accounting calendar of Holdings and its Subsidiaries.

"<u>Fiscal Quarter</u>" means any fiscal quarter of any Fiscal Year, which quarter shall end on the Saturday closest to the last day of each April, July, October and January of such Fiscal Year in accordance with the fiscal accounting calendar of Holdings and its Subsidiaries.

"<u>Fiscal Year</u>" means any period of twelve consecutive months ending on the Saturday closest to January 31 of each calendar year.

"Flood Insurance Laws" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto, (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (v) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"Foreign Lender" means any Lender that is not a U.S. Lender.

"Funding Office" means the office of the Administrative Agent specified in SECTION 9.01 or such other office as may be specified from time to time by the Administrative Agent as its funding office by written notice to the Borrower and the Lenders.

"GAAP" means generally accepted accounting principles in effect from time to time in the United States of America which are consistent with those promulgated or adopted by the Financial Accounting Standards Board and its predecessors (or successors) in effect and applicable to that accounting period in respect of which reference to GAAP is being made. Notwithstanding anything to the contrary contained above or in the definition of "Capital Lease Obligations," in the event of an accounting change requiring all leases to be capitalized, only those leases (assuming for purposes hereof that such leases were in existence on December 15, 2018) that would constitute Capital Lease Obligations in conformity with GAAP on December 15, 2018 shall be considered Capital Lease Obligations, and all calculations and deliverables under this Agreement or any other Loan Document shall be made or delivered, as applicable, in accordance therewith.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation, provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business or customary and reasonable indemnity obligations, including but not limited to, those in effect on the Closing Date or entered into in connection with any Permitted Disposition (other than such obligations

12

with respect to Indebtedness).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, mold, fungi or similar bacteria, and all other substances or wastes of any nature regulated pursuant to any Environmental Law because of their dangerous or deleterious properties, including any material listed as a hazardous substance under Section 101(14) of CERCLA.

"Holdings" means Guitar Center Holdings, Inc., a Delaware corporation.

"Indebtedness" of any Person means, without duplication:

> (a)    All obligations of such Person for borrowed money (including any obligations which are without recourse to the credit of such Person);

> (b)    All obligations of such Person evidenced by bonds, debentures, notes or similar instruments;

> (c)    All obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person;

> (d)    All obligations of such Person in respect of the deferred purchase price of property or services (excluding accrued expenses and accounts payable incurred in the ordinary course of business);

> (e)    All Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed or is limited in recourse;

> (f)    All Guarantees by such Person of Indebtedness of others;

> (g)    All Capital Lease Obligations of such Person;

> (h)    All obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty;

> (i)    All obligations, contingent or otherwise, of such Person in respect of bankers' acceptances;

> (j)    Net obligations of such Person under any Swap Contract relating to interest rates, foreign currency exchange rates or commodity prices;

13

(k)      The principal and interest portions of all rental obligations of such Person under any Synthetic Lease, tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing where such transaction is considered borrowed money indebtedness for tax purposes but is classified as an operating lease in accordance with GAAP;

(l)      [reserved]; and

(m)      All mandatory obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Capital Stock of such Person (including, without limitation, Disqualified Capital Stock), other than upon any change of control or sale of all or substantially all assets of such Person;

Indebtedness shall not include (A) any sale-leaseback transactions to the extent the lease or sublease thereunder is not required to be recorded under GAAP as a Capital Lease, (B) any obligations relating to overdraft protection and netting services, (C) any preferred stock required to be included as Indebtedness in accordance with GAAP, (D) items that would appear as a liability on a balance sheet prepared in accordance with GAAP as a result of the application of EITF 97-10, "The Effects of Lessee Involvement in Asset Construction" or (E) Guarantees by the Borrower of lease obligations of its Subsidiaries (other than Capital Lease Obligations).

The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means (a) Taxes other than Excluded Taxes imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitee" has the meaning provided in SECTION 9.03(b).

"Information" has the meaning provided in SECTION 9.15.

"Initial Budget" means that certain budget attached as Exhibit F hereto.

"Intellectual Property" means all present and future: trade secrets, know-how and other proprietary information; trademarks, Internet domain names, service marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing), indicia and other source and/or business identifiers, all of the goodwill related thereto, and all registrations and applications for registrations thereof; works of authorship and other copyrighted works (including copyrights for computer programs), and all registrations and applications for registrations thereof; inventions (whether or not patentable) and all improvements thereto; patents and patent applications, together with all continuances, continuations, divisions, revisions, extensions, reissuances, and reexaminations thereof; industrial design applications and registered industrial designs; and all other recognized forms of intellectual property throughout the world.

"Intercreditor Acknowledgment" means that certain Acknowledgment and Agreement, dated as of the date hereof, by and among the Administrative Agent and the ABL Agent, and acknowledged by the Loan Parties.

"Intercreditor Arrangement" means collectively, (i) the Intercreditor Acknowledgment and (ii) the Order; provided that in the event of a conflict as between the Intercreditor Acknowledgment and the Order, the Order shall control.

"Interest Payment Date" means with respect to any Loan, the last Business Day of each calendar month.

"Interest Rate" means, with respect to the Loans, a rate per annum equal to 7.00%.

"Interim Order" means the interim order entered by the Bankruptcy Court on the Interim Order Date in the Chapter 11 Cases approving the Facility, the Loans and the Loan Documents on an interim basis, substantially in the form attached hereto as Exhibit D.

"Interim Order Date" has the meaning set forth in the recitals.

"Investment" means with respect to any Person, any direct or indirect acquisition or investment by such Person, whether by means of:

      (a)    Any Capital Stock of another Person, evidence of Indebtedness or other security of another Person, including any option, warrant or right to acquire the same;

      (b)    Any loan, advance, contribution to capital, extension of credit (except for current trade and customer accounts receivable for inventory sold or services rendered in the ordinary course of business and deposits in connection with leases that are not required to be classified and accounted for as capital leases on a balance sheet of such Person in accordance with GAAP) to, or guaranty of Indebtedness of, another Person; and

      (c)    Any Acquisition;

in all cases whether now existing or hereafter made.  For purposes of calculation, the amount of any Investment outstanding at any time shall be the aggregate cash Investment *without giving effect to any* cash returns, cash dividends and cash distributions (or the fair market value of any non-cash returns, dividends and distributions) received by such Person in respect of such Investment.

"Joinder Agreement" means an agreement, in substantially the form attached hereto as Exhibit B, pursuant to which, among other things, a Person becomes a party to, and bound by the terms of, this Agreement and/or the other Loan Documents in the same capacity and to the same extent as either a Borrower or a Facility Guarantor, as the Administrative Agent may determine.

"Landlord Lien State" means any state in which a landlord's claim for rent has priority by operation of Applicable Law over the lien of the Collateral Agent in any of the Collateral.

"Lease" means any written agreement pursuant to which a Loan Party is entitled to the use or occupancy of any space in a structure, land, improvements or premises for any period of time.

"Lender" means each Person holding a Commitment or a Loan from time to time or at any time and each assignee that becomes a party to this Agreement as set forth in SECTION 9.04(b).

"Lien" means, with respect to any asset, (a) any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, encumbrance, collateral assignment, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

"Line-Item Variances" has the meaning specified in Section 6.01(b).

"Liquidity" means, as of any date, the sum of (i) Excess Availability plus (ii) Consolidated unrestricted book cash of the Loan Parties as of such date.

"Loan Account" has the meaning provided in SECTION 2.20.

"Loan Documents" means this Agreement, the Notes, the Agency Fee Letter, the Payment Letter, the Security Documents, the Facility Guarantee, the Intercreditor Acknowledgment, and any other instrument or agreement now or hereafter executed and delivered in connection herewith, each as amended and in effect from time to time.

"Loan Party" or "Loan Parties" means the Borrower and the Facility Guarantors.

"Loans" has the meaning given to such term in SECTION 2.01. For the avoidance of doubt, the Loans made herein shall be deemed to be "Loans" for all purposes of this Agreement and the other Loan Documents.

"Margin Stock" has the meaning assigned to such term in Regulation U.

"Material Adverse Effect" means any event, facts, circumstances, action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or governmental authority that has or could be reasonably likely to have a material adverse change or material adverse condition in or affecting (x) the businesses, assets, operations or financial condition of the Loan Parties and their respective direct and indirect subsidiaries taken as a whole or (y) the validity or enforceability of this Agreement or the other Loan Documents, taken as a whole, or the rights or remedies of the Secured Parties hereunder or thereunder, taken as a whole; provided, that none of (i) the Chapter 11 Cases, actions in connection with the solicitation of holders of claims and execution of the Restructuring Support Agreement, the events and conditions leading up to the Chapter 11 Cases, or their reasonably anticipated consequences, (ii) the actions expressly required to be taken pursuant to this Agreement, the

16

ABL DIP Facility or the Interim Order or Final Order (as applicable) and (iii) the COVID-19 Pandemic shall constitute a "Material Adverse Effect" for any purpose.

"Material Indebtedness" means Indebtedness (other than the Obligations) of the Loan Parties, individually or in the aggregate, having an aggregate principal amount exceeding $5,000,000. In any event, all Indebtedness evidenced by the Senior Secured Notes, the Senior Secured Superpriority Notes and the Senior Unsecured Notes shall be deemed Material Indebtedness, regardless of the outstanding balance thereunder from time to time.

"Maturity Date" means the date that is the earliest of (a) the date that is 12 months after the Petition Date; (b) 45 calendar days after the Petition Date, if the Final Order has not been entered by the Bankruptcy Court prior to the expiration of such 45-day period (or such later date as may be agreed in connection with an extension of Milestones as a result of the COVID-19 Pandemic); (c) the effective date of a plan of reorganization or liquidation in the Chapter 11 Cases; (d) the consummation of a sale of all or substantially all of the assets of the Debtors pursuant to section 363 of the Bankruptcy Code or otherwise; (e) the date of termination of the Commitments and the acceleration of any outstanding Loans, in each case, pursuant to Section 7.02 hereunder; and (f) dismissal of the Chapter 11 Cases or conversion of the Chapter 11 Cases into cases under chapter 7 of the Bankruptcy Code.

"Maximum Rate" has the meaning provided in SECTION 9.13.

"Minority Lenders" has the meaning provided in SECTION 9.02(c).

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgages" means the mortgages and deeds of trust and any other security documents granting a Lien on Real Estate between the Loan Party owning the Real Estate encumbered thereby and the Collateral Agent for its own benefit and the benefit of the other Secured Parties.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Proceeds" means, with respect to any event, (a) the cash proceeds received in respect of such event, including (i) any cash received in respect of any non-cash proceeds or amounts escrowed pursuant to clause (b)(iv) of this definition, but only as and when received, (ii) in the case of a casualty, insurance proceeds, and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, in each case net of (b) the sum of (i) to the extent included in and consistent with the Approved Budget, all reasonable and documented fees and out-of-pocket fees and expenses (including appraisals, and brokerage, legal, title and recording or transfer tax expenses and commissions) paid by any Loan Party or a Subsidiary to third parties (other than Affiliates, except to the extent permitted under SECTION 6.07 hereof) in connection with such event, (ii) in the case of a sale or other disposition of an asset (including pursuant to a casualty or condemnation), the amount of all payments required to be made by any Loan Party or any of their respective Subsidiaries as a result of such event to repay (or to establish an escrow for the repayment of) any Indebtedness (other than the Obligations) secured by a Permitted Encumbrance on such asset that is senior to the Lien of the Collateral Agent on such asset, (iii) capital gains or other income taxes paid or payable as a result

of any such sale or disposition (after taking into account any available tax credits or deductions), and (iv) any funded escrow established pursuant to the documents evidencing any such sale or disposition to secure any indemnification obligations or adjustments to the purchase price associated with any such sale or disposition.

"Non-Defaulting Lender" means each Lender other than a Defaulting Lender.

"Notes Priority Collateral" means all "Notes Priority Collateral" as such term is defined in the Intercreditor Acknowledgment.

"Notes Trustee" means The Bank of New York Mellon Trust Company, N.A., in its capacity as trustee under the Senior Secured Notes Documents, and any successor thereto.

"Obligations" means (a) (i) the principal of, interest on (including all interest that accrues after the commencement of any case or proceeding by or against any Borrower or Facility Guarantor under the Bankruptcy Code, including the Chapter 11 Cases, or any state or federal bankruptcy, insolvency, receivership or similar law, whether or not allowed in such case or proceeding), and Exit Payment with respect to the Loans and Facility Guarantees and (ii) all other monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise, of the Loan Parties to the Secured Parties under this Agreement and the other Loan Documents and (b) the due and punctual payment and performance of all the covenants, agreements, obligations and liabilities of each Loan Party under or pursuant to this Agreement and the other Loan Documents.

"OFAC" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"Orders" means, collectively, the Interim Order and the Final Order and separately, the Interim Order and the Final Order, as the context requires.

"Other Connection Taxes" means Taxes imposed as a result of a present or former connection between an Agent or any Lender and the jurisdiction imposing such Tax (other than connections arising from such Agent or Lender having executed, delivered, become a party to, performed its obligations under, received payments under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means any and all current or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document, except any such taxes, charges or similar levies that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made at the request of a Borrower under SECTION 2.24).

"Participant" has the meaning provided in SECTION 9.04(e).

"Participation Register" has the meaning provided in SECTION 9.04(e).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"Pension Act" means the Pension Protection Act of 2006.

"Permitted Disposition" means any of the following:

(a)     licenses of Intellectual Property of a Loan Party or any of its Subsidiaries entered into in the ordinary course of business;

(b)     licenses for the conduct of licensed departments within the Stores of a Loan Party or any of its Subsidiaries in the ordinary course of business and consistent with past practice;

(c)     sales or other dispositions of the Inventory of a Loan Party or any of its Subsidiaries in the ordinary course of business or otherwise in connection with Store closings to the extent consistent with the Approved Budget;

(d)     without duplication of the provisions of clause (c) of this definition, terminations of Leases in the ordinary course of business to the extent consistent with the Approved Budget;

(e)     dispositions of assets (other than Real Estate or Intellectual Property) in the ordinary course of business and consistent with past practice that is worn, damaged, obsolete, uneconomical or, in the judgment of a Loan Party, no longer used or useful or necessary in, or material to, its business;

(f)     sales, transfers and dispositions among the Loan Parties, so long as the Collateral Agent has a perfected first priority lien on the property so sold, transferred or disposed of subject only to Permitted Encumbrances (x) having priority by operation of Applicable Law on all Notes Priority Collateral, or (y) in favor of the ABL Agent on Revolver Priority Collateral, after giving effect to such exchange, transfer or swap;

(g)     sales, discounting or forgiveness of Accounts in the ordinary course of business and consistent with past practice or in connection with the collection or compromise thereof;

(h)     leases, subleases, licenses and sublicenses of real or personal property (other than Intellectual Property) entered into by Loan Parties and their Subsidiaries in the ordinary course of business at arm's length and consistent with past practice;

(i)     the making of Permitted Investments and payments permitted under SECTION 6.06;

(j)     sales, transfers and dispositions as set forth on Schedule 6.05; and

(k)    a one-time write-off and disposition of aged Inventory in an aggregate amount not to exceed $1,000,000 so long as the Net Proceeds of such disposition are applied to repay the Loans hereunder.

"Permitted Encumbrances" means:

(a)    Liens imposed by law for Taxes that are not required to be paid pursuant to SECTION 5.05;

(b)    Carriers', warehousemen's, mechanics', materialmen's, repairmen's, landlord's and other like Liens imposed by Applicable Law, (i) arising in the ordinary course of business, consistent with past practice and securing obligations that are not overdue by more than sixty (60) days, (ii) (A) that are being contested in good faith by appropriate proceedings, (B) the applicable Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (C) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, or (iii) the existence of which would not reasonably be expected to result in a Material Adverse Effect;

(c)    Pledges and deposits made in the ordinary course of business and consistent with past practice in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d)    Deposits to secure or relating to the performance of bids, trade contracts (other than for Indebtedness), leases (other than Capital Lease Obligations), statutory obligations, surety and appeal bonds, performance bonds (and Liens arising in accordance with Applicable Law in connection therewith), and other obligations of a like nature, in each case in the ordinary course of business and consistent with past practice;

(e)    Judgment Liens in respect of judgments that do not constitute an Event of Default under SECTION 7.01(j);

(f)    Easements, covenants, conditions, restrictions, building code laws, zoning restrictions, other land use laws, rights-of-way, development, site plan or similar agreements and similar encumbrances on real property imposed by law or arising in the ordinary course of business and consistent with past practice that do not secure any monetary obligations and do not materially detract from the value of the affected property when used in a manner consistent with current usage or materially interfere with the ordinary conduct of business of a Loan Party as currently conducted and such other minor title defects, or survey matters that are disclosed by current surveys, but that, in each case, do not interfere with the current use of the affected property in any material respect;

(g)    Any Lien on any property or asset of any Loan Party (other than Holdings) or any Subsidiary of it set forth on Schedule 6.02, provided that, if such Lien secured Indebtedness, such Lien shall secure only the Indebtedness listed on Schedule 6.01 as of the Closing Date (and extensions, renewals and replacements thereof permitted under SECTION 6.01;

(h)    Liens on fixed or capital assets acquired by any Loan Party or any of its Subsidiaries to secure Indebtedness permitted under clause (d) of the definition of Permitted Indebtedness so long as (i) such Liens and the Indebtedness secured thereby are incurred prior to or within 30 days after such acquisition or the completion of the construction or improvement thereof (other than refinancings thereof permitted hereunder), (ii) the Indebtedness secured thereby does not exceed 100% of the cost of acquisition or improvement of such fixed or capital assets, and (iii) such Liens shall not extend to any other property or assets of the Loan Parties or any of their Subsidiaries;

(i)    Liens in favor of the Collateral Agent, for its own benefit and the benefit of the other Secured Parties;

(j)    Landlords' and lessors' Liens in respect of rent not in default for more than sixty (60) days or the existence of which, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect;

(k)    Possessory Liens in favor of brokers and dealers arising in connection with the acquisition or disposition of Investments owned as of the date hereof and other Permitted Investments, provided that such liens (a) attach only to such Investments or other Investments held by such broker or dealer and (b) secure only obligations incurred in the ordinary course and arising in connection with the acquisition or disposition of such Investments and not any obligation in connection with margin financing, in each case, consistent with past practice;

(l)    Liens arising solely by virtue of any statutory or common law provisions relating to banker's liens, liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions or securities intermediaries, in each case, consistent with past practice;

(m)    [reserved];

(n)    [reserved];

(o)    Liens arising from precautionary UCC filings regarding "true" operating leases or the consignment of goods to a Loan Party, in each case, consistent with past practice;

(p)    [reserved];

(q)    Liens in favor of customs and revenues authorities imposed by Applicable Law arising in the ordinary course of business in connection with the importation of goods and securing obligations (i) that are not overdue by more than sixty (60) days, (ii)(A) that are being contested in good faith by appropriate proceedings, (B) the applicable Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (C) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such

obligation, or (iii) the existence of which would not reasonably be expected to result in a Material Adverse Effect, in each case, consistent with past practice;

(r)    (i) Liens granted by the Loan Parties to secure Indebtedness permitted under clause (h) of the definition of "Permitted Indebtedness"; provided, that the Liens incurred pursuant to this clause (r)(i) shall be junior to the Liens securing the Obligations pursuant to the Orders; (ii) Liens granted by the Loan Parties to secure Indebtedness permitted under clause (j) of the definition of "Permitted Indebtedness"; provided, that the Liens incurred pursuant to this clause (r)(ii) shall have the priorities set forth in the Intercreditor Arrangement and the Orders; and (iii) Liens granted by the Loan Parties to secure Indebtedness permitted under clause (k) of the definition of "Permitted Indebtedness"; provided, that the Liens incurred pursuant to this clause (r)(iii) shall have the priorities set forth in the Intercreditor Arrangement and the Orders;

(s)    any interest or title of a licensor, sublicensor, lessor or sublessor under any license or operating or true lease agreement, in each case, consistent with past practice;

(t)    leases or subleases granted to third Persons in the ordinary course of business and consistent with past practice;

(u)    licenses or sublicenses of Intellectual Property granted in the ordinary course of business and consistent with past practice;

(v)    the replacement, extension or renewal of any Permitted Encumbrance; provided, that such Lien shall at no time be extended to cover any assets or property other than such assets or property subject thereto on the Closing Date or the date such Lien was incurred, as applicable;

(w)    Liens on insurance proceeds incurred in the ordinary course of business and consistent with past practice in connection with the financing of insurance premiums;

(x)    Liens on securities which are the subject of repurchase agreements incurred in the ordinary course of business and consistent with past practice;

(y)    Liens arising by operation of law under Article 4 of the UCC in connection with collection of items provided for therein consistent with past practice;

(z)    Liens arising by operation of law under Article 2 of the UCC in favor of a reclaiming seller of goods or buyer of goods consistent with past practice;

(aa)    Liens on deposit accounts or securities accounts in connection with overdraft protection and netting services consistent with past practice;

(bb)    Security given to a public or private utility or any Governmental Authority as required in the ordinary course of business and consistent with past practice;

(cc)    Liens in the nature of the right of setoff in favor of counterparties to contractual agreements with the Loan Parties in the ordinary course of business and consistent with past practice;

(dd)    Other Liens securing Indebtedness and other obligations in an amount not to exceed $500,000 in the aggregate at any time outstanding;

(ee)    [reserved];

(ff)    Liens securing the obligations under the Prepetition ABL Credit Agreement;

(gg)    the Adequate Protection Liens and Adequate Protection Superpriority Claims;

provided, however, that, except as provided in any one or more of clauses (a) through (gg) above, the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness for borrowed money.

"Permitted Indebtedness" means each of the following:

(a)    Indebtedness created under the Loan Documents;

(b)    Indebtedness set forth on Schedule 6.01;

(c)    (i) Indebtedness of any Loan Party to any other Loan Party (excluding Holdings) or Guarantees by any Loan Party of Indebtedness or other obligations of any other Loan Party (excluding Holdings), (ii) Indebtedness of any non-Loan Party Subsidiary of a Loan Party to any other non-Loan Party Subsidiary of a Loan Party or Guarantees by any non-Loan Party Subsidiary of a Loan Party of Indebtedness or other obligations of any other non-Loan Party Subsidiary of a Loan Party, (iii) Indebtedness of any Loan Party to any Subsidiary of a Loan Party or, subject to compliance with SECTION 6.04, Guarantees by any Loan Party of Indebtedness or other obligations of any Subsidiary of a Loan Party, provided, that any such Indebtedness is subordinated in right of payment to the Obligations, and (iv) subject to compliance with SECTION 6.04, Indebtedness of any Subsidiary of a Loan Party to any Loan Party (excluding Holdings) or Guarantees by any Subsidiary of a Loan Party of Indebtedness or other obligations of any Loan Party (excluding Holdings);

(d)    Purchase money Indebtedness of any Loan Party or any Subsidiary of it to finance the acquisition or improvement of any fixed or capital assets (excluding Real Estate), including Capital Lease Obligations and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, provided that the aggregate principal amount of Indebtedness permitted by this clause (d)(i) outstanding at any time shall not exceed $1,000,000 or such greater amounts consistent with the Approved Budget;

(e)    [reserved];

(f)    Contingent liabilities under surety bonds, customs and appeal bonds, governmental contracts and leases or similar instruments incurred in the ordinary course of business;

(g)    Indebtedness under the Senior Unsecured Notes;

(h)    Indebtedness under the Senior Secured Notes and the Senior Secured Superpriority Notes;

(i)    [reserved];

(j)    Indebtedness under the Prepetition ABL Credit Agreement in an aggregate principal amount not to exceed $279,000,000;

(k)    Indebtedness of the Loan Parties under the ABL DIP Facility in an aggregate principal amount not to exceed $50,000,000;

(l)    Indebtedness incurred in the ordinary course of business in connection with the financing of insurance premiums;

(m)    [reserved];

(n)    Indebtedness relating to surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(o)    [reserved];

(p)    [reserved];

(q)    Guarantees and letters of credit and surety bonds (other than Guarantees of, or letters of credit and surety bonds related to, Indebtedness) issued in connection with Permitted Dispositions, in each case, consistent with past practice;

(r)    without duplication of any other Indebtedness, non-cash accruals of interest, accretion or amortization of original issue discount and payment-in-kind interest with respect to Indebtedness permitted hereunder, in each case, consistent with past practice;

(s)    Indebtedness due to any landlord in connection with the financing by such landlord of leasehold improvements, in each case, consistent with past practice;

(t)    [Reserved];

(u)    [Reserved];

(v)    other unsecured Indebtedness in an aggregate principal amount not exceeding $500,000 at any time outstanding; and

(w)   extensions, renewals and replacements of any such Indebtedness described in clauses (c) and (s) above provided that such Indebtedness constitutes a Permitted Refinancing.

"Permitted Investments" means each of the following:

(a)   Direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America) or any state or state agency thereof, in each case maturing within one (1) year from the date of acquisition thereof;

(b)   Investments in commercial paper maturing within one (1) year from the date of acquisition thereof and having, at the date of acquisition, the highest or next highest credit rating obtainable from S&P or from Moody's;

(c)   Investments in certificates of deposit, banker's acceptances and time deposits maturing within one (1) year from the date of acquisition thereof which are issued or guaranteed by, or placed with, and demand deposit and money market deposit accounts issued or offered by, any Lender or any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000;

(d)   Master demand notes and fully collateralized repurchase agreements with a term of not more than thirty (30) days for securities described in clause (a) above (without regard to the limitation on maturity contained in such clause) and entered into with a financial institution satisfying the criteria described in clause (c) above or with any primary dealer;

(e)   Shares of any money market or mutual fund that has substantially all of its assets invested in the types of investments referred to in clauses (a) through (d), above;

(f)   Investments existing or contemplated on the Closing Date and set forth on Schedule 6.04;

(g)   capital contributions or loans made by (i) any Loan Party (with respect to loans, excluding Holdings) to any other Loan Party or (ii) any non-Loan Party Subsidiary to any other non-Loan Party Subsidiary;

(h)   Guarantees constituting Permitted Indebtedness;

(i)   Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(j)   Loans or advances to employees made in the ordinary course of business, provided that all such loans and advances to employees shall not exceed

25

$500,000 in the aggregate at any time outstanding, and determined without regard to any write-downs or write-offs thereof;

(k)     Investments received from purchasers of assets pursuant to dispositions permitted pursuant to SECTION 6.05;

(l)     [reserved];

(m)     [reserved];

(n)     To the extent permitted by Applicable Law, notes from officers and employees in exchange for equity interests of Holdings purchased by such officers or employees pursuant to a stock ownership or purchase plan or compensation plan;

(o)     [reserved];

(p)     Subject to SECTION 2.18, Investments in deposit accounts opened in the ordinary course of business and consistent with past practice;

(q)     [reserved];

(r)     expenditures required to be capitalized in accordance with GAAP;

(s)     [reserved];

(t)     [reserved];

(u)     [reserved]; and

(v)     without duplication of, or accumulation with, other categories of Investments permitted hereunder, other Investments in an amount not to exceed $500,000 in the aggregate outstanding at any time;

provided, however, that for purposes of calculation, the amount of any Investment held by any Person outstanding at any time shall be the aggregate cash Investment *less* all cash returns, cash dividends and cash distributions (or the fair market value of any non-cash returns, dividends and distributions) received by such Person in respect of such Investment and *less* all liabilities expressly assumed by another Person in connection with the sale of such Investment.

"Permitted Refinancing" means any Indebtedness that replaces or refinances (whether in whole or in part) any other Permitted Indebtedness, as long as, after giving effect thereto (i) the principal amount of the Indebtedness outstanding at such time is not increased (except by the amount of any accrued interest and reasonable closing costs, expenses, fees and premiums paid in connection with such extension, renewal or replacement), (ii) the result of such refinancing of or replacement shall not be (A) an earlier maturity date or (B) decreased weighted average life, (iii) the holders of such refinancing Indebtedness are not afforded covenants, defaults, rights or remedies, taken as a whole, which are materially more burdensome to the obligor or obligors for any period prior to the Maturity Date than those contained in the Indebtedness being extended,

renewed or replaced, (iv) the obligor or obligors under any such refinancing Indebtedness and the collateral, if applicable, granted pursuant to any such refinancing Indebtedness are the same (or in the case of collateral, the same or less than) as the obligor(s) and collateral under the Indebtedness being extended, renewed or replaced, (v) the subordination, to the extent applicable, and other material provisions of the refinancing Indebtedness are no less favorable to the Lenders than those terms of the Indebtedness being refinanced, and (vi) the refinancing Indebtedness is not exchangeable or convertible into any other Indebtedness which does not comply with clauses (i) through (v) above.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning set forth in the recitals hereto.

"Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Borrower or any ERISA Affiliate or to which the Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years or for which the Borrower may have liability (including as an ERISA Affiliate).

"Pledge Agreement" means the Pledge Agreement dated as of the date hereof among the Loan Parties party thereto and the Collateral Agent for its own benefit and the benefit of the other Secured Parties, as amended and in effect from time to time.

"Portal" has the meaning specified in SECTION 2.04(b).

"Prepayment Event" means the occurrence of any of the following events:

(a)     Any sale, transfer or other disposition (including pursuant to a sale and leaseback transaction) of any assets of a Loan Party or any of its Subsidiaries (other than (i) the sale of assets in the ordinary course of business, (ii) the transfer of any assets among Stores and other locations of the Loan Parties or any of their Subsidiaries and (iii) the sale of assets in connection with the Specified Closures) where the proceeds therefrom are in excess of $500,000; or

(b)     Any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation, expropriation or similar proceeding of, any assets of a Loan Party or any of its Subsidiaries where the proceeds therefrom are in excess of $500,000.

"Prepetition ABL Credit Agreement" means Credit Agreement dated as of April 2, 2014 by and among the DIP Borrower, the other Borrowers and Guarantors parties thereto, Wells Fargo Bank, National Association, as administrative agent and collateral agent, the lenders from time to time party thereto and the other parties thereto, as amended, restated, amended and restated, supplemented or otherwise modified from time to time.

"Prepetition ABL Agent" means Wells Fargo Bank, National Association, as administrative agent and as collateral agent, under the Prepetition ABL Credit Agreement.

"Prepetition ABL Lenders" mean those lenders party to the Prepetition ABL Credit Agreement as lenders thereto.

"Real Estate" means all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned by any Loan Party, including all easements, rights-of-way, and similar rights relating thereto and all leases, tenancies, and occupancies thereof related to such owned property.

"Register" has the meaning provided in SECTION 9.04(c).

"Regulation U" means Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Regulation X" means Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"Related Fund" means, with respect to any Lender that is an Approved Fund, any other Approved Fund that is managed, administered or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Release" has the meaning provided in Section 101(22) of CERCLA without giving effect to the exclusions set forth in subsections (A), (B), (C) and (D) thereof.

"Remedies Notice Period" has the meaning ascribed to such term in the Orders.

"Reorganization Plan" means a plan of reorganization filed by the Loan Parties in the Chapter 11 Cases, in form and substance reasonably acceptable to the Agents and the Required Lenders, and consistent with the Restructuring Support Agreement.

"Reportable Event" means any reportable event as defined in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the 30-day notice period referred to in Section 4043(c) of ERISA has been waived, with respect to a Plan.

"Reports" has the meaning provided in SECTION 8.13.

"Required Lenders" means, at any time, Non-Defaulting Lenders having Commitments aggregating more than 50% of the Total Commitments held by Non-Defaulting Lenders or, if the Commitments have been terminated, Non-Defaulting Lenders whose percentage of the outstanding Loans aggregate more than 50% of all such Loans made by Non-Defaulting Lenders.

"Responsible Officer" of any Person shall mean any executive officer or financial officer of such Person and any other officer or similar official thereof with responsibility for the administration of the obligations of such Person in respect of this Agreement.

"Restricted Payment" means (a) any dividend or other distribution (whether in cash, securities or other property) with respect to any class of Capital Stock of a Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Capital Stock of a Person or any option, warrant or other right to acquire any Capital Stock of a Person or on account of any return of capital to the Person's stockholders, partners or members and (b) any principal or interest payment (or other distribution, whether in cash, securities or other property) on, or redemption, repurchase, defeasance or other acquisition or retirement for value of, in each case prior to any scheduled payment, sinking fund payment or maturity, of any Indebtedness due to Holdings, any of the Sponsors, Sponsor Related Parties and/or other stockholders, partners or members of Holdings or any of their respective Affiliates (other than Indebtedness due to the Borrower or any Subsidiary of it).  "Restricted Payments" shall not include any dividends payable solely in Capital Stock of a Loan Party.

"Restructuring Support Agreement" means that certain Restructuring Support Agreement, dated as of November 13, 2020, by and among the Borrower and each of its subsidiaries, the equity parties set forth therein, the consenting creditors set forth therein and Ares PE Extended Value Fund LP.

"Revolver Priority Collateral" means all ABL Priority Collateral (as such term is defined in the Intercreditor Acknowledgement).

"Sacred Rights" mean the consent right of each Lender as set forth in the first proviso of Section 9.02(b).

"Sanctioned Entity" means (a) a country or a government of a country, (b) an agency of the government of a country, (c) an organization directly or indirectly controlled by a country or its government, or (d) a Person resident in or determined to be resident in a country, in each case of clauses (a) through (d) that is a target of Sanctions, including a target of any country sanctions program administered and enforced by OFAC.

"Sanctioned Person" means, at any time (a) any Person named on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC ("SDN"), OFAC's consolidated Non-SDN list or any other Sanctions-related list maintained by any Governmental Authority, (b) a Person or legal entity that is a target of Sanctions, (c) any Person operating, organized or resident in a Sanctioned Entity, or (d) any Person directly or indirectly owned or controlled (individually or in the aggregate) by or acting on behalf of any such Person or Persons described in clauses (a) through (c) above.

"Sanctions" means individually and collectively, respectively, any and all economic sanctions, trade sanctions, financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes anti-terrorism laws and other sanctions laws, regulations or embargoes imposed, administered or enforced from time to time by:  (a) the United States of America, including those

administered by OFAC, the U.S. Department of State, the U.S. Department of Commerce, or through any existing or future executive order, (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) Her Majesty's Treasury of the United Kingdom, or (d) any other Governmental Authority with jurisdiction over any Lender or any Loan Party or any of their respective Subsidiaries or Affiliates.

"SEC" means the Securities and Exchange Commission or any Governmental Authority succeeding to any of its principal functions.

"Secured Party" means (a) each Credit Party, (b) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document, and (c) the successors and, subject to any limitations contained in this Agreement, assigns of each of the foregoing.

"Security Agreement" means the Security Agreement dated as of the date hereof among the Loan Parties and the Collateral Agent for its benefit and for the benefit of the other Secured Parties, as amended and in effect from time to time.

"Security Documents" means the Security Agreement, the Orders, the Facility Guarantee, and each other security agreement or other instrument or document executed and delivered pursuant to this Agreement or any other Loan Document that creates a Lien in favor of the Collateral Agent to secure any of the Obligations.

"Senior Secured Notes" means the 9.500% Senior Secured Notes Due 2021 in the original amount of $635,000,000, issued by the Borrower.

"Senior Secured Notes Documents" means the documents, instruments and other agreements now or hereafter executed and delivered in connection with the Senior Secured Notes, including, without limitation, the Indenture dated March 16, 2018.

"Senior Secured Superpriority Notes" means the 10.00% Senior Secured Superpriority Notes Due 2022 in the original amount of $35,750,000, issued by the Borrower.

"Senior Secured Superpriority Notes Documents" means the documents, instruments and other agreements now or hereafter executed and delivered in connection with the Senior Secured Superpriority Notes, including, without limitation, the Indenture dated May 15, 2020.

"Senior Unsecured Notes" means the Cash/PIK Senior Unsecured Notes Due 2022 in the original amount of up to $325,000,000 (as such amount may increase pursuant to PIK interest added to principal in accordance with the terms thereof) issued by the Borrower and any securities issued in lieu or in replacement thereof.

"Senior Unsecured Notes Documents" means the documents, instruments and other agreements now or hereafter executed and delivered in connection with the Senior Unsecured Notes, including, without limitation, the Indenture, dated as of APRIL 16, 2018.

"Settlement Date" has the meaning provided in SECTION 2.22(b).

"Specified Closures" means those seven (7) store closures disclosed to Province, Inc. on or prior to the Closing Date, and contemplated by the Approved Budget.

"Specified Indebtedness" means all Indebtedness under the Senior Secured Notes Documents, Senior Secured Superpriority Notes Documents and the Senior Unsecured Notes Documents of Holdings, the Borrower and/or their Subsidiaries.

"Sponsors" means collectively, Ares Management LLC and its Affiliates.

"Sponsor Group" means the Sponsors and the Sponsor Related Parties.

"Sponsor Related Parties" means, with respect to the Sponsors, (a) any Controlling stockholder or partner thereof (including in the case of an individual Person who possesses Control, the spouse or immediate family member of such Person provided such Person retains Control of the voting rights, by stockholders agreement, trust agreement or otherwise of the Capital Stock owned by such spouse or immediate family member) or (b) any trust, corporation, partnership or other entity, the beneficiaries, stockholders, partners, owners or Persons beneficially holding a 51% or more Controlling interest of which consist of such Person and/or such Persons referred to in the immediately preceding clause (a).

"Store" means any retail store (which includes any real property, fixtures, equipment, inventory and other property related thereto) operated, or to be operated, by any Loan Party.

"Subsidiary" means with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity (a) of which Capital Stock representing more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, Controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent. Unless the context requires otherwise, each Subsidiary shall be a reference to Subsidiaries of Holdings.

"Superpriority Claims" means all of the allowed superpriority administrative expense claims of the Agents and the other Secured Parties on account of the Obligations, which claims shall be entitled to the benefits of section 364(c)(1) and 364(e) of the Bankruptcy Code, having priority over any and all administrative expenses of the kind that are specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 1113, 1114 or any other provisions of the Bankruptcy Code and any other claims against the Loan Parties. Superpriority Claims shall, at all times be (x) junior only to the Carve-Out, (y) senior to any and all other administrative expense claims or other claims against the Loan Parties or their estates, in the Chapter 11 Cases and any successor cases, and (z) subject to the Intercreditor Arrangement.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor

transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Synthetic Lease" means any lease or other agreement for the use or possession of property creating obligations which do not appear as Indebtedness on the balance sheet of the lessee thereunder but which, upon the insolvency or bankruptcy of such Person, may be characterized as Indebtedness of such lessee without regard to the accounting treatment.

"Taxes" means any and all current or future income, stamp or other taxes, levies, imposts, duties (including stamp duties), deductions, fees, charges (including ad valorem charges) or withholdings now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, and any and all interest and penalties related thereto.

"Test Date" means December 11, 2020 and each Friday thereafter.

"Test Period" means with respect to each Test Date the immediately preceding four calendar weeks from such Test Date, on a cumulative basis; provided, that the Test Period corresponding to the Test Date on December 11, 2020 shall be the immediately preceding three calendar weeks from such Test Date, on a cumulative basis.

"Threshold Lenders" has the meaning provided in SECTION 9.02(c).

"Total Commitments" means the aggregate of the Commitments of all Lenders.

"Transactions" means collectively, the transactions to occur in connection with the Chapter 11 Cases, including (a) the execution and delivery of this Agreement and the borrowing of the Loans hereunder and the use of proceeds therefrom and (b) the payment of all fees, premiums, costs and expenses to be paid owing in connection with the foregoing (including to fund any original issue discount and upfront fees).

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9; provided further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"Updated Budget" has the meaning specified in Section 5.01(i).

"U.S. Lender" means any Lender that is a "United States person," as that term is defined in Section 7701(a)(30) of the Code.

"U.S. Special Resolution Regime" has the meaning assigned to it in SECTION 9.22.

"U.S. Tax Compliance Certificate" has the meaning provided in SECTION 2.23(e).

"Variance Report" has the meaning specified in Section 5.01(j).

"Variance Report Date" has the meaning specified in Section 5.01(j).

"Weighted Average Life to Maturity" means, when applied to any Indebtedness, at any date, the quotient obtained by dividing (1) the sum of the products of the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness multiplied by the amount of such payment, by (2) the sum of all such payments.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part 1 of Subtitle E of Title IV of ERISA.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

SECTION 1.02      Terms Generally.

With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)      The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Charter Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory

33

provisions consolidating, amending replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, (vi) the words "<u>asset</u>" and "<u>property</u>" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights, (vii) all references to "$" or "dollars" or to amounts of money and all calculations of Excess Availability, permitted "baskets" and other similar matters shall be deemed to be references to the lawful currency of the United States of America, and (viii) references to "knowledge" of any Loan Party means the actual knowledge of a Responsible Officer.

(b)    In the computation of periods of time from a specified date to a later specified date, the word "<u>from</u>" means "<u>from and including</u>;" the words "<u>to</u>" and "<u>until</u>" each mean "<u>to but excluding</u>;" and the word "<u>through</u>" means "<u>to and including</u>."

(c)    Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d)    This Agreement and the other Loan Documents are the result of negotiation among, and have been reviewed by counsel to, among others, the Loan Parties and the Administrative Agent and are the product of discussions and negotiations among all parties. Accordingly, this Agreement and the other Loan Documents are not intended to be construed against the Administrative Agent or any of the Lenders merely on account of the Administrative Agent's or any Lender's involvement in the preparation of such documents.

SECTION 1.03    <u>Accounting Terms.</u>

(a)    <u>Generally</u>.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the audited financial statements described in SECTION 3.04, except as otherwise specifically prescribed herein.  All amounts used for purposes of financial calculations required to be made shall be without duplication.

(b)    <u>Issues Related to GAAP</u>.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); <u>provided that</u>, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Borrower shall provide to the Administrative Agent and the Lenders as reasonably requested hereunder a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.  In addition, the definitions set forth in the Loan Documents and any financial calculations required by the Loan Documents shall be computed to exclude (a) the effect of purchase accounting adjustments, including the effect of non-cash items resulting from

any amortization, write-up, write-down or write-off of any assets or deferred charges (including, without limitation, intangible assets, goodwill and deferred financing costs in connection with any merger, consolidation or other similar transaction permitted by this Agreement), (b) the application of FAS 133, FAS 150 or FAS 123r (to the extent that the pronouncements in FAS 123r result in recording an equity award as a liability on the Consolidated balance sheet of Holdings and its Subsidiaries in the circumstance where, but for the application of the pronouncements, such award would have been classified as equity), (c) any mark-to-market adjustments to any derivatives (including embedded derivatives contained in other debt or equity instruments under FAS 133), (d) any non-cash compensation charges resulting from the application of FAS 123r and (e) FAS 159 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrower or any Subsidiary at "fair value", as defined therein.

SECTION 1.04    Rounding.  Any financial ratios required to be maintained pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

SECTION 1.05    Times of Day.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

SECTION 1.06    [Reserved].

SECTION 1.07    Certifications.    All certifications to be made hereunder by an officer or representative of a Loan Party shall be made by such person in his or her capacity solely as an officer or a representative of such Loan Party, on such Loan Party's behalf and not in such person's individual capacity.

SECTION 1.08    [Reserved].

SECTION 1.09    Divisions.    For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

ARTICLE II

Amount and Terms of Loans

SECTION 2.01    Commitments of the Lenders.  Subject to the terms and conditions hereof, each Lender severally agrees to make a term loan in Dollars to the Borrower on the Closing Date in an amount which will not exceed the amount of the Commitment of such Lender. The aggregate outstanding principal amount of the Loans for all purposes of this Agreement and the other Loan Documents shall be the stated principal amount thereof

outstanding from time to time. The Commitments of all Lenders shall terminate upon the funding of the Loans on the Closing Date. Once repaid the Loans may not be reborrowed.

SECTION 2.02    [Reserved].

SECTION 2.03    Borrowings.

(a)    The Borrower shall give the Administrative Agent written notice (which notice must be received by the Administrative Agent one Business Day prior to the anticipated Closing Date or such later date as the Administrative Agent may agree) requesting that the Lenders make Loans on the Closing Date and specifying the amount to be borrowed. Upon receipt of such notice the Administrative Agent shall promptly notify each Lender thereof. Not later than 11:00 A.M., New York City time, on the Closing Date each Lender shall make available to the Administrative Agent at the Funding Office an amount in immediately available funds equal to the Loans to be made by such Lender. The Administrative Agent shall credit the account designated in writing by the Borrower to the Administrative Agent with the aggregate of the amounts made available to the Administrative Agent by the Lenders in immediately available funds.

SECTION 2.04    [Reserved].

SECTION 2.05    [Reserved].

SECTION 2.06    [Reserved].

SECTION 2.07    Notes.    The Borrower, upon receipt of written notice from the relevant Lender, agrees to issue Notes to any Lender requiring the same (in the case of an assignment, following surrender by the assigning Lender of all Notes representing its assigned interests).

SECTION 2.08    Interest on Loans.

(a)    Subject to SECTION 2.12, each Loan shall bear interest (computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as applicable) at the Interest Rate.

(b)    Accrued interest on all Loans shall be payable in arrears on each Interest Payment Date applicable thereto upon prepayment, at maturity (whether by acceleration or otherwise) and after such maturity on demand.

SECTION 2.09    [Reserved].

SECTION 2.10    [Reserved].

SECTION 2.11    [Reserved].

SECTION 2.12    Default Interest.    At all times while an Event of Default is continuing, interest shall accrue on all Loans and other amounts owing by the Loan Parties

36

(computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as applicable) (the "Default Rate") equal to (a) with respect to overdue principal of any Loan, the rate otherwise applicable thereto plus two percent (2.00%) per annum and (b) with respect to any other amounts, the rate then applicable to Loans plus two percent (2.00%) per annum.  Such interest shall be payable on each Interest Payment Date.  Such interest shall not be payable to Defaulting Lenders.

SECTION 2.13    [Reserved].

SECTION 2.14    Increased Costs.

(a)    If any Change in Law shall impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender or any holding company of any Lender and the result of any of the foregoing shall be to increase the cost in any material amount in excess of those incurred by similarly situated lenders to such Lender of making or maintaining any Loan (or of maintaining its obligation to make any such Loan) or to increase the cost in any material amount in excess of those incurred by similarly situated lenders to such Lender or to reduce the amount in any material respect of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.  This SECTION 2.14 shall not apply to any costs related to any Indemnified Taxes or Excluded Taxes.

(b)    If any Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company would have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)    A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this SECTION 2.14 and setting forth in reasonable detail the manner in which such amount or amounts were determined shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender, the amount shown as due on any such certificate within fifteen (15) Business Days after receipt thereof.

(d)    Failure or delay on the part of any Lender to demand compensation pursuant to this SECTION 2.14 shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs or reductions incurred more than 90 days prior to the date that such Lender, notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor, and

provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 90 day period referred to above shall be extended to include the period of retroactive effect thereof.

SECTION 2.15        [Reserved].

SECTION 2.16        Optional Prepayment of Loans; Reimbursement of Lenders.

(a)        The Borrower shall have the right at any time to prepay the Loans in whole (but not in part) upon at least one (1) Business Days' prior written notice to the Administrative Agent; provided, that any prepayment of Loans shall be accompanied by the Exit Payment.

(b)        All prepayments (including prepayments pursuant to SECTION 2.17 hereof) shall be paid to the Administrative Agent for application (except as otherwise directed by the applicable Borrower), to the prepayment of outstanding Loans on a pro rata basis.

(c)        Each notice of prepayment shall specify the prepayment date and the principal amount of the Loans to be prepaid.  Each notice of prepayment shall be irrevocable and, once repaid, Loans may not be reborrowed.  The Administrative Agent shall, promptly after receiving notice from the Borrower hereunder, notify each applicable Lender of the principal amount of the Loans held by such Lender which are to be prepaid, the prepayment date and the manner of application of the prepayment.

SECTION 2.17        Mandatory Prepayment; Commitment Termination.

The outstanding Obligations shall be subject to prepayment as follows:

(a)        Immediately upon the issuance or incurrence by any Loan Party or any of its Subsidiaries of any Indebtedness (other than Permitted Indebtedness), the Borrower shall prepay the outstanding amount of the Loans in an amount equal to 100% of the Net Proceeds received by such Person in connection therewith. The provisions of this Section 2.17(b) shall not be deemed to be implied consent to any such issuance or incurrence of Indebtedness otherwise prohibited by the terms and conditions of this Agreement.

(b)        Any Net Proceeds received from a Prepayment Event (other than Excluded Net Proceeds) while this Agreement is in effect shall be paid over to the Administrative Agent within two (2) Business Days of receipt by the Loan Parties and shall be utilized to prepay the Loans in the order of priority set forth in this section 2.17(b).  The Agents shall not be obligated to release their Liens on any Collateral included in such Prepayment Event until such Net Proceeds have been so received (to the extent required in this clause (b)).  Such Net Proceeds shall be applied as follows:

(i)        first, to pay accrued and unpaid interest on, and expenses in respect of, the Obligations, to the extent then due and payable; then

(ii)        second, to any principal amounts or other obligations (including the Exit Payment) which are outstanding hereunder.

(c)       Upon the Maturity Date, the Loan Parties shall pay, jointly and severally, in full and in cash, all outstanding Loans and all other outstanding Obligations then owing by them.

(d)       Each mandatory prepayment of Loans pursuant to this Section 2.17 shall be accompanied by the Exit Payment.

SECTION 2.18       [Reserved].

SECTION 2.19       Fees; Payments.

(a)       The Borrower shall pay to the Agents, for their respective accounts, the fees set forth in the Payment Letter as and when payment of such fees is due as therein set forth.

(b)       [Reserved].

(c)       The Borrower shall pay the Administrative Agent, for the account of the Lenders, an aggregate payment in cash (the "Exit Payment") in an amount equal to 3.00% of each Lender's Commitment (or Loans, if the Commitments have terminated) on the earlier to occur of (i) the Maturity Date, (ii) any Exit Payment Other Event and (iii) a prepayment pursuant to Sections 2.16 or 2.17.  The Administrative Agent shall pay the Exit Payment to the Lenders (excluding Defaulting Lenders) upon the Administrative Agent's receipt of the Exit Payment based upon their pro rata share of Loans then outstanding (excluding Loans of Defaulting Lenders).  The Borrower and the Lenders agree to treat the Exit Payment for U.S. federal income tax purposes as an additional payment with respect to the Loans.

(d)       [Reserved].

(e)       All fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent for the account of the Administrative Agent and other Credit Parties as provided herein.  Once due, all fees shall be fully earned and shall not be refundable under any circumstances (except to the extent set forth in the Payment Letter).

SECTION 2.20       Maintenance of Loan Account; Statements of Account.

(a)       The Administrative Agent shall maintain an account on its books in the name of the Borrower (each, the "Loan Account") which will reflect (i) all Loans and other advances made by the Lenders to the Borrower or for the Borrower's account and (ii) any and all other monetary Obligations that have become payable.

(b)       The Loan Account will be credited with all amounts received by the Administrative Agent from the Borrower or from other Persons for the Borrower's account and the amounts so credited shall be applied as set forth in and to the extent required by SECTION 2.17(b) or 7.03, as applicable.  After the end of each month, the Administrative Agent shall send to the Borrower a statement accounting for the charges (including interest), loans, advances and other transactions occurring among and between the Administrative Agent, the Lenders and the Borrower during that month.  The monthly statements shall, absent manifest error, shall be deemed presumptively correct.

SECTION 2.21          Payments; Sharing of Setoff.

(a)          The Borrower shall make each payment required to be made hereunder or under any other Loan Document (whether of principal, interest or fees of amounts payable under SECTIONS 2.14 or 2.23, or otherwise) prior to 3:00 p.m. on the date when due, in immediately available funds, without setoff or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at its Funding Office, except that payments pursuant to SECTIONS 2.14, 2.23 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein.  The Administrative Agent shall distribute any such payments to the appropriate recipient promptly following receipt thereof.  If any payment under any Loan Document shall be due on a day that is not a Business Day, except with respect to Borrowings, the date for payment shall be extended to the next succeeding Business Day, and, if any payment due with respect to Borrowings shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, unless that succeeding Business Day is in the next calendar month, in which event, the date of such payment shall be on the last Business Day of subject calendar month, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.

(b)          All funds received by and available to the Administrative Agent to pay principal, interest, premium (including the Exit Payment), fees and other amounts then due hereunder, shall be applied in accordance with the provisions of SECTION 2.17(b) or 7.03 ratably among the parties entitled thereto in accordance with the amounts of principal, interest, fees and other amounts then due to such respective parties.  For purposes of calculating interest due to a Lender, that Lender shall be entitled to receive interest on the actual amount contributed by that Lender towards the principal balance of the Loans outstanding during the applicable period covered by the interest payment made by the Borrower.  Any net principal reductions to the Loans received by the Administrative Agent in accordance with the Loan Documents during such period shall not reduce such actual amount so contributed, for purposes of calculation of interest due to that Lender, until the Administrative Agent has distributed to the applicable Lender its pro rata portion thereof.

(c)          Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the Federal Funds Rate.

(d)          In accordance with the provisions of SECTION 2.27, if any Lender shall fail to make any payment required to be made by it pursuant to this Agreement, then the

Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Section until all such unsatisfied obligations are fully paid.

SECTION 2.22    [Reserved].

SECTION 2.23    Taxes.

(a)    Any and all payments by or on account of any obligation of the Loan Parties hereunder or under any other Loan Document shall be made free and clear of and without deduction for any Taxes, except as required by Applicable Law; provided, however, that if a Loan Party or an Agent or a Lender shall be required to deduct or remit any such Taxes from such payments, then (i) in the case of any Indemnified Taxes, the sum payable shall be increased as necessary so that after making all required deductions or remittances for such Taxes (including deductions applicable to additional sums payable under this SECTION 2.23) the applicable Credit Party receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Loan Party shall make such deductions and (iii) the Loan Party shall pay the full amount deducted to the relevant Governmental Authority in accordance with Applicable Law.

(b)    In addition, the Loan Parties shall pay any Other Taxes to the relevant Governmental Authority in accordance with Applicable Law.

(c)    The Loan Parties shall indemnify each Credit Party, within ten (10) days after written demand therefor, for the full amount of any Indemnified Taxes paid or payable by such Credit Party on or with respect to any payment by or on account of any obligation of the Loan Parties hereunder or under any other Loan Document (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this SECTION 2.23) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto; provided that if any Borrower reasonably believes that such Taxes were not correctly or legally asserted, each Lender will use reasonable efforts to cooperate with such Borrower to obtain a refund of such taxes so long as such efforts would not, in the good-faith determination of such Lender, result in any additional costs, expenses or risks or be otherwise disadvantageous to it; provided further, that the Borrower shall not be required to compensate any Lender pursuant to this SECTION 2.23 for any amounts payable by such Lender in any fiscal year of such Lender if such Lender does not furnish notice of such claim within nine (9) months from the end of such fiscal year; provided further, that if the law giving rise to such claim has a retroactive effect, then such nine (9) month period shall be extended to include such period of retroactive effect. A certificate as to the amount of such payment or liability delivered to the Borrower by a Credit Party, or by the Administrative Agent on its own behalf or on behalf of any other Credit Party, setting forth in reasonable detail the manner in which such amount was determined, shall be conclusive absent manifest error.

(d)    As soon as practicable after any payment of Indemnified Taxes by a Loan Party to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such

payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)     Any Foreign Lender that is entitled to an exemption from or reduction in United States withholding tax shall deliver to the Borrower and the Administrative Agent two (2) executed copies of (i) either United States Internal Revenue Service Form W-8BEN-E or W-8BEN, as applicable (claiming a treaty benefit) or Form W-8ECI, or any subsequent versions thereof or successors thereto, (ii) in the case of a Foreign Lender claiming exemption from or reduction in U.S. federal withholding Tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", a (A) Form W-8BEN-E or W-8BEN, as applicable, or any subsequent versions thereof or successors thereto and (B) a certificate substantially in the form of Exhibit E-1 representing that such Foreign Lender (1) is not a bank for purposes of Section 881(c) of the Code, (2) is not a 10 percent shareholder (within the meaning of Section 871(h)(3)(B) of the Code) of any Loan Party and (3) is not a controlled foreign corporation related to the Loan Parties (within the meaning of Section 864(d)(4) of the Code) (a "U.S. Tax Compliance Certificate"), in all cases, properly completed and duly executed by such Foreign Lender claiming, as applicable, complete exemption from or reduced rate of, U.S. federal withholding Tax on payments by the Loan Parties under this Agreement and the other Loan Documents, or, (iii) to the extent a Foreign Lender is not the beneficial owner, a Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN-E or W-8BEN, as applicable, a U.S. Tax Compliance Certificate substantially in the form of Exhibit E-2 or Exhibit E-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit E-4 on behalf of each such direct and indirect partner.  Such forms shall be delivered by each Foreign Lender on or before the date it becomes a party to this Agreement (or, in the case of a transferee that is a participation holder, on or before the date such participation holder becomes a transferee hereunder) and on or before the date, if any, such Foreign Lender changes its applicable lending office by designating a different lending office (a "New Lending Office").  In addition, each Foreign Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such Foreign Lender.  If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Notwithstanding any other provision of this SECTION 2.23(e), a Foreign Lender shall not be required to deliver any form pursuant to this SECTION 2.23(e) that such Foreign Lender is not legally able to deliver.

(f)     Any U.S. Lender shall deliver to the Borrower and the Administrative Agent two (2) properly completed and duly executed copies of Internal Revenue Service Form W-9 or any successor form certifying that such U.S. Lender is exempt from U.S. federal backup withholding tax.

(g)     The Loan Parties shall not be required to indemnify any Foreign Lender or to pay any additional amounts to any Foreign Lender in respect of U.S. federal withholding Tax pursuant to paragraph (a) or (c) above to the extent that the obligation to pay such additional amounts would not have arisen but for a failure by such Foreign Lender to comply with the provisions of paragraph (e) above.  Should a Lender become subject to Taxes because of its failure to deliver a form required hereunder, the Loan Parties shall, at such Lender's expense, take such steps as such Lender shall reasonably request to assist such Lender to recover such Taxes.

(h)     If any Loan Party shall be required pursuant to this SECTION 2.23 to pay any additional amount to, or to indemnify, any Credit Party to the extent that such Credit Party becomes subject to Taxes subsequent to the Closing Date (or, if applicable, subsequent to the date such Person becomes a party to this Agreement) as a result of any change in the circumstances of such Credit Party (other than a change in Applicable Law), including without limitation a change in the residence, place of incorporation, principal place of business of such Credit Party or a change in the branch or lending office of such Credit Party, as the case may be, such Credit Party shall use reasonable efforts to avoid or minimize any amounts which might otherwise be payable pursuant to this SECTION 2.23(h); provided, however, that such efforts shall not include the taking of any actions by such Credit Party that would result in any Tax, costs or other expense to such Credit Party (other than a tax, cost or other expense for which such Credit Party shall have been reimbursed or indemnified by the Loan Parties pursuant to this Agreement or otherwise) or any action which would or might in the reasonable opinion of such Credit Party have an adverse effect upon its business, operations or financial condition or otherwise be disadvantageous to such Credit Party.

(i)     If any Credit Party, in its sole discretion, determines in good faith that it has actually and finally realized, by reason of a refund, deduction or credit of any Taxes paid or reimbursed by the Loan Parties pursuant to subsection (a) or (c) above in respect of payments under the Loan Documents (which refund, deduction or credit is provided by the jurisdiction imposing such Taxes), a current monetary benefit that it would otherwise not have obtained and that would result in the total payments under this SECTION 2.23 exceeding the amount needed to make such Credit Party whole, such Credit Party shall pay to the Borrower, with reasonable promptness following the date upon which it actually realizes such benefit, an amount equal to the amount of such refund, deduction or credit (but only to the extent of the amount of any Taxes paid or reimbursed by the Loan Parties), net of all reasonable out of pocket expenses incurred in securing such refund, deduction or credit; provided, however, that the Borrower, upon the request of the Administrative Agent or such Credit Party, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Credit Party in the event the Administrative Agent or such Credit Party is required to repay such refund, deduction or credit to such Governmental Authority.  This SECTION 2.23(i) shall not be construed to require any Credit

Party to make available its tax returns (or any other information relating to its Taxes which it deems confidential) to any Loan Party.

SECTION 2.24    Mitigation Obligations; Replacement of Lenders.

(a)    If any Lender requests compensation under SECTION 2.14 or if the Loan Parties are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to SECTION 2.23, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to SECTION 2.14 or SECTION 2.23, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense. The Loan Parties hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment; provided, however, that the Loan Parties shall not be liable for such costs and expenses of a Lender requesting compensation if (i) such Lender becomes a party to this Agreement on a date after the Closing Date and (ii) the relevant Change in Law occurs on a date prior to the date such Lender becomes a party hereto.

(b)    If any Lender requests compensation under SECTION 2.14 for thirty (30) consecutive days, or if any Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to SECTION 2.23, or if any Lender is a Defaulting Lender, then the Borrower may, at its sole expense and effort, upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in SECTION 9.04), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided, however, that (i) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not be unreasonably withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees, the Exit Payment and all other amounts payable to it hereunder from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (iii) in the case of any such assignment resulting from a claim for compensation under SECTION 2.14 or payments required to be made pursuant to SECTION 2.23, such assignment will result in a reduction in such compensation or payments. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

SECTION 2.25    [Reserved].

SECTION 2.26    Security Interests in Collateral.

To secure their Obligations under this Agreement and the other Loan Documents, the Borrower shall, and shall cause each other Loan Party to, grant to the Collateral Agent, for its benefit and the benefit of the other Secured Parties, a first-priority security interest in (having the

priority set forth in the Order ), all of the Collateral pursuant hereto and to the Security Documents.

SECTION 2.27        Defaulting Lenders.

Notwithstanding anything to the contrary set forth herein, the Administrative Agent shall not be obligated to transfer to a Defaulting Lender any payments made by the Borrower to the Administrative Agent for the Defaulting Lender's benefit or any proceeds of Collateral that would otherwise be remitted hereunder to the Defaulting Lender, and, in the absence of such transfer to the Defaulting Lender, the Administrative Agent shall transfer any such payments (i) first, to each Non-Defaulting Lender ratably in accordance with their Commitments (but, in each case, only to the extent that such Defaulting Lender's portion of a Loan (or other funding obligation) was funded by such other Non-Defaulting Lender) and (ii) second, from and after the date on which all other Obligations have been paid in full, to such Defaulting Lender.  Solely for the purposes of voting or consenting to matters with respect to the Loan Documents such Defaulting Lender shall be deemed not to be a "Lender" and such Lender's Commitment shall be deemed to be zero; provided, that the foregoing shall not apply to any of the matters governed by SECTION 9.02(b)(i) or (ii) (A) or (B).  The provisions of this SECTION 2.27 shall remain effective with respect to such Defaulting Lender until the earlier of (y) the date on which all of the Non-Defaulting Lenders, the Administrative Agent, and the Borrower shall have waived, in writing, the application of this SECTION 2.27 to such Defaulting Lender, or (z) the date on which such Defaulting Lender pays to the Administrative Agent all amounts owing by such Defaulting Lender in respect of the amounts that it was obligated to fund hereunder, and, if requested by the Administrative Agent, provides adequate assurance of its ability to perform its future obligations hereunder.  The operation of this SECTION 2.27 shall not be construed to increase or otherwise affect the Commitment of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by any Borrower of its duties and obligations hereunder to the Administrative Agent or to the Lenders other than such Defaulting Lender.  Any failure by a Defaulting Lender to fund amounts that it was obligated to fund hereunder shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle the Borrower, at its option, upon written notice to the Administrative Agent, to arrange for a substitute Lender to assume the Commitment of such Defaulting Lender, such substitute Lender to be reasonably acceptable to the Administrative Agent.  In connection with the arrangement of such a substitute Lender, the Defaulting Lender shall have no right to refuse to be replaced hereunder, and agrees to execute and deliver a completed form of Assignment and Assumption in favor of the substitute Lender (and agrees that it shall be deemed to have executed and delivered such document if it fails to do so) subject only to being paid its share of the outstanding Obligations (including all interest, fees, and other amounts that may be due and payable in respect thereof); provided, that any such assumption of the Commitment of such Defaulting Lender shall not be deemed to constitute a waiver of any of the Credit Parties' or the Loan Parties' rights or remedies against any such Defaulting Lender arising out of or in relation to such failure to fund.  In the event of a direct conflict between the priority provisions of this SECTION 2.27 and any other provision contained in this Agreement or any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this SECTION 2.27 shall control and govern.

## ARTICLE III

### Representations and Warranties

To induce the Credit Parties to make the Loans, the Loan Parties executing this Agreement or a Joinder Agreement hereto, jointly and severally, make the following representations and warranties to each Credit Party with respect to each Loan Party and its Subsidiaries on the date hereof and on each other date required by SECTION 4.02 hereof, in each case as of the date such representation and warranty is made unless an earlier date is specified:

SECTION 3.01        Organization; Powers.

Each Loan Party is a Debtor in the Chapter 11 Cases.  Each Loan Party and each of its Subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and subject to the entry of the Interim Order (and the Final Order, when applicable), has all requisite corporate or other applicable entity power and authority to own its property and assets and to carry on its business as now conducted, except, in each case, where the failure to do so, or so possess, individually or in the aggregate would not reasonably be expected to result in a Material Adverse Effect.  Subject to the entry of the Interim Order (and the Final Order, when applicable), each Loan Party has all requisite organizational power and authority to execute and deliver and perform all its obligations under all Loan Documents to which such Loan Party is a party.  Each Loan Party and each of its Subsidiaries is qualified to do business in, and is in good standing (where such concept exists) in, every jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification necessary, except where the failure to be so qualified or in good standing individually or in the aggregate would not reasonably be expected to result in a Material Adverse Effect.  Schedule 3.01 annexed hereto sets forth, as of the date hereof, each Loan Party's and each of its Subsidiaries' name as it appears in official filings in its state of incorporation or organization, its state of incorporation or organization, organization type, organization number, if any, issued by its state of incorporation or organization, and its federal employer identification number.

SECTION 3.02        Authorization; Enforceability.

The transactions contemplated hereby and by the other Loan Documents to be entered into by each Loan Party are within such Loan Party's corporate powers and, subject to approval of the Bankruptcy Court pursuant to the Orders, have been duly authorized by all necessary corporate, membership, partnership or other necessary action.  Subject to approval of the Bankruptcy Court pursuant to the Orders, this Agreement has been duly executed and delivered by each Loan Party that is a party hereto or thereto and constitutes, and each other Loan Document to which any Loan Party is a party, when executed and delivered by such Loan Party will constitute, a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03        No Conflicts.

Upon entry of the Orders, as applicable, the transactions to be entered into and contemplated by the Loan Documents (a) will not violate any Applicable Law (except to the extent that such violation would not reasonably be expected to result in a Material Adverse Effect) or the Charter Documents of any Loan Party or any of its Subsidiaries, (b) do not violate or result in a default (with due notice, lapse of grace period or both) under any indenture or any other material agreement or instrument, except to the extent that such default would not reasonably be expected to result in a Material Adverse Effect or such default is stayed by the filing of the Chapter 11 Cases, and (c) will not result in the creation or imposition of any Lien on any asset of any Loan Party or any of its Subsidiaries, except Liens created under the Loan Documents and Permitted Encumbrances.

SECTION 3.04        Financial Condition.

The Borrower has heretofore furnished to the Agents (i) the Consolidated balance sheet, and statements of operations, stockholders' equity, and cash flows for the Borrower and its Subsidiaries as of and for the twelve month period ending December 31, 2019, audited by KPMG, LLP, independent public accountants, and (ii) the unaudited interim Consolidated balance sheet, and the related statements of operations, stockholders' equity, and cash flows for the Borrower and its Subsidiaries for the period ending September 30, 2020.  Such financial statements present fairly, in all material respects, the financial position, results of operations and cash flows of Holdings and its Subsidiaries as of such dates and for such periods in accordance with GAAP.  Since May 12, 2020, there has been no event, change, condition or development that has had or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.05        Properties.

(a)        Each Loan Party and each of its Subsidiaries has title to, or valid leasehold interests in or right to use, all its real and personal property material to its business, except for defects which would not reasonably be expected to have a Material Adverse Effect.

(b)        Schedule 3.05(b) sets forth with respect to each Loan Party and each of its Subsidiaries a list of all registrations and issuances of the Intellectual Property arising under the United States laws owned by such Loan Party and each of its Subsidiaries and all applications for the registrations or issuance thereof, in each case as of the date hereof.  Each such registration, issuance and application that is material to the business of such Loan Party or such Subsidiary is subsisting, has not expired or been abandoned or cancelled, and to the knowledge of each Loan Party, is valid and enforceable.  To the knowledge of each Loan Party, no proceeding is pending against any Loan Party challenging the ownership, registration, validity, enforceability or use of any item of Intellectual Property.  Each Loan Party and each of its Subsidiaries owns or is licensed to use, all Intellectual Property used in its business, free and clear of all Liens other than Permitted Encumbrances, except to the extent that the failure to so own or have the right to use would not reasonably be expected to have a Material Adverse Effect, and each Loan Party's and each of its Subsidiaries' conduct of its business and its use of the Intellectual Property owned by such Loan Party or such Subsidiary does not infringe upon, misappropriate, dilute or otherwise

violate the rights of any other Person, except for any such infringements, misappropriations, dilutions or other violations that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.  No proceeding is pending (or to the knowledge of each Loan Party, threatened) in which any Person is alleging that a Loan Party or any of its Subsidiaries is infringing, misappropriating, diluting, or otherwise violating the Intellectual Property rights of any Person in any material respect.  Each Loan Party and each of its Subsidiaries have taken reasonable actions to maintain and protect their material Intellectual Property, including protecting the secrecy and confidentiality of the confidential information and trade secrets of the Loan Parties and each of the Subsidiaries taking reasonable steps to prevent any trade secret of any Loan Party or any Subsidiary from falling into the public domain.  To the knowledge of each Loan Party, no Person is infringing, misappropriating, diluting or otherwise violating any intellectual property owned by any Loan Party or any of its Subsidiaries. Each Loan Party and each of its Subsidiaries owns or possesses adequate rights to use all computer systems (including hardware, software databases, firmware and related equipment), communications systems, and networking systems, (the "IT Systems") used by such Loan Party or Subsidiary in connection with the operation of its businesses and operations (such rights for all Loan Parties, collectively, the "Loan Party IT Systems").  The Loan Party IT Systems are adequate in all material respects for their intended use in the operation of the Loan Parties and their Subsidiaries' respective businesses and operations, taken as a whole, as such businesses and operations are currently conducted.

(c)       Schedule 3.05(c)(i) sets forth the address (including county) of all Real Estate that is owned by the Loan Parties and their Subsidiaries as of the date hereof.  Schedule 3.05(c)(ii) sets forth, in all material respects, the address of all real property that is leased by the Loan Parties and their Subsidiaries as of the date hereof in each Landlord Lien State on which Inventory (as defined in the ABL DIP Facility) included in the Borrowing Base (as defined in the ABL DIP Facility) is located with an aggregate Cost in excess of $700,000.

SECTION 3.06       Litigation and Environmental Matters.

(a)       As of the date hereof except the Chapter 11 Cases, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the actual knowledge of Responsible Officers of a Loan Party, threatened in writing against or affecting any Loan Party or any of its Subsidiaries (i) as to which there is a reasonable expectation of an adverse determination which, if adversely determined, would reasonably be expected individually or in the aggregate to result in a Material Adverse Effect or (ii) that involve any of the Loan Documents, the Senior Secured Notes Documents, the Senior Secured Superpriority Notes Documents or the Senior Unsecured Notes Documents.

(b)       No Loan Party nor any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received written notice of any actual or potential claim with respect to any Environmental Liability or (iv) knows of any basis for any Environmental Liability, which, in each case, individually or in the aggregate, would reasonably be expected  to result in a Material Adverse Effect.

(c)      No Real Estate or facility owned, operated or leased by any Loan Party or any of its Subsidiaries is listed or, to the knowledge of the Loan Parties, proposed for listing on the National Priorities List promulgated pursuant to CERCLA or similar state "Superfund" list except to the extent that such filings, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

(d)      No Lien has been recorded or, to the knowledge of any Loan Party, threatened under any Environmental Law with respect to any Real Estate of the Loan Parties or any of their Subsidiaries.

(e)      The execution, delivery and performance of this Agreement and the consummation of the Transactions and the other transactions contemplated hereby will not require any notification, registration, filing, reporting, disclosure, investigation, remediation or cleanup pursuant to any applicable Environmental Law, except for any requirement the noncompliance with which could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(f)      The Borrower has made available to the Agents and the Lenders all material documents, studies, and reports in the possession, custody or control of the Loan Parties and their Subsidiaries concerning compliance with or liability under Environmental Law, including those concerning the actual or suspected existence of Hazardous Material at Real Estate or facilities currently or formerly owned, operated, leased or used by any Loan Party or any of its Subsidiaries.

(g)      Hazardous Materials are not present at or about any of the Real Estate or any other facility currently owned, operated or leased by any Loan Party or any of its Subsidiaries in amount or condition that, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect.

SECTION 3.07      Compliance with Laws and Agreements.

Each Loan Party and each of its Subsidiaries is in compliance with all Applicable Law except where the failure to comply, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect. Without limiting the generality of the foregoing, each Loan Party and each of its Subsidiaries has obtained all permits, licenses and other authorizations which are required with respect to the ownership and operations of its business, except where the failure to obtain such permits, licenses or other authorizations, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  Each Loan Party and each of its Subsidiaries is in compliance with all terms and conditions of all such permits, licenses, orders and authorizations, except where the failure to comply with such terms or conditions, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  Without limiting the generality of the foregoing, each Loan Party has complied at all times in all material respects with applicable Laws regarding the collection, retention, use and protection of personal information.  No Person (including any Governmental Authority) has made any claim or commenced any action relating to the Loan Party's privacy or data security practices, including with respect to the access, disclosure or use of personal information maintained by or on behalf of any of such business or to the knowledge of each

Loan Party and their Subsidiaries threatened any such claim or action or conducted any investigation or inquiry thereof, except any such claim or action that could not reasonably be expected to have a Material Adverse Effect.  The execution, delivery, or performance of this Agreement and the consummation of the transactions contemplated hereby, will not violate any applicable privacy Laws or the privacy policy of any Loan Party or any of its Subsidiaries as it currently exists or as it existed at any time during which any personal information was collected or obtained by or on behalf of such Loan Party or Subsidiary.

SECTION 3.08        Investment Company Status.

No Loan Party nor any of its Subsidiaries is an "investment company" as defined in, and subject to regulation under, the Investment Company Act of 1940, as amended.

SECTION 3.09        Taxes.

Since the Closing Date, each Loan Party and each of its Subsidiaries has timely filed or caused to be filed all tax returns and reports required to have been filed and subject to the approval of the Bankruptcy Court has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings, for which such Loan Party or such Subsidiary has set aside on its books adequate reserves in accordance with GAAP, and as to which no Lien has arisen, (b) to the extent that the failure to do so could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect or (c) Taxes the non-payment of which is permitted or required by the Bankruptcy Code or order of the Court.

SECTION 3.10        ERISA.

Other than the Chapter 11 Cases and except as would not reasonably be expected to result in a Material Adverse Effect: (i) each of the Loan Parties and their ERISA Affiliates is in compliance with the applicable provisions of ERISA and the provisions of the Code relating to Plans and the regulations and published interpretations thereunder; (ii) the present value of all benefit liabilities under each Plan of each of the Loan Parties and their ERISA Affiliates (based on those assumptions used to fund such Plan) does not exceed the value of the assets of such Plan and the present value of all accrued benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) does not exceed the value of the assets of all such underfunded Plans; (iii) no ERISA Event has occurred or is reasonably expected to occur; and (iv) none of the Loan Parties or the ERISA Affiliates has received any written notification that any Multiemployer Plan is in reorganization or is in endangered or critical status or has been terminated within the meaning of Title IV of ERISA, or has knowledge that any Multiemployer Plan is reasonably expected to be in reorganization or in endangered or critical status or to be terminated.  Each of the Loan Parties represents and warrants as of the date hereof that the assets of such Loan Party do not constitute "plan assets" for purposes of Title I of ERISA.

SECTION 3.11        Disclosure.

As of the date hereof, none of the reports, financial statements, certificates or other written information (other than any projections, pro formas, budgets and general market

50

information) concerning any of the Loan Parties or any of their Subsidiaries furnished by or on at the direction of any Loan Party to any Credit Party in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or thereunder (as modified or supplemented by other information so furnished), when taken as a whole, contains, as of the date furnished, any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading in light of the circumstances under which such statements were made; provided, further, and notwithstanding the forgoing, the Loan Parties have not failed to disclose any and all material assumptions made in connection with the Initial Budget and then-Approved Budget, as applicable.

SECTION 3.12        Subsidiaries.

(a)        Schedule 3.12 sets forth the name of, and the ownership interest of each Loan Party and each of its Subsidiaries in, each Subsidiary as of the date hereof; there is no other Capital Stock of any class outstanding as of the date hereof.  To the knowledge of the Loan Parties, all such shares of Capital Stock as of the date hereof are validly issued, fully paid, and, with respect to corporate shares, non-assessable.

(b)        Except as set forth on Schedule 3.12, no Loan Party nor any of its Subsidiaries is party to any joint venture, general or limited partnership, or limited liability company agreements as of the date hereof.

SECTION 3.13        [Reserved].

SECTION 3.14        Labor Matters.

As of the date hereof, there are no strikes, lockouts or slowdowns against any Loan Party or any of its Subsidiaries pending or, to the actual knowledge of any Responsible Officer of any Loan Party, threatened, except to the extent that strikes, lockouts or slowdowns would not reasonably be expected to result in a Material Adverse Effect.  The hours worked by and payments made to employees of any of the Loan Parties and any of their Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable federal, state, local or foreign law dealing with such matters to the extent that any such violation could reasonably be expected to have a Material Adverse Effect.  Except as set forth on Schedule 3.06(a) or except to the extent that such liability would not reasonably be expected to have a Material Adverse Effect, all payments due from any Loan Party or any Subsidiary thereof, or for which any claim may be made against any Loan Party or any Subsidiary thereof, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued in accordance with GAAP as a liability on the books of such Loan Party or such Subsidiary.  Except as set forth on Schedule 3.14, as of the date hereof no Loan Party nor any Subsidiary thereof is a party to or bound by any material collective bargaining agreement, bonus, restricted stock, stock option, or stock appreciation plan or agreement or any similar plan, agreement or arrangement.  As of the date hereof, there are no representation proceedings pending or, to the actual knowledge of any Responsible Officer of any Loan Party, threatened to be filed with the National Labor Relations Board or other applicable Governmental Authority, and no labor organization or group of employees of any Loan Party or any Subsidiary thereof has made a pending demand in writing

for recognition. As of the date hereof, the consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party or any Subsidiary thereof is bound to the extent that such would be reasonably expected to result in a Material Adverse Effect.

SECTION 3.15        Security Documents.

The Interim Order is (and the Final Order when entered will be) effective to create in favor of the Collateral Agent, for the benefit of the Secured Parties, a legal, valid and enforceable, non-avoidable and automatically and fully and properly perfected priority security interest in all right, title and interest of the Loan Parties in each item of Collateral (which for the avoidance of doubt, shall include both tangible and intangible assets) and the proceeds thereof without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents with the priorities set forth in the Intercreditor Arrangement. Each Loan Party is the legal and beneficial owner of the Collateral pledged by it free and clear of any Lien, other than the Permitted Encumbrances. Pursuant to the terms of the Orders, the Obligations of the Loan Parties under this Agreement will constitute Superpriority Claims and be allowed as superpriority administrative expense claims in the Chapter 11 Cases under section 364(c) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against such Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person (including Avoidance Actions and the proceeds thereof), subject only to the terms of the Carve-Out and the Intercreditor Arrangement.

SECTION 3.16        Federal Reserve Regulations.

(a)        No Loan Party nor any Subsidiary thereof is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

(b)        No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, (i) to buy or carry Margin Stock or to extend credit to others for the purpose of buying or carrying Margin Stock or to refund indebtedness originally incurred for such purpose in violation of Regulation U or X or (ii) for any purpose that entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Board, including Regulation U or Regulation X.

SECTION 3.17        Initial Budget.

The Initial Budget, each Approved Budget and each Updated Budget is based upon good faith estimates and assumptions believed by management of the Borrower to be reasonable at the time made, in light of the circumstances under which they were made, it being recognized by the Administrative Agent and the Lenders that such financial information as it relates to future events is not to be viewed as fact and that actual results during the period or periods covered by

such financial information may differ from the projected results set forth therein by a material amount. The Loan Parties have not failed to disclose to the Lenders any material assumptions with respect to any of the Initial Budget, each Approved Budget and each Updated Budget, and the Borrower affirms the reasonableness of the material assumptions set forth in the Initial Budget in all material respects

SECTION 3.18        Chapter 11 Cases.    Chapter 11 Cases were commenced on the Petition Date, in accordance with applicable Requirements of Law and proper notice thereof under the circumstances, and proper notice under the circumstances of (x) the motion seeking approval of the Loan Documents and (y) entry of the Orders, as applicable and the hearings for the approval of the Interim Order have been held by the Bankruptcy Court

SECTION 3.19        [Reserved].

SECTION 3.20        OFAC/Sanctions.    No Loan Party nor any of its Subsidiaries nor any director, officer, employee, agent or Affiliate of such Loan Party or such Subsidiary (a) is a Sanctioned Person or a Sanctioned Entity, (b) has any material assets located in Sanctioned Entities, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities. Each of the Loan Parties and its Subsidiaries, each director, officer, employee, agent and Affiliate of each such Loan Party and each such Subsidiary, is in compliance with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws. No proceeds of any Loan made hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity, or otherwise used in any manner that would result in a violation of any applicable Sanctions, Anti-Corruption Laws or Anti-Money Laundering Laws by any Loan Party or any of its Subsidiaries.

SECTION 3.21        [Reserved].

SECTION 3.22        Orders.    The Interim Order or the Final Order, as applicable, is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the Administrative Agent and Required Lenders, amended or modified (other than amendments or modifications to the Interim Order as a result of entry of the Final Order) and no appeal of such order has been timely filed or, if timely filed, no stay pending such appeal is currently effective and if impacting or implicating the Sacred Rights, each Lender.

SECTION 3.23        Petition Date; Claims and Collateral.    Upon the entry of the Orders, each such Order and the Loan Documents are sufficient to provide that the Obligations will constitute a Superpriority Claim (as defined in the Orders) and the Liens and security interests securing the Obligations shall be senior secured, valid, enforceable and automatically and properly perfected priming liens, having the priorities set forth in the Orders.

ARTICLE IV

Conditions

SECTION 4.01        Closing Date.

The effectiveness of this Agreement on the date hereof, and the obligation of the Lenders to make Loans, is subject to the satisfaction by the Loan Parties or the waiver in accordance with SECTION 9.02 hereof of each of the following conditions precedent:

(a)        The Agents (or their counsel) shall have received either (i) a counterpart of this Agreement and all other Loan Documents from each party thereto signed on behalf of such

54

party or (ii) written evidence reasonably satisfactory to the Agents (which may include telecopy transmission or electronic pdf copy of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement and all other Loan Documents to which it is a party.

(b)     The Restructuring Support Agreement shall have been duly executed and filed with the Bankruptcy Court.

(c)     The Agents shall have received a written opinion (addressed to the Agents and the Lenders and dated the Closing Date) of Milbank LLP, counsel for the Loan Parties.

(d)     The Agents shall have received Charter Documents and such other documents and certificates as the Agents or their counsel may reasonably request relating to the organization and existence of each Loan Party, the authorization of the transactions contemplated by the Loan Documents and any other legal matters relating to the Loan Parties, the Loan Documents or the transactions contemplated thereby, all in form and substance reasonably satisfactory to the Agents and their counsel.

(e)     The Administrative Agent shall have received a borrowing request.

(f)     The Agents shall have received a certificate, reasonably satisfactory in form and substance to the Agents, certifying that, as of the Closing Date, no Default or Event of Default exists and that immediately after the consummation of the Transactions, no Default or Event of Default will exist.

(g)     The representations and warranties of the Borrower and each Facility Guarantor contained in this Agreement and the other Loan Documents or otherwise made in writing in connection herewith or therewith shall be true and correct in all material respects as of the Closing Date (unless qualified by materiality or Material Adverse Effect, in which case such representation and warranties shall be true and correct in all respects) on and as of the date hereof.

(h)     [Reserved].

(i)     The Administrative Agent shall have received a copy of the fully executed Intercreditor Acknowledgement.

(j)     [Reserved].

(k)     All Indebtedness outstanding under the Prepetition ABL Credit Agreement shall have been paid in full (other than contingent obligations) from the first borrowing hereunder and all commitments thereunder shall have terminated), and  the Administrative Agent shall have received a "pay-off" letter in form and substance reasonably satisfactory to the Administrative Agent with respect to such Indebtedness and such UCC (or equivalent) termination statements, mortgage releases, releases of assignments of leases and rents, releases of security interests in Intellectual Property and other instruments, in each case in proper form for recording or filing, as the Administrative Agent shall have reasonably requested to release and terminate of record the Liens securing such Indebtedness.

(l)    The Collateral Agent shall have received all Uniform Commercial Code financing statements, required by law or reasonably requested by the Collateral Agent to be filed, registered or recorded to create or perfect in the United States the first priority Liens intended to be created under the Loan Documents and all such documents and instruments shall have been so filed, registered or recorded to the satisfaction of the Collateral Agent and the Collateral Agent, for the benefit of the Secured Parties, shall have a legal, valid, binding, enforceable fully perfected first priority Lien on, and perfected security interest in, all right, title and interest of the Loan Parties in the Collateral, subject only to (i) Liens expressly permitted hereby, (ii) the Carve-Out and (iii) the Intercreditor Arrangement, and free of all other Liens, other than Liens expressly permitted hereby and by the Interim Order, *provided* that the Interim Order (and the Final Order, when applicable) shall be effective to create in favor of the Administrative Agent a legal, valid, perfected and enforceable security interest and Lien upon the Collateral, with the priority set forth in the Orders and the terms thereof.

(m)    There shall have been delivered to the Agents all documentation and other information requested by them that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Act (as defined in SECTION 9.16 below).

(n)    The Administrative Agent and the Lenders shall have received a copy of the Initial Budget in form and substance reasonably acceptable to the Administrative Agent and Required Lenders.

(o)    All premiums, payments, fees and documented out-of-pocket fees and expenses (including fees and expenses of counsel and financial advisors) required to be paid to the Lenders and Administrative Agent on or before the Closing Date (whether incurred before or after the Petition Date and including estimated fees and expenses through the Closing Date) shall have been paid, including without limitation, fees and expenses of Stroock & Stroock & Lavan LLP, as counsel to certain Lenders, and Province, Inc., as financial advisor to certain Lenders.

(p)    In connection with the Chapter 11 Cases, each of the following conditions shall have been met:

(i)    the Chapter 11 Cases for each of the Loan Parties shall have been commenced in the Bankruptcy Court for the Eastern District of Virginia, Richmond Division, and all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Chapter 11 Cases or shortly thereafter shall have been reviewed in advance by the Lenders and shall be in form and substance acceptable or reasonably acceptable, as applicable pursuant to the Restructuring Support Agreement, to the Required Lenders.

(ii)    the Bankruptcy Court shall have entered, upon motion in form and substance acceptable to the Required Lenders and the Administrative Agent, the Interim Order no later than three (3) Business Days after the Petition Date, approving and authorizing this Agreement, all provisions thereof and transactions contemplated thereby, in form and substance reasonably satisfactory to the Required Lenders in their sole discretion, and following its entry the Interim Order shall be in full force and effect and

shall not have been vacated, reversed, modified, amended or stayed without the prior written consent of the Required Lenders (not to be unreasonably withheld or delayed) or in the case of a Sacred Rights Amendment, each Lender;

(iii)    the Loan Parties shall be in compliance in all respects with the Interim Order;

(iv)    each other Milestone that is required to be complied with prior to or concurrently with entry of the Interim Order shall have been complied with;

(v)    No trustee or examiner with enlarged powers (beyond those set forth in Bankruptcy Code sections 1106(a)(3) and (4)) shall have been appointed with respect to the Borrower or their respective properties;

(vi)    Upon entry of the Interim Order, the entry into this Agreement shall not violate any Applicable Law and shall not be enjoined, temporarily, preliminarily or permanently;

(vii)    The Collateral Agent, for the benefit of the Secured Parties, shall have a valid and fully perfected lien on and security interest in the Collateral, having the priorities set forth in the Intercreditor Arrangement;

(viii)    An order approving the Debtors' cash management system, the form of which is reasonably acceptable to the Required Lenders, shall have been entered by the Bankruptcy Court; and

(q)    Since May 12, 2020, there shall not exist any Material Adverse Effect.

(r)    The Closing Date shall occur not later than two (2) Business Days after the entry of the Interim Order.

ARTICLE V

Affirmative Covenants

Until (i) the Commitments have expired or been terminated and (ii) the principal of and interest on each Loan and all fees and other Obligations (other than contingent indemnity obligations with respect to then-unasserted claims) shall have been paid in full, each Loan Party covenants and agrees with the Credit Parties that:

SECTION 5.01    Reporting Requirements.    The Borrower will furnish to the Administrative Agent (for delivery to the Lenders):

(a)    Within ninety (90) days after the end of each Fiscal Year of the Borrower, the Consolidated balance sheet and related statements of operations, and Consolidated statements of cash flows as of the end of and for such year for the Borrower and its Subsidiaries, setting forth in comparative form, the Consolidated figures for the previous Fiscal Year all audited and reported on by independent public accountants of recognized national standing to the effect that

57

such Consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Borrower and its Subsidiaries on a Consolidated basis in accordance with GAAP;

(b)    Within forty-five (45) days after the end of each first three (3) Fiscal Quarter of the Borrower, the Consolidated balance sheet and related statements of operations, and Consolidated statements of cash flows for the Borrower and its Subsidiaries as of the end of and for such Fiscal Quarter and the elapsed portion of the Fiscal Year, setting forth in each case in comparative form the Consolidated figures for the previous Fiscal Year, all such Consolidated figures certified by one of the Borrower's Financial Officers as fairly presenting in all material respects the financial condition and results of operations of the Borrower and its Subsidiaries on a Consolidated basis in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes;

(c)    Concurrently with any delivery of financial statements under clause (a) or clause (b) above, a certificate of a Financial Officer of the Borrower substantially in the form of Exhibit G hereto (a "Compliance Certificate") (i) certifying as to whether a Default or Event of Default has occurred and, if a Default or Event of Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) [reserved], (iii) detailing all Store openings and Store closings during the immediately preceding fiscal period, and stating the aggregate number of the Loan Parties' and their Subsidiaries' Stores as of the first day of the current fiscal period, and (iv) stating whether any change in GAAP or in the application thereof has occurred since the date of the Borrower's most recent audited financial statements and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such Compliance Certificate;

(d)    [Reserved];

(e)    [Reserved];

(f)    [reserved];

(g)    Promptly upon receipt thereof, copies of all material reports submitted to any Loan Party by independent certified public accountants in connection with each annual or special audit of the books of the Loan Parties or any of their Subsidiaries made by such accountants;

(h)    [Reserved];

(i)    On or before 12:00 p.m. New York City time of the fifth Business Day of each calendar month following the Petition Date commencing with January 2021, a supplement to the Initial Budget (or the previously supplemented Approved Budget, as the case may be), covering the period through the end of the Fiscal Month following the last week of the subsequent 11-week period that commences with the week immediately following the date of delivery of the supplemental budget (which may reforecast periods in any prior Approved Budget), consistent with the form and level of detail set forth in the Initial Budget and otherwise in form and substance acceptable to the Required Lenders in their sole discretion (each such supplemental budget, an "Updated Budget"). Three (3) calendar days following (and subject to)

the approval of any such Updated Budget by the Required Lenders in their reasonable discretion, such Updated Budget shall constitute the then-approved "<u>Approved Budget</u>"; provided that unless and until the Required Lenders approve such supplemental budget, the then-current Approved Budget shall remain in effect.

(j)    On or before 12:00 p.m. New York City time on Thursday of each calendar week following each Test Date (each such Thursday, a "<u>Variance Report Date</u>"), (A) a variance report (each, a "<u>Variance Report</u>") setting forth, in reasonable detail, any differences between (x) actual aggregate disbursements and receipts for each line item for the Test Period applicable to the immediately preceding Test Date and (y) projected aggregate disbursements and receipts for each line item for such applicable Test Period as set forth in the Approved Budget, with management commentary on any individual line item with a positive or negative variance of 10.0% or more as compared to the Approved Budget (unless the dollar amount corresponding to such percentage variance is less than $1,000,000, in which case no management commentary shall be required), together with a statement from the Borrower's chief financial officer certifying the information contained in the report is correct and (B) a report setting forth Liquidity as of the immediately preceding Test Date and certifying compliance with SECTION 6.14(d).

(k)    Promptly following any reasonable request therefor, on and after the effectiveness of the Pension Act, copies of (i) any documents described in Section 101(k) of ERISA that any Loan Party or any of their ERISA Affiliates have received with respect to any Multiemployer Plan and (ii) any notices described in Section 101(l) of ERISA that the any Loan Party any of their ERISA Affiliates have received with respect to any Plan or Multiemployer Plan; provided, that if the Loan Parties or any of their ERISA Affiliates have not requested such documents or notices from the administrator or sponsor of the applicable Plan or Multiemployer Plan, upon reasonable request of the Administrative Agent, the Loan Parties and/or their ERISA Affiliates shall promptly make a request for such documents or notices from such administrator or sponsor and the Borrower shall provide copies of such documents and notices promptly after receipt thereof;

(l)    Promptly following any reasonable request therefor, such other information regarding the operations, business affairs and financial condition of any Loan Party as the Agents or any Lender may reasonably request (other than information which is subject to an attorney-client privilege or would result in a breach of a confidentiality obligation of the Loan Parties to any other Person);

(m)    Promptly following any request therefor, provide information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with anti-terrorism laws, applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the Act and the Beneficial Ownership Regulation

(n)    Within fifteen (15) calendar days after the end of each Fiscal Month of the Borrower and its Subsidiaries, internally prepared monthly operating financial reports for the Borrower and its Subsidiaries, as of the end of and for such Fiscal Month and the elapsed portion of the Fiscal Year, setting forth in each case in comparative form the consolidated figures for the

previous Fiscal Year, all certified by one of the Borrower's Financial Officers as fairly presenting in all material respects the financial condition and results of operations of the Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP, subject to normal year end audit adjustments and the absence of footnotes.

(o)       Within forty-five (45) calendar days after the end of each Fiscal Quarter of the Borrower and its Subsidiaries, internally prepared quarterly store-level operating financial statements for all properties, as of the end of and for such Fiscal Quarter, setting forth in each case in comparative form the consolidated figures for the corresponding Fiscal Quarter in the previous Fiscal Year, all certified by one of the Borrower's Financial Officers as fairly presenting in all material respects the financial condition and results of operations thereof on a consolidated basis in accordance with GAAP, subject to normal year end audit adjustments and the absence of footnotes; provided, that such store-level reporting shall not disclose individual store names or locations.

(p)       On or before 12:00 p.m. New York City time on the Friday of each calendar week following the second week after the Petition Date (i) updates on the status of critical vendor agreements (including regarding inventory provided thereunder) and (ii) updates on closures of two (2) or more store locations (other than the Specified Closures) at any one time related to the COVID-19 Pandemic (other than Store closures set forth in and contemplated by the Initial Budget), in each case, certified by a Responsible Officer of the Borrower.

(q)       (i) Advance copies of all material pleadings, motions, applications, orders, financial information and/or filings in the Chapter 11 Cases or that are distributed to any official or unofficial committee appointed or appearing in the Chapter 11 Cases or any other party in interest (including, without limitation, the Orders, any plan of reorganization or liquidation and any disclosure statements related to such plan) to be made by the Debtors as promptly as practicable and no less than three (3) Business Days prior to the filing thereof other than in exigent circumstances in which case as soon as practicable and (ii) any monthly reporting provided to the Bankruptcy Court or the U.S. Trustee as soon as practicable after being provided to such entity; provided, that the deliverables described in this clause (q) shall be delivered to Stroock & Stroock & Lavan LLP at the same time as such deliverables are delivered to the Administrative Agent.

Documents required to be delivered pursuant to SECTION 5.01 (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date on which such documents are posted on the Borrower's and/or Holdings' behalf on IntraLinks/IntraAgency or another relevant website (the "Informational Website"), if any, to which each Lender and the Administrative Agent have unrestricted access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that: (A) the accommodation provided by the foregoing sentence shall not impair the right of the Administrative Agent, or any Lender through the Administrative Agent, to request and receive from the Loan Parties physical delivery of specific financial information provided for in this SECTION 5.01 and (B) the Borrower and/or Holdings, as applicable, shall give the Administrative Agent and each Lender (or if applicable, the Administrative Agent shall give each Lender) written or electronic notice each time any information is delivered by posting to the

Informational Website. The Credit Parties shall have no liability to any Loan Party, any Credit Party or any of their respective Affiliates associated with establishing and maintaining the security and confidentiality of the Informational Website and the information posted thereto.

SECTION 5.02    Notices of Material Events.

The Borrower will furnish to the Administrative Agent prompt written notice of the occurrence of any of the following after any Responsible Officer of the Borrower obtains knowledge thereof:

(a)    A Default or Event of Default, specifying the nature and extent thereof and the action (if any) which is proposed to be taken with respect thereto;

(b)    The filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority (other than the Chapter 11 Cases) against or affecting any Loan Party or any Subsidiary of the Borrower that, if adversely determined, would reasonably be expected to result in a Material Adverse Effect;

(c)    The occurrence of an ERISA Event that, alone or together with any other ERISA Events that have occurred, would reasonably be expected to result in a liability to any Loan Party or any of their respective ERISA Affiliates in excess of $5,000,000; and

(d)    Any development that results in a Material Adverse Effect.

Each notice delivered under SECTION 5.02 shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth the details of the event or development requiring such notice and, if applicable, any action taken or proposed to be taken with respect thereto.

SECTION 5.03    Information Regarding Collateral.

The Borrower will furnish to the Agents prompt written notice of any change in: (a) any Loan Party's name; (b) the location of any Loan Party's chief executive office or its principal place of business; (c) any Loan Party's organizational structure or jurisdiction of incorporation or formation; or (d) any Loan Party's Federal Taxpayer Identification Number or organizational identification number assigned to it by its state of organization.  The Loan Parties agree not to effect or permit any change referred to in the preceding sentence unless all filings, publications and registrations, have been made (or will be made in a timely fashion) under the Uniform Commercial Code or other Applicable Law that are required in order for the Collateral Agent to continue at all times following such change to have a valid, legal and perfected first priority security interest to the extent required under the Security Documents (subject only to Permitted Encumbrances) in all the Collateral for its own benefit and the benefit of the other Secured Parties.

SECTION 5.04    Existence; Conduct of Business.

Each Loan Party will, and will cause each Subsidiary of it to, do all things necessary (a) to comply with its Charter Documents in all material respects, and (b) to obtain, preserve, renew

and keep in full force and effect (i) its legal existence and (ii) the rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks, trade names, domain names, trade secrets and other proprietary and confidential information material to the conduct of its business, except, in the case of clause (a) and (b)(ii) above, to the extent that the failure to do so would not reasonably be expected to have a Material Adverse Effect; provided, however, that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under SECTION 6.03 or SECTION 6.05.

SECTION 5.05    Payment of Obligations.

Subject to the approval of the Bankruptcy Court, each Loan Party will cause each Subsidiary of it to, pay its Taxes before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings and such Loan Party or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (b) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, (c) the failure to make payment, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, or (d) the non-payment thereof is permitted or required under the Bankruptcy Code or order of the Court.  The provisions of this paragraph shall not limit or restrict the ability of the Agents to establish any Reserve for any unpaid Tax liabilities.

SECTION 5.06    Maintenance of Properties.

Each Loan Party will, and will cause each Subsidiary of it to, keep and maintain all tangible property material to the conduct of its business in substantially the same condition as of the Closing Date (ordinary wear and tear, casualty loss and condemnation excepted), except (a) where the failure to do so would not reasonably be expected to result in a Material Adverse Effect and (b) for Store closings and Permitted Dispositions permitted hereunder.  Each Loan Party will, and will cause each Subsidiary of it to, use commercially reasonable efforts to prosecute, maintain, and enforce the Intellectual Property, except to the extent such Intellectual Property is no longer used or deemed by such Loan Party or such Subsidiary in its reasonable business judgment to be materially useful or desirable in the conduct of the business of the Loan Parties and their Subsidiaries.

SECTION 5.07    Insurance.

(a)    Each Loan Party shall, and shall cause each Subsidiary of it to, (i) maintain insurance with financially sound and reputable insurers (or, to the extent consistent with business practices in effect on the Closing Date, a program of self-insurance) on such of its property and in at least such amounts and against at least such risks as is consistent with business practices in effect on the date hereof or as otherwise determined by the Responsible Officers of the Loan Parties acting reasonably in their business judgment, including public liability insurance against claims for personal injury or death occurring upon, in or about or in connection with the use of any properties owned, occupied or controlled by it (including the insurance required pursuant to the Security Documents); (ii) maintain such other insurance as may be required by law; and (iii) furnish to the Agents, upon written request, full information as to the insurance carried.

(b)     Fire and extended coverage policies maintained with respect to any Collateral shall be endorsed or otherwise amended to include (i) a non-contributing mortgage clause (regarding improvements to real property) and a lenders' loss payable clause (regarding personal property), in form and substance reasonably satisfactory to the Agents, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise payable to any of the Loan Parties or their Subsidiaries under the policies directly to the Administrative Agent, (ii) a provision to the effect that none of the Loan Parties, their Subsidiaries, Credit Parties (in their capacity as such) or any other Affiliate of a Loan Party shall be a co-insurer (the foregoing not being deemed to limit the amount of self-insured retention or deductibles under such policies, which self-insured retention or deductibles shall be consistent with business practices in effect on the Closing Date or as otherwise determined by the Responsible Officers of the Loan Parties acting reasonably in their business judgment), and (iii) such other provisions as the Administrative Agent may reasonably require from time to time to protect the interests of the Credit Parties. Commercial general liability policies shall be endorsed to name the Administrative Agent as an additional insured.  Business interruption policies shall name the Administrative Agent as a loss payee and shall be endorsed or amended to include a provision to the effect that none of the Loan Parties, their Subsidiaries, Credit Parties (in their capacity as such) or any other Affiliate of a Loan Party shall be a co-insurer and (iii) such other provisions to the endorsement as the Administrative Agent may reasonably require from time to time to protect the interests of the Credit Parties. Each such casualty or liability policy referred to in this SECTION 5.07(b) shall also provide that it shall not be canceled, modified in any manner that would cause this SECTION 5.07 to be violated, or not renewed (i) by reason of nonpayment of premium except upon not less than ten (10) days' prior written notice thereof by the insurer to the Administrative Agent (giving the Administrative Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason except upon not less than ten (10) days' prior written notice thereof by the insurer to the Administrative Agent. The Borrower shall deliver to the Administrative Agent, prior to the cancellation, modification or non-renewal of any such policy of insurance, a copy of a renewal or replacement insurance binder or certificate (or other evidence of renewal of a policy previously delivered to the Administrative Agent, including an insurance binder) together with evidence reasonably satisfactory to the Administrative Agent of payment of the premium therefor.

(c)     With respect to each improved Real Estate subject to a lien securing the Obligation that is located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a "special flood hazard area" with respect to which flood insurance has been made available under Flood Insurance Laws, the applicable Loan Party (A) has obtained and will maintain, with financially sound and reputable insurance companies (except to the extent that any insurance company insuring such Real Estate of the Loan Party ceases to be financially sound and reputable after the Closing Date, in which case, the Loan Parties shall promptly replace such insurance company with a financially sound and reputable insurance company), such flood insurance in such reasonable total amount as the Administrative Agent and the Lenders may from time to time reasonably require, and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (B) promptly upon request of the Administrative Agent or any Lender, will deliver to the Administrative Agent or such Lender as applicable, evidence of such compliance in form and substance reasonably acceptable to the Administrative Agent and such Lender, including, without limitation, evidence of annual renewals of such insurance.

SECTION 5.08          Books and Records; Inspection and Audit Rights; Appraisals; Accountants.

(a)          Each Loan Party will, and will cause each Subsidiary of it to, keep proper books of record and account in accordance with GAAP and in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities.  Each Loan Party will, and will cause each Subsidiary of it to, permit any representatives designated by any Agent, upon reasonable prior written notice and during regular business hours, to visit and inspect its properties, to discuss its affairs, finances and condition with its officers and to examine and make extracts from its books and records, all at the reasonable expense of the Loan Parties at such reasonable times and as often as reasonably requested; provided that, so long as no Event of Default has occurred and is continuing, the Loan Parties shall pay the reasonable out-of-pocket expenses for only one such visit/inspection in any calendar year.

(b)          Each Loan Party will from time to time upon the reasonable request of any Agent, permit any Agent or professionals (including consultants, accountants, lawyers and appraisers) retained by the Agents, on reasonable prior written notice and during normal business hours, to conduct appraisals and commercial finance examinations, including, without limitation, sales, gross margins, payables, accruals and reserves.  The Loan Parties shall pay the reasonable documented out-of-pocket fees and expenses of the Agents or such professionals with respect to such evaluations and appraisals within thirty (30) days after receipt of an invoice therefor.

(c)          The Loan Parties shall, and shall cause each Subsidiary of it to, at all times retain independent certified public accountants of national standing and shall instruct such accountants to cooperate with, and be available to, the Agents or their representatives to discuss the annual audited statements, the Loan Parties' and their Subsidiaries' financial performance, financial condition, operating results, controls, and such other matters, within the scope of the retention of such accountants for such audited statements, as may be raised by the Agents; subject, however, if requested by such accountants, to the execution of an access agreement by the Agents and such accountants in form reasonably satisfactory to each of them; provided that a representative of the Borrower shall be given the opportunity to be present all such discussions.

(d)          At its election, upon either (i) its reasonable belief that any Loan Party or any Subsidiary thereof has breached any representation, warranty or covenant herein relating to environmental matters, which breach could reasonably be expected to have a Material Adverse Effect, or (ii) in connection with the enforcement of remedies against any Real Estate after the occurrence and during the continuance of an Event of Default, the Collateral Agent or any Lender may request in writing that the Loan Party, at its own cost and expense, retain an independent engineer or environmental consultant to conduct an environmental assessment or other appropriate review of reasonable scope (but, prior to the occurrence of any such Event of Default, only with respect to the subject matter of such breach), including, as relevant of the condition of any Real Estate or facility of any Loan Party or any Subsidiary thereof and/or such Loan Party's or such Subsidiary's compliance with Environmental Law.  If the Loan Party fails to conduct such assessment or review within 30 days of receipt of the request, the Collateral Agent or Lender may retain an independent engineer or environmental consultant to conduct an environmental assessment or other appropriate review.  Each Loan Party shall, and shall cause each Subsidiary of it to, cooperate in the performance of any such environmental assessment or

64

review and permit any such engineer or consultant designated by the Collateral Agent or such Lender to have full access to each property or facility at reasonable times and after reasonable notice to the Borrower of the plans to conduct such an environmental assessment or review. Environmental assessments or reviews conducted under this paragraph shall be limited to visual inspections of the Real Estate or facility, interviews with representatives of the Loan Parties or their Subsidiaries or facility personnel, and review of applicable records and documents pertaining to the condition of the property or facility, its compliance with Environmental Law and any potential Environmental Liabilities, in each case prior to the occurrence and during the continuance of an Event of Default, to the extent relevant to the subject matter of such breach. All environmental assessments or reviews conducted pursuant to this paragraph shall be at the Loan Parties' sole cost and expense.

SECTION 5.09      [Reserved].

SECTION 5.10      Compliance with Laws.

Each Loan Party will, and will cause each Subsidiary of it to, comply with all Applicable Laws and the orders of any Governmental Authority except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect. Except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, each Loan Party shall, and shall cause each Subsidiary of it to: (a) conduct its operations and keep and maintain its Real Estate in compliance with all Environmental Laws; and (b) implement any and all investigation, remediation, removal and response actions that are appropriate or necessary to materially comply with Environmental Laws pertaining to the presence, generation, treatment, storage, use, disposal, transportation or Release of any Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate. The Loan Parties shall, and shall cause each Subsidiary of it to, notify the Administrative Agent promptly after such Person becomes aware of any violation of or non-compliance with any Environmental Laws or any Release on, at, in, under, above, to, from or about any Real Estate or any property subject to a Lease that is reasonably likely to result in Environmental Liabilities in excess of $1,000,000 individually or in the aggregate; and promptly forward to Administrative Agent a copy of any order, notice, request for information or any communication or report received by such Person in connection with any such violation or Release or any other matter that could reasonably be expected to result in Environmental Liabilities in excess of $1,000,000 individually or in the aggregate in each case whether or not any Governmental Authority has taken or threatened any action in connection with any such violation, Release or other matter.

SECTION 5.11      Use of Proceeds.

The proceeds of the Loans are being and shall at all times be used by the Borrower (and, to the extent provided to them by the Load Borrower, each other Loan Party) solely as follows, and in accordance with (and subject to) the terms of the Orders and the Loan Documents: (a) to refinance the Obligations (as defined in the Prepetition ABL Credit Agreement), (b) to finance the Borrower and its operations in accordance with the Approved Budget and (c) for general working capital purposes, in each case, in accordance with the Approved Budget.

Other than as expressly set forth in the Orders and notwithstanding anything to the contrary contained herein or in any other Loan Document, no proceeds of any Loans, cash collateral, the Carve Out or any other funds shall be used to investigate, challenge, object to or contest the validity, security, perfection, priority, extent or enforceability of any amount due under, or the liens or claims granted under or in connection with the facilities evidenced by this Agreement, the Senior Secured Notes or the Senior Secured Superpriority Notes.

SECTION 5.12      Additional Subsidiaries.

If any Loan Party shall form or directly acquire a Subsidiary after the Closing Date, the Borrower will notify the Agents thereof, such Loan Party will cause such Subsidiary to enter into a Joinder Agreement and to become a Loan Party hereunder and under each applicable Security Document in the manner provided therein within 30 calendar days (or such longer period as the Administrative Agent may reasonably agree) after such Subsidiary is formed or acquired and promptly take such actions to create and perfect Liens on such Subsidiary's assets to secure the Obligations to the extent that such assets constitute Collateral under any applicable Security Document or as the Agents or the Required Lenders shall reasonably request; provided, that Mortgages shall only be required in respect of Real Estate having a fair market value at the time of the acquisition of such Subsidiary exceeding $1,000,000. If any shares of Capital Stock or Indebtedness of any Subsidiary are owned by or on behalf of any Loan Party, such Loan Party will cause such shares and promissory notes evidencing such Indebtedness to be pledged to secure the Obligations within 30 calendar days (or such longer period as the Administrative Agent may reasonably agree) after such Subsidiary is formed or such shares of Capital Stock or Indebtedness are acquired.

SECTION 5.13      Further Assurances.

(a)      Each Loan Party will execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, Mortgages, deeds of trust and other documents), that may be required under any Applicable Law, or which any Agent or the Required Lenders may reasonably request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the validity or priority of any such Lien, all at the expense of the Loan Parties.

(b)      If any Real Estate having a fair market value in excess of $1,000,000 is acquired by any Loan Party after the Closing Date (other than Real Estate constituting Collateral under the Security Agreement that becomes subject to a Lien in favor of the Collateral Agent upon acquisition thereof), the Borrower will notify the Collateral Agent, and, if reasonably requested by the Collateral Agent, the Borrower will, or will cause the other Loan Parties to, take, such actions as shall be necessary to grant and perfect such Liens, including actions described in SECTION 4.01(b) and (m), paragraph (a) of this SECTION 5.13 and SECTION 5.16, all at the expense of the Loan Parties.

SECTION 5.14      Corporate Separateness. Each Loan Party shall satisfy, and cause each of its Subsidiaries to satisfy, customary corporate and other formalities, including, as

applicable, the holding of regular board of directors' and shareholders' meetings or action by directors or shareholders without a meeting, in each case, to the extent required by law and the maintenance of corporate offices and records.

SECTION 5.15          [Reserved].

SECTION 5.16          [Reserved].

SECTION 5.17          OFAC; Sanctions.

Each Loan Party will, and will cause each of its Subsidiaries to, comply in all material respects with all applicable Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.

SECTION 5.18          Lender Calls.

At the request of a Lender, the Borrower shall hold a weekly update meeting in the form of a telephonic conference call with the Required Lenders and/or their legal counsel and financial advisor, to discuss the Variance Reports, the Chapter 11 Cases, the financial and operational performance of the Loan Parties, and such other related matters as may be reasonably requested (such reporting and information delivery requirements, collectively, the "Reporting Requirements") with reasonable advance notice by the Required Lenders. Such telephonic conference calls shall upon request include senior management and advisors of Holdings, the Borrower and their Subsidiaries if requested by a Lender or an advisor to a Lender.

SECTION 5.19          Milestones. Comply with all milestones set forth in Schedule 5.19 attached hereto (the "Milestones").

SECTION 5.20          Other Bankruptcy Matters.

(a)    Comply in all material respects with all of the requirements and obligations set forth in the Orders and in all material respects with any other orders entered in the Chapter 11 Cases to the extent relevant to the interests of the Lenders, in each case after the entry thereof). Deliver to the Administrative Agent and Lenders (and their respective advisors including without limitation, Stroock & Stroock & Lavan LLP ("Stroock")) as soon as reasonably practicable, but in no event less than three (3) Business Days prior to any filing other than in exigent circumstances in which case as soon as practicable, copies of all proposed pleadings, motions, applications, orders, financial information and other documents to be filed by or on behalf of the Loan Parties with the Bankruptcy Court in the Chapter 11 Cases that affect or may affect the Administrative Agent or the Lenders, or distributed by or on behalf of the Loan Parties to any official or unofficial committee appointed or appearing in the Chapter 11 Cases or any other party in interest, including, without limitation, the Orders, any plan of reorganization or liquidation and any disclosure statements related to such plan, in the Chapter 11 Cases (each of which must be in form and substance acceptable to the Lenders and the Administrative Agent).

(b)    If not otherwise provided through the Bankruptcy Court's electronic docketing system, as soon as available, deliver to the Administrative Agent and the Lenders and to counsel to Administrative Agent and the Lenders promptly as soon as available, copies of all

final pleadings, motions, applications, orders, financial information and other documents distributed by or on behalf of the Loan Parties to any official or unofficial committee appointed or appearing in the Chapter 11 Cases.

(c)     Except as otherwise is permitted by the Orders, the Borrower shall provide prior written notice as soon as reasonably practicable to the Administrative Agent and the Lenders (and their respective counsel) prior to any assumption or rejection of any Loan Party's or any Subsidiary's material contracts or material non-residential real property leases pursuant to Section 365 of the Bankruptcy Code.

ARTICLE VI

Negative Covenants

Until (i) the Commitments have expired or been terminated and (ii) the principal of and interest on each Loan and all fees and other Obligations (other than contingent indemnity obligations with respect to then unasserted claims) shall have been paid in full, each Loan Party covenants and agrees with the Credit Parties that:

SECTION 6.01        Indebtedness and Other Obligations.

No Loan Party will, nor will it permit any Subsidiary of it to, create, incur, assume or permit to exist any Indebtedness, except Permitted Indebtedness.

SECTION 6.02        Liens.

No Loan Party will, nor will it permit any Subsidiary of it to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, except Permitted Encumbrances.

SECTION 6.03        Fundamental Changes; New Subsidiaries.

(a)     No Loan Party will, nor will it permit any Subsidiary of it to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, except that a Loan Party may convert from a corporation or a limited liability company or vice-versa with prior written notice to the Administrative Agent.  No Loan Party will, nor will it permit any Subsidiary of it to, create any new Subsidiary that is not in existence on the Closing Date or acquire any new Subsidiary.

(b)     No Loan Party will, nor will it permit any Subsidiary of it to, engage, to any material extent, in any business other than businesses of the type conducted by such Loan Party or such Subsidiary, as applicable, on the date of execution of this Agreement and businesses reasonably related thereto and those supportive, complementary or ancillary thereto.

(c)     Holdings shall not, nor shall it permit any of its Subsidiaries directly or indirectly owning Capital Stock of the Borrower to, (i) engage or commit to engage in any business or activity other than (A) the ownership of substantially all the outstanding shares of Capital Stock of the Borrower and activities incidental thereto and (B) the ownership of all the

outstanding shares of Capital Stock of other entities created or acquired in a transaction otherwise permitted hereunder and activities incidental thereto, (ii) own or acquire any assets (other than the outstanding shares of voting Capital Stock of the Borrower, the cash proceeds of any Restricted Payments permitted by SECTION 6.06 or all of the outstanding shares of voting Capital Stock of any other entity created or acquired in a transaction otherwise permitted hereunder) or (iii) incur any Indebtedness or other liabilities or financial obligations.

SECTION 6.04        Investments.

No Loan Party will, nor will it permit any Subsidiary of it to, make or permit to exist any Investment, except Permitted Investments.

SECTION 6.05        Asset Sales.

No Loan Party will, nor will it permit any Subsidiary of it to, sell, transfer, lease (as lessor), license (as licensor), abandon or otherwise voluntarily dispose of any asset, including any Capital Stock of another Person, except sales of Inventory and the use of cash or cash equivalents in the ordinary course of business and consistent with past practice and Permitted Dispositions and the making of Permitted Investments (to the extent such Investment would involve a sale, transfer or disposition of any assets).

SECTION 6.06        Restricted Payments; Certain Payments of Indebtedness.

(a)        No Loan Party will, nor will it permit any Subsidiary of it to, declare or make, directly or indirectly, any Restricted Payment, except that (a) any Loan Party or any Subsidiary of a Loan Party may declare and pay cash dividends or make other distributions of property to a Loan Party and (b) any non-Loan Party may declare and pay cash dividends to any Loan Party to its equity holders on a pro rata basis.

(b)        No Loan Party will, nor will it permit any Subsidiary of it to, make any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Specified Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Specified Indebtedness except payments required under the Order with respect to any Specified Indebtedness.

SECTION 6.07        Transactions with Affiliates.

No Loan Party will, nor will it permit any Subsidiary of it to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates involving aggregate payments or consideration in excess of $500,000, except (a) transactions pursuant to the Restructuring Support Agreement, (b) transactions between or among the Loan Parties and/or their Subsidiaries not otherwise prohibited hereunder, (c) [Reserved]; (d) payments of indemnities and expense reimbursements under the Management Agreements to the extent permitted by the Approved Budget; (e) payment of reasonable compensation to officers and employees for services actually rendered to any such Loan Party or any of its Subsidiaries; (f)

payment of director's fees, expenses and indemnities, (g) stock option, stock incentive, equity, bonus and other compensation plans of the Loan Parties and their Subsidiaries, (h) employment contracts with officers and management of the Loan Parties and their Subsidiaries, (i) advances and loans to officers and employees of the Loan Parties and their Subsidiaries to the extent specifically permitted under this Agreement, and (j) payments pursuant to the tax sharing agreements among the Loan Parties and their Subsidiaries to the extent attributable to the ownership or operations of Holdings and its Subsidiaries.

SECTION 6.08       Restrictive Agreements.

No Loan Party will, nor will it permit any Subsidiary of it to, directly or indirectly enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of such Loan Party or such Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets in favor of the Collateral Agent or (b) the ability of any Subsidiary thereof to pay dividends or other distributions with respect to any shares of its Capital Stock to such Loan Party or such Subsidiary or to make or repay loans or advances to a Loan Party or to guarantee Indebtedness of the Loan Parties, provided that (i) the foregoing shall not apply to restrictions and conditions imposed by Applicable Law, by any Loan Document, by any documents in existence on the Closing Date or under any documents relating to joint ventures of any Loan Party or any Subsidiary to the extent that such joint ventures are not prohibited hereunder, (ii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of assets or equity permitted hereunder by a Loan Party or a Subsidiary pending such sale, provided such restrictions and conditions apply only to the assets of the Loan Party or Subsidiary that are to be sold and such sale is permitted hereunder, (iii) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, (iv) clause (a) of the foregoing shall not apply to customary provisions in contracts or leases restricting the assignment or subleasing or sublicensing thereof, (v) the foregoing shall not apply to any agreement related to the Specified Indebtedness or ABL DIP Facility, (vi) clause (a) of the foregoing shall not apply to licenses or contracts which by the terms of such licenses and contracts prohibit the granting of Liens on the rights contained therein, and (vii) the foregoing shall not apply to any restrictions in existence prior to the time any such Person became a Subsidiary and not created in contemplation of any such acquisition.

SECTION 6.09       Amendment of Material Documents.

No Loan Party will, nor will it permit any Subsidiary of it to, amend, modify or waive any of its rights governing any Specified Indebtedness or the ABL DIP Facility, except, in the case of the ABL DIP Facility, any amendment, modification or waiver that is not materially adverse to the Lenders or the Administrative Agent in their capacity as such.

SECTION 6.10       Fiscal Year.

No Loan Party will, nor will it permit any Subsidiary of it to, change its Fiscal Year without the prior written consent of the Required Lenders.

SECTION 6.11            <u>Chapter 11 Cases</u>. No Loan Party will, nor will it permit any Subsidiary of it to:

(a)      Except for the Carve-Out, incur, create, assume, suffer to exist or permit, or file any motion seeking, any other superpriority claim which is pari passu with, or senior to, the Obligations (except as may be set forth in the Orders).

(b)      Incur, create, assume, suffer to exist or permit or file any motion seeking, any lien which is pari passu with, or senior to, the liens granted hereunder (except as may be set forth in the Orders).

(c)      Make or permit to be made any amendment, modification, supplement or change to the Orders, as applicable, without the prior written consent of the Required Lenders and, if such amendment, modification, supplement or change to any Order would adversely affect the Administrative Agent, without the prior written consent of the Administrative Agent not to be unreasonably withheld or delayed.

(d)      Commence any adversary proceeding, contested matter or other action asserting any claims or defenses or otherwise against the Administrative Agent or any Lender with respect to this Agreement or the other Loan Documents or the transactions contemplated hereby or hereby or thereby or any agent under any Specified Indebtedness or any such Specified Indebtedness or the loan documents with respect thereto.

SECTION 6.12            <u>Use of Proceeds</u>.

Use the proceeds of the Loans in any manner inconsistent with Section 5.11.

SECTION 6.13            <u>Budget Covenant</u>.

(a)      The Borrower shall not permit actual receipts for Holdings, the Borrower and their Subsidiaries for any Test Period to be less than 87.5% of budgeted receipts for the corresponding period in the Approved Budget (the "<u>Permitted Collections Budget Variances</u>").

(b)      The Borrower shall not permit actual disbursements (excluding professional fees) for Holdings, the Borrower and their Subsidiaries for any Test Period to be more than 15% greater than the budgeted disbursements for the corresponding period in the Approved Budget (the "<u>Permitted Expenditures Budget Variances</u>").

(c)      Notwithstanding anything to the contrary herein, the Borrower and the Required Lenders shall agree to increase the Permitted Expenditures Budget Variances, in the event that the Debtors are able to more rapidly open store locations than anticipated in the Initial Budget and the Permitted Collections Budget Variances shall be adjusted accordingly to the extent agreed.

(d)      The Borrower shall not permit Liquidity at any time to be less than $35,000,000.

SECTION 6.14      Subrogation.

Each Loan Party hereby agrees that until the payment and satisfaction in full in cash of all obligations and the expiration and termination of the Commitments of the Lenders under this Agreement it shall waive any claim and shall not exercise any right or remedy, direct or indirect, whether by subrogation or otherwise, against the Borrower or any other Loan Party of any of the obligations or any security for any of the obligations.

ARTICLE VII

Events of Default

SECTION 7.01      Events of Default.

If any of the following events ("Events of Default") shall occur:

(a)      Any Loan Party shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration or otherwise;

(b)      Any Loan Party shall fail to pay any interest on or fee with respect to any Loan as the same shall become due and payable under this Agreement or any other Loan Document and such failure continues for three (3) Business Days;

(c)      Any representation or warranty made or deemed made by or on behalf of any Loan Party in, or in connection with, any Loan Document or any amendment or modification thereof or waiver thereunder (including, without limitation, in any certificate of a Financial Officer accompanying any financial statement), shall prove to have been incorrect in any material respect when made or deemed made;

(d)      Any Loan Party shall fail to observe or perform when due any covenant, condition or agreement contained in (i) Article VI, Section 5.01(b)(i), 5.01(i), 5.01(j), 5.11, 5.17, 5.18, 5.19 and 5.20, (ii) Section 5.07 (but only with respect to insurance on the Revolver Priority Collateral) after a five (5) Business Day grace period, (iii) Section 5.08(b) (after a five (5) day grace period) or (iv) any of Section 5.01(b) (provided that, if (A) any such Default described in this clause (iv) is of a type that can be cured within five (5) Business Days and (B) such Default could not materially adversely impact the Lenders' Liens on the Collateral, such default shall not constitute an Event of Default for five (5) Business Days after the occurrence of such Default so long as the Loan Parties are diligently pursuing the cure of such Default;

(e)      Any Loan Party shall fail to observe or perform when due any covenant, condition or agreement contained in any Loan Document (other than those specified in SECTION 7.01(a), SECTION 7.01(b), SECTION 7.01(c), or SECTION 7.01(d)), and such failure shall continue unremedied for a period of fifteen (15) days after the earlier of (x) notice thereof from the Administrative Agent to the Borrower and (y) a Responsible Officer of any Loan Party obtaining actual knowledge thereof;

72

(f)    (i) Any Loan Party shall fail to make any payment (whether of principal, interest, fees or commitment fees and regardless of amount) in respect of any Material Indebtedness when and as the same shall become due and payable and such failure shall continue beyond the expiration of any applicable grace or cure period set forth in the documents governing such Material Indebtedness, (ii) any event, circumstance or condition occurs that, with or without any action on the part of the holder or holders of any such Material Indebtedness or any trustee or agent on its or their behalf, results in any Material Indebtedness becoming due prior to its scheduled maturity or requiring the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity or (iii) any event, circumstance or condition shall have occurred and be continuing that enables or permits (with or without the giving of notice) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any such Material Indebtedness to become due, or to require the prepayment, redemption, repurchase or defeasance thereof, prior to its scheduled maturity and any applicable grace or cure period set forth in respect of such event, circumstance or condition in the documents governing such Material Indebtedness shall have expired; provided that an event described in this paragraph shall not at any time constitute an Event of Default if the exercise of the rights and remedies by a holder of such Material Indebtedness against the obligors thereof is subject to the automatic stay in the Chapter 11 Cases; provided, further, that the foregoing proviso shall not apply to the ABL DIP Facility;

(g)    a Change in Control shall occur;

(h)    [reserved];

(i)    [reserved];

(j)    Except with respect to matters set forth on Schedule 3.06(a), one or more final judgments for the payment of money in an aggregate amount in excess of $5,000,000 (or such lesser amount as would reasonably be expected to result in a Material Adverse Effect) in excess of insurance coverage (or indemnities from indemnitors reasonably satisfactory to the Agents) shall be rendered against any Loan Party or any combination of Loan Parties and the same shall remain undischarged for a period of forty-five (45) days during which execution shall not be effectively stayed, satisfied or bonded or any action shall be legally taken by a judgment creditor to attach or levy upon any material assets of any Loan Party to enforce any such judgment;

(k)    (A) An ERISA Event shall have occurred that, when taken together with all other ERISA Events that have occurred, would reasonably be expected to result in a liability of any Loan Party in excess of $5,000,000 or such other amount that would reasonably be expected to result in a Material Adverse Effect or (B) the imposition of a Lien under Section 412 or 430(k) of the Code or Section 303 or 4608 of ERISA on any assets of any Loan Party;

(l)    Any challenge by or on behalf of any Loan Party to the validity of any Loan Document or the applicability or enforceability of any Loan Document strictly in accordance with the subject Loan Document's terms or which seeks to void, avoid, limit, or otherwise adversely affect any security interest created by or in any Loan Document or any

payment made pursuant thereto, in each case, as to which an order or judgment has been entered materially adverse to the Agents and the Lenders;

(m)     Any default under the ABL Credit Agreement that is not amended or waived;

(n)     The Interim Order and the Final Order, as applicable, together with the Loan Documents shall cease to create a valid and perfected Lien with such priority required by this Agreement; or

(o)     The termination of the Facility Guarantee or any other guaranty of the Obligations (except for any release or termination permitted hereunder);

(p)     Failure to comply with any of the Milestones;

(q)     Termination or modification of Debtors' exclusive right to file or solicit a plan of reorganization;

(r)     Entry into, or the making of any payment in respect of, any critical vendor agreements or otherwise entry into any agreement to pay, or the making of any payment in respect of, any prepetition trade obligations except as consented to by the Administrative Agent (which may be via consent to the "first day" orders);

(s)     There shall have occurred any of the following in the Chapter 11 Cases:

(i)     the bringing of a motion or application by any Loan Party in the Chapter 11 Cases, or the entry of any order by the Bankruptcy Court approving a motion: (i) to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code that does not provide for the repayment of all Obligations under this Agreement in full in cash immediately upon the consummation of such financing; (ii) to grant any Lien other than Liens expressly permitted under this Agreement or the Orders upon or affecting any Collateral; (iii) except as provided in this Agreement, the Interim Order or the Final Order, as the case may be, to use cash collateral of the Administrative Agent under section 363(c) of the Bankruptcy Code without the prior written consent of the Administrative Agent and the Required Lenders; or (iv) that (in the case of any Loan Party) requests or seeks authority for or that (in the case of an order entered by the Bankruptcy Court) approves or provides authority to take any other action or actions adverse to the rights and remedies of the Administrative Agent and the Lenders hereunder or their interest in the Collateral;

(ii)     the filing, proposal or support by any Loan Party of any plan of reorganization or plan of liquidation or disclosure statement attendant thereto, or any amendment, modification or supplement to such plan or disclosure statement, by any Loan Party other than a Reorganization Plan (it being understood that the plan described and defined in the Restructuring Support Agreement is a Reorganization Plan);

(iii)     reserved;

(iv)     the entry of an order in any of the Chapter 11 Cases approving a disclosure statement in respect of a plan other than a Reorganization Plan, or the entry of an order confirming a plan or plans of reorganization other than a Reorganization Plan;

(v)     the payment of, or application for authority to pay, any Pre-Petition claim without Administrative Agent's consent (which shall be deemed to have been given if the Administrative Agent does not object to a motion filed with the Bankruptcy Court) unless in accordance with the Approved Budget or as provided under a "first day" order;

(vi)     reserved;

(vii)     reserved;

(viii)     the entry of an order by the Bankruptcy Court appointing, or the filing of a motion or application by any Loan Party, for an order seeking the appointment of, in either case without the prior written consent of the Required Lenders, an interim or permanent trustee in the Chapter 11 Cases or the appointment of a receiver or an examiner under section 1104 of the Bankruptcy Code in the Chapter 11 Cases, with expanded powers (beyond those set forth in sections 1106(a)(3) and 1106(a)(4) of the Bankruptcy Code) to operate or manage the financial affairs, the business, or reorganization of the Borrower or with the power to conduct an investigation of (or compel discovery);

(ix)     the sale without the Administrative Agent's and the Required Lenders' written consent, of any of Borrower's assets either through a sale under section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases, or otherwise other than Permitted Dispositions

(x)     the dismissal of the Chapter 11 Cases which does not contain a provision for payment in full in cash of all noncontingent monetary Obligations of the Borrower ("Payment in Full") hereunder, or if any Loan Party shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases that does not contain a provision for Payment in Full, in each case, without the prior written consent of the Required Lenders;

(xi)     the conversion of the Chapter 11 Cases from one under chapter 11 to one under chapter 7 of the Bankruptcy Code or a bankruptcy under Debtor Relief Laws, as applicable, or any Loan Party shall file a motion or other pleading seeking the conversion of the Chapter 11 Cases under section 1112 of the Bankruptcy Code or otherwise;

(xii)     any Loan Party files a motion or application seeking, or the entry of an order by the Bankruptcy Court, as applicable, granting relief from or modifying the automatic stay of section 362 of the Bankruptcy Code (x) to allow any creditor to execute upon or enforce a Lien on any Collateral not in accordance with the terms hereof, in an amount in excess of $250,000 or (y) with respect to any Lien of or the granting of any Lien on any Collateral to any state or local environmental or regulatory agency or

authority having priority over the Liens in favor of the Administrative Agent and the DIP ABL Agent in an amount in excess of $250,000;

(xiii)   any Loan Party files a motion or application seeking, or the entry of an order in the Chapter 11 Cases challenging, subordinating, disgorging, avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement, the other Loan Documents or the Senior Secured Notes or the Senior Secured Superpriority Notes;

(xiv)   the failure of any Loan Party to perform any of its obligations under the Interim Order or the Final Order or any violation of any of the terms of the Interim Order or the Final Order, subject to any applicable grace or cure periods set forth therein;

(xv)   the challenge by any Loan Party to the validity, extent, perfection or priority of any liens granted under or obligations arising under the Loan Documents, the DIP ABL Facility, the Interim Order or the Final Order;

(xvi)   reserved;

(xvii)   any Loan Party files a motion or application seeking, or the entry of an order in any of the Chapter 11 Cases granting any other super priority administrative claim or Lien equal or superior to that granted to the Administrative Agent, on behalf of itself and the Lenders, without the consent in writing of the Required Lenders (other than any such super priority administrative claim or Lien that is expressly permitted to have such priority in this Agreement or pursuant to the terms of the Orders);

(xviii)   the filing of a motion or application by any Loan Party requesting, or the entry of any order granting, any super-priority claim which is senior or pari passu with the Lenders' claims, the DIP ABL Facility, or under the Loan Documents, as applicable, not in accordance with the terms of this Agreement or the Orders ;

(xix)   any Loan Party files a motion or application seeking, or the entry of an order precluding the Administrative Agent or the trustee under the Senior Secured Notes or the Senior Secured Superpriority Notes (or either of their respective designees) from having the right to or being permitted to "credit bid" with respect to the assets of the Loan Parties;

(xx)   any attempt by any Loan Party to reduce (other than a reduction in accordance with the terms of this Agreement), avoid, set off or subordinate the Obligations or the Liens securing such Obligations to any other debt excluding the DIP ABL Facility Obligations with respect to Revolving Priority Collateral or as expressly provided for in this Agreement or the Orders;

(xxi)   the reversal, vacation or stay of the effectiveness of or material modification of either the Interim Order or the Final Order or any provision thereof without the prior written consent of the Required Lenders not to be unreasonably withheld or delayed;

76

(xxii)   the payment of or granting adequate protection (except pursuant to (i) the Adequate Protection Provisions and (ii) as provided under the "first day orders") with respect to any Indebtedness of the Loan Parties (other than with respect to payment permitted under the Interim Order or the Final Order) without the prior consent of the Required Lenders; or

(xxiii)   the cessation of Liens or super-priority claims granted with respect to this Agreement to be valid, perfected and enforceable in all respects; or the Bankruptcy Court shall cease to have exclusive jurisdiction with respect to all matters relating to the exercise of rights and remedies under the Loan Documents, the Orders, the Liens granted under the Collateral Documents and the Collateral.

then, and in every such event, and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders, shall, by notice to the Borrower, take any or all of the following actions, at the same or different times: (i) terminate the Commitments, and thereupon the Commitments shall irrevocably terminate immediately; and/or (ii) declare the Obligations owing by such Borrower then outstanding to be due and payable in whole, and thereupon the principal of the Loans and all other Obligations so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Loan Parties accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Loan Parties to the extent permitted by Applicable Law.

If the Obligations are accelerated at any time, any Exit Payment Other Event occurs or the Obligations otherwise become due prior to or following the Maturity Date, the Exit Payment shall immediately become due and payable and the Exit Payment shall constitute part of the Obligations in respect of the Loans.  In view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Lender's loss as a result thereof, the Exit Payment constitutes liquidated damages, not unmatured interest or a penalty, sustained by each Lender, and the Loan Parties agree that it is  a reasonable estimation and calculation of such actual lost profits and other actual damages. THE LOAN PARTIES EXPRESSLY WAIVE (TO THE FULLEST EXTENT IT MAY LAWFULLY DO SO) THE PROVISIONS OF ANY PRESENT OR  FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE EXIT PAYMENT IN CONNECTION WITH ANY SUCH ACCELERATION OR MATURITY OR EXIT PAYMENT OTHER EVENT.  The Loan Parties expressly agree (to the fullest extent it may lawfully do so) that: (A) the Exit Payment is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel; (B) the Exit Payment shall be payable notwithstanding the then-prevailing market rates at the time payment is made; (C) there has been a course of conduct between the Lenders and the Borrower giving specific consideration in this transaction for such agreement to pay the Exit Payment; and (D) the Loan Parties shall be estopped hereafter from claiming differently than as agreed to in this paragraph or otherwise in this Agreement. The Borrower expressly acknowledges that its agreement to pay the Exit Payment as herein described is a material inducement to the Lenders to make the Loans.

SECTION 7.02      Remedies on Default.

In case any one or more of the Events of Default shall have occurred and be continuing, and whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, the Agents (at the direction of the Required Lenders) subject to the Remedies Notice Period, shall proceed to protect and enforce their rights and remedies under this Agreement or any of the other Loan Documents by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Secured Parties. No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of law.

At any hearing during the Remedies Notice Period to contest the enforcement of remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred, and the Loan Parties hereby waive their right to and shall not  be entitled to seek relief, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the Administrative Agent or the Secured Parties, as set forth in this Agreement, the applicable Order or other Loan Documents.

As set forth in and subject to the Order, the Automatic Stay shall be modified and vacated to permit the Administrative Agent and the Lenders to exercise all rights and remedies under this Agreement, the other Loan Documents or applicable Law, without further notice, motion or application to, hearing before, or order from, the Court.

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.

(a)      Subject to the Remedies Notice Period, the Agent may exercise any other appropriate right or remedy the Bankruptcy Court may fashion, including:

(i)      foreclosure, sale or disposition of the Collateral;

(ii)      collection of accounts receivable;

(iii)      seek the appointment of a receiver or keeper to take possession of any Collateral and to enforce any of the Agent's remedies (for the benefit of the Secured Parties); and

(iv)      taking any other actions or exercise any other rights or remedies permitted under the Orders, the Loan Documents or applicable Law or equity.

(b)      Each Loan Party further agrees, that, during the continuance of any Event of Default, subject to the Remedies Notice Period, (i) at the Agent's request, it shall assemble the

Collateral and make it available to the Agent at places that the Agent shall reasonably select, whether at such Secured Party's premises or elsewhere, (ii) without limiting the foregoing, the Agent also has the right to require that each Loan Party store and keep any Collateral pending further action by the Agent and, while any such Collateral is so stored or kept, provide such guards and maintenance services as shall be necessary to protect the same and to preserve and maintain such Collateral in good condition, and (iii) until the Agent is able to sell any Collateral, the Agent shall have the right to hold or use such Collateral to the extent that it deems appropriate for the purpose of preserving the Collateral or its value. The Agent shall not have any obligation to any Loan Party to maintain or preserve the rights of any Loan Party as against third parties with respect to any Collateral while such Collateral is in the possession of the Agent.

(c)     All of the rights and remedies of the Agent and any other Secured Party under any Loan Document shall be cumulative, may be exercised individually or concurrently and not exclusive of any other rights or remedies provided by any applicable Law. To the extent it may lawfully do so, each Loan Party absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Agent or any Lender, any valuation, stay, appraisement, extension, redemption or similar laws and any and all rights or defenses it may have as a surety, now or hereafter existing, arising out of the exercise by them of any rights hereunder. If any notice of a proposed sale or other disposition of any Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition.

(d)     To the extent that applicable Law imposes duties on the Agent to exercise remedies in a commercially reasonable manner, each Loan Party acknowledges and agrees that it is not commercially unreasonable for the Agent to do any of the following:

(i)     fail to incur significant costs, expenses or other liabilities reasonably deemed as such by the Agent to prepare any Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition;

(ii)     fail to obtain Permits, or other consents, for access to any Collateral to sell or for the collection or sale of any Collateral, or, if not required by applicable Law, fail to obtain Permits or other consents for the collection or disposition of any Collateral;

(iii)     fail to exercise remedies against account debtors or other Persons obligated on any Collateral or to remove Liens on any Collateral or to remove any adverse claims against any Collateral;

(iv)     advertise dispositions of any Collateral through publications or media of general circulation, whether or not such Collateral is of a specialized nature or to contact other Persons, whether or not in the same business as any Loan Party, for expressions of interest in acquiring any such Collateral;

(v)     exercise collection remedies against account debtors and other Persons obligated on any Collateral, directly or through the use of collection agencies or other

collection specialists, hire one or more professional auctioneers to assist in the disposition of any Collateral, whether or not such Collateral is of a specialized nature or, to the extent deemed appropriate by the Agent, obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Agent in the collection or disposition of any Collateral, or utilize internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets to dispose of any Collateral;

        (vi)    dispose of assets in wholesale rather than retail markets;

        (vii)    disclaim disposition warranties, such as title, possession or quiet enjoyment; or

        (viii)    purchase insurance or credit enhancements to insure the Agent against risks of loss, collection or disposition of any Collateral or to provide to the Agent a guaranteed return from the collection or disposition of any Collateral.

Notwithstanding anything contained herein or in any other Loan Document to the contrary, the Loan Parties hereby waive any right to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the Agent and the Lenders set forth in the Orders and in the Loan Documents.

        SECTION 7.03    <u>Application of Proceeds.</u>

        After the occurrence and during the continuance of any Event of Default and acceleration of the Obligations, all proceeds realized from any Loan Party or on account of any Collateral owned by a Loan Party or, without limiting the foregoing, on account of any Prepayment Event, any payments in respect of any Obligations and all proceeds of the Collateral, shall be applied in the following order:

        (a)    FIRST, ratably to pay the Obligations in respect of any Credit Party Expenses, indemnities and other amounts then due to the Agents until paid in full (other than contingent obligations);

        (b)    SECOND, ratably to pay any Credit Party Expenses and indemnities, and to pay any fees then due to the Lenders, until paid in full;

        (c)    THIRD, ratably to pay interest accrued in respect of the Obligations until paid in full;

        (d)    FOURTH, ratably to pay any other outstanding Obligations; and

        (e)    FIFTH, to the Borrower or such other Person entitled thereto under Applicable Law.

# ARTICLE VIII

## The Agents

SECTION 8.01          Appointment and Administration by Administrative Agent.

Each Credit Party hereby irrevocably designates Delaware Trust Company as Administrative Agent under this Agreement and the other Loan Documents.  The general administration of the Loan Documents shall be by the Administrative Agent.  The Credit Parties each hereby (a) irrevocably authorizes the Administrative Agent (i) to enter into the Loan Documents to which it is a party, and (ii) to take or refrain from taking such actions as agent on its behalf and to exercise or refrain from exercising such powers under the Loan Documents as are delegated by the terms hereof or thereof, as appropriate, together with all powers reasonably incidental thereto, and (b) agrees and consents to all of the provisions of the Security Documents.  The Administrative Agent shall have no duties or responsibilities except as expressly set forth in this Agreement and the other Loan Documents, nor shall it have any fiduciary relationship with any other Credit Party, and no implied covenants, responsibilities, duties, obligations, or liabilities shall be read into the Loan Documents or otherwise exist against the Administrative Agent.

SECTION 8.02          Appointment of Collateral Agent.

Each Secured Party hereby irrevocably designates Delaware Trust Company as Collateral Agent under this Agreement and the other Loan Documents.  The Secured Parties each hereby (i) irrevocably authorizes the Collateral Agent (x) to enter into the Loan Documents to which it is a party, and (y) to take or refrain from taking such actions as agent on its behalf and to exercise or refrain from exercising such powers under the Loan Documents as are delegated by the terms hereof or thereof, as appropriate, together with all powers reasonably incidental thereto, and (ii) agrees and consents to all of the provisions of the Security Documents.  All Collateral shall be held or administered by the Collateral Agent (or its duly-appointed agent) for its own benefit and for the ratable benefit of the other Credit Parties.  Any proceeds received by the Collateral Agent from the foreclosure, sale, lease or other disposition of any of the Collateral and any other proceeds received pursuant to the terms of the Security Documents or the other Loan Documents shall be paid over to the Administrative Agent for application as provided in this Agreement and the other Loan Documents.  The Collateral Agent shall have no duties or responsibilities except as expressly set forth in this Agreement and the other Loan Documents, nor shall it have any fiduciary relationship with any other Secured Party, and no implied covenants, responsibilities, duties, obligations, or liabilities shall be read into the Loan Documents or otherwise exist against the Collateral Agent.

SECTION 8.03          Sharing of Excess Payments.

If at any time or times any Secured Party shall receive (i) by payment, foreclosure, setoff, banker's lien, counterclaim, or otherwise, or any payments with respect to the Obligations owing to such Secured Party arising under, or relating to, this Agreement or the other Loan Documents, or (ii) payments from the Administrative Agent in excess of such Secured Party's ratable portion of all such distributions by the Administrative Agent, such Secured Party shall promptly (1) turn

the same over to the Administrative Agent, in kind, and with such endorsements as may be required to negotiate the same to the Administrative Agent, or in same day funds, as applicable, for the account of all of the Secured Parties and for application to the Obligations in accordance with the applicable provisions of this Agreement, or (2) purchase, without recourse or warranty, an undivided interest and participation in the Obligations owed to the other Secured Parties so that such excess payment received shall be applied ratably as among the Secured Parties in accordance with the provisions of SECTION 2.17 or SECTION 7.03, as applicable; provided, however, that if all or part of such excess payment received by the purchasing party is thereafter recovered from it, those purchases of participations shall be rescinded in whole or in part, as applicable, and the applicable portion of the purchase price paid therefor shall be returned to such purchasing party, but without interest except to the extent that such purchasing party is required to pay interest in connection with the recovery of the excess payment.  In no event shall the provisions of this paragraph be construed to apply to any payment made by the Loan Parties pursuant to and in accordance with the express terms of this Agreement or any other Loan Document or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Loan Parties or any Affiliate(s) thereof (as to which the provisions of this paragraph shall apply).

SECTION 8.04      Agreement of Applicable Lenders.

Upon any occasion requiring or permitting an approval, consent, waiver, election or other action on the part of the Applicable Lenders, action shall be taken by each Agent for and on behalf or for the benefit of all Credit Parties upon the written direction of the Applicable Lenders, and any such action shall be binding on all Credit Parties.  No amendment, modification, consent, or waiver shall be effective except in accordance with the provisions of SECTION 9.02.

SECTION 8.05      Liability of Agents.

(a)      The Agents may execute any of their respective duties under this Agreement or any of the other Loan Documents by or through any of their respective officers, agents and employees, and no Agent nor any of their respective directors, officers, agents or employees shall be liable to any other Secured Party for any action taken or omitted to be taken in good faith, or be responsible to any other Secured Party for the consequences of any oversight or error of judgment, or for any loss, except to the extent of any liability imposed by law by reason of such Agent's own gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision). No Agent nor any of their respective directors, officers, agents and employees shall in any event be liable to any other Secured Party for any action taken or omitted to be taken by it pursuant to instructions received by it from the Applicable Lenders, or in reliance upon the advice of counsel selected by it. Without limiting the foregoing no Agent, nor any of their respective directors, officers, employees, or agents shall be: (i) responsible to any other Secured Party for the due execution, validity, genuineness, effectiveness, sufficiency, or enforceability of, or for any recital, statement, warranty or representation in, this Agreement, any other Loan Document or any related agreement, document or order; (ii) required to ascertain or to make any inquiry concerning the performance or observance by any Loan Party of any of the terms, conditions, covenants, or agreements of this Agreement or any of the Loan Documents; (iii) responsible to

any other Secured Party for the state or condition of any properties of the Loan Parties or any other obligor hereunder constituting Collateral for the Obligations or any information contained in the books or records of the Loan Parties; (iv) responsible to any other Secured Party for the validity, enforceability, collectibility, effectiveness or genuineness of this Agreement or any other Loan Document or any other certificate, document or instrument furnished in connection therewith; or (v) responsible to any other Secured Party for the validity, priority or perfection of any Lien securing or purporting to secure the Obligations or for the value or sufficiency of any of the Collateral.

(b)     The Agents may execute any of their duties under this Agreement or any other Loan Document by or through their agents or attorneys-in-fact, and shall be entitled to the advice of counsel concerning all matters pertaining to its rights and duties hereunder or under the other Loan Documents.  The Agents shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by them with reasonable care.

(c)     None of the Agents nor any of their respective directors, officers, employees, or agents shall have any responsibility to any Loan Party on account of the failure or delay in performance or breach by any other Secured Party (other than by each such Agent in its capacity as a Lender) of any of its respective obligations under this Agreement or any of the other Loan Documents or in connection herewith or therewith.

(d)     The Agents shall be entitled to rely, and shall be fully protected in relying, upon any notice, consent, certificate, affidavit, or other document or writing believed by them to be genuine and correct and to have been signed, sent or made by the proper person or persons, and upon the advice and statements of legal counsel (including, without, limitation, counsel to the Loan Parties), independent accountants and other experts selected by any Loan Party or any Secured Party.  The Agents shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless they shall first receive such advice or concurrence of the Applicable Lenders as they deem appropriate or they shall first be indemnified to their satisfaction by the other Secured Parties against any and all liability and expense which may be incurred by them by reason of the taking or failing to take any such action.

(e)     The Administrative Agent is not obliged to expend or risk its own funds or otherwise incur any financial liability in the performance of its duties, obligations or responsibilities or the exercise of any right, power, authority or discretion if it has grounds for believing the repayment of such funds or adequate indemnity against, or security for, such risk or liability is not reasonably assured to it.

(f)     The Agents shall not be responsible for any unsuitability, inadequacy, expiration or unfitness of any security interest created hereunder or pursuant to any other security documents pertaining to this matter nor shall it be obligated to make any investigation into, and shall be entitled to assume, the adequacy and fitness of any security interest created hereunder or pursuant to any other security document pertaining to this matter.

(g)     The Agents shall not be liable for any error of judgment, or for any act done or step taken or omitted by it in good faith or for any mistake in act or law, or for anything

which it may do or refrain from doing in connection herewith, in each case except for such Agent's own gross negligence or willful misconduct as determined by a court of competent jurisdiction in a final, nonappealable judgment.

(h)    In no event shall the Agents be liable for any indirect, special, punitive or consequential loss or damage of any kind whatsoever, including, but not limited to, lost profits, even if such loss or damage was foreseeable or it has been advised of the likelihood of such loss or damage and regardless of the form of action.

(i)    The Agents shall be entitled to seek written directions from the Required Lenders prior to taking any action under this Agreement, any Collateral instrument or any of the Loan Documents.

(j)    The Agents shall have no responsibility for or liability with respect to monitoring compliance of any other party to the Loan Documents or any other document related hereto or thereto. The Agents have no duty to monitor the value or rating of any Collateral on an ongoing basis.

(k)    The Agents may request that the Required Lenders or other parties deliver a certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to the Loan Documents.

(l)    Beyond the exercise of reasonable care in the custody thereof, the Agents shall have no duty as to any Collateral in such Agent's possession or control or in the possession or control of any agent or bailee or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto and the Agents shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or times or otherwise perfecting or maintaining the perfection of any security interest in the Collateral. The Agents shall be deemed to have exercised reasonable care in the custody of the Collateral in such Agent's possession if the Collateral is accorded treatment substantially equal to that which such Agent accords similar collateral and shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee.

(m)    In no event shall the Agents be responsible or liable for any failure or delay in the performance of such Agent's obligations hereunder arising out of or caused by, directly or indirectly, forces beyond such Agent's control, including, without limitation, strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software and hardware) services.

(n)    For the avoidance of doubt and notwithstanding anything contrary in any Loan Document, in the event of inconsistency between the terms of this Agreement and any other Loan Document, the terms in this Agreement shall prevail.

(o)    Notwithstanding anything in the Loan Documents to the contrary, neither the Administrative Agent nor the Collateral Agent shall have any responsibility for the

preparation, filing or recording of any instrument, document or financing statement or for the perfection or maintenance of any security interest created hereunder.

SECTION 8.06        Notice of Default.

No Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless such Agent has received written notice from a Secured Party or Loan Party referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  In the event that an Agent obtains such a notice, such Agent shall give prompt notice thereof to each of the other Secured Parties.  Upon the occurrence of an Event of Default, the Agents shall (subject to the provisions of SECTION 9.02) take such action with respect to such Default or Event of Default as shall be reasonably directed in writing by the Required Lenders.  Unless and until the Agents shall have received such written direction, the Agents may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default or Event of Default as they shall deem advisable in the best interest of the Secured Parties.  In no event shall the Agents be required to comply with any such directions to the extent that the Agents believe that their compliance with such directions would be unlawful.

SECTION 8.07        Credit Decisions.

Each Secured Party (other than the Agents) acknowledges that it has, independently and without reliance upon the Agents or any other Secured Party, and based on the financial statements prepared by the Loan Parties and such other documents and information as it has deemed appropriate, made its own credit analysis and investigation into the business, assets, operations, property, and financial and other condition of the Loan Parties and has made its own decision to enter into this Agreement and the other Loan Documents.  Each Credit Party (other than the Agents) also acknowledges that it will, independently and without reliance upon the Agents or any other Secured Party, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in determining whether or not conditions precedent to closing any Loan hereunder have been satisfied and in taking or not taking any action under this Agreement and the other Loan Documents.

SECTION 8.08        Reimbursement and Indemnification.

Without limiting the obligations of the Loan Parties hereunder, each Secured Party (other than the Agents) agrees to (i) reimburse the Agents for such Secured Party's pro rata share of all Obligations held by such Secured Party of (x) any expenses and fees incurred by any Agent for the benefit of Secured Parties under this Agreement and any of the other Loan Documents or any other agreement or instrument contemplated hereby or thereby, including, without limitation, reasonable counsel fees and expenses and compensation of agents and employees paid for services rendered on behalf of the Secured Parties, and any other expense incurred in connection with the operations or enforcement thereof not reimbursed by the Loan Parties, and (y) any expenses of any Agent incurred for the benefit of the Secured Parties that the Loan Parties have agreed to reimburse pursuant to this Agreement or any other Loan Document and have failed to so reimburse, and (ii) indemnify and hold harmless each Agent and any of their respective directors, officers, employees, or agents, on demand, in the amount of such Secured Party's pro

rata share of all Obligations held by such Secured Party, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against it or any Secured Party in any way relating to or arising out of this Agreement or any of the other Loan Documents or any other agreement or instrument contemplated hereby or thereby or any action taken or omitted by it or any of them under this Agreement or any of the other Loan Documents or any other agreement or instrument contemplated hereby or thereby to the extent not reimbursed by the Loan Parties, including, without limitation, costs of any suit initiated by each Agent against any Secured Party (except such as shall have been determined by a court of competent jurisdiction or another independent tribunal having jurisdiction by final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Agent); provided, however, that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against such Secured Party in its capacity as such.  The provisions of this SECTION 8.08 shall survive the repayment of the Obligations and the termination of the Commitments.

SECTION 8.09        [Reserved].

SECTION 8.10        Notice of Transfer.

The Administrative Agent may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Obligations for all purposes, unless and until, and except to the extent, an Assignment and Acceptance shall have become effective as set forth in SECTION 9.04.

SECTION 8.11        Successor Agents.

Any Agent may resign at any time by giving thirty (30) Business Days' written notice thereof to the other Secured Parties and the Borrower.  Upon any such resignation of an Agent, the Required Lenders shall have the right to appoint a successor Agent, which, so long as there is no Event of Default, shall be reasonably satisfactory to the Borrower (whose consent in any event shall not be unreasonably withheld or delayed).  If no successor Agent shall have been so appointed by the Required Lenders and/or none shall have accepted such appointment within thirty (30) days after the retiring Agent's giving of notice of resignation, the retiring Agent may, on behalf of the other Secured Parties, appoint a successor Agent which shall be a commercial bank (or affiliate thereof) organized under the laws of the United States of America or of any State thereof and having a combined capital and surplus of a least $1,000,000,000, or capable of complying with all of the duties of such Agent hereunder (in the opinion of the retiring Agent and as certified to the other Secured Parties in writing by such successor Agent) which, so long as there is no Event of Default, shall be reasonably satisfactory to the Borrower (whose consent shall not in any event be unreasonably withheld or delayed).  Upon the acceptance of any appointment as Agent by a successor Agent, such successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent and the retiring Agent shall be discharged from its duties and obligations under this Agreement.  After any retiring Agent's resignation hereunder as such Agent, the provisions of this Article VIII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was such Agent under this Agreement.

SECTION 8.12        Relation Among the Lenders.

The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of any Agent) authorized to act for, any other Lender.

SECTION 8.13        Reports and Financial Statements.

By signing this Agreement, each Lender:

(a)        [Reserved];

(b)        is deemed to have requested that the Agents furnish such Lender, promptly after they become available, copies of (i) all financial statements required to be delivered by Holdings under SECTION 5.01, and (ii) all commercial finance examinations and appraisals of the Collateral received by the Agents, if any (collectively, the "Reports") (and the Agents agree to furnish such Reports promptly to the Lenders, which Reports may be furnished in accordance with the final paragraph of SECTION 5.01);

(c)        expressly agrees and acknowledges that no Agent makes any representation or warranty as to the accuracy of the Reports, and shall not be liable for any information contained in any Report;

(d)        expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agents or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

(e)        agrees to keep all Reports confidential pursuant to the terms of this Agreement and strictly for its internal use, and not to distribute except to its participants, or use any Report in any other manner; and

(f)        without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold each Agent and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any Loans that the indemnifying Lender has made or may make to the Borrower, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a Loan or Loans of the Borrower; and (ii) to pay and protect, and indemnify, defend, and hold each Agent and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including reasonable attorney costs) incurred by the Agents and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender in violation of the terms hereof.

SECTION 8.14          Agency for Perfection.

Each Lender hereby appoints each other Lender as agent for the purpose of perfecting Liens for the benefit of the Agents and the Secured Parties, in assets which, in accordance with Article 9 of the UCC or any other Applicable Law of the United States of America can be perfected only by possession. Should any Secured Party (other than an Agent) obtain possession of any such Collateral, such Secured Party shall notify the Collateral Agent thereof, and, promptly upon the Collateral Agent's request therefor shall deliver such Collateral to the Collateral Agent, or otherwise deal with such Collateral in accordance with the Collateral Agent's instructions.

SECTION 8.15          Reserved.

SECTION 8.16          Collateral Matters.

(a)      The Lenders hereby irrevocably authorize the Collateral Agent to release any Lien upon any Collateral (i) upon the termination of the Commitments and indefeasible payment and satisfaction in full in cash of all Obligations (other than contingent indemnity obligations with respect to then unasserted claims), or (ii) constituting property being sold, transferred or disposed of in a Permitted Disposition upon receipt by the Administrative Agent of the Net Proceeds thereof to the extent required by this Agreement. Except as provided above, the Collateral Agent will not release any of the Collateral Agent's Liens without the prior written authorization of the Applicable Lenders. Upon request by any Agent or any Loan Party at any time, the Lenders will confirm in writing the Collateral Agent's authority to release any Liens upon particular types or items of Collateral pursuant to this SECTION 8.16.

(b)      Upon at least two (2) Business Days' prior written request by the Borrower, the Collateral Agent shall (and is hereby irrevocably authorized by the Lenders to) execute such documents as may be necessary to evidence the release of the Liens upon any Collateral described in SECTION 8.16(a); provided, however, that (i) the Collateral Agent shall not be required to execute any such document on terms which, in its reasonable opinion, would, under Applicable Law, expose the Collateral Agent to liability or create any obligation or entail any adverse consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect or impair the Obligations or any Liens (other than those expressly being released) upon (or obligations of any Loan Party in respect of) all interests retained by any Loan Party, including (without limitation) the proceeds of any sale, all of which shall continue to constitute part of the Collateral.

ARTICLE IX

Miscellaneous

SECTION 9.01          Notices.

Except in the case of notices and other communications expressly permitted to be given by telephone or electronically, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy or e-mail, as follows:

(a)     if to any Loan Party, to it at Guitar Center, Inc., 5795 Lindero Canyon Road, Westlake Village, California 91362, Attention: Tim Martin (Telecopy No. (818) 735-8833, E-Mail: tim.martin@guitarcenter.com) and Michael Pendleton (Telecopy No. (818) 735-8833, E-Mail: mpendleton@guitarcenter.com), with copies to each of Ares Management LLC, 2000 Avenue of the Stars, 12th Floor, Los Angeles, California 90067, Attention: Adam Stein (Telecopy No. (310) 201-4170, E-Mail: stein@aresmgmt.com, and Milbank LLP, 55 Hudson Yards, New York, NY, 10001, Attention: Al Pisa (Telephone: (212) 530-5319, E-Mail: apisa@milbank.com);

(b)     if to the Administrative Agent or the Collateral Agent to Delaware Trust Company, 251 Little Falls Drive, Wilmington, Delaware 19808, Attention: Dana Dugan (Email: ddugan@delawaretrust.com) and 19 West 44th Street, Suite 200, New York, NY 10036, Attention: Sean Foronjy (Telephone: 302-425-9747, E-Mail: sean.foronjy@delawaretrust.com), with a copy to Pryor Cashman LLP, 7 Times Square, New York, New York 10036, Attention: Seth Lieberman, Esq., (Telephone: (212) 326-0819, Email: slieberman@pryorcashman.com);

(c)     if to any other Credit Party, to it at its address (or telecopy number or electronic mail address) set forth on the signature pages hereto or on any Assignment and Acceptance.

Notwithstanding the foregoing, any notice hereunder sent by e-mail shall be solely for the distribution of (i) routine communications such as financial statements and (ii) documents and signature pages for execution by the parties hereto, and for no other purpose. Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto. All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

SECTION 9.02      Waivers; Amendments.

(a)     No failure or delay by any Credit Party in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Credit Parties hereunder and under the other Loan Documents are cumulative and are not exclusive of any other rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by SECTION 9.02(b), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default or Event of Default, regardless of whether any Credit Party may have had notice or knowledge of such Default or Event of Default at the time.

(b)     Except as otherwise specifically provided herein, neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in

writing entered into by the Loan Parties and the Required Lenders or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Agent(s) and the Loan Parties that are parties thereto, in each case (other than the Payment Letter) with the consent of the Required Lenders; provided, however, that no such waiver, amendment, modification or other agreement shall:

(i)    Increase the Commitment of any Lender without the prior written consent of such Lender;

(ii)    Without:

(A)    the prior written consent of all Lenders directly adversely affected thereby, reduce the principal amount of any Obligation or reduce the rate of interest thereon (other than the waiver of the Default Rate), or reduce any fees or premiums payable under the Loan Documents, including the Exit Payment (it being understood that a waiver of a Default shall not constitute a reduction of interest for purposes of this Section);

(B)    the prior written consent of all Lenders directly adversely affected thereby, extend the date set forth in clause (a) of the Maturity Date or modify the definition of Maturity Date (other than clause (b) of the definition of Maturity Date), waive or postpone the scheduled date of payment of principal, any interest on any Obligation or any fees or premiums payable under the Loan Documents, including the Exit Payment (other than any waiver of default interest), or provide that repayment, satisfaction or discharge of the Obligations can occur in any manner other than indefeasible payment in full and in cash (provided that a waiver of a Default shall not constitute a reduction, excuse or waiver of interest for purposes of this Section), or postpone the expiration of, or increase the amount of, any Lender's Commitment;

(C)    the prior written consent of all Lenders, except for Collateral releases as provided in clause (a)(ii) of SECTION 8.16 following the termination of the Commitments and indefeasible payment and satisfaction in full in cash of all Obligations (other than contingent indemnity obligations with respect to then unasserted claims), release all or substantially all of the Collateral from the Liens of the Security Documents or release all or substantially all of the Facility Guarantors from their respective obligations under their Facility Guarantee or substantially limit their liability in respect of such Facility Guarantee;

(D)    the prior written consent of all Lenders, subordinate or otherwise modify the priority of the Liens securing the Obligations to any other Liens on the Collateral or subordinate or otherwise modify the priority of the Obligations in right of payment to any other obligation;

90

(E)     the prior written consent of all Lenders, release any Loan Party from its obligations under any Loan Document, or limit its liability in respect of such Loan Document;

(F)     the prior written consent of all Lenders, directly or indirectly, change any of the provisions of SECTION 2.16(b), SECTION 2.21(b) or SECTION 8.03;

(G)     the prior written consent of all Lenders, change any of the provisions of this SECTION 9.02(b) or the definitions of "<u>Required Lenders</u>" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder or change, amend, supplement or otherwise modify or waive any provision in any Loan Document providing for pro rata sharing among the Lenders; or

(H)     the prior written consent of all Lenders, directly or indirectly, change any of the provisions of SECTION 2.17(b), SECTION 7.03 or any provision in any Loan Document providing for a waterfall for application of proceeds;

(iii)     Without prior written consent of the Agents affect the rights or duties of the Agents.

(c)     Notwithstanding anything to the contrary contained in this SECTION 9.02, in the event that the Borrower shall request that this Agreement or any other Loan Document be modified, amended or waived in a manner which would require the consent of all Lenders or all directly adversely affected Lenders pursuant to SECTION 9.02(b) and such modification, amendment or waiver is approved by the Lenders holding at least 50% of the aggregate Commitments held by all Lenders or all directly adversely affected Lenders (as applicable) or, if Commitments have been terminated, at least 50% of the aggregate outstanding Loans held by all Lenders or all directly adversely affected Lenders (as applicable) (such Lender or Lenders collectively, the "<u>Threshold Lenders</u>"), but not by the requisite percentage of all the Lenders or all the directly adversely affected Lenders (as applicable), the Borrower and the Administrative Agent shall be permitted to amend this Agreement without the consent of the requisite Lender or Lenders which did not agree to the modification or amendment requested by the Borrower (such Lender or Lenders, collectively the "<u>Minority Lenders</u>"), subject to the Borrower or (in its sole discretion) the Administrative Agent providing for (i) the termination of the Commitment of each of the Minority Lenders and the repayment of any Loans of such Minority Lenders, together with accrued and unpaid interest thereon and together with the Exit Payment, (ii) the making of such additional Loans by such new or increasing Lender or Lenders, as the case may be, as may be necessary to repay in full the outstanding Loans (including principal, interest, fees and other amounts due and owing under the Loan Documents) of the Minority Lenders immediately before giving effect to such amendment and (iii) such other modifications to this Agreement or the Loan Documents as may be appropriate and incidental to the foregoing.

(d)     Further, notwithstanding anything to the contrary contained in this SECTION 9.02, if following the Closing Date, the Administrative Agent and the Borrower shall have jointly identified an obvious error or any error or omission of a technical or immaterial nature, in each case, in any provision of the Loan Documents, then the Administrative Agent and the Borrower shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Documents if the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof.

(e)     No notice to or demand on any Loan Party shall entitle any Loan Party to any other or further notice or demand in the same, similar or other circumstances.  Each holder of a Note shall be bound by any amendment, modification, waiver or consent authorized as provided herein, whether or not a Note shall have been marked to indicate such amendment, modification, waiver or consent and any consent by a Lender, or any holder of a Note, shall bind any Person subsequently acquiring a Note, whether or not a Note is so marked.  No amendment to this Agreement or any other Loan Document shall be effective against any Loan Party unless signed by such Loan Party.

SECTION 9.03        Expenses; Indemnity; Damage Waiver.

(a)     The Loan Parties shall jointly and severally pay all Credit Party Expenses incurred as of the Closing Date on the Closing Date.  Thereafter, the Loan Parties shall jointly and severally pay all Credit Party Expenses within thirty (30) days after receipt of an invoice therefor setting forth such expenses in reasonable detail; provided that in the event the Loan Parties have a bona fide dispute with any such expenses, payment of such disputed amounts shall not be required until the earlier of the date such dispute is resolved to the reasonable satisfaction of the Loan Parties or thirty (30) days after receipt of any such invoice (and any such disputed amount which is so paid shall be subject to a reservation of the Loan Parties' rights with respect thereto).

(b)     The Loan Parties shall, jointly and severally, indemnify the Secured Parties and each of their Subsidiaries and Affiliates, and each of the respective directors, officers, employees, agents and controlling persons of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all damages, actual out-of-pocket losses, claims, actions, causes of action, settlement payments, obligations, liabilities and related expenses, including the reasonable fees, charges and disbursements of one counsel for all the Indemnitees (plus, in each case, one local counsel in any other jurisdiction to the extent reasonably necessary) (provided that in the case of a conflict of interest the affected Indemnitee may engage and shall be reimbursed for one additional counsel, plus one local counsel in any other jurisdiction to the extent reasonably necessary), incurred, suffered, sustained or required to be paid by, or asserted against, any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution or delivery of any Loan Document or any other agreement or instrument contemplated hereby, the performance by the parties to the Loan Documents of their respective obligations thereunder or the consummation of the transactions contemplated by the Loan Documents or any other transactions contemplated hereby, (ii) any Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property currently or formerly owned or operated

by any Loan Party or any Subsidiary, or any Environmental Liability related in any way to any Loan Party or any Subsidiary, (iv) any actual or prospective claim, litigation, investigation or proceeding relating to or arising from any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto or whether such claim, litigation, investigation or proceeding is brought by a third party or any Loan Party or any Affiliate thereof or (v) any documentary taxes, assessments or similar charges made by any Governmental Authority by reason of the execution and delivery of this Agreement or any other Loan Document; provided, however, that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses have resulted from (i) the gross negligence, bad faith, fraud or willful misconduct of such Indemnitee (or any of its Affiliates or Related Parties), (ii) such Indemnitee's (or any of its Affiliates' or Related Parties') material breach of its obligations under this Agreement or any other Loan Document or (iii) any dispute solely among the Indemnitees other than claims against the Administrative Agent in its capacity or in fulfilling its role as an agent or arranger or any other similar role under this Agreement or any other Loan Document or any other agreement or instrument contemplated hereby or thereby, and any claims arising out of any act or omission by the Borrower or any of its Affiliates.  Notwithstanding anything to the contrary contained herein, the Loan Parties shall have no obligation to reimburse any Indemnitee for fees and expenses unless such Indemnitee provides the Loan Parties with an executed undertaking in which such Indemnitee agrees to refund and return any and all amounts paid by the Loan Parties to such Indemnitee to the extent any of the foregoing items described in clauses (i) through (iii) occurs. This SECTION 9.03(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)      No party to this Agreement shall assert and, to the extent permitted by Applicable Law, each such party hereby waives, any claim against any other party to this Agreement or any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the transactions contemplated by the Loan Documents, any Loan or the use of the proceeds thereof.

(d)      The provisions of paragraphs (b) and (c) of this SECTION 9.03 shall remain operative and in full force and effect regardless of the termination of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Obligations, the invalidity or unenforceability of any term or provision of any Loan Document, or any investigation made by or on behalf of any Credit Party.  All amounts due under this SECTION 9.03 shall be payable within thirty (30) days of written demand therefor, which written demand shall set forth such amounts in reasonable detail.

SECTION 9.04      Successors and Assigns.

(a)      The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Agents and the Lenders (and any such attempted assignment or transfer without such consent shall be null and void).  Nothing in this Agreement,

expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, Indemnitees), any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Any Lender may, with the consent of the Administrative Agent and the Borrower (which consent shall be deemed to have been granted unless the Borrower shall object thereto by written notice to the Administrative Agent within five Business Days after having received notice of any such assignment), assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); provided, however, that no such consent of the Administrative Agent shall be required in connection with any assignment to another Lender, an Affiliate of a Lender or an Approved Fund, and no such consent of the Borrower shall be required (A) in connection with any assignment to another Lender, an Affiliate of a Lender or an Approved Fund or (B) if an Event of Default has occurred and is continuing; and provided further that, each assignment shall be subject to the following conditions: (i) except in the case of an assignment to a Lender or an Affiliate of a Lender the amount of the Commitment or Loans of the assigning Lender subject to a partial assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent and determined on an aggregate basis in the event of concurrent assignments to Related Funds) shall not be less than $5,000,000 with respect to the Commitments, or, if less, the entire remaining amount of the assigning Lender's Commitment or Loans; (ii) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations; and (iii) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance, and, after completion of the syndication of the Loans, together with a processing and recordation fee of $3,500.00.  Subject to acceptance and recording thereof pursuant to SECTION 9.04(d), from and after the effective date specified in each Assignment and Acceptance the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of SECTION 9.03). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this SECTION 9.04(b) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with SECTION 9.04(e).  The Loan Parties hereby acknowledge and agree that any effective assignment shall give rise to a direct obligation of the Loan Parties to the assignee and that the assignee shall be considered to be a "Credit Party" for all purposes under this Agreement and the other Loan Documents.

(c)     The Administrative Agent, acting for this purpose as an agent of the Loan Parties, shall maintain at one of its offices in Wilmington, Delaware, a copy of each Assignment and Acceptance delivered to it and a register (the "Register") for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time.  The entries

in the Register shall be conclusive and the Loan Parties and Credit Parties shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement absent any manifest error, notwithstanding notice to the contrary. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)     Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, the processing and recordation fee referred to in SECTION 9.04(b) and any written consent to such assignment required by SECTION 9.04(a), the Administrative Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this SECTION 9.04(d).

(e)     Any Lender may, without the consent of the Loan Parties or any other Person, sell participations to one or more banks or other entities (other than a Disqualified Institution or any Person in direct competition with a Loan Party's business) (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it), subject to the following:

(i)     such Lender's obligations under this Agreement and the other Loan Documents shall remain unchanged;

(ii)     such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations;

(iii)     the Loan Parties and other Credit Parties shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement;

(iv)     any agreement or instrument pursuant to which a Lender sells a participation in the Commitments, the Loans shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents; provided, however, that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the proviso to SECTION 9.02(b)(ii)(A) , (B) or (C) that affects such Participant;

(v)     subject to clauses (viii) and (ix) of this SECTION 9.04(e), the Loan Parties agree that each Participant shall be entitled to the benefits of SECTION 2.14 and SECTION 2.23 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to SECTION 9.04(b);

(vi)     to the extent permitted by Applicable Law, each Participant also shall be entitled to the benefits of SECTION 9.08 as though it were a Lender so long as such Participant agrees to be subject to SECTION 2.21(c) as though it were a Lender;

(vii)     each Lender, acting for this purpose as an agent of the Loan Parties, shall maintain at its offices a record of each agreement or instrument effecting

95

any participation and a register (each a "<u>Participation Register</u>") meeting the requirements of 26 CFR §5f.103-1(c) for the recordation of the names and addresses of its Participants and their rights with respect to principal amounts (and stated interest) and other Obligations from time to time.  The entries in each Participation Register shall be conclusive and the Loan Parties and the Credit Parties may treat each Person whose name is recorded in a Participant Register as a Participant for all purposes of this Agreement (including, for the avoidance of doubt, for purposes of entitlement to benefits under SECTION 2.14, SECTION 2.23, and SECTION 9.08).  The Participation Register shall be available for inspection by the Borrower and any Credit Party at any reasonable time and from time to time upon reasonable prior notice;

(viii)   a Participant shall not be entitled to receive any greater payment under SECTION 2.14 or SECTION 2.23 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent; and

(ix)   a Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of SECTION 2.23 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Loan Parties, to comply with SECTION 2.23(e) as though it were a Lender and such Participant is eligible for exemption from, or reduction in,  the withholding Tax referred to therein, following compliance with SECTION 2.23(e).

(f)    Any Credit Party may at any time pledge or grant a security interest in all or any portion of its rights under this Agreement to secure obligations of such Credit Party, including any pledge or grant to secure obligations to any of the twelve Federal Reserve Banks organized under Section 4 of the Federal Reserve Act, 12 U.S.C. Section 341, and this SECTION 9.04 shall not apply to any such pledge or grant of a security interest; <u>provided</u>, <u>however</u>, that no such pledge or grant of a security interest shall release a Credit Party from any of its obligations hereunder or substitute any such pledgee or grantee for such Credit Party as a party hereto.

(g)    The Loan Parties authorize each Credit Party to disclose to any Participant or grantee and any prospective Participant or grantee, subject to the provisions of SECTION 9.15, any and all financial information in such Credit Party's possession concerning the Loan Parties which has been delivered to such Credit Party by or on behalf of the Loan Parties pursuant to this Agreement or which has been delivered to such Credit Party by or on behalf of the Loan Parties in connection with such Credit Party's credit evaluation of the Loan Parties prior to becoming a party to this Agreement.

(h)    Notwithstanding anything to the contrary contained herein, any Lender (a "<u>Granting Lender</u>") may grant to a special purpose funding vehicle (an "<u>SPC</u>"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Borrower, the option to provide to a Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to a Borrower pursuant to this Agreement; <u>provided</u> that (i) nothing herein shall constitute a commitment by any SPC to make any Loan, and (ii) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of

such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that (i) an SPC shall be entitled to the benefits of SECTIONS 2.11, 2.14, 2.21, 2.22 and 2.23 to the same extent as if it were a Lender, (ii) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of any Borrower under this Agreement (including its obligations under SECTION 2.14 or 2.23) unless the grant to the SPC was made with the Borrower's prior written consent, (iii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender) and (iv) the Granting Lender shall for all purposes including approval of any amendment, waiver or other modification of any provision of the Loan Documents, remain the Lender of record hereunder.  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPC, it will not institute against, or join any other Person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any state thereof.  In addition, notwithstanding anything to the contrary contained in this SECTION 9.04, any SPC may (i) with notice to, but without the prior written consent of, any Borrower or the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or, subject to obtaining the requisite consents under SECTION 9.04(b), to any other financial institutions providing liquidity and/or credit support to or for the account of such SPC to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPC.  Any Lender who grants an option to an SPC to make a Loan to the any Borrower shall, if such option is exercised, maintain a register similar to the Participant Register described in paragraph (c) of this SECTION.

(i)    No Lender may assign or sell a participation of, Loans to Holdings or any of its Subsidiaries or any of their Affiliates.

SECTION 9.05    Survival.

All covenants, agreements, indemnities, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Loans, regardless of any investigation made by any such other party or on its behalf and, notwithstanding that any Credit Party may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect until (i) the Commitments have expired or been terminated, and (ii) the principal of and interest on each Loan and all fees and other Obligations (other than contingent indemnity obligations with respect to then unasserted claims) shall have been paid in full.  The provisions of SECTION 2.14, SECTION 2.23, SECTION 9.03 and Article VIII shall survive and remain in full force and effect

regardless of the repayment of the Obligations and the Commitments or the termination of this Agreement or any provision hereof.  In connection with the termination of this Agreement and the release and termination of the security interests in the Collateral, the Agents, on behalf of themselves and the other Credit Parties, may require such indemnities as they shall reasonably deem necessary or appropriate to protect the Credit Parties against loss on account of credits previously applied to the Obligations that may subsequently be reversed or revoked.

SECTION 9.06        Counterparts; Integration; Effectiveness.

This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all contemporaneous or previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in SECTION 4.01, this Agreement shall become effective when it shall have been executed by the applicable Credit Parties and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or e-mail shall be effective as delivery of a manually executed counterpart of this Agreement.

SECTION 9.07        Severability.

Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof, and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 9.08        Right of Set-off.

If any Event of Default shall have occurred and be continuing, each Secured Party, each Participant and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to setoff and apply any and all deposits (general or special, time or demand, provisional or final, but excluding any payroll, trust and tax withholding accounts) at any time held and other obligations at any time owing by such Secured Party, Participant or Affiliate to or for the credit or the account of the Loan Parties against any and all of the Obligations of the Loan Parties now or hereafter existing under this Agreement or other Loan Document to the extent such are then due and owing, although such Obligations may be otherwise fully secured; provided that such Secured Party shall provide the Borrower with written notice promptly after its exercise of such right of setoff. The rights of each Secured Party under this SECTION 9.08 are in addition to other rights and remedies (including other rights of setoff) that such Credit Party may have.  No Credit Party will, or will permit its Participant to, exercise its rights under this SECTION 9.08 without the consent of the Administrative Agent or the Required Lenders.  ANY AND ALL RIGHTS TO REQUIRE THE COLLATERAL AGENT TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER

COLLATERAL WHICH SECURES ANY OF THE OBLIGATIONS PRIOR TO THE EXERCISE BY ANY SECURED PARTY, PARTICIPANT OR AFFILIATE OF ITS RIGHT OF SETOFF UNDER THIS SECTION ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

SECTION 9.09        Governing Law; Jurisdiction; Consent to Service of Process.

(a)    EXCEPT TO THE EXTENT SUPERSEDED BY THE BANKRUPTCY CODE, THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

(b)    Each Loan Party agrees that any suit for the enforcement of this Agreement or any other Loan Document shall be brought solely in the Bankruptcy Court and each party to this Agreement hereby waives any objection which it may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient forum and agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(c)    Each Loan Party agrees that any action commenced by any Loan Party asserting any claim or counterclaim arising under or in connection with this Agreement or any other Loan Document shall be brought solely in the Bankruptcy Court.

(d)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in SECTION 9.01. Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 9.10        WAIVER OF JURY TRIAL.

EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY); AND WAIVES DUE DILIGENCE, DEMAND, PRESENTMENT AND PROTEST AND ANY NOTICES THEREOF AS WELL AS NOTICE OF NONPAYMENT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 9.11          [Reserved].

SECTION 9.12          Headings.

Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 9.13          Interest Rate Limitation.

Notwithstanding anything herein to the contrary, if at any time the Interest Rate applicable to any Loan, together with all fees, charges and other amounts that are treated as interest on such Loan under Applicable Law (collectively, the "Charges"), shall be found by a court of competent jurisdiction in a final order to exceed the maximum lawful rate (the "Maximum Rate") that may be contracted for, charged, taken, received or reserved by the Lender holding such Loan in accordance with Applicable Law, the rate of interest payable in respect of such Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Rate to the date of repayment, shall have been received by such Lender.

SECTION 9.14          Additional Waivers.

(a)      The Obligations are the joint and several obligation of each Loan Party. To the fullest extent permitted by Applicable Law, the obligations of each Loan Party hereunder shall not be affected by (i) the failure of any Credit Party to assert any claim or demand or to enforce or exercise any right or remedy against any other Loan Party under the provisions of this Agreement, any other Loan Document or under Applicable Law, (ii) any rescission, waiver, amendment or modification of, or any release of any Loan Party from, any of the terms or provisions of, this Agreement, any other Loan Document, or (iii) the failure to perfect any security interest in, or the release of, any of the Collateral or other security held by or on behalf of the Collateral Agent or any other Credit Party.

(b)      The obligations of each Loan Party to pay the Obligations in full hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the payment in full in cash of the Obligations after the termination of all Commitments to any Loan Party under any Loan Document), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Loan Party hereunder shall not be discharged or impaired or otherwise affected by the failure of the Administrative Agent or any other Credit Party to assert any claim or demand or to enforce any remedy under this Agreement, any other Loan Document or any other agreement, by any waiver or modification of any

provision of any thereof, any default, failure or delay, willful or otherwise, in the performance of any of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Loan Party or that would otherwise operate as a discharge of any Loan Party as a matter of law or equity (other than the payment in full in cash of all the Obligations after termination of all Commitments to any Loan Party under any Loan Document).

(c)     To the fullest extent permitted by Applicable Law, each Loan Party waives any defense based on or arising out of any defense of any other Loan Party or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Loan Party, other than the payment in full in cash of all the Obligations after the termination of all Commitments to any Loan Party under any Loan Document. The Collateral Agent and the other Credit Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or nonjudicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any other Loan Party, or exercise any other right or remedy available to them against any other Loan Party, without affecting or impairing in any way the liability of any Loan Party hereunder except to the extent that all the Obligations have been indefeasibly paid in full in cash and performed in full after the termination of Commitments to any Loan Party under any Loan Document. Pursuant to Applicable Law, each Loan Party waives any defense arising out of any such election even though such election operates, pursuant to Applicable Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Loan Party against any other Loan Party, as the case may be, or any security.

(d)     Except as otherwise specifically provided herein, each Borrower is obligated to repay the Obligations as joint and several obligors under this Agreement. Upon payment by any Loan Party of any Obligations, all rights of such Loan Party against any other Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior payment in full in cash of all the Obligations (other than contingent indemnity obligations for then unasserted claims) and the termination of all Commitments to any Loan Party under any Loan Document. If any amount shall erroneously be paid to any Loan Party on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of any Loan Party, such amount shall be held in trust for the benefit of the Credit Parties and shall forthwith be paid to the Administrative Agent to be credited against the payment of the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement and the other Loan Documents. Subject to the foregoing, to the extent that any Loan Party shall, under this Agreement as a joint and several obligor, repay any of the Obligations constituting Loans made to another Loan Party hereunder (an "Accommodation Payment"), then the Loan Party making such Accommodation Payment shall be entitled to contribution and indemnification from, and be reimbursed by, each of the other Loan Parties in an amount equal to a fraction of such Accommodation Payment, the numerator of which fraction is such other Loan Party's Allocable Amount and the denominator of which is the sum of the Allocable Amounts of all of the Loan Parties. As of any date of determination, the "Allocable Amount" of each Loan Party shall be equal to the maximum amount of liability for Accommodation Payments which could be asserted against such Loan Party hereunder without (a) rendering such Loan Party "insolvent" within the meaning of Section 101 (32) of the

Bankruptcy Code, Section 2 of the Uniform Fraudulent Transfer Act ("UFTA") or Section 2 of the Uniform Fraudulent Conveyance Act ("UFCA"), (b) leaving such Loan Party with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA, or Section 5 of the UFCA, or (c) leaving such Loan Party unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA, or Section 5 of the UFCA.

(e)       Each Loan Party hereby agrees to keep each other Loan Party fully apprised at all times as to the status of its business, affairs, finances, and financial condition, and its ability to perform its Obligations under the Loan Documents, and in particular as to any adverse developments with respect thereto. Each Loan Party hereby agrees to undertake to keep itself apprised at all times as to the status of the business, affairs, finances, and financial condition of each other Loan Party, and of the ability of each other Loan Party to perform its Obligations under the Loan Documents, and in particular as to any adverse developments with respect to any thereof. Each Loan Party hereby agrees, in light of the foregoing mutual covenants to inform each other, and to keep themselves and each other informed as to such matters, that the Credit Parties shall have no duty to inform any Loan Party of any information pertaining to the business, affairs, finances, or financial condition of any other Loan Party, or pertaining to the ability of any other Loan Party to perform its Obligations under the Loan Documents, even if such information is adverse, and even if such information might influence the decision of one or more of the Loan Parties to continue to be jointly and severally liable for, or to provide Collateral for, the Obligations of one or more of the other Loan Parties. To the fullest extent permitted by Applicable Law, each Loan Party hereby expressly waives any duty of the Credit Parties to inform any Loan Party of any such information.

SECTION 9.15       Confidentiality.

Each of the Credit Parties agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to their and their Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors involved with the financing (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and agree to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by Applicable Laws or by any subpoena or similar legal process (the Credit Parties' agreeing to furnish the Borrower with notice of such process and an opportunity to contest such disclosure as long as furnishing such notice and opportunity would not result in the Credit Parties' violation of Applicable Law), (d) to any other party to this Agreement in accordance with Applicable Laws, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement and any actual or prospective counterparty or advisors to any swap or derivative transactions relating to the Loan Parties and the Obligations so long as such Person or any of their Affiliates is not a competitor of any Loan Party, (g) with the consent of the Loan Parties, (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section, or to the knowledge of such Credit Party, the breach of any other Person's obligation to keep the

information confidential, or (ii) becomes available to any Credit Party on a nonconfidential basis from a source other than the Loan Parties, or (iii) to the extent that such Information is independently developed by such Credit Party.  For the purposes of this Section, the term "Information" means all information received from or on behalf of the Loan Parties or any of their Affiliates relating to their business.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

SECTION 9.16     Patriot Act.

Each Lender hereby notifies the Loan Parties that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub.  L. 107-56 (signed into law October 26, 2001), as amended) (the "Act"), it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name and address of each Borrower and other information that will allow such Lender to identify such Borrower in accordance with the Act. Each Borrower is in compliance with (i) the Act, and (ii) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended), and any other enabling legislation or executive order relating thereto.  No part of the proceeds of the Loans will be used by the Loan Parties, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the FCPA, as amended, or any applicable Anti-Corruption Laws or Anti-Money Laundering Laws.  In addition, Agents and each Lender shall have the right to periodically conduct due diligence on all Loan Parties, their senior management and key principals and legal and beneficial owners.  Each Loan Party agrees to cooperate in respect of the conduct of such due diligence and further agrees that the reasonable costs and charges for any such due diligence by Agents shall constitute Credit Party Expenses hereunder and be for the account of Borrower.

SECTION 9.17     Foreign Asset Control Regulations.

Neither of the advance of the Loans nor the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56)). Furthermore, none of the Loan Parties or their Affiliates (a) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (b) knowingly engages or will engage in any dealings or transactions, or

be otherwise associated, with any such "blocked person" or in any manner violative of any such order.

SECTION 9.18       Order, Intercreditor Arrangement.

In the event of any conflict between the terms of the Order and the terms of this Agreement or any other Loan Document, the terms of the Order shall govern and control. Notwithstanding anything herein to the contrary, the Liens and security interests granted to the Collateral Agent pursuant to the Security Documents, Lien priority and the exercise of any right or remedy by the Collateral Agent hereunder or thereunder, are subject to the provisions of the Intercreditor Arrangement.

The Loan Parties, the Agents, the Lenders and the other Credit Parties acknowledge that the exercise of certain of the Agents' rights and remedies hereunder may be subject to, and restricted by, the provisions of the Intercreditor Arrangement.  Except as specified herein, nothing contained in the Intercreditor Arrangement shall be deemed to modify any of the provisions of this Agreement and the other Loan Documents, which, as among the Loan Parties, the Agents, the Lenders and the other Credit Parties shall remain in full force and effect.

SECTION 9.19       [Reserved].

SECTION 9.20       [Reserved].

SECTION 9.21       Acknowledgment and Consent to Bail-In of EEA Financial Institutions.

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)       the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)       the effects of any Bail-in Action on any such liability, including, if applicable:

(i)       a reduction in full or in part or cancellation of any such liability;

(ii)       a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

[Remainder of Page Intentionally Blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**BORROWER:**

**GUITAR CENTER, INC.**, as Borrower and as a Borrower

By: _____
      Name:
      Title:

**GUARANTORS**:

**GUITAR CENTER HOLDINGS, INC.**, as a Guarantor

By: _____
      Name:
      Title:

**GUITAR CENTER STORES, INC.**

By: _____
      Name:
      Title:

**MUSICIAN'S FRIEND, INC.**

By: _____
      Name:
      Title:

**GUITAR CENTER GIFT CARD COMPANY, LLC**, as a Guarantor

By: _____
    Name:
    Title:

**MUSIC123, INC.**, as a Guarantor

By: _____
    Name:
    Title:

**GTRC SERVICES, INC.**, as a Guarantor

By: _____
    Name:
    Title:

**WOODWIND & BRASSWIND, INC.**, as a Guarantor

By: _____
    Name:
    Title:

**GC BUSINESS SOLUTIONS, INC.**, as a Guarantor

By: _____
    Name:
    Title:

[Signature Page]

**AVDG, LLC**, as a Guarantor


By: _____
       Name:
       Title:


**MUSIC & ARTS INSTRUCTOR SERVICES, LLC**, as a Guarantor


By: _____
       Name:
       Title:

**DELAWARE TRUST COMPANY**, as
Administrative Agent and as Collateral Agent


By: _____

      Name:
      Title:

[Signature Page]

## **Exhibit B**

**ABL DIP Credit Agreement**

*Execution Version*

SENIOR SECURED, SUPER-PRIORITY PRIMING DEBTOR-IN-POSSESSION CREDIT
AGREEMENT

dated as of
November 24, 2020

GUITAR CENTER, INC.

The Lead Borrower
for
THE BORROWERS NAMED HEREIN

THE FACILITY GUARANTORS PARTY HERETO

WELLS FARGO BANK, NATIONAL ASSOCIATION
as Administrative Agent and Collateral Agent

THE LENDERS
NAMED HEREIN

i

# TABLE OF CONTENTS

ARTICLE I ........................................................................................................... 2

SECTION 1.01   Definitions...................................................................2
SECTION 1.02   Terms Generally.........................................................55
SECTION 1.03   Accounting Terms.......................................................56
SECTION 1.04   Rounding....................................................................57
SECTION 1.05   Times of Day..............................................................57
SECTION 1.06   Letter of Credit Amounts ...........................................57
SECTION 1.07   Certifications..............................................................57
SECTION 1.08   Effect of Benchmark Transition Event. ......................57
SECTION 1.09   Divisions. ...................................................................61

ARTICLE II Amount and Terms of Credit.......................................................... 61

SECTION 2.01   Commitment of the Lenders .......................................61
SECTION 2.02   [Reserved]. .................................................................62
SECTION 2.03   Reserves; Changes to Reserves ..................................62
SECTION 2.04   Borrowings, Conversions and Continuations of Revolving Credit
               Loans..........................................................................62
SECTION 2.05   Overadvances..............................................................64
SECTION 2.06   Reserved. ....................................................................64
SECTION 2.07   Notes. ..........................................................................64
SECTION 2.08   Interest on Revolving Credit Loans. ...........................65
SECTION 2.09   [Reserved]. .................................................................65
SECTION 2.10   Alternate Rate of Interest for Revolving Credit Loans. ...............65
SECTION 2.11   Change in Legality. ....................................................66
SECTION 2.12   Default Interest...........................................................66
SECTION 2.13   Letters of Credit. ........................................................66
SECTION 2.14   Increased Costs. ..........................................................76
SECTION 2.15   Optional Termination or Reduction of Commitments. ................77
SECTION 2.16   Optional Prepayment of Revolving Credit Loans; Reimbursement of
               Lenders........................................................................78
SECTION 2.17   Mandatory Prepayment; Commitment Termination; Cash Collateral. .........79
SECTION 2.18   Cash Management.......................................................81
SECTION 2.19   Fees. ...........................................................................84
SECTION 2.20   Maintenance of Loan Account; Statements of Account. ............84
SECTION 2.21   Payments; Sharing of Setoff. ......................................84
SECTION 2.22   Settlement Amongst Lenders ......................................86
SECTION 2.23   Taxes. ..........................................................................86
SECTION 2.24   Mitigation Obligations; Replacement of Lenders.......89
SECTION 2.25   Designation of Lead Borrower as Borrowers' Agent. ................90
SECTION 2.26   Security Interests in Collateral....................................91
SECTION 2.27   Defaulting Lenders......................................................91
SECTION 2.28   [Reserved]. .................................................................93
SECTION 2.29   MIRE Events...............................................................93

ARTICLE III Representations and Warranties ............................................................ 94

SECTION 3.01    Organization; Powers. ...............................................................94
SECTION 3.02    Authorization; Enforceability. ..................................................94
SECTION 3.03    No Conflicts. ..............................................................................95
SECTION 3.04    Financial Condition. ..................................................................95
SECTION 3.05    Properties. ..................................................................................95
SECTION 3.06    Litigation and Environmental Matters. ....................................96
SECTION 3.07    Compliance with Laws and Agreements. ..................................97
SECTION 3.08    Investment Company Status. .....................................................98
SECTION 3.09    Taxes. ..........................................................................................98
SECTION 3.10    ERISA. ........................................................................................98
SECTION 3.11    Disclosure. ..................................................................................99
SECTION 3.12    Subsidiaries. ...............................................................................99
SECTION 3.13    Reserved. .....................................................................................99
SECTION 3.14    Labor Matters. ............................................................................99
SECTION 3.15    Security Documents. .................................................................100
SECTION 3.16    Federal Reserve Regulations. ..................................................100
SECTION 3.17    Initial Budget. ...........................................................................101
SECTION 3.18    Chapter 11 Cases ......................................................................101
SECTION 3.19    Reserved. ...................................................................................101
SECTION 3.20    OFAC/Sanctions .......................................................................101
SECTION 3.21    Beneficial Ownership Certification. ........................................101
SECTION 3.22    Orders. .......................................................................................101
SECTION 3.23    Petition Date; Claims and Collateral. ......................................102

ARTICLE IV Conditions ......................................................................................... 102

SECTION 4.01    Closing Date. .............................................................................102
SECTION 4.02    Conditions Precedent to Each Revolving Credit Loan and Each
                Letter of Credit. .......................................................................105

ARTICLE V Affirmative Covenants ....................................................................... 106

SECTION 5.01    Financial Statements and Other Information. ...........................106
SECTION 5.02    Notices of Material Events. ......................................................110
SECTION 5.03    Information Regarding Collateral. ............................................111
SECTION 5.04    Existence; Conduct of Business. ..............................................111
SECTION 5.05    Payment of Obligations. ...........................................................111
SECTION 5.06    Maintenance of Properties. .......................................................111
SECTION 5.07    Insurance. ..................................................................................112
SECTION 5.08    Books and Records; Inspection and Audit Rights; Appraisals;
                Accountants. .............................................................................113
SECTION 5.09    Reserved. ...................................................................................114
SECTION 5.10    Compliance with Laws. .............................................................114
SECTION 5.11    Use of Proceeds and Letters of Credit. ....................................115
SECTION 5.12    Additional Subsidiaries. ...........................................................115
SECTION 5.13    Further Assurances. ...................................................................116
SECTION 5.14    Restructuring Advisor and Investment Banker. ........................116

SECTION 5.15    [Reserved]. ..........................................................................................117
SECTION 5.16    [Reserved]. ..........................................................................................117
SECTION 5.17    DIP Term Loan Facility; Requests for Loans Under DIP Term Loan
                Facility. ...................................................................................................117
SECTION 5.18    Lender Calls. .........................................................................................117
SECTION 5.19    Required Milestones. ............................................................................117
SECTION 5.20    OFAC; Sanctions. .................................................................................117

ARTICLE VI Negative Covenants ....................................................................................... 118

SECTION 6.01    Indebtedness and Other Obligations. ...................................................118
SECTION 6.02    Liens. .....................................................................................................118
SECTION 6.03    Fundamental Changes ...........................................................................118
SECTION 6.04    Investments. ..........................................................................................119
SECTION 6.05    Asset Sales. ...........................................................................................119
SECTION 6.06    Restricted Payments; Certain Payments of Indebtedness. ...................119
SECTION 6.07    Transactions with Affiliates. ................................................................120
SECTION 6.08    Restrictive Agreements. ........................................................................121
SECTION 6.09    Amendment of Material Documents. .....................................................121
SECTION 6.10    Fiscal Year. ...........................................................................................121
SECTION 6.11    Reclamation Claims. .............................................................................121
SECTION 6.12    Insolvency Proceeding Claims. .............................................................122
SECTION 6.13    Bankruptcy Actions. .............................................................................122
SECTION 6.14    Liquidity. ...............................................................................................122
SECTION 6.15    Budget Covenant. ..................................................................................122

ARTICLE VII Events of Default ......................................................................................... 123

SECTION 7.01    Events of Default. ..................................................................................123
SECTION 7.02    Remedies on Default. ............................................................................129
SECTION 7.03    Application of Proceeds. .......................................................................132

ARTICLE VIII The Agents .................................................................................................. 132

SECTION 8.01    Appointment and Administration by Administrative Agent. .................132
SECTION 8.02    Appointment of Collateral Agent. .........................................................133
SECTION 8.03    Sharing of Excess Payments. ................................................................133
SECTION 8.04    Agreement of Applicable Lenders. ........................................................134
SECTION 8.05    Liability of Agents. ...............................................................................134
SECTION 8.06    Notice of Default. ..................................................................................135
SECTION 8.07    Credit Decisions. ...................................................................................135
SECTION 8.08    Reimbursement and Indemnification. ...................................................136
SECTION 8.09    Rights of Agents. ...................................................................................136
SECTION 8.10    Notice of Transfer. ................................................................................137
SECTION 8.11    Successor Agents. ..................................................................................137
SECTION 8.12    Relation Among the Lenders. ................................................................137
SECTION 8.13    Reports and Financial Statements. ........................................................137
SECTION 8.14    Agency for Perfection. ..........................................................................138
SECTION 8.15    Reserved. ...............................................................................................139
SECTION 8.16    Collateral Matters. .................................................................................139

ARTICLE IX Miscellaneous ...................................................................................... 139

SECTION 9.01    Notices .................................................................................139
SECTION 9.02    Waivers; Amendments ..........................................................140
SECTION 9.03    Expenses; Indemnity; Damage Waiver. ...................................143
SECTION 9.04    Successors and Assigns. .........................................................146
SECTION 9.05    Survival. ...............................................................................150
SECTION 9.06    Counterparts; Integration; Effectiveness. ...............................150
SECTION 9.07    Severability. ..........................................................................151
SECTION 9.08    Right of Set-off. .....................................................................151
SECTION 9.09    Governing Law; Jurisdiction; Consent to Service of Process. .....151
SECTION 9.10    WAIVER OF JURY TRIAL. ...................................................152
SECTION 9.11    Press Releases and Related Matters. .......................................152
SECTION 9.12    Headings. ..............................................................................153
SECTION 9.13    Interest Rate Limitation. ........................................................153
SECTION 9.14    Additional Waivers. ...............................................................153
SECTION 9.15    Confidentiality. .....................................................................155
SECTION 9.16    Patriot Act. ...........................................................................156
SECTION 9.17    Foreign Asset Control Regulations. .........................................156
SECTION 9.18    Order; Intercreditor Arrangement. .........................................157
SECTION 9.19    Joint and Several Obligations .................................................157
SECTION 9.20    Keepwell. ..............................................................................157
SECTION 9.21    Acknowledgment and Consent to Bail-In of EEA Financial
                Institutions. ...........................................................................157
SECTION 9.22    Acknowledgement Regarding Any Supported QFCs. ................158

## EXHIBITS

| | |
|---|---|
| Exhibit A: | Form of Assignment and Acceptance |
| Exhibit B: | Form of LIBO Rate Loan Notice |
| Exhibit C: | Form of Revolving Credit Note |
| Exhibit D: | Form of Interim Order |
| Exhibit E: | Form of Facility Guarantee |
| Exhibit F: | Form of Credit Card Notification |
| Exhibit G: | Form of Compliance Certificate |
| Exhibit H: | Form of Borrowing Base Certificate |
| Exhibit I: | Form of Initial Budget |
| Exhibits K-1 – K-4: | Tax Compliance Certificates |

# **SCHEDULES**

Schedule 1.1:            Lenders and Commitments
Schedule 2.13:           Existing Letters of Credit
Schedule 2.18(a):        Credit Card Arrangements
Schedule 2.18(b):        Blocked Accounts
Schedule 3.01:           Organization Information
Schedule 3.05(b):        Intellectual Property
Schedule 3.05(c)(i):     Owned Real Property
Schedule 3.05(c)(ii):    Leased Real Property
Schedule 3.06(a):        Disclosed Matters
Schedule 3.12:           Subsidiaries; Joint Ventures
Schedule 3.14:           Collective Bargaining Agreements
Schedule 5.01(i):        Reporting Requirements
Schedule 5.19:           Milestones
Schedule 6.01:           Existing Indebtedness
Schedule 6.02:           Existing Encumbrances
Schedule 6.04:           Permitted Investments
Schedule 6.05:           Permitted Dispositions
Schedule 6.07:           Affiliate Transactions

**SENIOR SECURED, SUPER-PRIORITY PRIMING DEBTOR-IN-POSSESSION CREDIT AGREEMENT** dated as of November 24, 2020, among:

**GUITAR CENTER, INC.**, a corporation organized under the laws of the State of Delaware (the "<u>Lead Borrower</u>"), for itself and in conjunction with its capacity as Lead Borrower as agent for the Borrowers; and

The **BORROWERS AND THE FACILITY GUARANTORS** from time to time party hereto; and

**WELLS FARGO BANK, NATIONAL ASSOCIATION**, a national banking association, having a place of business at One Boston Place, 19th Floor, Boston, MA, as administrative agent (in such capacity, the "<u>Administrative Agent</u>"), and as collateral agent (in such capacity, the "<u>Collateral Agent</u>"), for its own benefit and the benefit of the other Secured Parties; and

The **LENDERS** party hereto.

W I T N E S E T H :

**WHEREAS**, on November 21, 2020 (the "<u>Petition Date</u>"), (i) the Lead Borrower, (ii) Guitar Center Stores, Inc., a Delaware corporation, (iii) Guitar Center Holdings, Inc., a Delaware corporation, (iv) AVDG, LLC, a Delaware limited liability company, (v) GC Business Solutions, Inc., a Delaware corporation, (vi) GTRC Services, Inc., a Delaware corporation, (vii) Guitar Center Gift Card Company, LLC, a Virginia limited liability company, and (viii) Music & Arts Instructor Services, LLC, a Maryland limited liability company ((i) through (viii) collectively, the "<u>Debtors</u>" and each individually, a "<u>Debtor</u>"), commenced Chapter 11 Case No. 20-34655 (the "<u>Chapter 11 Cases</u>") with the United States Bankruptcy Court for the Eastern District of Virginia (the "<u>Court</u>").

**WHEREAS**, prior to the Petition Date, the Lenders, among other Lenders party thereto, provided financing to the Borrowers pursuant to that certain Credit Agreement, dated as of April 2, 2014, by and among the Lead Borrower, the other Borrowers party thereto, the Facility Guarantors party thereto, Wells Fargo Bank, National Association, as Pre-Petition Agent, the Pre-Petition Lenders, and the other parties thereto (as amended, restated, modified, waived or supplemented through the date hereof, the "<u>Pre-Petition Credit Agreement</u>").

**WHEREAS**, as of the close of business on November 20, 2020, the Pre-Petition Lenders under the Pre-Petition Credit Agreement were owed: (i) $279,000,000 in outstanding principal with respect to Revolving Credit Loans (as such term is defined in the Pre-Petition Credit Agreement), and (ii) $7,550,000 in maximum aggregate amounts available to be drawn under outstanding Letters of Credit (as such term is defined in the Pre-Petition Credit Agreement), plus interest, fees, costs and expenses and all other Pre-Petition Obligations under the Pre-Petition Credit Agreement.

1

**WHEREAS**, the Obligations, under and as defined in the Pre-Petition Credit Agreement, are secured by a security interest in substantially all of the existing and after-acquired personal property assets of the Borrowers and the Facility Guarantors as more fully set forth in the Pre-Petition Loan Documents and such security interest is perfected and, with certain exceptions, as described in the Pre-Petition Loan Documents, has priority over other security interests.

**WHEREAS**, the Borrowers have requested, and, upon the terms and conditions set forth in this Agreement, the Lenders have agreed to make available to the Borrowers, a senior secured, super-priority revolving loan credit facility of up to $50,000,000 in the aggregate to fund the working capital requirements of the Debtors during the pendency of the Chapter 11 Cases.

**WHEREAS**, each Borrower and each Facility Guarantor have agreed to secure all of their Obligations under the Loan Documents by granting to the Collateral Agent, for the benefit of the Agents and the other Credit Parties, a security interest in and lien upon substantially all of their existing and after-acquired personal property (subject to the limitations contained in the Loan Documents and the Orders).

**WHEREAS**, each Borrowers' and each Facility Guarantors' business is a mutual and collective enterprise and the Borrowers and the Facility Guarantors believe that the loans and other financial accommodations to the Borrowers under this Agreement will enhance the aggregate borrowing powers of the Borrowers and facilitate the administration of the Chapter 11 Cases and their loan relationship with the Agents and the Lenders, all to the mutual advantage of the Borrowers and Facility Guarantors.

**WHEREAS**, each Borrower and each Facility Guarantor acknowledges that it will receive substantial direct and indirect benefits by reason of the making of loans and other financial accommodations to the Borrowers as provided in the Agreement.

**WHEREAS**, the Agent's and the Lenders' willingness to extend financial accommodations to the Borrowers as more fully set forth in this Agreement and the other Loan Documents, is done solely as an accommodation to the Borrowers and the Facility Guarantors and at the Borrowers' and the Facility Guarantors' request and in furtherance of the Borrowers' and the Facility Guarantors' mutual and collective enterprise.

**NOW, THEREFORE**, in consideration of the mutual conditions and agreements set forth in this Agreement, and for good and valuable consideration, the receipt of which is hereby acknowledged (these recitals being an integral part of this Agreement), the parties hereto hereby agree as follows:

ARTICLE I

SECTION 1.01 <u>Definitions</u>.

As used in this Agreement, the following terms have the meanings specified below:

"<u>ACH</u>" means automated clearing house transfers.

2

"<u>Accommodation Payment</u>" has the meaning provided in SECTION 9.14.

"<u>Account(s)</u>" means "accounts" as defined in the UCC, and also means a right to payment of a monetary obligation, whether or not earned by performance, (a) for property that has been or is to be sold, leased, licensed, assigned, or otherwise disposed of or (b) for services rendered or to be rendered.  The term "Account" does not include (a) rights to payment evidenced by chattel paper or an instrument, (b) commercial tort claims, (c) deposit accounts, (d) investment property, or (e) letter-of-credit rights or letters of credit.

"<u>Account Debtor</u>" means any Person obligated on an Account.

"<u>Account Party</u>" has the meaning specified in SECTION 2.13(h).

"<u>Acquisition</u>" means, with respect to a specified Person, (a) an Investment in or a purchase of a 50% or greater interest in the Capital Stock of any other Person, (b) a purchase or acquisition of all or substantially all of the assets of any other Person, (c) a purchase or acquisition of a Real Estate portfolio or Stores from any other Person, or (d) any merger or consolidation of such Person with any other Person or other transaction or series of transactions resulting in the acquisition of all or substantially all of the assets, or a 50% or greater interest in the Capital Stock of, any Person, in each case in any transaction or group of transactions which are part of a common plan.

"<u>Adequate Protection Liens</u>" has the meaning assigned to the term "Adequate Protection Liens" in the Interim Order (or the Final Order, when applicable).

"<u>Adequate Protection Superpriority Claims</u>" has the meaning assigned to the term "Adequate Protection Superpriority Claims" in the Interim Order (or the Final Order, when applicable).

"<u>Administrative Agent</u>" has the meaning provided in the preamble to this Agreement.

"<u>Affiliate</u>" means, with respect to a specified Person, any other Person that directly or indirectly through one or more intermediaries Controls, is Controlled by or is under common Control with the Person specified.

"<u>Agents</u>" means collectively, the Administrative Agent and the Collateral Agent.

"<u>Agreement</u>" means this Credit Agreement, as modified, amended, supplemented or restated, and in effect from time to time.

"<u>Anti-Corruption Laws</u>" means the FCPA, the U.K. Bribery Act of 2010, as amended, and all other applicable laws and regulations or ordinances concerning or relating to bribery, money laundering or corruption in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates is located or is doing business.

"<u>Anti-Money Laundering Laws</u>" means the applicable laws or regulations in any jurisdiction in which any Loan Party or any of its Subsidiaries or Affiliates is located or is doing

3

business that relates to money laundering, any predicate crime to money laundering, or any financial record keeping and reporting requirements related thereto.

"Applicable Law" means as to any Person: (a) all laws, statutes, rules, regulations, orders, codes, ordinances, treaties or other requirements having the force of law; and (b) all court orders, decrees, judgments, injunctions, enforceable notices, binding agreements and/or rulings, in each case of or by any Governmental Authority which has jurisdiction over such Person, or any property of such Person.

"Applicable Lenders" means the Required Lenders or all Lenders, as applicable.

"Applicable Margin" means (a) in the case of LIBO Loans, 2.75% per annum and (b) in the case of Base Rate Loans, 1.75% per annum.

"Appraised Inventory Advance Rate" means 90%.

"Approved Budget" means the Initial Budget until updated in accordance with Section 5.01(j).

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that advises, administers or manages a Lender.

"Assignment and Acceptance" means an assignment and acceptance entered into by a Lender and an assignee (with the consent of any party whose consent is required by SECTION 9.04), and accepted by the Administrative Agent, in substantially the form of Exhibit A, or any other form approved by the Administrative Agent.

"Automatic Stay" means the automatic stay provided under Section 362 of the Bankruptcy Code.

"Availability Reserves" means, (A) reserves in respect of the Carve-Out, (B) the Lease Reserve, and (C) without duplication of any other Reserves or items that are otherwise addressed or excluded through eligibility criteria, such reserves as the Administrative Agent, from time to time determines in its reasonable commercial discretion exercised in good faith as being appropriate (a) to reflect any impediments to the realization upon the Collateral included in the Borrowing Base (including, without limitation, claims that the Administrative Agent determines will need to be satisfied in connection with the realization upon such Collateral), and (b) to reflect any restrictions under the DIP Term Loan Documents, the Pre-Petition Senior Secured Notes Documents or the Pre-Petition Senior Unsecured Notes Documents on the incurrence of Indebtedness by the Loan Parties, but only to the extent that such restrictions reduce, or with the passage of time could reduce, the amounts available to be borrowed hereunder (including, without limitation as a result of the Loan Parties' receipt of net proceeds from asset sales) in order for the Loan Parties to comply with such restrictions.  Availability Reserves shall at any time include, without limitation,

4

(i) a layaway deposits reserve in an amount equal to fifty percent (50%) of the customer deposits made for layaway or other goods;

(ii) a landlord lien reserve equal to two (2) months' rent for all of the Loan Parties' (excluding Holdings') leased locations in each Landlord Lien State on which Inventory included in the Borrowing Base is located with an aggregate Cost in excess of $700,000, other than leased locations with respect to which the Agents have received a landlord's waiver or subordination of lien in form and substance reasonably satisfactory to the Agents;

(iii) without duplication, a reserve for Customer Credit Liabilities in an amount equal to fifty percent (50%) of credits due to customers;

(iv) Cash Management Reserves; and

(v) Bank Product Reserves.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Bank Products" means any services or facilities provided to any Loan Party by any Agent, any Lender or any of their respective Affiliates (but excluding Cash Management Services) including, without limitation, on account of (a) Swap Contracts, (b) merchant services constituting a line of credit, (c) leasing, (d) Factored Receivables, and (e) supply chain finance services including, without limitation, trade payable services and supplier accounts receivable purchases.

"Bank Product Reserves" means such reserves as the Administrative Agent from time to time determines in its reasonable commercial discretion exercised in good faith as being appropriate to reflect the reasonably anticipated liabilities and obligations of the Loan Parties with respect to Bank Products then provided or outstanding.

"Bankruptcy Code" means Title 11, U.S.C.

"Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Chapter 11 Cases.

"Base Rate" means, for any day, a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate *plus* ½%, (b) the LIBO Rate (which rate shall be calculated based upon an Interest Period of one month and shall be determined on a daily basis), *plus* one percentage point, and (c) the rate of interest announced, from time to time, within Wells Fargo at its principal office in San Francisco as its "prime rate", with the understanding that the "prime rate" is one of Wells Fargo's base rates (not necessarily the lowest of such rates) and serves as the

5

basis upon which effective rates of interest are calculated for those loans making reference thereto and is evidenced by the recording thereof after its announcement in such internal publications as Wells Fargo may designate. In no event shall the Base Rate be less than 1.50%.

"Base Rate Loan" means a Revolving Credit Loan that bears interest based on the Base Rate.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"BHC Act Affiliate" of a party means an "affiliate" (as such term is defined under, and interpreted in accordance with, 12 U.S.C. 1841(k)) of such party.

"Blocked Account" means each deposit account maintained by a Loan Party (excluding any Disbursement Account) (a) in which funds of any of the Loan Parties from one or more DDAs are concentrated or (b) that is a DDA (excluding any DDA which is swept daily to another deposit account that is subject to a Blocked Account Agreement).

"Blocked Account Agreement" has the meaning provided in SECTION 2.18(b).

"Blocked Account Bank" means each bank with whom a Blocked Account is maintained and with whom a Blocked Account Agreement has been, or is required to be, executed in accordance with the terms hereof.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrowers" means, collectively, the Lead Borrower and the Borrowers identified on the signature pages hereto.

"Borrowing" means the incurrence of Revolving Credit Loans of a single Type, on a single date and having, in the case of LIBO Loans, a single Interest Period.

"Borrowing Base" means, at any time of calculation, an amount equal to:

(a)     the face amount of Eligible Third Party Credit Card Receivables of the Loan Parties, net of Credit Card Receivables Reserves, multiplied by the Credit Card Advance Rate;

plus

(b)     the face amount of Eligible Trade Receivables of the Loan Parties, net of Trade Receivables Reserves, multiplied by the Eligible Trade Receivables Advance Rate;

6

plus

(c)      the lesser of (i) the Cost of Eligible Inventory of the Loan Parties, net of Inventory Reserves, <u>multiplied</u> by the Inventory Advance Rate and (ii) the Cost of Eligible Inventory of the Loan Parties, net of Inventory Reserves, <u>multiplied</u> by the result of the Appraised Inventory Advance Rate <u>multiplied</u> by the Net Appraised Recovery Value of Eligible Inventory of the Loan Parties;

minus

(d)      the then amount of all Availability Reserves.

"<u>Borrowing Base Certificate</u>" has the meaning provided in SECTION 5.01(f).

"<u>Borrowing Request</u>" means a request by the Lead Borrower on behalf of any of the Borrowers for a Borrowing in accordance with SECTION 2.04.

"<u>Breakage Costs</u>" has the meaning provided in SECTION 2.16(b).

"<u>Business Day</u>" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to remain closed; <u>provided</u>, <u>however</u>, that when used in connection with a LIBO Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"<u>Capital Lease Obligations</u>" means, with respect to any Person for any period, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP; for purposes of this Agreement, the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP (except for temporary treatment of construction related expenditures under EITF 97-10, "The Effects of Lessee Involvement in Asset Construction" which will ultimately be treated as operating leases upon a sale-leaseback transaction); <u>provided</u>, <u>however</u>, that, for the avoidance of doubt, any obligations relating to a lease that was accounted for by such Person as an operating lease as of the Closing Date and any similar lease entered into after the Closing Date by such Person shall be accounted for as an operating lease and not a Capital Lease Obligation.

"<u>Capital Stock</u>" means, as to any Person that is a corporation, the authorized shares of such Person's capital stock, including all classes of common, preferred, voting and nonvoting capital stock, and, as to any Person that is not a corporation or an individual, the membership or other ownership interests in such Person, including, without limitation, the right to share in profits and losses, the right to receive distributions of cash and other property, and the right to receive allocations of items of income, gain, loss, deduction and credit and similar items from such Person, whether or not such interests include voting or similar rights entitling the holder thereof to exercise Control over such Person, collectively with, in any such case, all warrants,

7

options and other rights to purchase or otherwise acquire, and all other instruments convertible into or exchangeable for, any of the foregoing.

"Carve-Out" has the meaning assigned to the term "Carve Out" in the Interim Order (or the Final Order, when applicable).

"Cash Collateral Account" means an interest bearing account established by the Loan Parties with the Collateral Agent, for its own benefit and the benefit of the other Secured Parties, under the sole and exclusive dominion and control of the Collateral Agent, in the name of the Collateral Agent or as the Collateral Agent shall otherwise direct, in which deposits are required to be made in accordance herewith.

"Cash Collateralize" has the meaning specified in SECTION 2.13(k). Derivatives of such term have corresponding meanings.

"Cash Dominion Event" means either (a) the occurrence and continuance of any Event of Default, or (b) the failure of the Loan Parties to maintain Excess Availability of at least $10,000,000 for three (3) consecutive Business Days. For purposes of this Agreement, the occurrence of a Cash Dominion Event shall be deemed continuing (unless the Administrative Agent otherwise agrees in its reasonable discretion or the Administrative Agent, in its reasonable judgment, has determined that circumstances surrounding such Event of Default cease to exist) (a) so long as such Event of Default is continuing and has not been cured or waived, and/or (b) if the Cash Dominion Event arises under clause (b) above, until Excess Availability is equal to or greater than $10,000,000 for thirty (30) consecutive days, in which case a Cash Dominion Event shall no longer be deemed to be continuing for purposes of this Agreement.

"Cash Management Order" means the order of the Court entered in the Chapter 11 Cases after the "first day" hearing, together with all extensions, modifications and amendments thereto, in form and substance reasonably satisfactory to the Administrative Agent, which among other matters authorizes the Debtors to maintain their existing cash management and treasury arrangements (as set forth in the Pre-Petition Credit Agreement) or such other arrangements as shall be reasonably acceptable to the Administrative Agent in all material respects.

"Cash Management Reserves" means such reserves as the Administrative Agent from time to time determines in its reasonable commercial discretion exercised in good faith as being appropriate to reflect the reasonably anticipated liabilities and obligations of the Loan Parties and their Subsidiaries with respect to Cash Management Services then provided or outstanding.

"Cash Management Services" means any cash management services or facilities provided to any Loan Party by any Agent or any Lender or any of their respective Affiliates, including, without limitation: (a) ACH transactions, (b) controlled disbursement services, treasury, depository, overdraft, and electronic funds transfer services, (c) credit or debit cards, (d) credit card processing services, and (e) purchase cards.

"Cash Receipts" has the meaning provided in SECTION 2.18(c).

8

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. § 9601 et seq.

"Change in Control" means, at any time:

(a)    any "change in/of control" or similar event as defined in any of the DIP Term Loan Documents, the Pre-Petition Senior Secured Notes Documents or the Pre-Petition Senior Unsecured Notes Documents; or

(b)    a change in the Control of Holdings such that the Loan Parties are not Controlled by any one or more of the Sponsor Group; or

(c)    Holdings fails at any time to own, directly or indirectly (i) 100% of the voting Capital Stock of the Lead Borrower or (ii) 100% of the Capital Stock of each of its other Subsidiaries (other than Subsidiaries that are directly or indirectly owned by the Lead Borrower), in each case, free and clear of all Liens (other than those Liens specified in clauses (a), (e), (i), (l) and (r) of the definition of Permitted Encumbrances), except, in the case of clause (ii), where such failure is as a result of a transaction permitted by the Loan Documents.

"Change in Law" means (a) the adoption of any Applicable Law after the Closing Date, (b) any change in any Applicable Law or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (c) compliance by any Credit Party (or, for purposes of SECTION 2.14, by any lending office of such Credit Party or by such Credit Party's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date applicable to the Loan Parties; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Chapter 11 Cases" has the meaning specified in the Recitals.

"Charges" has the meaning provided in SECTION 9.13.

"Charter Document" means as to any Person, its partnership agreement, certificate of incorporation, certificate of formation, operating agreement, membership agreement or similar constitutive document or agreement or its by-laws.

"Closing Date" means the first date all the conditions precedent in SECTION 4.01 were satisfied or waived in accordance with SECTION 9.02.

9

"Code" means the Internal Revenue Code of 1986, as amended, and the Treasury regulations promulgated thereunder.

"Collateral" means any and all "Collateral", "Pledged Collateral" or words of similar intent as defined in any applicable Security Document, and the "DIP Collateral" as referred to in the Orders, it being understood that "Collateral" shall (x) include all such "DIP Collateral" irrespective of whether any such property was excluded pursuant to the Pre-Petition Loan Documents, and (y) exclude any "Excluded Assets" (as defined in any applicable Security Document).

"Collateral Agent" has the meaning provided in the preamble to this Agreement.

"Commercial Letter of Credit" means any Letter of Credit issued for the purpose of providing the primary payment mechanism in connection with the purchase of any materials, goods or services by a Borrower in the ordinary course of business of such Borrower.

"Commercial Letter of Credit Agreement" means the Commercial Letter of Credit Agreement relating to the issuance of a Commercial Letter of Credit in the form from time to time in use by the Issuing Bank.

"Commitments" means, with respect to each Lender, the aggregate commitments of such Lender hereunder to make Credit Extensions (including Loans) to the Borrowers in the amount set forth opposite its name on Schedule 1.1 hereto or as may subsequently be set forth in the Register from time to time, as the same may be reduced from time to time pursuant to SECTION 2.15 of this Agreement.

"Commitment Percentage" means, with respect to each Lender, that percentage of the Commitments of all Lenders hereunder to make Credit Extensions to the Loan Parties, in the amount set forth opposite such Lender's name on Schedule 1.1 hereto or as may subsequently be set forth in the Register from time to time, as the same may be reduced from time to time pursuant to SECTION 2.15 of this Agreement.

"Committee" means an official committee of unsecured creditors appointed in any of the Chapter 11 Cases by the U.S. Trustee.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Compliance Certificate" has the meaning provided in SECTION 5.01(d).

"Concentration Account" has the meaning provided in SECTION 2.18(c).

"Consolidated" means, when used to modify a financial term, test, statement, or report of a Person, the application or preparation of such term, test, statement or report (as applicable) based upon the consolidation, in accordance with GAAP, of the financial condition or operating results of such Person and its Subsidiaries.

10

"<u>Control</u>" means the possession, directly or indirectly, of the power (a) to vote 50% or more of the securities having ordinary voting power for the election of directors (or any similar governing body) of a Person, or (b) to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power or by contract.  The terms "<u>Controlling</u>" and "<u>Controlled</u>" have meanings correlative thereto.

"<u>Cost</u>" means the cost of purchases, as reported on the applicable Loan Party's financial stock ledger based upon the Loan Parties' accounting practices in effect on the Closing Date or thereafter consented to by the Administrative Agent, whose consent will not be unreasonably withheld.  "Cost" does not include inventory capitalization costs or other non-purchase price charges (except for freight charges with respect to all Inventory to the extent treated consistently with the Loan Parties' accounting practices in effect on the Closing Date) used in the applicable Loan Party's calculation of cost of goods sold.

"<u>Court</u>" has the meaning specified in the Recitals.

"<u>Covered Entity</u>" means any of the following:

(i)      a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b);

(ii)     a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or

(iii)    a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b).

"<u>Covered Party</u>" has the meaning assigned to it in SECTION 9.22.

"<u>COVID-19 Pandemic</u>" means the COVID-19 pandemic and the economic, financial, business, operational and healthcare effects thereof and the response of governmental and healthcare authorities with respect thereto.

"<u>Credit Card Advance Rate</u>" means 90%.

"<u>Credit Card Issuer</u>" means any person (other than a Borrower or other Loan Party) who issues or whose members issue credit cards, including, without limitation, MasterCard or VISA bank credit cards or other bank credit cards issued through MasterCard International, Inc., Visa, U.S.A., Inc. or Visa International and American Express, Discover, Diners Club, PayPal, Bill Me Later and other non-bank credit cards, including, without limitation, credit cards issued by or through American Express Travel Related Services Company, Inc.,  and Novus Services, Inc. and other issuers approved by the Administrative Agent.

"<u>Credit Card Processor</u>" means any servicing or processing agent or any factor or financial intermediary who facilitates, services, processes or manages the credit authorization, billing transfer and/or payment procedures with respect to any Loan Party's sales transactions

11

involving credit card or debit card purchases by customers using credit cards or debit cards issued by any Credit Card Issuer.

"Credit Card Notifications" has the meaning provided in SECTION 2.18(b).

"Credit Card Receivables" means each "payment intangible" (as defined in the UCC) together with all income, payments and proceeds thereof, owed by a Credit Card Issuer or Credit Card Processor to a Loan Party resulting from charges by a customer of a Loan Party on credit or debit cards issued by such Credit Card Issuer in connection with the sale of goods by a Loan Party, or services performed by a Loan Party, in each case in the ordinary course of its business.

"Credit Card Receivables Reserves" means such reserves as may be established from time to time by the Administrative Agent, in its reasonable commercial discretion exercised in good faith and consistent with past practice, with respect to Dilution of Accounts related to Eligible Third Party Credit Card Receivables to the extent that such Dilution exceeds 5% of the gross sales of the Loan Parties for the then most recently completed period of twelve (12) consecutive months.

"Credit Extensions" as of any day, shall be equal to the sum of (a) the principal balance of all Revolving Credit Loans then outstanding, (b) the then Outstanding Amount of the Letters of Credit, and (c) the Purchase Card Reserve.

"Credit Party" means (a) the Lenders, (b) the Agents and their respective Affiliates and branches, (c) each Issuing Bank, and (d) the successors and permitted assigns of each of the foregoing.

"Credit Party Expenses" means, without limitation, all of the following to the extent incurred in connection with this Agreement and the other Loan Documents: (a) all reasonable documented out-of-pocket expenses incurred by the Agents, including the reasonable documented fees, charges and disbursements of one counsel for the Agents (plus one local counsel in any other jurisdiction to the extent reasonably necessary), MIII Partners as the Agents' financial advisor, outside consultants for the Agents consisting of one inventory appraisal firm, one real estate appraisal firm and one commercial finance examination firm with regard to asset classes included in the Borrowing Base (including the allocated expenses of field examinations conducted by the Agents and their Affiliates, to the extent such field examinations are substituting for the work of outside consultants), in connection with the preparation and administration of the Loan Documents, the Orders, or any amendments, modifications or waivers requested by a Loan Party of the provisions hereof or thereof (whether or not any such amendments, modifications or waivers shall be consummated), and any refinancing of the Obligations hereunder requested by the Borrowers, including any "exit financing" requested by the Loan Parties in connection with the Chapter 11 Cases (whether or not the transactions contemplated hereby or thereby shall be consummated), (b) all reasonable documented out-of-pocket expenses incurred by any Issuing Bank in connection with the issuance, amendment, renewal or extension of any Letter of Credit or any demand for payment thereunder, (c) all reasonable documented out-of-pocket expenses incurred by the Agents or, subject to the proviso below, any Lender and their respective Affiliates and branches, including the reasonable

12

documented fees, charges and disbursements of one counsel for the Agents, the Lenders and their respective Affiliates (plus one local counsel in any other jurisdiction to the extent reasonably necessary), MIII Partners as the Agents' financial advisor, and outside consultants for the Agents (including, without limitation, one inventory appraisal firm, one real estate appraisal firm and one commercial finance examination firm with regards to asset types included in the Borrowing Base), in connection with the enforcement and protection of their rights in connection with the Loan Documents, including all such reasonable documented out-of-pocket expenses incurred during any workout, restructuring or related negotiations in respect of such Revolving Credit Loans or Letters of Credit; provided that the Agents, the Lenders and their Affiliates shall be entitled to reimbursement for no more than one counsel representing all such Lenders (plus one local counsel in any other jurisdiction to the extent reasonably necessary); and provided further that in the case of an actual conflict of interest the Agents, the Lenders and their respective Affiliates may engage and shall be reimbursed for additional counsel (plus additional local counsel in any other jurisdiction to the extent reasonably necessary).  Except as expressly provided above, Credit Party Expenses shall not include the allocation of any overhead expenses of any Credit Party.

"Customer Credit Liabilities" means, at any time, the liability recorded on the financial reports of Holdings and its Subsidiaries at such time of (a) outstanding gift certificates and gift cards entitling the holder thereof to use all or a portion of the certificate or gift card to pay all or a portion of the purchase price to any Loan Party for any Inventory and (b) outstanding merchandise credits and customer deposits of the Loan Parties.

"DDAs" means any checking or other demand deposit account maintained by a Loan Party.  All funds in such DDAs shall be conclusively presumed to be Collateral and proceeds of Collateral and the Agents and the Lenders shall have no duty to inquire as to the source of the amounts on deposit in the DDAs.

"Debtors" has the meaning specified in the Recitals.

"Default" means any event or condition described in SECTION 7.01 that constitutes an Event of Default or that upon notice, lapse of any cure period set forth in SECTION 7.01, or both, would, unless cured or waived, become an Event of Default.

"Default Rate" has the meaning provided in SECTION 2.12.

"Default Right" has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable.

"Defaulting Lender" means any Lender, as determined by the Administrative Agent and until such time as the Administrative Agent and the Lead Borrower determine that such Lender is no longer a Defaulting Lender, that (a) has failed to fund any amounts required to be funded by it under this Agreement within one (1) Business Day of the date that it is required to do so under this Agreement (including the failure to make available to the Administrative Agent amounts required pursuant to a settlement or to make a required payment in connection with a Letter of Credit Disbursement), (b) notified the Borrowers, the Administrative Agent, or any

13

Lender in writing that it does not intend to comply with all or any portion of its funding obligations under this Agreement, (c) has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or under other agreements generally (as reasonably determined by the Administrative Agent) under which it has committed to extend credit, (d) failed, within one (1) Business Day after written request by the Administrative Agent, to confirm that it will comply with the terms of this Agreement relating to its obligations to fund any amounts required to be funded by it under this Agreement, (e) otherwise failed to pay over to the Administrative Agent or any other Lender any other amount required to be paid by it under this Agreement within one (1) Business Day of the date that it is required to do so under this Agreement, or (f) (i) becomes or is insolvent or has a parent company that has become or is insolvent, (ii) becomes the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, or custodian or appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become the subject of a bankruptcy or insolvency proceeding, or has had a receiver, conservator, trustee, or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment, or (iii) becomes the subject of a Bail-in Action.

"<u>Defaulting Lender Rate</u>" means (a) for the first three (3) days from and after the date the relevant payment is due, the Base Rate, and (b) thereafter, the interest rate then applicable to Base Rate Loans (inclusive of the Applicable Margin applicable thereto).

"<u>Dilution</u>" means a reduction, in the value of Accounts caused by returns, allowances, discounts, credits, and/or any other offsets asserted by customers or granted by any Loan Party having the effect of reducing the collections of accounts.

"<u>DIP Term Loan Agent</u>" means Delaware Trust Company in its capacity as administrative agent under the DIP Term Loan Agreement.

"<u>DIP Term Loan Agreement</u>" means that certain Senior Secured Super Priority Priming Debtor-In-Possession Credit Agreement dated as of the date hereof, by and among Guitar Center, Inc., as the Borrower, the other borrowers party thereto from time to time, Delaware Trust Company, as administrative agent, and the banks and other financial institutions party thereto, as in effect on the Closing Date and as the same may be amended from time to time in accordance with the Intercreditor Arrangement.

"<u>DIP Term Loan Documents</u>" means the "Loan Documents" as defined in the DIP Term Loan Agreement.

"<u>DIP Term Loan Facility</u>" means the term loan facility provided by the DIP Term Loan Lenders under the DIP Term Loan Agreement in an aggregate principal amount not to exceed $325 million, which will be made available to the Borrowers on the Closing Date subject to the entry of the Interim Order.

"<u>DIP Term Loan Lenders</u>" means the lenders under the DIP Term Loan Agreement.

"<u>DIP Term Loan Obligations</u>" means the "Obligations" as defined in the DIP Term Loan Agreement.

"<u>Disbursement Accounts</u>" has the meaning provided in SECTION 2.18(f).

"<u>Disqualified Capital Stock</u>" means any Capital Stock which, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) is mandatorily redeemable in whole or in part prior to the Maturity Date, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for Indebtedness or any Capital Stock referred to in (a) above prior to the Maturity Date, or (c) contains any mandatory repurchase obligation which comes into effect prior to the Maturity Date, <u>provided that</u> any Capital Stock that would not constitute Disqualified Capital Stock but for provisions thereof giving holders thereof (or the holders of any security into or for which such Capital Stock is convertible, exchangeable or exercisable) the right to require the issuer thereof to redeem such Capital Stock upon the occurrence of a Change in Control shall not constitute Disqualified Capital Stock.

"<u>Disqualified Institution</u>" means (a) any bank, financial institution or other Person or any competitor of the Lead Borrower and its Subsidiaries, in each case as identified in writing by the Lead Borrower to the Administrative Agent prior to the Closing Date, and (b) any Excluded Institution.

"<u>Documents</u>" has the meaning assigned to such term in the Security Agreement.

"<u>dollars</u>" or "<u>$</u>" refers to lawful money of the United States of America.

"<u>Drawing Document</u>" means any Letter of Credit or other document presented for purposes of drawing under any Letter of Credit, including by electronic transmission such as SWIFT, electronic mail, facsimile or computer generated communication.

"<u>EEA Financial Institution</u>" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"<u>EEA Member Country</u>" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"<u>EEA Resolution Authority</u>" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

15

"Eligible Assignee" means a commercial bank, insurance company, or company engaged in the business of making commercial loans or a commercial finance company, which Person, together with its Affiliates, has a combined capital and surplus in excess of $1,000,000,000, or any Affiliate of any Credit Party under common control with such Credit Party, or an Approved Fund, or a Related Fund of any Credit Party (any two or more Related Funds being treated as a single Eligible Assignee for all purposes hereof), provided that in any event, "Eligible Assignee" shall not include (x) any natural person, or (y) the Sponsor Group or any of their respective Affiliates (other than any fund that makes debt investments in the ordinary course of business and is managed or administered by Sankaty Advisors LLC or any of its Subsidiaries).

"Eligible Inventory" means, as of any date of determination, without duplication, items of Inventory of a Loan Party that are finished goods, merchantable and readily saleable to the public in the ordinary course that are not excluded as ineligible by virtue of the one or more of the criteria set forth below.  None of the following shall be deemed to be Eligible Inventory:

(a)    Inventory that is not solely owned by a Loan Party, or is leased by or is on consignment to a Loan Party, or the Loan Parties do not have title thereto;

(b)    Inventory that is not located in the United States of America;

(c)    Except as otherwise agreed by the Administrative Agent, Inventory that represents goods which (i) are damaged, defective, "seconds," or otherwise unmerchantable, (ii) are to be returned to the vendor and not able to be sold or (iii) are obsolete, custom items, work in process, raw materials, or that constitute spare parts, shipping materials or supplies used or consumed in a Borrower's business;

(d)    Except as otherwise agreed by the Agents, Inventory that represents goods that do not conform in all material respects to the representations and warranties contained in this Agreement or any of the Security Documents;

(e)    Inventory that is not subject to a perfected first priority security interest in favor of the Collateral Agent for its own benefit and the benefit of the other Secured Parties (subject only to Permitted Encumbrances having priority by operation of Applicable Law);

(f)    Inventory which consists of samples, labels, bags, packaging materials, displays or display items and other similar non-merchandise categories;

(g)    Inventory as to which casualty insurance in compliance with the provisions of SECTION 5.07 hereof is not in effect;

(h)    Inventory which has been sold but not yet delivered or Inventory to the extent that any Loan Party has accepted a deposit therefor;

(i)    [reserved];

(j)    Inventory on loan to a third party;

16

(k)      Inventory located at locations owned or leased by Affiliates (other than any Loan Party); and

(l)      Inventory that is considered rental inventory, which is either (i) in physical possession of customers under customer rental agreements or (ii) otherwise located at a third party location.

"Eligible Third Party Credit Card Receivables" means, as of any date of determination, Credit Card Receivables due to a Loan Party from a Credit Card Issuer or Credit Card Processor, net of fees and expenses payable to such Credit Card Issuer or Credit Card Processor in the ordinary course and cash payments made in respect of any such Credit Card Receivables but not yet applied thereto, as arise in the ordinary course of business and which have been earned by performance and that are not excluded as ineligible by virtue of one or more of the criteria set forth below.  None of the following shall be deemed to be Eligible Third Party Credit Card Receivables:

(a)      Credit Card Receivables due from Credit Card Issuers or Credit Card Processors that have been past due for more than five (5) Business Days, or for such longer period(s) as may be approved by the Administrative Agent in its reasonable discretion;

(b)      Credit Card Receivables due from Credit Card Issuers or Credit Card Processors with respect to which a Loan Party does not have good, valid and marketable title thereto, free and clear of any Lien, other than (i) Liens granted to the Collateral Agent for its own benefit and the benefit of the other Secured Parties pursuant to the Security Documents, (ii) a Permitted Encumbrance which does not have priority over such Liens in favor of the Collateral Agent and (iii) those Liens specified in clauses (a) and (e) of the definition of Permitted Encumbrances and Permitted Encumbrances having priority by operation of Applicable Law over the Lien of the Collateral Agent (the foregoing not being intended to limit the discretion of the Administrative Agent to change, establish or eliminate any Reserves on account of any such Liens);

(c)      Credit Card Receivables due from Credit Card Issuers or Credit Card Processors that are not subject to a first priority (except as provided in clause (b)(iii), above) security interest in favor of the Collateral Agent for its own benefit and the benefit of the other Secured Parties;

(d)      Credit Card Receivables due from Credit Card Issuers or Credit Card Processors which are disputed, or with respect to which a claim, counterclaim, offset or chargeback (other than chargebacks in the ordinary course by the Credit Card Issuers or Credit Card Processors) has been asserted, by the related Credit Card Issuer or Credit Card Processor (but only to the extent of such dispute, counterclaim, offset or chargeback);

(e)      Except as otherwise approved by the Administrative Agent, Credit Card Receivables due from Credit Card Issuers or Credit Card Processors as to which the

17

Credit Card Issuer or Credit Card Processor has the right under certain circumstances to require a Loan Party to repurchase the Credit Card Receivables from such Credit Card Issuer or Credit Card Processor;

(f)     [reserved]; and

(g)     Credit Card Receivables due from Credit Card Issuers or Credit Card Processors (other than VISA, Mastercard, American Express, Diners Club, DiscoverCard, PayPal, Bill Me Later and private label credit cards) which the Administrative Agent determines in its commercial reasonable discretion acting in good faith to be unlikely to be collected.

"Eligible Trade Receivables" means, as of any date of determination, Accounts due to a Loan Party (other than from Credit Card Issuers and Credit Card Processors), net of any payments made in respect of any such Account but not yet applied thereto, as arise in the ordinary course of business and which have been earned by performance, that are not excluded as ineligible by virtue of one or more of the criteria set forth below.  Eligible Trade Receivables shall not include any:

(a)     Account which is subject to any Lien other than (i) a Lien granted to the Collateral Agent for its own benefit and the benefit of the other Secured Parties pursuant to the Security Documents, (ii) a Permitted Encumbrance which does not have priority over such Liens in favor of the Collateral Agent and (iii) those Liens specified in clauses (a) and (e) of the definition of Permitted Encumbrances and Permitted Encumbrances having priority by operation of Applicable Law over the Lien of the Collateral Agent (the foregoing not being intended to limit the discretion of the Administrative Agent to change, establish or eliminate any Reserves on account of any such Liens);

(b)     Account which is not subject to a first priority (except as provided in clause (a)(iii) above) perfected security interest in favor of the Administrative Agent;

(c)     Account which is unpaid more than 90 days after the date of the original invoice therefor or more than 60 days after the original due date, or which has been written off the books of the applicable Loan Party or otherwise designated as uncollectible;

(d)     Account which is owing by an Account Debtor for which more than 50% of the Accounts owing from such Account Debtor and its Affiliates are ineligible hereunder;

(e)     Account which is owing by an Account Debtor to the extent the aggregate amount of Accounts owing from such Account Debtor and its Affiliates to (i) a Loan Party exceeds 10% of the aggregate amount of Eligible Accounts of such Loan Party or (ii) all Loan Parties exceeds 15% of the aggregate amount of Eligible Accounts of all Loan Parties;

18

(f)      except as otherwise agreed by the Agents, Account that does not conform in all material respects to the representations and warranties contained in this Agreement or in the Security Documents;

(g)      Account which (i) does not arise from the sale of goods or performance of services in the ordinary course of business, (ii) is not evidenced by an invoice or other documentation satisfactory to the Administrative Agent which has been sent to the Account Debtor, (iii) represents a progress billing, (iv) is contingent upon the applicable Loan Party's completion of any further performance, (v) represents a sale on a bill-and-hold, guaranteed sale, sale-and-return, sale on approval, consignment, cash-on-delivery or any other repurchase or return basis or (vi) relates to payments of interest;

(h)      Account for which the goods giving rise to such Account have not been shipped to the Account Debtor or for which the services giving rise to such Account have not been performed by such applicable Loan Party or if such Account was invoiced more than once;

(i)      Account with respect to which any check or other instrument of payment has been returned uncollected for any reason;

(j)      Account which is owed by an Account Debtor which has (i) applied for, suffered, or consented to the appointment of any receiver, custodian, trustee, or liquidator of its assets, (ii) has had possession of all or a material part of its property taken by any receiver, custodian, trustee or liquidator, (iii) filed, or had filed against it, any request or petition for liquidation, reorganization, arrangement, adjustment of debts, adjudication as bankrupt, winding-up, or voluntary or involuntary case under any state or federal bankruptcy laws, (iv) has admitted in writing its inability, or is generally unable to, pay its debts as they become due, (v) become insolvent, or (vi) ceased operation of its business;

(k)      Account which is owed by any Account Debtor which has sold all or a substantially all of its assets;

(l)      Account which is owed by an Account Debtor which (i) does not maintain its chief executive office in the U.S. or (ii) is not organized under applicable law of the U.S. or any state of the U.S. unless, in either case, such Account is backed by a letter of credit acceptable to the Administrative Agent which is in the possession of, has been assigned to and is directly drawable by the Administrative Agent;

(m)      Account which is owed in any currency other than U.S. dollars;

(n)      Account which is owed by (i) the government (or any department, agency, public corporation, or instrumentality thereof) of any country other than the U.S. unless such Account is backed by a letter of credit reasonably acceptable to the Administrative Agent which is in the possession of the Administrative Agent, or (ii) the government of the U.S., or any department, agency, public corporation, or instrumentality thereof, unless

19

the Federal Assignment of Claims Act of 1940, as amended (31 U.S.C. § 3727 et seq. and 41 U.S.C. § 15 et seq.), and any other steps necessary to perfect the Lien of the Administrative Agent in such Account have been complied with to the Administrative Agent's satisfaction;

(o)     Account which is owed by any Affiliate, employee, officer, director, agent or stockholder of any Loan Party;

(p)     [reserved];

(q)     Account which is owed by an Account Debtor or any Affiliate of such Account Debtor to which any Loan Party is indebted, but only to the extent of such indebtedness or is subject to any security, deposit, progress payment, retainage or other similar advance made by or for the benefit of an Account Debtor, in each case to the extent thereof;

(r)     Account which is subject to any counterclaim, deduction, defense, setoff or dispute;

(s)     Account which is evidenced by any promissory note, chattel paper, or instrument;

(t)     Account which is owed by an Account Debtor located in any jurisdiction which requires filing of a "Notice of Business Activities Report" or other similar report in order to permit a Loan Party to seek judicial enforcement in such jurisdiction of payment of such Account, unless such Loan Party has filed such report or qualified to do business in such jurisdiction;

(u)     Account with respect to which a Loan Party has made any agreement with the Account Debtor for any reduction thereof, other than discounts and adjustments given in the ordinary course of business, or any Account which was partially paid and such Loan Party created a new receivable for the unpaid portion of such Account;

(v)     Account which does not comply in all material respects with the requirements of all applicable laws and regulations, whether Federal, state or local, including without limitation the Federal Consumer Credit Protection Act, the Federal Truth in Lending Act and Regulation Z of the Board;

(w)     Account which is for goods that have been sold under a purchase order or pursuant to the terms of a contract or other agreement or understanding (written or oral) that indicates or purports that any Person other than a Loan Party has or has had an ownership interest in such goods, or which indicates any party other than such Loan Party as payee or remittance party;

(x)     Account which was created on cash on delivery terms;

20

(y)     Account which the Administrative Agent determines may not be paid by reason of the Account Debtor's inability to pay;

(z)     Account with respect to which the Account Debtor is a Sanctioned Person or Sanctioned Entity; or

(aa)     any Eligible Third Party Credit Card Receivables.

"Eligible Trade Receivables Advance Rate" means 85%.

"Environmental Laws" means all Applicable Laws issued, promulgated or entered into by or with any Governmental Authority, relating in any way to the protection of human health from environmental hazards, to the protection of the environment, to the handling, treatment, storage, disposal of Hazardous Materials or to the assessment or remediation of any Release or threatened Release of any Hazardous Material to the environment.

"Environmental Liability" means any liability, contingent or otherwise (including, without limitation, any liability for damages, natural resource damage, costs of environmental remediation, administrative oversight costs, fines, penalties or indemnities), of any Loan Party or any Subsidiary directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with any Loan Party, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414(m) or Section 414(o) of the Code.

"ERISA Event" means: (a) any Reportable Event; (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), and, on and after the effectiveness of the Pension Act, any failure by any Plan to satisfy the minimum funding standards (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such Plan, whether or not waived; (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan, the failure to make by its due date a required installment under Section 412(m) of the Code with respect to any Plan or the failure to make any required contribution to a Multiemployer Plan; (d) the incurrence by any of the Loan Parties or any ERISA Affiliate of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) on and after the effectiveness of the Pension Act, a determination that any Plan is, or is expected to be, in "at risk" status (within the meaning of Title IV of

21

ERISA) ; (f) the receipt by any of the Loan Parties or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan under Section 4042 of ERISA; (g) the incurrence by any of the Loan Parties or any ERISA Affiliate of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (h) the receipt by any of the Loan Parties or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from any of the Loan Parties or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization or in endangered or critical status, within the meaning of Section 432 of the Code or Section 305 or Title IV of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Event of Default" has the meaning provided in SECTION 7.01.

"Excess Availability" means, at any time, the difference between (a) the Loan Cap minus (b) the outstanding Credit Extensions to or for the account of the Borrowers.

"Excluded Institution" means any institution engaged as a principal primarily in private equity or venture capital.

"Excluded Net Proceeds" means (a) with respect to any Net Proceeds received from a sale, transfer or disposition of any Revolver Priority Collateral or any event described in clause (b) of the definition of "Prepayment Event" with respect to any of the Revolver Priority Collateral only, if no Cash Dominion Event has occurred and is continuing or would arise therefrom, such amount of such Net Proceeds as is required to be paid to the holders of the DIP Term Loan Facility or the Pre-Petition Senior Secured Notes and (b) with respect to any Net Proceeds received from any other Prepayment Event, such amount of such Net Proceeds as is required to be paid to the holders of the DIP Term Loan Facility or the Pre-Petition Senior Secured Notes.

"Excluded Swap Obligation" means, with respect to any Facility Guarantor, any Swap Obligation if, and to the extent that, all or a portion of the Facility Guarantee of such Facility Guarantor of, or the grant by such Facility Guarantor of a security interest to secure, such Swap Obligation (or any Facility Guarantee thereof) is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Facility Guarantor's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the Facility Guarantee of such Facility Guarantor or the grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under a master agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Facility Guarantee or security interest is or becomes illegal.

22

"Excluded Taxes" means any of the following Taxes imposed on or with respect to the Agents, any Lender, any Issuing Bank or any other recipient of any payment to be made by or on account of any obligation of the Loan Parties hereunder or under any other Loan Document or required to be withheld or deducted from a payment to such recipients, (a) income or franchise Taxes imposed on (or measured by) its net income (however denominated), in each case, (i) by the United States of America, or by the jurisdiction under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located (or any political subdivision thereof,) or (ii) that are Other Connection Taxes, (b) any branch profits taxes, (i) imposed by the United States of America or any similar tax imposed by any other jurisdiction under the laws of which the Agents, any Lender or any Issuing Bank is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located (or any political subdivision thereof,) or (ii) that are Other Connection Taxes, (c) any United States backup withholding tax imposed on amounts payable to such recipient, (d) in the case of a Lender (other than an assignee pursuant to a request by a Borrower under SECTION 2.24(a)), any United States withholding tax that is imposed on amounts payable to such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which such Lender becomes a party to this Agreement (or designates a new lending office other than at the request of a Borrower under SECTION 2.24), except to the extent that such Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Loan Parties with respect to such withholding tax pursuant to SECTION 2.23(a), (e) Taxes attributable to such recipient's failure to comply with SECTIONS 2.23(e) or (f), and (f) any U.S. federal withholding Taxes imposed under FATCA.

"Executive Order" has the meaning set forth in SECTION 9.17.

"Existing Letters of Credit" means the Letters of Credit issued by Wells Fargo under the Pre-Petition Credit Agreement and more fully described on Schedule 2.13 hereto.

"Facility Guarantee" means any Guarantee of the Obligations executed by Holdings and its Subsidiaries which are or hereafter become Facility Guarantors in favor of the Agents and the other Secured Parties, which shall be in the form of Exhibit E attached hereto.

"Facility Guarantors" means any Person executing a Facility Guarantee.

"Factored Receivables" means any Accounts originally owed or owing by a Loan Party to another Person which have been purchased by or factored with the Administrative Agent or any of its Affiliates pursuant to a factoring arrangement or otherwise with the Person that sold the goods or rendered the services to the Loan Party which gave rise to such Account.

"FATCA" means (a) Sections 1471 through 1474 of the Code, or any current or future Treasury regulations promulgated or Revenue Ruling, Revenue Procedure, Notice or other administrative guidance issued thereunder, (b) any treaty, law, regulation or other official guidance enacted in any other jurisdiction, or relating to an intergovernmental agreement between the U.S. and any other jurisdiction which (in either case) facilitates the implementation of the preceding clause (a), or (c) any agreement entered into pursuant to the implementation of

23

the preceding clauses (a) or (b) with the United States Internal Revenue Service, the U.S. Government or any governmental or taxation authority under any other jurisdiction.

"FCPA" means the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder.

"Federal Funds Rate" means, for any period, a fluctuating interest rate per annum equal to, for each day during such period, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by Administrative Agent from three Federal funds brokers of recognized standing selected by it (and, if any such rate is below zero, then the rate determined pursuant to this definition shall be deemed to be zero).

"Fee Letter" means the Fee Letter dated as of the Closing Date by and between Wells Fargo and the Lead Borrower, as amended and in effect from time to time.

"Final Order" means, collectively, the order of the Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Court, which order shall be reasonably satisfactory in form and substance to the Administrative Agent, together with all extensions, modifications, and amendments thereto, in form and substance reasonably satisfactory to the Administrative Agent, which, among other matters but not by way of limitation, authorizes the Loan Parties to obtain credit, incur (or guaranty) Indebtedness, and grant Liens under this Agreement and the other Loan Documents, as the case may be, and provides for the super-priority of the Administrative Agent's and the Lenders' claims.

"Financial Officer" means, with respect to any Loan Party, the chief financial officer, chief accounting officer, treasurer, assistant treasurer, controller or assistant controller of such Loan Party.

"Fiscal Month" means any fiscal month of any Fiscal Year, which month shall end on the last day of each calendar month in accordance with the fiscal accounting calendar of Holdings and its Subsidiaries.

"Fiscal Quarter" means any fiscal quarter of any Fiscal Year, which quarter shall end on the Saturday closest to the last day of each April, July, October and January of such Fiscal Year in accordance with the fiscal accounting calendar of Holdings and its Subsidiaries.

"Fiscal Year" means any period of twelve consecutive months ending on the Saturday closest to January 31 of each calendar year.

"Flood Insurance Laws" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statute thereto, (iii) the

24

National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto, (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto and (v) the Biggert-Waters Flood Insurance Reform Act of 2012 as now or hereafter in effect or any successor statute thereto.

"Foreign Lender" means any Lender that is not a U.S. Lender.

"Funding Office" means the office of the Administrative Agent specified in SECTION 9.01 or such other office as may be specified from time to time by the Administrative Agent as its funding office by written notice to the Lead Borrower and the Lenders.

"GAAP" means generally accepted accounting principles in effect from time to time in the United States of America which are consistent with those promulgated or adopted by the Financial Accounting Standards Board and its predecessors (or successors) in effect and applicable to that accounting period in respect of which reference to GAAP is being made. Notwithstanding anything to the contrary contained above or in the definition of "Capital Lease Obligations," in the event of an accounting change requiring all leases to be capitalized, only those leases (assuming for purposes hereof that such leases were in existence on December 15, 2018) that would constitute Capital Lease Obligations in conformity with GAAP on December 15, 2018 shall be considered Capital Lease Obligations, and all calculations and deliverables under this Agreement or any other Loan Document shall be made or delivered, as applicable, in accordance therewith.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation, provided that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business or customary and reasonable indemnity obligations, including but not limited to, those in effect on the Closing Date or entered into in connection with any Permitted Disposition (other than such obligations with respect to Indebtedness).  The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof,

25

in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, mold, fungi or similar bacteria, and all other substances or wastes of any nature regulated pursuant to any Environmental Law because of their dangerous or deleterious properties, including any material listed as a hazardous substance under Section 101(14) of CERCLA.

"Holdings" means Guitar Center Holdings, Inc., a Delaware corporation.

"Indebtedness" of any Person means, without duplication:

(a)    All obligations of such Person for borrowed money (including any obligations which are without recourse to the credit of such Person);

(b)    All obligations of such Person evidenced by bonds, debentures, notes or similar instruments;

(c)    All obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person;

(d)    All obligations of such Person in respect of the deferred purchase price of property or services (excluding accrued expenses and accounts payable incurred in the ordinary course of business);

(e)    All Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed or is limited in recourse;

(f)    All Guarantees by such Person of Indebtedness of others;

(g)    All Capital Lease Obligations of such Person;

(h)    All obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty;

(i)    All obligations, contingent or otherwise, of such Person in respect of bankers' acceptances;

(j)    Net obligations of such Person under any Swap Contract relating to interest rates, foreign currency exchange rates or commodity prices;

26

(k)     The principal and interest portions of all rental obligations of such Person under any Synthetic Lease, tax retention operating lease, off-balance sheet loan or similar off-balance sheet financing where such transaction is considered borrowed money indebtedness for tax purposes but is classified as an operating lease in accordance with GAAP;

(l)     [reserved]; and

(m)     All mandatory obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Capital Stock of such Person (including, without limitation, Disqualified Capital Stock), other than upon any change of control or sale of all or substantially all assets of such Person;

Indebtedness shall not include (A) any sale-leaseback transactions to the extent the lease or sublease thereunder is not required to be recorded under GAAP as a Capital Lease, (B) any obligations relating to overdraft protection and netting services, (C) any preferred stock required to be included as Indebtedness in accordance with GAAP, (D) items that would appear as a liability on a balance sheet prepared in accordance with GAAP as a result of the application of EITF 97-10, "The Effects of Lessee Involvement in Asset Construction" or (E) Guarantees by the Lead Borrower of lease obligations of its Subsidiaries (other than Capital Lease Obligations).

The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.

"Indemnified Taxes" means (a) Taxes other than Excluded Taxes imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitee" has the meaning provided in SECTION 9.03(b).

"Information" has the meaning provided in SECTION 9.15.

"Informational Website" has the meaning provided in SECTION 5.01.

"Initial Budget" means that certain budget attached as Exhibit I hereto.

"Intellectual Property" means all present and future: trade secrets, know-how and other proprietary information; trademarks, Internet domain names, service marks, trade dress, trade names, business names, designs, logos, slogans (and all translations, adaptations, derivations and combinations of the foregoing), indicia and other source and/or business identifiers, all of the goodwill related thereto, and all registrations and applications for registrations thereof; works of authorship and other copyrighted works (including copyrights for computer programs), and all registrations and applications for registrations thereof; inventions (whether or not patentable) and all improvements thereto; patents and patent applications, together with all continuances,

27

continuations, divisions, revisions, extensions, reissuances, and reexaminations thereof; industrial design applications and registered industrial designs; and all other recognized forms of intellectual property throughout the world.

"Intercreditor Acknowledgment" means that certain Acknowledgment and Agreement, dated as of the date hereof, by and among the Administrative Agent, the DIP Term Loan Agent and the Loan Parties, and acknowledged by the Loan Parties.

"Intercreditor Arrangement" means, collectively, (i) the Intercreditor Acknowledgment and (ii) the Order; provided that in the event of a conflict as between the Intercreditor Acknowledgment and the Order, the Order shall control.

"Interest Payment Date" means (a) with respect to any Base Rate Loan, the first day of each calendar quarter, and (b) with respect to any LIBO Loan, the last day of the Interest Period applicable to the Borrowing of which such LIBO Loan is a part, and, in addition, if such LIBO Loan has an Interest Period of greater than ninety (90) days, the last day of every third month of such Interest Period.

"Interest Period" means, with respect to any LIBO Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day in the calendar month that is one (1), two (2),  or three (3) months, and, if available to all relevant Lenders, two (2) weeks or six (6) or twelve (12) months thereafter as the Lead Borrower may elect by notice to the Administrative Agent in accordance with the provisions of this Agreement; provided, however, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period of one month or more that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month during which such Interest Period ends) shall end on the last Business Day of the calendar month of such Interest Period, and (c) any Interest Period that would otherwise end after the Termination Date shall end on the Termination Date. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interim Order" means, collectively, the order of the Court entered in the Chapter 11 Cases after an interim hearing substantially in the form attached hereto as Exhibit D.

"Inventory" has the meaning assigned to such term in the Security Agreement.

"Inventory Advance Rate" means 75%.

"Inventory Reserves" means such reserves as may be established from time to time by the Administrative Agent, in its reasonable commercial discretion exercised in good faith and consistent with past practice, with respect to changes in the determination of the saleability, at retail, of the Eligible Inventory or which reflect such other factors as negatively affect the market

28

value of the Eligible Inventory including, but not limited to reserves for (i) Shrink equal to the amount of Shrink posted from time to time in the Loan Parties' (excluding Holdings') general ledger or stock ledger since the date of the Loan Parties' (excluding Holdings') last physical inventory, (ii) slow-moving and obsolete inventory, (iii) accrued warranty, (iv) vendor rebates and (v) the lower of cost or market value in accordance with the Loan Parties' (excluding Holdings') general ledger or stock ledger with respect to the items described in the foregoing clauses (ii) through (iv).

"Investment" means with respect to any Person, any direct or indirect acquisition or investment by such Person, whether by means of:

(a)      Any Capital Stock of another Person, evidence of Indebtedness or other security of another Person, including any option, warrant or right to acquire the same;

(b)      Any loan, advance, contribution to capital, extension of credit (except for current trade and customer accounts receivable for inventory sold or services rendered in the ordinary course of business and deposits in connection with leases that are not required to be classified and accounted for as capital leases on a balance sheet of such Person in accordance with GAAP) to, or guaranty of Indebtedness of, another Person; and

(c)      Any Acquisition;

in all cases whether now existing or hereafter made.  For purposes of calculation, the amount of any Investment outstanding at any time shall be the aggregate cash Investment *less* all cash returns, cash dividends and cash distributions (or the fair market value of any non-cash returns, dividends and distributions) received by such Person in respect of such Investment.

"Investment Banker" has the meaning provided in Section 5.14.

"ISP" means, with respect to any Letter of Credit, the International Standby Practices 1998 (International Chamber of Commerce Publication No. 590) and any subsequent revision thereof adopted by the International Chamber of Commerce on the date such Letter of Credit is issued.

"Issuer Documents" means with respect to any Letter of Credit, the Letter Credit Application, the Standby Letter of Credit Agreement or Commercial Letter of Credit Agreement, as applicable, and any other document, agreement and instrument entered into by the Issuing Bank and the Lead Borrower (or any Subsidiary) or in favor of the Issuing Bank and relating to any such Letter of Credit.

"Issuing Bank" means, individually and collectively, each of Wells Fargo and its affiliates.  The Issuing Bank may, in its reasonable discretion, arrange for one or more Letters of Credit to be issued by Affiliates of such Issuing Bank and/or for such Affiliate to act as an advising, transferring, confirming and/or nominated bank in connection with the issuance or

29

administration of any such Letter of Credit, in which case the term "Issuing Bank" shall include any such Affiliate with respect to Letters of Credit issued by such Affiliate.

"Landlord Lien State" means any state in which a landlord's claim for rent has priority by operation of Applicable Law over the lien of the Collateral Agent in any of the Collateral.

"L/C Obligations" means, as at any date of determination, the sum of (a) the aggregate undrawn amount of all outstanding Letters of Credit, plus (b) the aggregate amount of outstanding reimbursement obligations with respect to Letters of Credit which remain unreimbursed or which have not been paid through a Loan.  For purposes of computing the amounts available to be drawn under any Letter of Credit, the amount of such Letter of Credit shall be determined in accordance with SECTION 1.06.  For all purposes of this Agreement, if on any date of determination a Letter of Credit has expired by its terms but any amount may still be drawn thereunder by reason of the operation of any Rule under the ISP or any article of the UCP, such Letter of Credit shall be deemed to be "outstanding" in the amount so remaining available to be drawn.

"Lead Borrower" has the meaning set forth in the Preamble to this Agreement.

"Lease" means any written agreement pursuant to which a Loan Party is entitled to the use or occupancy of any space in a structure, land, improvements or premises for any period of time.

"Lease Rejection Date" means the last day of the lease rejection/assumption period provided under Section 365(d)(4) of the Bankruptcy Code, as such period may be extended or shortened by the Court.

"Lease Reserve" means a reserve, in an amount established by the Administrative Agent in its commercially reasonable discretion, in respect of (a) Inventory held at any leased Store locations with respect to which the Lease therefor is, or is intended to be pursuant to a motion filed with the Court, terminated by the applicable Loan Party, (b) Inventory at leased Store locations with respect to which the Lease has not been assumed commencing on the Lease Reserve Commencement Date, or (c) Inventory held at any leased Store locations with respect to which there has been filed a motion to compel the assumption or rejection of the applicable Lease.  Notwithstanding anything to the contrary, no Lease Reserve shall be taken for any leased location for which the lease has been assumed by the Loan Parties.

"Lease Reserve Commencement Date" means the date that is nineteen (19) weeks prior to the Lease Rejection Date.

"Lender" means each Person holding a Commitment or a Loan from time to time or at any time, and each assignee that becomes a party to this Agreement as set forth in SECTION 9.04(b).

"Letter of Credit" means each Standby Letter of Credit and each Commercial Letter of Credit issued hereunder, and shall include the Existing Letters of Credit.

30

"<u>Letter of Credit Application</u>" means an application for the issuance or amendment of a Letter of Credit in the form from time to time in use by the Issuing Bank.

"<u>Letter of Credit Disbursement</u>" means a payment made by any Issuing Bank to the beneficiary of, and pursuant to, a Letter of Credit.

"<u>Letter of Credit Expiration Date</u>" means the day that is seven days prior to the Maturity Date then in effect (or, if such day is not a Business Day, the next preceding Business Day).

"<u>Letter of Credit Fee</u>" means the fee payable in respect of Letters of Credit pursuant to SECTION 2.13(l).

"<u>Letter of Credit Indemnified Costs</u>" has the meaning specified in SECTION 2.13(f).

"<u>Letter of Credit Related Person</u>" has the meaning specified in SECTION 2.13(f).

"<u>Letter of Credit Sublimit</u>" means, at any time, $20,000,000, as such amount may be increased or reduced in accordance with the provisions of this Agreement.

"<u>LIBO Borrowing</u>" means a Borrowing comprised of LIBO Loans.

"<u>LIBO Loan</u>" means any Revolving Credit Loan bearing interest at a rate determined by reference to the LIBO Rate in accordance with the provisions of Article II.

"<u>LIBO Rate</u>" means for any Interest Period with respect to a LIBO Loan, the rate per annum as published by ICE Benchmark Administration Limited (or any successor page or other commercially available source as the Administrative Agent may designate from time to time) as of 11:00 a.m., London time, two Business Days prior to the commencement of the requested Interest Period, for a term, and in an amount, comparable to the Interest Period and the amount of the LIBO Loan requested (whether as an initial LIBO Loan or as a continuation of a LIBO Loan or as a conversion of a Base Rate Loan to a LIBO Loan) by the Borrowers in accordance with this Agreement (and, if any such published rate is below 0.50%, then the rate determined pursuant to this clause (b) shall be deemed to be 0.50%). Each determination of the LIBO Rate shall be made by the Administrative Agent and shall be conclusive in the absence of manifest error.

"<u>LIBO Rate Loan Notice</u>" means a notice for a LIBO Borrowing or continuation pursuant to SECTION 2.04(b), which shall be substantially in the form of <u>Exhibit B</u>.

"<u>Lien</u>" means, with respect to any asset, (a) any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, encumbrance, collateral assignment, charge or security interest in, on or of such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities.

31

"Liquidation" means the exercise by the Agents of those rights and remedies accorded to the Agents under the Loan Documents and Applicable Law as a creditor of the Loan Parties, including (after the occurrence and during the continuation of an Event of Default) the conduct by any Loan Party, acting with the consent of the Administrative Agent, of any public, private or "Going-Out-Of-Business Sale" or other disposition of Collateral for the purpose of liquidating the Collateral.  Derivations of the word "Liquidation" (such as "Liquidate") are used with like meaning in this Agreement.

"Liquidity" means, as of any date, the sum of (i) Excess Availability plus (ii) Consolidated unrestricted book cash of the Loan Parties as of such date.

"Loan Account" has the meaning provided in SECTION 2.20.

"Loan Cap" means, at any time of calculation, the lesser of (a) the Revolving Credit Ceiling and (b) the Borrowing Base, as determined from the most recent Borrowing Base Certificate (delivered by the Lead Borrower to the Administrative Agent pursuant to SECTION 4.01(d) or SECTION 5.01(f) hereof (as may be adjusted from time to time pursuant to SECTION 2.03 hereof)).

"Loan Documents" means this Agreement, the Notes, the Letters of Credit, the Fee Letter, all Borrowing Base Certificates, the Blocked Account Agreements, the Credit Card Notifications, the Security Documents, the Facility Guarantee, the Intercreditor Acknowledgment, all Approved Budgets, all Variance Reports, and any other instrument or agreement now or hereafter executed and delivered in connection herewith (excluding agreements entered into in connection with any transaction arising out of any Bank Products or Cash Management Services), each as amended and in effect from time to time.

"Loan Party" or "Loan Parties" means the Borrowers and the Facility Guarantors.

"Loans" means, collectively, the Credit Extensions made by the Lenders hereunder.

"Management Agreements" means (1) the Management Services Agreement, dated as of April 2, 2014, by and among ACOF Operating Manager II, LLC, the Lead Borrower and Holdings, (2) the Management Services Agreement, dated as of April 2, 2014, by and among ACOF Operating Manager III, LLC, the Lead Borrower and Holdings and (3) the Advisory Agreement, dated as of October 9, 2007, by and among Holdings, the Lead Borrower and Bain Capital Partners, LLC, as amended by the Termination Agreement, dated as of April 2, 2014, in each case as in effect on the Closing Date.

"Margin Stock" has the meaning assigned to such term in Regulation U.

"Material Adverse Effect" means any event, facts, circumstances, action, suit, investigation, litigation or proceeding pending or threatened in any court or before any arbitrator or governmental authority that has or could be reasonably likely to have a material adverse change or material adverse condition in or affecting (x) the businesses, assets, operations or financial condition of the Loan Parties and their respective direct and indirect subsidiaries taken

DB1/ 117162443.7

as a whole or (y) the validity or enforceability of this Agreement or the other Loan Documents, taken as a whole, or the rights or remedies of the Secured Parties hereunder or thereunder, taken as a whole; provided, that none of (i) the Chapter 11 Cases, actions in connection with the solicitation of holders of claims and execution of the RSA, the events and conditions leading up to the Chapter 11 Cases, or their reasonably anticipated consequences, (ii) the actions expressly required to be taken pursuant to this Agreement, the DIP Term Loan Agreement or the Interim Order or Final Order (as applicable) and (iii) the COVID-19 Pandemic shall constitute a "Material Adverse Effect" for any purpose.

"Material Indebtedness" means Indebtedness (other than the Obligations) of the Loan Parties, individually or in the aggregate, having an aggregate principal amount exceeding $5,000,000.  In any event, all Indebtedness evidenced by the DIP Term Loan Agreement, the Pre-Petition Senior Secured Notes, and the Pre-Petition Senior Unsecured Notes shall be deemed Material Indebtedness, regardless of the outstanding balance thereunder from time to time.

"Maturity Date" means November 24, 2021.

"Maximum Rate" has the meaning provided in SECTION 9.13.

"Minority Lenders" has the meaning provided in SECTION 9.02(c).

"MIRE Event" means (a) any increase in the amount of any Lender's Commitment or (b) a renewal or extension of the Maturity Date.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Appraised Recovery Value" means, with respect to any Loan Party, the net appraised recovery value of such Loan Party's Inventory as set forth in such Loan Party's stock ledger (expressed as a percentage of the Cost of such Inventory) as reasonably determined from time to time by reference to the most recent appraisal received by the Administrative Agent conducted by an independent appraiser reasonably satisfactory to the Administrative Agent.

"Net Proceeds" means, with respect to any event, (a) the cash proceeds received in respect of such event, including (i) any cash received in respect of any non-cash proceeds or amounts escrowed pursuant to clause (b)(iv) of this definition, but only as and when received, (ii) in the case of a casualty, insurance proceeds, and (iii) in the case of a condemnation or similar event, condemnation awards and similar payments, in each case net of (b) the sum of (i) to the extent included in and consistent with the Approved Budget, all reasonable and documented fees and out-of-pocket fees and expenses (including appraisals, and brokerage, legal, title and recording or transfer tax expenses and commissions) paid by any Loan Party or a Subsidiary to third parties (other than Affiliates, except to the extent permitted under SECTION 6.07 hereof) in connection with such event, (ii) in the case of a sale or other disposition of an asset (including pursuant to a casualty or condemnation), the amount of all payments required to

33

be made by any Loan Party or any of their respective Subsidiaries as a result of such event to repay (or to establish an escrow for the repayment of) any Indebtedness (other than the Obligations) secured by a Permitted Encumbrance on such asset that is senior to the Lien of the Collateral Agent on such asset, (iii) capital gains or other income taxes paid or payable as a result of any such sale or disposition (after taking into account any available tax credits or deductions), provided that the Administrative Agent may, in its discretion, establish an Availability Reserve in the amount of any taxes so deducted in calculating Net Proceeds, and (iv) any funded escrow established pursuant to the documents evidencing any such sale or disposition to secure any indemnification obligations or adjustments to the purchase price associated with any such sale or disposition.

"Non-Defaulting Lender" means each Lender other than a Defaulting Lender.

"Notes" means, collectively, the Revolving Credit Notes.

"Notes Priority Collateral" means all "Notes Priority Collateral" (as such term is defined in the Intercreditor Acknowledgment).

"Obligations" means (a) (i) the principal of, and interest (including all interest that accrues after the commencement of any case or proceeding by or against any Borrower or Facility Guarantor under the Bankruptcy Code, including the Chapter 11 Cases, or any state or federal bankruptcy, insolvency, receivership or similar law, whether or not allowed in such case or proceeding) with respect to the Revolving Credit Loans and Facility Guarantees, (ii) other amounts owing by the Loan Parties under this Agreement or any other Loan Document in respect of any Letter of Credit, including payments in respect of reimbursement of disbursements, interest thereon and obligations to provide Cash Collateral and (iii) all other monetary obligations, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise, of the Loan Parties to the Secured Parties under this Agreement and the other Loan Documents, (b) the due and punctual payment and performance of all the covenants, agreements, obligations and liabilities of each Loan Party under or pursuant to this Agreement and the other Loan Documents, and (c) the Other Liabilities; provided that the Obligations shall not include any Excluded Swap Obligations.

"OFAC" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"Order" means, as applicable, and as the context may require, the Interim Order or the Final Order, whichever is then applicable.

"Other Connection Taxes" means Taxes imposed as a result of a present or former connection between an Agent, any Lender or any Issuing Bank and the jurisdiction imposing such Tax (other than connections arising from such Agent, Lender or Issuing Bank having executed, delivered, become a party to, performed its obligations under, received payments under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

34

"Other Liabilities" means outstanding liabilities of any Loan Party or any Subsidiary thereof with respect to or arising from any Bank Products or Cash Management Services.

"Other Taxes" means any and all current or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document, except any such taxes, charges or similar levies that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made at the request of a Borrower under Section 2.24).

"Outstanding Amount" means (i) with respect to Revolving Credit Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of Revolving Credit Loans, occurring on such date; and (ii) with respect to any L/C Obligations on any date, the amount of such L/C Obligations on such date after giving effect to any Credit Extension of any Letter of Credit occurring on such date and any other changes in the aggregate amount of the L/C Obligations as of such date.

"Overadvance" means a Revolving Credit Loan, advance, or providing of credit support (such as the issuance of a Letter of Credit) to the Borrowers to the extent that, immediately after the making of such loan or advance or the providing of such credit support, Excess Availability is less than zero.

"Participant" has the meaning provided in SECTION 9.04(e).

"Participation Register" has the meaning provided in SECTION 9.04(e).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"Pension Act" means the Pension Protection Act of 2006.

"Permitted Disposition" means any of the following:

(a)    licenses of Intellectual Property of a Loan Party or any of its Subsidiaries entered into in the ordinary course of business;

(b)    licenses for the conduct of licensed departments within the Stores of a Loan Party or any of its Subsidiaries in the ordinary course of business;

(c)    sales or other dispositions of the Inventory of a Loan Party or any of its Subsidiaries in the ordinary course of business or otherwise in connection with Store closings to the extent consistent with the Approved Budget;

(d)    without duplication of the provisions of clause (c) of this definition, terminations of Leases in the ordinary course of business to the extent consistent with the Approved Budget;

35

(e)      dispositions of assets (other than Real Estate and other than assets included in the Borrowing Base), including abandonment of or failure to maintain Intellectual Property, in the ordinary course of business that is worn, damaged, obsolete, uneconomical or, in the judgment of a Loan Party, no longer used or useful or necessary in, or material to, its business;

(f)      sales, transfers and dispositions among the Loan Parties, so long as the Collateral Agent has a perfected first priority lien on the property so sold, transferred to disposed of (subject only to Permitted Encumbrances (x) having priority by operation of Applicable Law on all Revolver Priority Collateral, or (y) in favor of the DIP Term Loan Agent and the Pre-Petition Notes Trustee on any Notes Priority Collateral) after giving effect to such exchange, transfer or swap;

(g)      [reserved];

(h)      sales, discounting or forgiveness of Accounts in the ordinary course of business or in connection with the collection or compromise thereof;

(i)      leases, subleases, licenses and sublicenses of real or personal property (other than Intellectual Property) entered into by Loan Parties and their Subsidiaries in the ordinary course of business at arm's length;

(j)      the making of Permitted Investments and payments permitted under SECTION 6.06;

(k)      sales, transfers and dispositions as set forth on <u>Schedule 6.05</u>; and

(l)      a one-time write-off and disposition of aged Inventory in an aggregate amount not to exceed $1,000,000 so long as the Net Proceeds of such disposition are applied to repay the Loans hereunder.

"<u>Permitted Encumbrances</u>" means:

(a)      Liens imposed by law for Taxes that are not required to be paid pursuant to SECTION 5.05;

(b)      Carriers', warehousemen's, mechanics', materialmen's, repairmen's, landlord's and other like Liens imposed by Applicable Law, (i) arising in the ordinary course of business and securing obligations that are not overdue by more than sixty (60) days, (ii) (A) that are being contested in good faith by appropriate proceedings, (B) the applicable Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (C) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, or (iii) the existence of which would not reasonably be expected to result in a Material Adverse Effect;

36

(c)        Pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(d)        Deposits to secure or relating to the performance of bids, trade contracts (other than for Indebtedness), leases (other than Capital Lease Obligations), statutory obligations, surety and appeal bonds, performance bonds (and Liens arising in accordance with Applicable Law in connection therewith), and other obligations of a like nature, in each case in the ordinary course of business;

(e)        Judgment Liens in respect of judgments that do not constitute an Event of Default under SECTION 7.01(j);

(f)        Easements, covenants, conditions, restrictions, building code laws, zoning restrictions, other land use laws, rights-of-way, development, site plan or similar agreements and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property when used in a manner consistent with current usage or materially interfere with the ordinary conduct of business of a Loan Party as currently conducted and such other minor title defects, or survey matters that are disclosed by current surveys, but that, in each case, do not interfere with the current use of the affected property in any material respect;

(g)        Any Lien on any property or asset of any Loan Party (other than Holdings) or any Subsidiary of it set forth on Schedule 6.02, provided that, if such Lien secured Indebtedness, such Lien shall secure only the Indebtedness listed on Schedule 6.01 as of the Closing Date (and extensions, renewals and replacements thereof permitted under SECTION 6.01);

(h)        Liens on fixed or capital assets acquired by any Loan Party or any of its Subsidiaries to secure Indebtedness permitted under clause (e) of the definition of Permitted Indebtedness so long as (i) such Liens and the Indebtedness secured thereby are incurred prior to or within thirty (30) days after such acquisition or the completion of the construction or improvement thereof (other than refinancings thereof permitted hereunder), (ii) the Indebtedness secured thereby does not exceed 100% of the cost of acquisition or improvement of such fixed or capital assets, and (iii) such Liens shall not extend to any other property or assets of the Loan Parties or any of their Subsidiaries;

(i)        Liens in favor of the Collateral Agent, for its own benefit and the benefit of the other Secured Parties;

(j)        Landlords' and lessors' Liens in respect of rent not in default for more than sixty (60) days or the existence of which, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect;

(k)      Possessory Liens in favor of brokers and dealers arising in connection with the acquisition or disposition of Investments owned as of the date hereof and other Permitted Investments, provided that such liens (a) attach only to such Investments or other Investments held by such broker or dealer and (b) secure only obligations incurred in the ordinary course and arising in connection with the acquisition or disposition of such Investments and not any obligation in connection with margin financing;

(l)      Liens arising solely by virtue of any statutory or common law provisions relating to banker's liens, liens in favor of securities intermediaries, rights of setoff or similar rights and remedies as to deposit accounts or securities accounts or other funds maintained with depository institutions or securities intermediaries;

(m)      [reserved];

(n)      [reserved];

(o)      Liens arising from precautionary UCC filings regarding "true" operating leases or the consignment of goods to a Loan Party;

(p)      [reserved];

(q)      Liens in favor of customs and revenues authorities imposed by Applicable Law arising in the ordinary course of business in connection with the importation of goods and securing obligations (i) that are not overdue by more than sixty (60) days, (ii)(A) that are being contested in good faith by appropriate proceedings, (B) the applicable Loan Party or Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP and (C) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, or (iii) the existence of which would not reasonably be expected to result in a Material Adverse Effect;

(r)      (i) Liens granted by the Loan Parties to secure Indebtedness permitted under clause (h) of the definition of "Permitted Indebtedness" with respect to the Pre-Petition Senior Secured Notes referenced in clause (i) of the definition thereof; provided, that the Liens incurred pursuant to this clause (r)(i) shall be junior to the Liens securing the Obligations pursuant to the Orders; and (ii) Liens granted by the Loan Parties to secure Indebtedness permitted under clause (h) of the definition of "Permitted Indebtedness" with respect to the DIP Term Loan Agreement referenced in clause (ii) of the definition thereof; provided, that the Liens incurred pursuant to this clause (r)(ii) shall have the priorities set forth in the Intercreditor Arrangement and the Orders;

(s)      any interest or title of a licensor, sublicensor, lessor or sublessor under any license or operating or true lease agreement;

(t)      leases or subleases granted to third Persons in the ordinary course of business;

38

(u)     licenses or sublicenses of Intellectual Property granted in the ordinary course of business;

(v)     the replacement, extension or renewal of any Permitted Encumbrance; provided that such Lien shall at no time be extended to cover any assets or property other than such assets or property subject thereto on the Closing Date or the date such Lien was incurred, as applicable;

(w)     Liens on insurance proceeds incurred in the ordinary course of business in connection with the financing of insurance premiums;

(x)     Liens on securities which are the subject of repurchase agreements incurred in the ordinary course of business;

(y)     Liens arising by operation of law under Article 4 of the UCC in connection with collection of items provided for therein;

(z)     Liens arising by operation of law under Article 2 of the UCC in favor of a reclaiming seller of goods or buyer of goods;

(aa)    Liens on deposit accounts or securities accounts in connection with overdraft protection and netting services;

(bb)    Security given to a public or private utility or any Governmental Authority as required in the ordinary course of business;

(cc)    Liens in the nature of the right of setoff in favor of counterparties to contractual agreements with the Loan Parties in the ordinary course of business;

(dd)    Other Liens securing Indebtedness and other obligations in an amount not to exceed $500,000 in the aggregate at any time outstanding; and

(ee)    [reserved];

(ff)    Liens securing the Pre-Petition Obligations; and

(gg)    the Adequate Protection Liens and Adequate Protection Superpriority Claims;

provided, however, that, except as provided in any one or more of clauses (a) through (gg) above, the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness for borrowed money.  The designation of a Lien as a Permitted Encumbrance shall not limit or restrict the ability of the Agents to establish any Reserve relating thereto.

"Permitted Indebtedness" means each of the following:

(a)      Indebtedness created under the Loan Documents and the Pre-Petition Loan Documents;

(b)      Indebtedness set forth on Schedule 6.01;

(c)      (i) Indebtedness of any Loan Party to any other Loan Party (excluding Holdings) or Guarantees by any Loan Party of Indebtedness or other obligations of any other Loan Party (excluding Holdings), (ii) Indebtedness of any Subsidiary of a Loan Party to any other Subsidiary of a Loan Party or Guarantees by any Subsidiary of a Loan Party of Indebtedness or other obligations of any other Subsidiary of a Loan Party, (iii) Indebtedness of any Loan Party to any Subsidiary of a Loan Party or, subject to compliance with SECTION 6.04, Guarantees by any Loan Party of Indebtedness or other obligations of any Subsidiary of a Loan Party, provided that any such Indebtedness is subordinated in right of payment to the Obligations, and (iv) subject to compliance with SECTION 6.04, Indebtedness of any Subsidiary of a Loan Party to any Loan Party (excluding Holdings) or Guarantees by any Subsidiary of a Loan Party of Indebtedness or other obligations of any Loan Party (excluding Holdings);

(d)      Purchase money Indebtedness of any Loan Party or any Subsidiary of it to finance the acquisition or improvement of any fixed or capital assets (excluding Real Estate), including Capital Lease Obligations and any Indebtedness assumed in connection with the acquisition of any such assets or secured by a Lien on any such assets prior to the acquisition thereof, provided that the aggregate principal amount of Indebtedness permitted by this clause (d)(i) outstanding at any time shall not exceed $1,000,000 or such greater amounts consistent with the Approved Budget;

(e)      [reserved];

(f)      Contingent liabilities under surety bonds, customs and appeal bonds, governmental contracts and leases or similar instruments incurred in the ordinary course of business;

(g)      Indebtedness under the Pre-Petition Senior Unsecured Notes outstanding as of the Closing Date;

(h)      Indebtedness under (i) the Pre-Petition Senior Secured Notes, including any adequate protection obligations under the Orders relating thereto, *provided* that Indebtedness under the Pre-Petition Senior Secured Notes is subject to the Intercreditor Acknowledgment, and (ii) Indebtedness under the DIP Term Loan Agreement in an aggregate principal amount at any time outstanding not to exceed $325,000,000, *provided* that Indebtedness under the DIP Term Loan Agreement is subject to the Intercreditor Arrangement;

(i)      [reserved];

40

(j)      [reserved];

(k)      [reserved];

(l)      Indebtedness incurred in the ordinary course of business in connection with the financing of insurance premiums;

(m)      [reserved];

(n)      Indebtedness relating to surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(o)      [reserved];

(p)      [reserved];

(q)      Guarantees and letters of credit and surety bonds (other than Guarantees of, or letters of credit and surety bonds related to, Indebtedness) issued in connection with Permitted Dispositions, in each case, consistent with past practice;

(r)      without duplication of any other Indebtedness, non-cash accruals of interest, accretion or amortization of original issue discount and payment-in-kind interest with respect to Indebtedness permitted hereunder;

(s)      Indebtedness due to any landlord in connection with the financing by such landlord of leasehold improvements;

(t)      [reserved];

(u)      [reserved];

(v)      other unsecured Indebtedness in an aggregate principal amount not exceeding $500,000 at any time outstanding; and

(w)      extensions, renewals and replacements of any such Indebtedness described in clauses (c) and (s) above provided that such Indebtedness constitutes a Permitted Refinancing.

"Permitted Investments" means each of the following:

(a)      Direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America) or any state or state agency thereof, in each case maturing within one (1) year from the date of acquisition thereof;

41

(b)      Investments in commercial paper maturing within one (1) year from the date of acquisition thereof and having, at the date of acquisition, the highest or next highest credit rating obtainable from S&P or from Moody's;

(c)      Investments in certificates of deposit, banker's acceptances and time deposits maturing within one (1) year from the date of acquisition thereof which are issued or guaranteed by, or placed with, and demand deposit and money market deposit accounts issued or offered by, any Lender or any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof that has a combined capital and surplus and undivided profits of not less than $500,000,000;

(d)      Master demand notes and fully collateralized repurchase agreements with a term of not more than thirty (30) days for securities described in clause (a) above (without regard to the limitation on maturity contained in such clause) and entered into with a financial institution satisfying the criteria described in clause (c) above or with any primary dealer;

(e)      Shares of any money market or mutual fund that has substantially all of its assets invested in the types of investments referred to in clauses (a) through (d), above;

(f)      Investments existing or contemplated on the Closing Date and set forth on Schedule 6.04;

(g)      capital contributions or loans made by (i) any Loan Party (with respect to loans, excluding Holdings) to any other Loan Party or (ii) any Subsidiary of a Loan Party to any other Subsidiary of a Loan Party or to any Loan Party;

(h)      Guarantees constituting Permitted Indebtedness;

(i)      Investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(j)      Loans or advances to employees made in the ordinary course of business, provided that all such loans and advances to employees shall not exceed $500,000 in the aggregate at any time outstanding, and determined without regard to any write-downs or write-offs thereof;

(k)      Investments received from purchasers of assets pursuant to dispositions permitted pursuant to SECTION 6.05;

(l)      [reserved];

(m)      [reserved];

42

(n)    To the extent permitted by Applicable Law, notes from officers and employees in exchange for equity interests of Holdings purchased by such officers or employees pursuant to a stock ownership or purchase plan or compensation plan;

(o)    [reserved];

(p)    Subject to SECTION 2.18, Investments in deposit accounts opened in the ordinary course of business;

(q)    [reserved];

(r)    expenditures required to be capitalized in accordance with GAAP;

(s)    [reserved];

(t)    [reserved];

(u)    [reserved]; and

(v)    without duplication of, or accumulation with, other categories of Investments permitted hereunder, other Investments in an amount not to exceed $500,000 in the aggregate outstanding at any time;

provided, however, that for purposes of calculation, the amount of any Investment held by any Person outstanding at any time shall be the aggregate cash Investment *less* all cash returns, cash dividends and cash distributions (or the fair market value of any non-cash returns, dividends and distributions) received by such Person in respect of such Investment and *less* all liabilities expressly assumed by another Person in connection with the sale of such Investment.

"Permitted Overadvance" means an Overadvance made by the Administrative Agent, in its reasonable discretion, which:

(a)    Is made to maintain, protect or preserve the Collateral and/or the Secured Parties' rights under the Loan Documents or which is otherwise for the benefit of the Secured Parties; or

(b)    Is made to enhance the likelihood of, or maximize the amount of, repayment of any Obligation; or

(c)    Is made to pay any other amount chargeable to any Borrower hereunder; and

(d)    Together with all other Permitted Overadvances then outstanding, shall not (i) exceed ten percent (10%) of the Borrowing Base each at the time, in the aggregate outstanding at any time or (ii) unless a Liquidation is taking place, remain outstanding for more than forty-five (45) consecutive Business Days;

43

provided however, that the foregoing shall not (i) modify or abrogate any of the provisions of SECTION 2.13 regarding the Lenders' obligations with respect to Letters of Credit, or (ii) result in any claim or liability against the Administrative Agent (regardless of the amount of any Overadvance) for "inadvertent Overadvances" (i.e. where an Overadvance results from changed circumstances beyond the control of the Administrative Agent (such as a reduction in the collateral value)), and further provided that in no event shall the Administrative Agent make an Overadvance, if after giving effect thereto, the principal amount of the Credit Extensions would exceed the aggregate of the Commitments (as in effect prior to any termination of the Commitments pursuant to SECTION 7.01 hereof).

"Permitted Refinancing" means any Indebtedness that replaces or refinances (whether in whole or in part) any other Permitted Indebtedness, as long as, after giving effect thereto (i) the principal amount of the Indebtedness outstanding at such time is not increased (except by the amount of any accrued interest and reasonable closing costs, expenses, fees and premiums paid in connection with such extension, renewal or replacement), (ii) the result of such refinancing of or replacement shall not be (A) an earlier maturity date or (B) decreased weighted average life, (iii) the holders of such refinancing Indebtedness are not afforded covenants, defaults, rights or remedies, taken as a whole, which are materially more burdensome to the obligor or obligors for any period prior to the Maturity Date than those contained in the Indebtedness being extended, renewed or replaced, (iv) the obligor or obligors under any such refinancing Indebtedness and the collateral, if applicable, granted pursuant to any such refinancing Indebtedness are the same (or in the case of collateral, the same or less than) as the obligor(s) and collateral under the Indebtedness being extended, renewed or replaced, (v) the subordination, to the extent applicable, and other material provisions of the refinancing Indebtedness are no less favorable to the Lenders than those terms of the Indebtedness being refinanced, and (vi) the refinancing Indebtedness is not exchangeable or convertible into any other Indebtedness which does not comply with clauses (i) through (v) above.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Petition Date" has the meaning set forth in the Recitals.

"Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by the Lead Borrower or any ERISA Affiliate or to which the Lead Borrower or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years or for which the Borrower may have liability (including as an ERISA Affiliate).

"Plan of Reorganization" means a plan of reorganization confirmed by an order of the Court in the Chapter 11 Cases (i) containing a provision for termination of the Commitments and repayment in full in cash of all of the Obligations and the Pre-Petition Obligations (if any) on or before the effective date of such plan or such other treatment acceptable to the Administrative Agent in its sole discretion and (ii) containing a customary release in favor of the Administrative

44

Agent, the Lenders, and the Pre-Petition Agents and the Pre-Petition Lenders, and each of their respective affiliates.

"Pledge Agreement" means the Pledge Agreement dated as of the Closing Date among the Loan Parties party thereto and the Collateral Agent for its own benefit and the benefit of the other Secured Parties, as amended and in effect from time to time.

"Portal" has the meaning specified in SECTION 2.04(b).

"Prepayment Event" means the occurrence of any of the following events:

(a)     Any sale, transfer or other disposition (including pursuant to a sale and leaseback transaction) of any assets of a Loan Party or any of its Subsidiaries (other than (i) the sale of assets in the ordinary course of business, (ii) the transfer of any assets among Stores and other locations of the Loan Parties or any of their Subsidiaries and (iii) the sale of assets in connection with the Specified Closures) where the proceeds therefrom are in excess of $500,000, unless, as long as no Cash Dominion Event has occurred and is continuing, the proceeds therefrom are utilized for purposes of replacing or repairing the assets in respect of which such proceeds were received or reinvesting in assets used in any Loan Party's or any of its Subsidiaries' business (any such application of proceeds, a "Proceeds Reinvestment") within twelve (12) months of the receipt of such proceeds (or, if a letter of intent or other binding commitment to reinvest such proceeds is entered into within twelve (12) months of receipt of such proceeds within the later of twelve (12) months of receipt of such proceeds and 180 days from the date of such letter of intent or other binding commitment) (such time period, with respect to such proceeds, the "Reinvestment Period"); or

(b)     Any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation, expropriation or similar proceeding of, any assets of a Loan Party or any of its Subsidiaries where the proceeds therefrom are in excess of $500,000, unless (i) the proceeds therefrom are required to be paid to the holder of a Lien on such property or asset having priority over the Lien of the Collateral Agent, or (ii) as long as no Cash Dominion Event has occurred and is continuing, the proceeds therefrom are utilized for purposes of replacing or repairing the assets in respect of which such proceeds, awards or payments were received or reinvesting in assets used in any Loan Party's or any of its Subsidiaries' business within the Reinvestment Period with respect to such proceeds.

"Pre-Petition 2021 Senior Secured Notes" means the 9.500% Senior Secured Notes Due 2021 in the original amount of $635,000,000 issued by the Lead Borrower, and any securities issued in lieu or in replacement thereof.

"Pre-Petition 2021 Senior Secured Notes Documents" means the documents, instruments and other agreements executed and delivered in connection with the Pre-Petition 2021 Senior Secured Notes, including, without limitation, the Indenture dated March 16, 2018 (as supplemented by that certain First Supplemental Indenture dated as of May 15, 2020), and any

45

documents, instruments and other agreements executed and delivered in connection therewith prior to the Petition Date.

"<u>Pre-Petition Agent</u>" means Wells Fargo, in its capacity as administrative agent under any of the Pre-Petition Loan Documents.

"<u>Pre-Petition Credit Agreement</u>" has the meaning specified in the Recitals.

"<u>Pre-Petition Credit Extensions</u>" means Pre-Petition Obligations in respect of "Credit Extensions" as defined in the Pre-Petition Credit Agreement.

"<u>Pre-Petition L/C Obligations</u>" means Pre-Petition Obligations in respect of "L/C Obligations" under, and as defined in, the Pre-Petition Credit Agreement and all interest, expenses, fees and other amounts payable in respect thereof under the Pre-Petition Credit Agreement.

"<u>Pre-Petition Loan Documents</u>" means the "Loan Documents" as defined in the Pre-Petition Credit Agreement.

"<u>Pre-Petition Mortgages</u>" means the mortgages and deeds of trust and any other security documents granting a Lien on Real Estate between the Loan Party owning the Real Estate encumbered thereby and the Collateral Agent under the Pre-Petition Credit Agreement for its own benefit and the benefit of the other Secured Parties under the Pre-Petition Loan Documents.

"<u>Pre-Petition Notes Trustee</u>" means The Bank of New York Mellon Trust Company, N.A., in its capacity as trustee under the Pre-Petition Senior Secured Notes Documents, and any successor thereto.

"<u>Pre-Petition Obligations</u>" means "Obligations" as defined in the Pre-Petition Credit Agreement.

"<u>Pre-Petition Senior Secured Notes</u>" means the Pre-Petition 2021 Senior Secured Notes and the Pre-Petition Superpriority Senior Secured Notes.

"<u>Pre-Petition Senior Secured Notes Documents</u>" means the Pre-Petition 2021 Senior Secured Notes Documents and the Pre-Petition Superpriority Senior Secured Notes Documents.

"<u>Pre-Petition Superpriority Senior Secured Notes</u>" means the 10.00% Senior Secured Superpriority Notes Due 2022 in the original amount of $35,748,000 issued by the Lead Borrower, and any securities issued in lieu or in replacement thereof.

"<u>Pre-Petition Superpriority Senior Secured Notes Documents</u>" means the documents, instruments and other agreements executed and delivered in connection with the Pre-Petition Superpriority Senior Secured Notes, including, without limitation, the Indenture dated May 15, 2020, and any documents, instruments and other agreements executed and delivered in connection therewith prior to the Petition Date.

46

"<u>Pre-Petition Senior Unsecured Notes</u>" means the 13.000% Cash/PIK Notes due 2022 in the aggregate principal amount of $317,957,000 issued by the Lead Borrower, and any securities issued in lieu or in replacement thereof.

"<u>Pre-Petition  Senior Unsecured Notes Documents</u>" means the documents, instruments and other agreements executed and delivered in connection with the Pre-Petition Senior Unsecured Notes, including, without limitation, the Indenture dated April 16, 2018 (as supplemented by that certain First Supplemental Indenture dated as of May 15, 2020), and any documents, instruments and other agreements executed and delivered in connection therewith prior to the Petition Date.

"<u>Proceeds Reinvestment</u>" has the meaning set forth in the definition of "Prepayment Event."

"<u>Purchase Card Reserve</u>" means the amount of $2,500,000 in respect of the purchase card program of the Loan Parties maintained with Wells Fargo.

"<u>QFC</u>" has the meaning assigned to the term "qualified financial contract" in, and shall be interpreted in accordance with, 12 U.S.C. 5390(c)(8)(D).

"<u>QFC Credit Support</u>" has the meaning assigned to it in SECTION 9.22.

"<u>Qualified ECP Guarantor</u>" means, in respect of any Swap Obligation, each Loan Party that has total assets exceeding $10,000,000 at the time the relevant Facility Guarantee or grant of the relevant security interest becomes effective with respect to such Swap Obligation or such other person as constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder and can cause another person to qualify as an "eligible contract participant" at such time by entering into a keepwell under Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

"<u>Real Estate</u>" means all land, together with the buildings, structures, parking areas, and other improvements thereon, now or hereafter owned by any Loan Party, including all easements, rights-of-way, and similar rights relating thereto and all leases, tenancies, and occupancies thereof related to such owned property.

"<u>Register</u>" has the meaning provided in SECTION 9.04(c).

"<u>Regulation U</u>" means Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"<u>Regulation X</u>" means Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"<u>Reinvestment Period</u>" has the meaning provided in clause (a) of the definition of Prepayment Event.

47

"Related Fund" means, with respect to any Lender that is an Approved Fund, any other Approved Fund that is managed, administered or advised by the same investment advisor as such Lender or by an Affiliate of such investment advisor.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Release" has the meaning provided in Section 101(22) of CERCLA without giving effect to the exclusions set forth in subsections (A), (B), (C) and (D) thereof.

"Remedies Notice Period" has the meaning specified in the Interim Order (or Final Order, when applicable).

"Reportable Event" means any reportable event as defined in Section 4043(c) of ERISA or the regulations issued thereunder, other than those events as to which the 30-day notice period referred to in Section 4043(c) of ERISA has been waived, with respect to a Plan.

"Reports" has the meaning provided in SECTION 8.13.

"Required Lenders" means, at any time, Non-Defaulting Lenders having Commitments aggregating more than 50% of the Total Commitments held by Non-Defaulting Lenders, or if the Commitments have been terminated, Non-Defaulting Lenders whose percentage of the outstanding Credit Extensions aggregate more than 50% of all such Credit Extensions made by Non-Defaulting Lenders; provided, however, that, at any time that there are two or more Non-Defaulting Lenders, "Required Lenders" must consist of at least two (2) Non-Defaulting Lenders.

"Reserves" means all (if any) Inventory Reserves and Availability Reserves (including, without limitation, Cash Management Reserves, Bank Product Reserves and reserves for Customer Credit Liabilities).

"Responsible Officer" of any Person shall mean any executive officer or financial officer of such Person and any other officer or similar official thereof with responsibility for the administration of the obligations of such Person in respect of this Agreement.

"Restricted Payment" means (a) any dividend or other distribution (whether in cash, securities or other property) with respect to any class of Capital Stock of a Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Capital Stock of a Person or any option, warrant or other right to acquire any Capital Stock of a Person or on account of any return of capital to the Person's stockholders, partners or members and (b) any principal or interest payment (or other distribution, whether in cash, securities or other property) on, or redemption, repurchase, defeasance or other acquisition or retirement for value of, in each case prior to any scheduled payment, sinking fund payment or maturity, of any Indebtedness due to Holdings, any of the Sponsors, Sponsor Related Parties

48

and/or other stockholders, partners or members of Holdings or any of their respective Affiliates (other than Indebtedness due to the Lead Borrower or any Restricted Subsidiary of it). "Restricted Payments" shall not include any dividends payable solely in Capital Stock of a Loan Party.

"Restructuring Advisor" has the meaning provided in Section 5.14.

"Revolver Priority Collateral" means all "ABL Priority Collateral" (as such term is defined in the Intercreditor Acknowledgment).

"Revolving Credit Ceiling" means as of any date, the Total Commitments, as of such date.

"Revolving Credit Facility" means the facility described herein providing for Revolving Credit Loans to the Borrowers and participations in respect of Letters of Credit by the Lenders in the aggregate principal amount of the Total Commitments.

"Revolving Credit Loans" means all loans at any time made by any Lender (including, without limitation, Loans) pursuant to Article II.

"Revolving Credit Notes" means the promissory notes of the Borrowers substantially in the form of Exhibit C, each payable to the order of a Lender, evidencing the Revolving Credit Loans made to the Borrowers.

"RSA" means that certain Restructuring Support Agreement dated as of November 13, 2020 by and among the Lead Borrower, Holdings and the Support Parties party thereto.

"S&P" means Standard & Poor's Ratings Services, advisor of The McGraw-Hill Companies, Inc. and any successor thereto.

"Sanctioned Entity" means (a) a country or a government of a country, (b) an agency of the government of a country, (c) an organization directly or indirectly controlled by a country or its government, or (d) a Person resident in or determined to be resident in a country, in each case of clauses (a) through (d) that is a target of Sanctions, including a target of any country sanctions program administered and enforced by OFAC.

"Sanctioned Person" means, at any time (a) any Person named on the list of Specially Designated Nationals and Blocked Persons maintained by OFAC ("SDN"), OFAC's consolidated Non-SDN list or any other Sanctions-related list maintained by any Governmental Authority, (b) a Person or legal entity that is a target of Sanctions, (c) any Person operating, organized or resident in a Sanctioned Entity, or (d) any Person directly or indirectly owned or controlled (individually or in the aggregate) by or acting on behalf of any such Person or Persons described in clauses (a) through (c) above.

"Sanctions" means individually and collectively, respectively, any and all economic sanctions, trade sanctions, financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes anti-terrorism laws and other sanctions laws, regulations or embargoes imposed,

49

administered or enforced from time to time by:  (a) the United States of America, including those administered by OFAC, the U.S. Department of State, the U.S. Department of Commerce, or through any existing or future executive order, (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) Her Majesty's Treasury of the United Kingdom, or (d) any other Governmental Authority with jurisdiction over any Lender or any Loan Party or any of their respective Subsidiaries or Affiliates.

"SEC" means the Securities and Exchange Commission or any Governmental Authority succeeding to any of its principal functions.

"Secured Party" means (a) each Credit Party, (b) any Lender or any Affiliate of a Lender providing Bank Products or Cash Management Services, (c) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document, and (d) the successors and, subject to any limitations contained in this Agreement, assigns of each of the foregoing.

"Security Agreement" means the Security Agreement dated as of Closing Date among the Loan Parties and the Collateral Agent for its benefit and for the benefit of the other Secured Parties, as amended and in effect from time to time.

"Security Documents" means the Security Agreement, the Pre-Petition Mortgages, the Pledge Agreement, the Facility Guarantee, and each other security agreement or other instrument or document executed and delivered pursuant to this Agreement or any other Loan Document that creates a Lien in favor of the Collateral Agent to secure any of the Obligations.

"Settlement Date" has the meaning provided in SECTION 2.22(b).

"Shrink" means Inventory identified by the Loan Parties as lost, misplaced, or stolen.

"Specified Closures" means those seven (7) store closures disclosed to MIII Partners on or prior to the Closing Date, and contemplated by the Approved Budget.

"Specified Indebtedness" means all Indebtedness under the DIP Term Loan Documents, the Pre-Petition Senior Secured Notes Documents and the Pre-Petition Senior Unsecured Notes Documents.

"Sponsors" means collectively, Ares Management LLC and its Affiliates.

"Sponsor Group" means the Sponsors and the Sponsor Related Parties.

"Sponsor Related Parties" means, with respect to the Sponsors, (a) any Controlling stockholder or partner thereof (including in the case of an individual Person who possesses Control, the spouse or immediate family member of such Person provided such Person retains Control of the voting rights, by stockholders agreement, trust agreement or otherwise of the Capital Stock owned by such spouse or immediate family member) or (b) any trust, corporation, partnership or other entity, the beneficiaries, stockholders, partners, owners or Persons

50

beneficially holding a 51% or more Controlling interest of which consist of such Person and/or such Persons referred to in the immediately preceding clause (a).

"Spot Rate" means, for a currency, the rate determined by the Administrative Agent to be the rate quoted by the Person acting in such capacity as the spot rate for the purchase by such Person of such currency with another currency through its principal foreign exchange trading office at approximately 11:00 a.m. on the date two Business Days prior to the date of such determination; provided that the Administrative Agent may obtain such spot rate from another financial institution designated by the Administrative Agent if the Person acting in such capacity does not have as of the date of determination a spot buying rate for any such currency.

"Standard Letter of Credit Practice" means, for the Issuing Bank, any domestic or foreign law or letter of credit practices applicable in the city in which the Issuing Bank issued the applicable Letter of Credit or, for its branch or correspondent, such laws and practices applicable in the city in which it has advised, confirmed or negotiated such Letter of Credit, as the case may be, in each case, (a) which letter of credit practices are of banks that regularly issue letters of credit in the particular city, and (b) which laws or letter of credit practices are required or permitted under ISP or UCP, as chosen in the applicable Letter of Credit.

"Standby Letter of Credit" means any Letter of Credit that is not a Commercial Letter of Credit.

"Standby Letter of Credit Agreement" means the Standby Letter of Credit Agreement relating to the issuance of a Standby Letter of Credit in the form from time to time in use by the Issuing Bank.

"Stated Amount" means at any time the maximum amount for which a Letter of Credit may be honored.

"Store" means any retail store (which includes any real property, fixtures, equipment, inventory and other property related thereto) operated, or to be operated, by any Loan Party.

"Subsidiary" means with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity (a) of which Capital Stock representing more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, Controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Successor Cases" means, with respect to the Chapter 11 Cases, any subsequent proceedings under Chapter 7 of the Bankruptcy Code.

"Supermajority Required Lenders" means, at any time, Non-Defaulting Lenders having Commitments aggregating more than 66 2/3% of the Total Commitments held by Non-Defaulting Lenders, or if the Commitments have been terminated, Non-Defaulting Lenders whose percentage of the outstanding Credit Extensions aggregate more than 66 2/3% of all such

51

Credit Extensions made by Non-Defaulting Lenders; provided, however, that, at any time that there are two or more Non-Defaulting Lenders, "Supermajority Required Lenders" must consist of at least two (2) Non-Defaulting Lenders.

"Superpriority Claims" means all of the allowed superpriority administrative expense claims of the Administrative Agent and the other Secured Parties on account of the Obligations, which claims shall be entitled to the benefits of section 364(c)(1) and 364(e) of the Bankruptcy Code, having priority over any and all administrative expenses of the kind that are specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 364(c)(1), 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 1113, 1114 or any other provisions of the Bankruptcy Code and any other claims against the Loan Parties. Superpriority Claims shall, at all times be (x) junior only to the Carve-Out, (y) senior to any and all other administrative expense claims or other claims against the Loan Parties or their estates, in the Chapter 11 Cases and any successor cases, and (z) subject to the Intercreditor Arrangement.

"Supported QFC" has the meaning assigned to it in SECTION 9.22.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Obligation" means, with respect to any Facility Guarantor, any obligation to pay or perform under any agreement, contract or transaction that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Synthetic Lease" means any lease or other agreement for the use or possession of property creating obligations which do not appear as Indebtedness on the balance sheet of the lessee thereunder but which, upon the insolvency or bankruptcy of such Person, may be characterized as Indebtedness of such lessee without regard to the accounting treatment.

"Taxes" means any and all current or future income, stamp or other taxes, levies, imposts, duties (including stamp duties), deductions, fees, charges (including ad valorem charges) or withholdings now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, and any and all interest and penalties related thereto.

52

"Termination Date" means the earliest to occur of (i) the Maturity Date, (ii) the effective date of a Plan of Reorganization, (iii) the date on which the maturity of the Obligations is accelerated (or deemed accelerated) and the Commitments are irrevocably terminated (or deemed terminated) in accordance with Article VII, (iv) the date on which the Aggregate Commitments are irrevocably terminated in accordance with the provisions of SECTION 2.15, (v) the date of consummation of a sale of all or substantially all of the Debtors' assets under Section 363 of the Bankruptcy Code, (vi) the date of conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, (vii) dismissal of any of the Chapter 11 Cases, unless otherwise consented to in writing by the Administrative Agent, and (viii) the earlier of (a) forty-five (45) days after the date of entry of the Interim Order if entry of the Final Order has not occurred by such date (or such later date as may be agreed in connection with an extension of Milestones as a result of the COVID-19 Pandemic) and (b) the first Business Day on which the Interim Order expires by its terms or is terminated, unless the Final Order has been entered and become effective prior thereto.

"Test Date" means December 11, 2020 and each Friday thereafter.

"Test Period" means with respect to each Test Date the immediately preceding four calendar weeks from such Test Date, on a cumulative basis; provided, that the Test Period corresponding to the Test Date on December 11, 2020 shall be the immediately preceding three calendar weeks from such Test Date, on a cumulative basis.

"Threshold Lenders" has the meaning provided in SECTION 9.02(c).

"Total Commitments" means the aggregate of the Commitments of all Lenders.

"Trade Receivables Reserves" means such reserves as may be established from time to time by the Administrative Agent, in its reasonable commercial discretion exercised in good faith and consistent with past practice, with respect to Dilution related to Eligible Trade Receivables to the extent that such Dilution exceeds 5% of the gross sales of the Loan Parties for the then most recently completed period of twelve (12) consecutive months.

"Type", when used in reference to any Revolving Credit Loan or Borrowing, refers to whether the rate of interest on such Revolving Credit Loan, or on the Revolving Credit Loans comprising such Borrowing, is determined by reference to the LIBO Rate or the Base Rate, as applicable.

"UCC" means the Uniform Commercial Code as in effect from time to time in the State of New York; provided, however, that if a term is defined in Article 9 of the Uniform Commercial Code differently than in another Article thereof, the term shall have the meaning set forth in Article 9; provided further that, if by reason of mandatory provisions of law, perfection, or the effect of perfection or non-perfection, of a security interest in any Collateral or the availability of any remedy hereunder is governed by the Uniform Commercial Code as in effect in a jurisdiction other than New York, "Uniform Commercial Code" means the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof

53

relating to such perfection or effect of perfection or non-perfection or availability of such remedy, as the case may be.

"UCP" means, with respect to any Letter of Credit, the Uniform Customs and Practice for Documentary Credits 2007 Revision, International Chamber of Commerce Publication No. 600 and any subsequent revision thereof adopted by the International Chamber of Commerce on the date such Letter of Credit is issued.

"Unanimous Consent" means the consent of Non-Defaulting Lenders holding 100% of the Commitments (other than Commitments held by a Defaulting Lender).

"Unused Commitment" means, on any day, (a) the then Total Commitments, minus (b) the sum of (i) the principal amount of the Revolving Credit Loans of the Borrowers then outstanding, and (ii) the Outstanding Amount of L/C Obligations.

"Unused Fee" has the meaning provided in SECTION 2.19(b).

"Updated Budget" has the meaning specified in Section 5.01(i).

"U.S. Lender" means any Lender that is a "United States person," as that term is defined in Section 7701(a)(30) of the Code.

"U.S. Special Resolution Regime" has the meaning assigned to it in SECTION 9.22.

"U.S. Tax Compliance Certificate" has the meaning provided in SECTION 2.23(e).

"U.S. Trustee" means the United States Trustee applicable in the Chapter 11 Cases.

"Variance Report" has the meaning specified in Section 5.01(j).

"Variance Report Date" has the meaning specified in Section 5.01(j).

"Weighted Average Life to Maturity" means, when applied to any Indebtedness, at any date, the quotient obtained by dividing (1) the sum of the products of the number of years from the date of determination to the date of each successive scheduled principal payment of such Indebtedness multiplied by the amount of such payment, by (2) the sum of all such payments.

"Wells Fargo" means Wells Fargo Bank, National Association.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part 1 of Subtitle E of Title IV of ERISA.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

54

SECTION 1.02 <u>Terms Generally</u>.

With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)     The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "<u>include</u>," "<u>includes</u>" and "<u>including</u>" shall be deemed to be followed by the phrase "without limitation."  The word "<u>will</u>" shall be construed to have the same meaning and effect as the word "<u>shall</u>."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Charter Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and permitted assigns, (iii) the words "<u>herein</u>," "<u>hereof</u>" and "<u>hereunder</u>," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, (vi) the words "<u>asset</u>" and "<u>property</u>" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights, (vii) all references to "$" or "dollars" or to amounts of money and all calculations of Excess Availability, Borrowing Base, permitted "baskets" and other similar matters shall be deemed to be references to the lawful currency of the United States of America, and (viii) references to "knowledge" of any Loan Party means the actual knowledge of a Responsible Officer.

(b)     In the computation of periods of time from a specified date to a later specified date, the word "<u>from</u>" means "<u>from and including</u>;" the words "<u>to</u>" and "<u>until</u>" each mean "<u>to but excluding</u>;" and the word "<u>through</u>" means "<u>to and including</u>."

(c)     Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d)     This Agreement and the other Loan Documents are the result of negotiation among, and have been reviewed by counsel to, among others, the Loan Parties and the Administrative Agent and are the product of discussions and negotiations among all parties.  Accordingly, this Agreement and the other Loan Documents are not intended to be construed against the Administrative Agent or any of the Lenders merely

55

on account of the Administrative Agent's or any Lender's involvement in the preparation of such documents.

SECTION 1.03 Accounting Terms.

(a)    Generally.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, applied in a manner consistent with that used in preparing the audited financial statements described in SECTION 3.04, except as otherwise specifically prescribed herein.  All amounts used for purposes of financial calculations required to be made shall be without duplication.

(b)    Issues Related to GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Lead Borrower or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Lead Borrower shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Lead Borrower shall provide to the Administrative Agent and the Lenders as reasonably requested hereunder a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.  In addition, the definitions set forth in the Loan Documents and any financial calculations required by the Loan Documents shall be computed to exclude (a) the effect of purchase accounting adjustments, including the effect of non-cash items resulting from any amortization, write-up, write-down or write-off of any assets or deferred charges (including, without limitation, intangible assets, goodwill and deferred financing costs in connection with any merger, consolidation or other similar transaction permitted by this Agreement), (b) the application of FAS 133, FAS 150 or FAS 123r (to the extent that the pronouncements in FAS 123r result in recording an equity award as a liability on the Consolidated balance sheet of Holdings and its Subsidiaries in the circumstance where, but for the application of the pronouncements, such award would have been classified as equity), (c) any mark-to-market adjustments to any derivatives (including embedded derivatives contained in other debt or equity instruments under FAS 133), (d) any non-cash compensation charges resulting from the application of FAS 123r and (e) FAS 159 (or any other Financial Accounting Standard having a similar result or effect) to value any Indebtedness or other liabilities of the Borrowers or any Subsidiary at "fair value", as defined therein.

SECTION 1.04 Rounding.  Any financial ratios required to be maintained pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

SECTION 1.05 <u>Times of Day</u>.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

SECTION 1.06 <u>Letter of Credit Amounts</u>.  Unless otherwise specified, all references herein to the amount of a Letter of Credit at any time shall be deemed to be the Stated Amount of such Letter of Credit in effect at such time; <u>provided</u>, however, that with respect to any Letter of Credit that, by its terms of any Issuer Documents related thereto, provides for one or more automatic increases in the Stated Amount thereof, the amount of such Letter of Credit shall be deemed to be the maximum Stated Amount of such Letter of Credit after giving effect to all such increases, whether or not such maximum Stated Amount is in effect at such time.

SECTION 1.07 <u>Certifications</u>.  All certifications to be made hereunder by an officer or representative of a Loan Party shall be made by such person in his or her capacity solely as an officer or a representative of such Loan Party, on such Loan Party's behalf and not in such person's individual capacity.

SECTION 1.08 <u>Effect of Benchmark Transition Event</u>.

(a)    <u>Benchmark Replacement</u>. Notwithstanding anything to the contrary herein or in any other Loan Document, upon the occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, the Administrative Agent and the Lead Borrower may amend this Agreement to replace the LIBO Rate with a Benchmark Replacement.  Any such amendment with respect to a Benchmark Transition Event will become effective at 5:00 p.m. on the fifth (5th) Business Day after the Administrative Agent has posted such proposed amendment to all Lenders and the Lead Borrower so long as the Administrative Agent has not received, by such time, written notice of objection to such amendment from Lenders comprising the Required Lenders.  Any such amendment with respect to an Early Opt-in Election will become effective on the date that Lenders comprising the Required Lenders have delivered to the Administrative Agent written notice that such Required Lenders accept such amendment.  No replacement of the LIBO Rate with a Benchmark Replacement pursuant to this SECTION 1.08 will occur prior to the applicable Benchmark Transition Start Date.

(b)    <u>Benchmark Replacement Conforming Changes</u>.  In connection with the implementation of a Benchmark Replacement, the Administrative Agent will have the right to make Benchmark Replacement Conforming Changes from time to time and, notwithstanding anything to the contrary herein or in another Loan Document, any amendments implementing such Benchmark Replacement Conforming Changes will become effective without any further action or consent of any other party to this Agreement.

(c)    <u>Notices; Standards for Decisions and Determinations</u>.  The Administrative Agent will promptly notify the Lead Borrower and the Lenders of (i) any occurrence of a Benchmark Transition Event or an Early Opt-in Election, as applicable, and its related Benchmark Replacement Date and Benchmark Transition Start Date, (ii) the implementation of any Benchmark Replacement, (iii) the effectiveness of any Benchmark Replacement Conforming Changes and (iv) the commencement or conclusion of any Benchmark Unavailability Period.  Any determination, decision or election that may be made by the Administrative Agent or Lenders pursuant to this SECTION 1.08, including any determination with respect to a tenor, rate or adjustment or of the occurrence or non-

57

occurrence of an event, circumstance or date and any decision to take or refrain from taking any action, will be conclusive and binding absent manifest error and may be made in its or their sole discretion and without consent from or consultation with any other party hereto, except, in each case, as expressly required pursuant to this SECTION 1.08.

(d)    Benchmark Unavailability Period.  Upon the Lead Borrower's receipt of notice of the commencement of a Benchmark Unavailability Period, the Lead Borrower may revoke any request for a Borrowing of LIBO Loans of, conversion to or continuation of LIBO Loans to be made, converted or continued during any Benchmark Unavailability Period and, failing that, the Lead Borrower will be deemed to have converted any such request into a request for a Borrowing of or conversion to Base Rate Loans.  During any Benchmark Unavailability Period, the component of the Base Rate based upon the LIBO Rate will not be used in any determination of the Base Rate.

(e)    Certain Defined Terms.  As used in this SECTION 1.08:

"Benchmark Replacement" means the sum of: (a) the alternate benchmark rate (which may include Term SOFR or SOFR) that has been selected by the Administrative Agent and the Lead Borrower giving due consideration to (i) any selection or recommendation of a replacement rate or the mechanism for determining such a rate by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a rate of interest as a replacement to the LIBO Rate for dollar-denominated syndicated credit facilities and (b) the Benchmark Replacement Adjustment; provided that, if the Benchmark Replacement as so determined would be less than 0.50%, the Benchmark Replacement will be deemed to be 0.50% for the purposes of this Agreement.

"Benchmark Replacement Adjustment" means, with respect to any replacement of the LIBO Rate with an Unadjusted Benchmark Replacement for each applicable Interest Period, the spread adjustment, or method for calculating or determining such spread adjustment, (which may be a positive or negative value or zero) that has been selected by the Administrative Agent and the Lead Borrower giving due consideration to (i) any selection or recommendation of a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the LIBO Rate with the applicable Unadjusted Benchmark Replacement by the Relevant Governmental Body or (ii) any evolving or then-prevailing market convention for determining a spread adjustment, or method for calculating or determining such spread adjustment, for the replacement of the LIBO Rate with the applicable Unadjusted Benchmark Replacement for dollar-denominated syndicated credit facilities at such time.

"Benchmark Replacement Conforming Changes" means, with respect to any Benchmark Replacement, any technical, administrative or operational changes (including changes to the definition of "Base Rate", the definition of "Interest Period", timing and frequency of determining rates and making payments of interest and other administrative matters) that the Administrative Agent, in consultation with the Lead Borrower, decides may be appropriate to reflect the adoption and implementation of such Benchmark Replacement and to permit the administration thereof by the Administrative Agent in a manner substantially consistent with market practice (or, if the Administrative Agent decides that adoption of any portion of such market practice is not administratively feasible or if the Administrative Agent determines that no market practice for the administration of the Benchmark Replacement exists, in such other manner of administration as the

58

Administrative Agent decides is reasonably necessary in connection with the administration of this Agreement).

"Benchmark Replacement Date" means the earlier to occur of the following events with respect to the LIBO Rate:

(1) in the case of clause (1) or (2) of the definition of "Benchmark Transition Event", the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which the administrator of the LIBO Rate permanently indefinitely ceases to provide the LIBO Rate; or

(2) in the case of clause (3) of the definition of "Benchmark Transition Event", the later of (a) the date of the public statement or publication of information referenced therein and (b) the date on which such public statement or publication has deemed the LIBO Rate to be no longer representative, if any.

"Benchmark Transition Event" means the occurrence of one or more of the following events with respect to the LIBO Rate:

(1) a public statement or publication of information by or on behalf of the administrator of the LIBO Rate announcing that such administrator has ceased or will cease to provide the LIBO Rate, permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the LIBO Rate;

(2) a public statement or publication of information by the regulatory supervisor for the administrator of the LIBO Rate, the Federal Reserve System, an insolvency official with jurisdiction over the administrator for the LIBO Rate, a resolution authority with jurisdiction over the administrator for the LIBO Rate or a court or an entity with similar insolvency or resolution authority over the administrator for the LIBO Rate, which states that the administrator of the LIBO Rate has ceased or will cease to provide the LIBO Rate permanently or indefinitely, provided that, at the time of such statement or publication, there is no successor administrator that will continue to provide the LIBO Rate; or

(3) a public statement or publication of information by the regulatory supervisor for the administrator of the LIBO Rate announcing that the LIBO Rate is no longer representative.

"Benchmark Transition Start Date" means (a) in the case of a Benchmark Transition Event, the earlier of (i) the applicable Benchmark Replacement Date and (ii) if such Benchmark Transition Event is a public statement or publication of information of a prospective event, the 90th day prior to the expected date of such event as of such public statement or publication of information (or if the expected date of such prospective event is fewer than 90 days after such statement or publication, the date of such statement or publication) and (b) in the case of an Early Opt-in Election, the date specified by the Administrative Agent or the Required Lenders, as applicable, by notice to the Lead Borrower, the Administrative Agent (in the case of such notice by the Required Lenders) and the Lenders.

59

"Benchmark Unavailability Period" means, if a Benchmark Transition Event and its related Benchmark Replacement Date have occurred with respect to the LIBO Rate and solely to the extent that the LIBO Rate has not been replaced with a Benchmark Replacement, the period (x) beginning at the time that such Benchmark Replacement Date has occurred if, at such time, no Benchmark Replacement has replaced the LIBO Rate for all purposes hereunder in accordance with this SECTION 1.08 and (y) ending at the time that a Benchmark Replacement has replaced the LIBO Rate for all purposes hereunder pursuant to this SECTION 1.08

"Early Opt-in Election" means the occurrence of:

(1) (i) a determination by the Administrative Agent or (ii) a notification by the Required Lenders to the Administrative Agent (with a copy to the Lead Borrower) that the Required Lenders have determined that dollar-denominated syndicated credit facilities being executed at such time, or that include language similar to that contained in this SECTION 1.08, are being executed or amended, as applicable, to incorporate or adopt a new benchmark interest rate to replace the LIBO Rate, and

(2) (i) the election by the Administrative Agent (in consultation with the Lead Borrower) or (ii) the election by the Required Lenders to declare that an Early Opt-in Election has occurred and the provision, as applicable, by the Administrative Agent of written notice of such election to the Lead Borrower and the Lenders   or by the Required Lenders of written notice of such election to the Administrative Agent.

"Federal Reserve Bank of New York's Website" means the website of the Federal Reserve Bank of New York at http://www.newyorkfed.org, or any successor source.

"Relevant Governmental Body" means the Board and/or the Federal Reserve Bank of New York, or a committee officially endorsed or convened by the Board and/or the Federal Reserve Bank of New York or any successor thereto.

"SOFR" with respect to any day means the secured overnight financing rate published for such day by the Federal Reserve Bank of New York, as the administrator of the benchmark, (or a successor administrator) on the Federal Reserve Bank of New York's Website.

"Term SOFR" means the forward looking term rate based on SOFR that has been selected or recommended by the Relevant Governmental Body.

"Unadjusted Benchmark Replacement" means the Benchmark Replacement excluding the Benchmark Replacement Adjustment.

SECTION 1.09 Divisions.

For all purposes under the Loan Documents, in connection with any division or plan of division under Delaware law (or any comparable event under a different jurisdiction's laws): (a) if any asset, right, obligation or liability of any Person becomes the asset, right, obligation or liability of a different Person, then it shall be deemed to have been transferred from the original Person to the subsequent Person, and (b) if any new Person comes into existence, such new Person shall be deemed to have been organized on the first date of its existence by the holders of its equity interests at such time.

ARTICLE II

Amount and Terms of Credit

SECTION 2.01 Commitment of the Lenders.

(a)    Each Lender, severally and not jointly with any other Lender, agrees, upon the terms and subject to the conditions herein set forth, to make Credit Extensions to or for the benefit of the Borrowers, on a revolving basis, subject in each case to the following limitations:

(i)    The aggregate Outstanding Amount of the Credit Extensions shall not at any time exceed the Loan Cap;

(ii)    Letters of Credit shall be available from the Issuing Bank to the Borrowers, provided that the Borrowers shall not at any time permit the Outstanding Amount of all L/C Obligations at any time to exceed the Letter of Credit Sublimit;

(iii)    No Lender shall be obligated to make any Credit Extension to the Borrowers in excess of such Lender's Commitment; and

(iv)    Subject to all of the other provisions of this Agreement, Revolving Credit Loans to the Borrowers that are repaid may be reborrowed prior to the Termination Date.  No new Credit Extensions (other than Permitted Overadvances) shall be made to the Borrowers after the Termination Date.

(b)    Each Borrowing of Revolving Credit Loans to the Borrowers shall be made by the Lenders pro rata as to the Revolving Credit Facility and in accordance with the Commitments of the Lenders.  The failure of any Lender to make any Revolving Credit Loan to the Borrowers shall neither relieve any other Lender of its obligation to fund its Revolving Credit Loan to the Borrowers in accordance with the provisions of this Agreement nor increase the obligation of any such other Lender.

61

SECTION 2.02 [Reserved].

SECTION 2.03 <u>Reserves; Changes to Reserves</u>.  The Administrative Agent may hereafter establish additional Reserves or modify any existing Reserves, in the exercise of its reasonable business judgment acting in accordance with industry standards for asset based lending in the retail industry.

SECTION 2.04 <u>Borrowings, Conversions and Continuations of Revolving Credit Loans.</u>

(a)     Except as set forth in SECTION 2.10 and SECTION 2.11, Revolving Credit Loans shall be either Base Rate Loans or LIBO Loans as the Lead Borrower on behalf of the Borrowers may request subject to and in accordance with this SECTION 2.04.  All Revolving Credit Loans made pursuant to the same Borrowing shall, unless otherwise specifically provided herein, be Revolving Credit Loans of the same Type.  Each Lender may fulfill its Commitment with respect to any Revolving Credit Loan by causing any lending office of such Lender to make such Revolving Credit Loan; <u>provided</u>, <u>however</u>, that any such use of a lending office shall not affect the obligation of the Borrowers to repay such Revolving Credit Loan in accordance with the terms of the applicable Revolving Credit Note.  Each Lender shall, subject to its overall policy considerations, use reasonable efforts to select a lending office which will not result in the payment of increased costs by the Borrowers.  Subject to the other provisions of this SECTION 2.04 and the provisions of SECTION 2.11, Borrowings of Revolving Credit Loans of more than one Type may be incurred at the same time, but in any event no more than ten (10) Borrowings of LIBO Loans may be outstanding at any time.

(b)     Each request for a Borrowing consisting of a Base Rate Loan shall be made by electronic request of the Lead Borrower through Administrative Agent's Commercial Electronic Office Portal or through such other electronic portal provided by Administrative Agent (the "<u>Portal</u>"), which must be received by the Administrative Agent not later than 3:00 p.m. on the requested date of any Borrowing of Base Rate Loans.  The Borrowers hereby acknowledge and agree that any request made through the Portal shall be deemed made by a Responsible Officer of the Borrowers.  Each request for a Borrowing consisting of a LIBO Loan shall be made pursuant to the Lead Borrower's submission of a LIBO Rate Loan Notice, which must be received by the Administrative Agent not later than 1:00 p.m. three (3) Business Days prior to the requested date of any Borrowing or continuation of LIBO Loans.  Each LIBO Loan Notice shall specify (i) the requested date of the Borrowing or continuation, as the case may be (which shall be a Business Day), (ii) the principal amount of LIBO Loans to be borrowed or continued (which shall be in a principal amount of $5,000,000 or a whole multiple of $1,000,000 in excess thereof), and (iii) the duration of the Interest Period with respect thereto.  If the Lead Borrower fails to specify an Interest Period, it will be deemed to have specified an Interest Period of one month.  On the requested date of any LIBO Loan, (i) in the event that Base Rate Loans are outstanding in an amount equal to or greater than the requested LIBO Loan, all or a portion of such Base Rate Loans shall be automatically converted to a LIBO Loan in the amount requested by the Lead Borrower, and (ii) if Base Rate Loans are not outstanding in an amount at least equal to the requested LIBO Loan, the Lead Borrower shall make an electronic request via the Portal for additional Base Rate Loans in such amount, when taken with the outstanding Base Rate Loans (which shall be converted automatically at such time), as is necessary to satisfy the requested LIBO Loan.  If the Lead Borrower fails to make such additional request via the Portal as required pursuant to clause (ii) of the foregoing sentence, then the Borrowers shall be responsible for all

62

amounts due pursuant to SECTION 2.16 hereof arising on account of such failure. If the Lead Borrower fails to give a timely notice with respect to any continuation of a LIBO Loan, then the applicable Loans shall be converted to Base Rate Loans, effective as of the last day of the Interest Period then in effect with respect to the applicable LIBO Loans.

(c)    The Administrative Agent shall promptly notify each Lender of its proportionate share of such Borrowing, the date of such Borrowing, the Type of Borrowing being requested and the Interest Period or Interest Periods applicable thereto, as appropriate. On the borrowing date specified in such notice, each Lender shall make its share of the Borrowing available at the office of the Administrative Agent at 125 High Street, Boston, Massachusetts 02110 no later than 1:00 p.m., in immediately available funds. Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with this SECTION 2.04 and may, in reliance upon such assumption, make available to the Borrowers a corresponding amount. In the event a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrowers severally agree to pay to the Administrative Agent, forthwith on demand such corresponding amount, with interest thereon for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Administrative Agent, at (i) in the case of such Lender, the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation, or (ii) in the case of the Borrowers, the interest rate applicable to Base Rate Loans. If such Lender pays such amount to the Administrative Agent, then such amount shall constitute such Lender's Revolving Credit Loan included in such Borrowing. Upon receipt of the funds made available by the Lenders to fund any borrowing hereunder, the Administrative Agent shall disburse such funds in the manner specified in the LIBO Rate Loan Notice delivered by the Lead Borrower and shall use reasonable efforts to make the funds so received from the Lenders available to the Borrowers no later than 5:00 p.m.

(d)    Except as otherwise provided herein, a LIBO Loan may be continued or converted only on the last day of an Interest Period for such LIBO Loan, unless the applicable Borrower pays all Breakage Costs incurred in connection with such conversion. During the existence and continuance of an Event of Default, no Loans may be converted to or continued as LIBO Loans without the consent of the Required Lenders.

(e)    The Administrative Agent shall promptly notify the Lead Borrower and the Lenders of the interest rate applicable to any Interest Period for LIBO Loans upon determination of such interest rate. At any time that Base Rate Loans are outstanding, the Administrative Agent shall notify the Lead Borrower and the Lenders of any change in Wells Fargo's prime rate used in determining the Base Rate promptly following the public announcement of such change.

(f)    To the extent not paid by the Borrowers when due (after taking into consideration any applicable grace period), the Administrative Agent, without the request of the Lead Borrower, may advance any interest, fee payable pursuant to SECTION 2.19 or other payment to which any Credit Party is entitled from the Loan Parties pursuant hereto or any other Loan Document and may charge the same to the Loan Account notwithstanding that an Overadvance may result thereby. The

63

Administrative Agent shall advise the Lead Borrower of any such advance or charge promptly after the making thereof.  Such action on the part of the Administrative Agent shall not constitute a waiver of the Administrative Agent's rights and the Borrowers' obligations under SECTION 2.17(a).  Any amount which is added to the principal balance of the Loan Account as provided in this SECTION 2.04(d) shall bear interest at the interest rate then and thereafter applicable to Base Rate Loans.

SECTION 2.05 Overadvances.

(a)    The Agents and the Lenders shall have no obligation to make any Revolving Credit Loan or to provide any Letter of Credit if an Overadvance would result.

(b)    The Administrative Agent may, in its discretion, make Permitted Overadvances to the Borrowers without the consent of the Lenders and each Lender shall be bound thereby.  The making of a Permitted Overadvance is for the benefit of the Borrowers and shall constitute a Revolving Credit Loan and an Obligation.  The making of any such Permitted Overadvance on any one occasion shall not obligate the Administrative Agent or any Lender to make or permit any Permitted Overadvance on any other occasion or to permit such Permitted Overadvances to remain outstanding.

(c)    The making by the Administrative Agent of a Permitted Overadvance shall not modify or abrogate any of the provisions of SECTION 2.13 regarding the Lenders' obligations with respect to Letters of Credit.

SECTION 2.06 Reserved.

SECTION 2.07 Notes.

(a)    Upon the request of any Lender, the Revolving Credit Loans made by such Lender shall be evidenced by a Revolving Credit Note, dated the Closing Date, duly executed on behalf of the Borrowers, payable to the order of such Lender in an aggregate principal amount equal to such Lender's Commitment, as each may be amended, supplemented or modified from time to time.

(b)    [Reserved].

(c)    Each Lender is hereby authorized by the Borrowers to endorse on a schedule attached to each Note delivered to such Lender (or on a continuation of such schedule attached to such Note and made a part thereof), or otherwise to record in such Lender's internal records, an appropriate notation evidencing the date and amount of each Revolving Credit Loan from such Lender, each payment and prepayment of principal of any such Revolving Credit Loan, each payment of interest on any such Revolving Credit Loan and the other information provided for on such schedule; provided, however, that the failure of any Lender to make such a notation or any error therein shall not affect the obligation of any Borrower to repay the Revolving Credit Loans made by such Lender in accordance with the terms of this Agreement and the applicable Notes.

(d)    Upon receipt of an affidavit and indemnity of a Lender as to the loss, theft, destruction or mutilation of such Lender's Note and upon cancellation of such Note, the Borrowers

64

will issue, in lieu thereof, a replacement Note in favor of such Lender, in the same principal amount thereof and otherwise of like tenor at such Lender's expense.

SECTION 2.08 <u>Interest on Revolving Credit Loans.</u>

(a)    Subject to SECTION 2.12, each Base Rate Loan shall bear interest (computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as applicable) at a rate per annum that shall be equal to the then Base Rate <u>plus</u> the Applicable Margin for Base Rate Loans.

(b)    Subject to SECTION 2.10 through SECTION 2.12, each LIBO Loan shall bear interest (computed on the basis of 360-day year and actual days elapsed) at a rate per annum equal, during each Interest Period applicable thereto, to the LIBO Rate for such Interest Period, <u>plus</u> the Applicable Margin for LIBO Loans.

(c)    Accrued interest on all Revolving Credit Loans shall be payable in arrears on each Interest Payment Date applicable thereto upon prepayment, at maturity (whether by acceleration or otherwise) and after such maturity on demand.

SECTION 2.09 <u>[Reserved].</u>

SECTION 2.10 <u>Alternate Rate of Interest for Revolving Credit Loans.</u>

If prior to the commencement of any Interest Period for a LIBO Borrowing, the Administrative Agent:

(a)    Reasonably determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the LIBO Rate (in accordance with the terms of the definition thereof) for such Interest Period; or

(b)    Is advised by the Required Lenders that the LIBO Rate for such Interest Period will not adequately and fairly reflect the cost to such Required Lenders of making or maintaining their Revolving Credit Loans included in such Borrowing for such Interest Period;

then the Administrative Agent shall give notice thereof to the Lead Borrower and the Lenders by telephone or telecopy as promptly as practicable thereafter and, until the Administrative Agent notifies the Lead Borrower and the Applicable Lenders that the circumstances giving rise to such notice no longer exist (which notice the Administrative Agent shall deliver promptly upon obtaining knowledge of the same), (i) any Borrowing Request that requests the continuation of any Borrowing as a LIBO Borrowing shall be ineffective and (ii) if any Borrowing Request requests a LIBO Borrowing, such Borrowing shall be made as a Borrowing of Base Rate Loans unless withdrawn by the Lead Borrower.

SECTION 2.11 <u>Change in Legality.</u>

(a)    Notwithstanding anything to the contrary contained elsewhere in this Agreement, if any Change in Law occurring after the Closing Date shall make it unlawful for a Lender to make or maintain a LIBO Loan or to give effect to its obligations as contemplated hereby with respect to a LIBO Loan, then, by written notice to the Lead Borrower, such Lender may (x) declare that LIBO Loans will not thereafter be made by such Lender hereunder, whereupon any request by the Lead Borrower for a LIBO Borrowing shall, as to such Lender only, be deemed a request for a Base Rate Loan unless such declaration shall be subsequently withdrawn; and (y) require that all outstanding LIBO Loans made by such Lender be converted to Base Rate Loans, in which event all such LIBO Loans shall be automatically converted to Base Rate Loans as of the effective date of such notice as provided in SECTION 2.04.  In the event any Lender shall exercise its rights hereunder, all payments and prepayments of principal which would otherwise have been applied to repay the LIBO Loans that would have been made by such Lender or the converted LIBO Loans of such Lender, shall instead be applied to repay the Base Rate Loans made by such Lender in lieu of, or resulting from the conversion of, such LIBO Loans.

(b)    For purposes of this SECTION 2.11, a notice to the Lead Borrower pursuant to SECTION 2.11(a) above shall be effective, if lawful, and if any LIBO Loans shall then be outstanding, on the last day of the then-current Interest Period; and otherwise such notice shall be effective on the date of receipt by the Lead Borrower.

SECTION 2.12 <u>Default Interest.</u>

Effective upon written notice from the Administrative Agent after the occurrence and during the continuance of an Event of Default, interest shall accrue on all Loans and other amounts owing by the Loan Parties (after as well as before judgment, as and to the extent permitted by Applicable Law) at a rate per annum (computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as applicable) (the "<u>Default Rate</u>") equal to (a) with respect to overdue principal of any Loan (including any Letter of Credit Disbursement), the rate (including the Applicable Margin) otherwise applicable thereto plus two percent (2.00%) per annum and (b) with respect to any other overdue amount, the rate then applicable to Base Rate Loans plus two percent (2.00%) per annum.  Such interest shall be payable on each Interest Payment Date (or any earlier maturity of the Revolving Credit Loans).  Such interest shall not be payable to Defaulting Lenders.

SECTION 2.13 <u>Letters of Credit.</u>

(a)    Subject to the terms and conditions of this Agreement, upon the request of the Lead Borrower made in accordance herewith, and prior to the Maturity Date, the Issuing Bank agrees to issue a requested Letter of Credit for the account of the Loan Parties.  By submitting a request to the Issuing Bank for the issuance of a Letter of Credit, the Borrowers shall be deemed to have requested that the Issuing Bank issue the requested Letter of Credit. Each request for the issuance of a Letter of Credit, or the amendment, renewal, or extension of any outstanding Letter of Credit, shall be (i) irrevocable and be made in writing pursuant to a Letter of Credit Application by a Responsible Officer, (ii) delivered to the Issuing Bank and the

66

Administrative Agent via telefacsimile or other electronic method of transmission reasonably acceptable to the Issuing Bank not later than 11:00 a.m. at least two Business Days (or such other date and time as the Administrative Agent and the Issuing Bank may agree in a particular instance in their sole discretion) prior to the requested date of issuance, amendment, renewal, or extension, and (iii) subject to the Issuing Bank's authentication procedures with results reasonably satisfactory to the Issuing Bank.  Each such request shall be in form and substance reasonably satisfactory to the Issuing Bank and (i) shall specify (A) the amount of such Letter of Credit, (B) the date of issuance, amendment, renewal, or extension of such Letter of Credit, (C) the proposed expiration date of such Letter of Credit, (D) the name and address of the beneficiary of the Letter of Credit, and (E) such other information (including, the conditions to drawing, and, in the case of an amendment, renewal, or extension, identification of the Letter of Credit to be so amended, renewed, or extended) as shall be necessary to prepare, amend, renew, or extend such Letter of Credit, and (ii) shall be accompanied by such Issuer Documents as the Administrative Agent or the Issuing Bank may request or require, to the extent that such requests or requirements are consistent with the Issuer Documents that the Issuing Bank generally requests for Letters of Credit in similar circumstances.  The Administrative Agent's records of the content of any such request will be conclusive.

(b)    The Issuing Bank shall have no obligation to issue a Letter of Credit if, after giving effect to the requested issuance, (i) the aggregate Outstanding Amount of all Loans and all L/C Obligations would exceed Loan Cap, (ii) the aggregate Outstanding Amount of the Loans of any Lender, plus such Lender's Commitment Percentage of the Outstanding Amount of all L/C Obligations, would exceed such Lender's Commitment, or (iii) the Outstanding Amount of the L/C Obligations would exceed the Letter of Credit Sublimit;

(c)    In the event there is a Defaulting Lender as of the date of any request for the issuance of a Letter of Credit, the Issuing Bank shall not be required to issue or arrange for such Letter of Credit to the extent (i) the Defaulting Lender's participation with respect to such Letter of Credit may not be reallocated pursuant to SECTION 2.27(b), or (ii) the Issuing Bank has not otherwise entered into arrangements reasonably satisfactory to it and the Borrowers to eliminate the Issuing Bank's risk with respect to the participation in such Letter of Credit of the Defaulting Lender, which arrangements may include the Borrowers Cash Collateralizing such Defaulting Lender's participation with respect to such Letter of Credit in accordance with SECTION 2.27(b).  Additionally, the Issuing Bank shall have no obligation to issue and/or extend a Letter of Credit if (A) any order, judgment, or decree of any Governmental Authority or arbitrator shall, by its terms, purport to enjoin or restrain the Issuing Bank from issuing such Letter of Credit, or any law applicable to the Issuing Bank or any request or directive (whether or not having the force of law) from any Governmental Authority with jurisdiction over the Issuing Bank shall prohibit or request that the Issuing Bank refrain from the issuance of letters of credit generally or such Letter of Credit in particular, or (B) the issuance of such Letter of Credit would violate one or more policies of the Issuing Bank applicable to letters of credit generally, or (C) if the expiry date of such requested Letter of Credit would occur after the Letter of Credit Expiration Date, unless either such Letter of Credit is Cash Collateralized on or prior to the date of issuance of such Letter of Credit (or such later date as to which the Administrative Agent may agree) or the Issuing Bank and all the Lenders have approved such expiry date.

67

(d)    Each Letter of Credit shall be in form and substance reasonably acceptable to the Issuing Bank, including the requirement that the amounts payable thereunder must be payable in Dollars; provided that if the Issuing Bank, in its discretion, issues a Letter of Credit denominated in a currency other than Dollars, all reimbursements by the Borrowers of the honoring of any drawing under such Letter of Credit shall be paid in Dollars based on the Spot Rate.  If the Issuing Bank makes a payment under a Letter of Credit, the Borrowers shall pay to Administrative Agent an amount equal to the applicable Letter of Credit Disbursement on the Business Day such Letter of Credit Disbursement is made and, in the absence of such payment, the amount of the Letter of Credit Disbursement immediately and automatically shall be deemed to be a Revolving Credit Loan hereunder (notwithstanding any failure to satisfy any condition precedent set forth in SECTION 4.02 hereof) and, initially, shall bear interest at the rate then applicable to Base Rate Loans. If a Letter of Credit Disbursement is deemed to be a Revolving Credit Loan hereunder, the Borrowers' obligation to pay the amount of such Letter of Credit Disbursement to the Issuing Bank shall be automatically converted into an obligation to pay the resulting Revolving Credit Loan.  Promptly following receipt by the Administrative Agent of any payment from the Borrowers pursuant to this paragraph, the Administrative Agent shall distribute such payment to the Issuing Bank or, to the extent that the Lenders have made payments pursuant to SECTION 2.13(e) to reimburse the Issuing Bank, then to such Lenders and the Issuing Bank as their interests may appear.

(e)    Promptly following receipt of a notice of a Letter of Credit Disbursement pursuant to SECTION 2.13(d), each Lender agrees to fund its Commitment Percentage of any Revolving Credit Loan deemed made pursuant to SECTION 2.13(d) on the same terms and conditions as if the Borrowers had requested the amount thereof as a Revolving Credit Loan and the Administrative Agent shall promptly pay to the Issuing Bank the amounts so received by it from the Lenders.  By the issuance of a Letter of Credit (or an amendment, renewal, or extension of a Letter of Credit) and without any further action on the part of the Issuing Bank or the Lenders, the Issuing Bank shall be deemed to have granted to each Lender, and each Lender shall be deemed to have purchased, a participation in each Letter of Credit issued by the Issuing Bank, in an amount equal to its Commitment Percentage of such Letter of Credit, and each such Lender agrees to pay to the Administrative Agent, for the account of the Issuing Bank, such Lender's Commitment Percentage of any Letter of Credit Disbursement made by the Issuing Bank under the applicable Letter of Credit.  In consideration and in furtherance of the foregoing, each Lender hereby absolutely and unconditionally agrees to pay to the Administrative Agent, for the account of the Issuing Bank, such Lender's Commitment Percentage of each Letter of Credit Disbursement made by the Issuing Bank and not reimbursed by Borrowers on the date due as provided in SECTION 2.13(d), or of any reimbursement payment that is required to be refunded (or that the Administrative Agent or the Issuing Bank elects, based upon the advice of counsel, to refund) to the Borrowers for any reason.  Each Lender acknowledges and agrees that its obligation to deliver to the Administrative Agent, for the account of the Issuing Bank, an amount equal to its respective Commitment Percentage of each Letter of Credit Disbursement pursuant to this SECTION 2.13(e) shall be absolute and unconditional and such remittance shall be made notwithstanding the occurrence or continuation of a Default or Event of Default or the failure to satisfy any condition set forth in SECTION 4.02 hereof.  If any such Lender fails to make available to the Administrative Agent the amount of such Lender's Commitment Percentage of a

DB1/ 117162443.7

Letter of Credit Disbursement as provided in this Section, such Lender shall be deemed to be a Defaulting Lender and the Administrative Agent (for the account of the Issuing Bank) shall be entitled to recover such amount on demand from such Lender together with interest thereon at the Defaulting Lender Rate until paid in full.

(f)    Each Borrower agrees to indemnify, defend and hold harmless each Credit Party (including the Issuing Bank and its branches, Affiliates, and correspondents) and each such Person's respective directors, officers, employees, attorneys and agents (each, including the Issuing Bank, a "Letter of Credit Related Person") (to the fullest extent permitted by Applicable Law) from and against any and all claims, demands, suits, actions, investigations, proceedings, liabilities, fines, costs, penalties, and damages, and all reasonable fees and disbursements of attorneys, experts, or consultants and all other costs and expenses actually incurred in connection therewith or in connection with the enforcement of this indemnification (as and when they are incurred and irrespective of whether suit is brought), which may be incurred by or awarded against any such Letter of Credit Related Person (other than Taxes, which shall be governed by SECTION 2.23) (the "Letter of Credit Indemnified Costs"), and which arise out of or in connection with, or as a result of:

(i)    any Letter of Credit or any pre-advice of its issuance;

(ii)    any transfer, sale, delivery, surrender or endorsement (or lack thereof) of any Drawing Document at any time(s) held by any such Letter of Credit Related Person in connection with any Letter of Credit;

(iii)    any action or proceeding arising out of, or in connection with, any Letter of Credit (whether administrative, judicial or in connection with arbitration), including any action or proceeding to compel or restrain any presentation or payment under any Letter of Credit, or for the wrongful dishonor of, or honoring a presentation under, any Letter of Credit;

(iv)    any independent undertakings issued by the beneficiary of any Letter of Credit;

(v)    any unauthorized instruction or request made to the Issuing Bank in connection with any Letter of Credit or requested Letter of Credit, or any error, omission, interruption or delay in such instruction or request, whether transmitted by mail, courier, electronic transmission, SWIFT, or any other telecommunication including communications through a correspondent;

(vi)    an adviser, confirmer or other nominated person seeking to be reimbursed, indemnified or compensated;

(vii)    any third party seeking to enforce the rights of an applicant, beneficiary, nominated person, transferee, assignee of Letter of Credit proceeds or holder of an instrument or document;

69

(viii)    the fraud, forgery or illegal action of parties other than the Letter of Credit Related Person;

(ix)    any prohibition on payment or delay in payment of any amount payable by the Issuing Bank to a beneficiary or transferee beneficiary of a Letter of Credit arising out of Anti-Corruption Laws, Anti-Money Laundering Laws, or Sanctions;

(x)    the Issuing Bank's performance of the obligations of a confirming institution or entity that wrongfully dishonors a confirmation;

(xi)    any foreign language translation provided to the Issuing Bank in connection with any Letter of Credit;

(xii)    any foreign law or usage as it relates to the Issuing Bank's issuance of a Letter of Credit in support of a foreign guaranty including without limitation the expiration of such guaranty after the related Letter of Credit expiration date and any resulting drawing paid by the Issuing Bank in connection therewith; or

(xiii)    the acts or omissions, whether rightful or wrongful, of any present or future de jure or de facto governmental or regulatory authority or cause or event beyond the control of the Letter of Credit Related Person;

provided, however, that such indemnity shall not be available to any Letter of Credit Related Person claiming indemnification under clauses (i) through (x) above to the extent that such Letter of Credit Indemnified Costs may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction to have resulted directly from the gross negligence, bad faith, fraud or willful misconduct of the Letter of Credit Related Person (or any of its Affiliates or Related Parties) claiming indemnity.  The Borrowers hereby agree to pay the Letter of Credit Related Person claiming indemnity within ten (10) Business Days of receiving a written demand therefor from time to time all amounts owing under this SECTION 2.13(f).  If and to the extent that the obligations of the Borrowers under this SECTION 2.13(f) are unenforceable for any reason, the Borrowers agree to make the maximum contribution to the Letter of Credit Indemnified Costs permissible under Applicable Law.  This indemnification provision shall survive termination of this Agreement and all Letters of Credit.

(g)    The liability of the Issuing Bank (or any other Letter of Credit Related Person) under, in connection with or arising out of any Letter of Credit (or pre-advice), regardless of the form or legal grounds of the action or proceeding, shall be limited to direct damages suffered by the Borrowers that are caused directly by the Issuing Bank's gross negligence, bad faith, fraud or willful misconduct in (i) honoring a presentation under a Letter of Credit that on its face does not at least substantially comply with the terms and conditions of such Letter of Credit, (ii) failing to honor a presentation under a Letter of Credit that strictly complies with the terms and conditions of such Letter of Credit or (iii) retaining Drawing Documents presented under a Letter of Credit.  The Borrowers' aggregate remedies against the Issuing Bank and any Letter of Credit Related Person for wrongfully honoring a presentation under any Letter of Credit or wrongfully retaining honored Drawing Documents shall in no event

70

exceed the aggregate amount paid by the Borrowers to the Issuing Bank in respect of the honored presentation in connection with such Letter of Credit under SECTION 2.13(d), plus interest at the rate then applicable to Base Rate Loans hereunder.  The Borrowers shall take action to avoid and mitigate the amount of any damages claimed against the Issuing Bank or any other Letter of Credit Related Person, including by enforcing its rights against the beneficiaries of the Letters of Credit.  Any claim by the Borrowers under or in connection with any Letter of Credit shall be reduced by an amount equal to the sum of (x) the amount (if any) saved by the Borrowers as a result of the breach or alleged wrongful conduct complained of; and (y) the amount (if any) of the loss that would have been avoided had the Borrowers taken all reasonable steps to mitigate any loss, and in case of a claim of wrongful dishonor, by specifically and timely authorizing the Issuing Bank to effect a cure.

(h)    The Borrowers shall be responsible for the final text of the Letter of Credit as issued by the Issuing Bank, irrespective of any assistance the Issuing Bank may provide such as drafting or recommending text or by the Issuing Bank's use or refusal to use text submitted by the Borrowers.  The Borrowers understand that the final form of any Letter of Credit may be subject to such revisions and changes as are deemed necessary or appropriate by the Issuing Bank, and Borrowers hereby consent to such revisions and changes not materially different from the application executed in connection therewith.  The Borrowers are solely responsible for the suitability of the Letter of Credit for the Borrowers' purposes.  If the Borrowers request that the Issuing Bank issue a Letter of Credit for an affiliated or unaffiliated third party (an "Account Party"), (i) such Account Party shall have no rights against the Issuing Bank; (ii) the Borrowers shall be responsible for the application and obligations under this Agreement; and (iii) communications (including notices) related to the respective Letter of Credit shall be among the Issuing Bank and the Borrowers.  The Borrowers will examine the copy of the Letter of Credit and any other documents sent by the Issuing Bank in connection therewith and shall promptly notify the Issuing Bank (not later than three (3) Business Days following the Borrowers' receipt of documents from the Issuing Bank) of any non-compliance with the Borrowers' instructions and of any discrepancy in any document under any presentment or other irregularity.  The Borrowers understand and agree that the Issuing Bank is not required to extend the expiration date of any Letter of Credit for any reason.  With respect to any Letter of Credit containing an "automatic amendment" to extend the expiration date of such Letter of Credit, the Issuing Bank, in its sole and absolute discretion, may give notice of nonrenewal of such Letter of Credit and, if the Borrowers do not at any time want the then current expiration date of such Letter of Credit to be extended, the Borrowers will so notify the Administrative Agent and the Issuing Bank at least 30 calendar days before the Issuing Bank is required to notify the beneficiary of such Letter of Credit or any advising bank of such non-extension pursuant to the terms of such Letter of Credit.

(i)    The Borrowers' reimbursement and payment obligations under this SECTION 2.13 are absolute, unconditional and irrevocable and shall be performed strictly in accordance with the terms of this Agreement under any and all circumstances whatsoever, including:

(i)      any lack of validity, enforceability or legal effect of any Letter of Credit, any Issuer Document, this Agreement or any Loan Document, or any term or provision therein or herein;

(ii)      payment against presentation of any draft, demand or claim for payment under any Drawing Document that does not comply in whole or in part with the terms of the applicable Letter of Credit or which proves to be fraudulent, forged or invalid in any respect or any statement therein being untrue or inaccurate in any respect, or which is signed, issued or presented by a Person or a transferee of such Person purporting to be a successor or transferee of the beneficiary of such Letter of Credit;

(iii)      the Issuing Bank or any of its branches or Affiliates being the beneficiary of any Letter of Credit;

(iv)      the Issuing Bank or any correspondent honoring a drawing against a Drawing Document up to the amount available under any Letter of Credit even if such Drawing Document claims an amount in excess of the amount available under the Letter of Credit;

(v)      the existence of any claim, set-off, defense or other right that the Lead Borrower or any of its Subsidiaries may have at any time against any beneficiary or transferee beneficiary, any assignee of proceeds, the Issuing Bank or any other Person;

(vi)      the Issuing Bank or any correspondent honoring a drawing upon receipt of an electronic presentation under a Letter of Credit requiring the same, regardless of whether the original Drawing Documents arrive at the Issuing Bank's counters or are different from the electronic presentation;

(vii)      any other event, circumstance or happening whatsoever, whether or not similar to any of the foregoing that might, but for this SECTION 2.13(i), constitute a legal or equitable defense to or discharge of, or provide a right of set-off against, any Borrower's or any of its Subsidiaries' reimbursement and other payment obligations and liabilities, arising under, or in connection with, any Letter of Credit, whether against the Issuing Bank, the beneficiary or any other Person; or

(viii)      the fact that any Default or Event of Default shall have occurred and be continuing;

provided, however, that subject to SECTION 2.13(g) above, the foregoing shall not release the Issuing Bank from such liability to the Borrowers as may be finally determined in a final, non-appealable judgment of a court of competent jurisdiction against the Issuing Bank following reimbursement or payment of the obligations and liabilities, including reimbursement and other payment obligations, of the Borrowers to the Issuing Bank arising under, or in connection with, this SECTION 2.13 or any Letter of Credit.

72

(j)      Without limiting any other provision of this Agreement, the Issuing Bank and each other Letter of Credit Related Person (if applicable) shall not be responsible to the Borrowers for, and the Issuing Bank's rights and remedies against the Borrowers and the obligation of the Borrowers to reimburse the Issuing Bank for each drawing under each Letter of Credit shall not be impaired by:

(i)      honor of a presentation under any Letter of Credit that on its face substantially complies with the terms and conditions of such Letter of Credit, even if the Letter of Credit requires strict compliance by the beneficiary;

(ii)      honor of a presentation of any Drawing Document that appears on its face to have been signed, presented or issued (A) by any purported successor or transferee of any beneficiary or other Person required to sign, present or issue such Drawing Document or (B) under a new name of the beneficiary;

(iii)      acceptance as a draft of any written or electronic demand or request for payment under a Letter of Credit, even if nonnegotiable or not in the form of a draft or notwithstanding any requirement that such draft, demand or request bear any or adequate reference to the Letter of Credit;

(iv)      the identity or authority of any presenter or signer of any Drawing Document or the form, accuracy, genuineness or legal effect of any Drawing Document (other than the Issuing Bank's determination that such Drawing Document appears on its face substantially to comply with the terms and conditions of the Letter of Credit);

(v)      acting upon any instruction or request relative to a Letter of Credit or requested Letter of Credit that the Issuing Bank in good faith believes to have been given by a Person authorized to give such instruction or request;

(vi)      any errors, omissions, interruptions or delays in transmission or delivery of any message, advice or document (regardless of how sent or transmitted) or for errors in interpretation of technical terms or in translation or any delay in giving or failing to give notice to any Borrower;

(vii)      any acts, omissions or fraud by, or the insolvency of, any beneficiary, any nominated person or entity or any other Person or any breach of contract between any beneficiary and any Borrower or any of the parties to the underlying transaction to which the Letter of Credit relates;

(viii)      assertion or waiver of any provision of the ISP or UCP that primarily benefits an issuer of a letter of credit, including any requirement that any Drawing Document be presented to it at a particular hour or place;

(ix)      payment to any presenting bank (designated or permitted by the terms of the applicable Letter of Credit) claiming that it rightfully honored or is entitled to reimbursement or indemnity under Standard Letter of Credit Practice applicable to it;

(x)      acting or failing to act as required or permitted under Standard Letter of Credit Practice applicable to where the Issuing Bank has issued, confirmed, advised or negotiated such Letter of Credit, as the case may be;

(xi)      honor of a presentation after the expiration date of any Letter of Credit notwithstanding that a presentation was made prior to such expiration date and dishonored by the Issuing Bank if subsequently the Issuing Bank or any court or other finder of fact determines such presentation should have been honored;

(xii)      dishonor of any presentation that does not strictly comply or that is fraudulent, forged or otherwise not entitled to honor; or

(xiii)      honor of a presentation that is subsequently determined by the Issuing Bank to have been made in violation of international, federal, state or local restrictions on the transaction of business with certain prohibited Persons.

(k)      Upon the request of the Administrative Agent, if, as of the Letter of Credit Expiration Date, any L/C Obligation for any reason remains outstanding, the Borrowers shall, in each case, immediately Cash Collateralize the then Outstanding Amount of all L/C Obligations. SECTIONS 2.17 and 7.01 set forth certain additional requirements to deliver Cash Collateral hereunder.  For purposes of this SECTION 2.13, SECTION 2.16, SECTION 2.17, SECTION 2.27, SECTION 7.01, SECTION 7.03 and SECTION 9.05 and ARTICLE V and ARTICLE VI, "Cash Collateralize" means providing to the Administrative Agent, for the benefit of the Issuing Bank and the Lenders, as collateral for the L/C Obligations, cash or deposit account balances in an amount equal to 103% of the Outstanding Amount of all L/C Obligations, pursuant to documentation in form and substance satisfactory to the Administrative Agent and the Issuing Bank (which documents are hereby Consented to by the Lenders).  The Borrowers hereby grant to the Agents a security interest in all such cash, deposit accounts and all balances therein and all proceeds of the foregoing.  Cash Collateral shall be maintained in blocked, non-interest bearing deposit accounts at Wells Fargo.  If at any time the Administrative Agent determines that any funds held as Cash Collateral are subject to any right or claim of any Person other than the Administrative Agent or that the total amount of such funds is less than the aggregate Outstanding Amount of all L/C Obligations, the Borrowers will, forthwith upon demand by the Administrative Agent, pay to the Administrative Agent, as additional funds to be deposited as Cash Collateral, an amount equal to the excess of (x) such aggregate Outstanding Amount over (y) the total amount of funds, if any, then held as Cash Collateral that the Agents determine to be free and clear of any such right and claim.  Upon the drawing of any Letter of Credit for which funds are on deposit as Cash Collateral, such funds shall be applied, to the extent permitted under Applicable Laws, to reimburse the Issuing Bank and, to the extent not so applied, shall thereafter be applied to satisfy other Obligations.

(l)      The Borrowers shall pay to the Administrative Agent for the account of each Lender in accordance with its Commitment Percentage a Letter of Credit fee (the "Letter of Credit Fee") for each Letter of Credit issued pursuant to this Agreement equal to the following per annum percentages of the aggregated Stated Amount of the following categories of Letters of Credit outstanding during the three-month period then ended: (i) Standby Letters of Credit, at a

74

per annum rate equal to the then Applicable Margin for LIBO Loans, and (ii) Commercial Letters of Credit, at a per annum rate equal to fifty percent (50%) of the then Applicable Margin for LIBO Loans. For purposes of computing the daily amount available to be drawn under any Letter of Credit, the amount of the Letter of Credit shall be determined in accordance with SECTION 1.06.  Letter of Credit Fees shall be due and payable on the first day of each calendar quarter and on demand after the Termination Date, in arrears, calculated on the basis of a 365 day or 366-day year, as applicable, and actual days elapsed.  Notwithstanding anything to the contrary contained herein, while any Event of Default exists, all Letter of Credit Fees shall accrue at the Default Rate as provided in SECTION 2.12 hereof.

(m)     In addition to the Letter of Credit Fees as set forth in SECTION 2.13(l) above, the Borrowers shall pay promptly upon demand to the Administrative Agent for the account of the Issuing Bank as non-refundable fees, commissions, and charges (it being acknowledged and agreed that any charging of such fees, commissions, and charges to the Loan Account pursuant to the provisions of SECTION 2.04(d) shall be deemed to constitute a demand for payment thereof for the purposes of this SECTION 2.13(m)):  (i) a fronting fee which shall be imposed by the Issuing Bank equal to 0.125% per annum <u>times</u> the average amount of the L/C Obligations during the immediately preceding quarter (or if an Event of Default has occurred, month) (or portion thereof), <u>plus</u> (ii) any and all other reasonable and customary fees and charges then in effect imposed by, and any and all expenses incurred by, the Issuing Bank, relating to Letters of Credit, at the time of issuance of any Letter of Credit and upon the occurrence of any other activity with respect to any Letter of Credit (including transfers, assignments of proceeds, amendments, drawings, renewals or cancellations).

(n)     Unless otherwise expressly agreed by the Issuing Bank and the Borrowers when a Letter of Credit is issued (including any such agreement applicable to an Existing Letter of Credit), (i) the rules of the ISP shall apply to each Standby Letter of Credit, and (ii) the rules of the UCP shall apply to each Commercial Letter of Credit.

(o)     The Issuing Bank shall be deemed to have acted with due diligence and reasonable care if the Issuing Bank's conduct is in accordance with Standard Letter of Credit Practice or in accordance with this Agreement.

(p)     The Issuing Bank shall act on behalf of the Lenders with respect to any Letters of Credit issued by it and the documents associated therewith, and the Issuing Bank shall have all of the benefits and immunities (A) provided to the Agents in <u>Article VIII</u> with respect to any acts taken or omissions suffered by the Issuing Bank in connection with Letters of Credit issued by it or proposed to be issued by it and Issuer Documents pertaining to such Letters of Credit as fully as if the term "Agents" as used in <u>Article VIII</u> included the Issuing Bank with respect to such acts or omissions, and (B) as additionally provided herein with respect to the Issuing Bank.

(q)     In the event of a direct conflict between the provisions of this SECTION 2.13 and any provision contained in any Issuer Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert

75

with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this SECTION 2.13 shall control and govern.

(r)     The provisions of this SECTION 2.13 shall survive the termination of this Agreement and the repayment in full of the Obligations with respect to any Letters of Credit that remain outstanding.

(s)     At the Borrowers' costs and expense, the Borrowers shall execute and deliver to the Issuing Bank such additional certificates, instruments and/or documents and take such additional action as may be reasonably requested by the Issuing Bank to enable the Issuing Bank to issue any Letter of Credit pursuant to this Agreement and related Issuer Document, to protect, exercise and/or enforce the Issuing Bank's rights and interests under this Agreement or to give effect to the terms and provisions of this Agreement or any Issuer Document.

(t)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, all Pre-Petition L/C Obligations on the Closing Date shall be refinanced and constitute L/C Obligations hereunder on the Closing Date (including all Existing Letters of Credit being deemed issued under this Agreement on Closing Date).  It is hereby acknowledged and agreed that each of the Existing Letters of Credit shall constitute a "Letter of Credit" for all purposes of this Agreement and shall be deemed issued under this Agreement on the Closing Date and all Pre-Petition L/C Obligations shall constitute "L/C Obligations" for all purposes of this Agreement.

SECTION 2.14 Increased Costs.

(a)     If any Change in Law shall:

(i)     impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender or any holding company of any Lender (except any such reserve requirement reflected in the LIBO Rate) or any Issuing Bank; or

(ii)     impose on any Lender or any Issuing Bank or the London interbank market any other condition affecting LIBO Loans made by such Lender or any Letter of Credit or participation therein;

and the result of any of the foregoing shall be to increase the cost in any material amount in excess of those incurred by similarly situated lenders to such Lender of making or maintaining any LIBO Loan (or of maintaining its obligation to make any such Revolving Credit Loan) or to increase the cost in any material amount in excess of those incurred by similarly situated lenders to such Lender or the Issuing Bank of participating in, issuing or maintaining any Letter of Credit or to reduce the amount in any material respect of any sum received or receivable by such Lender or the Issuing Bank hereunder (whether of principal, interest or otherwise), then the Borrowers will pay to such Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank, as the case may be, for

76

such additional costs incurred or reduction suffered.  This SECTION 2.14 shall not apply to any costs related to any Indemnified Taxes or Excluded Taxes.

(b)    If any Lender or the Issuing Bank determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's or the Issuing Bank's capital or on the capital of such Lender's or the Issuing Bank's holding company, if any, as a consequence of this Agreement or the Revolving Credit Loans made by, or participations in Letters of Credit held by, such Lender, or the Letters of Credit issued by the Issuing Bank, to a level below that which such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company would have achieved but for such Change in Law (taking into consideration such Lender's or the Issuing Bank's policies and the policies of such Lender's or the Issuing Bank's holding company with respect to capital adequacy), then from time to time the Borrowers will pay to such Lender or the Issuing Bank, as the case may be, such additional amount or amounts as will compensate such Lender or the Issuing Bank or such Lender's or the Issuing Bank's holding company for any such reduction suffered.

(c)    A certificate of a Lender or the Issuing Bank setting forth the amount or amounts necessary to compensate such Lender or the Issuing Bank or its holding company, as the case may be, as specified in paragraph (a) or (b) of this SECTION 2.14 and setting forth in reasonable detail the manner in which such amount or amounts were determined shall be delivered to the Lead Borrower and shall be conclusive absent manifest error.  The Borrowers shall pay such Lender or the Issuing Bank, as the case may be, the amount shown as due on any such certificate within fifteen (15) Business Days after receipt thereof.

(d)    Failure or delay on the part of any Lender or the Issuing Bank to demand compensation pursuant to this SECTION 2.14 shall not constitute a waiver of such Lender's or the Issuing Bank's right to demand such compensation, provided that the Borrowers shall not be required to compensate a Lender or the Issuing Bank pursuant to this Section for any increased costs or reductions incurred more than 90 days prior to the date that such Lender or the Issuing Bank, as the case may be, notifies the Borrowers of the Change in Law giving rise to such increased costs or reductions and of such Lender's or the Issuing Bank's intention to claim compensation therefor, and provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 90 day period referred to above shall be extended to include the period of retroactive effect thereof.

SECTION 2.15 Optional Termination or Reduction of Commitments.

Upon at least two (2) Business Days' prior written notice to the Administrative Agent, the Lead Borrower may, at any time, in whole permanently terminate, or from time to time in part permanently reduce, the Commitments.  Each such reduction shall be in the principal amount of $5,000,000 or any integral multiple thereof.  Each such reduction or termination shall (i) be applied pro rata to the Commitments of the Lenders based on the Commitment Percentage of each lender, and (ii) be irrevocable at the effective time of any such termination or reduction. The Borrowers shall pay to the Administrative Agent for application as provided herein (i) at the effective time of any such termination (but not any partial reduction), all earned and unpaid fees under the Fee Letter and all Unused Fees accrued on the Commitments so terminated, and (ii) at

77

the effective time of any such reduction or termination, any amount by which the Credit Extensions to the Borrowers outstanding on such date exceed the amount to which the Commitments are to be reduced effective on such date.

SECTION 2.16 Optional Prepayment of Revolving Credit Loans; Reimbursement of Lenders.

(a)    The Borrowers shall have the right at any time and from time to time to prepay without premium or penalty (but subject to payment of Breakage Costs as provided herein) (without a commitment reduction) outstanding Revolving Credit Loans in whole or in part, (x) with respect to LIBO Loans, upon at least three (3) Business Days' prior written, telex or facsimile notice to the Administrative Agent, prior to 1:00 p.m., and (y) with respect to Base Rate Loans, on the same Business Day if written, telex or facsimile notice is received by the Administrative Agent prior to 1:00 p.m., subject in each case to the following limitations:

(i)    Subject to SECTION 2.17, all prepayments shall be paid to the Administrative Agent for application (except as otherwise directed by the applicable Borrower), first, to the prepayment of outstanding Revolving Credit Loans, ratably in accordance with each Lender's Commitment Percentage, and second, if a Cash Dominion Event then exists, to the funding of a Cash Collateral deposit in the Cash Collateral Account to Cash Collateralize the L/C Obligations;

(ii)    Subject to the foregoing, outstanding Base Rate Loans of the Borrowers shall be prepaid before outstanding LIBO Loans of the Borrowers are prepaid (except as otherwise directed by the Lead Borrower).  Each partial prepayment of LIBO Loans shall be in an integral multiple of $1,000,000 (but in no event less than $5,000,000).  No prepayment of LIBO Loans shall be permitted pursuant to this SECTION 2.16 other than on the last day of an Interest Period applicable thereto, unless the Borrowers reimburse the Lenders for all Breakage Costs associated therewith within five (5) Business Days of receiving a written demand for such reimbursement which sets forth the calculation of such Breakage Costs in reasonable detail.  No partial prepayment of a Borrowing of LIBO Loans shall result in the aggregate principal amount of the LIBO Loans remaining outstanding pursuant to such Borrowing being less than $5,000,000 (unless all such outstanding LIBO Loans are being prepaid in full); and

(iii)    Each notice of prepayment shall specify the prepayment date, the principal amount and Type of the Revolving Credit Loans to be prepaid and, in the case of LIBO Loans, the Borrowing or Borrowings pursuant to which such Revolving Credit Loans were made.  Each notice of prepayment shall be revocable, provided that, within ten (10) Business Days of receiving a written demand for such reimbursement which sets forth the calculation of such Breakage Costs in reasonable detail, the Borrowers shall reimburse the Lenders for all Breakage Costs associated with the revocation of any notice of prepayment.  The Administrative Agent shall, promptly after receiving notice from the Lead Borrower hereunder, notify each applicable Lender of the principal amount and Type of the Revolving Credit Loans held by such Lender which are to be prepaid, the prepayment date and the manner of application of the prepayment.

78

(b)    The Borrowers shall reimburse each Lender as set forth below for any loss incurred or to be incurred by the Lenders in the reemployment of the funds (i) resulting from any prepayment (for any reason whatsoever, including, without limitation, conversion to Base Rate Loans or acceleration by virtue of, and after, the occurrence and during the continuance of an Event of Default) of any LIBO Loan required or permitted under this Agreement, if such Revolving Credit Loan is prepaid other than on the last day of the Interest Period for such Revolving Credit Loan or (ii) in the event that after the Lead Borrower delivers LIBO Rate Loan Notice under SECTION 2.04 in respect of LIBO Loans, such Revolving Credit Loans are not made on the first day of the Interest Period specified in such LIBO Rate Loan Notice for any reason other than a breach by such Lender of its obligations hereunder or the delivery of any notice pursuant to SECTION 2.10 or SECTION 2.11, or (iii) in the event that after a Borrower delivers a notice of commitment reduction under SECTION 2.15 or a notice of prepayment under SECTION 2.16 in respect of LIBO Loans, such commitment reductions or such prepayments are not made on the day specified in such notice of reduction or prepayment.   Such loss shall be the amount (herein, collectively, "Breakage Costs") as reasonably determined by such Lender as the excess, if any, of (A) the amount of interest which would have accrued to such Lender on the amount so paid, not prepaid or not borrowed at a rate of interest equal to the LIBO Rate for such Revolving Credit Loan (but specifically excluding any Applicable Margin), for the period from the date of such payment or failure to borrow or convert or failure to prepay to the last day (x) in the case of a payment or refinancing of a LIBO Loan with Base Rate Loans other than on the last day of the Interest Period for such Revolving Credit Loan or the failure to prepay a LIBO Loan, of the then current Interest Period for such Revolving Credit Loan or (y) in the case of such failure to borrow or convert, of the Interest Period for such LIBO Loan which would have commenced on the date of such failure to borrow or convert, over (B) the amount of interest which would have accrued to such Lender on such amount by placing such amount on deposit for a comparable period with leading banks in the London interbank market.  Any Lender demanding reimbursement for such loss shall deliver to the Lead Borrower from time to time one or more certificates setting forth the amount of such loss as determined by such Lender and setting forth in reasonable detail the manner in which such amount was determined and such amounts shall be due within ten (10) Business Days after the receipt of such notice.

(c)    Whenever any partial prepayment of Revolving Credit Loans is to be applied to LIBO Loans, such LIBO Loans shall be prepaid in the chronological order of their Interest Payment Dates or as the Lead Borrower may otherwise designate in writing.

SECTION 2.17 Mandatory Prepayment; Commitment Termination; Cash Collateral.

The outstanding Obligations shall be subject to prepayment as follows:

(a)    If at any time the amount of the Credit Extensions by the Lenders causes Excess Availability to be less than zero (including as a result of a reduction or termination of Commitments pursuant to SECTION 2.15), the Borrowers will, immediately upon notice from the Administrative Agent: (x) prepay the Loans in an amount necessary to eliminate such deficiency and (y) if, after giving effect to the prepayment in full of all outstanding Loans such deficiency has not been eliminated, deposit cash into the Cash Collateral Account to Cash Collateralize the L/C Obligations.

79

(b)      The Revolving Credit Loans shall be repaid daily in accordance with (and to the extent required under) the provisions of SECTION 2.18, to the extent then applicable.

(c)      Any Net Proceeds received from a Prepayment Event (other than Excluded Net Proceeds), whether or not a Cash Dominion Event then exists, shall be paid over to the Administrative Agent on receipt by the Loan Parties and shall be utilized to prepay the Revolving Credit Loans in the order of priority set forth in SECTION 7.03. The Agents shall not be obligated to release their Liens on any Collateral included in such Prepayment Event until such Net Proceeds have been so received (to the extent required in this clause (c)).  The application of such Net Proceeds to the Revolving Credit Loans shall not reduce the Commitments.  If all Obligations then due are paid, any excess Net Proceeds shall be remitted to the operating account of the Loan Parties maintained with the Administrative Agent.

(d)      Except as set forth in SECTION 2.17(c) and except during the continuance of a Cash Dominion Event, any Net Proceeds, Cash Receipts and other payments received by the Administrative Agent shall be applied as the Lead Borrower shall direct the Administrative Agent in writing.

(e)      [Reserved].

(f)      Subject to the foregoing, outstanding Base Rate Loans shall be prepaid before outstanding LIBO Loans are prepaid.  No prepayment of LIBO Loans shall be permitted pursuant to this SECTION 2.17 other than on the last day of an Interest Period applicable thereto, unless the Borrowers reimburse the Lenders for all Breakage Costs associated therewith within ten (10) Business Days of receiving a written demand for such reimbursement which sets forth the calculation of such Breakage Costs in reasonable detail.  In order to avoid such Breakage Costs, as long as no Cash Dominion Event has occurred and is continuing, at the request of the Lead Borrower, the Administrative Agent shall hold all amounts required to be applied to LIBO Loans in the Cash Collateral Account and will apply such funds to the applicable LIBO Loans at the end of the then pending Interest Period therefor (provided that the foregoing shall in no way limit or restrict the Agents' rights upon the occurrence and during the continuance of any Cash Dominion Event).  A prepayment of the Revolving Credit Loans pursuant to SECTION 2.16 or SECTION 2.17 shall not permanently reduce the Total Commitments.

(g)      Upon the Termination Date, the Commitments and the Revolving Credit Facility shall be terminated in full and the Loan Parties shall pay, jointly and severally, in full and in cash, all outstanding Revolving Credit Loans and all other outstanding Obligations then owing by them.

80

SECTION 2.18 Cash Management.

(a)    Annexed hereto as Schedule 2.18(a) is a list describing, as of the Closing Date, all arrangements to which any Loan Party is a party with respect to the payment to such Loan Party of the proceeds of all credit card charges for sales by such Loan Party.

(b)    On or prior to the Closing Date, each Loan Party shall (*provided* that the items set forth below previously delivered under the Pre-Petition Credit Agreement shall be deemed to satisfy the requirements set forth in this clause (b)):

(i)    deliver to the Agents a schedule of all DDAs that, to the knowledge of the Responsible Officers of the Loan Parties, are maintained by the Loan Parties, which schedule includes, with respect to each depository (A) the name and address of such depository; (B) the account number(s) maintained with such depository; and (C) a contact person at such depository;

(ii)    deliver to the Collateral Agent notifications (each, a "Credit Card Notification") substantially in the form attached hereto as Exhibit F which have been executed on behalf of such Loan Party and addressed to such Loan Party's Credit Card Issuers and Credit Card Processors listed on Schedule 2.18(a); and

(iii)    enter into a blocked account agreement (each, a "Blocked Account Agreement"), reasonably satisfactory in form and substance to the Agents, with any Blocked Account Bank with respect to each Blocked Account existing as of the Closing Date listed on Schedule 2.18(b) attached hereto.

(c)    Each Credit Card Notification and Blocked Account Agreement shall require, during the continuance of a Cash Dominion Event (and delivery of notice thereof from the Collateral Agent), the ACH or wire transfer on each Business Day (and whether or not there is then an outstanding balance in the Loan Account) of all available cash receipts (the "Cash Receipts") to the concentration account maintained by the Administrative Agent at Wells Fargo (the "Concentration Account"), from:

(i)    the sale of Inventory and other Collateral;

(ii)    all proceeds of collections of Accounts;

(iii)    all Net Proceeds on account of any Prepayment Event (other than, until the DIP Term Loan Obligations and the Pre-Petition Senior Secured Notes are repaid in full, a Prepayment Event arising in connection with the Notes Priority Collateral);

(iv)    each Blocked Account (including all cash deposited therein from each DDA); and

(v)    the cash proceeds of all credit card charges.

81

(d)    If, at any time during the continuance of a Cash Dominion Event, any cash or cash equivalents owned by any Loan Party (other than (i) any petty cash accounts funded in the ordinary course of business, the deposits in which shall not aggregate more than $3,000,000 or exceed $25,000 with respect to any one account (or in each case, such greater amounts to which the Administrative Agent may agree), (ii) any payroll, trust and tax withholding accounts funded in the ordinary course of business or pursuant to the Approved Budget and (iii) any Disbursement Account) are deposited to any account, or held or invested in any manner, otherwise than in a Blocked Account that is subject to a Blocked Account Agreement (or a DDA which is swept daily to a Blocked Account subject to a Blocked Account Agreement), or if at any time a Blocked Account shall cease to be subject to a Blocked Account Agreement, the applicable Loan Party shall promptly furnish the Collateral Agent with written notice thereof and the Collateral Agent may require such Loan Party to close such account and have any such funds transferred to a Blocked Account which is subject to a Blocked Account Agreement.  In addition to the foregoing, during the continuance of a Cash Dominion Event, the Loan Parties shall provide the Collateral Agent with an accounting of the contents of the Blocked Accounts, which shall identify, to the reasonable satisfaction of the Collateral Agent, the proceeds from the Notes Priority Collateral which were deposited into a Blocked Account and swept to the Concentration Account.  Upon the receipt of (x) the contents of the Blocked Accounts, and (y) such accounting, the Collateral Agent agrees to promptly remit to the DIP Term Loan Agent the proceeds of the Notes Priority Collateral received by the Administrative Agent.

(e)    The Loan Parties may close DDAs or Blocked Accounts, maintain existing DDAs or Blocked Accounts and/or open new DDAs or Blocked Accounts, subject to the execution and delivery to the Collateral Agent of appropriate Blocked Account Agreements with respect to each Blocked Account (except with respect to (i) any petty cash accounts funded in the ordinary course of business, the deposits in which shall not aggregate more than $1,000,000 or exceed $25,000 with respect to any one account (or in each case, such greater amounts to which the Administrative Agent may agree), (ii) any payroll, trust, and tax withholding accounts funded in the ordinary course of business or pursuant to the Approved Budget and (iii) unless expressly waived by the Collateral Agent) consistent with the provisions of this SECTION 2.18 and otherwise reasonably satisfactory to the Collateral Agent.  The Loan Parties shall furnish the Collateral Agent with prior written notice of its intention to open or close a Blocked Account and the Collateral Agent shall promptly notify the Lead Borrower as to whether the Collateral Agent shall require a Blocked Account Agreement with the Person with whom such account will be maintained.  Unless consented to in writing by the Collateral Agent, the Loan Parties shall not enter into any agreements with Credit Card Issuers or Credit Card Processors other than the ones expressly contemplated herein unless contemporaneously therewith, a Credit Card Notification, is executed and delivered to the Collateral Agent.

(f)    The Loan Parties may also maintain one or more disbursement accounts which shall be used by the Loan Parties solely for disbursements and payments (including payroll) in the ordinary course of business or as otherwise permitted hereunder (any account so used, a "Disbursement Account").

(g)    The Concentration Account shall at all times be under the sole dominion and control of the Collateral Agent.  Each Borrower hereby acknowledges and agrees that (i) such Borrower has no right of withdrawal from the Concentration Account, (ii) the funds on deposit in the

82

Concentration Account shall at all times continue to be collateral security for all of the Obligations, and (iii) the funds on deposit in the Concentration Account shall be applied as provided in this Agreement.  In the event that, notwithstanding the provisions of this SECTION 2.18, during the continuation of a Cash Dominion Event, any Borrower receives or otherwise has dominion and control of any such proceeds or collections, such proceeds and collections shall be held in trust by such Borrower for the Collateral Agent, shall not be commingled with any of such Borrower's other funds or deposited in any account of such Borrower and shall promptly be deposited into the Concentration Account or dealt with in such other fashion as such Borrower may be instructed by the Collateral Agent.

(h)     Any amounts remaining in the Concentration Account at any time when all of the Obligations (other than contingent obligations) then due have been and remain fully repaid shall be remitted to the operating account of the Loan Parties maintained with the Administrative Agent.

(i)     The Collateral Agent shall promptly (but in any event within two (2) Business Days) furnish written notice to each Person with whom a Blocked Account is maintained when a Cash Dominion Event is no longer continuing for purposes of this Agreement.

(j)     The following shall apply to deposits and payments under and pursuant to this Agreement:

(i)     Funds shall be deemed to have been deposited to the Concentration Account on the Business Day on which deposited, provided that such deposit is available to the Administrative Agent by 4:00 p.m. on that Business Day (except that if the Obligations are being paid in full, by 3:00 p.m., on that Business Day);

(ii)     Funds paid to the Administrative Agent, other than by deposit to the Concentration Account, shall be deemed to have been received on the Business Day when they are good and collected funds, provided that such payment is available to the Administrative Agent by 4:00 p.m. on that Business Day (except that if the Obligations are being paid in full, by 4:00 p.m., on that Business Day);

(iii)     If a deposit to the Concentration Account or payment is not available to the Administrative Agent until after 4:00 p.m. on a Business Day, such deposit or payment shall be deemed to have been made at 9:00 a.m. on the then next Business Day;

(iv)     If any item deposited to the Concentration Account and credited to the Loan Account is dishonored or returned unpaid for any reason, whether or not such return is rightful or timely, the Administrative Agent shall have the right to reverse such credit and charge the amount of such item to the applicable Loan Account and the Loan Parties shall indemnify the Secured Parties against all reasonable documented out-of-pocket claims and losses resulting from such dishonor or return; and

(v)     All amounts received under this SECTION 2.18 shall be applied in the manner set forth in SECTION 7.03.

83

SECTION 2.19 <u>Fees.</u>

(a)     The Borrowers shall pay to the Agents, for their respective accounts, the fees set forth in the Fee Letter as and when payment of such fees is due as therein set forth.

(b)     The Borrowers shall pay the Administrative Agent, for the account of the Lenders, an aggregate fee (the "<u>Unused Fee</u>") at a rate equal to 0.375% per annum (computed on the basis of actual days elapsed in a year of 365 or 366 days, as applicable) of the average daily balance of the Unused Commitment, during the calendar quarter just ended (or relevant period with respect to the payment being made on the Termination Date).  The Unused Fee shall be paid in arrears, on the first day of each calendar quarter and on the Termination Date.   The Administrative Agent shall pay the Unused Fee to the Lenders (excluding Defaulting Lenders) upon the Administrative Agent's receipt of the Unused Fee based upon their pro rata share of an amount equal to the aggregate Unused Fee payable to all Lenders.

(c)     The Administrative Agent shall pay the Letter of Credit Fees to the Lenders (excluding Defaulting Lenders) upon the Administrative Agent's receipt of the Letter of Credit Fees based upon their Commitment Percentage.

(d)     All fees shall be paid on the dates due, in immediately available funds, to the Administrative Agent for the account of the Administrative Agent and other Credit Parties as provided herein.  Once due, all fees shall be fully earned and shall not be refundable under any circumstances (except to the extent set forth in the Fee Letter).

SECTION 2.20 <u>Maintenance of Loan Account; Statements of Account.</u>

(a)     The Administrative Agent shall maintain an account on its books in the name of the Borrowers (each, the "<u>Loan Account</u>") which will reflect (i) all Revolving Credit Loans and other advances made by the Lenders to the Borrowers or for the Borrowers' account, (ii) all Letter of Credit Disbursements, fees and interest that have become payable as herein set forth, and (iii) any and all other monetary Obligations that have become payable.

(b)     The Loan Account will be credited with all amounts received by the Administrative Agent from the Borrowers or from other Persons for the Borrowers' account, including all amounts received in the Concentration Account from the Blocked Account Banks, and the amounts so credited shall be applied as set forth in and to the extent required by SECTION 2.17(f) or 7.03, as applicable.  After the end of each month, the Administrative Agent shall send to the Borrowers a statement accounting for the charges (including interest), loans, advances and other transactions occurring among and between the Administrative Agent, the Lenders and the Borrowers during that month.  The monthly statements shall, absent manifest error, shall be deemed presumptively correct.

SECTION 2.21 <u>Payments; Sharing of Setoff.</u>

(a)     The Borrowers shall make each payment required to be made hereunder or under any other Loan Document (whether of principal, interest, fees or reimbursement of drawings under Letters of Credit, of amounts payable under SECTIONS 2.14, 2.16(b) or 2.23, or otherwise) prior to

84

3:00 p.m. on the date when due, in immediately available funds, without setoff or counterclaim.  Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at its Funding Office, except payments to be made directly to each Issuing Bank as expressly provided herein and except that payments pursuant to SECTIONS 2.14, 2.16(b), 2.23 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein.  The Administrative Agent shall distribute any such payments to the appropriate recipient promptly following receipt thereof.  If any payment under any Loan Document shall be due on a day that is not a Business Day, except with respect to LIBO Borrowings, the date for payment shall be extended to the next succeeding Business Day, and, if any payment due with respect to LIBO Borrowings shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, unless that succeeding Business Day is in the next calendar month, in which event, the date of such payment shall be on the last Business Day of subject calendar month, and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.

(b)    All funds received by and available to the Administrative Agent to pay principal, unreimbursed drawings under Letters of Credit, interest, fees and other amounts then due hereunder, shall be applied in accordance with the provisions of SECTIONS 2.17(f) or 7.03 ratably among the parties entitled thereto in accordance with the amounts of principal, unreimbursed drawings under Letters of Credit, interest, fees and other amounts then due to such respective parties.  For purposes of calculating interest due to a Lender, that Lender shall be entitled to receive interest on the actual amount contributed by that Lender towards the principal balance of the Revolving Credit Loans outstanding during the applicable period covered by the interest payment made by the Borrowers.  Any net principal reductions to the Revolving Credit Loans received by the Administrative Agent in accordance with the Loan Documents during such period shall not reduce such actual amount so contributed, for purposes of calculation of interest due to that Lender, until the Administrative Agent has distributed to the applicable Lender its Commitment Percentage thereof.

(c)    Unless the Administrative Agent shall have received notice from the Lead Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders or the Issuing Banks hereunder that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders or the applicable Issuing Bank, as the case may be, the amount due. In such event, if the Borrowers have not in fact made such payment, then each of the Lenders or the applicable Issuing Bank, as the case may be, severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender or such Issuing Bank with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the Federal Funds Rate.

(d)    In accordance with the provisions of SECTION 2.27, if any Lender shall fail to make any payment required to be made by it pursuant to this Agreement, then the Administrative Agent may, in its discretion (notwithstanding any contrary provision hereof), apply any amounts

85

thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Section until all such unsatisfied obligations are fully paid.

SECTION 2.22 Settlement Amongst Lenders

(a)    [Reserved].

(b)    The amount of each Lender's Commitment Percentage of outstanding Revolving Credit Loans shall be computed weekly (or more frequently in the Administrative Agent's discretion) and shall be adjusted upward or downward based on all Revolving Credit Loans and repayments of Revolving Credit Loans received by the Administrative Agent as of 3:00 p.m. on the first Business Day (such date, the "Settlement Date") following the end of the period specified by the Administrative Agent.

(c)    The Administrative Agent shall deliver to each of the Lenders promptly after a Settlement Date a summary statement of the amount of outstanding Revolving Credit Loans for the period and the amount of repayments received for the period.  As reflected on the summary statement, (i) the Administrative Agent shall transfer to each Lender its applicable Commitment Percentage of repayments, and (ii) each Lender shall transfer to the Administrative Agent (as provided below) or the Administrative Agent shall transfer to each Lender, such amounts as are necessary to insure that, after giving effect to all such transfers, the amount of Revolving Credit Loans made by each Lender with respect to Revolving Credit Loans to the Borrowers shall be equal to such Lender's applicable Commitment Percentage of Revolving Credit Loans outstanding as of such Settlement Date.  If the summary statement requires transfers to be made to the Administrative Agent by the Lenders and is received prior to 12:00 Noon on a Business Day, such transfers shall be made in immediately available funds no later than 3:00 p.m. that day; and, if received after 12:00 Noon, then no later than 3:00 p.m. on the next Business Day.  The obligation of each Lender to transfer such funds is irrevocable, unconditional and without recourse to or warranty by the Administrative Agent.  If and to the extent any Lender shall not have so made its transfer to the Administrative Agent, such Lender agrees to pay to the Administrative Agent, forthwith on demand such amount, together with interest thereon, for each day from such date until the date such amount is paid to the Administrative Agent, at the Federal Funds Rate.

SECTION 2.23 Taxes.

(a)    Any and all payments by or on account of any obligation of the Loan Parties hereunder or under any other Loan Document shall be made free and clear of and without deduction for any Taxes, except as required by Applicable Law; provided, however, that if a Loan Party or an Agent or a Lender shall be required to deduct or remit any such Taxes from such payments, then (i) in the case of any Indemnified Taxes, the sum payable shall be increased as necessary so that after making all required deductions or remittances for such Taxes (including deductions applicable to additional sums payable under this SECTION 2.23) the applicable Credit Party receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Loan Party shall make such deductions and (iii) the Loan Party shall pay the full amount deducted to the relevant Governmental Authority in accordance with Applicable Law.

86

(b)    In addition, the Loan Parties shall pay any Other Taxes to the relevant Governmental Authority in accordance with Applicable Law.

(c)    The Loan Parties shall indemnify each Credit Party, within ten (10) days after written demand therefor, for the full amount of any Indemnified Taxes paid or payable by such Credit Party on or with respect to any payment by or on account of any obligation of the Loan Parties hereunder or under any other Loan Document (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this SECTION 2.23) and any penalties, interest and reasonable expenses arising therefrom or with respect thereto; <u>provided that</u> if any Borrower reasonably believes that such Taxes were not correctly or legally asserted, each Lender will use reasonable efforts to cooperate with such Borrower to obtain a refund of such taxes so long as such efforts would not, in the good-faith determination of such Lender, result in any additional costs, expenses or risks or be otherwise disadvantageous to it; <u>provided further</u>, that the Borrowers shall not be required to compensate any Lender pursuant to this SECTION 2.23 for any amounts payable by such Lender in any fiscal year of such Lender if such Lender does not furnish notice of such claim within nine (9) months from the end of such fiscal year; <u>provided further</u>, that if the law giving rise to such claim has a retroactive effect, then such nine (9) month period shall be extended to include such period of retroactive effect. A certificate as to the amount of such payment or liability delivered to the Lead Borrower by a Credit Party, or by the Administrative Agent on its own behalf or on behalf of any other Credit Party, setting forth in reasonable detail the manner in which such amount was determined, shall be conclusive absent manifest error.

(d)    As soon as practicable after any payment of Indemnified Taxes by a Loan Party to a Governmental Authority, the Lead Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)    Any Foreign Lender that is entitled to an exemption from or reduction in United States withholding tax shall deliver to the Lead Borrower and the Administrative Agent two (2) executed copies of (i) either United States Internal Revenue Service Form W-8BEN-E or W-8BEN, as applicable (claiming a treaty benefit) or Form W-8ECI, or any subsequent versions thereof or successors thereto, (ii) in the case of a Foreign Lender claiming exemption from or reduction in U.S. federal withholding Tax under Section 871(h) or 881(c) of the Code with respect to payments of "portfolio interest", a (A) Form W-8BEN-E or W-8BEN, as applicable, or any subsequent versions thereof or successors thereto and (B) a certificate substantially in the form of Exhibit K-1 representing that such Foreign Lender (1) is not a bank for purposes of Section 881(c) of the Code, (2) is not a 10 percent shareholder (within the meaning of Section 871(h)(3)(B) of the Code) of any Loan Party and (3) is not a controlled foreign corporation related to the Loan Parties (within the meaning of Section 864(d)(4) of the Code) (a "U.S. Tax Compliance Certificate"), in all cases, properly completed and duly executed by such Foreign Lender claiming, as applicable, complete exemption from or reduced rate of, U.S. federal withholding Tax on payments by the Loan Parties under this Agreement and the other Loan Documents, or, (iii) to the extent a Foreign Lender is not the beneficial owner, a Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN-E or W-8BEN, as applicable, a U.S. Tax Compliance Certificate substantially in the form of Exhibit K-2 or Exhibit K-3, IRS Form W-9,

87

and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit K-4 on behalf of each such direct and indirect partner. Such forms shall be delivered by each Foreign Lender on or before the date it becomes a party to this Agreement (or, in the case of a transferee that is a participation holder, on or before the date such participation holder becomes a transferee hereunder) and on or before the date, if any, such Foreign Lender changes its applicable lending office by designating a different lending office (a "New Lending Office").  In addition, each Foreign Lender shall deliver such forms promptly upon the obsolescence or invalidity of any form previously delivered by such Foreign Lender.  If a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Lead Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Lead Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Lead Borrower or the Administrative Agent as may be necessary for the Lead Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Notwithstanding any other provision of this SECTION 2.23(e), a Foreign Lender shall not be required to deliver any form pursuant to this SECTION 2.23(e) that such Foreign Lender is not legally able to deliver.

(f)     Any U.S. Lender shall deliver to the Lead Borrower and the Administrative Agent two (2) properly completed and duly executed copies of Internal Revenue Service Form W-9 or any successor form certifying that such U.S. Lender is exempt from U.S. federal backup withholding tax.

(g)     The Loan Parties shall not be required to indemnify any Foreign Lender or to pay any additional amounts to any Foreign Lender in respect of U.S. federal withholding Tax pursuant to paragraph (a) or (c) above to the extent that the obligation to pay such additional amounts would not have arisen but for a failure by such Foreign Lender to comply with the provisions of paragraph (e) above.  Should a Lender become subject to Taxes because of its failure to deliver a form required hereunder, the Loan Parties shall, at such Lender's expense, take such steps as such Lender shall reasonably request to assist such Lender to recover such Taxes.

(h)     If any Loan Party shall be required pursuant to this SECTION 2.23 to pay any additional amount to, or to indemnify, any Credit Party to the extent that such Credit Party becomes subject to Taxes subsequent to the Closing Date (or, if applicable, subsequent to the date such Person becomes a party to this Agreement) as a result of any change in the circumstances of such Credit Party (other than a change in Applicable Law), including without limitation a change in the residence, place of incorporation, principal place of business of such Credit Party or a change in the branch or lending office of such Credit Party, as the case may be, such Credit Party shall use reasonable efforts to avoid or minimize any amounts which might otherwise be payable pursuant to this SECTION 2.23(h); provided, however, that such efforts shall not include the taking of any actions by such Credit Party

88

that would result in any Tax, costs or other expense to such Credit Party (other than a tax, cost or other expense for which such Credit Party shall have been reimbursed or indemnified by the Loan Parties pursuant to this Agreement or otherwise) or any action which would or might in the reasonable opinion of such Credit Party have an adverse effect upon its business, operations or financial condition or otherwise be disadvantageous to such Credit Party.

(i)    If any Credit Party, in its sole discretion, determines in good faith that it has actually and finally realized, by reason of a refund, deduction or credit of any Taxes paid or reimbursed by the Loan Parties pursuant to subsection (a) or (c) above in respect of payments under the Loan Documents (which refund, deduction or credit is provided by the jurisdiction imposing such Taxes), a current monetary benefit that it would otherwise not have obtained and that would result in the total payments under this SECTION 2.23 exceeding the amount needed to make such Credit Party whole, such Credit Party shall pay to the Lead Borrower, with reasonable promptness following the date upon which it actually realizes such benefit, an amount equal to the amount of such refund, deduction or credit (but only to the extent of the amount of any Taxes paid or reimbursed by the Loan Parties), net of all reasonable out of pocket expenses incurred in securing such refund, deduction or credit; provided, however, that the Lead Borrower, upon the request of the Administrative Agent or such Credit Party, agrees to repay the amount paid over to the Lead Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Credit Party in the event the Administrative Agent or such Credit Party is required to repay such refund, deduction or credit to such Governmental Authority.  This SECTION 2.23(j) shall not be construed to require any Credit Party to make available its tax returns (or any other information relating to its Taxes which it deems confidential) to any Loan Party.

SECTION 2.24 Mitigation Obligations; Replacement of Lenders.

(a)    If any Lender requests compensation under SECTION 2.14 or cannot make Revolving Credit Loans under SECTION 2.11, or if the Loan Parties are required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to SECTION 2.23, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Revolving Credit Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the reasonable judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to SECTION 2.14 or SECTION 2.23, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense. The Loan Parties hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment; provided, however, that the Loan Parties shall not be liable for such costs and expenses of a Lender requesting compensation if (i) such Lender becomes a party to this Agreement on a date after the Closing Date and (ii) the relevant Change in Law occurs on a date prior to the date such Lender becomes a party hereto.

(b)    If any Lender requests compensation under SECTION 2.14 or cannot make Revolving Credit Loans under SECTION 2.11 for thirty (30) consecutive days, or if any Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to SECTION 2.23, or if any Lender is a Defaulting Lender, then the Borrowers may, at their sole expense and effort, upon notice to such Lender and the Administrative Agent,

89

require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in SECTION 9.04), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided, however, that (i) the Lead Borrower shall have received the prior written consent of the Administrative Agent and the Issuing Bank, which consent shall not be unreasonably withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Revolving Credit Loans and participations in unreimbursed drawings under Letters of Credit, accrued interest thereon, accrued fees and all other amounts payable to it hereunder from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts) and (iii) in the case of any such assignment resulting from a claim for compensation under SECTION 2.14 or payments required to be made pursuant to SECTION 2.23, such assignment will result in a reduction in such compensation or payments. A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrowers to require such assignment and delegation cease to apply.

SECTION 2.25 Designation of Lead Borrower as Borrowers' Agent.

(a)    Each Borrower hereby irrevocably designates and appoints the Lead Borrower as such Borrower's agent to obtain Revolving Credit Loans and Letters of Credit, the proceeds of which shall be available to each Borrower for such uses as are permitted under this Agreement.  As the disclosed principal for its agent, each Borrower shall be obligated to the Administrative Agent and each Lender on account of Revolving Credit Loans so made and Letters of Credit so issued as if made directly by the Lenders to such Borrower, notwithstanding the manner by which such Revolving Credit Loans and Letters of Credit are recorded on the books and records of the Lead Borrower and of any other Borrower.

(b)    Each Borrower represents to the Credit Parties that it is an integral part of a consolidated enterprise, and that each Loan Party will receive direct and indirect benefits from the availability of the joint credit facility provided for herein, and from the ability to access the collective credit resources of the consolidated enterprise which the Loan Parties comprise.  Each Borrower recognizes that credit available to it hereunder is in excess of and on better terms than it otherwise could obtain on and for its own account and that one of the reasons therefor is its joining in the credit facility contemplated herein with all other Borrowers.  Consequently, each Borrower hereby assumes and agrees to discharge all Obligations of each of the other Borrowers as if the Borrower which is so assuming and agreeing were each of the other Borrowers.

(c)    The Lead Borrower shall act as a conduit for each Borrower (including itself, as a Borrower) on whose behalf the Lead Borrower has requested a Revolving Credit Loan.  None of the Agents nor any other Credit Party shall have any obligation to see to the application of such proceeds.

(d)    The authority of the Lead Borrower to request Revolving Credit Loans and Letters of Credit on behalf of, and to bind, the Borrowers, shall continue unless and until the Administrative Agent actually receives written notice of: (i) the termination of such authority, (ii) the subsequent appointment of a successor Lead Borrower, which notice is signed by the respective Financial Officers of each Borrower and (iii) written notice from such successive Lead Borrower

90

accepting such appointment and acknowledging that from and after the date of such appointment, the newly appointed Lead Borrower shall be bound by the terms hereof, and that as used herein, the term "Lead Borrower" shall mean and include the newly appointed Lead Borrower.

SECTION 2.26 Security Interests in Collateral.

To secure their Obligations under this Agreement and the other Loan Documents, the Borrowers shall, and shall cause each other Loan Party to, grant to the Collateral Agent, for its benefit and the benefit of the other Secured Parties, a first-priority security interest in (subject only to Permitted Encumbrances (x) having priority by operation of Applicable Law, or (y) in favor of the DIP Term Loan Agent and the Pre-Petition Notes Trustee on any Notes Priority Collateral), all of the Collateral pursuant hereto and to the Orders and the Security Documents.

SECTION 2.27 Defaulting Lenders.

(a)    Notwithstanding anything to the contrary set forth herein, the Administrative Agent shall not be obligated to transfer to a Defaulting Lender any payments made by the Borrowers to the Administrative Agent for the Defaulting Lender's benefit or any proceeds of Collateral that would otherwise be remitted hereunder to the Defaulting Lender, and, in the absence of such transfer to the Defaulting Lender, the Administrative Agent shall transfer any such payments (i) first, to the Issuing Bank, to the extent of the portion of a Letter of Credit Disbursement that was required to be, but was not, paid by the Defaulting Lender, (iii) second, to each Non-Defaulting Lender ratably in accordance with their Commitments (but, in each case, only to the extent that such Defaulting Lender's portion of a Loan (or other funding obligation) was funded by such other Non-Defaulting Lender), (iii) third, to the Cash Collateral Account, the proceeds of which shall be retained by the Administrative Agent and may be made available to or for the benefit of the Borrowers (upon the request of the Lead Borrower and subject to the conditions set forth in SECTION 4.02) as if such Defaulting Lender had made its portion of the Loans (or other funding obligations) hereunder, and (iv) fourth, from and after the date on which all other Obligations have been paid in full, to such Defaulting Lender. Subject to the foregoing, the Administrative Agent may hold and, in its discretion, re-lend to the Borrowers for the account of such Defaulting Lender the amount of all such payments received and retained by the Administrative Agent for the account of such Defaulting Lender. Solely for the purposes of voting or consenting to matters with respect to the Loan Documents (including the calculation of Commitment Percentages in connection therewith) and for the purpose of calculating the fee payable under SECTION 2.19(b), such Defaulting Lender shall be deemed not to be a "Lender" and such Lender's Commitment shall be deemed to be zero; provided, that the foregoing shall not apply to any of the matters governed by SECTION 9.02(b)(i) or (ii) (A) or (B). The provisions of this SECTION 2.27 shall remain effective with respect to such Defaulting Lender until the earlier of (y) the date on which all of the Non-Defaulting Lenders, the Administrative Agent, the Issuing Banks, and the Borrowers shall have waived, in writing, the application of this SECTION 2.27 to such Defaulting Lender, or (z) the date on which such Defaulting Lender pays to the Administrative Agent all amounts owing by such Defaulting Lender in respect of the amounts that it was obligated to fund hereunder, and, if requested by the Administrative Agent, provides adequate assurance of its ability to perform its future obligations hereunder (on which earlier date, so long as no Event of Default has occurred and is continuing, any remaining Cash Collateral held by the Agents pursuant to SECTION 2.27(b) shall be released to the Borrowers). The operation of this SECTION

91

2.27 shall not be construed to increase or otherwise affect the Commitment of any Lender, to relieve or excuse the performance by such Defaulting Lender or any other Lender of its duties and obligations hereunder, or to relieve or excuse the performance by any Borrower of its duties and obligations hereunder to the Administrative Agent, the Issuing Bank, or to the Lenders other than such Defaulting Lender.  Any failure by a Defaulting Lender to fund amounts that it was obligated to fund hereunder shall constitute a material breach by such Defaulting Lender of this Agreement and shall entitle the Borrowers, at their option, upon written notice to the Administrative Agent, to arrange for a substitute Lender to assume the Commitment of such Defaulting Lender, such substitute Lender to be reasonably acceptable to the Administrative Agent.  In connection with the arrangement of such a substitute Lender, the Defaulting Lender shall have no right to refuse to be replaced hereunder, and agrees to execute and deliver a completed form of Assignment and Assumption in favor of the substitute Lender (and agrees that it shall be deemed to have executed and delivered such document if it fails to do so) subject only to being paid its share of the outstanding Obligations (other than any Other Liabilities, but including (1) all interest, fees (except any Unused Fees or Letter of Credit Fees not due to such Defaulting Lender in accordance with the terms of this Agreement), and other amounts that may be due and payable in respect thereof, and (2) an assumption of its Commitment Percentage of its participation in the Letters of Credit); provided, that any such assumption of the Commitment of such Defaulting Lender shall not be deemed to constitute a waiver of any of the Credit Parties' or the Loan Parties' rights or remedies against any such Defaulting Lender arising out of or in relation to such failure to fund.  In the event of a direct conflict between the priority provisions of this SECTION 2.27 and any other provision contained in this Agreement or any other Loan Document, it is the intention of the parties hereto that such provisions be read together and construed, to the fullest extent possible, to be in concert with each other.  In the event of any actual, irreconcilable conflict that cannot be resolved as aforesaid, the terms and provisions of this SECTION 2.27 shall control and govern.

(b)     If any Letter of Credit is outstanding at the time that a Lender becomes a Defaulting Lender, then:

(i)     such Defaulting Lender's participation interest in any Letter of Credit shall be reallocated among the Non-Defaulting Lenders in accordance with their respective Commitment Percentages but only to the extent (x) the aggregate sum of all Non-Defaulting Lenders' Credit Extensions after giving effect to such reallocation does not exceed the total of all Non-Defaulting Lenders' Commitments and the sum of each Non-Defaulting Lender's Credit Extensions after giving effect to such reallocation does not exceed such Non-Defaulting Lender's Commitment and (y) the conditions set forth in SECTION 4.02 are satisfied at such time;

(ii)     if the reallocation described in clause (b)(i) above cannot, or can only partially, be effected, the Borrowers shall within one Business Day following notice by the Administrative Agent Cash Collateralize such Defaulting Lender's participation in Letters of Credit (after giving effect to any partial reallocation pursuant to clause (b)(i) above), pursuant to a Cash Collateral agreement to be entered into in form and substance reasonably satisfactory to the Administrative Agent; provided, that the Borrowers shall not be obligated to Cash Collateralize any Defaulting Lender's participations in Letters of Credit if such Defaulting Lender is also an Issuing Bank;

92

(iii)    if the Borrowers Cash Collateralize any portion of such Defaulting Lender's participation in Letters of Credit Exposure pursuant to this SECTION 2.27(b), the Borrowers shall not be required to pay any Letter of Credit Fees to the Administrative Agent for the account of such Defaulting Lender pursuant to SECTION 2.19 with respect to such Cash Collateralized portion of such Defaulting Lender's participation in Letters of Credit during the period such participation is Cash Collateralized;

(iv)    to the extent the participation by any Non-Defaulting Lender in the Letters of Credit is reallocated pursuant to this SECTION 2.27(b), then the Letter of Credit Fees payable to the Non-Defaulting Lenders pursuant to SECTION 2.19 shall be adjusted in accordance with such reallocation;

(v)    to the extent any Defaulting Lender's participation in Letters of Credit is neither Cash Collateralized nor reallocated pursuant to this SECTION 2.27(b), then, without prejudice to any rights or remedies of the Issuing Bank or any Lender hereunder, all Letter of Credit Fees that would have otherwise been payable to such Defaulting Lender under SECTION 2.19 with respect to such portion of such participation shall instead be payable to the Issuing Bank until such portion of such Defaulting Lender's participation is Cash Collateralized or reallocated;

(vi)    so long as any Lender is a Defaulting Lender, the Issuing Bank shall not be required to issue, amend, or increase any Letter of Credit, in each case, to the extent (x) the Defaulting Lender's Commitment Percentage of such Letter of Credit cannot be reallocated pursuant to this SECTION 2.27(b) or (y) the Issuing Bank has not otherwise entered into arrangements reasonably satisfactory to the Issuing Bank and the Borrowers to eliminate the Issuing Bank's risk with respect to the Defaulting Lender's participation in Letters of Credit; and

(vii)    The Administrative Agent may release any Cash Collateral provided by the Borrowers pursuant to this SECTION 2.27(b) to the Issuing Bank and such Issuing Bank may apply any such Cash Collateral to the payment of such Defaulting Lender's Commitment Percentage of any Letter of Credit Disbursement that is not reimbursed by the Borrowers pursuant to SECTION 2.13.

SECTION 2.28 [Reserved].

SECTION 2.29    MIRE Events.

Each of the parties hereto acknowledges and agrees that, if there is any improved Real Estate of the Loan Parties subject to a Mortgage at the time of any proposed MIRE Event, such MIRE Event (excluding (i) any continuation or conversion of Borrowings, (ii) the making of any Revolving Credit Loans or (iii) the issuance, renewal or extension of Letters of Credit) shall be subject to (and conditioned upon): (1) the prior delivery of all flood hazard determination certifications, acknowledgements and evidence of flood insurance and other flood-related documentation with respect to such improved Real Estate of the Loan Parties subject to a Mortgage as required by Flood Insurance Laws and (2) the Administrative Agent shall have

93

received written confirmation from the Lenders that reasonable and customary flood insurance due diligence and flood insurance compliance has been completed by the Lenders (such written confirmation not to be unreasonably conditioned, withheld or delayed).

ARTICLE III

Representations and Warranties

To induce the Credit Parties to make the Revolving Credit Loans and to issue Letters of Credit, the Loan Parties executing this Agreement, jointly and severally, make the following representations and warranties to each Credit Party with respect to each Loan Party and its Subsidiaries on the Closing Date and on each other date required by SECTION 4.02 hereof, in each case as of the date such representation and warranty is made unless an earlier date is specified:

SECTION 3.01 Organization; Powers.

Each Loan Party is a Debtor in the Chapter 11 Cases. Each Loan Party and each of its Subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization and subject to the entry of the Interim Order (and the Final Order, when applicable), has all requisite corporate or other applicable entity power and authority to own its property and assets and to carry on its business as now conducted, except, in each case, where the failure to do so, or so possess, individually or in the aggregate would not reasonably be expected to result in a Material Adverse Effect.  Subject to the entry of the Interim Order (and the Final Order, when applicable), each Loan Party has all requisite organizational power and authority to execute and deliver and perform all its obligations under all Loan Documents to which such Loan Party is a party.  Each Loan Party and each of its Subsidiaries is qualified to do business in, and is in good standing (where such concept exists) in, every jurisdiction in which the nature of its business or the ownership or leasing of its properties makes such qualification necessary, except where the failure to be so qualified or in good standing individually or in the aggregate would not reasonably be expected to result in a Material Adverse Effect.  Schedule 3.01 annexed hereto sets forth, as of the Closing Date, each Loan Party's and each of its Subsidiaries' name as it appears in official filings in its state of incorporation or organization, its state of incorporation or organization, organization type, organization number, if any, issued by its state of incorporation or organization, and its federal employer identification number.

SECTION 3.02 Authorization; Enforceability.

The transactions contemplated hereby and by the other Loan Documents to be entered into by each Loan Party are within such Loan Party's corporate powers and, subject to the approval of the Court pursuant to the Orders, have been duly authorized by all necessary corporate, membership, partnership or other necessary action.  Subject to the approval of the Court pursuant to the Orders, this Agreement has been duly executed and delivered by each Loan Party that is a party hereto or thereto and constitutes, and each other Loan Document to which any Loan Party is a party, when executed and delivered by such Loan Party will constitute, a legal, valid and binding obligation of such Loan Party, enforceable in accordance with its terms,

94

subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

SECTION 3.03 <u>No Conflicts.</u>

Upon the entry of the Orders, as applicable, the transactions to be entered into and contemplated by the Loan Documents (a) will not violate any Applicable Law (except to the extent that such violation would not reasonably be expected to result in a Material Adverse Effect) or the Charter Documents of any Loan Party or any of its Subsidiaries, (b) do not violate or result in a default (with due notice, lapse of grace period or both) under any indenture or any other material agreement or instrument, except to the extent that such default would not reasonably be expected to result in a Material Adverse Effect or such default is stayed by the filing of the Chapter 11 Cases, and (c) will not result in the creation or imposition of any Lien on any asset of any Loan Party or any of its Subsidiaries, except Liens created under the Loan Documents and Permitted Encumbrances.

SECTION 3.04 <u>Financial Condition.</u>

The Lead Borrower has heretofore furnished to the Agents (i) the Consolidated balance sheet, and statements of operations, stockholders' equity, and cash flows for the Lead Borrower and its Subsidiaries as of and for the twelve month period ending December 31, 2019, audited by KPMG, LLP, independent public accountants, and (ii) the unaudited interim Consolidated balance sheet, and the related statements of operations, stockholders' equity, and cash flows for the Lead Borrower and its Subsidiaries for the period ending September 30, 2020. Such financial statements present fairly, in all material respects, the financial position, results of operations and cash flows of Holdings and its Subsidiaries as of such dates and for such periods in accordance with GAAP. Since the Petition Date, there has been no event, change, condition or development that has had or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

SECTION 3.05 <u>Properties.</u>

(a)    Each Loan Party and each of its Subsidiaries has title to, or valid leasehold interests in or right to use, all its real and personal property material to its business, except for defects which would not reasonably be expected to have a Material Adverse Effect.

(b)    <u>Schedule 3.05(b)</u> sets forth with respect to each Loan Party and each of its Subsidiaries a list of all registrations and issuances of the Intellectual Property arising under the United States laws owned by such Loan Party and each of its Subsidiaries and all applications for the registrations or issuance thereof, in each case as of the Closing Date. Each such registration, issuance and application that is material to the business of such Loan Party or such Subsidiary is subsisting, has not expired or been abandoned or cancelled, and to the knowledge of each Loan Party, is valid and enforceable. To the knowledge of each Loan Party, no proceeding is pending against any Loan Party challenging the ownership, registration, validity, enforceability or use of any item of Intellectual Property. Each Loan Party and each of its Subsidiaries owns or is licensed to use, all Intellectual

95

Property used in its business, free and clear of all Liens other than Permitted Encumbrances, except to the extent that the failure to so own or have the right to use would not reasonably be expected to have a Material Adverse Effect, and each Loan Party's and each of its Subsidiaries' conduct of its business and its use of the Intellectual Property owned by such Loan Party or such Subsidiary does not infringe upon, misappropriate, dilute or otherwise violate the rights of any other Person, except for any such infringements, misappropriations, dilutions or other violations that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.  No proceeding is pending (or to the knowledge of each Loan Party, threatened) in which any Person is alleging that a Loan Party or any of its Subsidiaries is infringing, misappropriating, diluting, or otherwise violating the Intellectual Property rights of any Person in any material respect. Each Loan Party and each of its Subsidiaries have taken reasonable actions to maintain and protect their material Intellectual Property, including protecting the secrecy and confidentiality of the confidential information and trade secrets of the Loan Parties and each of the Subsidiaries taking reasonable steps to prevent any trade secret of any Loan Party or any Subsidiary from falling into the public domain. To the knowledge of each Loan Party, no Person is infringing, misappropriating, diluting or otherwise violating any intellectual property owned by any Loan Party or any of its Subsidiaries. Each Loan Party and each of its Subsidiaries owns or possesses adequate rights to use all computer systems (including hardware, software databases, firmware and related equipment), communications systems, and networking systems, (the "IT Systems") used by such Loan Party or Subsidiary in connection with the operation of its businesses and operations (such rights for all Loan Parties, collectively, the "Loan Party IT Systems"). The Loan Party IT Systems are adequate in all material respects for their intended use in the operation of the Loan Parties and their Subsidiaries' respective businesses and operations, taken as a whole, as such businesses and operations are currently conducted.

(c)     Schedule 3.05(c)(i) sets forth the address (including county) of all Real Estate that is owned by the Loan Parties and their Subsidiaries as of the Closing Date.  Schedule 3.05(c)(ii) sets forth, in all material respects, the address of all real property that is leased by the Loan Parties and their Subsidiaries as of the Closing Date in each Landlord Lien State on which Inventory included in the Borrowing Base is located with an aggregate Cost in excess of $700,000.

SECTION 3.06 Litigation and Environmental Matters.

(a)     Except for the Chapter 11 Cases, as of the Closing Date, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the actual knowledge of Responsible Officers of a Loan Party, threatened in writing against or affecting any Loan Party or any of its Subsidiaries (i) as to which there is a reasonable expectation of an adverse determination which, if adversely determined, would reasonably be expected individually or in the aggregate to result in a Material Adverse Effect or (ii) that involve any of the Loan Documents, the DIP Term Loan Documents, the Pre-Petition Senior Secured Notes Documents or the Pre-Petition Senior Unsecured Notes Documents.

(b)     No Loan Party nor any of its Subsidiaries (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has become subject to any Environmental Liability, (iii) has received written notice of any actual or potential claim with respect to any Environmental Liability

96

or (iv) knows of any basis for any Environmental Liability, which, in each case, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect.

(c)    No Real Estate or facility owned, operated or leased by any Loan Party or any of its Subsidiaries is listed or, to the knowledge of the Loan Parties, proposed for listing on the National Priorities List promulgated pursuant to CERCLA or similar state "Superfund" list except to the extent that such filings, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

(d)    No Lien has been recorded or, to the knowledge of any Loan Party, threatened under any Environmental Law with respect to any Real Estate of the Loan Parties or any of their Subsidiaries.

(e)    The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not require any notification, registration, filing, reporting, disclosure, investigation, remediation or cleanup pursuant to any applicable Environmental Law, except for any requirement the noncompliance with which could not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(f)    The Lead Borrower has made available to the Agents and the Lenders all material documents, studies, and reports in the possession, custody or control of the Loan Parties and their Subsidiaries concerning compliance with or liability under Environmental Law, including those concerning the actual or suspected existence of Hazardous Material at Real Estate or facilities currently or formerly owned, operated, leased or used by any Loan Party or any of its Subsidiaries.

(g)    Hazardous Materials are not present at or about any of the Real Estate or any other facility currently owned, operated or leased by any Loan Party or any of its Subsidiaries in amount or condition that, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Effect.

SECTION 3.07 Compliance with Laws and Agreements.

Each Loan Party and each of its Subsidiaries is in compliance with all Applicable Law except where the failure to comply, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect. Without limiting the generality of the foregoing, each Loan Party and each of its Subsidiaries has obtained all permits, licenses and other authorizations which are required with respect to the ownership and operations of its business, except where the failure to obtain such permits, licenses or other authorizations, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. Each Loan Party and each of its Subsidiaries is in compliance with all terms and conditions of all such permits, licenses, orders and authorizations, except where the failure to comply with such terms or conditions, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. Without limiting the generality of the foregoing, each Loan Party has complied at all times in all material respects with applicable Laws regarding the collection, retention, use and protection of personal information. No Person (including any Governmental Authority) has made any claim or commenced any action relating to the Loan Party's privacy or

97

data security practices, including with respect to the access, disclosure or use of personal information maintained by or on behalf of any of such business or to the knowledge of each Loan Party and their Subsidiaries threatened any such claim or action or conducted any investigation or inquiry thereof, except any such claim or action that could not reasonably be expected to have a Material Adverse Effect. The execution, delivery, or performance of this Agreement and the consummation of the transactions contemplated hereby, will not violate any applicable privacy Laws or the privacy policy of any Loan Party or any of its Subsidiaries as it currently exists or as it existed at any time during which any personal information was collected or obtained by or on behalf of such Loan Party or Subsidiary.

SECTION 3.08 Investment Company Status.

No Loan Party nor any of its Subsidiaries is an "investment company" as defined in, and subject to regulation under, the Investment Company Act of 1940, as amended.

SECTION 3.09 Taxes.

Each Loan Party and each of its Subsidiaries has timely filed or caused to be filed all tax returns and reports required to have been filed and, subject to the approval of the Bankruptcy Court, has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings, for which such Loan Party or such Subsidiary has set aside on its books adequate reserves in accordance with GAAP, and as to which no Lien has arisen, (b) to the extent that the failure to do so could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect or (c) Taxes the non-payment of which is permitted or required by the Bankruptcy Code or order of the Court.

SECTION 3.10 ERISA.

Other than the Chapter 11 Cases and except as would not reasonably be expected to result in a Material Adverse Effect: (i) each of the Loan Parties and their ERISA Affiliates is in compliance with the applicable provisions of ERISA and the provisions of the Code relating to Plans and the regulations and published interpretations thereunder; (ii) the present value of all benefit liabilities under each Plan of each of the Loan Parties and their ERISA Affiliates (based on those assumptions used to fund such Plan) does not exceed the value of the assets of such Plan and the present value of all accrued benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) does not exceed the value of the assets of all such underfunded Plans; (iii) no ERISA Event has occurred or is reasonably expected to occur; and (iv) none of the Loan Parties or the ERISA Affiliates has received any written notification that any Multiemployer Plan is in reorganization or is in endangered or critical status or has been terminated within the meaning of Title IV of ERISA, or has knowledge that any Multiemployer Plan is reasonably expected to be in reorganization or in endangered or critical status or to be terminated.  Each of the Loan Parties represents and warrants as of the Closing Date that the assets of such Loan Party do not constitute "plan assets" for purposes of Title I of ERISA.

98

SECTION 3.11 <u>Disclosure.</u>

As of the Closing Date, none of the reports, financial statements, certificates or other written information (other than any projections, pro formas, budgets and general market information) concerning any of the Loan Parties or any of their Subsidiaries furnished by or on at the direction of any Loan Party to any Credit Party in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or thereunder (as modified or supplemented by other information so furnished), when taken as a whole, contains, as of the date furnished, any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading in light of the circumstances under which such statements were made; provided, further, and notwithstanding the forgoing, the Loan Parties have not failed to disclose any and all material assumptions made in connection with the Initial Budget and then-Approved Budget, as applicable.

SECTION 3.12 <u>Subsidiaries.</u>

(a)  <u>Schedule 3.12</u> sets forth the name of, and the ownership interest of each Loan Party and each of its Subsidiaries in, each Subsidiary as of the Closing Date; there is no other Capital Stock of any class outstanding as of the Closing Date.  To the knowledge of the Loan Parties, all such shares of Capital Stock as of the Closing Date are validly issued, fully paid, and, with respect to corporate shares, non-assessable.

(b)  Except as set forth on <u>Schedule 3.12</u>, no Loan Party nor any of its Subsidiaries is party to any joint venture, general or limited partnership, or limited liability company agreements as of the Closing Date.

SECTION 3.13      <u>Reserved.</u>

SECTION 3.14      <u>Labor Matters.</u>

As of the Closing Date, there are no strikes, lockouts or slowdowns against any Loan Party or any of its Subsidiaries pending or, to the actual knowledge of any Responsible Officer of any Loan Party, threatened, except to the extent that strikes, lockouts or slowdowns would not reasonably be expected to result in a Material Adverse Effect.  The hours worked by and payments made to employees of any of the Loan Parties and any of their Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable federal, state, local or foreign law dealing with such matters to the extent that any such violation could reasonably be expected to have a Material Adverse Effect.  Except as set forth on <u>Schedule 3.06(a)</u> or except to the extent that such liability would not reasonably be expected to have a Material Adverse Effect, all payments due from any Loan Party or any Subsidiary thereof, or for which any claim may be made against any Loan Party or any Subsidiary thereof, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued in accordance with GAAP as a liability on the books of such Loan Party or such Subsidiary.  Except as set forth on <u>Schedule 3.14</u>, as of the Closing Date no Loan Party nor any Subsidiary thereof is a party to or bound by any material collective bargaining agreement, bonus, restricted stock, stock option, or

99

stock appreciation plan or agreement or any similar plan, agreement or arrangement.  As of the Closing Date, there are no representation proceedings pending or, to the actual knowledge of any Responsible Officer of any Loan Party, threatened to be filed with the National Labor Relations Board or other applicable Governmental Authority, and no labor organization or group of employees of any Loan Party or any Subsidiary thereof has made a pending demand in writing for recognition.  As of the Closing Date, the consummation of the transactions contemplated by the Loan Documents will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which any Loan Party or any Subsidiary thereof is bound to the extent that such would be reasonably expected to result in a Material Adverse Effect.

SECTION 3.15 <u>Security Documents.</u>

The Interim Order is (and the Final Order when entered will be) effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties, a legal, valid and enforceable, non-avoidable and automatically and fully and properly perfected priority security interest in all right, title and interest of the Loan Parties in each item of Collateral (which for the avoidance of doubt, shall include both tangible and intangible assets) and the proceeds thereof without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements or documents with the priorities set forth in the Intercreditor Arrangement. Each Loan Party is the legal and beneficial owner of the Collateral pledged by it free and clear of any Lien, other than the Permitted Encumbrances. Pursuant to the terms of the Orders, the Obligations of the Loan Parties under this Agreement will constitute Superpriority Claims and be allowed as superpriority administrative expense claims in the Chapter 11 Cases under section 364(c) of the Bankruptcy Code, having priority over all administrative expense claims and unsecured claims against such Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code and all super-priority administrative expense claims granted to any other Person (including Avoidance Actions and the proceeds thereof), subject only to the terms of the Carve-Out and the Intercreditor Arrangement.

SECTION 3.16 <u>Federal Reserve Regulations.</u>

(a)     No Loan Party nor any Subsidiary thereof is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of buying or carrying Margin Stock.

(b)     No part of the proceeds of any Revolving Credit Loan or any Letter of Credit will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, (i) to buy or carry Margin Stock or to extend credit to others for the purpose of buying or carrying Margin Stock or to refund indebtedness originally incurred for such purpose in violation of Regulation U or X or (ii) for any purpose that entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Board, including Regulation U or Regulation X.

100

SECTION 3.17 <u>Initial Budget.</u>

The Initial Budget, each Approved Budget and each Updated Budget is based upon good faith estimates and assumptions believed by management of the Borrower to be reasonable at the time made, in light of the circumstances under which they were made, it being recognized by the Administrative Agent and the Lenders that such financial information as it relates to future events is not to be viewed as fact and that actual results during the period or periods covered by such financial information may differ from the projected results set forth therein by a material amount. The Loan Parties have not failed to disclose to the Lenders any material assumptions with respect to any of the Initial Budget, each Approved Budget and each Updated Budget, and the Borrower affirms the reasonableness of the material assumptions set forth in the Initial Budget in all material respects.

SECTION 3.18        <u>Chapter 11 Cases</u>.

The Chapter 11 Cases were commenced on the Petition Date in accordance with Applicable Law and proper notice thereof was given for (i) the motion seeking approval of the Loan Documents and the Interim Order and Final Order, (ii) the hearing for the entry of the Interim Order, and (iii) the hearing for the entry of the Final Order.  The Debtors shall give, on a timely basis as specified in the Interim Order or the Final Order, as applicable, all notices required to be given to all parties specified in the Interim Order or Final Order, as applicable.

SECTION 3.19 <u>Reserved</u>.

SECTION 3.20 <u>OFAC/Sanctions</u>.  No Loan Party nor any of its Subsidiaries nor any director, officer, employee, agent or Affiliate of such Loan Party or such Subsidiary (a) is a Sanctioned Person or a Sanctioned Entity, (b) has any material assets located in Sanctioned Entities, or (c) derives revenues from investments in, or transactions with Sanctioned Persons or Sanctioned Entities. Each of the Loan Parties and its Subsidiaries, and each director, officer, employee, agent and Affiliate of each such Loan Party and each such Subsidiary, is in compliance with all Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws. No proceeds of any Loan made or Letter of Credit issued hereunder will be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Entity, or otherwise used in any manner that would result in a violation of any applicable Sanctions, Anti-Corruption Laws or Anti-Money Laundering Laws by any Loan Party or any of its Subsidiaries.

SECTION 3.21 <u>Beneficial Ownership Certification.</u>

As of the Closing Date, the information included in the Beneficial Ownership Certification, if applicable, is true and correct in all respects.

SECTION 3.22 <u>Orders</u>.

The Interim Order or the Final Order, as applicable, is in full force and effect and has not been vacated, reversed or rescinded or, without the prior written consent of the Administrative

101

Agent and Required Lenders, amended or modified (other than amendments or modifications to the Interim Order as a result of entry of the Final Order) and no appeal of such order has been timely filed or, if timely filed, no stay pending such appeal is currently effective.

SECTION 3.23 Petition Date; Claims and Collateral.

Upon the entry of the Orders, each such Order and the Loan Documents are sufficient to provide that the Obligations will constitute a Superpriority Claim (as defined in the Orders) and the Liens and security interests securing the Obligations shall be senior secured, valid, enforceable and automatically and properly perfected priming liens, having the priorities set forth in the Orders.

ARTICLE IV

Conditions

SECTION 4.01 Closing Date.

The obligation of the Issuing Bank and each Lender to make its initial Credit Extension hereunder and the effectiveness of this Agreement on the Closing Date is subject to the satisfaction by the Loan Parties or the waiver in accordance with SECTION 9.02 hereof of each of the following conditions precedent:

(a)     Subject to SECTION 2.18(b) and SECTION 5.17, the Agents (or their counsel) shall have received either (i) a counterpart of this Agreement and all other Loan Documents from each party thereto signed on behalf of such party or (ii) written evidence reasonably satisfactory to the Agents (which may include telecopy transmission or electronic pdf copy of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement and all other Loan Documents to which it is a party.

(b)     The Agents shall have received a written opinion (addressed to the Agents and the Lenders and dated the Closing Date) of Milbank LLP, counsel for the Loan Parties.

(c)     The Agents shall have received Charter Documents and such other documents and certificates as the Agents or their counsel may reasonably request relating to the organization and existence of each Loan Party, the authorization of the transactions contemplated by the Loan Documents and any other legal matters relating to the Loan Parties, the Loan Documents or the transactions contemplated thereby, all in form and substance reasonably satisfactory to the Agents and their counsel.

(d)     The Administrative Agent shall have received a notice with respect to such Borrowing or issuance, as the case may be, as required by Article II and a Borrowing Base Certificate relating to the month ended on October 31, 2020 (and dated as of the Closing Date) evidencing that, after giving effect to the Credit Extensions

102

requested to be made on the Closing Date and the borrowing under the DIP Term Loan Facility, Excess Availability will be no less than $40,000,000, and executed by a Financial Officer of the Lead Borrower.

(e)      The Agents shall have received a certificate, reasonably satisfactory in form and substance to the Agents, certifying that, as of the Closing Date, no Default or Event of Default exists.

(f)      The Administrative Agent shall have received a copy of the fully executed DIP Term Loan Documents and the Intercreditor Acknowledgment.

(g)      No Material Adverse Effect shall have occurred since the Petition Date.

(h)      There shall not be any other Indebtedness of the Loan Parties outstanding immediately after the Closing Date other than (i) this Agreement, and (ii) Permitted Indebtedness.

(i)      The Administrative Agent shall have received the initial Approved Budget, the draft Plan of Reorganization and related disclosure statement.

(j)      The Collateral Agent shall have received results of searches or other evidence reasonably satisfactory to the Collateral Agent (in each case dated as of a date reasonably satisfactory to the Collateral Agent) indicating the absence of Liens on the assets of the Loan Parties, except for Permitted Encumbrances.

(k)      [Reserved].

(l)      All Indebtedness outstanding under the Pre-Petition Credit Agreement shall have been paid in full (other than contingent obligations and other than the Existing Letters of Credit) and all commitments thereunder shall have terminated), and  the Administrative Agent shall have received a "pay-off" letter in form and substance reasonably satisfactory to the Administrative Agent with respect to such Indebtedness and such UCC (or equivalent) termination statements, mortgage releases, releases of assignments of leases and rents, releases of security interests in Intellectual Property and other instruments, in each case in proper form for recording or filing, as the Administrative Agent shall have reasonably requested to release and terminate of record the Liens securing such Indebtedness.

(m)      The Collateral Agent shall have received all Uniform Commercial Code financing statements, required by law or reasonably requested by the Collateral Agent to be filed, registered or recorded to create or perfect in the United States the first priority Liens intended to be created under the Loan Documents and all such documents and instruments shall have been so filed, registered or recorded to the satisfaction of the Collateral Agent and the Collateral Agent, for the benefit of the Secured Parties, shall have a legal, valid, binding, enforceable fully perfected first priority Lien on, and perfected security interest in, all right, title and interest of the Loan Parties in the

Collateral, subject only to (i) Liens expressly permitted hereby, (ii) the Carve-Out and (iii) the Intercreditor Arrangement, and free of all other Liens, other than Liens expressly permitted hereby and by the Interim Order; *provided* that the Interim Order (and the Final Order, when applicable) shall be effective to create in favor of the Administrative Agent a legal, valid, perfected and enforceable security interest and Lien upon the Collateral, with the priority set forth in the Orders and the terms thereof.

(n)    There shall have been delivered to the Agents all documentation and other information requested by them that is required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Act (as defined in SECTION 9.16 below).

(o)    All accrued and reasonable and documented out-of-pocket fees and expenses of the Agents (including reasonable and documented fees and expenses of counsel) shall have been paid.

(p)    Bankruptcy Matters.

(i)    *Entry of Interim Order*. The Interim Order shall have been entered by no later than two (2) Business Days after the Petition Date and no more than three (3) Business Days prior to the Closing Date, and such Order shall not have been reversed, modified, amended (other than non-material modifications or amendments that do not adversely affect the Administrative Agent or the Lenders), stayed or vacated absent prior written consent of the Administrative Agent.

(ii)    *Cash Management.* The Loan Parties shall have established or shall maintain the cash management systems described in SECTION 2.18, and the Loan Parties shall have taken all steps necessary to comply with the Cash Management Order.  The Credit Parties acknowledge that the cash management systems in effect on the Petition Date are acceptable.

(iii)    *First Day Pleadings*.  The Administrative Agent shall have received drafts of the "first day" pleadings for the Chapter 11 Cases, in each case, in form and substance reasonably satisfactory to the Administrative Agent, it being agreed that the forms of such pleadings delivered to counsel to the Administrative Agent on November 22, 2020 are satisfactory to the Administrative Agent.

(iv)    *First Day Orders*.  All motions, orders (including the "first day orders") and other documents to be filed with and submitted to the Court on the Petition Date shall be in form and substance reasonably satisfactory to the Administrative Agent, and the Court shall have approved all "first day" orders, including, without limitation, the Cash Management Order, it being agreed that the forms of such orders delivered to counsel to the Administrative Agent on November 23, 2020 are satisfactory to the Administrative Agent.

104

      (v)     *DIP Term Loan Facility.*  The Administrative Agent and the Lenders shall have received evidence, in form and substance satisfactory to the Administrative Agent, that, prior to or concurrently with the effectiveness of this Agreement, (i) the DIP Term Loan Facility shall be in full force and effect and (ii) the Lead Borrower has received gross proceeds from the DIP Term Loans in an amount of not less than $325,000,000 (net of fess and closing costs) and such net proceeds shall be applied to repayment in full of the Pre-Petition Obligations (other than the Pre-Petition L/C Obligations) as set forth herein and in the Interim Order.

     SECTION 4.02 <u>Conditions Precedent to Each Revolving Credit Loan and Each Letter of Credit.</u>

     The obligation of the Lenders to make each Revolving Credit Loan and of the Issuing Banks to issue each Letter of Credit (including all Credit Extensions made on the Closing Date) is also subject to the satisfaction by the Loan Parties or the waiver of each of the following conditions precedent:

      (a)     The Administrative Agent shall have received a notice with respect to such Borrowing or issuance, as the case may be, as required by Article II, and in the case of the issuance of a Letter of Credit (other than with respect to any Existing Letter of Credit), the Issuing Bank shall have received notice with respect thereto in accordance with SECTION 2.13.

      (b)     All representations and warranties contained in this Agreement and the other Loan Documents or otherwise made in writing in connection herewith or therewith (including in any Borrowing Base Certificate) shall be true and correct in all material respects on and as of the date of each Borrowing or the issuance of each Letter of Credit hereunder with the same effect as if made on and as of such date, other than representations and warranties that specifically relate solely to an earlier date.

      (c)     On the date of each Borrowing hereunder and the issuance of each Letter of Credit and after giving effect thereto, no Default or Event of Default shall have occurred and be continuing.

The request by the Lead Borrower for, and the acceptance by any Loan Party of, each extension of credit hereunder shall be deemed to be a representation and warranty by the Loan Parties that the conditions specified in this SECTION 4.02 have been satisfied at that time and that after giving effect to such extension of credit the Loan Parties shall continue to be in compliance with the Borrowing Base.  The conditions set forth in this SECTION 4.02 are for the sole benefit of the Administrative Agent and each other Credit Party and may be waived by the Administrative Agent, in whole or in part, without prejudice to the rights of the Administrative Agent or any other Credit Party.

105

ARTICLE V

Affirmative Covenants

Until (i) the Commitments have expired or been terminated, (ii) the principal of and interest on each Revolving Credit Loan and all fees and other Obligations (other than contingent indemnity obligations with respect to then unasserted claims and the Other Liabilities) shall have been paid in full, (iii) all Letters of Credit shall have expired or terminated (or been Cash Collateralized in a manner reasonably satisfactory to the Issuing Bank) and (iv) all Outstanding Amounts of any L/C Obligations have been reduced to zero (or Cash Collateralized in a manner reasonably satisfactory to the Issuing Bank), each Loan Party covenants and agrees with the Credit Parties that:

SECTION 5.01 Financial Statements and Other Information.

The Lead Borrower will furnish to the Administrative Agent:

(a)    Within ninety (90) days after the end of each Fiscal Year of the Borrower, the Consolidated balance sheet and related statements of operations, and Consolidated statements of cash flows as of the end of and for such year for the Borrower and its Subsidiaries, setting forth in comparative form, the Consolidated figures for the previous Fiscal Year all audited and reported on by independent public accountants of recognized national standing to the effect that such Consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Borrower and its Subsidiaries on a Consolidated basis in accordance with GAAP;

(b)    Within forty-five (45) days after the end of each first three (3) Fiscal Quarter of the Borrower, the Consolidated balance sheet and related statements of operations, and Consolidated statements of cash flows for the Borrower and its Subsidiaries as of the end of and for such Fiscal Quarter and the elapsed portion of the Fiscal Year, setting forth in each case in comparative form the Consolidated figures for the previous Fiscal Year, all such Consolidated figures certified by one of the Borrower's Financial Officers as fairly presenting in all material respects the financial condition and results of operations of the Borrower and its Subsidiaries on a Consolidated basis in accordance with GAAP, subject to year-end audit adjustments and the absence of footnotes;

(c)    Concurrently with any delivery of financial statements under clause (a) or clause (c) above, a certificate of a Financial Officer of the Lead Borrower substantially in the form of Exhibit G hereto (a "Compliance Certificate") (i) certifying as to whether a Default or Event of Default has occurred and, if a Default or Event of Default has occurred, specifying the details thereof and any action taken or proposed to be taken with respect thereto, (ii) setting forth reasonably detailed calculations with respect to the daily Excess Availability for such period, (iii) detailing all Store openings and Store closings during the immediately preceding fiscal period, and stating the aggregate number of the Loan Parties' and their Subsidiaries' Stores as of the first day of the current fiscal period,

106

and (iv) stating whether any change in GAAP or in the application thereof has occurred since the date of the Lead Borrower's most recent audited financial statements and, if any such change has occurred, specifying the effect of such change on the financial statements accompanying such Compliance Certificate;

(d)     [reserved];

(e)      (A) On the 10th day of each Fiscal Month and (B) more frequently (but no more frequently than weekly) as the Loan Parties may elect or the Administrative Agent may reasonably request at any time that Excess Availability is less than $15,000,000 for two (2) consecutive Business Days, a certificate in substantially the form of Exhibit H (a "Borrowing Base Certificate") showing the Borrowing Base as of the close of business on the immediately preceding Fiscal Month (or, in the case of a delivery of a Borrowing Base Certificate pursuant to clause (B) above, a subsequent date), each Borrowing Base Certificate to be certified as complete and correct in all material respects on behalf of the Lead Borrower by a Financial Officer of the Lead Borrower;

(f)     Promptly after the same become publicly available, copies of (i) all material periodic and other reports, proxy statements and other materials filed by any Loan Party with the SEC, and (ii) SEC Forms 10K and 10Q for the Lead Borrower and/or Holdings (for so long as the Lead Borrower and/or Holdings is subject to the reporting requirements under the Securities Exchange Act of 1934, as amended);

(g)     Promptly upon receipt thereof, copies of all material reports submitted to any Loan Party by independent certified public accountants in connection with each annual or special audit of the books of the Loan Parties or any of their Subsidiaries made by such accountants;

(h)     The financial and collateral reports described on Schedule 5.01(i) hereto, at the times set forth in such Schedule 5.01(i);

(i)     On or before 12:00 p.m. New York City time of the fifth Business Day of each calendar month following the Petition Date commencing with January 2021, a supplement to the Initial Budget (or the previously supplemented Approved Budget, as the case may be), covering the period through the end of the Fiscal Month following the last week of the subsequent 11-week period that commences with the week immediately following the date of delivery of the supplemental budget (which may reforecast periods in any prior Approved Budget), consistent with the form and level of detail set forth in the Initial Budget and otherwise in form and substance acceptable to the Required Lenders in their sole discretion (each such supplemental budget, an "Updated Budget"). Three (3) calendar days following (and subject to) the approval of any such Updated Budget by the Required Lenders in their reasonable discretion, such Updated Budget shall constitute the then-approved "Approved Budget"; provided that unless and until the Required Lenders approve such supplemental budget, the then-current Approved Budget shall remain in effect; provided further that, in the event that the Required Lenders have not approved such supplemental budget but the Required Lenders under the DIP Term

107

Loan Agreement have approved such supplemental budget, then such supplemental budget shall become the Approved Budget for all purposes hereunder;

(j)       On or before 12:00 p.m. New York City time on Thursday of each calendar week following each Test Date (each such Thursday, a "Variance Report Date"), (A) a variance report (each, a "Variance Report") setting forth, in reasonable detail, any differences between (x) actual aggregate disbursements and receipts for each line item for the Test Period applicable to the immediately preceding Test Date and (y) projected aggregate disbursements and receipts for each line item for such applicable Test Period as set forth in the Approved Budget, with management commentary on any individual line item with a positive or negative variance of 10.0% or more as compared to the Approved Budget (unless the dollar amount corresponding to such percentage variance is less than $1,000,000, in which case no management commentary shall be required), together with a statement from the Borrower's chief financial officer certifying the information contained in the report is correct and (B) a report setting forth Liquidity as of the immediately preceding Test Date and certifying compliance with SECTION 6.14.

(k)       Promptly following any reasonable request therefor, on and after the effectiveness of the Pension Act, copies of (i) any documents described in Section 101(k) of ERISA that any Loan Party or any of their ERISA Affiliates have received with respect to any Multiemployer Plan and (ii) any notices described in Section 101(l) of ERISA that the any Loan Party any of their ERISA Affiliates have received with respect to any Plan or Multiemployer Plan; provided, that if the Loan Parties or any of their ERISA Affiliates have not requested such documents or notices from the administrator or sponsor of the applicable Plan or Multiemployer Plan, upon reasonable request of the Administrative Agent, the Loan Parties and/or their ERISA Affiliates shall promptly make a request for such documents or notices from such administrator or sponsor and the Lead Borrower shall provide copies of such documents and notices promptly after receipt thereof;

(l)       Promptly following any reasonable request therefor, such other information regarding the operations, business affairs and financial condition of any Loan Party as the Agents or any Lender may reasonably request (other than information which is subject to an attorney-client privilege or would result in a breach of a confidentiality obligation of the Loan Parties to any other Person); and

(m)       Promptly following any request therefor, provide information and documentation reasonably requested by the Administrative Agent or any Lender for purposes of compliance with anti-terrorism laws, applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the Act and the Beneficial Ownership Regulation.

(n)       Within fifteen (15) calendar days after the end of each Fiscal Month of the Borrower and its Subsidiaries, internally prepared monthly operating financial reports for the Borrower and its Subsidiaries, as of the end of and for such Fiscal Month and the elapsed portion of the Fiscal Year, setting forth in each case in comparative form the

108

consolidated figures for the previous Fiscal Year, all certified by one of the Borrower's Financial Officers as fairly presenting in all material respects the financial condition and results of operations of the Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP, subject to normal year end audit adjustments and the absence of footnotes.

(o)      Within forty-five (45) calendar days after the end of each Fiscal Quarter of the Borrower and its Subsidiaries, internally prepared quarterly store-level operating financial statements for all properties, as of the end of and for such Fiscal Quarter, setting forth in each case in comparative form the consolidated figures for the corresponding Fiscal Quarter in the previous Fiscal Year, all certified by one of the Borrower's Financial Officers as fairly presenting in all material respects the financial condition and results of operations thereof on a consolidated basis in accordance with GAAP, subject to normal year end audit adjustments and the absence of footnotes; provided, that such store-level reporting shall not disclose individual store names or locations.

(p)      On or before 12:00 p.m. New York City time on the Friday of each calendar week following the second week after the Petition Date (i) updates on the status of critical vendor agreements (including regarding inventory provided thereunder) and (ii) updates on closures of two (2) or more store locations (other than the Specified Closures) at any one time related to the COVID-19 Pandemic (other than Store closures set forth in and contemplated by the Initial Budget), in each case, certified by a Responsible Officer of the Borrower.

(q)      (i) Advance copies of all material pleadings, motions, applications, orders, financial information and/or filings in the Chapter 11 Cases or that are distributed to any official or unofficial committee appointed or appearing in the Chapter 11 Cases or any other party in interest (including, without limitation, the Orders, any plan of reorganization or liquidation and any disclosure statements related to such plan) to be made by the Debtors as promptly as practicable and no less than three (3) Business Days prior to the filing thereof other than in exigent circumstances in which case as soon as practicable and (ii) any monthly reporting provided to the Bankruptcy Court or the U.S. Trustee as soon as practicable after being provided to such entity; provided, that the deliverables described in this clause (q) shall be delivered to Morgan, Lewis & Bockius LLP at the same time as such deliverables are delivered to the Administrative Agent.

Documents required to be delivered pursuant to SECTION 5.01 (to the extent any such documents are included in materials otherwise filed with the SEC) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date on which such documents are posted on the Lead Borrower's and/or Holdings' behalf on IntraLinks/ IntraAgency or another relevant website (the "Informational Website"), if any, to which each Lender and the Administrative Agent have unrestricted access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that:  (A) the accommodation provided by the foregoing sentence shall not impair the right of the Administrative Agent, or any Lender through the Administrative Agent, to request and receive from the Loan Parties physical delivery of specific financial information provided for in this

109

SECTION 5.01 and (B) the Lead Borrower and/or Holdings, as applicable, shall give the Administrative Agent and each Lender (or if applicable, the Administrative Agent shall give each Lender) written or electronic notice each time any information is delivered by posting to the Informational Website.  The Credit Parties shall have no liability to any Loan Party, any Credit Party or any of their respective Affiliates associated with establishing and maintaining the security and confidentiality of the Informational Website and the information posted thereto.

SECTION 5.02 Notices of Material Events.

The Lead Borrower will furnish to the Administrative Agent prompt written notice of the occurrence of any of the following after any Responsible Officer of the Lead Borrower obtains knowledge thereof:

(a)      A Default or Event of Default, specifying the nature and extent thereof and the action (if any) which is proposed to be taken with respect thereto;

(b)      The filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority (other than the Chapter 11 Cases) against or affecting any Loan Party or any Subsidiary of the Lead Borrower that, if adversely determined, would reasonably be expected to result in a Material Adverse Effect;

(c)      The occurrence of an ERISA Event that, alone or together with any other ERISA Events that have occurred, would reasonably be expected to result in a liability to any Loan Party or any of their respective ERISA Affiliates in excess of $5,000,000;

(d)      Any development that results in a Material Adverse Effect; and

(e)      (1) to the extent feasible, in no less than one (1) day (other than in exigent circumstances in which case as soon as practicable) in advance of filing with the Court or delivering to the Committee appointed in the Chapter 11 Cases, if any, or to the U.S. Trustee, as the case may be, the Final Order, all other material proposed orders and pleadings related to the Pre-Petition Credit Agreement, this Agreement and the credit facilities contemplated thereby, the Pre-Petition Senior Secured Notes Documents, the Pre-Petition Senior Unsecured Notes Documents, the DIP Term Loan Facility and any Plan of Reorganization and/or any disclosure statement related thereto, (2) substantially simultaneously with the filing with the Court or delivering to the Committee appointed in any Chapter 11 Case, if any, or to the U.S. Trustee, as the case may be, monthly operating reports and all other notices, filings, motions, pleadings or other information concerning the financial condition of the Loan Parties or their Subsidiaries or the Chapter 11 Cases that may be filed with the Court or delivered to the Committee appointed in any Chapter 11 Case, if any, or to the U.S. Trustee, and (3) each report, notice or certificate required to be delivered to any of the lenders or agents under the DIP Term Loan Agreement.

Each notice delivered under SECTION 5.02 shall be accompanied by a statement of a Responsible Officer of the Lead Borrower setting forth the details of the event or development

110

requiring such notice and, if applicable, any action taken or proposed to be taken with respect thereto.

SECTION 5.03 Information Regarding Collateral.

The Lead Borrower will furnish to the Agents prompt written notice of any change in: (a) any Loan Party's name; (b) the location of any Loan Party's chief executive office or its principal place of business; (c) any Loan Party's organizational structure or jurisdiction of incorporation or formation; or (d) any Loan Party's Federal Taxpayer Identification Number or organizational identification number assigned to it by its state of organization.  The Loan Parties agree not to effect or permit any change referred to in the preceding sentence unless all filings, publications and registrations, have been made (or will be made in a timely fashion) under the Uniform Commercial Code or other Applicable Law that are required in order for the Collateral Agent to continue at all times following such change to have a valid, legal and perfected first priority security interest to the extent required under the Security Documents (subject only to Permitted Encumbrances) in all the Collateral for its own benefit and the benefit of the other Secured Parties.

SECTION 5.04 Existence; Conduct of Business.

Each Loan Party will, and will cause each Subsidiary of it to, do all things necessary (a) to comply with its Charter Documents in all material respects, and (b) to obtain, preserve, renew and keep in full force and effect (i) its legal existence and (ii) the rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks, trade names, domain names, trade secrets and other proprietary and confidential information material to the conduct of its business, except, in the case of clause (a) and (b)(ii) above, to the extent that the failure to do so would not reasonably be expected to have a Material Adverse Effect; provided, however, that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under SECTION 6.03 or SECTION 6.05.

SECTION 5.05 Payment of Obligations.

Subject to the approval of the Bankruptcy Court, each Loan Party will, and will cause each Subsidiary of it to, pay its Taxes before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings and such Loan Party or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with GAAP, (b) such contest effectively suspends collection of the contested obligation and enforcement of any Lien securing such obligation, (c) the failure to make payment, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect or (d) the non-payment thereof is permitted or required under the Bankruptcy Code or order of the Court.  The provisions of this paragraph shall not limit or restrict the ability of the Agents to establish any Reserve for any unpaid Tax liabilities.

111

SECTION 5.06 <u>Maintenance of Properties.</u>

Each Loan Party will, and will cause each Subsidiary of it to, keep and maintain all tangible property material to the conduct of its business in substantially the same condition as of the Closing Date (ordinary wear and tear, casualty loss and condemnation excepted), except (a) where the failure to do so would not reasonably be expected to result in a Material Adverse Effect and (b) for Store closings and Permitted Dispositions permitted hereunder.  Each Loan Party will, and will cause each Subsidiary of it to, use commercially reasonable efforts to prosecute, maintain, and enforce the Intellectual Property, except to the extent such Intellectual Property is no longer used or deemed by such Loan Party or such Subsidiary in its reasonable business judgment to be materially useful or desirable in the conduct of the business of the Loan Parties and their Subsidiaries.

SECTION 5.07 <u>Insurance.</u>

(a)    Each Loan Party shall, and shall cause each Subsidiary of it to, (i) maintain insurance with financially sound and reputable insurers (or, to the extent consistent with business practices in effect on the Closing Date, a program of self-insurance) on such of its property and in at least such amounts and against at least such risks as is consistent with business practices in effect on the Closing Date or as otherwise determined by the Responsible Officers of the Loan Parties acting reasonably in their business judgment, including public liability insurance against claims for personal injury or death occurring upon, in or about or in connection with the use of any properties owned, occupied or controlled by it (including the insurance required pursuant to the Security Documents); (ii) maintain such other insurance as may be required by law; and (iii) furnish to the Agents, upon written request, full information as to the insurance carried.

(b)    Fire and extended coverage policies maintained with respect to any Collateral shall be endorsed or otherwise amended to include (i) a non-contributing mortgage clause (regarding improvements to real property) and a lenders' loss payable clause (regarding personal property), in form and substance reasonably satisfactory to the Agents, which endorsements or amendments shall provide that the insurer shall pay all proceeds otherwise payable to any of the Loan Parties or their Subsidiaries under the policies directly to the Administrative Agent, (ii) a provision to the effect that none of the Loan Parties, their Subsidiaries, Credit Parties (in their capacity as such) or any other Affiliate of a Loan Party shall be a co-insurer (the foregoing not being deemed to limit the amount of self-insured retention or deductibles under such policies, which self-insured retention or deductibles shall be consistent with business practices in effect on the Closing Date or as otherwise determined by the Responsible Officers of the Loan Parties acting reasonably in their business judgment), and (iii) such other provisions as the Administrative Agent may reasonably require from time to time to protect the interests of the Credit Parties. Commercial general liability policies shall be endorsed to name the Administrative Agent as an additional insured.  Business interruption policies shall name the Administrative Agent as a loss payee and shall be endorsed or amended to include (i) a provision that, after the occurrence and during the continuance of a Cash Dominion Event, the insurer shall pay all proceeds of such business interruption policies otherwise payable to any of the Loan Parties or their Subsidiaries under the policies directly to the Administrative Agent, (ii) a provision to the effect that none of the Loan Parties, their Subsidiaries, Credit Parties (in their capacity as such) or any other Affiliate of a Loan Party shall be a co-insurer and (iii) such other provisions to the endorsement as the

112

Administrative Agent may reasonably require from time to time to protect the interests of the Credit Parties. Each such casualty or liability policy referred to in this SECTION 5.07(b) shall also provide that it shall not be canceled, modified in any manner that would cause this SECTION 5.07 to be violated, or not renewed (i) by reason of nonpayment of premium except upon not less than ten (10) days' prior written notice thereof by the insurer to the Administrative Agent (giving the Administrative Agent the right to cure defaults in the payment of premiums) or (ii) for any other reason except upon not less than ten (10) days' prior written notice thereof by the insurer to the Administrative Agent. The Lead Borrower shall deliver to the Administrative Agent, prior to the cancellation, modification or non-renewal of any such policy of insurance, a copy of a renewal or replacement insurance binder or certificate (or other evidence of renewal of a policy previously delivered to the Administrative Agent, including an insurance binder) together with evidence reasonably satisfactory to the Administrative Agent of payment of the premium therefor.

(c)    With respect to each improved Real Estate for which a Mortgage is required to be delivered under the Loan Documents that is located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a "special flood hazard area" with respect to which flood insurance has been made available under Flood Insurance Laws, the applicable Loan Party (A) has obtained and will maintain, with financially sound and reputable insurance companies (except to the extent that any insurance company insuring such Real Estate of the Loan Party ceases to be financially sound and reputable after the Closing Date, in which case, the Loan Parties shall promptly replace such insurance company with a financially sound and reputable insurance company), such flood insurance in such reasonable total amount as the Administrative Agent and the Lenders may from time to time reasonably require, and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (B) promptly upon request of the Administrative Agent or any Lender, will deliver to the Administrative Agent or such Lender as applicable, evidence of such compliance in form and substance reasonably acceptable to the Administrative Agent and such Lender, including, without limitation, evidence of annual renewals of such insurance.

SECTION 5.08 Books and Records; Inspection and Audit Rights; Appraisals; Accountants.

(a)    Each Loan Party will, and will cause each Subsidiary of it to, keep proper books of record and account in accordance with GAAP and in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities. Each Loan Party will, and will cause each Subsidiary of it to, permit any representatives designated by any Agent, upon reasonable prior written notice and during regular business hours, to visit and inspect its properties, to discuss its affairs, finances and condition with its officers and to examine and make extracts from its books and records, all at the reasonable expense of the Loan Parties at such reasonable times and as often as reasonably requested.

(b)    The Agents may undertake (x) one (1) commercial finance examination hereunder in the event that the Termination Date has not occurred on or prior to May 31, 2021 and (y) one (1) inventory appraisal hereunder in the event that an Event of Default has occurred and is continuing. The Loan Parties shall pay the reasonable documented out-of-pocket fees and expenses of the Agents or such professionals with respect to such evaluations within the time periods required in the Order.

113

(c)    The Loan Parties shall, and shall cause each Subsidiary of it to, at all times retain independent certified public accountants of national standing and shall instruct such accountants to cooperate with, and be available to, the Agents or their representatives to discuss the annual audited statements, the Loan Parties' and their Subsidiaries' financial performance, financial condition, operating results, controls, and such other matters, within the scope of the retention of such accountants for such audited statements, as may be raised by the Agents; subject, however, if requested by such accountants, to the execution of an access agreement by the Agents and such accountants in form reasonably satisfactory to each of them; provided that a representative of the Lead Borrower shall be given the opportunity to be present all such discussions.

(d)    At its election, upon either (i) its reasonable belief that any Loan Party or any Subsidiary thereof has breached any representation, warranty or covenant herein relating to environmental matters, which breach could reasonably be expected to have a Material Adverse Effect, or (ii) in connection with the enforcement of remedies against any Real Estate after the occurrence and during the continuance of an Event of Default, the Collateral Agent or any Lender may request in writing that the Loan Party, at its own cost and expense, retain an independent engineer or environmental consultant to conduct an environmental assessment or other appropriate review of reasonable scope (but, prior to the occurrence of any such Event of Default, only with respect to the subject matter of such breach), including, as relevant to the condition of any Real Estate or facility of any Loan Party or any Subsidiary thereof and/or such Loan Party's or such Subsidiary's compliance with Environmental Law.  If the Loan Party fails to conduct such assessment or review within 30 days of receipt of the request, the Collateral Agent or Lender may retain an independent engineer or environmental consultant to conduct an environmental assessment or other appropriate review.  Each Loan Party shall, and shall cause each Subsidiary of it to, cooperate in the performance of any such environmental assessment or review and permit any such engineer or consultant designated by the Collateral Agent or such Lender to have full access to each property or facility at reasonable times and after reasonable notice to the Lead Borrower of the plans to conduct such an environmental assessment or review.  Environmental assessments or reviews conducted under this paragraph shall be limited to visual inspections of the Real Estate or facility, interviews with representatives of the Loan Parties or their Subsidiaries or facility personnel, and review of applicable records and documents pertaining to the condition of the property or facility, its compliance with Environmental Law and any potential Environmental Liabilities, in each case prior to the occurrence and during the continuance of an Event of Default, to the extent relevant to the subject matter of such breach.  All environmental assessments or reviews conducted pursuant to this paragraph shall be at the Loan Parties' sole cost and expense.

SECTION 5.09 Reserved.

SECTION 5.10 Compliance with Laws.

Each Loan Party will, and will cause each Subsidiary of it to, comply with (i) all Applicable Laws and the orders of any Governmental Authority except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, or where such compliance is stayed by the Chapter 11 Cases, and (ii) the Bankruptcy Code, the Bankruptcy Rules, the Orders, and any other order of the Court in all material respects.  Except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, each Loan Party shall, and shall

114

cause each Subsidiary of it to: (a) conduct its operations and keep and maintain its Real Estate in compliance with all Environmental Laws; and (b) implement any and all investigation, remediation, removal and response actions that are appropriate or necessary to materially comply with Environmental Laws pertaining to the presence, generation, treatment, storage, use, disposal, transportation or Release of any Hazardous Materials on, at, in, under, above, to, from or about any of its Real Estate.  The Loan Parties shall, and shall cause each Subsidiary of it to, notify the Administrative Agent promptly after such Person becomes aware of any violation of or non-compliance with any Environmental Laws or any Release on, at, in, under, above, to, from or about any Real Estate or any property subject to a Lease that is reasonably likely to result in Environmental Liabilities in excess of $1,000,000 individually or in the aggregate; and promptly forward to Administrative Agent a copy of any order, notice, request for information or any communication or report received by such Person in connection with any such violation or Release or any other matter that could reasonably be expected to result in Environmental Liabilities in excess of $1,000,000 individually or in the aggregate in each case whether or not any Governmental Authority has taken or threatened any action in connection with any such violation, Release or other matter.

SECTION 5.11 <u>Use of Proceeds and Letters of Credit.</u>

The proceeds of Revolving Credit Loans made hereunder and of Letters of Credit issued hereunder after the Closing Date will be used solely to fund the Chapter 11 Cases in accordance with the Approved Budget (subject to permitted variances under Section 6.15 hereof) and for the financing of the Lead Borrower's and its Subsidiaries' ordinary working capital, letters of credit and other general corporate needs including certain fees and expenses of professionals retained by the Loan Parties, subject to the Carve-Out, and for certain other Pre-Petition and pre-filing expenses that are approved by the Court and in accordance with the Approved Budget.  No part of the proceeds of any Revolving Credit Loan or any Letter of Credit will be used, whether directly or, to the knowledge of any Loan Party, indirectly, (i) for any purpose that entails a violation of any of the regulations of the Board, including Regulations U and X, (ii) in contravention of the provisions of the applicable Order or the Bankruptcy Code, or (iii) to make any payments to a Sanctioned Entity or a Sanctioned Person, to finance any investments in a Sanctioned Entity or a Sanctioned Person, to fund any operations of a Sanctioned Entity or a Sanctioned Person), or in any other manner that would result in a violation of Sanctions, Anti-Corruption Laws or Anti-Money Laundering Laws by any Person.

SECTION 5.12 <u>Additional Subsidiaries.</u>

If any Loan Party shall form or directly acquire all or substantially all of the outstanding Capital Stock of a Subsidiary after the Closing Date, the Lead Borrower will notify the Agents thereof and will cause such Subsidiary to become a Loan Party hereunder and under each applicable Security Document in the manner provided therein within 30 calendar days (or such longer period as the Administrative Agent may reasonably agree) after such Subsidiary is formed or acquired and promptly take such actions to create and perfect Liens on such Subsidiary's assets to secure the Obligations to the extent that such assets constitute Collateral under any applicable Security Document or as the Agents or the Required Lenders shall reasonably request; <u>provided that</u> no Mortgages shall be required.  If any shares of Capital Stock or Indebtedness of

115

any Subsidiary are owned by or on behalf of any Loan Party, such Loan Party will cause such shares and promissory notes evidencing such Indebtedness to be pledged to secure the Obligations within 30 calendar days (or such longer period as the Administrative Agent may reasonably agree) after such Subsidiary is formed or such shares of Capital Stock or Indebtedness are acquired.

SECTION 5.13 Further Assurances.

(a)    Each Loan Party will execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, Mortgages, deeds of trust and other documents), that may be required under any Applicable Law, or which any Agent or the Required Lenders may reasonably request, to effectuate the transactions contemplated by the Loan Documents or to grant, preserve, protect or perfect the Liens created or intended to be created by the Security Documents or the validity or priority of any such Lien, all at the expense of the Loan Parties.

(b)    [Reserved].

(c)    To the extent not delivered pursuant to the Pre-Petition Credit Agreement, each Loan Party shall deliver to the Collateral Agent any and all certificates representing Capital Stock (to the extent certificated) that are required to be pledged pursuant to the Pledge Agreement, accompanied by undated stock powers or other appropriate instruments of transfer executed in blank (or any other documents customary under local law) and instruments evidencing the intercompany Indebtedness held by such Loan Party and required to be pledged pursuant to the Pledge Agreement, indorsed in blank to the Collateral Agent.

SECTION 5.14 Restructuring Advisor and Investment Banker.

(a)    Continue to engage and retain (x) Berkeley Research Group, LLC ("BRG") or such other restructuring advisor reasonably acceptable to the Administrative Agent (each, a "Restructuring Advisor"), and (y) Houlihan Lokey ("Houlihan") or such other investment banker reasonably acceptable to the Administrative Agent (each, an "Investment Banker").  The retention of any Restructuring Advisor and any Investment Banker shall be on terms and conditions (including as to scope of engagement) reasonably satisfactory to the Administrative Agent.  The Administrative Agent hereby confirms that, as of the Closing Date, the existing engagement of BRG as the Restructuring Advisor and the existing engagement of Houlihan as Investment Banker shall satisfy the applicable requirements set forth in this clause (a).  The Restructuring Advisor and the Investment Banker shall be retained by and at the sole cost and expense of the Loan Parties and solely on behalf of the Loan Parties at all times.

(b)    Cooperate with the Restructuring Advisor and Investment Banker in all material respects.  The Loan Parties hereby (i) authorize the Administrative Agent (or their respective agents or advisors) to communicate directly with the Restructuring Advisor and Investment Banker regarding any and all matters related to the Loan Parties and their Affiliates, including, without limitation, all financial reports and projections developed, reviewed or verified by the Restructuring Advisor or the Investment Banker and all additional information, reports and statements reasonably requested by the

116

Administrative Agent (it being understood that a Financial Officer of the Lead Borrower will be invited to participate in such communications), and (ii) authorize and direct each Restructuring Advisor and Investment Banker to provide the Administrative Agent (or their respective agents or advisors, including the Agents' Advisor) with copies of reports and other information or materials prepared or reviewed by such Restructuring Advisor and Investment Banker as the Administrative Agent may reasonably request (in each case, subject to protection as necessary in respect of bona fide attorney-client privilege).

SECTION 5.15 [Reserved].

SECTION 5.16 [Reserved].

SECTION 5.17 DIP Term Loan Facility; Requests for Loans Under DIP Term Loan Facility.

(a)    The Borrowers shall receive gross proceeds from the DIP Term Loan under the DIP Term Loan Facility of not less than $325 million on the Closing Date (which amount may be reduced by closing date fees and expenses).

(b)    The Loan Parties shall keep and maintain the DIP Term Loan Facility in full force and effect and use the proceeds of advances thereunder solely for purposes and in amounts (subject to permitted variances under Section 6.15 hereof) set forth in the Approved Budget and as permitted by the DIP Term Loan Agreement, DIP Term Loan Documents and the Orders.

(c)    So long as any Pre-Petition Obligations remain outstanding, the proceeds of the DIP Term Loan Facility shall first be applied to repay the Pre-Petition Obligations (other than L/C Obligations).

SECTION 5.18 Lender Calls.

At the request of a Lender, the Borrower shall hold a weekly update meeting in the form of a telephonic conference call with the Required Lenders and/or their legal counsel and financial advisor, to discuss the Variance Reports, the Chapter 11 Cases, the financial and operational performance of the Loan Parties, and such other related matters as may be reasonably requested (such reporting and information delivery requirements, collectively, the "Reporting Requirements") with reasonable advance notice by the Administrative Agent. Such telephonic conference calls shall upon request include senior management and advisors of Holdings, the Borrower and their Subsidiaries if requested by the Administrative Agent or its advisors.

SECTION 5.19 Required Milestones.

The Loan Parties shall comply with all milestones set forth in Schedule 5.19 attached hereto (the "Milestones").

SECTION 5.20 OFAC; Sanctions.

117

Each Loan Party will, and will cause each of its Subsidiaries to comply in all material respects with all applicable Sanctions, Anti-Corruption Laws and Anti-Money Laundering Laws.

## ARTICLE VI

### Negative Covenants

Until (i) the Commitments have expired or been terminated, (ii) the principal of and interest on each Revolving Credit Loan and all fees and other Obligations (other than contingent indemnity obligations with respect to then unasserted claims and the Other Liabilities) shall have been paid in full, (iii) all Letters of Credit shall have expired or terminated (or been Cash Collateralized in a manner reasonably satisfactory to the Issuing Bank) and (iv) all Outstanding Amounts of any L/C Obligations have been reduced to zero (or Cash Collateralized in a manner reasonably satisfactory to the Issuing Bank), each Loan Party covenants and agrees with the Credit Parties that:

SECTION 6.01 Indebtedness and Other Obligations.

No Loan Party will, nor will it permit any Subsidiary of it to, create, incur, assume or permit to exist any Indebtedness, except Permitted Indebtedness.

SECTION 6.02 Liens.

No Loan Party will, nor will it permit any Subsidiary of it to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, except Permitted Encumbrances.

SECTION 6.03 Fundamental Changes.

(a)    No Loan Party will, nor will it permit any Subsidiary of it to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve, except that a Loan Party may convert from a corporation or a limited liability company or vice-versa with prior written notice to the Administrative Agent and completion of know your customer diligence by the Lenders.  No Loan Party will, nor will it permit any Subsidiary of it to, create any new Subsidiary that is not in existence on the Closing Date or acquire any new Subsidiary.

(b)    No Loan Party will, nor will it permit any Subsidiary of it to, engage, to any material extent, in any business other than businesses of the type conducted by such Loan Party or such Subsidiary, as applicable, on the date of execution of this Agreement and businesses reasonably related thereto and those supportive, complementary or ancillary thereto.

(c)    Holdings shall not, nor shall it permit any of its Subsidiaries directly or indirectly owning Capital Stock of the Lead Borrower to, (i) engage or commit to engage in any business or activity other than (A) the ownership of substantially all the outstanding shares of Capital Stock of the Lead Borrower and activities incidental thereto and (B) the ownership of all the outstanding shares of

118

Capital Stock of other entities created or acquired in a transaction otherwise permitted hereunder and activities incidental thereto, (ii) own or acquire any assets (other than the outstanding shares of voting Capital Stock of the Lead Borrower, the cash proceeds of any Restricted Payments permitted by SECTION 6.06 or all of the outstanding shares of voting Capital Stock of any other entity created or acquired in a transaction otherwise permitted hereunder), or (iii) incur any Indebtedness or other liabilities or financial obligations.

SECTION 6.04 <u>Investments.</u>

No Loan Party will, nor will it permit any Subsidiary of it to, make or permit to exist any Investment, except Permitted Investments.

SECTION 6.05 <u>Asset Sales.</u>

No Loan Party will, nor will it permit any Subsidiary of it to, sell, transfer, lease (as lessor), license (as licensor), abandon or otherwise voluntarily dispose of any asset, including any Capital Stock of another Person, except sales of Inventory and the use of cash or cash equivalents in the ordinary course of business, transactions permitted by SECTION 6.03 and Permitted Dispositions and the making of Permitted Investments (to the extent such Investment would involve a sale, transfer or disposition of any assets).

SECTION 6.06 <u>Restricted Payments; Certain Payments of Indebtedness.</u>

(a)     No Loan Party will, nor will it permit any Subsidiary of it to, declare or make, directly or indirectly, any Restricted Payment, except that (a) any Loan Party or any Subsidiary of a Loan Party may declare and pay cash dividends or make other distributions of property to a Loan Party and (b) any non-Loan Party may declare and pay cash dividends to any Loan Party to its equity holders on a pro rata basis.

(b)     No Loan Party will, nor will it permit any Subsidiary of it to, make any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Specified Indebtedness, or any payment or other distribution (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Specified Indebtedness except payments required under the Order with respect to any Specified Indebtedness.

SECTION 6.07 <u>Transactions with Affiliates.</u>

No Loan Party will, nor will it permit any Subsidiary of it to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates involving aggregate payments or consideration in excess of $500,000, except (a) transactions in the ordinary course of business that are at prices and on terms and conditions, taken as a whole, not less favorable to such Loan Party or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties, (b) transactions between or among the Loan Parties and/or their Subsidiaries not otherwise prohibited hereunder, (c) transactions pursuant to the RSA; (d)

119

payments of indemnities and expense reimbursements under the Management Agreements to the extent permitted by the Approved Budget; (e) payment of reasonable compensation to officers and employees for services actually rendered to any such Loan Party or any of its Subsidiaries; (f) payment of director's fees, expenses and indemnities permitted by the Approved Budget; (g) stock option, stock incentive, equity, bonus and other compensation plans of the Loan Parties and their Subsidiaries; (h) employment contracts with officers and management of the Loan Parties and their Subsidiaries; (i) the repurchase of equity interests from officers, directors and employees to the extent specifically permitted under this Agreement; (j) advances and loans to officers and employees of the Loan Parties and their Subsidiaries to the extent specifically permitted under this Agreement; (k) Investments consisting of notes from officers, directors and employees to purchase equity interests to the extent specifically permitted under this Agreement; (l) payments pursuant to the tax sharing agreements among the Loan Parties and their Subsidiaries to the extent attributable to the ownership or operations of the Holdings and its Subsidiaries; (m) [reserved]; (n) other transactions with Affiliates specifically permitted under SECTION 6.01 in connection with clause (c)(i), (ii) and (iv), (l) and (p) of the definition of "Permitted Indebtedness," SECTION 6.04(j) and (n) of the definition of "Permitted Investments," SECTION 6.05 in connection with clause (q) of the definition of "Permitted Dispositions" or SECTION 6.06(a)(i); and (o) as set forth on <u>Schedule 6.07</u>.

SECTION 6.08 <u>Restrictive Agreements.</u>

No Loan Party will, nor will it permit any Subsidiary of it to, directly or indirectly enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of such Loan Party or such Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets in favor of the Collateral Agent or (b) the ability of any Subsidiary thereof to pay dividends or other distributions with respect to any shares of its Capital Stock to such Loan Party or such Subsidiary or to make or repay loans or advances to a Loan Party or to guarantee Indebtedness of the Loan Parties, <u>provided that</u> (i) the foregoing shall not apply to restrictions and conditions imposed by Applicable Law, by any Loan Document, by any documents in existence on the Closing Date or under any documents relating to joint ventures of any Loan Party or any Subsidiary to the extent that such joint ventures are not prohibited hereunder, (ii) the foregoing shall not apply to customary restrictions and conditions contained in agreements relating to the sale of assets or equity permitted hereunder by a Loan Party or a Subsidiary pending such sale, provided such restrictions and conditions apply only to the assets of the Loan Party or Subsidiary that are to be sold and such sale is permitted hereunder, (iii) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, (iv) clause (a) of the foregoing shall not apply to customary provisions in contracts or leases restricting the assignment or subleasing or sublicensing thereof, (v) the foregoing shall not apply to any agreement related to the Specified Indebtedness or DIP Term Loan Facility, (vi) clause (a) of the foregoing shall not apply to licenses or contracts which by the terms of such licenses and contracts prohibit the granting of Liens on the rights contained therein, and (vii) the foregoing shall not apply to any restrictions in existence prior to the time any such Person became a Subsidiary and not created in contemplation of any such acquisition.

120

SECTION 6.09 <u>Amendment of Material Documents.</u>

No Loan Party will, nor will it permit any Subsidiary of it to, amend, modify or waive any of its rights governing any Indebtedness in any way to (i) increase the rate of or accelerate the time for payment of interest on any Indebtedness, (ii) advance the final maturity date of or shorten the Weighted Average Life to Maturity of any Indebtedness or (iii) alter the redemption provisions or the price or terms at which any Loan Party is required to offer to purchase any Indebtedness in any manner materially adverse to the Lenders.

SECTION 6.10 <u>Fiscal Year.</u>

No Loan Party will, nor will it permit any Subsidiary of it to, change its Fiscal Year without the prior written consent of the Administrative Agent.

SECTION 6.11 <u>Reclamation Claims.</u>

No Loan Party shall enter into any agreement to return any of its Inventory to any of its creditors for application against any pre-petition Indebtedness, pre-petition trade payables or other pre-petition claims under Section 546(c) of the Bankruptcy Code or, except as contemplated by or permitted pursuant to a "first day" motion or order, allow any creditor to take any setoff or recoupment against any of its pre-petition Indebtedness, pre-petition trade payables or other pre-petition claims based upon any such return pursuant to Section 553(b)(1) of the Bankruptcy Code or otherwise if, after giving effect to any such agreement, setoff or recoupment, the aggregate amount applied to pre-petition Indebtedness, pre-petition trade payables and other pre-petition claims subject to all such agreements, setoffs and recoupments since the Petition Date would exceed $1,000,000.

SECTION 6.12 <u>Insolvency Proceeding Claims.</u>

No Loan Party shall incur, create, assume, suffer to exist or permit any other superpriority administrative claim which is *pari passu* with or senior to the claim of the Administrative Agent or the Lenders against the Debtors, except as set forth in the applicable Order.

SECTION 6.13 <u>Bankruptcy Actions.</u>

No Loan Party shall seek, consent to, or permit to exist, without the prior written consent of the Administrative Agent, any order granting authority to take any action that is prohibited by the terms of this Agreement, the Order or the other Loan Documents or refrain from taking any action that is required to be taken by the terms of this Agreement, the Order or any of the other Loan Documents.

SECTION 6.14 <u>Liquidity.</u>

The Loan Parties shall not permit Liquidity to be less than $35,000,000 at any time.

SECTION 6.15 Budget Covenant.

(a)    The Borrower shall not permit actual receipts for Holdings, the Borrower and their Subsidiaries for any Test Period to be less than 87.5% of budgeted receipts for the corresponding period in the Approved Budget (the "Permitted Collections Budget Variances").

(b)    The Borrower shall not permit actual disbursements (excluding professional fees) for Holdings, the Borrower and their Subsidiaries for any Test Period to be more than 15% greater than the budgeted disbursements for the corresponding period in the Approved Budget (the "Permitted Expenditures Budget Variances").

(c)    Notwithstanding anything to the contrary herein, the Borrower and the Administrative Agent shall agree to increase the Permitted Expenditures Budget Variances, in the event that the Debtors are able to more rapidly open store locations than anticipated in the Initial Budget and the Permitted Collections Budget Variances shall be adjusted accordingly to the extent agreed.

ARTICLE VII

Events of Default

SECTION 7.01 Events of Default.

If any of the following events ("Events of Default") shall occur:

(a)    Any Loan Party shall fail to pay any principal of any Revolving Credit Loan or any reimbursement obligation in respect of any Letter of Credit Disbursement when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration or otherwise;

(b)    Any Loan Party shall fail to pay (i) any interest on or fee with respect to any Revolving Credit Loan as the same shall become due and payable under this Agreement or any other Loan Document and such failure continues for three () Business Days; or (ii) any other amount (other than an amount referred to in SECTION 7.01(a), any amount payable for Cash Management Services or Other Liabilities) as the same shall become due and payable under this Agreement or any other Loan Document and such failure continues for five (5) Business Days;

(c)    Any representation or warranty made or deemed made by or on behalf of any Loan Party in, or in connection with, any Loan Document or any amendment or modification thereof or waiver thereunder (including, without limitation, in any Borrowing Base Certificate or any certificate of a Financial Officer accompanying any financial statement), shall prove to have been incorrect in any material respect when made or deemed made;

122

(d)       Any Loan Party shall fail to observe or perform when due any covenant, condition or agreement contained in (i) Article VI or Section 5.01(i) and (j), Section 5.04(b)(i), (ii) Section 5.07 (but only with respect to insurance on the Revolver Priority Collateral) after a ten (10) Business Day grace period, (iii) Section 5.01(e) or 5.08(b) (in each case, after a five (5) day grace period), (iv) any of Section 2.18, Section 5.01(d), or Section 5.11 (provided that, if (A) any such Default described in this clause (iv) is of a type that can be cured within five (5) Business Days and (B) such Default could not materially adversely impact the Lenders' Liens on the Collateral, such default shall not constitute an Event of Default for five (5) Business Days after the occurrence of such Default so long as the Loan Parties are diligently pursuing the cure of such Default), or (v) any of Sections 5.14, 5.17, 5.18 or 5.19;

(e)       Any Loan Party shall fail to observe or perform when due any covenant, condition or agreement contained in any Loan Document (other than those specified in Section 7.01(a), Section 7.01(b), Section 7.01(c), or Section 7.01(d)), and such failure shall continue unremedied for a period of fifteen (15) days after the earlier of (x) notice thereof from the Administrative Agent to the Lead Borrower and (y) a Responsible Officer of any Loan Party obtaining actual knowledge thereof;

(f)       (i) Any Loan Party shall fail to make any payment (whether of principal, interest, letter of credit fees or commitment fees and regardless of amount) in respect of any Material Indebtedness when and as the same shall become due and payable and such failure shall continue beyond the expiration of any applicable grace or cure period set forth in the documents governing such Material Indebtedness, (ii) any event, circumstance or condition occurs that, with or without any action on the part of the holder or holders of any such Material Indebtedness or any trustee or agent on its or their behalf, results in any Material Indebtedness becoming due prior to its scheduled maturity or requiring the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity or (iii) any event, circumstance or condition shall have occurred and be continuing that enables or permits (with or without the giving of notice) the holder or holders of any Material Indebtedness or any trustee or agent on its or their behalf to cause any such Material Indebtedness to become due, or to require the prepayment, redemption, repurchase or defeasance thereof, prior to its scheduled maturity and any applicable grace or cure period set forth in respect of such event, circumstance or condition in the documents governing such Material Indebtedness shall have expired; provided that an event described in this paragraph shall not at any time constitute an Event of Default if the exercise of the rights and remedies by a holder of such Material Indebtedness against the obligors thereof is subject to the automatic stay in the Chapter 11 Cases; provided, further, that the foregoing proviso shall not apply to the Term Loan DIP Facility;

(g)       a Change in Control shall occur;

(h)       [Reserved];

(i)       [Reserved];

123

(j)     Except with respect to matters set forth on Schedule 3.06(a), one or more final judgments for the payment of money in an aggregate amount in excess of $5,000,000 (or such lesser amount as would reasonably be expected to result in a Material Adverse Effect) in excess of insurance coverage (or indemnities from indemnitors reasonably satisfactory to the Agents) shall be rendered against any Loan Party or any combination of Loan Parties and the same shall remain undischarged for a period of forty-five (45) days during which execution shall not be effectively stayed, satisfied or bonded or any action shall be legally taken by a judgment creditor to attach or levy upon any material assets of any Loan Party to enforce any such judgment;

(k)     (A) An ERISA Event shall have occurred that, when taken together with all other ERISA Events that have occurred, would reasonably be expected to result in a liability of any Loan Party in excess of $5,000,000 or such other amount that would reasonably be expected to result in a Material Adverse Effect or (B) the imposition of a Lien under Section 412 or 430(k) of the Code or Section 303 or 4068 of ERISA on any assets of any Loan Party;

(l)     Any challenge by or on behalf of any Loan Party to the validity of any Loan Document or the applicability or enforceability of any Loan Document strictly in accordance with the subject Loan Document's terms or which seeks to void, avoid, limit, or otherwise adversely affect any security interest created by or in any Loan Document or any payment made pursuant thereto, in each case, as to which an order or judgment has been entered materially adverse to the Agents and the Lenders;

(m)     The Interim Order and the Final Order, as applicable, together with the Loan Documents shall cease to create a valid and perfected Lien with such priority required by this Agreement and the Order; or

(n)     The termination of the Facility Guarantee or any other guaranty of the Obligations (except for any release or termination permitted hereunder); or

(o)     The provisions of the Intercreditor Arrangement or the Intercreditor Acknowledgment shall for any reason be revoked or invalidated, in whole or in part, or otherwise cease to be in full force and effect, or any Loan Party, the Pre-Petition Notes Trustee, the DIP Term Loan Agent, any lender under the DIP Term Loan Facility or any Affiliate of any of the foregoing shall have commenced a suit or an action, including any motion or adversary proceeding in the Chapter 11 Cases, contesting in any manner the validity or enforceability thereof or deny that it has any further liability or obligation thereunder, or the Obligations, for any reason shall not have the priority contemplated by this Agreement, the Pre-Petition Credit Agreement, the Intercreditor Arrangement or the Intercreditor Acknowledgment; or

(p)     The occurrence of any of the following in the Chapter 11 Cases:

(i)     the bringing of a motion, taking of any action or the filing of any plan of reorganization or disclosure statement attendant thereto by any of the Loan

124

Parties or any Subsidiary, in the Chapter 11 Cases: (A) to obtain additional financing under Section 364(c) or Section 364(d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (B) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral; (C) except as provided in the Interim Order or Final Order, as the case may be, to use cash collateral of the Administrative Agent and the other Secured Parties or the Pre-Petition Agent and Pre-Petition Lenders under Section 363(c) of the Bankruptcy Code without the prior written consent of the Administrative Agent; or (D) any other action or actions adverse to (x) the Administrative Agent and Lenders or Pre-Petition Agent and Pre-Petition Lenders or their rights and remedies hereunder, under any other Loan Documents, or their interest in the Collateral or (y) Pre-Petition Agent and Pre-Petition Lenders or their rights under the Pre-Petition Credit Agreement or the other Pre-Petition Loan Documents or their interest in the Collateral (as defined in the Pre-Petition Credit Agreement); or

(ii)      (A) the filing by a Loan Party of any plan of reorganization that is not a Plan of Reorganization or disclosure statement attendant thereto, or any direct or indirect amendment to such plan that causes it to no longer be a Plan of Reorganization is not a Plan of Reorganization, (B) the entry of any order terminating any Loan Party's exclusive right to file a plan of reorganization, or (C) the expiration of any Loan Party's exclusive right to file a plan of reorganization; or

(iii)     the entry of an order in any of the Chapter 11 Cases confirming a plan of reorganization other than a Plan of Reorganization; or

(iv)      (A) the entry of an order amending, supplementing, staying, vacating or otherwise modifying the Loan Documents or the Interim Order, the Final Order or the Cash Management Order without the written consent of the Administrative Agent or the Interim Order, the Final Order or the Cash Management Order shall otherwise not be in full force and effect or (B) any Loan Party or any Subsidiary shall fail to comply with the Order in any material respect; or

(v)       the payment of, or application for authority to pay, any Pre-Petition claim without Administrative Agent's consent (which shall be deemed to have been given if the Administrative Agent does not object to a motion filed with the Bankruptcy Court) unless in accordance with the Approved Budget or as provided under a "first day" order; or

(vi)      the allowance of any claim or claims under Section 506(c) of the Bankruptcy Code or otherwise against the Administrative Agent, any Lender or any of the Collateral or against the Pre-Petition Agent, any Pre-Petition Lender or any Collateral (as defined in the Pre-Petition Credit Agreement); or

(vii)     (A) the appointment of an interim or permanent trustee in the Chapter 11 Cases or the appointment of a trustee receiver or an examiner in the

125

Chapter 11 Cases with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Loan Parties; or (B) the sale without the Administrative Agent's consent, of all or substantially all of the Debtors' assets either through a sale under Section 363 of the Bankruptcy Code, through a confirmed plan of reorganization in the Chapter 11 Cases or otherwise that does not result in payment in full in cash of all of the Obligations under this Agreement and all Pre-Petition Obligations at the closing of such sale or initial payment of the purchase price or effectiveness of such plan, as applicable; or

(viii)    the dismissal of any Chapter 11 Case, or the conversion of any Chapter 11 Case from one under chapter 11 to one under chapter 7 of the Bankruptcy Code or any Loan Party shall file a motion or other pleading seeking the dismissal of the Chapter 11 Cases under Section 1112 of the Bankruptcy Code or otherwise or the conversion of the Chapter 11 Cases to chapter 7 of the Bankruptcy Code; or

(ix)    except as provided in or contemplated by the Orders, any Loan Party shall file a motion seeking, or the Court shall enter an order granting, relief from or modifying the Automatic Stay (A) to allow any creditor (other than the Administrative Agent and the DIP Term Loan Agent) to execute upon or enforce a Lien on any Collateral, (B) approving any settlement or other stipulation not approved by the Administrative Agent with any secured creditor of any Loan Party providing for payments as adequate protection or otherwise to such secured creditor, (C) with respect to any Lien on or the granting of any Lien on any Collateral to any federal, state or local environmental or regulatory agency or authority, which in either case involves a claim of $500,000 or more or (D) permit other actions that would have a Material Adverse Effect on the Debtors or their estates (taken as a whole); or

(x)    the entry of an order in the Chapter 11 Cases avoiding or permitting recovery of any portion of the payments made on account of the Obligations owing under this Agreement or the other Loan Documents or the Pre-Petition Obligations owing under the Pre-Petition Loan Documents; or

(xi)    the failure of any Loan Party to perform any of its obligations under the Interim Order, the Final Order, the Cash Management Order, or any order of the Court approving the Plan of Reorganization in all material respects; or

(xii)    the entry of any order of the Court authorizing any claims or charges, other than in respect of this Agreement and the other Loan Documents, the DIP Term Loan Agreement, or as otherwise permitted under the applicable Loan Documents or permitted under the Orders, (A) entitled to superpriority administrative expense claim status in any Chapter 11 Case pursuant to Section 364(c)(1) of the Bankruptcy Code *pari passu* with or senior to the claims of the Administrative Agent and the Secured Parties under this Agreement and the other Loan Documents or (B) granting any Lien on the Collateral having a priority

126

senior to or *pari passu* with the Liens and security interests granted herein or in the Orders then in effect; or

(xiii)    the Order shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect; or

(xiv)    termination of the RSA other than any automatic termination as a result of the effective date of the Plan of Reorganization; or

(xv)    any Loan Party shall seek or support any Person seeking an order in the Chapter 11 Cases (A) charging any of the Collateral under Section 506(c) of the Bankruptcy Code against the Administrative Agent and the Secured Parties or (B) limiting the extension under Section 552(b) of the Bankruptcy Code of the Liens of the Pre-Petition Agent on the Collateral to any proceeds, products, offspring, or profits of the Collateral acquired by any Loan Party after the Petition Date; or

(xvi)    if the Final Order does not include a waiver, in form and substance satisfactory to the Administrative Agent, of (A) the right to surcharge the Collateral under Section 506(c) of the Bankruptcy Code and (B) any ability to limit the extension under Section 552(b) of the Bankruptcy Code of the Liens of the Pre-Petition Agent on the Collateral to any proceeds, products, offspring, or profits of the Collateral acquired by any Loan Party after the Petition Date; provided that in no event shall a violation of this clause (xv) constitute an Event of Default prior to the entry of the Final Order; or

(xvii)    an order of the Court shall be entered denying or terminating use of cash collateral by the Loan Parties; or

(xviii)    any Loan Party shall challenge, support or encourage a challenge of any payments made to the Administrative Agent or any Lender with respect to the Obligations or the Pre-Petition Agent or the Pre-Petition Lenders with respect to the Pre-Petition Obligations, or without the consent of the Administrative Agent, the filing of any motion by the Loan Parties seeking approval of (or the entry of an order by the Court approving) adequate protection to any Pre-Petition Agent or the Pre-Petition Lenders that is inconsistent with the Order; or

(xix)    without the Administrative Agent's consent, the entry of any order by the Court granting, or the filing by any Loan Party or any of its Subsidiaries of any motion or other request with the Court (in each case, other than the Orders and motions seeking entry thereof or permitted amendments or modifications thereto) seeking, authority to use any cash proceeds of any of the Collateral without the Administrative Agent's consent or to obtain any financing under Section 364 of the Bankruptcy Code other than the Loan Documents and the DIP Term Loan Agreement; or

127

(xx)    any Loan Party shall file any motion seeking authority to consummate a sale of assets of the Loan Parties or the Collateral to the extent having a value in excess of $1,000,000 outside the ordinary course of business and not otherwise permitted hereunder; or

(xxi)    [reserved]; or

(xxii)    without the Administrative Agent's consent, any Loan Party or any Subsidiary thereof shall file any motion or other request with the Court seeking (A) to grant or impose, under Section 364 of the Bankruptcy Code or otherwise, liens or security interests in any DIP Collateral (as defined in the Orders), whether senior or equal to the Agents' or the DIP Term Loan Lenders' liens and security interests, except as otherwise provided in the Loan Documents or the Orders; or (B) to modify or affect any of the rights of the Administrative Agent, the Lenders or the DIP Term Loan Lenders under the Orders, the Loan Documents, or the DIP Term Loan Agreement and related documents by any subsequent order entered in the Chapter 11 Cases; or

(xxiii)    any Loan Party or any Subsidiary thereof shall take any action in support of any matter set forth in this Section 7.01(p) or any other Person shall do so and such application is not contested in good faith by the Loan Parties and the relief requested is granted in an order that is not stayed pending appeal;

then, and in every such event, and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders, shall, by notice to the Lead Borrower, subject to the Order and the terms thereof, notwithstanding the provisions of Section 362 of the Bankruptcy Code and without notice, application or motion, hearing before, or order of the Court, take any or all of the following actions, at the same or different times: (i) terminate the Commitments, and thereupon the Commitments shall irrevocably terminate immediately; (ii) declare the Obligations owing by such Borrower then outstanding to be due and payable in whole, and thereupon the principal of the Revolving Credit Loans and all other Obligations so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Loan Parties accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Loan Parties to the extent permitted by Applicable Law; (iii) require the Loan Parties to Cash Collateralize its respective Outstanding Amounts of any L/C Obligations to be held and applied in accordance with SECTION 7.03; and/or (iv) declare that the Post-Carve Out Trigger Notice Cap (as defined in the Order) has been invoked through the delivery of a Carve-Out Trigger Notice (as defined in the Order) to the Loan Parties.

SECTION 7.02 Remedies on Default.

In case any one or more of the Events of Default shall have occurred and be continuing, and whether or not the maturity of the Obligations shall have been accelerated pursuant hereto, the Agents (at the direction of the Required Lenders), subject to the Remedies Notice Period , shall proceed to protect and enforce their rights and remedies under this Agreement or any of the

128

other Loan Documents by suit in equity, action at law or other appropriate proceeding, whether for the specific performance of any covenant or agreement contained in this Agreement and the other Loan Documents or any instrument pursuant to which the Obligations are evidenced, and, if such amount shall have become due, by declaration or otherwise, proceed to enforce the payment thereof or any other legal or equitable right of the Secured Parties. No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of law.

At any hearing during the Remedies Notice Period to contest the enforcement of remedies, the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred, and the Loan Parties hereby waive their right to and shall not be entitled to seek relief, including, without limitation, under Section 105 of the Bankruptcy Code, to the extent that such relief would in any way impair or restrict the rights and remedies of the Administrative Agent or the Secured Parties, as set forth in this Agreement, the applicable Order or other Loan Documents.

As set forth in and subject to the Order, the Automatic Stay shall be modified and vacated to permit the Administrative Agent and the Lenders to exercise all rights and remedies under this Agreement, the other Loan Documents or applicable Law, without further notice, motion or application to, hearing before, or order from, the Court.

No remedy herein is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of Law.

(a)     Subject to the Remedies Notice Period, the Collateral Agent may exercise any other appropriate right or remedy the Bankruptcy Court may fashion, including:

(i)     foreclosure, sale or disposition of the Collateral;

(ii)     collection of accounts receivable;

(iii)     seek the appointment of a receiver or keeper to take possession of any Collateral and to enforce any of the Collateral Agent's remedies (for the benefit of the Secured Parties); and

(iv)     taking any other actions or exercise any other rights or remedies permitted under the Orders, the Loan Documents or applicable Law or equity.

(b)     Each Loan Party further agrees, that, during the continuance of any Event of Default, subject to the Remedies Notice Period, (i) at the Collateral Agent's request, it shall assemble the Collateral and make it available to the Collateral Agent at places that the Collateral Agent shall reasonably select, whether at such Secured Party's premises or elsewhere, (ii) without limiting the foregoing, the Collateral Agent also has the right to require that each Loan Party store and keep any Collateral pending further action by the Collateral Agent and, while any such Collateral is so stored or kept, provide such guards and maintenance services as shall be

129

necessary to protect the same and to preserve and maintain such Collateral in good condition, and (iii) until the Collateral Agent is able to sell any Collateral, the Collateral Agent shall have the right to hold or use such Collateral to the extent that it deems appropriate for the purpose of preserving the Collateral or its value. The Agents shall not have any obligation to any Loan Party to maintain or preserve the rights of any Loan Party as against third parties with respect to any Collateral while such Collateral is in the possession of any Agent.

(c)     All of the rights and remedies of the Agents and any other Secured Party under any Loan Document shall be cumulative, may be exercised individually or concurrently and not exclusive of any other rights or remedies provided by any applicable Law. To the extent it may lawfully do so, each Loan Party absolutely and irrevocably waives and relinquishes the benefit and advantage of, and covenants not to assert against the Agents or any Lender, any valuation, stay, appraisement, extension, redemption or similar laws and any and all rights or defenses it may have as a surety, now or hereafter existing, arising out of the exercise by them of any rights hereunder. If any notice of a proposed sale or other disposition of any Collateral shall be required by law, such notice shall be deemed reasonable and proper if given at least 10 days before such sale or other disposition.

(d)     To the extent that applicable Law imposes duties on the Collateral Agent to exercise remedies in a commercially reasonable manner, each Loan Party acknowledges and agrees that it is not commercially unreasonable for the Collateral Agent to do any of the following:

(i)     fail to incur significant costs, expenses or other liabilities reasonably deemed as such by the Collateral Agent to prepare any Collateral for disposition or otherwise to complete raw material or work in process into finished goods or other finished products for disposition;

(ii)     fail to obtain Permits, or other consents, for access to any Collateral to sell or for the collection or sale of any Collateral, or, if not required by applicable Law, fail to obtain Permits or other consents for the collection or disposition of any Collateral;

(iii)     fail to exercise remedies against account debtors or other Persons obligated on any Collateral or to remove Liens on any Collateral or to remove any adverse claims against any Collateral;

(iv)     advertise dispositions of any Collateral through publications or media of general circulation, whether or not such Collateral is of a specialized nature or to contact other Persons, whether or not in the same business as any Loan Party, for expressions of interest in acquiring any such Collateral;

(v)     exercise collection remedies against account debtors and other Persons obligated on any Collateral, directly or through the use of collection agencies or other collection specialists, hire one or more professional auctioneers to assist in the disposition of any Collateral, whether or not such Collateral is of a specialized nature or, to the extent deemed appropriate by the Collateral Agent, obtain the services of other brokers, investment bankers, consultants and other professionals to assist the Collateral Agent in the collection or disposition of any

130

Collateral, or utilize internet sites that provide for the auction of assets of the types included in the Collateral or that have the reasonable capacity of doing so, or that match buyers and sellers of assets to dispose of any Collateral;

(vi)    dispose of assets in wholesale rather than retail markets;

(vii)    disclaim disposition warranties, such as title, possession or quiet enjoyment; or

(viii)    purchase insurance or credit enhancements to insure the Collateral Agent against risks of loss, collection or disposition of any Collateral or to provide to the Collateral Agent a guaranteed return from the collection or disposition of any Collateral.

Notwithstanding anything contained herein or in any other Loan Document to the contrary, the Loan Parties hereby waive any right to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the Agents and the Lenders set forth in the Orders and in the Loan Documents.

SECTION 7.03 Application of Proceeds.

After the occurrence and during the continuance of (i) any Cash Dominion Event or (ii) any Event of Default and acceleration of the Obligations, all proceeds realized from any Loan Party or on account of any Collateral owned by a Loan Party or, without limiting the foregoing, on account of any Prepayment Event, any payments in respect of any Obligations and all proceeds of the Collateral, shall be applied in the following order:

(a)    FIRST, ratably to pay the Obligations in respect of any Credit Party Expenses, indemnities and other amounts then due to the Agents until paid in full (other than contingent obligations);

(b)    SECOND, ratably to pay any Credit Party Expenses and indemnities, and to pay any fees then due to the Lenders, until paid in full;

(c)    THIRD, ratably to pay interest accrued in respect of the Obligations until paid in full;

(d)    FOURTH, ratably to pay principal due in respect of the Revolving Credit Loans until paid in full;

(e)    FIFTH, to the Administrative Agent, to be held by the Administrative Agent, for the ratable benefit of the Issuing Bank and the Lenders, to Cash Collateralize that portion of L/C Obligations comprised of the aggregate undrawn amount of Letters of Credit;

(f)    SIXTH, ratably to pay outstanding Obligations with respect to Cash Management Services furnished to any Loan Party;

(g)    SEVENTH, ratably to pay any other outstanding Obligations (including any Bank Products and any other outstanding Other Liabilities); and

131

(h)    EIGHTH, to the Lead Borrower or such other Person entitled thereto under Applicable Law.

## ARTICLE VIII

### The Agents

SECTION 8.01 <u>Appointment and Administration by Administrative Agent.</u>

Each Credit Party hereby irrevocably designates Wells Fargo as Administrative Agent under this Agreement and the other Loan Documents.  The general administration of the Loan Documents shall be by the Administrative Agent.  The Credit Parties each hereby (a) irrevocably authorizes the Administrative Agent (i) to enter into the Loan Documents to which it is a party, and (ii) at its discretion, to take or refrain from taking such actions as agent on its behalf and to exercise or refrain from exercising such powers under the Loan Documents as are delegated by the terms hereof or thereof, as appropriate, together with all powers reasonably incidental thereto, and (b) agrees and consents to all of the provisions of the Security Documents. The Administrative Agent shall have no duties or responsibilities except as set forth in this Agreement and the other Loan Documents, nor shall it have any fiduciary relationship with any other Credit Party, and no implied covenants, responsibilities, duties, obligations, or liabilities shall be read into the Loan Documents or otherwise exist against the Administrative Agent. Without limiting the generality of the foregoing, each Lender hereby authorizes the Administrative Agent to consent, on behalf of each Lender, to the Interim Order and the Final Order, each to be negotiated between the Loan Parties, the Administrative Agent, certain other parties and the statutory committees appointed pursuant to Sections 327 and 1103 of the Bankruptcy Code.

SECTION 8.02 <u>Appointment of Collateral Agent.</u>

Each Secured Party hereby irrevocably designates Wells Fargo as Collateral Agent under this Agreement and the other Loan Documents.  The Secured Parties each hereby (i) irrevocably authorizes the Collateral Agent (x) to enter into the Loan Documents to which it is a party, and (y) at its discretion, to take or refrain from taking such actions as agent on its behalf and to exercise or refrain from exercising such powers under the Loan Documents as are delegated by the terms hereof or thereof, as appropriate, together with all powers reasonably incidental thereto, and (ii) agrees and consents to all of the provisions of the Security Documents.  All Collateral shall be held or administered by the Collateral Agent (or its duly-appointed agent) for its own benefit and for the ratable benefit of the other Credit Parties.  Any proceeds received by the Collateral Agent from the foreclosure, sale, lease or other disposition of any of the Collateral and any other proceeds received pursuant to the terms of the Security Documents or the other Loan Documents shall be paid over to the Administrative Agent for application as provided in this Agreement and the other Loan Documents.  The Collateral Agent shall have no duties or responsibilities except as set forth in this Agreement and the other Loan Documents, nor shall it have any fiduciary relationship with any other Secured Party, and no implied covenants, responsibilities, duties, obligations, or liabilities shall be read into the Loan Documents or otherwise exist against the Collateral Agent.

132

SECTION 8.03 <u>Sharing of Excess Payments.</u>

If at any time or times any Secured Party shall receive (i) by payment, foreclosure, setoff, banker's lien, counterclaim, or otherwise, or any payments with respect to the Obligations owing to such Secured Party arising under, or relating to, this Agreement or the other Loan Documents, or (ii) payments from the Administrative Agent in excess of such Secured Party's ratable portion of all such distributions by the Administrative Agent, such Secured Party shall promptly (1) turn the same over to the Administrative Agent, in kind, and with such endorsements as may be required to negotiate the same to the Administrative Agent, or in same day funds, as applicable, for the account of all of the Secured Parties and for application to the Obligations in accordance with the applicable provisions of this Agreement, or (2) purchase, without recourse or warranty, an undivided interest and participation in the Obligations owed to the other Secured Parties so that such excess payment received shall be applied ratably as among the Secured Parties in accordance with the provisions of SECTION 2.17 or SECTION 7.03, as applicable; <u>provided</u>, <u>however</u>, that if all or part of such excess payment received by the purchasing party is thereafter recovered from it, those purchases of participations shall be rescinded in whole or in part, as applicable, and the applicable portion of the purchase price paid therefor shall be returned to such purchasing party, but without interest except to the extent that such purchasing party is required to pay interest in connection with the recovery of the excess payment.  In no event shall the provisions of this paragraph be construed to apply to any payment made by the Loan Parties pursuant to and in accordance with the express terms of this Agreement or any other Loan Document or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Revolving Credit Loans or participations in drawings under Letters of Credit to any assignee or participant, other than to the Loan Parties or any Affiliate(s) thereof (as to which the provisions of this paragraph shall apply).

SECTION 8.04 <u>Agreement of Applicable Lenders.</u>

Upon any occasion requiring or permitting an approval, consent, waiver, election or other action on the part of the Applicable Lenders, action shall be taken by each Agent for and on behalf or for the benefit of all Credit Parties upon the direction of the Applicable Lenders, and any such action shall be binding on all Credit Parties.  No amendment, modification, consent, or waiver shall be effective except in accordance with the provisions of SECTION 9.02.

SECTION 8.05 <u>Liability of Agents.</u>

(a)    The Agents, when acting on behalf of the Credit Parties, may execute any of their respective duties under this Agreement or any of the other Loan Documents by or through any of their respective officers, agents and employees, and no Agent nor any of their respective directors, officers, agents or employees shall be liable to any other Secured Party for any action taken or omitted to be taken in good faith, or be responsible to any other Secured Party for the consequences of any oversight or error of judgment, or for any loss, except to the extent of any liability imposed by law by reason of such Agent's own gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision). No Agent nor any of their respective directors, officers, agents and employees shall in any event be liable to any other Secured Party for any action taken or omitted to be taken by it pursuant to instructions received by it from the Applicable Lenders,

133

or in reliance upon the advice of counsel selected by it.  Without limiting the foregoing no Agent, nor any of their respective directors, officers, employees, or agents shall be: (i) responsible to any other Secured Party for the due execution, validity, genuineness, effectiveness, sufficiency, or enforceability of, or for any recital, statement, warranty or representation in, this Agreement, any other Loan Document or any related agreement, document or order; (ii) required to ascertain or to make any inquiry concerning the performance or observance by any Loan Party of any of the terms, conditions, covenants, or agreements of this Agreement or any of the Loan Documents; (iii) responsible to any other Secured Party for the state or condition of any properties of the Loan Parties or any other obligor hereunder constituting Collateral for the Obligations or any information contained in the books or records of the Loan Parties; (iv) responsible to any other Secured Party for the validity, enforceability, collectibility, effectiveness or genuineness of this Agreement or any other Loan Document or any other certificate, document or instrument furnished in connection therewith; or (v) responsible to any other Secured Party for the validity, priority or perfection of any Lien securing or purporting to secure the Obligations or for the value or sufficiency of any of the Collateral.

(b)    The Agents may execute any of their duties under this Agreement or any other Loan Document by or through their agents or attorneys-in-fact, and shall be entitled to the advice of counsel concerning all matters pertaining to its rights and duties hereunder or under the other Loan Documents.  The Agents shall not be responsible for the negligence or misconduct of any agents or attorneys-in-fact selected by them with reasonable care.

(c)    None of the Agents nor any of their respective directors, officers, employees, or agents shall have any responsibility to any Loan Party on account of the failure or delay in performance or breach by any other Secured Party (other than by each such Agent in its capacity as a Lender) of any of its respective obligations under this Agreement or any of the other Loan Documents or in connection herewith or therewith.

(d)    The Agents shall be entitled to rely, and shall be fully protected in relying, upon any notice, consent, certificate, affidavit, or other document or writing believed by them to be genuine and correct and to have been signed, sent or made by the proper person or persons, and upon the advice and statements of legal counsel (including, without, limitation, counsel to the Loan Parties), independent accountants and other experts selected by any Loan Party or any Secured Party.  The Agents shall be fully justified in failing or refusing to take any action under this Agreement or any other Loan Document unless they shall first receive such advice or concurrence of the Applicable Lenders as they deem appropriate or they shall first be indemnified to their satisfaction by the other Secured Parties against any and all liability and expense which may be incurred by them by reason of the taking or failing to take any such action.

SECTION 8.06 Notice of Default.

No Agent shall be deemed to have knowledge or notice of the occurrence of any Default or Event of Default unless such Agent has actual knowledge of the same or has received notice from a Secured Party or Loan Party referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default".  In the event that an Agent obtains such actual knowledge or receives such a notice, such Agent shall give prompt notice thereof to each of the other Secured Parties.  Upon the occurrence of an Event of Default, the

134

Agents shall (subject to the provisions of SECTION 9.02) take such action with respect to such Default or Event of Default as shall be reasonably directed by the Required Lenders.  Unless and until the Agents shall have received such direction, the Agents may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to any such Default or Event of Default as they shall deem advisable in the best interest of the Secured Parties.  In no event shall the Agents be required to comply with any such directions to the extent that the Agents believe that their compliance with such directions would be unlawful.

SECTION 8.07 Credit Decisions.

Each Secured Party (other than the Agents) acknowledges that it has, independently and without reliance upon the Agents or any other Secured Party, and based on the financial statements prepared by the Loan Parties and such other documents and information as it has deemed appropriate, made its own credit analysis and investigation into the business, assets, operations, property, and financial and other condition of the Loan Parties and has made its own decision to enter into this Agreement and the other Loan Documents.  Each Credit Party (other than the Agents) also acknowledges that it will, independently and without reliance upon the Agents or any other Secured Party, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in determining whether or not conditions precedent to closing any Revolving Credit Loan hereunder have been satisfied and in taking or not taking any action under this Agreement and the other Loan Documents.

SECTION 8.08 Reimbursement and Indemnification.

Without limiting the obligations of the Loan Parties hereunder, each Secured Party (other than the Agents) agrees to (i) reimburse the Agents for such Secured Party's pro rata share of all Obligations held by such Secured Party of (x) any expenses and fees incurred by any Agent for the benefit of Secured Parties under this Agreement and any of the other Loan Documents or any other agreement or instrument contemplated hereby or thereby, including, without limitation, reasonable counsel fees and compensation of agents and employees paid for services rendered on behalf of the Secured Parties, and any other expense incurred in connection with the operations or enforcement thereof not reimbursed by the Loan Parties, and (y) any expenses of any Agent incurred for the benefit of the Secured Parties that the Loan Parties have agreed to reimburse pursuant to this Agreement or any other Loan Document and have failed to so reimburse, and (ii) indemnify and hold harmless each Agent and any of their respective directors, officers, employees, or agents, on demand, in the amount of such Secured Party's pro rata share of all Obligations held by such Secured Party, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses, or disbursements of any kind or nature whatsoever which may be imposed on, incurred by, or asserted against it or any Secured Party in any way relating to or arising out of this Agreement or any of the other Loan Documents or any other agreement or instrument contemplated hereby or thereby or any action taken or omitted by it or any of them under this Agreement or any of the other Loan Documents or any other agreement or instrument contemplated hereby or thereby to the extent not reimbursed by the Loan Parties, including, without limitation, costs of any suit initiated by each Agent against any Secured Party (except such as shall have been determined by a court of competent jurisdiction or another independent tribunal having jurisdiction by final and non-

135

appealable judgment to have resulted from the gross negligence or willful misconduct of such Agent); provided, however, that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against such Secured Party in its capacity as such.  The provisions of this SECTION 8.08 shall survive the repayment of the Obligations and the termination of the Commitments.

SECTION 8.09 Rights of Agents.

It is understood and agreed that the Agents shall have the same rights and powers hereunder (including the right to give such instructions) as the other Lenders and may exercise such rights and powers, as well as their rights and powers under other agreements and instruments to which they are or may be party, and engage in other transactions with the Loan Parties, as though they were not the Agents.  Each Agent and their respective Affiliates may accept deposits from, lend money to, and generally engage in any kind of commercial or investment banking, trust, advisory or other business with the Loan Parties and their Affiliates as if it were not an Agent thereunder.

SECTION 8.10 Notice of Transfer.

The Administrative Agent may deem and treat a Lender party to this Agreement as the owner of such Lender's portion of the Obligations for all purposes, unless and until, and except to the extent, an Assignment and Acceptance shall have become effective as set forth in SECTION 9.04.

SECTION 8.11 Successor Agents.

Any Agent may resign at any time by giving thirty (30) Business Days' written notice thereof to the other Secured Parties and the Lead Borrower upon the occurrence and during the continuation of an Event of Default.  Upon any such resignation of an Agent, the Required Lenders shall have the right to appoint a successor Agent, which, so long as there is no Event of Default, shall be reasonably satisfactory to the Lead Borrower (whose consent in any event shall not be unreasonably withheld or delayed).  If no successor Agent shall have been so appointed by the Required Lenders and/or none shall have accepted such appointment within thirty (30) days after the retiring Agent's giving of notice of resignation, the retiring Agent may, on behalf of the other Secured Parties, appoint a successor Agent which shall be a commercial bank (or affiliate thereof) organized under the laws of the United States of America or of any State thereof and having a combined capital and surplus of a least $1,000,000,000, or capable of complying with all of the duties of such Agent hereunder (in the opinion of the retiring Agent and as certified to the other Secured Parties in writing by such successor Agent) which, so long as there is no Event of Default, shall be reasonably satisfactory to the Lead Borrower (whose consent shall not in any event be unreasonably withheld or delayed).  Upon the acceptance of any appointment as Agent by a successor Agent, such successor Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent and the retiring Agent shall be discharged from its duties and obligations under this Agreement.  After any retiring Agent's resignation hereunder as such Agent, the provisions of this Article VIII shall

136

inure to its benefit as to any actions taken or omitted to be taken by it while it was such Agent under this Agreement.

SECTION 8.12 <u>Relation Among the Lenders.</u>

The Lenders are not partners or co-venturers, and no Lender shall be liable for the acts or omissions of, or (except as otherwise set forth herein in case of any Agent) authorized to act for, any other Lender.

SECTION 8.13 <u>Reports and Financial Statements.</u>

By signing this Agreement, each Lender:

(a)      agrees to furnish the Administrative Agent on the first day of each month with a summary of all Other Liabilities due or to become due to such Lender;

(b)      is deemed to have requested that the Agents furnish such Lender, promptly after they become available, copies of (i) all financial statements required to be delivered by Holdings under SECTIONS 5.01(a) through and including 5.01(e), (ii) all Borrowing Base Certificates required to be delivered by the Lead Borrower under SECTION 5.01(f), (iii) all commercial finance examinations and appraisals of the Collateral received by the Agents (collectively, the "<u>Reports</u>") (and the Agents agree to furnish such Reports promptly to the Lenders, which Reports may be furnished in accordance with the final paragraph of SECTION 5.01) and (iv) upon request, all monthly statement of accounts or inventory reporting submitted in support of the Borrowing Base Certificates;

(c)      expressly agrees and acknowledges that no Agent makes any representation or warranty as to the accuracy of the Reports, and shall not be liable for any information contained in any Report;

(d)      expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Agents or any other party performing any audit or examination will inspect only specific information regarding the Loan Parties and will rely significantly upon the Loan Parties' books and records, as well as on representations of the Loan Parties' personnel;

(e)      agrees to keep all Reports confidential and strictly for its internal use, and not to distribute except to its participants, or use any Report in any other manner; and

(f)      without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold each Agent and any such other Lender preparing a Report harmless from any action the indemnifying Lender may take or conclusion the indemnifying Lender may reach or draw from any Report in connection with any Credit Extensions that the indemnifying Lender has made or may make to the Borrowers, or the indemnifying Lender's participation in, or the indemnifying Lender's purchase of, a Revolving Credit Loan or Revolving Credit Loans of the Borrowers; and

137

(ii) to pay and protect, and indemnify, defend, and hold each Agent and any such other Lender preparing a Report harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including reasonable attorney costs) incurred by the Agents and any such other Lender preparing a Report as the direct or indirect result of any third parties who might obtain all or part of any Report through the indemnifying Lender in violation of the terms hereof.

SECTION 8.14 <u>Agency for Perfection.</u>

Each Lender hereby appoints each other Lender as agent for the purpose of perfecting Liens for the benefit of the Agents and the Secured Parties, in assets which, in accordance with Article 9 of the UCC or any other Applicable Law of the United States of America can be perfected only by possession.  Should any Secured Party (other than an Agent) obtain possession of any such Collateral, such Secured Party shall notify the Collateral Agent thereof, and, promptly upon the Collateral Agent's request therefor shall deliver such Collateral to the Collateral Agent, or otherwise deal with such Collateral in accordance with the Collateral Agent's instructions.

SECTION 8.15 <u>Reserved.</u>

SECTION 8.16 <u>Collateral Matters</u>.

(a)    The Lenders hereby irrevocably authorize the Collateral Agent to release any Lien upon any Collateral (i) upon the termination of the Commitments and indefeasible payment and satisfaction in full in cash of all Obligations (other than contingent indemnity obligations with respect to then unasserted claims), all Letters of Credit shall have expired or terminated (or been collateralized in a manner satisfactory to the applicable Issuing Bank) and all Outstanding Amounts of any L/C Obligations have been reduced to zero (or collateralized in a manner satisfactory to the applicable Issuing Bank), or (ii) constituting property being sold, transferred or disposed of in a Permitted Disposition upon receipt by the Administrative Agent of the Net Proceeds thereof to the extent required by this Agreement. Except as provided above, the Collateral Agent will not release any of the Collateral Agent's Liens without the prior written authorization of the Applicable Lenders.  Upon request by any Agent or any Loan Party at any time, the Lenders will confirm in writing the Collateral Agent's authority to release any  Liens upon particular types or items of Collateral pursuant to this SECTION 8.16.

(b)    Upon at least two (2) Business Days' prior written request by the Lead Borrower, the Collateral Agent shall (and is hereby irrevocably authorized by the Lenders to) execute such documents as may be necessary to evidence the release of the Liens upon any Collateral described in SECTION 8.16(a); <u>provided</u>, <u>however</u>, that (i) the Collateral Agent shall not be required to execute any such document on terms which, in its reasonable opinion, would, under Applicable Law, expose the Collateral Agent to liability or create any obligation or entail any adverse consequence other than the release of such Liens without recourse or warranty, and (ii) such release shall not in any manner discharge, affect or impair the Obligations or any Liens (other than those expressly being

138

released) upon (or obligations of any Loan Party in respect of) all interests retained by any Loan Party, including (without limitation) the proceeds of any sale, all of which shall continue to constitute part of the Collateral.

ARTICLE IX

Miscellaneous

SECTION 9.01 Notices.

Except in the case of notices and other communications expressly permitted to be given by telephone or electronically, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy or e-mail, as follows:

(a)     if to any Loan Party, to it at Guitar Center, Inc., 5795 Lindero Canyon Road, Westlake Village, California 91362, Attention: Tim Martin (Telecopy No. (818) 735-8833, E-Mail: tim.martin@guitarcenter.com) and Michael Pendleton (Telecopy No. (818) 735-8833, E-Mail: mpendleton@guitarcenter.com), with copies to each of Ares Management LLC, 2000 Avenue of the Stars, 12th Floor, Los Angeles, California 90067, Attention: Adam Stein (Telecopy No. (310) 201-4170, E-Mail: stein@aresmgmt.com, and Milbank LLP, 55 Hudson Yards, New York, NY, 10001, Attention: Al Pisa (Telephone: (212) 530-5319, E-Mail: apisa@milbank.com);

(b)     if to the Administrative Agent or the Collateral Agent to Wells Fargo Bank, National Association, 125 High Street, Boston, Massachusetts 02110, Attention: Danielle Baldinelli (Telecopy No. (888) 353-3045, E-Mail: Danielle.M.Baldinelli@wellsfargo.com), with a copy to Morgan, Lewis & Bockius LLP, One Federal Street, Boston, Massachusetts 02110, Attention: Marjorie S. Crider, Esquire (Telecopy No. (617) 341-7701, E-Mail: marjorie.crider@morganlewis.com);

(c)     if to any other Credit Party, to it at its address (or telecopy number or electronic mail address) set forth on the signature pages hereto or on any Assignment and Acceptance.

Notwithstanding the foregoing, any notice hereunder sent by e-mail shall be solely for the distribution of (i) routine communications such as financial statements and (ii) documents and signature pages for execution by the parties hereto, and for no other purpose.  Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt.

SECTION 9.02 <u>Waivers; Amendments</u>.

(a)   No failure or delay by any Credit Party in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Credit Parties hereunder and under the other Loan Documents are cumulative and are not exclusive of any other rights or remedies that they would otherwise have. No waiver of any provision of any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by SECTION 9.02(b), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Revolving Credit Loan or issuance of a Letter of Credit shall not be construed as a waiver of any Default or Event of Default, regardless of whether any Credit Party may have had notice or knowledge of such Default or Event of Default at the time.

(b)   Except as otherwise specifically provided herein, neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by the Loan Parties and the Required Lenders or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Agent(s) and the Loan Parties that are parties thereto, in each case (other than the Fee Letter) with the consent of the Required Lenders; <u>provided</u>, <u>however</u>, that no such waiver, amendment, modification or other agreement shall:

(i)   Increase the Commitment of any Lender without the prior written consent of such Lender;

(ii)   Without:

(A)   the prior written Unanimous Consent of all Lenders directly adversely affected thereby, reduce the principal amount of any Obligation or reduce the rate of interest thereon (other than the waiver of the Default Rate), or reduce any fees payable under the Loan Documents (it being understood that a waiver of a Default shall not constitute a reduction of interest for purposes of this Section);

(B)   the prior written Unanimous Consent of all Lenders directly adversely affected thereby, postpone the scheduled date of payment of any interest on any Obligation or any fees payable under the Loan Documents, or reduce the amount of, waive or excuse any such payment (<u>provided that</u> a waiver of a Default shall not constitute a reduction, excuse or waiver of interest for purposes of this Section), or postpone the expiration of the Commitments or postpone the Maturity Date;

(C)   the prior written Unanimous Consent of all Lenders, except for Permitted Dispositions or for Collateral releases as provided in SECTION

140

8.16 and for mergers, consolidations, liquidations and dissolutions permitted under SECTION 6.03, release all or substantially all of the Collateral from the Liens of the Security Documents or release all or substantially all of the Facility Guarantors from their respective obligations under their Facility Guarantee or substantially limit their liability in respect of such Facility Guarantee;

(D)     the prior written consent of the Supermajority Required Lenders, change the definition of the terms "Excess Availability" or "Borrowing Base" or any component definition thereof if as a result thereof the amounts available to be borrowed by the Loan Parties would be increased, provided that the foregoing shall not limit the discretion of the Administrative Agent to change, establish or eliminate any Reserves or to add Inventory, Accounts and Credit Card Receivables acquired in a Permitted Acquisition to the Borrowing Base as provided herein;

(E)     the prior written Unanimous Consent of all Lenders, except in connection with Permitted Dispositions and mergers, consolidations, liquidations and dissolutions permitted under SECTION 6.03, release any Loan Party from its obligations under any Loan Document, or limit its liability in respect of such Loan Document;

(F)     the prior written Unanimous Consent of all Lenders, change any of the provisions of SECTION 8.03; or

(G)     the prior written Unanimous Consent of all Lenders, change any of the provisions of this SECTION 9.02(b) or the definitions of "Required Lenders", "Supermajority Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder;

(iii)     Without prior written consent of the Agents or the Issuing Banks, as the case may be, affect the rights or duties of the Agents or the Issuing Banks.

(c)     Notwithstanding anything to the contrary contained in this SECTION 9.02, in the event that the Lead Borrower shall request that this Agreement or any other Loan Document be modified, amended or waived in a manner which would require the consent of the Supermajority Required Lenders, all Lenders or all directly adversely affected Lenders pursuant to SECTION 9.02(b) and such modification, amendment or waiver is approved by the Lenders holding at least 50% of the aggregate Commitments held by the Supermajority Required Lenders, all Lenders or all directly adversely affected Lenders (as applicable) or, if Commitments have been terminated, at least 50% of the aggregate outstanding Credit Extensions held by the Supermajority Required Lenders, all Lenders or all directly adversely affected Lenders (as applicable) (such Lender or Lenders collectively, the "Threshold Lenders"), but not by the requisite percentage of the Supermajority Required Lenders, all the Lenders or all the directly adversely affected Lenders (as applicable), the Lead Borrower and the Administrative Agent shall be permitted to amend this Agreement without the consent of the requisite

141

Lender or Lenders which did not agree to the modification or amendment requested by the Lead Borrower (such Lender or Lenders, collectively the "Minority Lenders") subject to the Lead Borrower or (in its sole discretion) the Administrative Agent providing for (i) the termination of the Commitment of each of the Minority Lenders, (ii) the addition to this Agreement of one or more other financial institutions which would qualify as an Eligible Assignee, subject to the reasonable approval of the Administrative Agent, or an increase in the Commitment of one or more of the Threshold Lenders, so that the Total Commitments after giving effect to such amendment shall be in the same amount as the aggregate Commitments immediately before giving effect to such amendment, (iii) if any Revolving Credit Loans are outstanding at the time of such amendment, the making of such additional Revolving Credit Loans by such new or increasing Lender or Lenders, as the case may be, as may be necessary to repay in full the outstanding Revolving Credit Loans (including principal, interest, fees and other amounts due and owing under the Loan Documents) of the Minority Lenders immediately before giving effect to such amendment and (iv) such other modifications to this Agreement or the Loan Documents as may be appropriate and incidental to the foregoing.

(d)     Further, notwithstanding anything to the contrary contained in this SECTION 9.02, if following the Closing Date, the Administrative Agent and the Lead Borrower shall have jointly identified an obvious error or any error or omission of a technical or immaterial nature, in each case, in any provision of the Loan Documents, then the Administrative Agent and the Lead Borrower shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Loan Documents if the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof.

(e)     No notice to or demand on any Loan Party shall entitle any Loan Party to any other or further notice or demand in the same, similar or other circumstances.  Each holder of a Note shall be bound by any amendment, modification, waiver or consent authorized as provided herein, whether or not a Note shall have been marked to indicate such amendment, modification, waiver or consent and any consent by a Lender, or any holder of a Note, shall bind any Person subsequently acquiring a Note, whether or not a Note is so marked.  No amendment to this Agreement or any other Loan Document shall be effective against any Loan Party unless signed by such Loan Party.

SECTION 9.03 Expenses; Indemnity; Damage Waiver.

(a)     The Loan Parties shall jointly and severally pay all Credit Party Expenses incurred as of the Closing Date on the Closing Date.  Thereafter, the Loan Parties shall jointly and severally pay all Credit Party Expenses after receipt of an invoice therefor with detail and within the time periods required under the Order.  For the avoidance of doubt, the Loan Parties shall reimburse Administrative Agent, the Issuing Bank, and the Lenders and their respective Affiliates for all reasonable and documented out-of-pocket legal, accounting, appraisal, consulting, financial advisors, business valuation experts, environmental engineer or consultant and other fees, costs and expenses incurred in connection with the negotiation, preparation and administration of the Loan Documents, the Interim Order and the Final Order, including, without limitation, MIII Partners, and incurred in connection with:

(i)     any amendment, modification or waiver of, consent with respect to, or termination of, any of the Loan Documents or advice in connection with the

142

administration of the Loans made pursuant hereto or its rights hereunder or thereunder;

(ii)       any litigation, contest, dispute, suit, proceeding or action (whether instituted by the Administrative Agent, any Lender, the Loan Parties or any other Person and whether as a party, witness or otherwise) in any way relating to the Collateral, any of the Loan Documents or any other agreement to be executed or delivered in connection herewith or therewith, including any litigation, contest, dispute, suit, case, proceeding or action, and any appeal or review thereof, in connection with a case or proceeding commenced by or against any Loan Party or any other Person that may be obligated to the Administrative Agent by virtue of the Loan Documents; including any such litigation, contest, dispute, suit, proceeding or action arising in connection with any work-out or restructuring of the Loans during the pendency of one or more Events of Default; provided that no Person shall be entitled to reimbursement under this clause (ii) in respect of any litigation, contest, dispute, suit, proceeding or action to the extent any of the foregoing results from such Person's gross negligence or willful misconduct (as determined by a final non-appealable judgment);

(iii)      any attempt to enforce or prosecute any rights or remedies of the Administrative Agent against any or all of the Loan Parties or any other Person that may be obligated to the Administrative Agent or any Lender by virtue of any of the Loan Documents, including any such attempt to enforce any such remedies in the course of any work-out or restructuring of the Loans during the pendency of one or more Events of Default;

(iv)      any work-out or restructuring of the Loans during the pendency of one or more Events of Default;

(v)       the obtaining of approval of the Loan Documents by the Court;

(vi)      the preparation and review of pleadings, documents and reports related to the Chapter 11 Cases and any Successor Cases, attendance at meetings, court hearings or conferences related to the Chapter 11 Cases and any Successor Cases, and general monitoring of the Chapter 11 Cases and any Successor Cases;

(vii)     efforts to (A) monitor the Loans or any of the other Obligations, (B) evaluate, observe or assess any of the Loan Parties or their respective affairs, and (C) verify, protect, evaluate, assess, appraise, collect, sell, liquidate or otherwise dispose of any of the Collateral;

(viii)    any lien searches or request for information listing financing statements or liens filed or searches conducted to confirm receipt and due filing of financing statements and security interests in all or a portion of the Collateral; and

143

(ix)     including, as to each of <u>clauses (i)</u> through <u>(viii)</u> above, all reasonable and documented attorneys' and other professional and service providers' fees arising from such services and other advice, assistance or other representation, including those in connection with any appellate proceedings, and all reasonable and documented expenses, costs, charges and other fees incurred by such counsel and others in connection with or relating to any of the events or actions described in this SECTION 9.03, all of which shall be payable, on demand, by Borrowers to the Administrative Agent; <u>provided that</u> such Credit Parties shall be entitled to reimbursement for no more than one counsel and one local counsel representing all such Credit Parties (absent a conflict of interest, in which case the Credit Parties may engage and be reimbursed for one additional counsel). Without limiting the generality of the foregoing, such expenses, costs, charges and fees may include:  reasonable fees, costs and expenses of accountants, sales consultants, financial advisors, environmental advisors, appraisers, investment bankers, management and other consultants and paralegals; court costs and expenses; photocopying and duplication expenses; court reporter fees, costs and expenses; air express charges; and reasonable expenses for travel, lodging and food paid or incurred in connection with the performance of such legal or other advisory services.

(b)     The Loan Parties shall, jointly and severally, indemnify the Secured Parties and each of their Subsidiaries and Affiliates, and each of the respective directors, officers, employees, agents and controlling persons of any of the foregoing Persons (each such Person being called an "<u>Indemnitee</u>") against, and hold each Indemnitee harmless from, any and all damages, actual out-of-pocket losses, claims, actions, causes of action, settlement payments, obligations, liabilities and related expenses, including the reasonable fees, charges and disbursements of one counsel for all the Indemnitees (plus, in each case, one local counsel in any other jurisdiction to the extent reasonably necessary) (<u>provided that</u> in the case of a conflict of interest the affected Indemnitee may engage and shall be reimbursed for one additional counsel, plus one local counsel in any other jurisdiction to the extent reasonably necessary), incurred, suffered, sustained or required to be paid by, or asserted against, any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution or delivery of any Loan Document or any other agreement or instrument contemplated hereby, the performance by the parties to the Loan Documents of their respective obligations thereunder or the consummation of the transactions contemplated by the Loan Documents or any other transactions contemplated hereby, (ii) any Credit Extension or the use of the proceeds therefrom (including any refusal by the Issuing Bank to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any property currently or formerly owned or operated by any Loan Party or any Subsidiary, or any Environmental Liability related in any way to any Loan Party or any Subsidiary, (iv) any actual or prospective claim, litigation, investigation or proceeding relating to or arising from any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto or whether such claim, litigation, investigation or proceeding is brought by a third party or any Loan Party or any Affiliate thereof or (v) any documentary taxes, assessments or similar charges made by any Governmental Authority by reason of the execution and delivery of this Agreement or any other Loan Document; <u>provided</u>, <u>however</u>, that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses have resulted from (i) the

144

gross negligence, bad faith, fraud or willful misconduct of such Indemnitee (or any of its Affiliates or Related Parties), (ii) such Indemnitee's (or any of its Affiliates' or Related Parties') material breach of its obligations under this Agreement or any other Loan Document or (iii) any dispute solely among the Indemnitees other than claims against the Administrative Agent in its capacity or in fulfilling its role as an agent or arranger or any other similar role under this Agreement or any other Loan Document or any other agreement or instrument contemplated hereby or thereby, and any claims arising out of any act or omission by the Lead Borrower or any of its Affiliates.  Notwithstanding anything to the contrary contained herein, the Loan Parties shall have no obligation to reimburse any Indemnitee for fees and expenses unless such Indemnitee provides the Loan Parties with an executed undertaking in which such Indemnitee agrees to refund and return any and all amounts paid by the Loan Parties to such Indemnitee to the extent any of the foregoing items described in clauses (i) through (iii) occurs.  This SECTION 9.03(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c)    No party to this Agreement shall assert and, to the extent permitted by Applicable Law, each such party hereby waives, any claim against any other party to this Agreement or any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the transactions contemplated by the Loan Documents, any Credit Extension or the use of the proceeds thereof.

(d)    The provisions of paragraphs (b) and (c) of this SECTION 9.03 shall remain operative and in full force and effect regardless of the termination of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Obligations, the invalidity or unenforceability of any term or provision of any Loan Document, or any investigation made by or on behalf of any Credit Party.  All amounts due under this SECTION 9.03 shall be payable upon written demand therefor within the time period set forth in the Order.

SECTION 9.04 Successors and Assigns.

(a)    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Bank that issues any Letter of Credit), except that no Loan Party may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Agents and the Lenders (and any such attempted assignment or transfer without such consent shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby (including any Affiliate of the Issuing Bank that issues any Letter of Credit) and, to the extent expressly contemplated hereby, Indemnitees), any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)    Any Lender may, with the consent of the Administrative Agent, the Issuing Bank at the time of such assignment and the Lead Borrower (which consent shall be deemed to have been granted unless the Lead Borrower shall object thereto by written notice to the Administrative Agent within five Business Days after having received notice of any such assignment), assign to one or more

145

Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Revolving Credit Loans at the time owing to it); provided, however, that no such consent of the Administrative Agent or the Issuing Bank shall be required in connection with any assignment to another Lender, an Affiliate of a Lender or an Approved Fund (unless such Lender Affiliate or Approved Fund is a Disqualified Institution), and no such consent of the Lead Borrower shall be required (A) in connection with any assignment to another Lender, an Affiliate of a Lender or an Approved Fund (unless such Lender Affiliate or Approved Fund is a Disqualified Institution) or (B) if an Event of Default has occurred and is continuing; and provided further that, each assignment shall be subject to the following conditions: (i) except in the case of an assignment to a Lender or an Affiliate of a Lender (unless such Lender Affiliate is a Disqualified Institution), the amount of the Commitment or Revolving Credit Loans of the assigning Lender subject to a partial assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent and determined on an aggregate basis in the event of concurrent assignments to Related Funds) shall not be less than $5,000,000 with respect to the Commitments, or, if less, the entire remaining amount of the assigning Lender's Commitment or Revolving Credit Loans; (ii) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations; and (iii) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Acceptance, and, after completion of the syndication of the Revolving Credit Loans, together with a processing and recordation fee of $3,500.00. Subject to acceptance and recording thereof pursuant to SECTION 9.04(d), from and after the effective date specified in each Assignment and Acceptance the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of SECTION 9.03). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this SECTION 9.04(b) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with SECTION 9.04(e). The Loan Parties hereby acknowledge and agree that any effective assignment shall give rise to a direct obligation of the Loan Parties to the assignee and that the assignee shall be considered to be a "Credit Party" for all purposes under this Agreement and the other Loan Documents.

(c)    The Administrative Agent, acting for this purpose as an agent of the Loan Parties, shall maintain at one of its offices in New York, New York, a copy of each Assignment and Acceptance delivered to it and a register (the "Register") for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount (and stated interest) of the Credit Extensions owing to, each Lender pursuant to the terms hereof from time to time. The entries in the Register shall be conclusive and the Loan Parties and Credit Parties shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement absent any manifest error, notwithstanding notice to the contrary. The Register shall be available for inspection by the Lead Borrower, the Issuing Bank and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

146

(d)    Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, the processing and recordation fee referred to in SECTION 9.04(b) and any written consent to such assignment required by SECTION 9.04(a), the Administrative Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this SECTION 9.04(d).

(e)    Any Lender may, without the consent of the Loan Parties or any other Person, sell participations to one or more banks or other entities (other than a Disqualified Institution or any Person in direct competition with a Loan Party's business) (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Revolving Credit Loans owing to it), subject to the following:

(i)    such Lender's obligations under this Agreement and the other Loan Documents shall remain unchanged;

(ii)    such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations;

(iii)    the Loan Parties and other Credit Parties shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement;

(iv)    any agreement or instrument pursuant to which a Lender sells a participation in the Commitments, the Revolving Credit Loans and the Letters of Credit shall provide that such Lender shall retain the sole right to enforce the Loan Documents and to approve any amendment, modification or waiver of any provision of the Loan Documents; provided, however, that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the proviso to SECTION 9.02(b)(ii)(A) , (B) or (C) that affects such Participant;

(v)    subject to clauses (viii) and (ix) of this SECTION 9.04(e), the Loan Parties agree that each Participant shall be entitled to the benefits of SECTION 2.14 and SECTION 2.23 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to SECTION 9.04(b);

(vi)    to the extent permitted by Applicable Law, each Participant also shall be entitled to the benefits of SECTION 9.08 as though it were a Lender so long as such Participant agrees to be subject to SECTION 2.21(c) as though it were a Lender;

(vii)    each Lender, acting for this purpose as an agent of the Loan Parties, shall maintain at its offices a record of each agreement or instrument effecting any participation and a register (each a "Participation Register") meeting the requirements of 26 CFR §5f.103-1(c) for the recordation of the names and addresses of its Participants and their rights with respect to principal amounts (and stated interest) and

147

other Obligations from time to time.  The entries in each Participation Register shall be conclusive and the Loan Parties and the Credit Parties may treat each Person whose name is recorded in a Participant Register as a Participant for all purposes of this Agreement (including, for the avoidance of doubt, for purposes of entitlement to benefits under SECTION 2.14, SECTION 2.23, and SECTION 9.08).  The Participation Register shall be available for inspection by the Lead Borrower and any Credit Party at any reasonable time and from time to time upon reasonable prior notice;

(viii)   a Participant shall not be entitled to receive any greater payment under SECTION 2.14 or SECTION 2.23 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Lead Borrower's prior written consent; and

(ix)   a Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of SECTION 2.23 unless the Lead Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Loan Parties, to comply with SECTION 2.23(e) as though it were a Lender and such Participant is eligible for exemption from, or reduction in,  the withholding Tax referred to therein, following compliance with SECTION 2.23(e).

(f)   Any Credit Party may at any time pledge or grant a security interest in all or any portion of its rights under this Agreement to secure obligations of such Credit Party, including any pledge or grant to secure obligations to any of the twelve Federal Reserve Banks organized under Section 4 of the Federal Reserve Act, 12 U.S.C. Section 341, and this SECTION 9.04 shall not apply to any such pledge or grant of a security interest; provided, however, that no such pledge or grant of a security interest shall release a Credit Party from any of its obligations hereunder or substitute any such pledgee or grantee for such Credit Party as a party hereto.

(g)   The Loan Parties authorize each Credit Party to disclose to any Participant or grantee and any prospective Participant or grantee, subject to the provisions of SECTION 9.15, any and all financial information in such Credit Party's possession concerning the Loan Parties which has been delivered to such Credit Party by or on behalf of the Loan Parties pursuant to this Agreement or which has been delivered to such Credit Party by or on behalf of the Loan Parties in connection with such Credit Party's credit evaluation of the Loan Parties prior to becoming a party to this Agreement.

(h)   Notwithstanding anything to the contrary contained herein, any Lender (a "Granting Lender") may grant to a special purpose funding vehicle (an "SPC"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and the Lead Borrower, the option to provide to a Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to a Borrower pursuant to this Agreement; provided that (i) nothing herein shall constitute a commitment by any SPC to make any Loan, and (ii) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.  The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender.  Each party hereto hereby agrees that (i) an SPC shall be

148

entitled to the benefits of SECTIONS 2.11, 2.14, 2.21, 2.22 and 2.23 to the same extent as if it were a Lender, (ii) neither the grant to any SPC nor the exercise by any SPC of such option shall increase the costs or expenses or otherwise increase or change the obligations of any Borrower under this Agreement (including its obligations under SECTION 2.14 or 2.23) unless the grant to the SPC was made with the Lead Borrower's prior written consent, (iii) no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender) and (iv) the Granting Lender shall for all purposes including approval of any amendment, waiver or other modification of any provision of the Loan Documents, remain the Lender of record hereunder.  In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPC, it will not institute against, or join any other Person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any state thereof.  In addition, notwithstanding anything to the contrary contained in this SECTION 9.04, any SPC may (i) with notice to, but without the prior written consent of, any Borrower, the Administrative Agent or the Issuing Bank and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or, subject to obtaining the requisite consents under SECTION 9.04(b), to any other financial institutions providing liquidity and/or credit support to or for the account of such SPC to support the funding or maintenance of Loans and (ii) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPC.  Any Lender who grants an option to an SPC to make a Loan to the any Borrower shall, if such option is exercised, maintain a register similar to the Participant Register described in paragraph (c) of this SECTION.

SECTION 9.05 Survival.

All covenants, agreements, indemnities, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making of any Revolving Credit Loans and issuance of any Letters of Credit, regardless of any investigation made by any such other party or on its behalf and, notwithstanding that any Credit Party may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect until (i) the Commitments have expired or been terminated, (ii) the principal of and interest on each Revolving Credit Loan and all fees and other Obligations (other than contingent indemnity obligations with respect to then unasserted claims) shall have been paid in full, (iii) all Letters of Credit shall have expired or terminated (or been Cash Collateralized in a manner satisfactory to the Issuing Bank) and (iv) all Outstanding Amounts of any L/C Obligations have been reduced to zero (or Cash Collateralized in a manner satisfactory to the applicable Issuing Bank).  The provisions of SECTION 2.14, SECTION 2.23, SECTION 9.03 and Article VIII shall survive and remain in full force and effect regardless of the repayment of the Obligations, the expiration or termination of the Letters of Credit and the Commitments or the termination of this Agreement or any provision hereof.  In connection with

149

the termination of this Agreement and the release and termination of the security interests in the Collateral, the Agents, on behalf of themselves and the other Credit Parties, may require such indemnities as they shall reasonably deem necessary or appropriate to protect the Credit Parties against (x) loss on account of credits previously applied to the Obligations that may subsequently be reversed or revoked, and (y) any obligations that may thereafter arise with respect to the Other Liabilities.

SECTION 9.06 Counterparts; Integration; Effectiveness.

This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all contemporaneous or previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in SECTION 4.01, this Agreement shall become effective when it shall have been executed by the applicable Credit Parties and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  This Agreement shall be valid, binding and enforceable against a party only when executed by an authorized individual on behalf of the party by means of (i) a DocuSign® electronic signature, (ii) an original, manual signature, or (iii) a faxed, electronic image scan transmission (e.g., "pdf" or "tif" via electronic mail) or photocopied manual signature. Each DocuSign®, faxed, electronic image scan transmission (e.g., "pdf" or "tif" via electronic mail) or photocopied manual signature shall for all purposes have the same validity, legal effect and admissibility in evidence as an original manual signature and shall include the relevant certificate of completion for the relevant notice of update.

SECTION 9.07 Severability.

Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof, and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 9.08 Right of Set-off.

If any Event of Default shall have occurred and be continuing, each Secured Party, each Participant and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to setoff and apply any and all deposits (general or special, time or demand, provisional or final, but excluding any payroll, trust and tax withholding accounts) at any time held and other obligations at any time owing by such Secured Party, Participant or Affiliate to or for the credit or the account of the Loan Parties against any and all of the Obligations of the Loan Parties now or hereafter existing under this Agreement or other Loan Document to the extent such are then due and owing, although such Obligations may be

150

otherwise fully secured; provided that such Secured Party shall provide the Lead Borrower with written notice promptly after its exercise of such right of setoff. The rights of each Secured Party under this SECTION 9.08 are in addition to other rights and remedies (including other rights of setoff) that such Credit Party may have.  No Credit Party will, or will permit its Participant to, exercise its rights under this SECTION 9.08 without the consent of the Administrative Agent or the Required Lenders.  ANY AND ALL RIGHTS TO REQUIRE THE COLLATERAL AGENT TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER COLLATERAL WHICH SECURES ANY OF THE OBLIGATIONS PRIOR TO THE EXERCISE BY ANY SECURED PARTY, PARTICIPANT OR AFFILIATE OF ITS RIGHT OF SETOFF UNDER THIS SECTION ARE HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.

SECTION 9.09 Governing Law; Jurisdiction; Consent to Service of Process.

(a)    EXCEPT TO THE EXTENT SUPERSEDED BY THE BANKRUPTCY CODE, THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.

(b)    Each Loan Party agrees that any suit for the enforcement of this Agreement or any other Loan Document shall be brought solely in the Bankruptcy Court and  each party to this Agreement hereby waives any objection which it may now or hereafter have to the venue of any such suit or any such court or that such suit is brought in an inconvenient forum and agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(c)    Each Loan Party agrees that any action commenced by any Loan Party asserting any claim or counterclaim arising under or in connection with this Agreement or any other Loan Document shall be brought solely in the Bankruptcy Court for the Eastern District of Virginia and consents to the exclusive jurisdiction of such Bankruptcy Court with respect to any such action.

(d)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in SECTION 9.01.  Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

SECTION 9.10 WAIVER OF JURY TRIAL.

EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY); AND WAIVES DUE DILIGENCE, DEMAND, PRESENTMENT AND PROTEST AND ANY NOTICES THEREOF AS WELL AS NOTICE OF NONPAYMENT.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS

151

REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVERS, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

SECTION 9.11 Press Releases and Related Matters.

Each Borrower consents to the publication by the Administrative Agent of customary trade advertising material in tombstone format relating to the financing transactions contemplated by this Agreement using any Borrower's name, and with the consent of the Lead Borrower, logo or trademark.  The Administrative Agent shall provide a draft reasonably in advance of any advertising material to the Lead Borrower for review and comment prior to the publication thereof.  The Administrative Agent and the Lenders reserve the right to provide to industry trade organizations information necessary and customary for inclusion in league table measurements.

SECTION 9.12 Headings.

Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

SECTION 9.13 Interest Rate Limitation.

Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Revolving Credit Loan, together with all fees, charges and other amounts that are treated as interest on such Revolving Credit Loan under Applicable Law (collectively, the "Charges"), shall be found by a court of competent jurisdiction in a final order to exceed the maximum lawful rate (the "Maximum Rate") that may be contracted for, charged, taken, received or reserved by the Lender holding such Revolving Credit Loan in accordance with Applicable Law, the rate of interest payable in respect of such Revolving Credit Loan hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Revolving Credit Loan but were not payable as a result of the operation of this Section shall be cumulated and the interest and Charges payable to such Lender in respect of other Revolving Credit Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Rate to the date of repayment, shall have been received by such Lender.

SECTION 9.14 Additional Waivers.

(a)     The Obligations are the joint and several obligation of each Loan Party.  To the fullest extent permitted by Applicable Law, the obligations of each Loan Party hereunder shall not be affected by (i) the failure of any Credit Party to assert any claim or demand or to enforce or exercise any right or remedy against any other Loan Party under the provisions of this Agreement, any other

152

Loan Document or under Applicable Law, (ii) any rescission, waiver, amendment or modification of, or any release of any Loan Party from, any of the terms or provisions of, this Agreement, any other Loan Document, or (iii) the failure to perfect any security interest in, or the release of, any of the Collateral or other security held by or on behalf of the Collateral Agent or any other Credit Party.

(b)     The obligations of each Loan Party to pay the Obligations in full hereunder shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the payment in full in cash of the Obligations after the termination of all Commitments to any Loan Party under any Loan Document), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise. Without limiting the generality of the foregoing, the obligations of each Loan Party hereunder shall not be discharged or impaired or otherwise affected by the failure of the Administrative Agent or any other Credit Party to assert any claim or demand or to enforce any remedy under this Agreement, any other Loan Document or any other agreement, by any waiver or modification of any provision of any thereof, any default, failure or delay, willful or otherwise, in the performance of any of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Loan Party or that would otherwise operate as a discharge of any Loan Party as a matter of law or equity (other than the payment in full in cash of all the Obligations after termination of all Commitments to any Loan Party under any Loan Document).

(c)     To the fullest extent permitted by Applicable Law, each Loan Party waives any defense based on or arising out of any defense of any other Loan Party or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other Loan Party, other than the payment in full in cash of all the Obligations after the termination of all Commitments to any Loan Party under any Loan Document. The Collateral Agent and the other Credit Parties may, at their election, foreclose on any security held by one or more of them by one or more judicial or nonjudicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any other Loan Party, or exercise any other right or remedy available to them against any other Loan Party, without affecting or impairing in any way the liability of any Loan Party hereunder except to the extent that all the Obligations have been indefeasibly paid in full in cash and performed in full after the termination of Commitments to any Loan Party under any Loan Document. Pursuant to Applicable Law, each Loan Party waives any defense arising out of any such election even though such election operates, pursuant to Applicable Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Loan Party against any other Loan Party, as the case may be, or any security.

(d)     Except as otherwise specifically provided herein, each Borrower is obligated to repay the Obligations as joint and several obligors under this Agreement. Upon payment by any Loan Party of any Obligations, all rights of such Loan Party against any other Loan Party arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior payment in full in cash of all the Obligations (other than contingent indemnity obligations for then unasserted claims) and the termination of all Commitments to any Loan Party under any Loan Document. If any amount shall

153

erroneously be paid to any Loan Party on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of any Loan Party, such amount shall be held in trust for the benefit of the Credit Parties and shall forthwith be paid to the Administrative Agent to be credited against the payment of the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement and the other Loan Documents.  Subject to the foregoing, to the extent that any Loan Party shall, under this Agreement as a joint and several obligor, repay any of the Obligations constituting Revolving Credit Loans made to another Loan Party hereunder (an "Accommodation Payment"), then the Loan Party making such Accommodation Payment shall be entitled to contribution and indemnification from, and be reimbursed by, each of the other Loan Parties in an amount equal to a fraction of such Accommodation Payment, the numerator of which fraction is such other Loan Party's Allocable Amount and the denominator of which is the sum of the Allocable Amounts of all of the Loan Parties.  As of any date of determination, the "Allocable Amount" of each Loan Party shall be equal to the maximum amount of liability for Accommodation Payments which could be asserted against such Loan Party hereunder without (a) rendering such Loan Party "insolvent" within the meaning of Section 101 (32) of the Bankruptcy Code, Section 2 of the Uniform Fraudulent Transfer Act ("UFTA") or Section 2 of the Uniform Fraudulent Conveyance Act ("UFCA"), (b) leaving such Loan Party with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA, or Section 5 of the UFCA, or (c) leaving such Loan Party unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA, or Section 5 of the UFCA.

(e)     Each Loan Party hereby agrees to keep each other Loan Party fully apprised at all times as to the status of its business, affairs, finances, and financial condition, and its ability to perform its Obligations under the Loan Documents, and in particular as to any adverse developments with respect thereto.  Each Loan Party hereby agrees to undertake to keep itself apprised at all times as to the status of the business, affairs, finances, and financial condition of each other Loan Party, and of the ability of each other Loan Party to perform its Obligations under the Loan Documents, and in particular as to any adverse developments with respect to any thereof.  Each Loan Party hereby agrees, in light of the foregoing mutual covenants to inform each other, and to keep themselves and each other informed as to such matters, that the Credit Parties shall have no duty to inform any Loan Party of any information pertaining to the business, affairs, finances, or financial condition of any other Loan Party, or pertaining to the ability of any other Loan Party to perform its Obligations under the Loan Documents, even if such information is adverse, and even if such information might influence the decision of one or more of the Loan Parties to continue to be jointly and severally liable for, or to provide Collateral for, the Obligations of one or more of the other Loan Parties. To the fullest extent permitted by Applicable Law, each Loan Party hereby expressly waives any duty of the Credit Parties to inform any Loan Party of any such information.

SECTION 9.15 Confidentiality.

Each of the Credit Parties agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to their and their Affiliates' (other than Excluded Institutions') directors, officers, employees and agents, including accountants, legal counsel and other advisors involved with the financing (it being understood that the Persons

154

to whom such disclosure is made will be informed of the confidential nature of such Information and agree to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent required by Applicable Laws or by any subpoena or similar legal process (the Credit Parties' agreeing to furnish the Lead Borrower with notice of such process and an opportunity to contest such disclosure as long as furnishing such notice and opportunity would not result in the Credit Parties' violation of Applicable Law), (d) to any other party to this Agreement in accordance with Applicable Laws, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement and any actual or prospective counterparty or advisors to any swap or derivative transactions relating to the Loan Parties and the Obligations so long as such Person or any of their Affiliates is not a competitor of any Loan Party, (g) with the consent of the Loan Parties, (h) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section, or to the knowledge of such Credit Party, the breach of any other Person's obligation to keep the information confidential, or (ii) becomes available to any Credit Party on a nonconfidential basis from a source other than the Loan Parties, or (iii) to the extent that such Information is independently developed by such Credit Party.  For the purposes of this Section, the term "Information" means all information received from or on behalf of the Loan Parties or any of their Affiliates relating to their business.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

SECTION 9.16 Patriot Act.

Each Lender hereby notifies the Loan Parties that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub.  L. 107-56 (signed into law October 26, 2001), as amended) (the "Act"), it is required to obtain, verify and record information that identifies the Loan Parties, which information includes the name and address of each Borrower and other information that will allow such Lender to identify such Borrower in accordance with the Act.  Each Borrower is in compliance, in all material respects, with (i) the Act, and (ii) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto.  No part of the proceeds of the Revolving Credit Loans will be used by the Loan Parties, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the FCPA, as amended.  In addition, Agents and each Lender shall have the right to periodically conduct due diligence on all Loan Parties, their senior management and key principals and legal and beneficial owners.  Each Loan Party agrees to cooperate in respect of the conduct of such due diligence and further agrees that

155

the reasonable costs and charges for any such due diligence by Agents shall constitute Credit Party Expenses hereunder and be for the account of Borrowers.

SECTION 9.17 Foreign Asset Control Regulations.

Neither of the advance of the Revolving Credit Loans nor the use of the proceeds of any thereof will violate the Trading With the Enemy Act (50 U.S.C. § 1 et seq., as amended) (the "Trading With the Enemy Act") or any of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) (the "Foreign Assets Control Regulations") or any enabling legislation or executive order relating thereto (which for the avoidance of doubt shall include, but shall not be limited to (a) Executive Order 13224 of September 21, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)) (the "Executive Order") and (b) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56)). Furthermore, none of the Loan Parties or their Affiliates (a) is or will become a "blocked person" as described in the Executive Order, the Trading With the Enemy Act or the Foreign Assets Control Regulations or (b) knowingly engages or will engage in any dealings or transactions, or be otherwise associated, with any such "blocked person" or in any manner violative of any such order.

SECTION 9.18 Order; Intercreditor Arrangement.

In the event of any conflict between the terms of the Order and the terms of this Agreement or any other Loan Document, the terms of the Order shall govern and control. Notwithstanding anything herein to the contrary, the Liens and security interests granted to the Collateral Agent pursuant to the Security Documents, Lien priority and the exercise of any right or remedy by the Collateral Agent hereunder or thereunder, are subject to the provisions of the Intercreditor Arrangement.

The Loan Parties, the Agents, the Lenders and the other Credit Parties acknowledge that the exercise of certain of the Agents' rights and remedies hereunder may be subject to, and restricted by, the provisions of the Intercreditor Arrangement.  Except as specified herein, nothing contained in the Intercreditor Arrangement shall be deemed to modify any of the provisions of this Agreement and the other Loan Documents, which, as among the Loan Parties, the Agents, the Lenders and the other Credit Parties shall remain in full force and effect.

SECTION 9.19 Joint and Several Obligations.

The Obligations are the joint and several obligations of each Borrower.

SECTION 9.20 Keepwell.

Each Qualified ECP Guarantor hereby jointly and severally absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Loan Party to honor all of its obligations under the Facility Guarantee in

156

respect of Swap Obligations (provided, however, that each Qualified ECP Guarantor shall only be liable under this SECTION 9.20 for the maximum amount of such liability that can be hereby incurred without rendering its obligations under this SECTION 9.20, or otherwise under the Facility Guarantee, voidable under Applicable Law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations of each Qualified ECP Guarantor under this Section shall remain in full force and effect until payment in full of the Obligations.  Each Qualified ECP Guarantor intends that this SECTION 9.20 constitute, and this SECTION 9.20 shall be deemed to constitute, a "keepwell, support, or other agreement" for the benefit of each other Loan Party for all purposes of Section 1a(18)(A)(v)(II) of the Commodity Exchange Act.

SECTION 9.21 <u>Acknowledgment and Consent to Bail-In of EEA Financial Institutions.</u>

Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)   the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)   the effects of any Bail-in Action on any such liability, including, if applicable:

(i)   a reduction in full or in part or cancellation of any such liability;

(ii)   a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)   the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

SECTION 9.22 <u>Acknowledgement Regarding Any Supported QFCs.</u>

(a)       To the extent that the Loan Documents provide support, through a guarantee or otherwise, for Swap Contracts or any other agreement or instrument that is a QFC (such support "QFC Credit Support" and each such QFC a "Supported QFC"), the parties acknowledge and agree as follows with respect to the resolution power of the Federal Deposit Insurance Corporation

157

under the Federal Deposit Insurance Act and Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act (together with the regulations promulgated thereunder, the "U.S. Special Resolution Regimes") in respect of such Supported QFC and QFC Credit Support (with the provisions below applicable notwithstanding that the Loan Documents and any Supported QFC may in fact be stated to be governed by the laws of the State of New York and/or of the United States of America or any other state of the United States of America):

(b)    In the event a Covered Entity that is party to a Supported QFC (each, a "Covered Party") becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer of such Supported QFC and the benefit of such QFC Credit Support (and any interest and obligation in or under such Supported QFC and such QFC Credit Support, and any rights in property securing such Supported QFC or such QFC Credit Support) from such Covered Party will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if the Supported QFC and such QFC Credit Support (and any such interest, obligation and rights in property) were governed by the laws of the United States of America or a state of the United States of America. In the event a Covered Party or a BHC Act Affiliate of a Covered Party becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under the Loan Documents that might otherwise apply to such Supported QFC or any QFC Credit Support that may be exercised against such Covered Party are permitted to be exercised to no greater extent than such Default Rights could be exercised under the U.S. Special Resolution Regime if the Supported QFC and the Loan Documents were governed by the laws of the United States of America or a state of the United States of America. Without limitation of the foregoing, it is understood and agreed that rights and remedies of the parties with respect to a Defaulting Lender shall in no event affect the rights of any Covered Party with respect to a Supported QFC or any QFC Credit Support.

[Remainder of Page Intentionally Blank]

158

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the date first above written.

**BORROWERS:**

**GUITAR CENTER, INC.**, as Lead Borrower and as a Borrower

By: _____
Name: _____
Title:_____

**GUITAR CENTER STORES, INC.**, as a Borrower

By: _____
Name: _____
Title:_____

**GUARANTORS**:

**GUITAR CENTER HOLDINGS, INC.**, as a Guarantor

By: _____
Name: _____
Title:_____

**GUITAR CENTER GIFT CARD COMPANY, LLC**, as a Guarantor

By: _____
Name: _____
Title:_____

DB1/ 117162443.7

**GTRC SERVICES, INC.**, as a Guarantor

By: _____
Name: _____
Title:_____


**GC BUSINESS SOLUTIONS, INC.**, as a Guarantor

By: _____
Name: _____
Title:_____

**AVDG, LLC**, as a Guarantor

By: _____
Name: _____
Title:_____

**MUSIC & ARTS INSTRUCTOR SERVICES, LLC**, as a Guarantor

By: _____
Name: _____
Title:_____

**WELLS FARGO BANK, NATIONAL ASSOCIATION**, as Administrative Agent, as Collateral Agent, as Issuing Bank, and as a Lender


By: _____

Name:

Its Authorized Signatory

## <u>Exhibit C</u>

**Initial Budget**

**Guitar Center**
**DIP Budget**
*$ in 000s*

| Week Number / Fiscal Month / Week Ending Friday | 1 Nov 27-Nov POST | 2 Dec 4-Dec POST | 3 Dec 11-Dec POST | 4 Dec 18-Dec POST | 5 Dec 25-Dec POST | 6 Dec 1-Jan POST | 7 Jan 8-Jan POST | 8 Jan 15-Jan POST | 9 Jan 22-Jan POST | 10 Jan 29-Jan POST | 11 Feb 5-Feb POST | Post WK 1-11 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **I. Cash Flows** | | | | | | | | | | | | |
| **Receipts** | | | | | | | | | | | | |
| 1.) Sales Receipts | 46,828 | 81,401 | 55,663 | 67,541 | 76,354 | 49,584 | 40,397 | 36,541 | 41,032 | 37,830 | 45,024 | 578,194 |
| **Operating Disbursements** | | | | | | | | | | | | |
| 2.) Merchandise Disbursements | (28,505) | (26,225) | (22,588) | (22,342) | (21,320) | (26,949) | (28,773) | (24,906) | (18,993) | (17,729) | (16,822) | (255,153) |
| 3.) Payroll Related | (100) | (11,983) | (105) | (16,578) | (105) | (12,269) | (105) | (11,108) | (105) | (17,955) | (105) | (70,519) |
| 4.) Occupancy & Utilities | (600) | (11,306) | (500) | (500) | (500) | (500) | (12,864) | (500) | (500) | (500) | (12,337) | (40,608) |
| 5.) Sales Tax | (461) | (199) | (182) | - | (11,327) | (425) | (114) | - | (7,600) | (3,926) | - | (30,150) |
| 6.) Freight & Other Operating Disbursements | (15,736) | (7,693) | (8,368) | (9,608) | (11,146) | (7,930) | (6,774) | (8,098) | (13,517) | (6,685) | (7,289) | (96,926) |
| 7.) Total Operating Disbursements | (45,400) | (57,405) | (31,743) | (49,029) | (44,398) | (48,073) | (48,631) | (44,613) | (40,715) | (46,796) | (36,553) | (493,355) |
| **Non-Operating Disbursements** | | | | | | | | | | | | |
| 8.) DIP Fees & Interest | (941) | (451) | (9) | (9) | (9) | (9) | (2,221) | (9) | (9) | (9) | (1,778) | (5,453) |
| 9.) Superpriority Note Interest | (2,085) | - | - | - | - | - | - | - | - | - | - | (2,085) |
| 10.) Professional Fees | (6,727) | (3,318) | (3,318) | (3,318) | (3,318) | (3,618) | (3,318) | (3,318) | (3,318) | (3,618) | (21,017) | (58,206) |
| 11.) US Trustee | - | - | - | - | - | - | - | - | - | (819) | - | (819) |
| 12.) Utility & Other Deposits | (670) | - | - | - | - | - | - | - | - | - | - | (670) |
| 13.) Total Non-Operating Disbursements | (10,422) | (3,769) | (3,327) | (3,327) | (3,327) | (3,627) | (5,539) | (3,327) | (3,327) | (4,446) | (22,795) | (67,232) |
| 14.) *Memo: Total Disbursements* | (55,823) | (61,174) | (35,070) | (52,356) | (47,724) | (51,700) | (54,169) | (47,940) | (44,042) | (51,242) | (59,348) | (560,588) |
| 15.) Net Cash Flow | (8,995) | 20,227 | 20,593 | 15,185 | 28,630 | (2,116) | (13,773) | (11,399) | (3,010) | (13,412) | (14,324) | 17,606 |
| **II. Operating Cash Roll** | | | | | | | | | | | | |
| 16.) Beginning Cash | 6,538 | 43,543 | 63,770 | 84,363 | 99,548 | 128,178 | 126,062 | 112,289 | 100,890 | 97,880 | 84,469 | 6,538 |
| 17.) +/- Net Cash Flow | (8,995) | 20,227 | 20,593 | 15,185 | 28,630 | (2,116) | (13,773) | (11,399) | (3,010) | (13,412) | (14,324) | 17,606 |
| 18.) ABL Draws / (Paydown) | (279,000) | - | - | - | - | - | - | - | - | - | - | (279,000) |
| 19.) Term DIP Draws / (Paydown) | 325,000 | - | - | - | - | - | - | - | - | - | - | 325,000 |
| 20.) Ending Cash | 43,543 | 63,770 | 84,363 | 99,548 | 128,178 | 126,062 | 112,289 | 100,890 | 97,880 | 84,469 | 70,145 | 70,145 |
| **III. Liquidity** | | | | | | | | | | | | |
| 21.) Borrowing Base Availability | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 |
| 22.) - Total ABL Outstanding | (7,550) | (7,550) | (7,550) | (7,550) | (7,550) | (7,550) | (7,550) | (7,550) | (7,550) | (7,550) | (7,550) | (7,550) |
| 23.) Net Availability * | 42,450 | 42,450 | 42,450 | 42,450 | 42,450 | 42,450 | 42,450 | 42,450 | 42,450 | 42,450 | 42,450 | 42,450 |
| 24.) Ending Cash | 43,543 | 63,770 | 84,363 | 99,548 | 128,178 | 126,062 | 112,289 | 100,890 | 97,880 | 84,469 | 70,145 | 70,145 |
| 25.) Total Liquidity | 85,994 | 106,220 | 126,813 | 141,999 | 170,628 | 168,512 | 154,739 | 143,340 | 140,331 | 126,919 | 112,595 | 112,595 |
| **IV. Debt Summary** | | | | | | | | | | | | |
| 27.) Beginning ABL Outstanding | 279,000 | - | - | - | - | - | - | - | - | - | - | 279,000 |
| 28.) Change in Debt: Draw / (Paydown) | (279,000) | - | - | - | - | - | - | - | - | - | - | (279,000) |
| 29.) Ending ABL Outstanding | - | - | - | - | - | - | - | - | - | - | - | - |
| 30.) Letters of Credit | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 |
| 31.) Ending ABL Debt Outstanding | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 | 7,550 |
| 32.) Beginning Term DIP Debt Outstanding | - | 325,000 | 325,000 | 325,000 | 325,000 | 325,000 | 325,000 | 325,000 | 325,000 | 325,000 | 325,000 | - |
| 33.) Change in Debt: Draw / (Paydown) | 325,000 | - | - | - | - | - | - | - | - | - | - | 325,000 |
| 34.) Ending Term DIP Debt Outstanding | 325,000 | 325,000 | 325,000 | 325,000 | 325,000 | 325,000 | 325,000 | 325,000 | 325,000 | 325,000 | 325,000 | 325,000 |
| 35.) Total Debt Outstanding | 332,550 | 332,550 | 332,550 | 332,550 | 332,550 | 332,550 | 332,550 | 332,550 | 332,550 | 332,550 | 332,550 | 332,550 |

* Net ABL Availability will also be reduced to reflect the outstanding balance under the Debtors' "P-Cards" with Wells Fargo.